# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AMY WAX,

**Plaintiff,**

v.

UNIVERSITY OF PENNSYLVANIA,

BOARD OF TRUSTEES OF THE
UNIVERSITY OF PENNSYLVANIA,

**Defendants.**

**ATTACHMENT TO**

**VERIFIED COMPLAINT**

EXHIBITS

INDEX

| Exhibit Number | Name of Document | Page # |
|---|---|---|
| 1 | Penn Faculty Handbook § II.E.12: Academic Freedom at Penn. | Pg. 1 |
| 2 | Penn Faculty Handbook § II.E.16: Procedure Governing Sanctions Taken Against Members of the Faculty. | Pg. 6 |
| 3 | Penn Faculty Handbook § II.A:  Senate Committee on Academic Freedom and Responsibility. | Pg. 10 |
| 4 | Charging Document of Dean Ted Ruger | Pg. 11 |
| 5 | Letter of AGC Burke (July 29, 2022) | Pg. 21 |
| 6 | Final Hearing Board Report (June 21, 2023) | Pg. 23 |
| 7 | University of Pennsylvania Office of General Counsel Hearing in re: Amy L. Wax Transcript Excerpts | Pg. 31 |
| 8 | Decision of the President In the Matter of Professor Amy Wax (August 11, 2023) | Pg. 48 |
| 9 | Senate Committee on Academic Freedom and Responsibility Report (May 29, 2024) | Pg. 62 |
| 10 | Final Provost Jackson Letter to Wax (September 23, 2024) | Pg. 64 |

| 11 | Publication of Sanctions against Professor Wax Online | Pg. 66 |
|----|--------------------------------------------------------|--------|
| 12 | Letter of Jules van Binsbergen | Pg. 70 |
| 13 | Tenure Appointment Letter (July 1, 2001) | Pg. 76 |
| 14 | University of Pennsylvania's Open Expression Policy (Retrieved from Penn Website) | Pg. 78 |
| 15 | President Magill's Submitted Testimony to Congress | Pg. 84 |
| 16 | Counsel for Plaintiff Wax Letter to Penn: "A Reasonable Accommodation of a Postponement of These Proceedings." Memorandum of August 31, 2022 | Pg. 89 |

### C. Advice and Guidance

Any questions concerning potential conflicts of interest, appropriate distribution of effort, or other problems associated with externally sponsored research, should be addressed to the office of the Vice Provost for Research.

## VI. Requirements for Reporting Extramural Activities and Obligations

At the end of each academic year, each faculty member shall submit to their department chair and dean a report of the faculty member's extramural activities during that year, containing the following information:

1. Number of days (or hours, if preferred) of extramural activities for fee (include consulting, professional practice, and outside teaching commitments).
2. Names of organizations (government agencies, private firms, partnerships) for which the extramural activities conducted represented a continuing engagement.
3. Number of days (or hours, if preferred) of extramural activities on behalf of business enterprises in which the faculty member has a financial interest or official position.
4. Names of business organizations in which the faculty member is a significant owner, partner, officer, director, or staff member.

The last item shall also be reported by all part-time faculty members for whom any of the following conditions obtain:

1. The organization is a supplier of the University and the part-time faculty member participates in the decision to engage its services.
2. The organization supplies goods or services to the University to be used in the performance of externally sponsored research projects in which the part-time faculty member participates.
3. The part-time faculty member is privy to confidential University information that could be used to the business advantage of the organization.
4. The affiliation of the part-time faculty member with the University may be mentioned in any publication of the organization.

Forms for the reporting of extramural activity are available from the Office of the Provost.

All faculty members must also report on a continuing and timely basis to the appropriate administrators the relevant circumstances, as noted in the sections cited, whenever any of the following conditions are met:

1. They have or wish to initiate a relationship with an extramural business organization that is or may become a supplier or competitor of the University (see section II.E.10.A. on Policy on Disclosure of Relationships with Organizations that are Suppliers or Potential Competitors of the University).
2. They wish to undertake an engagement (grant, contract, client, etc.) through an extramural organization (see section II.E.10.B. on Policy on Acceptance of Engagements through Extramural Organizations).
3. They intend to participate in a sponsored research project that may be related to their other sponsored research projects, to any of their extramural consulting relationships, or to any organization in which they have significant managerial or financial interests (see section II.E.10 on Policy on Acceptance of Engagements through Extramural Organizations).

## II.E.11. Decreases in Salary

*(Source: Standing Resolution of the Trustees, October 16, 1959; revised September 9, 1983; revised, Office of the Provost, Memorandum No. 190, June 8, 1990 (https://www.upenn.edu/provost/images/uploads/Decreases_in_Salary_(revised_1990).pdf))*

Academic base salaries of faculty members may be decreased only in accordance with an expressed agreement between the faculty member and the University or because of financial exigency. Decreases for financial exigency shall be limited to the following:

- Simultaneous uniform percentage decreases in the academic base salaries of all faculty members in the University; and
- Simultaneous uniform percentage decreases in the academic base salaries of a class of faculty members such as a particular rank, department or school.

No decrease for financial exigency shall be made except after consultation, initiated by the President, with the Executive Committee of the Faculty Senate or with representatives selected by the class of faculty members subject to a proposed decrease. Consultation shall cover such issues as the existence in fact of a financial exigency, the appropriateness of the selection of the particular class for salary decrease, alternative actions and the like.

If after such consultation the academic base salaries of faculty members are decreased, with or without the concurrence of the Senate or the representatives of the class of faculty members, the President shall notify the affected faculty members, in writing, of

1. the fact that the academic base salaries of all of the faculty members in the University, or of a described class of faculty members, have been simultaneously decreased,
2. the formula applied uniformly to determine the amount of the decrease, and
3. the reasons for the action taken.

## II.E.12. Faculty Grievance Procedure

*(Source: Offices of the President and Provost, Almanac, November 21, 1978; Addenda, Almanac, December 5, 1978; revised, Office of the Provost, Almanac, August 30, 1988; revised, Almanac, May 24, 1994 (https://almanac.upenn.edu/archive/v40pdf/n34/052494.pdf); revised, Almanac, August 26, 2014 (https://almanac.upenn.edu/archive/volumes/v61/n02/faculty-grievance-procedure.html).)*

### I. Applicability

This grievance procedure is available to any member of the standing faculty, standing faculty-clinician-educator, associated faculty, academic support staff, or compensated emeritus faculty at the University of Pennsylvania (members of these classes are referred to in this document as "faculty" or "faculty members").

A grievance is a claim that action has been taken that involves a faculty member's personnel status or the terms or conditions of employment and that is:

1. arbitrary or capricious;
2. discriminatory with regard to race, color, sex, sexual orientation, gender identity, religion, creed, national or ethnic origin, citizenship

status, age, disability, veteran status or any other legally protected class status; or

3. not in compliance with University procedures or regulations.

## II. Faculty Grievance Commission

The Faculty Grievance Commission (the Commission) will be composed of three members of the standing faculty holding the rank of Professor. They will be appointed by the Senate Executive Committee for staggered three-year terms expiring June 30. These three members will serve serially as Chair-elect, Chair, and past-Chair of the Commission.

The Chair of the Commission will serve as the primary administrator of the Faculty Grievance Procedure, and will be the Presiding Officer at any grievance hearings during the Chair's service in that position. The Chair-elect will observe the functions of the Commission, and additionally will serve as one of three hearing panel members should a complaint proceed to a hearing. The past-Chair will observe the functions of the Commission and serve as an alternate to the Chair and the Chair-elect in the roles described above. Each member of the Commission may substitute for any other member when a member is unable to serve. If for any reason a member of the Commission is unable to serve, the Commission, with the advice of the Chair of the Faculty Senate, may replace its missing members with former Commission members who still hold compensated faculty appointments.

There will be an independent Legal Officer to assist the Commission in its operations. The Legal Officer's appointment and terms of employment will be jointly determined by the Chair of the Faculty Senate and the Provost. Once appointed, the Legal Officer's professional responsibility will be to the Commission.

There will be a hearings list consisting of at least 30 persons selected by the Senate Executive Committee (SEC) from members of the standing and associated faculties. The list should be broadly representative of these faculties and include women and members of underrepresented minorities. The hearings list may not include faculty members holding administrative appointments at the level of department Chair or above. Faculty members will serve on the hearing list for three-year terms expiring on June 30. Appointments should be arranged so that the terms of approximately one-third of the members will expire each year. Replacements will be selected by SEC as needed.

## III. Pre-Hearing Procedures

A. Before filing a grievance with the Commission, a faculty member must first review the complaint with their Department Chair or Dean, or, alternatively, the Vice Provost for Faculty in a case in which the grievance involves the dean. Every effort should be made to bring about an equitable resolution among the parties. If a resolution is not reached, the Department Chair, Dean, or the Vice Provost for Faculty, upon request of the grievant, must provide the grievant with a written statement of the reasons for the actions which are the subject of the complaint. Before filing a grievance with the Commission, the faculty member is advised to consult with the University Ombuds, to determine whether the Ombuds' office can be of assistance in resolving the dispute, and whether the Commission is the appropriate body to hear the potential complaint.

If after these consultations, the faculty member still wishes to file a complaint, the faculty member may initiate a grievance with the Commission. The faculty member must submit written notice of the complaint, and the request for a hearing will be submitted to the Commission through its Chair. The faculty member must provide copies to the Provost and the Department Chair or Dean.

Since grievances may be cumulative, a faculty member may base their grievance on prior as well as current events or conditions. The grievance must be initiated not later than two years after the grievant becomes aware of the initial event complained of and not later than four months after the end of the faculty member's compensated faculty appointment.

B. After the filing of a complaint, the grievant and the Chair of the Commission (or an individual the Chair designates for this role) will meet to discuss the grounds for the grievance. If the Chair believes that the faculty member's claims raise issues of academic freedom, or if the grievant so asserts, the Chair will send a copy of the grievance to the Senate Committee on Academic Freedom and Responsibility (SCAFR), which will promptly determine whether the grievance raises significant questions of academic freedom. If so, the Commission will not hear the matter until SCAFR has resolved such questions. SCAFR will communicate its findings to the Commission which will accept SCAFR's findings with respect to the academic freedom portions of the complaint. If the complaint that is concerned with academic freedom is brought against a University administrator, Dean, or involves more than one school or University policies of general interest, SCAFR will have jurisdiction. If the complaint concerns matters occurring in one school, the chair of SCAFR will forward the grievance to the chair of the appropriate school committee on academic freedom and responsibility, which will have jurisdiction in this matter.

C. For complaints not deemed to be significantly concerned with academic freedom, the Chair will respond to the complaint by discussing with the grievant possible options for resolution. The Chair or the Chair's designee may also meet with the parties against whom the grievance has been filed to pursue possible resolution. The Chair may also arrange a meeting with the grievant and the person(s) against whom s/he is bringing the grievance in an attempt to mediate the dispute. The Chair, at their discretion, may include someone trained in formal mediation procedures from the university in such discussions. The Chair may gather such information and documentation from both parties and from other sources as the Chair deems useful to aid in the resolution of the complaint.

D. If a resolution to the complaint cannot be reached, the Commission will evaluate whether a hearing is warranted based on the information available. The Commission may decide not to proceed with a hearing, for example, because the claim is deemed not to be a grievance as defined under Section I, because the matter at issue has been the subject of a previous grievance, or because the grievance is of so little consequence or merit that no panel should be created. Once the Commission has decided to proceed with the grievance hearing, the Chair will so inform in writing the grievant, the dean, or department chair, as well as the Provost. This document will ask the Provost to name the University's representative (the respondent) who will act on behalf of all the persons complained of. The grievant and the respondent may each designate a University colleague to act as advisors during the hearing. The grievant's colleague may be any member of the standing, associated, or emeritus faculty; the respondent's colleague must be selected from the group of persons eligible to serve on panels. A colleague may not serve as a legal advocate, but may aid the grievant and the respondent in preparation and presentation of their respective cases. Neither the grievant nor the University may have counsel present in the hearing room; both parties may consult with attorneys outside of the hearing.

E. For each hearing, the Chair will form a hearing panel of three persons, including

1. the Chair-elect of the Commission, and
2. two faculty members from the hearings list selected by the Chair with due regard for relevant subject matter expertise, balance, and representativeness, and other considerations the Chair may deem important. As soon as possible after receiving notice from the Chair of the initial panel membership, either party may move the Commission to disqualify individuals from service on the hearing panel for cause, such as conflicts of interest due to personal relationships with individuals involved. In addition, both the grievant and the respondent may exercise one peremptory strike to remove a member of the hearing panel without cause, although neither of the parties may move to strike the Chair-elect. A party choosing to exercise this right must inform the Chair in writing within one week of learning of the proposed composition of the panel. Replacements for disqualified panel members will be selected by the Chair of the Commission from the list of potential hearing members.

## IV. Hearings

Hearings should begin within two months after the acceptance of a grievance by the Commission. Hearings will be convened and organized by the Chair of the Commission, assisted by the Legal Officer who may advise the Chair on procedural and evidentiary matters. The decision on the merits of a grievance will be made by the panel after hearings in which the grievant and the respondent have the opportunity to present their cases. Where consistent with confidentiality rules outlined in this section, each party should submit evidence and arguments in written form for prior distribution to the other side and to the panel. The Chair, as Presiding Officer, has the power to call witnesses and to introduce documents and obtain expert opinion from inside or outside the University. Each side will have the right to address questions to witnesses, and members of the panel may question witnesses during the hearing.

The hearings will be audio-recorded, and such recording will be kept in the custody of the Commission. The hearing panel, the grievant, the respondent, and their advisors will have reasonable access to this recording during the processing of a grievance. No copies of the whole or part of any such recording may be made without express permission of, and supervision by, the Commission. Such permission will be granted to the Provost and the grievant upon request.

A hearing will follow an agenda prepared by the Chair that is based on demonstration of relevance by the grievant or the respondent. The Chair may seek advice from the Legal Officer as to the admissibility or relevance of issues, oral statements, and other evidence presented. However, the final decision on admissibility or relevance will be made by the Chair.

The Commission will have access to all documentary evidence that is in the custody of or under the control of the person or persons who took the action complained of or of the grievant and that is deemed by the Commission to be relevant to the grievance, with the exception of such evidence that was prepared specifically in connection with the Chair's efforts to mediate and resolve the complaint described in Section III.b above. The Presiding Officer has the authority to obtain additional documents including the dossiers of other comparable members of the same department, or if none exists, comparable members of the same school who are alleged to have recently or currently received more favorable treatment. Such dossiers will be examined and held in accordance with the confidentiality procedures described below in subsection e. Notice is to be given to those faculty members whose

dossiers are to be examined. The panel may request the Presiding Officer to obtain expert opinion from inside or outside the University.

If documentary evidence is needed by the grievant or the respondent in the preparation of their case, or by the panel in the course of its deliberations, application will be made to the Presiding Officer. The Presiding Officer will determine whether the evidence requested is relevant. The Presiding Officer will then obtain all relevant evidence. All such evidence will be available to the panel, the respondent, the colleagues, and, subject to the restrictions of confidentiality set forth below, to the grievant.

The confidentiality of peer evaluation materials, including letters of recommendation and evaluation, is integral to the tenure process. Accordingly, while the Commission may obtain peer evaluation materials, if during the hearings, the grievant asks that such materials be presented to the panel, the Presiding Officer will consider the following factors to determine whether disclosure to the panel is appropriate. The Presiding Officer will take into account, among other things, whether the grievant has shown cause to believe that the grievance is sufficiently well-founded to justify examination of confidential peer evaluation materials, and whether examination of confidential peer evaluation materials is essential to reach a judgment concerning the substance of the grievance.

If the Presiding Officer decides that peer evaluation materials are relevant and essential to reaching a judgment concerting the substance of the grievance, the Presiding Officer will make such materials available for examination by the hearing panel. Under no circumstances may such confidential materials be provided by the Grievance Commission or hearing panel to either the grievant or the respondent or their advisors.

Like all other members of the faculty, members of departmental or school personnel committees may testify in grievance hearings, although they will not be required to testify in any such proceeding. Members of such committees who agree to appear in grievance hearings may testify specifically about their own participation in committee deliberations, present the committee's vote, and give a general characterization of its discussion. They are explicitly prohibited from disclosing direct quotations, positions, or votes of other individuals on these committees.

Unreasonable delays by either side may subject the offending party to sanctions. In cases where primary blame for the delay may be attributed to one side, the Commission has the right to suspend or terminate proceedings and recommend that the panel send to the Provost an accusatory report including reasons for this suspension or termination and recommendations for action. A copy of this document will be sent to the Chair of the Faculty Senate.

The Commission may establish further rules and procedures to govern its operations. Where procedures have not been adopted, the Presiding Officer may rule on the matter and may seek the advice of the Legal Officer in making such rulings. Appeals from rulings established in this way may be presented to the SEC to be decided by majority vote. Procedures adopted under this provision should be included in the Commission's annual report.

## V. Findings

Upon conclusion of the hearings and after consultation with the Presiding Officer and the Legal Advisor concerning the format of the report, the panel will prepare a written report to the Provost which may include a minority opinion. The report will state each element of the grievance and in separate, clearly labeled sections record the findings of fact and the recommendations for action by the Provost.

As part of its recommendations, the panel may propose remedies. In cases where reappointment, promotion or tenure has been denied, it may recommend a full review and reevaluation of the case. The panel may also suggest to the Provost procedures that might be followed in such a reevaluation, but the choice of procedures remains with the Provost.

However, a panel will not have the responsibility or the authority to evaluate professional competence either in the case of an individual or in comparison with other individuals. If the Provost, on receiving the panel's report, decides that a reevaluation will be carried out, the Provost will ensure that the recommendations of the panel and the relevant supporting documentation are included in the documents considered in that reevaluation.

The Presiding Officer will distribute the panel's report to the Provost, the dean, the grievant, the respondent, the person or persons who took the action complained of, and the Chair of the Faculty Senate. If the Provost wishes to consult with the Presiding Officer to obtain more information about the case, the Presiding Officer will provide details and make available the full documentation, including a copy of the hearing recording.

If the grievance is withdrawn or settled prior to the completion of the hearings, the Presiding Officer will dismiss the panel with thanks, and no report will be prepared. However, if the hearings are completed and the panel submits a report to the Provost, the Presiding Officer will be informed by the Provost when final action on the grievance has been taken within the University. The Presiding Officer will then dissolve the panel.

After the receipt of the panel's final report, the Presiding Officer will return all borrowed documents to their owners and turn over to the Commission a complete file of the case for secure retention — including one complete set of documents and the audio-recording of the hearings. The Presiding Officer will destroy all other copies of the documents used by the panel. The confidentiality of peer evaluation materials, including outside letters, will be preserved by the Commission. Except when the Chair of the Commission determines otherwise, the complete file will be sent to the archive for permanent storage according to the University archives policy for six years after the grievance has terminated. However, the panel's report will be kept permanently on file along with the Provost's response.

Although the panel's report is to be accorded great weight, it is advisory and not binding upon the Provost. The Provost's decision will be communicated in writing without undue delay to the Chair of the Commission, the grievant, and the respondent.

In the event the Provost declines to implement one or more of the Commission's recommendations, the written communication will include the detailed reasons for the failure to adopt the relevant recommendation and will be sent also to the Chair of the Faculty Senate.

If the grievance proceeding identifies an administrative action or practice that seemingly violated University procedures or otherwise led to inequitable treatment, the Commission on behalf of itself or the panel should bring the matter to the attention of the Provost and the Chair of the Faculty Senate. The Provost and the Chair of the Faculty Senate should examine the matter and see to it that appropriate corrections are made if needed. Within six months they will inform the Senate Executive Committee concerning the problem and its resolution.

## VI. Confidentiality

The work of the Commission and its panels requires the highest level of sensitivity to the privacy of all concerned. Members of the Commission,

members of panels, grievants, respondents, colleagues, witnesses and all other concerned parties have the professional obligation to maintain confidentiality with respect to oral and documentary evidence presented and deliberations occurring during the processing of grievances (except as necessary for the preparation of a grievance or as subject to legal process, or as otherwise noted in this document). Any breaches of confidentiality will be reported by the Chair of the Commission to the Provost and the Chair of the Faculty Senate. In the event of a breach of confidentiality, the Commission has the right to terminate proceedings. In such a case it may advise the panel that it should send to the Provost its recommendations in a report.

Except as otherwise provided in this document or as authorized by the Provost or the Chair of the Faculty Senate, the report of a panel will be treated as confidential by all participants in a grievance hearing and by all members of the University community.

## VII. Hearings by Senate Committee on Academic Freedom and Responsibility

In cases in which reappointment, promotion, or tenure has been denied to the grievant, and in which the Provost has declined or failed to implement the recommendations of the panel, within one month after the issuance of the Provost's response, the grievant may request a hearing before SCAFR to review the Provost's decision. The report of the panel and the Provost's decision will be made available to SCAFR which will then decide whether to hold its own hearing on the matter. SCAFR will also have access to all evidence presented to the panel and to the records of the grievance hearings.

SCAFR will follow the procedures outlined in Part IV of these Grievance Procedures, except that the parties will not be permitted to introduce evidence before SCAFR. The findings of fact made by the panel will be binding on SCAFR, except to the extent SCAFR finds from the records that the Commission's findings are not substantially supported by the evidence. SCAFR will issue an opinion as to whether the Provost's action in declining or failing to implement the recommendations of the panel was reasonable. If, however, SCAFR finds that there is significant evidence not previously available to the panel, SCAFR may return the case to the Presiding Officer for reconsideration by the panel.

SCAFR will promptly report its findings and recommendations to the President, with copies to the Provost, the Chair of the Commission, the panel, the Chair of the Faculty Senate, the grievant and the respondent, and the *Almanac* for publication.

## VIII. Expenses

The Commission's appropriate expenses for processing a grievance, including compensation for the Legal Officer, will be met from University resources. It will be the responsibility of the Presiding Officer to determine what is appropriate; such expenses will not include any per diem expenses, released time charges, or travel expenses for any participant in the hearings. To the extent possible, administrative and secretarial services will be provided by the office of the Senate. Services that cannot be provided in this way and other appropriate expenses should be charged to the Faculty Senate. These charges will be under the administration of the Chair of the Grievance Commission.

## IX. Annual Report

At the end of each academic year, the Commission will write a report describing its activities and giving a summary account of the cases completed or in progress. The report will be sent to the president, the Provost, and the Chair of the Faculty Senate. The Commission must

send a separate report to the Almanac for publication. This report must be written with due regard for the maintenance of confidentiality of any involved parties, and should contain only a brief summary of the matters addressed or decided.

## II.E.13. Transfers of Faculty Members or Terminations of Faculty Appointments Resulting from Discontinuation of Programs

*(Source:* Standing Resolution of the Trustees, September 9, 1983 *(https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-1983/september-9/))*

Where a faculty or school is discontinued for valid academic or financial considerations in accordance with University procedures, an attempt to relocate members of the Standing Faculty and the Associated Faculty within the University shall be made. In considering any transfer of a faculty member from one faculty to another, the rights of the faculty as expressed in the Statutes of the Trustees shall not be impaired. The University's obligation to those faculty members whose academic base has been terminated must be balanced with the considered opinion of the receiving faculty on the suitability of any transfer. The final decision on any transfer from one faculty to another is made by the Trustees on the recommendation of the President and Provost.

Where a program or department within a faculty is discontinued for valid academic or financial considerations, in accordance with University procedures, the faculty concerned, and its dean, shall attempt to relocate members of the Standing Faculty and Associated Faculty in other programs or departments within the faculty. If suitable intrafaculty transfer cannot be effected, the possibility of transfer to another faculty shall be pursued in accordance with the above paragraph.

If, after full exploration of the opportunities for transfer, no suitable appointment within the University can be found for faculty members affected by the discontinuation of a school, department or program, and if the continuation of their salaries would become an undue burden on the University, proceedings to terminate academic tenure under the financial exigency provisions may be implemented.

(See page 21 - Standing Resolution of the Trustees, September 9, 1983 (https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-1983/september-9/))

## II.E.14. Procedures for the Establishment, Merger and Closing of Departments, Divisions and Similar Entities within Schools

*(Source: Offices of the President and Provost, Almanac, September 5 1995; proposed, for comment, Almanac, April 30, 2002 and approved, Almanac, September 3, 2002; revised, as* Article 10, Statutes of the Trustees, November 2, 2001 *(https://secretary.upenn.edu/trustees-governance/statutes-trustees/#ten))*

According to the Statutes of the Trustees of the University of Pennsylvania, "Upon recommendation of the President and Provost, the Trustees may authorize the establishment, merging, or closing of departments, divisions or similar entities in schools that do not have departments." Subject to the statutes of the University, these procedures govern the establishment, merger and closing of departments, divisions and similar entities (hereinafter "departments") within the schools of the University.

Although the organization of a school into departments is an administrative decision, the dean should make a recommendation concerning the establishment, merger or closing of a department only after careful study and consultation with involved faculty inside and outside the school, including discussion in a meeting of the faculty of the school. The process leading to such recommendations requires special care in reviewing possible courses of action, special efforts to consult early and often with interested parties, and special sensitivity to the legitimate interests of faculty who may be affected.

### Careful Study

The decision to establish, merge or close a department should be based upon academic considerations and priorities as determined by the faculty as a whole or appropriate committees hereof. Accordingly, there should be early and meaningful faculty involvement in the process leading to decisions relating to the creation, reorganization or reduction of instructional and research programs.

Schools having a departmental structure should have regular reviews of departments. Departmental reviews should be used to provide departments with timely notice of any shortcomings and the need for improvement and to provide school decision-makers with information essential to a sound evaluation of the department. Such reviews also provide formal and informal opportunities to alert departments to the school's plans. Departmental reviews should not be triggered by specific proposals for closing or making other adverse changes to a department. However, when a closing is being considered, there should be a timely external review.

### Consultation

1. Most, if not all, schools, and the University as a whole, have faculty committees charged with responsibility to review planning and budget decisions. Such committees should be involved in the process leading to decisions to establish, merge or close departments. However, such reviews are not substitutes for early and frequent consultation with the faculty of the affected departments themselves and/or with the faculty as a whole. Consultation should include the opportunity for thorough discussion at a meeting of the faculty of the school. Consultation also will require soliciting an advisory vote, in favor of or against the proposed course of action, from those members of the faculty of the school with voting privileges. Although such vote is advisory only, in most circumstances the dean should act in accordance with the advice received.

2. Action to establish, merge or close departments within one school may have serious implications for the activities and resources of departments in other schools. At such time as a dean initiates consultation with the faculty of the school directly affected, the dean should send a communication to all other deans requesting that they bring the possibility of the action to the attention of their colleagues who may be interested and inviting comment.

### Informing Departments of Recommendations to Close

1. Given that department closings typically follow a protracted period during which the department in question receives limited resources, school administrations have ample time to explain the implications of such action for the future. Departments that are at risk should be so informed promptly and provided with a full, frank and detailed explanation of the reasons.

2. Faculty members of a department facing closure must be informed well before a formal recommendation is publicly announced. At that time, they must be given information regarding their future at the University and the procedures the school has initiated to find a new University affiliation for them.

## Academic Freedom

1. Although decisions regarding departmental structure may be made for reasons that would not justify adverse action against an individual faculty member, ordinarily they do not for that reason give rise to an academic freedom violation. However, even if all appropriate review and consultation procedures have been followed, structural decisions concerning a department may present delicate and difficult questions of academic freedom.

2. In cases where academic freedom issues appear to be raised, the dean should seek the advice of the committee on academic freedom and responsibility of the school or the Faculty Senate at a sufficiently early stage for that advice to be considered before the dean makes a recommendation.

3. Aggrieved faculty members have the right to complain of the dean's action to the appropriate committee on academic freedom and responsibility.

# II.E.15. Extension of Faculty Appointments When a School is Being Discontinued

*(Source:* Standing Resolution of the Trustees, January 13, 1978 *(https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-1978/january-13/))*

Notwithstanding other provisions of the University's policies on faculty appointments and tenure, non-tenured faculty in schools which are to be discontinued may continue to serve beyond expiration of their normal tenure probationary periods without acquiring tenure, provided:

- The Trustees of the University have formally adopted a resolution to discontinue the school, and have set a date for the closing of the school.
- The faculty of the school has formally adopted a resolution to the effect that extensions of the appointments of non-tenured faculty are necessary in order to maintain appropriate academic standards in the programs to be discontinued.
- Each faculty member for whom such extension is proposed has formally requested the extension in writing to the dean, and has clearly indicated their understanding and acceptance of the fact that the extended appointment will not convey tenure.
- The extensions of appointments are not more than five years from the June 30 following the resolution of the Trustees authorizing the closing of the school.

If the appointment of a faculty member is extended under these provisions and the decision to close the school is rescinded after the expiration of the probationary period for that individual, the faculty member shall be deemed to have acquired tenure.

If during the term of an extended appointment, a faculty member from the school to be closed is appointed to a standing faculty position in another school in the University, the probationary period shall be measured

without regard to these provisions, and if that period has expired, the new appointment must be with tenure.

(See page 2 - Standing Resolution of the Trustees, January 13, 1978 (https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-1978/january-13/))

# II.E.16. Procedure Governing Sanctions Taken Against Members of the Faculty

*(Source: Standing Resolution of the Trustees, October 16, 1959; revised, June 21, 1991; revised, June 20, 1997 and Almanac, October 21, 1997; revised, October 19, 2007 and* Almanac, November 6, 2007 *(https://almanac.upenn.edu/archive/volumes/v54/n11/ofrecord.html))*

## 1. Introduction and Definitions

### A. Introduction

The imposition of a sanction on a faculty member of the University of Pennsylvania is a rare event. However, when situations that might lead to such an action arise, they must be handled fairly and expeditiously. It is essential to have a process that both protects the rights of faculty members and addresses the legitimate concerns of the University. This policy replaces the previously existing "Procedure Governing Sanctions Taken Against Members of the Faculty" *(Standing Resolution of the Trustees, June, 1991 and Almanac, October 21, 1997)*.

Any cases initiated after this policy is in force, even if the alleged actions preceded its adoption, shall be governed by the procedures prescribed here.

### B. Definitions

1. Charging party: The Provost, a dean of a school, or a Provost's or dean's designee who shall be a faculty member of the University, or a Group for Complaint.

2. Complainant: Individual bringing to the attention of a dean or the Provost a situation that may call for a sanction against a faculty member. The complainant may be a student or faculty or staff member of the University, or any individual outside the University.

3. Faculty Member: A member of the Standing Faculty, or a Standing Faculty-Clinician-Educator.

4. Counsel: An advisor, who may be an attorney.

5. Group for Complaint: A charging party elected by the Standing Faculty of a school, by majority vote, from its own tenured professors.

6. Hearing Board: The body, selected by the Chair of the Faculty Senate, in consultation with the Past Chair and Chair-Elect of the Faculty Senate from the University Tribunal *(see definition of the Tribunal below)*, that adjudicates a just cause matter. It serves both an investigative and deliberative function. The Board shall consist of five members, with a chair chosen by and among the members. If feasible, one member of the Hearing Board should be on the faculty of the Respondent's school. Should any Hearing Board member become unable to serve or to satisfy their responsibilities on the Board as the matter progresses, the Chair of the Faculty Senate shall select a substitute from the University Tribunal.

7. Major infraction of University behavioral standards: An action involving flagrant disregard of the standards, rules, or mission of the University or the customs of scholarly communities, including, but not limited to, serious cases of the following: plagiarism; misuse of University funds; misconduct in research; repeated failure to meet classes or carry out major assigned duties; harassment of, improperly providing controlled substances to, or physical assault upon, a

**Pg.6**

member of the University community; the bringing of charges of major or minor infractions of University standards against a member of the University community, knowing these charges to be false or recklessly indifferent to their truth or falsity; flagrant or knowing violation of the University's conflict of interest policy or commission of serious crimes such as, but not limited to, murder, sexual assault or rape.

8. Major sanction: Serious penalties that include, but are not limited to, termination; suspension; reduction in academic base salary; zero salary increases stipulated in advance for a period of four or more years.

9. Minor infraction of University behavioral standards: An action involving disregard of the University's standards, rules, or mission, or the customs of scholarly communities that is less serious than a major infraction.

10. Minor sanction: Penalties less serious than a major sanction that may include, but are not limited to, a private letter of reprimand, a public letter of reprimand, monitoring the manner and conditions of specific future research, teaching, or supervision of students, provided they relate to the infraction.

11. Respondent: The Faculty Member against whom a complaint is lodged.

12. University Tribunal: A body comprised of past and present tenured faculty members on the Senate Committee on Academic Freedom and Responsibility, the school committees on academic freedom and responsibility, and if necessary, past and present members of the Senate Executive Committee.

## 2. Suspension or Termination for Just Cause

### A. Preliminary Procedures
Should a question arise regarding the possible infraction of University behavioral standards, the dean or Provost shall interview the respondent, normally in the presence of any department chair concerned, and may afford the respondent the opportunity for informal resolution of the matter under appropriate circumstances.

The dean or Provost shall provide a written description of the charges to the respondent, if requested by the respondent in writing. If the matter is resolved informally to the satisfaction of the dean or Provost and the respondent, no further proceedings shall be invoked by them. An informal resolution must be consistent with all existing University policies and behavioral standards, and does not derogate from a complainant's right to invoke procedures subsumed under these policies and standards.

If the matter is not adjusted informally, the dean or Provost shall consult with several tenured members of the University faculty. Relying on these consultations, the dean or Provost shall decide whether to invoke the just cause procedures in a case involving major infractions of University behavioral standards, to impose minor sanctions directly in a case involving minor infractions of University behavioral standards, or to discontinue the matter. If the decision is to discontinue the matter, the dean or Provost shall notify the respondent and any complainant in writing.

### B. Formation of a Group for Complaint
If the dean or Provost decides to discontinue the matter or impose a minor sanction, no further proceedings shall be initiated with the single exception of the standing faculty's prerogative to form a Group for Complaint. If formed, the Group shall promptly conduct an investigation and, based on this investigation, may a) initiate proceedings for

imposition of a major sanction, b) recommend imposition of a minor sanction, or c) determine not to proceed further.

## 3. Minor Sanction

### A. Imposition by Dean or Provost
If, having consulted with several members of the tenured faculty, the dean or Provost concludes that the situation involves a minor infraction of University behavioral standards, the dean or Provost shall impose a minor sanction on the respondent. The dean or Provost shall notify the respondent in writing of this decision and take the steps necessary to put the sanction into effect.

### B. Application for Relief to Faculty Grievance Commission
The respondent may apply to the Faculty Grievance Commission for relief from any minor sanction imposed by the dean or Provost.

## 4. Major Sanction

### A. Charging Party Requests Formation of Hearing Board
If the charging party believes that a major infraction of University standards has occurred, the charging party shall promptly request that the Chair of the Faculty Senate convene a Hearing Board. The Dean or Provost shall notify the respondent in writing of this decision.

### B. Disqualification of Potential Members of Hearing Board
The charging party and the respondent each shall be given the opportunity to move to disqualify for prejudice any potential member of the Hearing Board designated by the Chair of the Faculty Senate. Such motion shall set forth, in writing, the reasons therefore and shall be delivered to the Chair of the Faculty Senate.

Motions to disqualify Hearing Board members shall be decided by the remaining members of the Board (with a tie to be broken by the Chair of the Faculty Senate). If the remaining members decide that disqualification is proper, an alternate member shall be designated by the Chair of the Faculty Senate.

### C. Hearing Board Determines Whether to Proceed
1. Once the composition of the Hearing Board is determined, the charging party shall promptly send to the Chair of the Hearing Board, the respondent, the dean and Provost a written statement that sets forth in as much detail as is practicable the grounds for the complaint and for the recommendation of a major sanction. In the case of misconduct in research, the report of the formal investigation committee issued under the Misconduct in Research Procedures shall be included. To determine whether formal hearings shall take place, the Hearing Board shall immediately consider the statement from the charging party, consult the relevant documents, and afford the charging party opportunity to present oral and written arguments, but shall not hold a hearing to receive evidence.

2. If the Hearing Board concludes that the grounds stated, if true, would clearly not constitute just cause for imposition of a major sanction, it shall issue a report to that effect, sending copies to the charging party, the President, any complainant, and the respondent. The substance of the complaint shall not be the basis of any further proceedings with respect to major sanctions. However, the Hearing Board may remand the case to the dean or Provost for further proceedings or actions that relate to a minor sanction.

3. If the Hearing Board concludes that the grounds stated, if true, might constitute just cause for the imposition of a major sanction, and it believes that there is probable cause that in further proceedings the grounds stated shall be found to be true, it shall conduct such proceedings as hereinafter provided.

## D. Notification of Right to a Hearing

If further proceedings are conducted, the Chair of the Hearing Board shall send to the respondent written notice that the respondent may preserve and elect the right to a hearing by promptly notifying the Chair of the Hearing Board in writing. If the respondent requests a hearing before the Hearing Board, the Chair of the Hearing Board shall notify the charging party and the respondent in writing of the date and place of the hearing. One month prior to the hearing, the charging party shall supply to the Chair of the Hearing Board a summary statement of the evidence to be presented by the charging party, including a list of witnesses, a detailed summary of the testimony expected from each witness, copies of relevant extracts from the Statutes and standing resolutions of the Trustees of the University of Pennsylvania, a copy of these procedures, and copies of any other University documents that are relevant to the respondent's procedural and substantive rights in this matter. The Chair of the Hearing Board shall immediately furnish these documents with the notice to the respondent.

## E. Hearing Board Procedure in the Absence of Participation by Respondent

If the respondent does not request a hearing, the charging party shall nevertheless present evidence to the Hearing Board. The Hearing Board shall then make a written report of its findings, conclusions and recommendations and send a copy of its report to the charging party and the respondent. If the Hearing Board concludes that the charging party has not shown clear and convincing evidence of just cause for the imposition of a major sanction, no major sanction may be imposed, and the substance of the complaint shall not be the basis for any further proceedings with respect to major sanctions. However, based on clear and convincing evidence of a minor infraction, the Hearing Board may recommend that the dean or Provost impose a minor sanction and the dean or Provost will normally implement that recommendation. If the Hearing Board concludes that the charging party has shown clear and convincing evidence of just cause for the imposition of a major sanction, the Hearing Board shall promptly send to the President a copy of its report recommending the major sanction.

## F. Hearing Board Procedure when Respondent Participates

The hearing shall be held at the earliest date that is practicable to the respondent, charging party and Hearing Board, and ordinarily no more than three months from the notification date. Two weeks prior to the date of the hearing, the respondent shall provide to the Chair of the Hearing Board a written answer to the charging party's statement of the grounds for the complaint and for the recommendation of a major sanction. At that time the respondent shall also provide to the Chair of the Hearing Board a list of witnesses, a detailed summary of the testimony expected from each witness, copies of relevant extracts from the statutes and standing resolutions of the Trustees of the University of Pennsylvania, and copies of any other University documents that are relevant to the respondent's procedural and substantive rights in this matter.

## G. Procedures During a Hearing

Hearings shall be private with two exceptions. The respondent shall have the right to invite as observers, representatives of national professional academic associations concerned with matters of academic freedom and tenure. Other observers may be invited to attend if the charging party, the respondent and the Chair of the Hearing Board consent in advance of the hearing. A transcript of the hearing shall be made available to the parties at the expense of the University.

The charging party has the burden of proving by clear and convincing evidence that there is just cause for imposition of a major sanction against the respondent. Both the respondent and the charging party may

appear personally throughout the hearing; both may have the assistance of counsel. The Hearing Board shall afford the respondent and the charging party the opportunity to present oral and written argument. The respondent and the charging party shall have the right to confront any witnesses, each of whom shall have the right not to incriminate himself or herself in answer to any question, and to question them personally or through counsel. They may call witnesses and shall receive the cooperation of the University administration in securing the attendance of such witnesses and the production of such documents as may be relevant.

The extent of document production shall be determined by the Hearing Board. The Chair of the Hearing Board, in consultation with the other Board members, shall rule on any procedural or substantive issues complained of by either the charging party or respondent. The Hearing Board shall have the discretion to limit the number of witnesses in order to prevent overly repetitious or cumulative testimony. It shall not be bound by formal rules of evidence, and may elect to admit any evidence it deems to be of probative value in evaluating the issues. The Hearing Board may permit the use of electronic or other means of remote communication, such as telephone conference calls, in lieu of the appearance of witnesses.

## H. Report of Hearing Board and Objections of Respondent

1. Upon concluding the hearings, the Hearing Board shall deliberate privately, and determine whether or not the charging party has established by clear and convincing evidence that a major infraction has occurred. If so, the Hearing Board shall recommend what the major sanction should be. Decisions shall require a majority of the members participating. The Hearing Board may, in its discretion, recommend a minor sanction instead if it determines that a minor infraction has occurred.

2. The Hearing Board shall conclude its deliberations promptly and send to the President a written report in which it shall set forth its findings, conclusions, recommendations, and a transcript of the hearings. Copies of these documents shall also be sent to the respondent, the charging party, and the dean and/or Provost.

3. The respondent may request reconsideration of the sanction by submitting a written statement to the Chair of the Hearing Board within five days of the receipt of the Hearing Board's recommendation. In the event of such a request, the Chair shall reconvene the Hearing Board as soon as possible and hear statements from both the complainant and the respondent, delivered either personally or through counsel. The Hearing Board may, by majority vote, change its recommendation, but only if there is new evidence or there are new arguments to be presented. If there is a change in the recommendation, the Chair of the Hearing Board shall communicate it to the President, the Dean and/or Provost, and to the respondent promptly.

4. The respondent may send to the President, within a reasonable time, any objections to the findings, conclusions or recommendations of the Hearing Board.

## I. The President's Actions

1. The President, relying only upon the materials forwarded by the Hearing Board and objections submitted by the respondent, shall normally accept the Hearing Board's recommendations.

2. The President may depart from the Hearing Board's recommendations only in exceptional circumstances, and only to reduce the severity of recommended sanctions or to dismiss the charges for failure of proof. Any departure may be made only after consulting the individuals then serving as the Chair, Past Chair

and Chair-elect of the Faculty Senate ("the three Chairs"). When a departure is proposed, the President shall send to the three Chairs all of the documents received from the Hearing Board and the respondent and shall secure their views before taking action. Should any of the three Chairs be unable to serve, the other two Chairs shall select a replacement from the available former Chairs of the Faculty Senate.

3. Without limit to the right of departure, the President may request reconsideration of the decision recommended by the Hearing Board by submitting a written statement to the Chair of the Hearing Board within a reasonable time. In the event of such a request, the Chair shall reconvene the Hearing Board promptly and hear statements from both the President and the respondent, delivered either personally or through counsel. The Hearing Board may, by majority vote, elect to adopt or reject the recommendation of the President.

4. The President may also remand the matter to the Hearing Board because there has been a significant defect in procedure. The Hearing Board shall reconvene, take steps to repair any procedural defects, and hold an additional hearing, if needed. The Hearing Board shall then send a second report to the President, along with the transcript of any second hearing, with copies to the respondent by certified mail, and to the charging party and the dean and/or Provost.

5. After all proceedings of the Hearing Board have been concluded, including any reconsideration proceedings, the President shall render a decision and send it, together with the reasons for the decision. The President's decision, except a decision that is subject of an appeal as described below, is final within the University.

### J. Appeal of the President's Decision

If the respondent objects that there has been a significant defect in procedure but the President declines to remand the matter to the Hearing Board, the respondent may appeal on that ground in writing to SCARF. The President shall promptly forward to SCAFR all of the documents upon which the decision was made. SCAFR shall review the documents forwarded by the President and the respondent's written statement of appeal and shall decide the appeal promptly. If SCAFR finds that there has been a significant defect in procedure, it shall remand the matter to the Hearing Board for further proceedings in accordance with paragraph I(4).

### K. Termination

If the Hearing Board recommends that the respondent's appointment be terminated, it shall also recommend a date of termination and a date of termination of salary, benefits, and other privileges of employment which cannot be more than one calendar year after the date of the President's final action.

### L. Hearing Board Records

On the completion of the case the Hearing Board shall transfer all of its records to the Office of the General Counsel. These records shall be stored in a locked file. The Chair, Past Chair and Chair-elect of the Faculty Senate are responsible for obtaining and maintaining these records.

## 5. Interim Suspension

A faculty member shall not be suspended prior to the conclusion of proceedings under this policy unless continuance of employment poses a threat of immediate harm to the faculty member or others, or seriously threatens to significantly disrupt the academic or research activities of the University. Any such suspension shall be with salary. A dean's decision to suspend a faculty member shall be accompanied by a concise statement of the factual assumptions on which it is based

and the grounds for concluding that the faculty member's continuance threatens immediate harm. Such a decision should be made only after consultation with the school's Committee on Academic Freedom and Responsibility, which should, whenever possible, afford the faculty member an opportunity to be heard, and to present evidence of why interim suspension should not be imposed. (See also, II.E. 18, Temporary Suspension or Exclusion of a Faculty Member.)

## 6. General Matters
### A. No Public Statements When Proceedings Are in Progress

To preserve the integrity of the process, members of the University community shall avoid public statements about charges and proceedings that involve minor or major sanctions until the proceedings have been completed.

### B. Actions When Charges Are Unfounded

If final action completely exonerates the respondent, and a determination is made that the allegations were without any foundation or were filed in bad faith, the University shall reimburse that individual for the reasonable costs and expenses, including attorney fees, incurred in their defense. In that event, the administration should also attempt to ameliorate any damage wrongly done to the reputation of the respondent or of any complainant, provided that the complainant acted in good faith. If it appears that the complainant did not act in good faith, the administration shall investigate and take appropriate action.

### C. Statements Following a Minor Sanction

If the respondent has been subjected to a minor sanction, the dean or Provost, after consultation with the President and discussion with the Chair of the Faculty Senate, may publicize this fact.

### D. Statements Following a Major Sanction

If the respondent has been subjected to a major sanction, the President, after informal discussion with the Chair, Past Chair and Chair-elect of the Faculty Senate, shall publish in *Almanac* a statement describing the case and its disposition in appropriate detail.

### E. Modification of Time Periods

The time periods contained in these procedures may be modified by the Hearing Board in its discretion.

### F. Timeliness

If the President determines that the Hearing Board is untimely in pursuit of its charge, thereby detrimentally affecting the legitimate interests of the University, the President may disband the existing Hearing Board. The President shall then promptly request that the Chair of the Faculty Senate reconstitute the Hearing Board.

# II.E.17. Removal of Faculty by Reason of Financial Exigency

*(Source: Standing Resolution of the Trustees, October 16, 1959; revised, September 9, 1983; revised, 1991)*

A. If the administration of the University proposes to curtail an activity of the University that might involve the removal of faculty members, it shall initiate consultation with the Executive Committee of the Senate on the issues of the existence in fact of a financial exigency, the appropriateness of the selection of the particular segment of the faculty for removal, possible alternative actions and the like, at least thirty days before it proposes to send to the affected faculty members the notice described in paragraph b. below.

gender identity, religion, creed, national or ethnic origin, citizenship status, age, disability, veteran status or any other legally protected class status in the administration of its admissions, financial aid, educational or athletic programs, or other University-administered programs or in its employment practices. Questions or complaints regarding this policy should be directed to the Executive Director of the Office of Affirmative Action and Equal Opportunity Programs, Franklin Building, 3451 Walnut Street, Suite 421, Philadelphia, PA 19104-6106; or (215) 898-6993 (Voice).

## I.K.2. Affirmative Action Office

The Office of Affirmative Action exists organizationally under the Office of the President. It is headed by the Director of Affirmative Action and is responsible for the development and functioning of the University's Affirmative Action Program and for providing a formal liaison between the federal, state, and city compliance agencies and the University. The responsibilities include coordinating affirmative action implementation, programs for the handicapped, and overseeing the mechanism for resolving non-academic employee grievances as they relate to equal opportunity and affirmative action.

# II. Faculty Policies and Procedures

- II.A. Academic Freedom and Responsibility (p. 17)
- II.B. Structure of the Academic Staff (p. 17)
- II.C. Tenure System at the University of Pennsylvania (p. 33)
- II.D. Appointments and Promotions (p. 35)
- II.E. Terms and Conditions of Faculty Appointments (p. 38)

# II.A. Academic Freedom and Responsibility

*(Source: Resolution of the Executive Board of Trustees, February 13, 1953; revised, Statutes of the Trustees, Article 10, June 17, 1983; revised as* Article 11, November 2, 2001 (https://secretary.upenn.edu/trustees-governance/statutes-trustees/#eleven)*; revised, Office of the Provost, November 21, 2022)*

The University recognizes the importance of a system of tenure for faculty members as the preeminent means of fostering and protecting academic freedom in teaching and in scholarly inquiry.

There shall be a Senate Committee on Academic Freedom and Responsibility of ten members, consisting of the Faculty Senate Chair-Elect and nine members of the Faculty Senate, three of whom are selected each year in accordance with the Rules of the Senate. This committee shall advise and consult with each faculty's Committee on Academic Freedom and Responsibility, and with administrative officers, on the establishment of appropriate procedures to be followed in the event of a claim of violation of academic freedom or responsibility. At the beginning of each year, the Senate Committee on Academic Freedom and Responsibility shall distribute the "Procedural Principles for Handling Complaints Concerning Academic Freedom and Responsibility" to the members of each faculty's Committee on Academic Freedom and Responsibility. The Committee shall have power to make investigations, reports, and recommendations on any matter relating to academic freedom and responsibility within the University. The Committee shall be governed in its responsibilities and procedures by rules established by the Faculty Senate.

Each faculty shall have a standing Committee on Academic Freedom and Responsibility that shall be elected annually. Each faculty's Committee on Academic Freedom and Responsibility shall, subject to review by the faculty, and to the extent provided in the relevant procedures, including the Procedures Governing Sanctions Taken Against Members of the Faculty adopted on June 20, 1997, and as they may be hereafter amended, represent the faculty in all proceedings that involve temporary exclusion of or imposition of a major sanction on a faculty member; suspension or termination of the appointment of a faculty member, some matters arising from financial exigency proceedings, or other questions concerning an individual faculty member's claim of violation of their academic freedom. The committee shall have power to make investigations, reports, and recommendations on any matter relating to academic freedom and responsibility within the school that may affect one or more faculty members.

Each faculty's Committee on Academic Freedom and Responsibility shall consist of not less than three members. The faculty shall also elect one or more alternate members to serve in the event of the resignation or disqualification of a Committee member. A faculty's Committee on Academic Freedom and Responsibility shall not contain department chairs or administrators. Exceptions, if necessary in small schools, should be allowed with the approval of the Senate Committee on Academic Freedom and Responsibility. Most members of a faculty's committee should be tenured faculty. Such committees shall be elected annually, and in accordance with the bylaws of a faculty, by those faculty members who are members of the Standing Faculty. Elections shall be held not later than the beginning of the academic year. The dean shall report to the Provost, not later than October 15 of each year, giving the names of the members of the faculty Committee on Academic Freedom and Responsibility that is currently in existence. Each faculty Committee on Academic Freedom and Responsibility shall elect its own chair.

It is the policy of the University of Pennsylvania to maintain and encourage freedom of inquiry, discourse, teaching, research, and publication and to protect any member of the academic staff against influences, from within or without the University, which would restrict a member of the academic staff in the exercise of these freedoms in their area of scholarly interest. The teacher is entitled to freedom in research and in the publication of results, subject to the adequate performance of their other academic duties, and to the institutional policies and procedures as set forth in the research policies of the University. Research for pecuniary return should be based upon an understanding with the authorities of the institution.

The teacher is entitled to freedom in the classroom in discussing their subject. The teacher is a member of a learned profession and of an educational institution. When speaking or writing as an individual, the teacher should be free from institutional censorship or discipline, but should note that a special position in the community imposes special obligations. As a person of learning and a member of an educational institution, the teacher should remember that the public may judge the profession and the institution by their utterances. Hence the teacher should at all times show respect for the opinions of others, and should indicate when they are not speaking for the institution.

# II.B. Structure of the Academic Staff

## II.B.1. Standing Faculty

*(Source: Standing Resolution of the Trustees, June 4, 1976; revised, September 9, 1983 and Statutes of the Trustees, Article 9, 1983; revised as Article 10, November 2, 2001 (https://secretary.upenn.edu/trustees-*

March 2, 2022

Professor Amy Wax
1531 Amity Road
Rydal, PA 19046

      Via Email and Overnight Mail

Dear Professor Wax,

      As set forth in the Faculty Handbook, I write to provide you with a written description of the charges I intend to file with the Faculty Senate if we are unable to reach a mutually agreed resolution of the issues presented.

      As you know, if a charging party believes that a major infraction of University standards has occurred, and no mutually acceptable resolution can be reached, the charging party then requests that the Chair of the Faculty Senate convene a Hearing Board. *Faculty Handbook Section II.E.16, Procedure Governing Sanctions Taken Against Members of the Faculty.* Once the composition of the Board is determined, the charging party sends a written statement outlining the grounds for complaint. If the Hearing Board concludes that the grounds might constitute just cause for the imposition of a major sanction, a hearing will be conducted.

      I am initiating this disciplinary action because for several years and in multiple instances you have shown a callous and flagrant disregard for our University community—including students, faculty, and staff—who have been repeatedly subjected to your intentional and incessant racist, sexist, xenophobic, and homophobic statements and actions that inflict harm on them and undermine the core values of our University. Your statements, made in the classroom and on campus, other academic settings, and in public forums in which you were identified as a University of Pennsylvania professor, are antithetical to the University's mission to foster a diverse and inclusive community and have led students and faculty to reasonably believe they will be subjected to discriminatory animus if they come into contact with you. That concern— entirely reasonable under the circumstances you have created—has led students to conclude that they cannot take your classes and faculty to call your presence "demoralizing and disruptive."

      Moreover, in public discussions about our students' academic performance, you have disseminated false information about segments of our university community. In addition, you have exploited access to student's confidential grade information in ostensible support of derogatory and inaccurate statements made about the characteristics, attitudes, and abilities of your students. As a result of your derogatory statements, students who have taken your classes

**Pg.11**

have expressed anxiety that they will be accused of being at the bottom of their class since the number of minority students in your classes is finite and easily identifiable. Your conduct threatens to cause a chilling effect on students who have chosen to forego enrollment in your classes due to a concern they will be treated more harshly and unfairly relative to their white peers. In addition, your conduct is antithetical to the university's core mission to attract a diverse student body to an inclusive educational environment.

In 2018, your conduct necessitated a prophylactic policy removing you from teaching required courses where students from marginalized groups would be subject to your evaluation without the ability to opt out, shifting a burden to your colleagues who had to compensate with an increased course load. Since then, you have continued to make increasingly vitriolic statements, knowingly rendering yourself unfit for teaching and mentorship of students. Your colleagues report that your conduct, which has included derogatory statements made directly to other faculty members, has led them to feel demoralized and demeaned.

Although the University values academic discretion, your decision to invite a renown white supremacist, Jared Taylor, to be the featured guest speaker in a regular meeting of your Law School course as part of our institutional curriculum, and to have lunch with your students who were expected to attend, crosses the line of what is acceptable in a university environment where principles of non-discrimination apply. Taylor's explicit racism, hate-speech and white supremacy contravenes Penn's express policies and mission and his white supremacist ideology has been associated closely with those perpetrating violence towards minorities in this country and others. In promoting this ideology yourself and bringing it into our curriculum, you have caused profound harm to our students and faculty, and your escalating pattern of behavior raises risks of increased harm and escalating damage going forward.

Our University appreciates divergent speech, values academic freedom, and believes in open debate, but while engaging in such wide-ranging discourse faculty members must adhere to basic norms of civil and professional behavior. You have repeatedly breached such minimum standards of civility and professionalism in recent years. While the policy of the University is to encourage freedom of inquiry and discourse, your conduct constitutes a major infraction of the University's behavioral standards outlined in the Faculty Handbook, including the following:

When speaking or writing as an individual, the teacher should be free from institutional censorship or discipline, but should note that *a special position in the community imposes special obligations*. As a person of learning and a member of an educational institution, the teacher should remember that the public may judge the profession and the institution by his/her utterances. Hence the teacher should at all times *show respect for the opinions of others*, and should indicate when he or she is not speaking for the institution. *Faculty Handbook Section II.A, Academic Freedom and Responsibility* (emphasis added).

The concomitant responsibility of faculty members, benefited and encouraged by the tenure system, is to *use the opportunities thus provided for the advancement of the purposes of the University and of the communities it serves*. These purposes include teaching and scholarship. ***Members of the Standing Faculty are***

**Pg.12**

*obliged to share in the teaching mission so that their students may advance in learning.* They are also obliged to push forward the frontiers of knowledge through study and research. These activities go hand in hand, for scholarship is unavailing if its results are not communicated, and a lively stimulus to learn is best imparted by one who is adding to our store of knowledge. *Faculty Handbook Section II.C.1, Tenure System at the University of Pennsylvania* (emphasis added).

You have repeatedly used the platform you were granted when you became a professor at the University to disparage immigrants, people of color, and women, including our students, alumni, and faculty. Much of your public persona has become anti-intellectual: you rely on outdated science, make statements grounded in insufficiently supported generalizations, and trade on our University's reputation to amplify your baseless disdain for many members of our University community. The harm you cause when you repeatedly attack the inherent value of our community members is real. No member of our community should be made to feel like they do not belong, are unwelcome, or are incapable of achieving excellence because of who they are or whence they come. Your statements are a persistent reminder that racism, sexism, and xenophobia are not mere abstractions, but real and insidious beliefs.

Your escalating pattern of conduct raises serious questions as to whether you are fit to perform the requirements of your job, and your deliberate disregard for students, faculty, and the University as a whole constitutes a major infraction that warrants major sanctions. Accordingly, it is my responsibility as Dean to initiate the University procedure governing sanctions taken against a faculty member.

The following is a non-comprehensive list of the relevant standards for faculty conduct that you have breached:

1. ***Teaching faculty must avoid exploitation, harassment, and discriminatory treatment of students and must avoid conducting themselves in a manner reasonably interpreted as creating a hostile or discriminatory classroom.***

The mission of the University of Pennsylvania is, in part, to "offer a world class education to our students, train future leaders of our country, expand and advance research and knowledge, [and] serve our community and society both at home and abroad." *Principles of Responsible Conduct*. To fulfill this mission, the University has prioritized inclusion and diversity "as a central component" in creating an "educational and working environment that best supports the University's commitment to excellence in teaching, research, and scholarship." *University of Pennsylvania's Equal Opportunity and Affirmative Action Policy.*

Accordingly, professors must adhere to a basic standard of ethical and responsible conduct by treating students even-handedly and without harassment or discrimination, including "discrimination on the basis of irrelevant characteristics." *Faculty Handbook, II.E.10*; *see also Principles of Responsible Conduct, Principle Two.* This basic standard of professional competence is reiterated by the American Association of University Professors ("AAUP") Statement of Professional Ethics, which sets forth "general standards that serve as a reminder of the variety of responsibility assumed by all members of the profession." The AAUP states

**Pg.13**

professors must "avoid any exploitation, harassment, or discriminatory treatment of students." *AAUP, Statement on Professional Ethics*.

Examples of your discriminatory conduct in the classroom include, but are not limited to:

- Telling a student who asked whether you agreed with panelist John Derbyshire's[1] statements that Black people are inherently inferior to white people that "you can have two plants that grow under the same conditions, and one will just grow higher than the other."
- Telling a Black law school student that she "only got into Yale because of affirmative action."
- Telling a student that Black students don't perform as well as white students because they are less well prepared, and that they are less well prepared because of affirmative action.
- Emailing a Black student that "[i]f blacks really and sincerely wanted to be equal, they would make a lot of changes in their own conduct and communities."
- Stating in class that people of color needed to stop acting entitled to remedies, to stop getting pregnant, to get better jobs, and to be more focused on reciprocity.
- Stating in class that Mexican men are more likely to assault women and remarking such a stereotype was accurate in the same way as "Germans are punctual."
- Commenting in class that gay couples are not fit to raise children and making other references to LGBTQ people that a student reported evinced a "pattern of homophobia."
- Inviting on campus Jared Taylor, one of the world's most prominent white supremacists, for a mandatory lecture in your Penn Law course.[2] To prepare for this class, you assigned an interview with Enoch Powell, a man who is regarded even by those who support his other views as deeply racist on immigration, and who was ousted from his leadership role in the British Conservative party over fifty years ago for his inflammatory and racist public speeches, which today are influential among violent white supremacist groups and individuals worldwide.
- Commenting after a series of students with foreign-sounding names introduced themselves that one student was "finally, an American" adding "it's a good thing, trust me."
- Telling students invited into your home that "Hispanic people don't seem to mind…liv[ing] somewhere where people are loud."

[1] Derbyshire is widely regarded as a white supremacist who was fired by the National Review for making statements that were "indefensible." https://www.nationalreview.com/corner/parting-ways-rich-lowry/

[2] According to the Southern Poverty Law Center, "Taylor hosts the annual American Renaissance Conference, where racist intellectuals rub shoulders with Klansmen, neo-Nazis and other white supremacists" and edited the discontinued American Renaissance magazine, which "regularly published proponents of eugenics and blatant anti-black and anti-Latino racists." As a result, Taylor was named an "extremist" by the Southern Poverty Law Center and the Anti-Defamation League. https://www.splcenter.org/fighting-hate/extremist-files/individual/jared-taylor; https://www.adl.org/sites/default/files/documents/assets/pdf/combating-hate/jared-taylor-extremism-in-america.pdf

**Pg.14**

Your in-class and on-campus statements, the way you conduct your classroom, and the extreme and exclusionary voices you have inserted into the Law School's curriculum have led minority students to report feeling "marginalized, isolated, unsupported, and unprioritized"[3] and to reasonably conclude that your classroom is not an equal-opportunity learning environment.

## 2. *Teaching faculty must evaluate each student's true merit.*

The American Association of University Professors Statement of Professional Ethics holds that professors must "demonstrate respect for students as individuals" and "make every reasonable effort to foster honest academic conduct and to ensure their evaluations of students reflect each student's true merit." *AAUP, Statement on Professional Ethics*.

In addition to the statements you have made directly to students or in class, your public commentary espousing derogatory and hateful stereotypes has led students to reasonably conclude that you are unable to evaluate them fairly based on their individualized merit rather than on unmistakable biases you possess related to race, sex, national origin, and socioeconomic class. You have repeatedly made public bigoted statements against women, Black people, Asian people, and members of the LGBTQ community, including but not limited to:

- Stating, based on misleading citation of other sources, that "women, on average, are less knowledgeable than men," women are "less intellectual than men" and there is "some evidence" for the proposition that "men and women differ in cognitive ability."[4]
- Stating that "our country will be better off with more whites and fewer nonwhites."[5]
- Stating publicly that Blacks have "different average IQs" than non-Blacks, could "not be evenly distributed through all occupations," and that such a phenomenon would not be "due to racism."[6]
- Stating "some of them shouldn't" even go to college in reference to Black students who attend Penn Law and its peer schools.[7]
- Stating that Asians lack "thoughtful and audacious individualism" and that "the United States is better off with fewer Asians."[8]

[3] Summer 2019 Statement: Re: Immigration Remarks from Penn Law Professor Amy Wax (https://docs.google.com/forms/d/e/1FAIpQLSfbZe8jPHNzNB6J9l13xS-kLtd2x59Nw97BZgAWZhTZ4EwIdQ/viewform?fbclid=IwAR03-nnDcijd5NS5H8WL1Ac-y1cuheuXDKWfn3Y1-DbcX41p5KLcAEZN-nI)

[4] https://www.newyorker.com/news/q-and-a/a-penn-law-professor-wants-to-make-america-white-again; https://www.youtube.com/watch?v=AhyeUd7vOe4&t=21s

[5] https://thefederalist.com/2019/07/26/heres-amy-wax-really-said-immigration/

[6] https://www.youtube.com/watch?v=AhyeUd7vOe4&t=21s

[7] https://youtu.be/cb9Ey-SsNsg

[8] https://glennloury.substack.com/p/amy-wax-redux?utm_source=url

- Stating that "groups have different levels of ability, demonstrated ability, different competencies,"[9] and that there are "clear individual and group differences in talent, ability, and drive" between races.[10]
- Stating that "there were some very smart Jews" among your past students but that Ashkenazi Jews are "diluting [their] brand like crazy because [they are] intermarrying."[11]
- Stating that low-income students may cause "reverse contagion," infecting more "capable and sophisticated" students with their "delinquency and rule-breaking."[12]
- Stating that "if you go into medical schools, you'll see that Indians, South Asians are now rising stars. . . . [T]hese diversity, equity and inclusion initiatives are poisoning the scientific establishment and the medical establishment now."[13]
- Writing without valid support that some cultures are "not equal in preparing people to be productive in an advanced economy," including . . . . . "the anti-'acting white' rap culture of inner-city blacks," and "the anti-assimilation ideas gaining ground among some Hispanic immigrants."[14]
- Stating that that "fairness requires that we open channels of opportunity to women, although I will say that you know, the crusty old patriarchs of old, in being reluctant to do that, they were kind of on to something."[15]
- Stating that "given the realities of different rates of crime, different average IQs, people have to accept without apology that Blacks are not going to be evenly distributed through all occupations."[16]
- Stating that it is "overly optimistic" to think that "Blacks would be in the same position as whites if we had not been a racist society."[17]
- Stating that your students at this Law School are "cowed benighted sheeples [sic]" who "are ignorant" and "know nothing."[18]

Although faculty members have great freedom to speak in ways that diverge from majority or institutional views, that freedom accompanies a correlative responsibility to adhere carefully to

[9] https://www.youtube.com/watch?v=AhyeUd7vOe4&t=21s

[10] https://glennloury.substack.com/p/amy-wax-redux?utm_source=url

[11] https://www.youtube.com/watch?v=AhyeUd7vOe4&t=21s

[12] *Harvard Journal of Law and Public Policy: "Educating the Disadvantaged: Two Models," June 2017*

[13] https://glennloury.substack.com/p/amy-wax-contesting-american-identity?utm_source=url

[14] *Philadelphia Inquirer Op-Ed.*

[15] https://www.youtube.com/watch?v=AhyeUd7vOe4&t=21s

[16] https://www.youtube.com/watch?v=AhyeUd7vOe4&t=21s

[17] https://www.youtube.com/watch?v=jZnbDhrw_DI

[18] https://www.youtube.com/watch?v=AhyeUd7vOe4&t=21s

**Pg.16**

standards of research accuracy and attribution, particularly on subjects that, if not protected by academic freedom, might verge on group defamation or harassment and hostility. Your public comments about gender, race, and ethnicity have on numerous occasions breached fundamental ethical and research standards of rigor and attribution.

For example, in support of your sexist claims that "women are less thoughtful than men," you have mischaracterized the source and improperly cited a decades-old study for present tense meaning. Notably, the author of the study has stated that it does not stand for the proposition you cite it for, clarifying that his research was about the life choices of men and women and did not address claims such as women being less intellectual than men.[19] As another example, you have claimed that the *University of Pennsylvania Law Review* had a racial diversity mandate when it does not.[20] On another occasion, when challenged regarding your unsupported and uncited claim that communities that are "more diverse" litter more, you responded that "[s]ociologists don't study this stuff," when in fact there are multiple studies on the topic. Lastly, you proclaimed that "there is essentially no science being done in a place like Malaysia. No science, no technology coming out." This is patently false.[21]

Your pervasive and derogatory racism and sexism expressed in public statements, taken together with your behavior in the classroom, leads reasonable students to conclude that they will be judged and evaluated based on their race, ethnicity, gender, or sexual orientation rather than on their academic performance and "true merit." Students have expressed it is "impossible to fathom" that you will "treat non-conservative, not-white students fairly."[22]

In fact, several Black students in your Civil Procedure course reported that in the aftermath of your inflammatory interview with Glenn Lowry in 2017, they "deliberately steered clear" of you, "did not feel comfortable engaging [you] throughout the semester and did not trust that [you were] committed to creating a productive learning environment for all students."[23] One student reported feeling "extremely vulnerable and afraid" working on a student law journal with you, in part, based on your claims that women and people of color, like her, are generally unqualified to be in elite higher education institutions.[24] Minority students also reported they were "discouraged" from applying for clerkships when you were on the clerkship committee and questioned whether the committee would zealously advocate for them, in light of your views.

[19] https://www.newyorker.com/news/q-and-a/a-penn-law-professor-wants-to-make-america-white-again

[20] https://www.youtube.com/watch?v=cb9Ey-SsNsg

[21] https://oec.world/en/profile/country/mys

[22] January 3, 2022 Letter to Dean Ruger and the Faculty Senate Executive Board https://docs.google.com/document/d/1muCvT8lBZZnjIvWGboFJhNQnDs3bZ9ULTCyDFuPg1F8/edit

[23] Complaint Regarding Professor Amy Wax's Employment at the University of Pennsylvania Carey Law School (April 27, 2021)

[24] Complaint Regarding Professor Amy Wax's Employment at the University of Pennsylvania Carey Law School (April 27, 20201)

**Pg.17**

3. **_Teaching faculty must respect the confidential nature of the relationship between professor and student._**

Faculty may be aware of confidential information as it relates to students and are expected to maintain the confidentiality of such information "so as to protect it from improper disclosure and to protect the privacy interests of members of our community." *Principle Seven, Respect for Privacy and Confidentiality*; *see generally Faculty Handbook IV.J. Policy on the Confidentiality of Student Records*. On multiple occasions, you have violated the confidential relationship with your students by publicly discussing their performance, including but not limited to:

- Discussing specific grade distributions in your first-year Civil Procedure course in a 2017 interview.[25]
- Stating in a 2017 interview "I don't think I've ever seen a black student graduate in the top quarter of the [Penn Law School] class and rarely, rarely in the top half" and "I can think of one or two students who've graduated in the top half of my required first-year course."[26]
- Stating, incorrectly, in a 2017 interview that the *Law Review* has a diversity mandate in its selection process.[27]
- Stating that Black students tend not to graduate at the top of the class and adding "anybody who teaches law school knows this to be true."[28]
- Stating no law professor can honestly say that "Blacks are evenly distributed throughout the class, top, middle, and bottom."[29]

The numbers of Black students in your classes in any given year is limited and finite, such that your discussion of their alleged performance reveals impressions and facts about identifiable individuals in your courses. These public statements have contributed to students concern that they will be treated as de facto research subjects in support of your harmful bigotry.

4. **_Teaching faculty must show respect for others, including faculty._**

As a colleague to other staff and faculty, you "have obligations that derive from common membership in the community of scholars." *AAUP's Statement of Professional Ethics*. Among those obligations is to treat colleagues even-handedly and without discrimination and harassment. *Principles of Responsible Conduct*; *University of Pennsylvania Nondiscrimination Statement*. Penn's Principles for Responsible Conduct advance a no-tolerance approach in the

---

[25] https://www.youtube.com/watch?v=cb9Ey-SsNsg; https://www.youtube.com/watch?v=u0GB0LffzCk

[26] https://www.youtube.com/watch?v=cb9Ey-SsNsg

[27] https://www.youtube.com/watch?v=cb9Ey-SsNsg

[28] https://www.youtube.com/watch?v=AhyeUd7vOe4

[29] https://www.youtube.com/watch?v=AhyeUd7vOe4

**Pg.18**

workplace to conduct that constitutes harassment on the basis of race, gender, sexuality, ethnicity, and national origin, among others. *Principle Two, Respect for Others in the Workplace.*

You have made repeated disparaging comments to and about faculty colleagues that violate this standard and exhibit a disregard for your colleagues and your role at our University, including but not limited to:

- Telling a Black faculty member that it is "rational to be afraid of Black men in elevators."
- Stating, while on a panel with an openly gay faculty colleague, that "no one should have to live in a dorm room with a gay roommate" and, separately, that same-sex relationships are selfish and not focused on family or community.
- Referring to your faculty colleagues who criticized your behavior as "anti-role models" in a talk given to an audience of law students.[30]

Your actions towards your colleagues, coupled with the stereotypical, demeaning, and false statements you have made about the racial, gender, and ethnic groups to which many of them belong, have led your colleagues to report that your conduct is harassing and your presence on-campus is demoralizing and disruptive.

### *Your Repeated Violations of University Standards Warrant Major Sanctions*

Academic freedom for a tenured scholar is, and always has been, premised on a faculty member remaining fit to perform the minimal requirements of the job. In light of the aforementioned conduct, there is a genuine question as to your fitness for your position. The student body has expressed a mistrust of your ability to fairly instruct or judge them based on their individual merit. Moreover, students, faculty, and staff have expressed that your persistent racist and bigoted on- and off-campus statements have created a demoralizing and demeaning environment for them.

Your statements and actions demonstrate a "flagrant disregard of the standards, rules, or mission of the University." *Faculty Handbook Section II.E.16, Procedure Governing Sanctions Taken Against Members of the Faculty.* Such disregard for students, faculty, and the University as a whole constitutes a major infraction that warrants major sanctions, which includes significant discipline up to and including termination. Any sanctions will be determined by your peers on the University's tenured faculty who are best suited to define and apply the minimal standards required for faculty at this University as well as the appropriate sanctions for your refusal to meet such standards.

Past attempts to address your behavior, including not assigning you to teach first-year law students in mandatory courses, have failed to result in a change of conduct. In fact, your hateful disregard for members of our University community has only grown worse. Imposing sanctions on a faculty member of the University of Pennsylvania is a "rare event." *Faculty Handbook Section II.E.16, Procedure Governing Sanctions Taken Against Members of the Faculty.* However, your continuous violations of University standards and the increasingly negative

---

[30]  https://www.youtube.com/watch?v=vXZ-s5ASHnw

impact your conduct has had on students, faculty, and staff leaves me with no option but to seek major sanctions against you unless we can arrive at a mutually agreed path forward.

I appreciate your review of this summary document, and hope that it gives you a clearer sense of the institutional harms that your behavior has caused. This stage in the Faculty Handbook process provides an opportunity for informal resolution prior to forwarding a charge to the Faculty Senate's Hearing Board. I will be open to discussing such a resolution when we meet as the next step in the process.

Sincerely,

Ted B.

**Sean V. Burke, Esq.**
*Associate General Counsel*
Direct Dial:  215-746-5254
sean.burke@ogc.upenn.edu

July 29, 2022

**VIA ELECTRONIC MAIL (dshapiro@shapirolit.com)**

David J. Shapiro, Esq.
Shapiro Litigation Group
1460 Broadway
Suite 7019
New York, NY  10036

**Re:  Written Description of Charges Against Prof. Amy Wax**

Dear Mr. Shapiro:

This office represents the University of Pennsylvania, and I write in response to your July 20, 2022, letter to Prof. Vivian Gadsden, chair of the University's Faculty Senate, regarding the sanctions proceeding initiated against Prof. Amy Wax by Dean Ted Ruger of the University of Pennsylvania Carey Law School.

We understand Prof. Wax's condition as described in Dr. Amy Clark's June 27, 2022, letter, and we recognize she is entitled to a reasonable accommodation with respect to any hearing on Dean Ruger's charges.  Given your recent engagement, the Senate is willing to extend the deadline to object to the proposed panel members to August 31, 2022.  It is not our position that Prof. Wax must take a continuous leave of absence to be entitled to an accommodation, only that if she were to take such a leave, we would expect her to be unavailable to appear for the duration of the leave.  Otherwise, any accommodation must be reasonable under the facts and circumstances.  In our view, indefinite postponement of a sanctions proceeding for someone fulfilling the essential functions of her position is not a reasonable request, but the Senate (as well as the Hearing Board, at such time as it may take up the case) will be willing to make accommodations concerning the timing and format of the proceeding, including prehearing procedures.

The procedure is governed by the University's *Handbook for Faculty and Academic Administrators*, section II.E.16 ("Procedure Governing Sanctions Taken Against Members of the Faculty"), which provides in pertinent part as follows:

The charging party and the respondent each shall be given the opportunity to move to disqualify for prejudice any potential member of the Hearing Board designated by the Chair of the Faculty Senate. Such motion shall set forth, in writing, the reasons therefore and shall be delivered to the Chair of the Faculty Senate. Motions to disqualify Hearing Board members shall be decided by the remaining members of the Board (with a tie to be broken by the Chair of the Faculty Senate). If the remaining members decide that disqualification is proper, an alternate member shall be designated by the Chair of the Faculty Senate.

The process does not provide for discovery in support of a potential motion for disqualification of proposed Hearing Board members.  You are of course welcome to conduct independent research in support of a motion to disqualify.

Sincerely,

Sean V. Burke



June 21, 2023

M. Elizabeth Magill
President
University of Pennsylvania
1 College Hall, Room 100
Philadelphia, PA  19104

Dear President Magill:

On June 23, 2022, the Chair of the Faculty Senate received a request from Penn Carey Law School Dean Ted Ruger ("Charging Party") to convene a Hearing Board to review whether the conduct of Professor Amy Wax ("Respondent") constitutes a major infraction of University Standards under Faculty Handbook Section II.E.16., "Procedure Governing Sanctions Taken Against Members of the Faculty."  A hearing was held from May 1-3, 2023, in which both the Charging Party and the Respondent participated.  The following report represents the Hearing Board's findings, conclusions, recommendations.

### Background
.
The Hearing Board spent many hours over the past year considering the details of the case submitted by Dean and Professor Ted Ruger, in which Professor Amy Wax was charged with engaging in conduct that involved a "flagrant disregard of the standards, rules, or mission of the University or the customs of scholarly communities."[1] In discussing this case we reviewed the charging statement, the responses submitted by Professor Wax, and the additional information provided at the hearing held in May 2023, including the numerous documents submitted by the Charging Party and the Respondent before, during, and after the hearing.[2]

We regard this to be a case not of free speech, which is broadly protected by University policy as articulated in the Faculty Handbook[3], but rather of flagrant unprofessional conduct by a faculty member of the Penn Carey Law School, and of the University of Pennsylvania. This conduct has had a detrimental impact on equal access to educational opportunities at the Law School and on the community more broadly. For this reason, we focus in this report on widely acknowledged standards of our profession, which recognize a difference between professional conduct and

---

[1] Faculty Handbook, Section II.E.16.1.B.7.
[2] In his June 12 letter to the Board co-chairs Mr. Shapiro states that in the report from Dean Chemerinsky, that was submitted by the Charging Party and states that Respondent has crossed the line of speech protected by academic freedom, there was "no discussion of where this magical "line" exists, who gets to draw it, or how professors are supposed to know when they've crossed it." We suggest that the process resulting in this report is one important way to draw such a line.
[3] Faculty Handbook, Section II.A.

protected free speech. In coming to our conclusions, we are applying the standards of the Faculty Handbook.[4]

## I.    Conclusions

(1) The Hearing Board finds Professor Wax in dereliction of her scholarly responsibilities, especially as a teacher.

Our faculty's primary teaching responsibilities are to teach our students according to the *highest professional standards*, and to do so *equitably*. Professor Wax has violated the first of these standards through her *uncritical* use of data[5] and unfounded *declarative* claims[6] in some of her courses, campus events, and elsewhere as a representative of the University of Pennsylvania. Her consistent reliance on misleading and partial information, which often leads her to make unsubstantiated statements[7] and to draw sweeping and unreliable conclusions[8],  violates the University of Pennsylvania's Faculty Handbook as well as broader professional standards, expectations, and norms.[9] Professor Wax's uncritical use of data, and her promulgation of unfounded claims are detrimental to her students[10], and particularly where they concern groups with which many of our students and colleagues identify[11].

We do not dispute the protection Professor Wax has to hold her views or to express them in public. However, when controversial views, rejected by most peers and unsupported by peer-reviewed scholarship, are presented as uncontroverted[12] scholarly facts by a faculty member of the University of Pennsylvania, and when those views are, additionally, demeaning and demoralizing to minority groups[13], they cannot help but *inequitably* impact the learning environment at our institution, as well as violate behavioral professional norms.

We stress that the impact of the positions Professor Wax has taken as a professor who holds a named Chair at Penn[14], has been extraordinarily detrimental to her students and to the student body as a whole. By conveying these positions with reckless disregard for scholarly and professional norms, she has failed to effectively teach all our students, majority and minority

---

[4] Faculty Handbook, Section II.E.1.
[5] Appendix 2, Item 3.
[6] Appendix 1, Item 17
[7] Appendix 2, Item 5.
[8] Appendix 1, Item 15.
[9] Leading a conservative alum to describe them as 'reprehensible and unscholarly', Exhibit 32. We note that here and through the report we refrain from mentioning names and identifying information of students and alums to protect their privacy and safety, as was agreed by the sides prior to the hearing and reiterated at the hearing without objection. In some instances in this report we refrain from providing reference to specific statements for the same reason.
[10] Appendix 2, Item 3.
[11] Appendix 2, Item 5.
[12] The syllabi submitted to the Board, and multiple student witnesses. In a June 12th letter to the Hearing Board, the Respondent's counsel suggests that "the goal of Prof. Wax's class is to present students with ideas with which they – and she – might well disagree" (p.4). Later in the same document Mr. Shapiro suggests that no evidence was presented to refute the "observed differences between groups" or to discredit "factual statements by Murray, Powell, and Taylor, or by Prof. Wax herself" on these matters.
[13] As was evident in students' and colleagues' testimonies at the hearing.
[14] https://almanac.upenn.edu/archive/volumes/v53/n08/lawchairs.html

**Pg.24**

students alike, particularly in the area of Conservative Legal Thought.[15] Indeed, not only has she modeled shoddy "science"[16] in her teaching practice, but in so doing she has polarized the student body and alienated many students. This has produced a double loss to Penn students, limiting their exposure to scholarly discussions on conservative legal thought, and negatively impacting their learning environment.

(2) The Hearing Board finds Professor Wax in violation of privacy policies of the University of Pennsylvania.

Repeated statements that Professor Wax has made in public about her students', and Penn Carey Law School students' grade distributions by race[17,18] constitute serious violations of professional norms. For professors to publicly discuss grades by race (irrespective of whether such statements are grounded in fact) violates norms around grading privacy at universities across the country,[19] and Penn is no exception. Despite warnings,[20] Professor Wax continues to assert her right to make such statements. This practice has further discouraged racially diverse and minoritized students from taking her classes; several have expressed concern that potential employers may infer they earned a low grade from her.

(3) The Hearing Board concludes that Professor Wax has on numerous occasions, both inside the classroom and in public, flagrantly violated University norms to treat all students with equitable due respect.

Professor Wax's history of disrespectful and dismissive treatment of various groups is long, persistent, and well-documented. Indeed, it demonstrates a pattern of flagrant, even escalating disregard for University expectations and professional norms regarding the treatment of members of the University community. Various groups of students - most significantly Black students, but also Asian students, Hispanic and immigrant students, LGBTQ students and women – are not only harmed but also wronged by this treatment. These students have a justified expectation of equitable, respectful treatment by faculty at the University of Pennsylvania.[21] We

---

[15] By Professor Wax's account at the hearing, she sees her public appearances and her classes as a continuum and draws ideas and perspectives from her engagements in public venues. This leads to a reductive view of conservative and right-leaning thought in her class.

[16] Appendix 2, Items 1, 2, 3; Appendix 1, Items 2 and 14 (as examples of public speech given in her capacity as professor at Penn Carey Law School).

[17] "The downside to social uplift | Glenn Loury & Amy Wax [The Glenn Show]", September 11, 2017, https://www.youtube.com/watch?v=cb9Ey-SsNsg.  Referenced in Charging Party's "Wax Cross Exhibits" "Tab 11 – 2021.04.27 – Student Complaint."

[18] "Tucker Carlson Today," *Fox Nation*, April 8, 2022.  Referenced in Charging Party's "Wax Transcripts" "Tab 11 – 2022.04.08 – Tucker Carlson and Amy Wax."

[19] https://catalog.upenn.edu/pennbook/confidentiality-student-records/; https://www.umsl.edu/services/academic/policy/gradeconfidentiality.html; https://clas.uiowa.edu/faculty/student-records-confidentiality-ferpa; https://www1.villanova.edu/villanova/provost/resources/student/policies/disclosure.html; https://www.fordham.edu/download/downloads/id/1850/09_-_dos_and_donts_for_teachers.pdf; https://infoforfaculty.fas.harvard.edu/book/student-privacy; https://www.registrar.columbia.edu/content/privacy-rights-ferpa; https://deanofstudents.stanford.edu/policies-processes-and-protocols/privacy-and-confidentiality

[20] Professor Wax has been warned in writing by the Dean that such statements are in violation of both the Family Educational Rights and Policy Act (FERPA) and University of Pennsylvania policy.

[21] https://oaaeop.upenn.edu/resources/policies-handbooks-procedures

conclude that disciplinary action is necessary when such disrespectful and dismissive treatment *negatively and inequitably* impacts the learning environment, whether in the classroom, elsewhere on campus, or in other professional settings in which students reasonably expect to learn and to be treated equitably.

## II.    Summary

The Hearing Board unanimously finds that the issues and facts presented by the Charging Party, and those further illuminated during the Hearing process, constitute serious violations of University norms and policies, and therefore should be treated as major infractions of University behavioral standards. We find that Professor Wax repeatedly violated professional norms by 1) presenting topics in reckless disregard of scholarly standards and presenting misleading and partial information, which is often not scholarly or peer-reviewed, in order to draw sweeping conclusions with the predictable impact of negatively and inequitably harming the learning environment at the University of Pennsylvania; 2) violating widely held standards of privacy and confidentiality by discussing her perception of Penn Carey Law student grades by racial groups; and 3) repeatedly and persistently making discriminatory and disrespectful statements to specific targeted racial, national, ethnic, sexual orientation, and gender groups with which our students and colleagues identify. Her behavior has created a hostile campus environment and a hostile learning atmosphere.

## III.    Major sanctions

Based on these findings, we recommend the following major sanctions:

- Public reprimand, expressed by University leadership.
- Loss of named chair, to reflect Professor Wax's unsuitability for University and/or School honors.
- A requirement to note in her public appearances that she is not speaking for or as member of the Penn Carey Law School or the University of Pennsylvania.
- One year suspension at half pay (with benefits remaining intact).
- Loss of summer pay in perpetuity.

## IV.    Recommendations

The hearing board spent many hours considering the impact of the violations noted above. As members of the Penn community, we care about repairing this impact. The following recommendations are not a part of the sanctions and are suggested by the Board as actions to be considered by the University and Penn Carey Law's leadership as steps forward.

### a.    Professional Development

In addition, and in response to Professor Wax's request during the hearing for suggestions on how to alleviate her students' concerns about possible unequal treatment in her classes[22], we recommend that Professor Wax be required to engage in professional development in the area of

---

[22] Hearing Transcript, Day 3, pages 128-129

**Pg.26**

pedagogical practice, which will help align her teaching practice with the University's professional expectations. She clearly demonstrated teaching excellence in the past, and we think both she and her future students would benefit from this professional development.

### b. Future Participation at Penn Carey Law School

Given significant factual disputes over statements and interactions in Professor Wax's classes, we recommend that Penn Carey Law records her classes and ensure that the recordings are preserved by the Dean of Students to better facilitate resolution of any future disputes.

When feasible, we recommend that her classes are co-taught with another member of the faculty.

We recommend that Professor Wax's office be moved outside Penn Carey Law School buildings and that her classes are taught outside Penn Carey Law School buildings.

We recommend that Professor Wax not receive any committee assignments or advising roles.


Respectfully submitted,
*Members of the Hearing Board in the Just Cause Matter regarding Professor Amy Wax*

CC:
John Jackson, Jr., Provost
Crystal Nix-Hines, Charging Party Counsel
Theodore Ruger, Charging Party
David Shapiro, Respondent Party Counsel
Amy Wax, Respondent
Wendy White, Senior Vice President and General Counsel


Enclosure:
Hearing Transcripts, redacted to protect the identities of students and alumni

**Appendices**[23]

Appendix 1. Examples of inequitably targeted disrespect:

1. "I'll just come right out and say it right, that on average blacks have lower cognitive ability than whites. You know, that's just a fact. It's a fact which you can be persecuted for stating. But it is a fact."
2. "Groups have different levels of ability, demonstrated ability. Different competencies, that they, and you know, you don't just say that. Given the realities of different rates of crime, different average IQ's, people have to accept, without apology, that blacks are not going to be evenly distributed through all occupations. They're just not. And that's not a problem. That's not due to racism. That's due to these differences."
3. "I think the crime problem in this country, I'm sorry it is true, is overwhelmingly, certainly within cities, it is a black problem. It is a minority problem, okay? Overwhelmingly. I mean your chance of being, you know, a victim of gun violence by a white person in New York City, is essentially non-existent."
4. "The basic idea is that, at this juncture in African-American history shall we say, in the United States, the main problems that are holding blacks back are really problems of behavior and not of overt racism, discrimination, really what society is doing to us, but the choices people are making. And I identify the main areas of difficulty as educational under-achievement, high crime rates and family breakdown."
5. Low-income students may cause "reverse contagion"—infecting more "capable and sophisticated" students with their "delinquency and rule-breaking."
6. "I often chuckle at the ads on TV which show a black man married to a white woman in an upper-class picket-fence house….They never show blacks the way they really are: a bunch of single moms with a bunch of guys who float in and out. Kids by different men."
7. "We indulge the assumption, which I will say, we now see was overly, overly optimistic that blacks would be in the same position as whites if we had not, uh been a racist society."
8. "... I mean, there are a lot of things that blacks themselves could reform to make their lives better, not have such a high out-of-wedlock birth rate, for example. Use drugs less, you know, be more obedient to law, stop committing crimes. These are all behaviors that are within the power of the people to change. So there is a lot of room for improvement."
9. Asking whether "the spirit of liberty beat[s] in the[] breasts" of Asian people.
10. "As long as most Asians support Democrats and help to advance their positions, I think the United States is better off with fewer Asians and less Asian immigration."
11. "And this hideous monstrosity, the diversity, inclusion and equity bureaucracy, which that is filled with mediocrities. You know people who don't care about truth seeking, don't care about academic values, couldn't be scholars if their life depended on it, you know, are just kind of time-serving true believer bureaucrats ... It's welfare for the, you know, for the barely-educated upper middle class, really."
12. Speaking of University students: "And they have become these cowed, benighted sheeples. I mean, it's just unbelievable. So not only are they, you know, thoroughly intimidated, as they should be, but they are ignorant. They know nothing."

---

[23] Quotations are referenced in the Charging Party's request to form this Hearing Board.

13. "We could have admitted women, which you know, fairness requires that we open channels of opportunity to women, although I will say that, you know, the crusty old patriarchs of old, in being reluctant to do that, they were kind of on to something."

14. "So, women, on average, are more agreeable than men. Women, on average, are less knowledgeable than men. They're less intellectual than men. Now, I can actually back up all those statements with social-science research.... They know less about every single subject, except fashion."

15. "I mean, a lot of local governments, big city governments, they are not in the hands of what we would call legacy Americans. They're not in traditional hands. They are being run like third world countries, frankly, in many respects... it's a mixed bag...But I just worry that, you know, these corrupt grifters are going to take over our cities, have taken them over in part and, you know, bring us back to third world conditions...So we really have to be afraid of that and be vigilant. And of course, it's all mixed up with race. So nobody feels like they can criticize these big city governments when, for example, they're in black hands, that if they're not well run, they can't say anything negative..."

16. "I have been called a racist. I lost count of how many times I've been called a racist, and my view at this point is, you know, being a racist is an honorific. To be called a racist means you notice reality and to me that's a positive thing not a negative thing that's an occasion for praise and admiration."

17. Some cultures are "not equal in preparing people to be productive in an advanced economy," including ..... "the anti-'acting white' rap culture of inner-city blacks," and "the anti-assimilation ideas gaining ground among some Hispanic immigrants."

Appendix 2. Incidents recalled by alumni and which, for the purposes of this report, were supplied under oath:

1. Telling a black law student who wondered whether Professor Wax agreed that black people are inherently inferior to white people that "you can have two plants that grow under the same conditions, and one will just grow higher than the other."

2. Emailing a black student that "[i]f blacks really and sincerely wanted to be equal, they would make a lot of changes in their own conduct and communities."

3. Telling a student that black students do not perform as well as white students because they are less well prepared, and that they are less well prepared because of affirmative action.

4. Telling a student who was part of a larger group of students invited to her home, that "Not everyone wants to live in a quiet neighborhood. Many Hispanic people, for instance, don't seem to like that sort of thing."

5. Emailing students after a lunch gathering with them that "there is very little savings in the black community (I say this based on data)" and "Look around and see who is running the businesses in Philadelphia—west, south, north, center city. Sadly, its mostly Asians, Indians, Jewish merchants—not blacks."

6. Emphasizing loudly in class that a case witness was a black man, and then calling a black male student in class by the name of the black witness in the case.

**Pg.29**

Appendix 3. Incidents recalled by Professor Wax's former students, supplied under oath:

1. Stating in class that Mexican men are more likely to assault women and remarking such a stereotype was accurate in the same way as "Germans are punctual."
2. Commenting after a series of students with foreign-sounding names introduced themselves that one student was "finally, an American" adding, "it's a good thing, trust me."
3. Stating in class that people of color needed to stop acting entitled to remedies, to stop getting pregnant, to get better jobs, and to be more focused on reciprocity.

Page 192

1    just felt like if I did speak back, that could

2    endanger my grades potentially in my future.

3    Q. How did her in class behavior impact your

4    experience in her class and your experience as a 1L in

5    that first semester?

6    A. Sure.

7    Well, I definitely think that the best way to

8    counter any generalized belief about race,

9    specifically, is to prove it wrong.  I studied very

10   hard for her course to the point where I was not

11   sleeping sufficiently, maybe two to four hours a

12   night.  I was not eating, and it actually got to a

13   point where I was having sleep deprivation-based

14   hallucinations and dissociation.

15   Q. You mentioned that she would make these

16   statements somewhat regularly.  How did you feel each

17   time when she would kind of launch into a discussion

18   in civil procedure class about the general topic that

19   we discussed?

20   A. Sure.  It was like a slap in the face every time.

21   Q. Were you surprised that --- as a 1L is your first

22   semester in law school, were you surprised that a Penn

23   law professor would speak like this in class to

24   students?

25   A. Yes.



Page 193

1    I don't see Penn as a particularly liberal

2    institution.   I am not surprised to hear that there

3    are conservative viewpoints.   In fact, the Chicago

4    School of Economics is taught somewhat as dogma, and

5    that's perfectly fine and agreeable.   But to have

6    comments about race and about families made so

7    generally, that isn't something that I expect of any

8    professional, let alone somebody who is being held out

9    by an academic institution as an award-winning

10   professor.

11   Q. Did Professor Wax make other comments outside of

12   the Civ Pro classroom in your presence that you found

13   to be offensive or inappropriate?

14   A. We went to lunch at one point.   She would take

15   her students out to lunch as a getting-to-know you.

16   She was talking about her medical history, and she was

17   talking about working at a medical center in the

18   Bronx.   She said she left the institution when she

19   realized that she didn't care whether her patients

20   lived or died anymore.   She definitely described her

21   patients as low-income people.   It seemed to me like

22   she was talking about patients of color.

23   Q. How did that make you feel experiencing that

24   comment at lunch?

25   A. This was a getting-to-know you conversation.



1    That is not the way that I want to get to know any

2    professor.   It seemed cold-hearted, and it was not

3    something that I wanted to know about a teacher of

4    mine.

5    Q. Did you say anything?

6    A. I did not.

7    Q. Did anyone at the lunch say anything?

8    A. Not to my remembrance.

9    Q. Why didn't you say anything?

10   A. I didn't say anything.   Again, because she was in

11   a position of power and I was afraid.

12   Q. Did you speak with anyone in the administration

13   or any of your other professors about this around that

14   time?

15   A. I did.   There is a possibility that I spoke with

16   Wendell Pritchett, but I do remember specifically

17   talking with Professor William Burk-White and

18   Professor Fernando Chang-Muy.

19   Q. Okay.

20  And what did you discuss with them?

21   A. I discussed how I felt that these statements were

22   extremely problematic and hurtful to students, and

23   their essential response was, she has tenure, so there

24   is nothing that we can do about it.

25   Q. Did you speak with any of your friends or family



Page 195

1    at that time about what happened?

2    A. I did.   I spoke with some of my friends.

3    Q. These are your law school peers, your colleagues,

4    classmates?

5    A. Yes.

6    Q. What was the result of those discussions?

7    A. Sure.   People who were in their second year of

8    law school while I was in my first year of law school,

9    they told me that this was something that I should

10   expect as a student of color.   My family told me, just

11   let it roll off your back.   This is how things are in

12   the world.   Other friends who were in their first year

13   of law school said they wished I'd had another civil

14   procedure professor.

15   Q. Law students who were ahead of you in law school,

16   2L's, or you mentioned 2L's, they essentially said

17   that this was something that you should expect as a

18   black law student from Professor Wax.

19   A. Yes.

20   Q. Was it your understanding that your experiences

21   with her were particularly unique?

22   A. They were not.

23   Q. Do you believe that you were harmed by your

24   personal interactions with her in class?

25   A. I do.   I don't like saying that, but I do.   I



1  feel like it impacted my first year of law school.  I

2  feel like it impacted my confidence as somebody who

3  was going to be an attorney, and I carried that for

4  years, the assumption that I was not a good student

5  and that I couldn't possibly be a good lawyer.

6  Q. Are you aware of statements Professor Wax made

7  about the performance of black students in her class?

8  A. Yes, I am.

9  Q. What did she say to the extent that you recall?

10  A. She's been on-the-air multiple times saying

11  things like, it's very rare that black students

12  perform in the top half of the class, let alone in the

13  top quarter.  That comment, I don't know how she could

14  say something like that as our grades are blind.  Her

15  book, if you want a direct quote, it says that black

16  people lack industriousness, perseverance,

17  trustworthiness, honesty, cooperativeness,

18  agreeableness, conscientiousness and forward thinking.

19  Q. With respect to the statements about the grades,

20  as a student who was in her class, what was the impact

21  to you of those statements?

22  A. Could you clarify?

23  Q. Her statements that black students don't finish

24  in the top half of her class?  Right.  As a student

25  who had been in her class, what was the impact to you



1    of those statements?

2    A. So first of all, there are plenty of conservative

3    thinkers in the legal field.  I was worried that after

4    she had said something like this, if I'm going to go

5    and interview with people who believe her commentary,

6    they're automatically going to assume that I'm a poor

7    performer.  To have that said about students of color

8    on the whole does injure our job prospects.

9    Q. Even those external statements could create real

10   harm or in fact, did create real harm to you as a

11   student, as an alumni?

12   A. Absolutely.

13   Q. Did you ever seek a recommendation from Professor

14   Wax?

15   A. I did.

16   Q. Why?

17   A. It was not my best idea, but I had performed well

18   in her class, and I hoped that based on my

19   performance, she would recommend me for this

20   internship.

21   Q. Okay.

22   Did she recommend you for the internship?

23   A. No, she did not.  I withdrew my request.

24   Q. Why?

25   A. She asked to see my entire transcript, which is



Page 198

1    something that no other professor has done, either in

2    my graduate work or my undergraduate work.  I felt

3    that was strange.  Given my other feelings about

4    Professor Wax, I decided maybe the best thing to do

5    would be seek recommendations elsewhere.

6    Q. Was that request made in a private interaction?

7    A. Yes.

8    Q. What was her demeanor when she delivered that

9    message to you?

10   A. Again, it was quite smug.

11   Q. That similar to the demeanor that you were

12   characterizing in class when she would speak

13   disparagingly about black culture and black

14   characteristics?

15   A. Yes.

16   Q. Did your experience with Professor Wax impact

17   your mental health?

18   A. Yes.

19   Q. How?

20   A. Well, again, like I was saying, I was studying to

21   the point of my physical detriment.  Around the time I

22   started having hallucinations, I went into student

23   psychological services.  They recommended that I take

24   some time off of class, which is never a good thing,

25   because what you miss in law school is very difficult



Page 199

1    to catch up on.  So ---.

2    Q. Do you think that Professor Wax's presence

3    negatively impacts Penn Law students?

4    A. Yes, in a number of ways.

5    Students of color, of course, have to study and

6    perform well in the environment that she creates,

7    which is difficult enough.  Other students are looking

8    at her work, which, in my personal opinion, is flawed.

9    This is shaping minds of people who are going to be

10   setting legal precedent, of people who are supposed to

11   be, at some point in their career, perhaps judicial

12   decision makers.  I think this has an effect not just

13   on the students in terms of the environment that they

14   face, but on the legal profession as a whole.

15   Q. Did her conduct or does it now impact your view

16   of your law school?

17   A. Looking back at her interview with Tucker

18   Carlson, Glenn Loury, reading her book, it definitely

19   made me realize, again, I wasn't making things up.

20   This really happened.  Beyond that, I realized that I

21   needed to take another look at how I performed in law

22   school, and I found out that I had actually done

23   fairly well.  I had a B-plus average overall, and my

24   feelings of inadequacy were something that I had taken

25   with me for some time, and I could finally let go of



Page 312

1    Intellectual Property Counsel.

2        Q    Was Amy Wax your assigned Civil Procedure

3    professor in fall of 2010?

4        A    Yes, she was.

5        Q    While you were in her class, did she do

6    anything that you found to be offensive or

7    hurtful?

8        A    Yes.

9        Q    You can go on.

10        A    So in November of 2010, we were

11    discussing the case Denman v. Spain.  That's a

12    case from the 1960's.  One of the parties was an

13    African American man.  Obviously again, because

14    the case is from the 1960's, the terminology used

15    to describe him with Negro.  And I had known about

16    some of Professor Wax's beliefs prior to taking

17    her class.  And when a few of my classmates and I

18    were discussing that case the night before, I kind

19    of said in gest if she were to use that term,

20    which is very outdated term, that I would leave

21    class.  Again, not thinking that that was going to

22    happen.  But the day of class came and the case

23    was being discussed, Socratic Method, and she

24    referred to the party as a negro.



Page 313

1    Q    I'm just going to stop.  What was about

2    what she said that offended you or how she said it

3    that offended you?

4    A    I think two things.  One, it was the use

5    of the word.  Again, I understand that that was

6    what was referred to in this case, but this is

7    2010, it's not the 1960's.  No more would I expect

8    someone to call oriental if that's what the case

9    said.  But we don't use that term anymore to

10   diagnose Asians or Asian Americans.  One, I think

11   her use of the term was a bit shocking.  And also

12   just the way she said it was very distasteful,

13   kind of very smug and yeah, demeaning.  So for

14   those two reasons.

15   Q    What, if anything, did you do in

16   response?

17   A    So at first I was shocked.  Honestly, I

18   just again didn't think that that was going to

19   happen.  Certainly again, I understood some of the

20   beliefs that she had.  But we were in a Civil

21   Procedure class.  It's not necessarily a class

22   where your viewpoints on particular races or

23   ethnicities or groups of people would naturally

24   come up.  So I was shocked.  But then a couple



Page 314

1    minutes later, I gathered my stuff and I left.

2        Q    Where did you go when you left?

3        A    So I went to see Professor Allen, Anita

4    Allen who was my Torts professor, and I had her

5    the next period.  Frankly, I didn't know where to

6    go.  I was upset, kind of on the verge of tears.

7    But she was in her office, so I spoke with her

8    first.

9        Q    So I'd like to pull up an exhibit, and

10   I'm not quite sure of the next exhibit number.

11   And it's titled Today's Incident.  And it's e-mail

12   from you.  Who are the e-mail recipients here?

13       A    So everyone except Tiffany Sutherland

14   were the other six African American students in my

15   class.  Tiffany Sutherland was a 3L student and

16   she was BLSA president.

17       Q    So I'd like to scroll down and you write

18   in this e-mail, "After I left, I went and spoke to

19   Professor Allen who is the Deputy Dean.

20   Obviously, we all know that Wax has controversial

21   views and has made inappropriate comments before.

22   Allen completely sympathized with our situation.

23   She did make it a point to say that given the time

24   of the year, we shouldn't dwell too much on the



Page 315

1    issue.   To put it bluntly, she said that while our

2    white counterparts may have been offended, they

3    are going to go remain focus on studying.  We

4    can't let Wax keep us from doing the same even if

5    that is her plan."  Does that accurately reflect

6    what Professor Allen told you?

7         A    Yes.

8         Q    I'd like to go to the next exhibit.  This

9    appears to be an e-mail, an e-mail to Professor

10   Allen that you wrote on November 29th, 2010.  You

11   wrote, "After I spoke with you, I ran into Dean

12   Clinton who was at school unofficially.  He was

13   concerned given that she has made comments like

14   this in the past.  Similar to what you said, he

15   doubted that speaking with her directly would be

16   productive.  However, he did feel that the issue

17   should be addressed.  He actually encouraged me to

18   speak with you."  Who is Dean Clinton here?

19        A    So Dean Clinton was the Dean of Student

20   Affairs.  He has since retired.

21        Q    This is referencing what happened with

22   Professor Wax?

23        A    Yes.

24        Q    Scrolling down.  You then write, "Later



**Pg.42**

Page 316

1    that day, my six African American classmates and I

2    met with Kathleen Overly.  We discussed that we

3    felt the word plus the tone and the context was

4    inappropriate.  All of us were offended in

5    different ways.  Obviously, I left, but others

6    were angry and had a hard time concentrating the

7    rest of the class.  Furthermore, I know some of

8    our non-black classmates were offended as well.

9    We all agree we don't want this to get swept under

10   the rug.  Even though we know the consequences for

11   her will be slight, if any, we would be doing

12   ourselves a disservice to remain silent."  How did

13   you know that the white students were offended as

14   well?

15        A    So at least one of them, one of them came

16   up to me after, later in that day and expressed

17   her support of the fact what I did.  Also, after I

18   left, two of my other black classmates also got up

19   and left.  Obviously, I didn't know that at the

20   time because I was the first one to leave.  Then

21   the other, I guess the four of them that stayed,

22   again, as you saw in the e-mail, the class was

23   very uncomfortable.  And they felt kind of tenor

24   and the tone of the class had changed.  Not just



Page  317

1    for them, but for a lot of our classmates.

2        Q      Did you and the other blacks students who

3    were in your class meet again with Professor Allen

4    as Dean Clinton and Kathleen Overly from Student

5    Affairs had suggested?

6        A      Yes.

7        Q      What did you discuss with her this time

8    as a group?

9        A      So in one of the e-mails, the e-mail that

10   I had shared with my classmates, and actually in

11   the e-mail that Professor Allen had written to me,

12   she had suggested that we potentially put on like

13   a panel discussion on what's -- it's actually in

14   there, but what's in a word and the meaning of

15   names and connotations over time.  And she had

16   suggested a few potential people that could be on

17   the panel.

18       Q      Did you end up organizing a panel as she

19   suggested?

20       A      We did not.

21       Q      Why not?

22       A      I think part of it was just again, we

23   were first-year students, 1Ls at that point trying

24   to focus on getting through this semester.  And it



Page 318

1    would have been, honestly, would have been

2    burdensome.  And I think while I appreciated her

3    and Dean Clinton and Kathleen Overly who was I

4    think the Associate Dean of Student Affairs, we

5    appreciated their sympathy and their empathy.  But

6    it also just felt like, why do we have to do

7    something?  Why is it for us as the victims, the

8    people that had been offended to have to put on a

9    panel or something like that?

10           We were also very much aware of the panel

11   that BLSA had put on the previous year after

12   Professor Wax's book had come out, and just how

13   that had gone kind of left, I would use that word

14   or had been very controversial due to the person

15   that Professor Wax had invited.  So we just

16   weren't really sure what benefit it would be.  But

17   more importantly, it's just again, putting the

18   work on the victims to have to do something.

19       Q    Was there anything else that Professor

20   Wax did or said in class that you found to be

21   offensive?

22       A    So about a week later, one of my black

23   male classmates, there was kind of a dialogue back

24   and forth between her and him regarding he had



Page 12

1    pointed to various statements in the media, including

2    comments about Dr. Blasey Ford, Brett Kavanaugh at the

3    confirmation hearings.

4    Q. What do you want the Hearing Board to take away

5    from that statement by Dean Rodriguez?

6    A. Well, I'm very grateful to Dean Rodriguez because

7    I thought, by and large, with a few exceptions, he did

8    a great job.  And I think that this distinction is

9    important.  It is so easy to utter phrases like

10   prolific with her bigotry, but when it comes to

11   actually giving concrete examples, that's a lot

12   harder.  And in many cases, these allegations fall

13   short, and that's what Rodriguez found in a number of

14   situations.

15   Q. Professor Wax, I now want to draw your attention

16   to the testimony of Ms. ███████████████  Tell

17   us about the day you used the word Negro in discussing

18   a case.

19   A. Yes, there was --- this was a case.  I'm not sure

20   the date of it, but it was a while ago, in the good

21   old days, I guess, or the bad old days.  And the word

22   Negro was used to describe one of the witnesses.  So

23   in talking about the case, I used the language of the

24   case.  I had no idea that there was anything wrong

25   with this.  Maybe I'm just out of touch, but I



Page 13

1    generally do use the language of the cases when

2    talking about the cases.

3    Q. Did you use the word Negro in a snide and

4    derogatory tone of voice?

5    A. Certainly not.  Certainly not.  Sometimes when

6    I'm talking about cases and we're trying to get

7    through a lot of material, I have a very serious look

8    on my face because I want to get on with it.  And

9    maybe people can construe that in different ways, but

10   certainly, certainly not.  It actually is one of my

11   favorite cases.  It's a very interesting case.  So I

12   don't think I was being snide.

13   Q. Professor Wax, tell us about the student with the

14   headphones.

15   A. Yes.  I just very vaguely recall that.  A student

16   came in, tall guy, African American student.  He had

17   these massive headphones on his head.  The students

18   kept saying they were around his neck.  They were not.

19   They were on his head and covering his ears.  And I

20   was a little bit mystified as to how he could listen

21   to the class while having these earphones on.  And I

22   thought the earphones were, you know, big earphones.

23   So I tried to make a lame joke about, wow, that's

24   what I would call paraphernalia.  Maybe you should

25   take those off and you'll hear the class.  And I was





*Confidential Personnel Matter*
*Do Not Distribute*

M. Elizabeth Magill
President
The Trustees University Professor

Decision of the President
In the Matter of Professor Amy Wax
August 11, 2023

I write in my role as President of the University of Pennsylvania, pursuant to Section II.E.16 of the Faculty Handbook, subsection 4.I, to advise you of my decision on the report and recommendations of the Hearing Board convened by the Faculty Senate on the charges brought by then Dean Theodore Ruger against Professor Amy Wax on June 23, 2022.

I.

In considering the Hearing Board's report and recommendations, I am guided by the University's long-standing policy that allegations of an infraction of University behavioral standards by a faculty member are to be adjudicated by faculty peers. University policy reflects the view that, as peers, faculty members are trusted to be fair-minded judges of the behavior of their colleagues. The Board renders its decision only after following an extensive process, allowing the parties, especially the faculty member charged with an infraction, to present her views in written submissions and testimony at an in-person hearing.

Reflecting this institutional choice, the role of the President in this process is sharply limited. As a general matter, the Handbook provides that the President "shall normally accept the Hearing Board's recommendations." Section II.E.16.4.I(1). I have the authority to depart from the Board's recommendations only in "exceptional circumstances," and only to "reduce the severity of recommended sanctions" or to dismiss the charges "for failure of proof." Section II.E.16.4.I(2). If I do believe this high standard is met, I can depart from the Hearing Board's recommendations, but only after "securing the views" of the Faculty Senate Tri-Chairs. I may also request that the Board reconsider its decision, but I cannot require them to do so; the Board determines whether it will grant my request for reconsideration. Section II.E.16.4.I(3). Finally, I have the authority to remand the issue to the Hearing Board, but only where there has been a "significant defect in procedure." Section II.E.16.4.I(4). All in all, these provisions make crystal clear that my role as President is not to look with fresh eyes—or *de novo*—at the factual findings, policy interpretations, or sanctions recommendations made by the Hearing Board. On the contrary, the Hearing Board's recommendations must stand absent "exceptional circumstances" justifying reduction of the recommended sanctions or dismissal for failure of proof, reconsideration, or remand on account of a significant defect in procedure.

II.

In the charging letter, Dean Ruger sought major sanctions based on Professor Wax's alleged violation of the following standards and practices: "(i) teaching faculty must avoid exploitation, harassment, and discriminatory treatment of students and must avoid conducting themselves in a manner reasonably interpreted as creating a hostile or discriminatory classroom; (ii) teaching

faculty must evaluate each student's true merit; (iii) teaching faculty must respect the confidential nature of the relationship between professor and student; and (iv) teaching faculty must show respect for others, including faculty."

In response, a five-member Board of tenured faculty members, selected by the Faculty Senate Tri-Chairs and representing the Graduate School of Education, the Penn Carey Law School, the Perelman School of Medicine, and the School of Arts and Sciences, convened in October, 2022, to review the written charges. After considering the charges and Professor Wax's response, the Board unanimously found that there were sufficient grounds to proceed to a hearing. A hearing took place from May 1 to May 3, 2023, during which both sides offered arguments, submitted exhibits, and presented testimony from students, alumni, and faculty colleagues. Additionally, both sides presented reports from expert witnesses they engaged to address questions concerning standards of professional conduct and the scope of academic freedom. After the hearing, the parties submitted closing statements to the Board.

Following deliberation, the Board unanimously found that Professor Wax committed a major infraction of the University's behavioral standards – that is, a "flagrant disregard of the standards, rules, or mission of the University or the customs of scholarly communities." Section II.E.16.1.B.7. The Board found that Professor Wax engaged in "flagrant unprofessional conduct" that breached her responsibilities as a teacher to offer an equal opportunity to all students to learn from her. That conduct included a history of sweeping, blithe, and derogatory generalizations about groups by race, ethnicity, gender, sexual orientation, and immigration status; breaching the requirement that student grades be kept private by publicly speaking about the grades of law students by race and continuing to do so even after cautioned by the dean that it was a violation of University policy; and by, on numerous occasions in and out of the classroom and in public, making discriminatory and disparaging statements targeted at specific racial, ethnic, and other groups with which many students identify.

Based on its findings, the Board did not recommend the highest sanction available, namely, termination from her faculty position. Instead, it recommended the following sanctions: a one-year suspension at half pay, with benefits intact; the loss of a named chair and summer pay; a public reprimand; and a requirement that the respondent note in public appearances that she does not speak on behalf of the institution.

III.

A.

I have reviewed the entirety of the voluminous record in this case and given careful consideration to the respondent's objections to the Hearing Board's decision. No matter involving an alleged violation of University behavioral standards by a long-standing member of our tenured faculty is an easy one, and this case is no exception. The respondent has been an engaged member of the Penn Carey Law School community and an award-winning teacher. But, after careful review, I find no "exceptional circumstances" warranting a departure from the Board recommendations, either to reduce the severity of the recommended sanctions or to

*Confidential Personnel Matter*
*Do Not Distribute*

dismiss the charges for failure of proof (Section II.E.16.4.I(2)); nor do I find any basis to ask the Board to reconsider its decision (Section II.E.16.4.I(3)); nor is there any "significant defect in procedure" that would warrant a remand to the Board (Section II.E.16.4.I(4)).  I thus uphold the Board's recommended sanctions.

B.

As noted above, under subsection I(2), I am permitted to depart from the Hearing Board's recommendations only in exceptional circumstances, and then only to reduce the severity of recommended sanctions or to dismiss the charges for failure of proof.  In my judgment there are no exceptional circumstances in this case warranting reduction of the severity of the Board's recommended sanctions.  The proposed sanctions are well within the scope of a major sanction as defined by our policy.  For a major infraction of University behavioral standards, a faculty Hearing Board is empowered to recommend a sanction up to and including termination—that is, revocation of tenure and dismissal from the faculty.  That the Board in this case recommended lesser sanctions demonstrates a careful attempt by our faculty to calibrate the sanction in proportion to the infraction.

Moreover, there is no basis for dismissal of the charges for failure of proof.  The Board's decision rests on a considerable body of evidence that is more than sufficient to support its recommendations.  The charging party presented ample evidence to support the allegation that Professor Wax violated the University's behavioral standards, and the Board credited that evidence.  This included exhibits, affidavits, expert opinions, and in-person testimony at the hearing from Dean Ruger, several faculty colleagues, and multiple former students.  On many matters, there is no dispute about key facts that form the basis of the Board's actions, and where there were matters of factual dispute, the Board made determinations based on a clear and convincing standard.  There is, in short, no "failure of proof" in this case.  To weigh this evidence, or to assess the credibility of the witnesses myself, would be to substitute my judgment for that of the Hearing Board and that is not permitted under our policy.

C.

A request to the Board to reconsider its decision, under subsection I(3), in my view ought only to be made if I have a basis to believe that the Board failed to consider important facts or consequential arguments offered by the respondent.  There is no indication in this voluminous record that any such failure occurred.  Nearly all the objections the respondent presented to me (which I address in section IV below) are arguments that were presented directly to and evaluated by the Hearing Board itself.  The record and the Board's report demonstrate that it heard and carefully considered each argument before reaching its decision and recommendations. The respondent argues that the Board's report does not analyze the testimony of individual witnesses.  But that was not the Board's responsibility under our policy.  Rather, the Board's obligation was to set forth its "findings, conclusions, and recommendations" (subsection H(2)).  The Board met that obligation by producing a report that makes clear that it evaluated the arguments of counsel and the testimony of witnesses concerning the respondent's teaching, the issue of academic freedom, and the question of student privacy.  In sum, I do not see any ground

for concluding that the Board overlooked any evidence or consequential argument in the matter that would justify my requesting reconsideration.

D.

Finally, the record does not reflect any deviation in procedure, and no "significant defect" warranting remand to the Hearing Board.

A chronology of the process leading to Dean Ruger's charges, the hearing, and the Board's decision is attached to this written decision as Appendix A. It shows the process followed to have been scrupulously fair, generous to the respondent, and assiduous in its adherence to the procedures in the Faculty Handbook. The matter began in 2021, when Dean Ruger asked an eminent scholar and former law school dean to review complaints made by former students against Professor Wax. Professor Wax declined to participate in that process. After Dean Ruger received additional complaints, citing more recent disparaging public comments from Professor Wax, he met with Professor Wax to attempt informal resolution of the matter, as required by our policy. Only after that attempt failed did he request the formation of a Hearing Board, in June 2022. Professor Wax requested a delay in the proceedings on multiple occasions; these requests were duly considered and accommodated, and the hearing accordingly was not held until nearly eleven months after Dean Ruger submitted his charges. In the interim, Professor Wax was provided with relevant documents and more than the prescribed time to prepare her case. The hearing was held over three days, during which the charging party and the respondent were given equal time to present and cross-examine witnesses. The respondent presented twenty-one witnesses to the Board, including four faculty colleagues and nine students who testified at the hearing, plus one student whose testimony was submitted in an affidavit. The hearing generated over 700 pages of transcript. The Board received nearly seventy exhibits. After the hearing, the respondent provided statements from seven expert witnesses, a presentation summarizing their statements, and a written closing argument of twenty pages. The Board then deliberated over several weeks before submitting its report and recommendations. I commend the Board for its extraordinary efforts, and I find this procedure fully complied with the letter and spirit of the University's Faculty Handbook and the respondent's rights.

IV.

Pursuant to Penn's procedure, the respondent submitted to me a wide variety of objections to the Board's decision, including objections to the procedure followed, the Board's findings, and the Board's recommendations. I carefully considered each of these objections, as discussed below.

A.

The respondent raises three challenges to the procedure followed here: (1) the Board allegedly recommended sanctions based on "vague, novel, and undefined allegations of offenses"; (2) the University declined to tell the respondent if Hearing Board members had attended or read a public presentation by one of the charging party's witnesses; and (3) the Board declined to order Dean Ruger to produce to the respondent the grades and class standing of current and former law

*Confidential Personnel Matter*
*Do Not Distribute*

students.  None of these three claims identifies a deviation from accepted University procedure, or a "significant defect" in procedure.

First, the claim that the Board adopted a "vague, novel, and undefined" theory is unpersuasive for several reasons. This, it should be noted, is not a procedural objection to the Board's action; it is a substantive criticism of the Board's application of the relevant standards.  Even so, it is unpersuasive.  The requirements that faculty behave professionally and treat students in a fair and non-discriminatory way are not novel—or surprising—behavioral standards.  And the basis for the Board's findings and recommendations is not vague or undefined.  The record before the Board and its decision are replete with specific examples of the behavior the Board found flagrantly unprofessional that created an unequal learning environment for students.

This argument also misunderstands the role of our faculty in a University sanctions proceeding. A core protection of faculty rights in our tenure system that we assign to faculty peers the primary responsibility for determining whether there has been a major infraction of behavioral standards and, if so, whether forfeiture of tenure or some other major sanction is appropriate.  In a case like this, where the matter is contested, the Hearing Board's job was to determine the boundary between acceptable conduct by a faculty member and flagrantly unprofessional conduct creating a hostile and unequal learning environment.  I find no exceptional circumstances or procedural error that would warrant setting their judgment aside, and I would be usurping the role assigned to our faculty under our policy if I did so.

The second procedural objection also falls short of a significant defect in procedure.  The Board was not required to disclose whether any of its members had previously attended a public presentation, open to all faculty and members of the University community, given by one of the charging party's witnesses.  Such an encounter is commonplace in the academy and does not bear on a Board member's fitness under our policy or suggest an appearance or actual conflict for the Board member.

Third, the decision not to disclose to the respondent and her counsel the private academic records of our law students was not a procedural error because it was entirely appropriate.  Such records are confidential, and the issue before the Board did not concern academic performance, but rather whether the respondent violated behavioral standards by repeatedly and publicly characterizing the performance of a select and potentially identifiable group of students, as reflected in the Board's second finding.

B.

The respondent additionally objects to the charges and the Board's recommended sanctions because, the respondent claims, the evidence demonstrated that she is "an outstanding teacher and scholar."  This objection, contrary to our process, asks me to re-weigh the evidence presented to the Board.  It also misses the mark for another reason.  Professor Wax has indeed been recognized in the past for her teaching excellence, and multiple former students testified at the hearing on her behalf as to the quality of her teaching.  Nevertheless, the Board's findings are not in tension with this testimony.  The Board found that Professor Wax violated her duty to

*Confidential Personnel Matter*
*Do Not Distribute*

"teach our students according to the *highest professional standards*, and to do so *equitably*" (emphasis in original); moreover, "she has failed to effectively teach all our students," prompting the Board to find that "[v]arious groups of students . . . are not only harmed but also wronged. . . . These students have a justified expectation of equitable, respectful treatment . . ."  In short, the Board found that notwithstanding the evidence that Professor Wax's teaching has been of benefit to some students, her conduct harmed others equally entitled to an education of the highest standard.

C.

The respondent also argues that the Board's recommendations should be rejected because they would punish her for extramural statements "protected by core principles of academic freedom." The respondent separately asserts that many of her comments regarding group differences are part of social scientific academic debates, and therefore protected by academic freedom.  These arguments deserve special attention given the importance of the value they invoke.  Article 11 of the Statutes of the University of Pennsylvania provides that "[t]he University recognizes the importance of a system of tenure for faculty as the preeminent means of fostering and protecting academic freedom in teaching and scholarly inquiry."  Similarly, the Guidelines on Open Expression, appearing in the Handbook as section V.A., state: "The University of Pennsylvania, as a community of scholars, affirms, supports and cherishes the concepts of freedom of thought, inquiry, speech, and lawful assembly."  As President, I embrace these principles.  They are essential to the vigorous pursuit of the University's missions of research, scholarship, and teaching.

Faculty members rightly enjoy broad academic freedom in their scholarly inquiry and in their teaching.  This means they are free to pursue in their scholarship and their teaching a wide range of ideas, including those that are the subject of great debate and disagreement.  Faculty members also have responsibilities.  As teachers, they have responsibilities to their students.  Students can and should expect that their teachers will evaluate them fairly, not as a member of an identifiable group, but on their individual merit.  The corollary for the teacher is that they must conduct themselves in a manner that conveys a willingness to assess all students fairly, on their own merits.

The Board found that Professor Wax failed in this responsibility to students, engaging in what it determined was flagrantly unprofessional behavior that created an unequal learning environment in three distinct ways: (1) Professor Wax's sweeping, blithe, and derogatory generalizations about groups by race, ethnicity, gender, sexual orientation, and immigration status; (2) her repeated breaches of the confidentiality of student grades; and (3) her repeated and persistent discriminatory and disrespectful statements regarding groups based on race, ethnicity, or other identity inside the classroom, in the law school setting, and in public.  Under our policy, it was the Board's responsibility to weigh all of the evidence and determine whether Professor Wax crossed the line into conduct "involving flagrant disregard of the standards, rules, or mission of the University" that created an unequal learning environment for students.  I find no exceptional circumstances warranting a departure from the Board's determinations, and Professor Wax's conduct would make many students reasonably wonder whether they could be fairly educated

*Confidential Personnel Matter*
*Do Not Distribute*

and evaluated by her. Academic freedom is and should be very broad, but it does not include the right to engage in flagrantly unprofessional conduct that creates an unequal educational environment for students.

D.

The respondent makes two other objections that are similarly unpersuasive. She argues that "the evidence does not support the conclusion that respondent failed to treat all students with 'equitable due respect.'" This is a challenge to the core of the Board's report, and it is against the weight of the evidence the Board found credible. The Board's judgment was that Professor Wax has a "history of disrespectful and dismissive treatment of various groups" that "demonstrates a pattern of flagrant, even escalating disregard for University expectations and professional norms." This objection, contrary to our policies, asks me to re-weigh the evidence before the Board.

Finally, the respondent argues that she did not violate privacy policies. Again, this asks me to substitute my judgment for that of the Board, which our rules do not permit. The Board found that it is a gross violation of professional norms for an instructor to speak about student outcomes in a way that could be understood to disclose the academic standing of one or more members of an identifiable group, and that the respondent did just that. The Board's finding of a violation in this regard is well-supported by the evidence.

V.

In reviewing the proceeding in its totality, it is evident to me that the Board gave Professor Wax ample opportunity to make her case, carefully considered all of her arguments, including on the critical point about academic freedom, and relied on a well-developed factual record in reaching its conclusions. Mindful of the limit of my authority as established by our policy – that I shall "normally accept" the judgment of a faculty Hearing Board both with respect to our behavioral standards as well as when the conduct of a faculty member constitutes a flagrant disregard of those standards – I accept the Board's recommendation of major sanctions as set forth in section III of its report. This decision, subject to the right of appeal set forth in section II.E.16, subsection 4.J, is final within the University.

In closing, I wish to thank the Board members, as well as the Faculty Senate Tri-Chairs and their staff, for their service to the institution in this important matter.

M. Elizabeth Magill, President
Trustees University Professor and Professor of Law

8·11-23
Date

*Confidential Personnel Matter*
*Do Not Distribute*

cc:       Hearing Board
           Professor Amy Wax
           Former Dean and Professor Theodore Ruger
           Provost John L. Jackson, Jr.
           Dean Sophia Z. Lee
           Crystal Nix-Hines, Charging Party Counsel
           David Shapiro, Respondent Counsel
           Wendy White, Senior Vice President and General Counsel
           Sean Burke, Associate General Counsel

Enclosed:   Appendix A (procedural appendix)

*Confidential Personnel Matter*
*Do Not Distribute*

Appendix A
August 11, 2023
Procedures Followed in Compliance with the Faculty Handbook

1. April 27, 2021 – Complaint is filed against Professor Wax by a group of Penn Law alumni alleging that Professor Wax has made derogatory remarks inside and outside the classroom resulting in harm to students.

2. June 3, 2021 – Dean Ruger contacts Professor Daniel B. Rodriguez, former Dean of Northwestern University Pritzker School of Law, asking him to investigate the allegations.

3. August 2021 – Professor Rodriguez accepts the assignment; he speaks with twenty-six Penn Law alumni and reviews available documentation to evaluate the allegations.  Professor Wax declines to participate in the process.  In his report, dated August 3, 2021, Professor Rodriguez does not uncover evidence of discrimination against any individual student, but does conclude that "Professor Wax has made a number of comments in class and a few outside of class which could reasonably be viewed as derogatory and harmful."

4. September 10, September 29, and October 4, 2021 – Dean Ruger consults with three tenured members of the University faculty to decide whether to invoke procedures for major infractions, impose minor sanctions directly, or discontinue the matter.

5. January 2022 – Dean Ruger receives additional complaints from students and alumni citing Professor Wax's additional public comments, including the statement that America would be "better off with fewer Asians and less Asian immigration."

6. March 2, 2022 – Dean Ruger provides Professor Wax with a written description of charges, including a summary of the negative impact her comments had on the Penn community.

7. April 2022 – Professor Wax appears on *Tucker Carlson Today* asserting that "Blacks" and other "non-Western groups" harbor "resentment, shame and envy" against Western people for their "outsized achievements and contributions even though, on some level, their country is a shithole."

8. May 11, 2022 – Dean Ruger meets with Professor Wax to afford her the opportunity for an informal resolution of the matter, in accordance with Section II.E.16.2.A of the Faculty Handbook.

9. June 23, 2022 – Dean Ruger, as Charging Party, requests that the Chair of the Faculty Senate convene a Hearing Board, in accordance with Section II.E.16 of the Faculty Handbook, and submits a written statement of the grounds for complaint.

**Pg.56**

*Confidential Personnel Matter*
*Do Not Distribute*

10. June 24, 2022 – Notice of Hearing Board composition is sent to Charging Party Dean Ruger and Respondent Professor Amy Wax, with an option to disqualify members, giving a deadline of July 5.

11. June 24, 2022 – Respondent replies to Dean Ruger indicating that she will be away with family and then undergoing treatment for a medical condition in July and August and asks for more time to respond.

12. June 30, 2022 – Hearing Board extends response deadline to July 12.

13. July 11, 2022 – Respondent replies with a physician's note requesting a six-month delay of proceedings.

14. July 15, 2022 – Deadline for Respondent extended to July 22, asking only that Respondent indicate whether she wishes to seek to disqualify any proposed Hearing Board members.

15. July 20, 2022 – Letter from Respondent's counsel, David Shapiro of Shapiro Litigation Group, arguing that the timetable for response violates the ADA and including eight requests for background information on the Hearing Board members, including a current CV and list of publications for each, as well as a demand that the University search Board members' University and personal emails and text messages for references to Professor Wax and/or a presentation given to the Faculty Senate by Professor Anita Allen, and a demand that the University produce all documents relating to any other disciplinary proceeding in which any Board member may have participated.

16. July 28, 2022 – Second notice of Board composition is sent by the Hearing Board to the parties.

17. July 29, 2022 – Sean Burke, as counsel for the University and on behalf of the Faculty Senate, replies to Mr. Shapiro's July 20 letter. Mr. Burke states that the Senate has granted an extension of time to object to proposed Hearing Board members. Mr. Burke also states that if Professor Wax were on a medical leave from the faculty (which she had not requested), the proceeding would be postponed for the duration of the leave, and that the Faculty Senate and Hearing Board "will be willing to make accommodations concerning the timing and format of the proceeding, including prehearing procedures." Finally, Mr. Burke communicates the Hearing Board's determination that sufficient information about the members of the Board is publicly available and for that reason the Board has denied Mr. Shapiro's July 20 requests for information about the Board members.

18. August 31, 2022 – Mr. Shapiro, files a memorandum with the Hearing Board seeking to postpone the proceedings due to Professor Wax's health issues; dismiss the charges; disqualify Dean Ruger; and retain a neutral third party to determine pre-hearing issues. Additionally, Mr. Shapiro and Professor Wax argue that "Penn Law must provide Prof. Wax with statistics, facts, evidence, and information about the performance of Black students at the Law School. This is

best done via a forensic analysis by an independent expert, chosen by both parties and paid for by Penn." Professor Wax also seeks to disqualify all members of the proposed Hearing Board.

19. September 13, 2022 – Faculty Senate Chair Vivian Gadsden sends a memo to the Hearing Board members finalizing their membership and requesting they proceed with their work.

20. October 11, 2022 – Hearing Board meeting is held (in-person) to determine whether any member should recuse themselves, per Section II.E.16.4.B. They conclude no recusal is warranted.

21. October 18, 2022 – Pursuant to Section II.E.16.4.C(1) of the Faculty Handbook (which requires the Hearing Board to meet to determine whether to proceed to a hearing, and permits the Board to solicit written and/or oral argument from the charging party on the question), the Hearing Board writes to Dean Ruger, inviting him to the Board's October 25, 2022, meeting to present oral argument on whether the Hearing Board should proceed to schedule a hearing on the charges.

22. October 25, 2022 – Hearing Board meets (virtually) with Charging Party and asks Charging Party to respond to the August 31, 2022, memorandum from Respondent.

23. October 27, 2022 – Hearing Board sends letters to Charging Party and Respondent notifying them that the Board has determined that the charges are sufficient to proceed to consider a major sanction and offering Respondent an opportunity for a hearing.

24. November 8, 2022 – Crystal Nix-Hines of Quinn Emanuel Urquhart & Sullivan, LLP, counsel for the Charging Party, responds to the August 31 memo to the Hearing Board from Respondent's counsel, David Shapiro.

25. November 16, 2022 – Respondent requests a medical-related pause in all the proceedings until "the beginning of the January 2023 semester."

26. November 21, 2022 – Hearing Board meets (virtually) to determine whether to delay proceedings and sends a letter to Respondent extending to January 17, 2023, her deadline by which to state whether she is requesting a hearing as provided for in the Faculty Handbook.

27. January 16, 2023 – Mr. Shapiro submits a memorandum to the Hearing Board renewing his arguments from August 2022 that the charges are "defective," that the Charging Party is "biased," and that the Board "will never appear to be impartial"; Respondent further argues that the matter should be suspended pending review by the Faculty Grievance Commission.

28. January 24, 2023 – Hearing Board meets (virtually) to discuss process.

29. February 2, 2023 – Charging Party responds to Respondent's memo of January 16 arguing that the Hearing Board is the appropriate forum to resolve the matter and seeking a hearing date during the first week of May 2023.

*Confidential Personnel Matter*
*Do Not Distribute*

30. February 16, 2023 – In a letter to the Respondent, the Hearing Board declines to suspend the proceedings indefinitely and declines to hold a preliminary hearing as requested. The Board further states that it will "provide reasonable accommodation throughout the remainder of the process, including in the scheduling and conduct of the hearing."

31. February 23, 2023 – Hearing Board notifies parties of the hearing, initially scheduled for two days (May 1-2), and further notes that it has not been notified whether Respondent will participate in the hearing.

32. March 9, 2023 – Respondent withdraws grievance and requests meeting with Vice Provost for Faculty, which occurs on March 21, 2023.

33. March 29, 2023 – Respondent affirms participation in hearing but states that a hearing might not be practicable due to commitments that will take Professor Wax out of the country in May, being overseas for the last part of June, and "prior commitments which will keep her abroad for much of July and away for much of August."

34. March 29, 2023 – Hearing Board meets to hold internal discussion regarding the conduct of the hearing, including scheduling and the deadlines for the parties' pre-hearing submissions.

35. March 31, 2023 – Hearing Board sends letter to parties reiterating planned May 1-2 dates and outlining format.

36. April 2, 2023 – Mr. Shapiro, counsel for the Respondent, objects to the deadlines, the proposal to redact students' names from the transcript, and the May 2 date for the hearing.

37. April 3, 2023 – Hearing Board declines to change the dates and sets a deadline of April 17 for Respondent to submit materials.

38. April 3, 2023 – Ms. Nix-Hines, counsel for the Charging Party, submits documentation for the hearing to the Hearing Board and Respondent.

39. April 4, 2023 – Mr. Shapiro reiterates his objection to the hearing dates.

40. April 10, 2023 – Ms. Nix-Hines requests clarification on hearing procedure and dates.

41. April 17, 2023 – Hearing Board schedules hearing for a third day (May 3).

42. April 17, 2023 – Respondent reiterates objections to hearing dates and again seeks a pre-hearing conference.

43. April 17, 2023 – Respondent submits materials for the hearing to the Hearing Board.

44. April 24, 2023 – Hearing Board meets to discuss process and notifies both parties that the hearing dates will be May 1-3. It further sets forth details of the hearing process.

45. May 1-3, 2023 – Hearing is held. Respondent is advised that she may take whatever breaks she needs to accommodate her health condition. Respondent participates fully in the three-day

*Confidential Personnel Matter*
*Do Not Distribute*

hearing, including testifying, making a statement for the record, and examining witnesses. At the hearing, both parties are represented by counsel, present live testimony, are given the opportunity to cross-examine witnesses, submit declarations and expert reports, and provide other documentation in support of their positions.

46. May 5, 2023 – Both parties submit post-hearing presentations to the Hearing Board.

47. May 8, 2023 – Hearing Board meets (in person) to deliberate.

48. May 10, 2023 – Hearing Board sends request to counsel for Respondent, David Shapiro, requesting course syllabi for Professor Wax's classes.

49. May 16, 2023 – Course syllabi are received by Hearing Board.

50. May 17, 2023 – Hearing Board receives transcripts of Hearing Day 1 and Hearing Day 2.

51. May 18, 2023 – Hearing Board meets (in person) to conduct further deliberations.

52. Between May 18 and June 21, 2023 – Hearing Board continues deliberations and prepares report.

53. May 22, 2023 – Charging Party sends letter to Hearing Board reacting to contents of course syllabi.

54. May 23, 2023 – Transcript of Hearing Day 3 is received by the Hearing Board.

55. May 26, 2023 – Respondent replies to Charging Party's letter of May 22 concerning the course syllabi.

56. June 3, 2023 – Charging Party replies to May 26 letter from Respondent concerning the course syllabi.

57. June 12, 2023 – Respondent replies to Charging Party's June 3 letter concerning the course syllabi.

58. June 21, 2023 – Hearing Board submits report to President, copying the Charging Party and the Respondent, and reminds parties of confidentiality expectations. The report provides that the Hearing Board has determined that the Respondent is responsible for a major infraction of University behavioral standards, warranting major sanctions, short of tenure revocation.

59. June 25, 2023 – David Shapiro, counsel for the Respondent, writes to President Magill that objections will be submitted by mid-August.

60. June 27, 2023 – The President's Office responds by setting a deadline of July 14, 2023, for objections to be submitted.

61. June 29, 2023 – Mr. Shapiro requests a deadline of August 9, 2023.

62. June 30, 2023 – The President's Office extends the deadline for objections to July 19, 2023.

**Pg.60**

*Confidential Personnel Matter*
*Do Not Distribute*

63. July 18, 2023 – Mr. Shapiro requests a medical-related deadline extension to July 24, and the President's Office agrees.  President's Office further provides the Charging Party with the opportunity to respond by July 28, 2023.

64. July 24, 2023 – Respondent's objections are submitted to President Magill.

65. July 28, 2023 – Charging Party's response to the objections is submitted to the President.

66. August 11, 2023 – President Magill provides the parties with her decision on the report of the Hearing Board and the recommended sanctions.

May 29, 2024

J. Larry Jameson, MD, PhD
Interim President
University of Pennsylvania
1 College Hall, Room 100
Philadelphia, PA  19104

Dear Interim President Jameson:

The Senate Committee on Academic Freedom and Responsibility ("SCAFR") hereby submits its Report in the Matter of Professor Amy L. Wax.

After careful considerations, the Committee has found no significant defect in procedure that would require a remand to the Hearing Board.  Our report appears below:

On September 29, 2023, Respondent, Professor Amy L. Wax, filed a Written Statement of Appeal ("the Appeal") from the Decision of the President of the University of Pennsylvania ("the President") issued on August 11, 2023, to accept the Report of the Hearing Board convened in this matter and issued on June 21, 2023 ("the Hearing Board Report"). The Appeal was filed with the Senate Committee on Academic Freedom and Responsibility ("SCAFR"), which is charged, pursuant to Section II.E.16.4.J. of the Faculty Handbook, with the review of all documents forwarded to it by the President and the Respondent's Written Statement of Appeal. In addition to the Appeal, SCAFR also received, reviewed, and considered a letter dated October 9, 2023, from Respondent's counsel, which raised an additional issue which Respondent believed should be considered as part of her Appeal.

SCAFR's responsibility under the rules proscribed by the Faculty Handbook is limited: its duty is to determine whether there has been "a significant defect in procedure," in which case SCAFR is required to remand the matter to the Hearing Board for further proceedings pursuant to Section II.E.16.I.4.

SCAFR's review occurs after, but is separate from, the President's review of any appeal. In this instance, the President considered the matter pursuant to the standard set forth in Section II.E.16.I.4. of the Handbook and found no "exceptional circumstances" warranting a departure from the Hearing Board's recommendation. Faced with the President's decision to accept the Hearing Board's Report, the Respondent's Appeal to SCAFR followed.

To assist SCAFR, the Committee retained outside independent counsel. The work of the Committee and the advice of counsel were not shared with the University's Office of General Counsel.

In undertaking its work in this matter, the Committee adhered to the limited role set forth for it in the Faculty Handbook. Under the Committee's interpretation of the language in the Handbook, SCAFR's role was not to conduct a *de novo* review of the matter. Ambiguities, if any, in the record below were to be resolved in favor of the Hearing Board's Report. Deference was accorded to the Hearing Board's decisions about how it weighed the evidence before it and the value and credibility of all witness testimony. Phrased differently, SCAFR did not reach its own conclusion on the substance of the matter (that is, whether the Charging Party met its burden of proof of establishing "just cause" for imposition of a major sanction). Under the Handbook, that substantive determination rests with the Hearing Board as does the determination of which sanctions were warranted in this case. The Committee did, however, make its own, independent judgment about whether the required procedures were followed and whether any potential defects in procedure rose to the level of "significant." In doing so, SCAFR reviewed all relevant Faculty Handbook language, the record below, all the filed submissions, and the October 9, 2023, letter from Respondent's counsel. The Committee considered each of the Respondent's allegations of procedural defect, and the Committee also searched the record for other potential procedural defects.

After careful consideration and thoughtful discussion, the Committee found no significant procedural defect. The Committee hereby shares its decision with the President.

Respectfully submitted,
*The Faculty Senate Committee on Academic Freedom and Responsibility*

CC:
Sophia Z. Lee, Dean, Penn Carey Law School, as the Charging Party
Amy L. Wax, Respondent
Crystal Nix-Hines, Counsel for the Charging Party
David J. Shapiro, Counsel for the Respondent
John L. Jackson, Jr., Provost
Wendy S. White, Senior Vice President and General Counsel



The Provost

September 23, 2024

Professor Amy Wax
Penn Carey Law School
3501 Sansom St.
Philadelphia, PA 19104

Dear Professor Wax:

I write in connection with the decision of the Faculty Senate Hearing Board rendered in accordance with the University of Pennsylvania Procedure Governing Sanctions Taken Against Members of the Faculty (section II.E.16 of the Handbook for Faculty and Academic Administrators) on the charges brought against you by former Dean Theodore Ruger. As you know, following a three-day hearing held in May 2023, the faculty Hearing Board concluded that you engaged in "flagrant unprofessional conduct" that breached your responsibilities as a teacher to offer an equal opportunity to all students to learn from you. That conduct included a history of making sweeping and derogatory generalizations about groups by race, ethnicity, gender, sexual orientation, and immigration status; breaching the requirement that student grades be kept private by publicly speaking about the grades of law students by race and continuing to do so even after cautioned by the dean that it was a violation of University policy; and, on numerous occasions in and out of the classroom and in public, making discriminatory and disparaging statements targeting specific racial, ethnic, and other groups with which many students identify.

The Board recommended sanctions including a one-year suspension from the University at half pay; the loss of your named chair; the loss of summer pay in perpetuity; the requirement that you note in public appearances that you speak for yourself alone and not as a University or Penn Carey Law School faculty member; and a public reprimand.

Under our policy, former President M. Elizabeth Magill reviewed the Board's recommendations. The Handbook provides that the President "may depart from the Hearing Board's recommendations only in exceptional circumstances, and only to reduce the severity of recommended sanctions or to dismiss the charges for failure of proof" (Section II.E.16.4.I.2). As she found no exceptional circumstances warranting departure from the Board's recommendations, nor any ground to return the case to the Board for further review, President Magill accepted the Board's recommendations. You subsequently appealed the matter to the Faculty Senate Committee on Academic Freedom and Responsibility, which found no procedural defect warranting remand to the Hearing Board.

Professor Amy Wax
-Page 2-

Interim President J. Larry Jameson confirmed and is implementing the final decision. The matter is now concluded, so in accordance with the recommendations of the Hearing Board, I am issuing to you this public letter of reprimand.

Academic freedom is and should be very broad. Teachers, however, must conduct themselves in a manner that conveys a willingness to assess all students fairly. They may not engage in unprofessional conduct that creates an unequal educational environment. The Board has determined that your conduct failed to meet these expectations, leaving many students understandably concerned that you cannot and would not be an impartial judge of their academic performance.

It is imperative that you conduct yourself in a professional manner in your interactions with faculty colleagues, students, and staff. This includes refraining from flagrantly unprofessional and targeted disparagement of any individual or group in the University community. These directives will remain in effect for so long as you are a member of the University's standing faculty.

Sincerely,

John L. Jackson, Jr.
Provost

almanac.upenn.edu /articles/final-determination-of-complaint-against-professor-amy-wax

# Final Determination of Complaint Against Professor Amy Wax

9-11 minutes

### Final Determination of Complaint Against Professor Amy Wax

### From the Interim President

The University of Pennsylvania's Handbook for Faculty and Academic Administrators, in the *Procedure Governing Sanctions Taken Against Members of the Faculty*, provides that at the conclusion of a proceeding resulting in the imposition of a major sanction against a faculty member, the University President shall publish in *Almanac* a statement describing the case and its disposition.

The case involving charges brought against Penn Carey Law Professor Amy Wax, initiated during the tenure of President Emerita Gutmann, has now concluded, following a review of Professor Wax's appeal by the Senate Committee on Academic Freedom and Responsibility (SCAFR). Under the provisions of the Handbook for Faculty and Academic Administrators, the SCAFR was charged with determining whether there was a significant defect in procedure for this case. The SCAFR has since determined there has not been any significant defect in procedure, thereby concluding this matter.

For the benefit of the University community's understanding of the matter, I have elected to publish in full the decision by then-President M. Elizabeth Magill to accept the recommendations of a faculty hearing board, which found Professor Wax responsible for major infractions of University behavioral standards and recommended the imposition of major sanctions, along with a timeline of the case appended to President Magill's decision. As Interim President, I am confirming and implementing this final decision.

—*J. Larry Jameson, Interim President*

### From the Provost

*As noted below, in the matter involving Professor Amy Wax, the Faculty Hearing Board recommended a public reprimand. That reprimand is included here for publication. The suspension recommended by the Faculty Hearing Board will be imposed in the 2025-2026 academic year.*

*Published: September 24, 2024*

*Dear Professor Wax:*

chrome-extension://ecabifbgmdmgdllomnfinbmaellmclnh/data/reader/index.html?id=500054313&url=https%3A%2F%2Falmanac.upenn.edu%2Farticles%2Ffinal-det...        1/4

I write in connection with the decision of the Faculty Senate Hearing Board rendered in accordance with the University of Pennsylvania Procedure Governing Sanctions Taken Against Members of the Faculty (section II.E.16 of the Handbook for Faculty and Academic Administrators) on the charges brought against you by former Dean Theodore Ruger. As you know, following a three-day hearing held in May 2023, the faculty Hearing Board concluded that you engaged in "flagrant unprofessional conduct" that breached your responsibilities as a teacher to offer an equal opportunity to all students to learn from you. That conduct included a history of making sweeping and derogatory generalizations about groups by race, ethnicity, gender, sexual orientation, and immigration status; breaching the requirement that student grades be kept private by publicly speaking about the grades of law students by race and continuing to do so even after cautioned by the dean that it was a violation of University policy; and, on numerous occasions in and out of the classroom and in public, making discriminatory and disparaging statements targeting specific racial, ethnic, and other groups with which many students identify.

The Board recommended sanctions including a one-year suspension from the University at half pay; the loss of your named chair; the loss of summer pay in perpetuity; the requirement that you note in public appearances that you speak for yourself alone and not as a University or Penn Carey Law School faculty member; and a public reprimand.

Under our policy, former President M. Elizabeth Magill reviewed the Board's recommendations. The Handbook provides that the President "may depart from the Hearing Board's recommendations only in exceptional circumstances, and only to reduce the severity of recommended sanctions or to dismiss the charges for failure of proof" (Section II.E.16.4.I.2). As she found no exceptional circumstances warranting departure from the Board's recommendations, nor any ground to return the case to the Board for further review, President Magill accepted the Board's recommendations. You subsequently appealed the matter to the Faculty Senate Committee on Academic Freedom and Responsibility, which found no procedural defect warranting remand to the Hearing Board.

Interim President J. Larry Jameson confirmed and is implementing the final decision. The matter is now concluded, so in accordance with the recommendations of the Hearing Board, I am issuing to you this public letter of reprimand.

Academic freedom is and should be very broad. Teachers, however, must conduct themselves in a manner that conveys a willingness to assess all students fairly. They may not engage in unprofessional conduct that creates an unequal educational environment. The Board has determined that your conduct failed to meet these expectations, leaving many students understandably concerned that you cannot and would not be an impartial judge of their academic performance.

It is imperative that you conduct yourself in a professional manner in your interactions with faculty colleagues, students, and staff. This includes refraining from flagrantly unprofessional and targeted disparagement of any individual or group in the University

**Pg.67**

community. These directives will remain in effect for so long as you are a member of the University's standing faculty.

*Sincerely,*
*—John L. Jackson, Jr., Provost*

## Report of the Senate Committee on Academic Freedom and Responsibility

*May 29, 2024*

*Dear Interim President Jameson*:

The Senate Committee on Academic Freedom and Responsibility ("SCAFR") hereby submits its Report in the Matter of Professor Amy L. Wax.

After careful considerations, the Committee has found no significant defect in procedure that would require a remand to the Hearing Board. Our report appears below:

On September 29, 2023, Respondent, Professor Amy L. Wax, filed a Written Statement of Appeal ("the Appeal") from the Decision of the President of the University of Pennsylvania ("the President") issued on August 11, 2023, to accept the Report of the Hearing Board convened in this matter and issued on June 21, 2023 ("the Hearing Board Report"). The Appeal was filed with the Senate Committee on Academic Freedom and Responsibility ("SCAFR"), which is charged, pursuant to Section II.E.16.4.J. of the Faculty Handbook, with the review of all documents forwarded to it by the President and the Respondent's Written Statement of Appeal. In addition to the Appeal, SCAFR also received, reviewed, and considered a letter dated October 9, 2023, from Respondent's counsel, which raised an additional issue which Respondent believed should be considered as part of her Appeal.

SCAFR's responsibility under the rules proscribed by the Faculty Handbook is limited: its duty is to determine whether there has been "a significant defect in procedure," in which case SCAFR is required to remand the matter to the Hearing Board for further proceedings pursuant to Section II.E.16.I.4.

SCAFR's review occurs after, but is separate from, the President's review of any appeal. In this instance, the President considered the matter pursuant to the standard set forth in Section II.E.16.I.4. of the Handbook and found no "exceptional circumstances" warranting a departure from the Hearing Board's recommendation. Faced with the President's decision to accept the Hearing Board's Report, the Respondent's Appeal to SCAFR followed.

To assist SCAFR, the Committee retained outside independent counsel. The work of the Committee and the advice of counsel were not shared with the University's Office of General Counsel.

**Pg.68**

In undertaking its work in this matter, the Committee adhered to the limited role set forth for it in the Faculty Handbook. Under the Committee's interpretation of the language in the Handbook, <u>SCAFR's role was not to conduct a *de novo* review of the matter</u>. Ambiguities, if any, in the record below were to be resolved in favor of the Hearing Board's Report. Deference was accorded to the Hearing Board's decisions about how it weighed the evidence before it and the value and credibility of all witness testimony. Phrased differently, <u>SCAFR did not reach its own conclusion on the substance of the matter</u> (that is, whether the Charging Party met its burden of proof of establishing "just cause" for imposition of a major sanction). Under the Handbook, that substantive determination rests with the Hearing Board as does the determination of which sanctions were warranted in this case. The Committee did, however, make its own, independent judgment about whether the required procedures were followed and whether any potential defects in procedure rose to the level of "significant." In doing so, SCAFR reviewed all relevant Faculty Handbook language, the record below, all the filed submissions, and the October 9, 2023, letter from Respondent's counsel. The Committee considered each of the Respondent's allegations of procedural defect, and the Committee also searched the record for other potential procedural defects.

After careful consideration and thoughtful discussion, the Committee found no significant procedural defect. The Committee hereby shares its decision with the President.

*Respectfully submitted,*
*—The Faculty Senate Committee on Academic Freedom and Responsibility*

**Pg.69**

chrome-extension://ecabifbgmdmgdllomnfinbmaellmclnh/data/reader/index.html?id=500054313&url=https%3A%2F%2Falmanac.upenn.edu%2Farticles%2Ffinal-det…    4/4

**Report for the Senate Committee on Academic Freedom and Responsibility (SCAFR) regarding the Appeal Procedure of Amy Wax**

Jules van Binsbergen, member of SCAFR

The case before us is not about agreeing or disagreeing with Professor Amy Wax's points of view. Well-functioning universities encourage a plurality of views, even those that are upsetting to part of their student body and faculty. Further, openly disagreeing with other people's points of view is part and parcel of any well-functioning academic institution. The question of whether we like her speech (or her beliefs) is also not part of SCAFR's charge. Many people dislike her speech, and she herself has described her character as disagreeable, in public. What SCAFR is charged with is to judge whether the procedure against Professor Wax was followed appropriately. This includes the question of whether such a procedure should have been started to begin with.

The handbook states in Section II.E.16. that "*The imposition of a sanction on a faculty member of the University of Pennsylvania is a rare event. However, when situations that might lead to such an action arise, they must be handled **fairly** and expeditiously. It is essential to have a process that **both** protects the rights of faculty members and addresses the legitimate concerns of the University [emphasis added].*"

The documentation provided to SCAFR makes it clear that the procedure against Professor Wax did not appropriately protect her rights. Further, insufficient effort was made to ensure that it was handled fairly. To an independent observer, this case has similarities to a Kafka trial: a trial where it is never made explicit what exactly the crime or violation ("the professional misconduct") entails, and where the process is specifically tailored to arrive at a predetermined verdict. The procedure comes across as a poorly concealed ploy to persecute speech (all of the cited "offenses" concern speech) while pretending that it is not about speech, but about professional misconduct. Allowing this ploy to continue any further is dangerous and not in the best interest of the university, particularly in light of recent events. Penn's former president had to resign over the exact same issues that we are grappling with here. The conclusion of this report is that as a ma tter of procedure, (then) Dean Ruger should never have brought charges against Professor Wax and (then) President Magill should never have upheld the verdict. Further, in the interim process, a large number of <u>major procedural errors</u> were committed. These include (but are not limited to):

1. University administrators involved in the case making statements in (a) congressional testimony, (b) public interviews, and (c) on one of Penn's official websites on free speech, are in direct contradiction with the decision to bring a case against Professor Wax, let alone convict her and uphold that conviction. Nearly all of the stated examples of speech "misconduct" in (then) Dean Ted Ruger's complaint letter to Professor Vivian Gadsden occurred in the public square and not in the classroom. They are fully protected by first amendment principles, which Penn leadership has claimed university policy is based on.[1] As such, as a matter of procedure, these examples cannot be used to bring a charge against Professor Wax or base the verdict on.

2. The recently introduced false dichotomy between protected speech and the conduct/behavior that comes with that speech. Speech is indeed behavior, but a very particular form of behavior

---

[1] Both the Academic Freedom Alliance (AFA) and the Foundation of Individual Rights and Expression (FIRE), two independent organizations that protect academic freedom and free speech, have argued the same.

that is protected. The newly introduced standard, which separates the behavior from the speech and labels it professional (mis)conduct that is punishable, is fundamentally at odds with first amendment principles. It would imply that speech is only protected to the extent that appointed administrators deem it consistent with some subjective notion of professional conduct. That is, speech would not be protected at all. This proposed behavioral standard is such an egregious infraction of academic freedom and free speech principles inconsistent with Penn's publicly stated policies, that <u>I formally request an investigation by SCAFR into this matter as soon as possible.</u>

3. The <u>*retroactive*</u> application of this nonsensical behavioral standard to Professor Wax's <u>*past*</u> behavior. Most of the stated examples of speech "misconduct" have occurred before the new behavioral standard was introduced.

4. The inappropriate use of the "major infraction" article in the faculty handbook intended for cases like physical abuse, research misconduct, misuse of university funds, providing illegal substances to or harassing students, and plagiarism, to persecute a member of the faculty for protected speech. The "minor infraction" article was never invoked.

5. The intentional initial suppression and later misrepresentation of a report largely favorable to the accused by (then) law school Dean Professor Ted Ruger and the legal counsel of the university.

6. The selection of a hearing board that was <u>unaltered</u> despite the defendant's exercised right to suggest the exclusion of certain members because of their conflict of interest. While there is no formal obligation to honor these suggestions, any reasonable application of fairness principles (combined with the availability of many alternative candidates), should have led to honoring those requests. Jury selection is a crucial element of any fair trial. Yet, there was insufficient effort taken in this case to ensure an unbiased and balanced hearing board.

7. The inappropriate use of a guilt-by-association mechanism. Professor Ruger used the invitation of a controversial speaker to campus by Professor Wax as part of the charges against her.

8. The inappropriate conduct of Penn's legal counsel by pretending to SCAFR that they are impartial in this matter which, given their actions described in the previous points, is clearly false. Asking the same legal counsel to instruct SCAFR how its meetings should be run and what exactly is SCAFR's <u>*scope of investigation*</u>, is a blatant conflict of interest that in and of itself <u>constitutes a major procedural defect</u>. Legal counsel should have recused themselves rather than inappropriately inserting themselves into the procedure. Unsurprisingly, legal counsel has attempted to define SCAFR's scope quite narrowly, while the handbook allows SCAFR's scope to be as extensive as it chooses it to be. SCAFR is allowed to investigate and write reports on <u>*any*</u> matter it deems important, including this case. That specific language in the faculty handbook was chosen for a reason. <u>I formally request an investigation by SCAFR into legal counsel's conduct in this matter as soon as possible.</u>

The remainder of this report elaborates on these points.

**Pg.71**

**Add 1.**

In her decision, Penn's former president Professor Liz Magill writes that she has chosen to uphold the proposed conviction against Professor Wax. However, shortly after that decision she has testified in front of congress and has stated in interviews (e.g. CNN) that Penn adheres to first amendment principles which protect speech (even perceived hateful speech) as long as it does not provoke a crowd to immediately carry out violent and unlawful action. Similarly, Professor Sigal Ben-Porath, who is the co-chair of the hearing board that convicted Amy Wax, and who has reaffirmed the hearing board's conviction by ensuring in written form that this was not a close case, writes on the [Penn's FAQ website](#) when asked "What about hate speech?":

> *"Hate speech is very hard to define in a way that would allow institutions to address it. Even if we could define it, **we could not prevent or punish hate speech, because it is protected under the First Amendment. While as a private institution we are not subject to the First Amendment, the University's policies have embraced these values**. Universities can invest their efforts and resources in educating their members and in creating spaces and contexts for productive dialogue, **but they cannot legitimately punish members — students, staff, and <u>faculty</u> — who choose not to participate in those, or who profess bigoted and other hateful views. This is especially true in open and public spaces**, like Locust Walk. We can address classroom speech and behaviors that disrupt learning, but what our community members say in public spaces, including those spaces that are part of our campus, is only subject to discipline if the inflammatory speech intentionally and effectively provokes a crowd to immediately carry out violent and unlawful action. This means that if someone voices hateful views, **the <u>only</u> appropriate response** that can come from the community takes the form of disagreement, rejection, or offering alternative (or even ignoring the hateful statements, which may not deserve our attention). [emphasis added]"*

The statements by President Magill and Professor Ben-Porath are fundamentally at odds with the decisions to start a case against and to convict (or uphold the conviction of) Professor Wax. Nearly all of the stated examples of speech "misconduct" in Dean Ted Ruger's complaint letter to Professor Vivian Gadsden <u>occurred in the public square and not in the classroom</u>. This severely undermines the hearing board's conclusion that Professor Wax has mistreated students in a classroom setting.[2] Little direct evidence of that claim has been offered, and even that evidence has been disputed by Amy Wax. It is her word against that of the (former) students.[3] The inappropriate inclusion and overrepresentation of her first-amendment-protected public statements in Dean Ruger's complaint letter is testament to the weakness of the case, particularly given that her classroom behavior earned her a university-wide teaching award in 2015. More importantly, allowing these public statements to largely carry the case and use them to start the case to begin with, is a major *procedural error*. The case should have been dismissed out of hand.

To my knowledge, nobody has argued that Professor Wax's public statements have provoked a crowd to immediately carry out violent and unlawful action, her public speech should have been fully

---

[2] See also the Rodriguez report.
[3] Given the incredibly large number of students she has taught over the years, finding a few that were offended by her speech in class surely was not hard. One would hope that the existence of such students does not justify a "major infraction" procedure for our faculty. Given that she has won the Lindback award in 2015, certainly many students and colleagues who thought she was an outstanding instructor were readily available as well.

protected.[4] That leaves us with the following conundrum. Either (1) Professors Magill and Ben-Porath while claiming that they (and the university) adhere to first amendment principles in fact do not, or (2) since Professor Wax's conviction, Professors Magill and Ben-Porath have changed their mind and now believe that first amendment principles should apply while previously other considerations trumped those principles (this change of heart is not implausible given the recent turmoil at Penn resulting from the events on October 7th) or (3) Amy Wax's case was a miscarriage of justice that due to unfortunate procedural circumstances has led us to why we are here today. Each of these three possible explanations should give SCAFR pause and should be grounds for sending this case back to the interim president for reconsideration. Further, I formally request that SCAFR investigates how as an institution we ended up with this conundrum, so that it can be avoided in the future.

Another important detail in the file should give SCAFR pause. Professor Ben-Porath has reaffirmed the hearing board's conviction by ensuring in written form that Professor Wax's conviction was not a close call. This raises the question of how she and/or the committee could have reached that conclusion. Given that no precedent to the current case was provided to SCAFR despite my repeated requests, I can only conclude that this case is the first of its kind. Indeed, given that a new behavioral standard was introduced by Professor Anita Allen shortly before proceeding with this case, it begs the question what the statement made by Professor Ben-Porath exactly communicates. How can she claim that the case was not a close case when no other case exists that it can be compared to? Perhaps she means: not a close case as measured by the recently invented new behavioral standard that was then retroactively applied to Amy Wax's speech? Professor Ben-Porath's statement thus undermines the hearing board's supposedly independent verdict. Given that this was an unprecedented action taken against a faculty member based on speech "violations" alone, it should have been an *incredibly hard* case to decide. That is indeed what (then) President Magill writes in her letter. SCAFR should ask Professor Ben-Porath for clarification in this matter.

**Add 2.**

The hearing board, in its verdict, is attempting to have it both ways. On the one hand, they would like to acknowledge that Professor Wax's speech is protected. On the other hand, they dislike her speech so much that they want to sanction it. As no actual major misconduct, as defined in the handbook, is available to base a sanction on, the hearing board is left with only one other option: the introduction of a dichotomy between speech (that is fully protected) and the conduct that comes with that speech that they can then sanction. This dichotomy is false and baseless. Not only is it in direct contradiction with first amendment principles (which, as argued before, the university and its administrators claim to uphold), but it poses a major risk to all faculty at the university that have unpopular opinions. Who is to decide in future cases which unpopular speech is professional misconduct and which speech is not? Recent events on campus have made it painfully clear how difficult such calls will be.

The hearing board is attempting to give some credence to a professional misconduct charge by arguing that Professor Wax has professed outdated theories and/or scientific inaccuracies. Once again, this point of view is misguided. First amendment principles explicitly give people the right to profess opinions that turn out to be incorrect. The only way to challenge and test orthodoxies and solidify

---

[4] This has also been pointed out by the Foundation for Individual Rights and Expression (FIRE) as well as the Academic Freedom Alliance (AFA) who have both indicated that all the speech Amy Wax is convicted for is fully protected by first amendment rights and common standards of academic freedom.

scientific knowledge is to sometimes (or even often) be wrong. <u>The whole point of academic freedom and speech protections is that faculty are allowed to challenge orthodoxies that are deemed scientifically accurate at that time. Faculty are also allowed to try and revive old theories that have been deemed inaccurate.</u> It would not be the first time that old theories are revived and are reintroduced as valid scientific arguments. None of this in any way implies that Professor Wax's theories are correct. It only implies that she is allowed to pose them. The hearing board fails to acknowledge that any well-functioning academic institution explicitly embraces the insight that no party possesses the moral authority to monopolize the truth or censor opponents, not even the esteemed members of the hearing board. Incorrect hypotheses are rejected only by argument and persuasion, logic and evidence, not suppression, sanctions or ad-hominem attacks.

**Add 3.**

Independently of whether one believes the newly proposed behavioral standard should be applied going forward, certainly it is inconsistent with fairness principles to apply them retroactively. When Amy Wax received tenure at the University of Pennsylvania, none of these standards were in place. In fact, several of the testimonies that were given referred to speech that occurred over a decade ago. Related to this point, there are important asynchronicities in the file. The charging party seems to argue that in the past she was an outstanding teacher (as is evident from her 2015 University-wide teaching award) and that the issues raised are recent. This undermines the severity of the testimonies in the file that refer to speech "violations" that occurred long before the granting of that teaching award.

**Add 4.**

The Academic Freedom Alliance writes in its letter to the charging party: "*Professor Wax's personal opinions do not exhibit "a 'flagrant disregard of the standards, rules, or mission of the University or the customs of scholarly communities' that might give rise to disciplinary action under the Faculty Handbook, and the list of major infractions provided in the Handbook in no way resemble the actions at issue here.*" The key question indeed is why Dean Ruger has decided to immediately move to a major infraction charge when the examples listed are indeed far removed from the unpleasant speech that professor Wax is accused of. Was a minor infraction procedure ever under consideration? The potentially inappropriate use of the major infraction article can have material implications. After all, the handbook states that "*the bringing of charges of major or minor infractions of University standards against a member of the University community, knowing these charges to be false or recklessly indifferent to their truth or falsity*" does itself constitute a major infraction. <u>I formally request that SCAFR investigates this matter.</u>

**Add 5.**

The documents that were shared with SCAFR contain a detailed and nuanced report by the former Dean of the law school of Northwestern University, Professor Daniel Rodriguez. From what I understand it was Penn who commissioned this report. From e-mail communication I have had with Professor Rodriguez it has come to my attention that he was instructed to only share the report with (then) Dean Ruger and Wendy White (the legal counsel of the university) and not share it with anybody else, including Professor Wax and her legal counsel. Only later was this report released to the larger public (presumably through a leak). The strategic use of information in this manner by the university and its legal representatives when somebody's livelihood and reputation are at stake are in my opinion not consistent with the handbook's prescription of a fair proceeding. Professor Rodriguez has indicated

in e-mail communication with me that he had his own thoughts about the request not to share the report with Professor Wax, but that he did what he was told. He also indicated that he was disappointed with Dean Ruger referring in public statements to parts of the report out of context. This behavior on the part of the university and its representatives is of course disappointing, and does not give credence to the process. It, in fact, provides evidence of declining governance standards at Penn. <u>SCAFR should investigate who decided to withhold this important evidence from the accused.</u>

**Add 6.**

In any proceeding, the selection of jury members is an incredibly important step that if done incorrectly can severely undermine a fair trial. The handbook states that the charging party and the respondent each shall be given the opportunity to move to disqualify for prejudice any potential member of the Hearing Board designated by the Chair of the Faculty Senate. Professor Wax was concerned about the potential conflict of interest of those hearing board members who attended Professor Anita Allen's presentation that outlined the new behavioral standard mentioned above. Given the topic and timing of this presentation, it is conceivable that this presentation was specifically targeted to provide tools to get a conviction in Professor Wax's case. As such, the request to exclude from the hearing board the self-selected group of faculty that chose to attend that talk is reasonable. Given that the vast majority of faculty members did not attend that talk, composing an impartial hearing board that satisfied Professor Wax's request would have been easy to achieve.

**Add 7.**

Inviting others to speak in one's class (or anywhere elsewhere for that matter) in no way implies the endorsement of their views. More importantly, exposing students to controversial views is an important part of a university education. If we believe that we have properly educated our students in critically analyzing all statements and arguments presented to them by professors, classmates and speakers, there should be no issue with confronting them with controversial claims. In fact, the only way to teach them such critical thinking skills is to confront them with such claims. This seems particularly important for law students, most of whom will be confronted with controversial opinions in their careers. Regardless, including the invitation of a controversial speaker as part of a major infraction charge is highly inappropriate.

**Conclusion**

As outlined in this report, SCAFR should be aware of many serious procedural flaws in the case of Professor Amy Wax. These flaws are so severe that absent an immediate dismissal of the case, it will cause long-term harm to the university and its reputation. There is a very large chance that these procedural flaws will become public in the inevitable lawsuit that will follow if SCAFR would uphold the hearing board's decision. Given the university's recent stance against antisemitism, a severely unjust procedure against a Jewish female faculty member, of all things over free speech issues, is the last thing the university's administration should want to continue. SCAFR should recommend to the university interim president that the case should be dismissed immediately.



# UNIVERSITY *of* PENNSYLVANIA

**The Law School**
3400 Chestnut Street
Philadelphia, PA 19104-6204
215-898-7061
215-573-2025 (Fax)
Email: mfitts@law.upenn.edu

Michael A. Fitts, *Dean*
*Bernard G. Segal Professor of Law*

January 22, 2001

Professor Amy Wax
300 Barracks Hill
Charlottesville, VA 22901

Dear Amy,

My colleagues and I are absolutely delighted that you will be joining the Penn Law School faculty. As you probably know, news of your decision was received very enthusiastically.

This letter will confirm the terms of our arrangement. If I have missed anything, or have misstated your understanding, please let me know as soon as possible. You will be appointed to the "Standing Faculty" of the University of Pennsylvania, as a Professor of Law, with Tenure, effective July 1, 2001. As you know, under University rules, we must solicit letters from external referees, and submit the file to the Provost, who gives final formal approval. I do not anticipate any difficulty, however.

As we discussed, your first year starting salary for the 2001-2002 academic year will be $150,000, with a summer stipend of $17,000. In addition, because you will not be able to teach at Penn your first year the seminar you would have taught at Virginia, I will also give you an extra $4,000 dollars your first year. In summers after 2001, your summer research grant would be determined by the normal procedures for the granting of research grants. The final determinations are made by the Dean, based on grant applications by faculty members. Active researchers generally get grants for full time research projects up to one-ninth of academic base.

As a member of the Standing Faculty, you will receive an office, office computer set-up, secretarial support, and a research allowance (for such matters as research assistants, travel, books, serial publications, and software). The research allowance for next year will be $5000. Additional amounts may be requested for special needs. You may make arrangements with our Information Technology Services for the purchase of a home computer or laptop from your research allowance and for this purpose may "borrow" from the following year's allowance.

**Pg.76**

Professor Amy Wax
January 22, 2001
Page 2


The regular annual teaching load at Penn is a minimum of ten credit hours, usually configured as three courses, including a four-credit course and two three-credit courses. (For this purpose, seminars are considered three-credits, even though they meet only two hours per week.) In any year in which a faculty member is on leave for one semester, the normal expectation is that she/he will teach two courses during her/his semester in residence.

In addition, during your first two years at Penn, I will provide you with a paid semester off, depending on our teaching needs.

Finally, as we discussed, the Law School will cover all reasonable moving expenses of your household and office furnishings and goods from Virginia to Philadelphia.

I hope that this letter correctly summarizes the terms of appointment as we discussed them. Let me know if there is anything that you think needs to be clarified. I very much look forward to your joining the faculty.

Warmest regards,

Mike

Michael A. Fitts


MAF:ij

# GUIDELINES ON OPEN EXPRESSION

## I. Principles

A. The University of Pennsylvania, as a community of scholars, affirms, supports and cherishes the concepts of freedom of thought, inquiry, speech, and lawful assembly. The freedom to experiment, to present and examine alternative data and theories; the freedom to hear, express, and debate various views; and the freedom to voice criticism of existing practices and values are fundamental rights that must be upheld and practiced by the University in a free society.

B. Recognizing that the educational processes can include meetings, demonstrations, and other forms of collective expression, the University affirms the right of members of the University community to assemble and demonstrate peaceably in University locations within the limits of these Guidelines and undertakes to ensure that such rights shall not be infringed. In keeping with the rights outlined in I.A. (p. 1) above, the University affirms that the substance or the nature of the views expressed is not an appropriate basis for any restriction upon or encouragement of an assembly or a demonstration. The University also affirms the right of others to pursue their normal activities within the University and to be protected from physical injury or property damage. The University shall attempt to ensure that, at any meeting, event or demonstration likely to be attended by non-University law enforcement authorities, the rights provided by these Guidelines are not infringed.

C. The University shall be vigilant to ensure the continuing openness and effectiveness of channels of communication among members of the University community on questions of common interest. To further this purpose, a Committee on Open Expression has been established as a standing Committee of the University Council. The Committee on Open Expression has as its major tasks: participating in the resolution of conflicts that may arise from incidents or disturbances implicating these Guidelines; mediating among the parties to prevent conflicts and violations of these Guidelines; interpreting these Guidelines; advising administrative officers when appropriate; and recommending policies and procedures for the improvement of all levels of communication.

D. In case of conflict between the principles of the Guidelines on Open Expression and other University policies, the principles of the Guidelines shall take precedence.

## II. Definitions

A. For the purposes of these guidelines, the "University community" shall mean the following individuals:

1. Persons who are registered as students or who are on an unexpired official leave of absence.

2. All persons who are employed by the University.

3. Trustees and associate trustees of the University and members of Boards of Overseers or other bodies advisory to the University.

B. For the purposes of these Guidelines, "meeting" and "event" designate a gathering of persons in a University location previously reserved for that purpose. Unless designated as public, meetings are considered to be private. Events are considered to be public. "Demonstration" designates the presence of one or more persons in a University location with the intent to express a particular point of view in a manner that attracts attention, as in protest, rallies, sit-ins, vigils, or similar forms of expression. "University location" designates:

1. The campus of the University;

2. Any location owned, leased or used by the University, when used by members of the University community; and

3. Areas immediately adjacent thereto.

## III. Standards

A. The University, through the President, the Provost, and the Vice Provost for University Life, shall act to encourage and facilitate free and open expression within these Guidelines.

1. The University shall publish these Guidelines at least once each academic year in a manner that brings them to the attention of members of the University community. The University shall publish the rules adopted pursuant to IV.B.1 (p. 2) by the Committee on Open Expression at least once each academic year in a manner that brings them to the attention of members of the University community.

2. The University shall establish standards for the scheduling of meetings and events. This shall involve:

   a. Publishing policies and procedures whereby members of the University community, upon suitable request, can reserve and use designated spaces within University buildings for public or private meetings or events;

   b. Publishing policies and procedures whereby members of the University community, upon suitable request, can reserve and use designated outdoor spaces on the University campus for public meetings or events;

   c. Publishing policies and procedures that specifically address requests involving groups composed entirely or predominantly of persons who are not members of the University community (see Section VI (p. 4));

   d. Consulting with the Committee on Open Expression with regard to the substance of the policies and procedures and the manner of their publication; and, if practicable, consulting with the Committee on Open Expression before denying a request for use of a room, facility, or space by an organization recognized by the University for a reason other than prior assignment of the room, facility, or space. In any event, any such denial must be reported promptly to the Committee.

B. Each member of the University community is expected to know and follow the Guidelines on Open Expression. A person whose conduct violates the following Standards may be held accountable for that conduct, whether or not the Vice Provost or delegate has given an instruction regarding the conduct in question. Any member of the University community who is in doubt as to the propriety of planned conduct may obtain an advisory opinion from the Committee on Open Expression in advance of the event.

1. Individuals or groups violate these Guidelines if:

   a. They interfere unreasonably with the activities of other persons. The time of day, size, noise level,[1] and general tenor of a meeting, event or demonstration are factors that may be considered in determining whether conduct is reasonable;

   b. They cause injury to persons or property or threaten to cause such injury;

   c. They hold meetings, events or demonstrations under circumstances where health or safety is endangered; or

   d. They knowingly interfere with unimpeded movement in a University location.

2. Individuals or groups violate these Guidelines if they hold a demonstration in the following locations:
   a. Private offices, research laboratories and associated facilities, and computer centers; or
   b. Offices, museums, libraries, and other facilities that normally contain valuable or sensitive materials, collections, equipment, records protected by law or by existing University policy such as educational records, student-related or personnel-related records, or financial records; or
   c. Classrooms, seminar rooms, auditoriums or meeting rooms in which classes or private meetings are being held or are immediately scheduled; or
   d. Hospitals, emergency facilities, communication systems, utilities, or other facilities or services vital to the continued functioning of the University.
3. a. Individuals or groups violate these Guidelines if they continue to engage in conduct after the Vice Provost for University Life or delegate has declared that the conduct is in violation of the Guidelines and has instructed the participants to modify or terminate their behavior. Prompt compliance with the instructions shall be a mitigating factor in any disciplinary proceedings based upon the immediate conduct to which the instructions refer, unless the violators are found to have caused or intended to cause injury to person or property or to have demonstrated willfully in an impermissible location.
   b. If the individuals or groups refuse to comply with the Vice Provost's or delegate's order, they may challenge the appropriateness of the order to the judicial system. If the judiciary finds that the conduct was protected by the Guidelines, all charges shall be dismissed.
   c. Individuals or groups complying with the Vice Provost's or delegate's order may request that the Committee on Open Expression determine if the Guidelines were properly interpreted and applied to their conduct.

# IV. Committee on Open Expression

A. **Composition**

1. The Committee on Open Expression consists of seventeen members: eight faculty members named by the Faculty Senate Executive Committee, two representatives of the Penn Professional Staff Assembly, one representative of the Weekly-Paid Professional Staff Assembly, and three undergraduate students and three graduate/professional students selected by the appropriate student governance organizations (currently the Nominations and Elections Committee of the Undergraduate Assembly and the Graduate and Professional Student Assembly).
2. Members of the Committee are appointed for the following terms:
   a. The faculty and representatives of the Penn Professional Staff Assembly are appointed to two-year terms, staggered so that in each year either two or three faculty members are appointed and one representative of the Penn Professional Staff Assembly is appointed.
   b. The representative of the Weekly-Paid Professional Staff Assembly is appointed for a two-year term.
   c. The undergraduate and graduate/professional student members are appointed to one-year terms.
   d. Vacancies shall be filled for the unexpired term by the appropriate nominating body or persons.

3. The Chair of the Committee shall be selected by the Committee on Committees from among the members of the Committee on Open Expression.

B. **Jurisdiction**

The Committee has competence to act in issues and controversies involving open expression in accordance with these Guidelines. The Committee's responsibilities are the following:

1. Issuing rules to interpret or give more specific meaning to the Guidelines. Before adopting a rule, the Committee must hold an open hearing on the proposed rule and receive the views of individuals or groups. An affirmative vote of eight members is required for adoption, modification or recision of a rule to be effective.
2. Recommending to the University Council proposals to amend or repeal the Guidelines. An affirmative vote of seven members is required to make such recommendations.
3. Giving advisory opinions interpreting the Guidelines at the request of a member of the University community for the purpose of advising that person or the University community. Such advice is provided to guide future action. If the Committee does not give a requested opinion, it must indicate its reasons for not doing so. The Committee must respond to such requests as soon as feasible but in any event not later than within one month of the receipt by the Chair of the Committee.
4. Giving advisory opinions interpreting the Guidelines at the request of administrative officials with responsibilities affecting freedom of expression and communication. Such advice is provided for the purpose of guiding future action.
5. Mediating in situations that involve possible violations of the Guidelines. Those Committee members available at the time may act on behalf of the Committee. In carrying out the mediation function, the Committee or those members present may advise the responsible administrative officials and any other person with respect to the implementation of the Guidelines. Those Committee members who have acted on behalf of the Committee must report on their activities to the full Committee.
6. Reviewing the following administrative decisions for the purpose of providing advice on future actions.
   a. At the discretion of the Committee, administrative decisions involving these Guidelines made without consultation with the full Committee.
   b. All instructions by the Vice Provost or delegate to modify or terminate behavior under Section III.B.3 (p. 2) of these Guidelines.
7. Investigating incidents involving the application of these Guidelines to aid the Committee in its functions of rule making, recommending changes in the Guidelines or issuing advisory opinions. Such functions provide guidance to the University community for future action. The results of Committee investigations for these purposes shall not be a part of the initiation, consideration or disposition of disciplinary proceedings, if any, arising from the incidents.
8. Adopting procedures for the functions of the Committee, varied to suit its several functions, consistent with these Guidelines. Procedures that are not to modify matters of internal Committee practice must be made public in advance of implementation. Except as otherwise provided, the Committee may determine its own voting procedures.

9. Submitting an annual report to the Council and the University on the status of the Committee's work in the University journal of record.

C. **Procedures**

1. Except as provided with respect to the mediation function in Section IV.B.5 (p. 2), seven members of the Committee constitute a quorum.

2. The Committee can authorize subcommittees, selected from its own members, to act for the Committee in any matter except the issuance of rules interpreting or implementing the Guidelines or the making of recommendations to amend or repeal the Guidelines.

3. The Committee shall respect the privacy of individuals as its general policy and shall maintain the right to declare the confidentiality of its proceedings.

   a. If a person appearing before the Committee requests that his or her testimony or information be kept confidential, the Committee shall consider such a request. The Committee then shall determine whether to honor that request and shall inform that person of its decision before testimony is given.

   b. Minutes of particular Committee meetings may be declared confidential by the Committee or be so declared at the discretion of the chair subject to review by the Committee.

   c. All Committee documents containing confidential material, as determined by the chair, shall be clearly marked "confidential" and shall carry a warning against unauthorized disclosure.

# V. Responsibilities for Enforcement

A. It is the responsibility of the Vice Provost for University Life (hereafter referred to simply as the "Vice Provost") to protect and maintain the right of open expression under these Guidelines.

B. Observation of meetings, events or demonstrations, when deemed necessary by the Vice Provost to protect and maintain open expression, shall be the responsibility of the Vice Provost, who may delegate such responsibility. This delegate shall have full authority to act in the name of the Vice Provost under these Guidelines.

1. The observer (Vice Provost or delegate) shall identify himself or herself to those responsible for the meeting or event or to the leaders of the demonstration.

2. The Vice Provost shall attempt to inform the chair of the Committee on Open Expression of meetings, events or demonstrations to which an observer will be sent. The chair may designate a member or members of the Committee to accompany and advise the observer. Such a Committee representative shall also be identified to those responsible for the meeting or event or to the leaders of the demonstration.

3. Except in emergencies, the Vice Provost's authority under these Guidelines shall not be delegated to employees of the University's Department of Public Safety. The role of public safety personnel at a meeting, event or demonstration is defined below, in Section V.C.3 (p. 3).

4. Any observer or Committee representative who attends a meeting, event or demonstration shall respect the privacy of those involved. If there has been no violation of these Guidelines, other University regulations, or applicable laws, an observer, committee representative, or public safety employee who attends a meeting, event or demonstration shall not report on the presence of any person at such meeting, event or demonstration.

C. The Vice Provost or delegate is responsible for enforcing Section III.B (p. 1). and may instruct anyone whose behavior is violating or threatens to violate these Guidelines to modify or terminate such behavior. The instruction shall include notice that failure or refusal to comply is a further violation according to Section III.B (p. 1). of these Guidelines. However, an instruction or warning by the Vice Provost or delegate is not a prerequisite for a finding that a violation has occurred.

1. When the Vice Provost or delegate declares that an individual or a group has violated the Guidelines, he or she may request to examine their University identification.

   a. Failure to comply with this request is in violation of the Guidelines.

   b. In the event that any person(s) are deemed by the Vice Provost or delegate, in consultation with available members of the Committee on Open Expression, to have violated the Guidelines and such person(s) refuse to show University or other identification, the Vice Provost or delegate shall if practicable inquire of other individuals present as to the identity of the claimed violator(s). Identification by two other individuals shall suffice to establish identity. Should it not be possible to establish identity in this way, the Vice Provost or delegate may direct that photographs be taken of the participant(s) in the claimed violation. The Vice Provost or delegate must warn the individual(s) that their photographs will be taken unless identification is presented. Photographs and videotapes obtained without such warning may not be used as evidence in disciplinary proceedings. It is preferred that a member of the Committee on Open Expression take any such photographs; however, if no such person is able or willing to do so, another member of the University community may be requested to do so. As soon as safely practicable, all such photographs shall be turned over to the Vice Provost or delegate. Any photographs taken (including videotapes and negatives) shall be used solely by the Office of Student Conduct for the purpose of investigation of alleged violations and possible identification of alleged violators of these Guidelines. If it is determined that no violation has occurred, the Vice Provost or delegate shall destroy the photographs. If a violation is found to have occurred, after identification has been made and the case has been adjudicated, the Vice Provost or delegate shall destroy the photographs. None of the photographs shall be published. After each incident at which photographs are taken, the Committee on Open Expression shall report on the incident to the University Council, via the chair of the University Council Steering Committee, regarding what happened in the incident, which individuals saw the photographs, and the disposition of the photographs.

2. In carrying out this responsibility for safeguarding the right of open expression, the Vice Provost shall obtain the advice and recommendation of the representatives of the Committee on Open Expression whenever feasible.

3. The Vice Provost or delegate may request members of the University Police to attend meetings, events or demonstrations to help protect the open expression of those involved.

   a. Any person acting as an agent of the Division of Public Safety who attends a meeting, event or demonstration in a University location shall be clearly identifiable as such and in normal duty uniform. (Arms may be carried if they are part of "normal duty uniform.")

b. Public Safety personnel also may attend meetings, events or demonstrations when requested to do so by the person or group responsible for the event, when prominent public figures are involved, or when the Commissioner of Public Safety or delegate determines that there exists an imminent danger of violence at the event.

4. Terminating a meeting, event or demonstration by force is a most serious step, as this action may exacerbate existing tensions and may lead to personal injury and property damage.

   a. Avoidance of injury to persons by the continuation of a meeting, event or demonstration is a key factor in determining whether it should be forcibly terminated. Property damage and significant interference with educational processes are also factors to be considered and may be of sufficient magnitude to warrant forcible termination.

   b. Whenever possible, the Vice Provost or delegate should consult with the Committee on Open Expression before seeking a court injunction against those involved in a meeting, event or demonstration or calling for police action.

   c. The Vice Provost or delegate shall inform those involved that he or she intends to seek an injunction or call for police intervention before he or she does so.

   d. When a meeting, event or demonstration is forcibly terminated, a full statement of the circumstances leading to the incident shall be publicized by the Vice Provost within the University.

D. 1. Cases involving undergraduate students are referred to the Office of Student Conduct who investigates the event and decides what disciplinary proceedings, if any, to pursue.

   2. Cases involving graduate or professional students are referred to the Office of Student Conduct or to the established disciplinary body of the school in which the student is enrolled.

   3. Cases involving faculty are referred to the appropriate Dean or to the Provost.

   4. Cases involving University staff or administrators are referred to that individual's supervisor or any other person with supervisory responsibility over that individual.

   5. Cases involving trustees and associate trustees of the University and members of the Boards of Overseers or other bodies advisory to the University are referred to the Executive Committee of the Trustees.

E. The Division of Public Safety shall not collect or maintain information about members of the University community,[2] except in connection with alleged crimes, violations of University regulations, or as specifically authorized in writing by the President (to Public Safety and the Open Expression Committee). This regulation shall not affect personnel information concerning current, past or prospective employees of the Division of Public Safety.

# VI. Non-University Persons

These Guidelines address themselves explicitly to forms of individual and collective expression in a University location by members of the University community. The extent to which the privileges and obligations of these Guidelines may be made applicable in particular circumstances to individuals who are not members of the University community shall be determined by the Vice Provost or delegate. Participants in meetings, events and demonstrations in a University location are required to comply with the instructions of the Vice Provost or delegate. (See III.A.2.c (p. 1).)

[1] An "unreasonable noise level" is defined as sound above 85 decibels measured by a calibrated sound-level meter at an "A" weighting on "slow" response ten feet away from and directly in front of the source, amplifier or loudspeaker when the latter is within 50 feet of a building.

[2] Videotaped or closed circuit television information collected by posted, fixed location cameras is excluded, as long as it is in conformance with the rules of the CCTV policy as of January 13, 1999.

(Source: Almanac, March 16, 1993 (https://almanac.upenn.edu/archive/v39pdf/n25/031693.pdf))

# Interpretative Guidelines (Sections I & II) Adopted by the 2014-2015 Committee on Open Expression

These are interpretative guidelines adopted by the members of the 2014-2015 Committee on Open Expression of the University, pursuant to the Guidelines on Open Expression, Section IV.B.

## I. Inviting Speakers to Campus

A. The Guidelines clearly express the foundational value of free speech at Penn (I.A.): "The University of Pennsylvania, as a community of scholars, affirms, supports and cherishes the concepts of freedom of thought, inquiry, speech, and lawful assembly. The freedom to experiment, to present and examine alternative data and theories; the freedom to hear, express, and debate various views; and the freedom to voice criticism of existing practices and values are fundamental rights that must be upheld and practiced by the University in a free society." These values are of paramount importance: "In case of conflict between the principles of the Guidelines on Open Expression and other University policies, the principles of the Guidelines shall take precedence" (I.D).

By allowing a controversial speaker to speak or a group to organize and invite a speaker or hold an event, the University of course in no way endorses that speaker's or event organizer's content or viewpoint; rather, it affirms the value of creating a robust marketplace of ideas and fostering reasoned disagreement and discourse.

B. The Guidelines on Open Expression already unambiguously forbid discriminating against particular content and viewpoints (I.B): "the substance or nature of the views expressed is not an appropriate basis for any restriction upon or encouragement of an assembly or demonstration." The unpopularity of a speech's content or viewpoint is not a reason to suppress speech. Objectors may not have a "heckler's veto" over speech with which they disagree. Allowing threats of protests or violence to suppress speech in any way would encourage protesters to make such threats. In keeping with this foundational principle, the University has never revoked a commencement speaker's invitation to speak based upon the substance of the speaker's views, including any controversy they might generate.

Most speakers at Penn are invited not by the University itself, but by particular organizations, departments, schools, and individuals at Penn. The Guidelines protect members of the entire University community against official reprisals for hosting controversial speakers and events. An event organizer is at liberty to change its

mind freely, without duress, and to cancel an event or a speaker invitation. Other members of the University community likewise have the right to criticize a proposed speaker's or event's substance or viewpoint, or even to call upon the event organizer to cancel an event or rescind an invitation. But they may not go beyond criticism to exert any duress on the event organizer or speaker to withdraw. Duress includes any express or implied threat—by an administrator, a member of an administrative staff, a student leader, or a faculty member or teaching assistant in a supervisory or hierarchical relationship to an event organizer or speaker (particularly one within the same department or school)—to an organization's or speaker's or event's safety, recognition, registration, budget, funding, or access to venues or security, or to any faculty, student, administrator, or staff member's employment, tenure candidacy, funding, grades, honors, academic standing, or other status within the University, or a threat of violence or similar unlawful conduct. Any such duress, express or implied, gives rise to the natural inference that the actor is seeking to suppress speech because it is controversial or unpopular. That would amount to "any restriction upon" "the substance or nature of the views expressed," in violation of the Guidelines (I.B).

C.  The norm at the University is to allow reservations of rooms and other venues on a first-come, first-served basis. Denying a room-reservation request on any other basis, or worse rescinding an existing reservation of a room or other venue, raises the almost inescapable inference that the denial or rescission is based on "the substance or nature of the views expressed" (I.B). Thus, the Guidelines already require, "if practicable, consulting with the Committee on Open Expression before denying a request for use of a room, facility, or space by an organization recognized by the University for a reason other than prior assignment of the room, facility, or space. In any event, any such denial must be reported promptly to the Committee" (III.A.2.d).

The same principle, in keeping with the Guidelines' letter and spirit, applies to the authorization of events and to the provision of security, audiovisual, publicity, and other logistical support. An organization must of course have a budget sufficient to defray the necessary expenses and must reserve any such resources sufficiently in advance to allow the University to provide them on a first-come, first-served basis. Once such reservations have been made with adequate funding and advance planning, however, and particularly once a student group, faculty member, school, department, or organization has formally invited a speaker, whether by contract or other formal invitation such as one on University letterhead, any rescission or compelled modification of existing reservations or security arrangements raises the strong inference that the rescission or modification is based on "the substance or nature of the views expressed" (I.B). "[I]f practicable, [any member of the University community must thus] consult[] with the Committee on Open Expression before denying [such] a request [or rescinding or forcibly modifying such a reservation] . . . for a reason other than prior [reservation of the scarce resource at issue]. In any event, any such denial [including a rescission or compelled modification] must be reported promptly to the Committee" (III.A.2.d).

D.  "[T]o ensure the continuing openness and effectiveness of channels of communications" at Penn, the Guidelines establish the Committee on Open Expression (I.C). The Committee is expressly charged with "its major tasks" of "interpreting these Guidelines" and "recommending policies and procedures for the improvement of

all levels of communication" (I.C). The Committee is also expressly charged with preventing, mediating, and resolving conflicts related to open expression (IV.B).

Penn's tradition strongly encourages consulting with interested stakeholders across campus. On issues involving open expression, such consultation ought to include the Committee on Open Expression and the Office of the Vice Provost for University Life. The Committee strongly encourages students, faculty, staff, and campus organizations and groups to raise such issues at the earliest possible opportunity. If a student group or other University of Pennsylvania affiliate believes that a member of the University community is violating or attempting to violate the Guidelines on Open Expression, including any of the foregoing provisions, it may ask the Office of the Vice Provost for University Life to mediate to resolve the issue. If the mediation does not produce a mutually satisfactory resolution, the aggrieved party may file a complaint with the Committee on Open Expression, or with the chair, administrative liaison, or members of the committee if a quorum is not immediately available.

## II. Open Expression in Electronic Media and Cyberspace

The University's Guidelines on Open Expression were originally drafted decades before the spread of email and the Internet and well before the creation of social media, and therefore do not expressly mention electronic forms of communication. But their principles apply equally online.

The value of free and open expression and vigorous debate apply with equal force to newer forms of communication, including emails, web sites, social media, and other technologies and communication media. As the University's Information Systems and Computing Department's Policy on Acceptable Uses of Electronic Resources puts it, "The University's commitment to the principles of open expression extends to and includes the electronic information environment, and interference in the exercise of those rights is a violation of this policy and of the Guidelines on Open Expression" *http://www.upenn.edu/computing/policy/aup.html* Whether communications occur on Locust Walk or in cyberspace, open expression remains equally valuable to the University and equally protected to the same extent, under the same principles, and subject to the same limitations as non-digital forms of communication.

(Source: Almanac, March 3, 2015, Volume 61 Issue 25 (https://almanac.upenn.edu/archive/volumes/v61/n25/open-expression.html); Almanac, July 14, 2015, Volume 62 Issue 1 (https://almanac.upenn.edu/articles/council-2014-2015-year-end-report-of-the-committee-on-open-expression/))

# Interpretive Guidelines (Section III) Adopted by the 2022-2023 Committee on Open Expression

June 20, 2023

These interpretative guidelines are adopted by the members of the 2022-2023 committee (Section III below), pursuant to the Guidelines on Open Expression, Section IV.B. This interpretation provides clarification to the University community regarding the role of the Committee on Open Expression (COE) on campus. Parenthetical references below are to the Guidelines on Open Expression (guidelines). This interpretation is

adopted in accordance with Section IV.B.1 of the guidelines and will be published as Section III of the Interpretive Guidelines.

## III. Clarification of the Role of the Committee on Open Expression within the University Community

1. The Vice Provost for University Life (VPUL) or its delegate (VPUL-D) has the authority to determine if the guidelines are being violated by any member of the University community. The COE is advisory to the VPUL and to members of the University community regarding interpretations of the guidelines (Section II.B). COE members may assist in offering real time advice to requesting parties regarding the Open Expression guidelines if they are present during a situation that involves possible violations of the guidelines. Currently, the VPUL refers to its delegates as "Open Expression Observers," which has led some members of the University community, including some students, to view them incorrectly as representatives of the COE. In order to avoid confusion, the COE recommends that VPUL refer to its delegates instead as VPUL-delegates charged with enforcing the guidelines (Section III) but who do not represent the COE.

2. The VPUL or a VPUL-D may intervene to address in real time any conduct that it has declared to be in violation of the guidelines (Section V.C). Intervention may include instructions to participants to modify or terminate their behavior (Id.). The COE interprets these provisions to mean the following:

- For students, compliance with instructions from the VPUL or a VPUL-D will have the consequence that no referral will be made by the VPUL to the Center for Community Standards and Accountability (CSA) for a disciplinary hearing or penalty. (The CSA was formerly known as the Office of Student Conduct and renamed in 2022.)
- Refusal to comply with these instructions may lead to a referral by the VPUL to the CSA, who will investigate the event and decide what disciplinary proceedings, if any, to pursue.

3. Whenever feasible, the VPUL and its delegates shall, in carrying out their responsibility for safeguarding the rights of open expression, obtain the advice and recommendation of the representatives of the Committee on Open Expression (Section V.C.2). The COE interprets this requirement to mean that the chair of the COE should be advised of any likely future possible controversial conduct or events (see also Section V.B.2) to determine if the COE should meet and provide anticipatory guidance. The COE recognizes that the VPUL and its delegates may sometimes need to act expeditiously in situations about which they did not have advance notice or warning.  Even in these situations, all instructions given by the VPUL or its delegates to members of the University community to modify or terminate their behavior under the authority of the guidelines should be reported to the COE as soon as practical and in a manner agreed with the COE chair. (See Section IV.B.6.b.)

4. Any member of the University community (including, without limitation, the VPUL and any of its delegates, as well as students or student groups) may request advice from the COE. Although the COE may sometimes be requested to provide advisory opinions in advance about its interpretation of the guidelines (Section IV.B.3 & 4), its primary role is to review incidents in retrospect to provide guidance to the University community for future action (Section IV.B.6 & 7).  The COE interprets these provisions to mean that the VPUL and its delegates, or any other members of the University community, including students and student groups, may consult with the COE in advance of meetings, events or demonstrations, but this is optional and choosing not to consult the COE in advance cannot be used as grounds for punitive action against any member of

the University community. Advance consultation with COE does not offer any blanket protection with respect to VPUL's enforcement jurisdiction. The COE shall respect the privacy of individuals as general policy and maintains the right to declare the confidentiality of its proceedings.

5. With respect to COE's responsibilities in reviewing administrative decisions for the purpose of providing advice for future action (Section IV.B.6 & 7), the COE interprets these provisions to mean that it may provide advice to the appropriate governing body (VPUL for students, deans for faculty, supervisors for staff, etc.) prior to referral regarding the application/interpretation of the guidelines. The COE may suggest that their advice be included in any referrals for consideration of any further adjudication and/or restorative practice. However, the COE acts in an advisory capacity only in this context, and its advice is not binding with respect to either a decision to bring a disciplinary action or the nature of such disciplinary actions.

(Source: Almanac, June 20, 2023, Volume 67 Issue 37) (https://almanac.upenn.edu/articles/interpretative-guidelines-adopted-by-the-2022-2023-committee-on-open-expression/)

magill-archived.www.upenn.edu /content/congressional-hearing-written-testimony

# Congressional Hearing Written Testimony | Office of the President

11-14 minutes

President M. Elizabeth Magill, University of Pennsylvania
Testimony before the
United States House of Representatives
Committee on Education and the Workforce on
"Holding Campus Leaders Accountable and Confronting Antisemitism"

December 5, 2023

Thank you, Chairwoman Foxx, Ranking Member Scott, and distinguished members of this Committee, for the opportunity to discuss the important issue of rising antisemitism in our society and the actions we are taking in response at the University of Pennsylvania (Penn).

My name is Elizabeth Magill. For just over a year, I have had the honor of serving as the 9th President of the University of Pennsylvania, a 283-year-old institution founded by Benjamin Franklin. Prior to joining Penn, I was Executive Vice President and Provost of the University of Virginia, the Dean of the Stanford Law School, and for many years a professor of law at the University of Virginia. Early in my career, I worked as a law clerk for J. Harvie Wilkinson of the U.S. Court of Appeals for the Fourth Circuit and U.S. Supreme Court Justice Ruth Bader Ginsburg.

Let me begin by saying that I, and the University of Pennsylvania, are horrified by and condemn Hamas's abhorrent terrorist attack on Israel on October 7th. There is no justification—none—for those heinous attacks. The loss of life and suffering that are occurring in Israel and Gaza during the ensuing war are heartbreaking. The pain extends to our campus. I know it from my daily conversations with our students, faculty, and staff, as well as parents and alumni.

This hearing was called to discuss antisemitism on college campuses. I value this opportunity to reaffirm my and Penn's unyielding opposition to antisemitism and to outline the urgent, university-wide actions we are taking to combat this centuries-old and resurgent threat.

As President, my first priority is to members of the Penn community and, above all, to their safety and support. I must also ensure that our academic mission thrives; that academic freedom and the free exchange of ideas endure; and that we swiftly address any violation

chrome-extension://ecabifbgmdmgdllomnfinbmaellmclnh/data/reader/index.html?id=500054276&url=https%3A%2F%2Fmagill-archived.www.upenn.edu%2Fconten...    1/5

Case 2:25-cv-00269-AB    Document 1-1    Filed 01/16/25    Page 88 of 150

of the law or our University's policies. These are the priorities Penn is seeking to achieve in the actions I will discuss today.

Penn's Relationship with the Jewish Community

The vibrant engagement of Jewish faculty, students, staff, and alumni has long been an integral part of Penn. To see this sense of belonging shaken by recent events is deeply troubling. We trace our history back to 1772 with the enrollment of Penn's first Jewish student, Moses Levy, who later became the first Jewish Trustee of the University. The Jewish Students' Association at Penn was established in 1924. In 1970, Martin Meyerson became the first Jewish Ivy League President. Since 2012, we have partnered with the USC Shoah Foundation Institute's Visual History Archive to make available to students and researchers more than 50,000 video testimonials of Holocaust survivors and other witnesses.

We—and I—are proud of our history and the prominent role our Jewish community plays in campus life and, broadly, in Penn's academic excellence. Under my leadership, we will never shrink from our moral responsibility to combat antisemitism and educate others to recognize and reject hate.

Addressing Antisemitism

Prior to October 7th, antisemitism—a pernicious, viral evil—was already rising in our society, and global events have dramatically accelerated the surge. No place is immune, and campuses, including ours, have recently experienced an unacceptable number of antisemitic incidents. We are combatting this evil head on with immediate action.

I have condemned antisemitism publicly, regularly, and in the strongest terms possible and today want to reiterate my and Penn's commitment to combatting it. For decades our Division of Public Safety has learned from and worked with the Anti-Defamation League office in Philadelphia, and we are working closely with them, as well as local, state, and federal law enforcement to promptly report and investigate antisemitic acts against any member of the Penn community. Where we have been able to identify individuals who committed these acts in violation of existing University policy or law, we have initiated disciplinary proceedings and referred these matters to law enforcement where appropriate.

We have also acted decisively to ensure safety throughout and near campus. We have expanded the presence of Penn Public Safety and Allied Security at our religious life centers including Penn Hillel, the Herbert D. Katz Center for Advanced Judaic Studies, and the Lubavitch House. We also enhanced security at every event, rally, protest, and vigil on campus. Penn Public Safety works in close collaboration with law enforcement, including the Philadelphia Police Department.

Like many communities around the world, Penn has also experienced protests, rallies, and vigils related to the terrorist attack and the subsequent war. Protest—and all it entails

**Pg.85**

—has long been a feature of university life. Penn's approach to protest is guided by the U.S. Constitution, outlined in decades-old open expression policies, and supported and upheld by trained Open Expression Observers. We recognize the right of peaceful protest and assembly, and we give broad protection to free expression—even expression that is offensive. At the same time, we have zero tolerance for violence or speech intended to incite it. Our public safety officers are present at every protest, rally, or vigil, trained in de-escalation techniques, and, if necessary, they are ready to act.

Protests playing out on campuses and in cities worldwide demonstrate the challenges of fostering robust debate during difficult times. In addition to respecting the right of protest, Penn is offering many ways for students to come together in classrooms and in small groups to discuss these issues. Making space for this sort of debate is in keeping with the best traditions and educational missions of institutions like Penn. Educating citizens requires engagement with real-world challenges and hard topics—topics that often inspire passionate responses. University leadership must provide guardrails that encourage free and open expression while also ensuring a secure environment, and that is what I am seeking to do.

These immediate actions are only the first step. I am also committed to lasting change and laying the foundation for a Penn that leads on these issues. On November 1, 2023, I announced Penn's Action Plan to Combat Antisemitism, which builds on our anti-hate efforts to date and is anchored in the U.S. National Strategy to Counter Antisemitism. Developed in collaboration with faculty, staff, students, campus leaders, alumni, and national organizations like the American Jewish Committee, our Action Plan centers on three key areas: (1) Safety and Security, (2) Engagement, and (3) Education. In each of these areas, we announced both immediate and medium-term actions.

As part of that Action Plan, I have convened and charged an Antisemitism Task Force, with membership across Penn's schools and communities, to identify concrete, actionable recommendations. I have directed the Task Force to provide me with their recommendations in real time and to deliver their final report by this spring.

We are making certain that all our educational efforts aimed at addressing bigotry include antisemitism and other forms of hate.

To ensure our Jewish students have a direct channel to share their experiences with me, I have invited and received over 80 applications for membership to a new Student Advisory Group on the Jewish Student Experience.

I also sent a delegation of university leaders to attend the Brandeis Leadership Symposium on Antisemitism in Higher Education. They have reported back to me and are already contributing best practices and lessons learned toward our efforts.

As these efforts progress, I know we will have more to report.

The Rise of Other Forms of Hate

**Pg.86**

While I know this hearing is focused on antisemitism, we, and society broadly, are facing another significant challenge in this moment as well. We are seeing rising harassment, intimidation, doxing, and threats toward students, faculty, and staff based on their identity or perceived identity as Muslim, Palestinian, or Arab. Some have lost family members in this war, and many are worried about the safety of their loved ones in the region. Many are also afraid for their own safety, and the horrifying shooting of three Palestinian students in Vermont has only deepened their fears.

I am appalled by and have publicly condemned these acts of harassment, threats, and intimidation. We are investigating all allegations, even when threats have come from outside our campus. We are providing resources and advice to assist individuals with online doxing, harassment, and threats. Safety and security for individuals and places of worship has been increased across the board, and we are deploying all necessary resources to support any member of our community who is the target of hate.

In addition to these immediate steps, I have created a Presidential Commission on Countering Hate and Building Community to empower our campus leaders to address antisemitism, Islamophobia, and hate in all forms, and to lay the groundwork for a stronger, more connected community. I will direct the Commission to provide me their recommended actions by spring.

Changing Penn for the Better

In challenging times, leaders must make many choices. The most important choice is to take the full measure of what we face, act decisively, communicate clearly, and lay the foundation for a stronger institution in the years to come. Our immediate actions—safety and support of our community, investigation and enforcement of policies and laws, and condemnation of hate—are essential. We will remain vigilant. We are also setting the stage for long-term change. I am committed to ensuring that Penn not only takes immediate action to combat antisemitism, but also creates lasting change and emerges as a higher education leader in this regard. Penn's all-in efforts today, I believe, will bring about that better tomorrow.

Closing

Higher education institutions create knowledge, share it for good, and educate the next generation—missions that have never been more essential. Leading Penn is the honor of a lifetime because, even in these challenging times, we have never been stronger than we are today. Penn has attracted and is home to more-talented faculty, students, and staff than ever before. Each day, our faculty educate students while producing life-changing and award-winning insights and discoveries. Our health system provides world-class clinical care. Our students grow in their respective fields and go on to lead.

If you visited Penn's campus today, you would see vibrant university life. Students are walking to class and preparing for exams. Faculty are teaching seminars and undertaking

**Pg.87**

research. Doctors, nurses, and health care providers are tending to thousands of patients. Dedicated staff are enabling the work of the University. You would also see many people engaged in serious and respectful conversation—despite disagreement—about difficult topics, including those related to the Israel-Hamas war.

Thank you for the opportunity to discuss the topic of this hearing, the disturbing rise of antisemitism. As the President of Penn, I join you—emphatically—in addressing these concerns and fostering solutions. That is why we are urgently taking both immediate and lasting action to make Penn an even better, stronger institution now and for the future. We must and we will stand together in unyielding opposition to antisemitism, hate in all its forms, and all forces that would seek to divide us.

I look forward to your questions.

**Pg.88**

chrome-extension://ecabifbgmdmgdllomnfinbmaellmclnh/data/reader/index.html?id=500054276&url=https%3A%2F%2Fmagill-archived.www.upenn.edu%2F2conten…    5/5

# SHAPIRO LITIGATION GROUP

### INVESTIGATIONS, TRIALS & APPEALS

Office: 212.265.2870

Fax: 917.210.3236

1460 Broadway

Suite 7019

New York, New York 10036

dshapiro@shapirojuris.com

MEMORANDUM

August 31, 2022

<u>Via Email and FedEx</u>

TO:        Dr. Vivian L. Gadsden, Chair of the Faculty Senate

FROM:     David J. Shapiro

RE:        Request That You (1) Postpone Further Proceedings Until Prof. Wax's Cancer Treatment Concludes; (2) Order The University To Produce Information Regarding The Proposed Hearing Board Members Pursuant To Section II.E.16.4.D Of The Faculty Handbook; (3) Dismiss The March 2, 2022 Written Charges Against Prof. Amy Wax; (4) Disqualify Dean Ruger As Charging Party; (5) Retain A Neutral Third-Party To Determine Pre-Hearing Issues; And (6) Order The University To Produce Information Relevant To Prof. Wax's Affirmative Defense, Among Others, That Her Comments On Black Law <u>Student Performance Was Truthful And Accurate.</u>

COPY TO:   William W. Braham, Past Chair of the Faculty Senate
               Tulia G. Falleti, Chair-Elect of the Faculty Senate
               Wendy S. White, Senior Vice President and General Counsel
               Sean V. Burke, Associate General Counsel
               Dean Theodore W. Ruger
               Sarah Hope Kagan, Ph. D. Chair, Faculty Grievance Commission
               John Paul MacDuffie, Ph. D. Chair-Elect, Faculty Grievance Commission
               Santosh S. Venkatesh, Ph. D. Past Chair, Faculty Grievance Commission

## Table of Contents

Preliminary Statement .................................................................................................. 1

ARGUMENT ................................................................................................................. 4

I.    Prof. Wax Is Battling Cancer And Therefore Deserves A Reasonable Accommodation Of A Postponement Of These Proceedings ................................................................................... 4

II.    The University's Refusal To Provide Information About Proposed Hearing Board Members Renders Meaningless Her Right To Move To Disqualify Them For Prejudice. .................. 8

III.    The Charges Should Be Dismissed And A New Charging Party Ordered To File A Revised Charging Document. ........................................................................................................ 9

   A.    The Problems With The March 2, 2022 Charges And The Hearing Board Request. ........ 10

      1.    The Charges Do Not Contain A Complete And Final List Of All Statements And Actions That Are Allegedly Sanctionable. ................................................................... 10

      2.    The Charges Are Not Presented In A Coherent And Intelligible Manner. ...................... 11

      3.    The Charges Unfairly Exclude Crucial Contextual Information. ..................................... 13

      4.    By Alleging That Prof. Wax "Crossed A Line," Dean Ruger Is Inventing A Code Of Conduct That Is Nonexistent At The University. ............................................................ 14

      5.    Prof. Wax Cannot Be Sanctioned Based On Course Content. .......................................... 16

IV.    The Charges Fail To Put Prof. Wax On Notice Of The Specific, Non-Vague Penn Rule, Regulation, Guideline, Mandate Or Condition Of Employment She Allegedly Violated... 17

V.    The Charges Paint An Untrue Picture Of Prof. Wax Based On One-Sided And Incomplete Information. ......................................................................................................................... 22

   A.    The Misuse Of The Rodriguez Report. ............................................................................. 23

   B.    The Misuse Of Student Allegations. ................................................................................. 26

   C.    The Omission Of Key, Material Facts. .............................................................................. 26

   D.    The Baseless And False Assertions About Jared Taylor. ................................................. 27

   E.    The Misuse Of The Enoch Powell Interview. ................................................................... 29

VI.    Dean Ruger Must Be Disqualified As The Charging Party Based On His Demonstrated Bias Against The Respondent. .......................................................................................... 30

VII.  The Handbook's Guarantee That Prof. Wax Will Be Treated Fairly Requires That A Neutral Third-Party Be Retained To Make All Pre-Hearing Procedural Decisions. ........... 31

VIII. The University Is Obligated By The Handbook To Provide Prof. Wax With Information Relevant To Her Procedural And Substantive Rights ......................................................... 32

    A.  An Independent Forensic Expert Must Be Retained To Study Student Performance At The Law School By Race. ......................................................................................................... 32

    B.  An Independent Forensic Examination Of Academic Performance By Race Is Needed To Test The Accuracy Of Dean Ruger's Allegations That Prof. Wax's Statements Were "False" Or "Inaccurate." ....................................................................................................... 35

    C.  An Independent Forensic Examination Of Class Performance By Race Will Also Demonstrate That Dean Ruger Breached The University's Confidentiality Rules By Accusing Prof. Wax Of Making "False" Or "Inaccurate" Statements. ............................. 35

    D.  The Independent Forensic Expert Will Also Study Facts Relevant To Whether Professor Wax Is "Biased" Against Minority Students Relative To Other Professors. ..................... 36

    E.  The Law School Must Produce All Information On How Members Of The Law Review Are Chosen And The Extent To Which Race Is A Factor. ................................................. 37

    F.  What The Independent Forensic Analysis Will Entail. ..................................................... 38

    G.  Now Is The Time To Release Information About Grade Performance By Race At The Law School. ....................................................................................................................... 39

    H.  Ramifications Of Not Producing The Information Requested. ......................................... 41

IX.  Other Information Which The University Must Provide Before Prof. Wax Can File An Answer. ................................................................................................................................. 42

X.  Prof. Wax's Offer To Resolve The Matter. ....................................................................... 51

Conclusion ................................................................................................................................. 55

<u>Preliminary Statement</u>

I have reviewed the following materials from the University to Professor Amy Wax:  (1) a complaint dated April 27, 2021 (Ex. 1);[1] (2) the August 3, 2021 report issued by Prof. Daniel Rodriguez (the "Rodriguez Report") (Ex. 2); (3) the March 2, 2022 Written Description of Charges (the "Charges") (Ex. 3); (4) materials related to the May 11, 2022 pre-Hearing meeting between Prof. Wax and Dean Ruger (the "May 11 Meeting"), including a request that Dean Ruger recuse himself as the Charging Party; and (5) the June 23, 2022 Request for Hearing Board Formation (the "Hearing Board Request") (Ex. 4).

The substantive and procedural problems with the proceedings instituted by Dean Ruger are immense and require immediate rectification before any more harm is done to the University, the Law School, Professor Wax, and other University stakeholders.  As Chair of the Faculty Senate, you are "the principal executive officer" of the Senate, and you have "such powers as are appropriate to the office."  Faculty Senate Rules, Rule 4 ("Duties of the Chair").  I therefore respectfully submit this memorandum in support of Prof. Wax's request that you, as Chair:

1.  Postpone further proceedings until Prof. Wax's cancer treatment concludes; [2]

2.  Order the University to produce information regarding the proposed Hearing Board Members pursuant to Section II.E.16.4.D of the Handbook for Faculty and Academic Administrators (the "Handbook");

3.  Dismiss the March 2, 2022 Written Charges;

4.  Disqualify Dean Ruger as the Charging Party;

---

[1] Prof. Wax did not receive this complaint from the University's General Counsel, despite several requests, until June 10, 2021.  (This complaint has been designated in some previous correspondence as the "May 2021 complaint").  In February 2022, Dean Ruger notified Prof. Wax that this 2021 complaint has been "consolidated" with the March 2, 2022 Written Charges.

[2] The Chair, Past Chair, and Chair-Elect of the Faculty Grievance Commission are being copied because, absent a satisfactory resolution of the issues addressed in this memorandum, Prof. Wax will be forced to start a formal grievance procedure.  At a minimum, the University's refusal to provide Prof. Wax with an accommodation given her cancer treatment is arbitrary and capricious.  Handbook, § II.E.12(1).

5. Retain, on behalf of the University and Prof. Wax, a neutral third-party to determine pre-hearing issues;

6. Order the University to produce information, pursuant to Section II.E.16.4.D of the Handbook, relevant to Prof. Wax's affirmative defense that her comments on Black law student performance was truthful and accurate; and

7. Provide additional information requested below on the various charges against Professor Wax.

As documented in letters from her physicians attached as exhibits to this memorandum, Professor Wax is too ill to meet arbitrary deadlines or participate in any proceedings and will be unable to do so until at least the end of the Fall semester 2022. As Chair, we implore you to use your office to postpone further proceedings, as an accommodation under the Americans With Disabilities Act (the "ADA"), until Prof. Wax's disabled state from cancer treatment has sufficiently abated. The Charging Party's continued refusal to provide this basic humanitarian accommodation is simply shocking and we turn to you.

As well as unnecessarily rushing these proceedings and putting Prof. Wax's health at risk, Dean Ruger's referral of the Charges to the Faculty Board is premature, unwarranted, and prejudicial to her. The rights afforded to Prof. Wax under the Handbook have not been honored. The University is contractually obligated to treat Professor Wax "fairly" and protect her "rights," but it has not done so.

This memorandum is not a comprehensive, charge-by-charge review and rebuttal of the allegations made against Prof. Wax in the Charges and other various documents. An Answer and Affirmative Defenses will be filed when we receive a revised set of charges from a new Charging Party that comports with, among other things, the University's obligation to provide Prof. Wax with adequate notice of which University rule, regulation, guideline, manual or

condition of employment she allegedly violated.[3]  Rather, this memorandum is in support of Prof. Wax's request that you, as Chair of the Faculty Senate, exercise your power to correct the many legal (and, frankly, ethical) problems that have infected these proceedings.  The mistreatment of my client has resulted in Charges to which, for the reasons set forth below, Prof. Wax cannot adequately respond nor properly mount a defense.

I wish to emphasize at the outset the importance of our request for University materials necessary for Dr. Wax to respond to the Charges and prepare for the Hearing.  One among many of the Charges against Prof. Wax is that she deserves a "major sanction" because she made statements regarding Black students' performance at the Law School in connection with its affirmative action policies.  The school, on the one hand, contends that Prof. Wax made "false" and "inaccurate" statements on this topic which (i) allegedly makes her a white nationalist racist; (ii) means that minority students have a "legitimate" reason to fear that she will be biased against them; and (iii) requires that she must go.  Prof. Wax contends, on the other hand, that her comments were accurate and therefore cannot be the basis for any sanction, nor for any compromise of her right, as a tenured professor, to discuss affirmative action without fear of being terminated.  A key issue at the Hearing, therefore, will be whether Prof. Wax's statements were accurate.  And there is only one party who has the information relevant to that issue, and that is the Law School.

---

[3] We cannot wait until after the members of the Hearing Board have been finalized to receive the Charging Party's "written statement" pursuant to Section II.E.16.4.C.1 of the Handbook.  It should be issued now.  The allegations have been known for years; the Dean keeps adding charges every few months; and there have already been three charging documents in this action (the April 2021 complaint, the March 2, 2022 Written Charges, and the June 23, 2022 Request for Hearing Board Formation).  Prof. Wax will need time and University documents to prepare her Answer and Affirmative Defenses and waiting until after the Hearing Board members have been finalized will not leave her with enough time, especially if we receive information which will require a motion to disqualify Hearing Board members for prejudice.

Given the obvious importance of this information to the proceedings and Prof. Wax's affirmative defenses, we ask that you order the University to appoint an outside forensic expert to examine the Law School's records on students' grades and academic performance by race.[4] Only from that exercise will the Hearing Board know if Prof. Wax made accurate statements, and whether the Dean's contentions to the contrary are themselves incorrect. Access to this information is guaranteed by the Handbook. Handbook, § II.E.16.4.D. Prof. Wax's right to this information is discussed in greater detail below in Section VIII.

<u>**ARGUMENT**</u>

## I.    Prof. Wax Is Battling Cancer And Therefore Deserves A Reasonable Accommodation Of A Postponement Of These Proceedings.

Prof. Wax is currently undergoing active treatment for a life-threatening cancer, and she is recuperating from cancer treatment and other therapies. Per her treating physicians' conclusions and instructions (see letters from Dr. Gary Freedman (Ex. 5) and Dr. Amy Clark (Ex. 6)), Prof. Wax will be unable to meet deadlines, participate in proceedings, or respond adequately to charges against her until at least the end of 2022, and possibly longer. Threatening her with "major sanctions" under these circumstances is cruel and violates her rights under the ADA. It also guarantees that she will not have an adequate opportunity to defend herself against the Charges, which violates the fundamental fairness accorded to her under the Handbook.

This is not the first time that the University has refused to provide Prof. Wax with a medical accommodation. Dean Ruger disregarded Prof. Wax's request for more time before he insisted on having the Handbook-mandated pre-Hearing May 11 Meeting. He did this even though she told him that she did not have the time and capacity to prepare given her medical

---

[4] Because of the time and effort it will take to produce this exculpatory evidence, we cannot wait until one month before the Hearing to receive it. Handbook, § II.E.16.4.D.

condition and treatment.  He scheduled the meeting despite Prof. Wax's objections, and the meeting took place over her vociferous protests.

Dean Ruger also refused to provide Prof. Wax with any materials or information beyond the Charges themselves, and he continued to do so despite repeated requests.  There was no rational basis for demanding the pre-Hearing meeting without an extension of time or without the information and documentation requested.  As Prof. Wax explained, absent the information requested, there was no chance that the Handbook-mandated pre-Hearing meeting could be successful.  Dean Ruger's behavior was a clear violation of the reasonable accommodation requirement of the ADA as well as the guarantees of fundamental fairness and the protection of Faculty members' rights as guaranteed in the Handbook.

I am aware that in a letter dated July 15, 2022 to Prof. Wax, you would not give her more time to move to disqualify proposed Hearing Board members.  And, in his letter to me dated July 29, 2022 (Ex. 7), Associate General Counsel Burke gave me until the end of August to do so, but – as explained herein – Prof. Wax needs more time because of her medical condition.  We urge you to reconsider and postpone these proceedings until Prof. Wax's treatment is complete.  The medical evidence provided establishes that Prof. Wax cannot participate in a hearing that seeks major sanctions and will involve dozens of witnesses, extensive and detailed submissions from her and her attorney, and hundreds of pages of documents.  Being forced to participate before she is sufficiently recovered from her cancer and its treatment will seriously compromise her health, impede her recuperation, and undermine here ability to defend herself.  As a matter of federal law, failure to grant her enough time to recover will be a violation of the reasonable accommodation requirement of the ADA as well as the guarantee of fundamental fairness provided in the Handbook.  I am flabbergasted that the University is treating a tenured professor

*who has cancer* this way, and I am confident that the Faculty Grievance Commission will feel the same.

In his letter of July 29, Associate General Counsel Burke wrote that, "It is not our position that Prof. Wax must take a continuous leave of absence to be entitled to an accommodation[.]" (Ex. 7) That is not true. When Prof. Wax asked for more time to prepare a defense to the Charges, the University offered her a leave. But a leave will not relieve Prof. Wax of the enormous ongoing burden of having to deal with the Charges. To the contrary, it would lead to the very opposite effect. The proceedings initiated by Dean Ruger, which threaten Prof. Wax's job, livelihood, and reputation, and which require a constant and unrelenting investment of time and energy, are causing Prof. Wax the utmost in stress, and have already impeded her treatment and recuperation. These proceedings are not only detrimental to her health but also directly contrary to her doctor's advice and admonition, as detailed in the June 27, 2022 letter from her oncologist, Dr. Amy S. Clark (Ex. 6), and the April 15, 2022 letter from Dr. Gary Freedman (Ex. 5).

Dr. Wax's physicians have concluded that the extra obligations entailed by these proceedings will compromise her physical and psychological health and will interfere with her treatment and recovery. That should be enough to grant her the accommodation for which she is asking. The suggestion that Prof. Wax must take a leave from teaching in the next academic year as a *condition* of any postponement is itself a violation of the ADA. It is an inadequate response to Prof. Wax's limitations and circumstances, and it is not the reasonable accommodation to which she is legally entitled under the ADA.

As I explained in my July 20, 2022 letter to Associate General Counsel Burke (Ex. 8) (and he did not take issue with it), students, junior faculty, and fellows at Penn now regularly

contact Prof. Wax with requests to meet with her to voice their unhappiness with the dogmatic campus climate and the often one-sided education they are receiving, their disagreement with the prevalent ideas on campus, their desire to hear and debate unpopular views, and their dismay at the vendetta against her.  They seek support and advice from Prof. Wax on how to deal with the oppressive and frightening conditions created by the "woke" orthodoxy now prevalent at Penn. Prof. Wax has devoted a significant amount of time and energy to responding to these requests and meeting and counseling students.  According to many of these students Professor Wax is the *only* faculty member taking on this role and shouldering this responsibility at Penn.  Students repeatedly tell her in private that she is the one faculty member to whom they can disclose their opposition to what is happening on campus.

Given her unique role at Penn, and the pleas of her students and supporters worldwide, Professor Wax has promised that she will not surrender to the speech police or abandon the people on campus who rely on her presence and advice.  Prof. Wax views those promises as a sacred obligation which she is duty-bound to fulfill.  It is essential to her mental and physical well-being that she continue to advise students in fulfillment of her pledges as well as teach her classes.  Prof. Wax, therefore, cannot agree to take a leave of absence as a condition for getting more time to prepare to defend herself against the Charges.  She cannot agree to a violation of the ADA.

**II.    The University's Refusal To Provide Information About Proposed Hearing Board**
**Members Renders Meaningless Her Right To Move To Disqualify Them For Prejudice.**

In his letter of July 29, 2022, Associate General Counsel Burke refused to provide me

with the information necessary to determine whether Prof. Wax should move to have any of the

proposed Hearing Board members disqualified for prejudice.  (Ex. 7.)  This information, which is

*solely* within Penn's possession, custody, and control, is essential to my client's ability to assess

the impartiality of the proposed members.  Only the University has access to information which

will determine whether the proposed Hearing Board members will be prejudiced against my

client based on, among others, attendance at Anita L. Allen's February 16, 2022 presentation to

the Faculty Senate.  Access to this information is guaranteed by the Handbook.  *See* Handbook, §

II.E.16.4.D (University must provide Respondent with "copies of any other University

documents that are relevant to the respondent's *procedural*  . . . rights in this matter") (emphasis

added).

Associate General Counsel Burke's position that the University is not obligated to

provide this information because the word "discovery" does not appear in the Handbook is

spurious, and it demonstrates the need for a pre-Hearing neutral third-party, which I discuss

below in Section VII.  First, this is not "discovery" – no one is going to depose the proposed

members.  If the proposed Hearing Board members have memorialized their pre-conceived

conclusions, Prof. Wax has the right to that information.  Second, the Handbook gives the

Respondent the "opportunity" to move to disqualify proposed Hearing Board members "*for*

*prejudice.*"  Handbook, II.E.16.4.B (emphasis added).  That "opportunity" is meaningless if the

University will not, at a minimum, provide emails from the proposed Members that discuss Prof.

Wax or Prof. Allen's presentation.  ==*There is simply no way that Prof. Wax can know if the*==

==*proposed Members are "prejudiced" if the University does not provide the information that*==

**Pg.99**

==only it has.  And if the University does not provide the information that only it has, then the== =="opportunity" to move to disqualify for prejudice is meaningless.==  Third, Prof. Wax is contractually guaranteed the right to a "fair" hearing that protects her "rights," and it is obviously grossly unfair if, on the one hand, the University gives her the right to move to disqualify proposed Hearing Board members for prejudice but, on the other hand, it refuses to provide her with the information necessary to do so.  As Chair, you can correct this inequity.  Fourth, this is information that as Chair you should want to know, too.  If the University is interested in a fair and rights-based proceeding, we all need to know whether any of the proposed Hearing Board members will be going into the Hearing with prejudicial preconceptions or a pre-existing animus against Prof. Wax.

The only fair and rights-based way of reading this provision of the Handbook is to conclude that Prof. Wax is entitled to the information.  The Handbook guarantees fairness and a protection of rights, and that is why it mandates access to University materials.  Handbook, § II.E.16.4.D.  The commitment to fair treatment means that Prof. Wax has a right to obtain materials relevant to the proceedings, including basic information about any pre-existing bias proposed Hearing Board members may have against her.  Until the materials are received, Prof. Wax objects to all proposed Hearing Board members and does not consent to any further proceedings.

## III.    The Charges Should Be Dismissed And A New Charging Party Ordered To File A Revised Charging Document.

The Handbook contractually guarantees Prof. Wax a procedure that is fair and that protects her rights.  Handbook § II.E.16.  This means, in turn, that the charging document must, at a minimum, provide her with adequate notice of what exactly she is being charged with, and

**Pg.100**

which specific, non-vague Penn rule, regulation, guideline, manual or condition of employment

she violated. The Charges do not do that. You should, therefore, as Chair, dismiss the current

Charges and instruct a new Charging Party to submit a revised charging document that corrects

these defects.[5]

A.    **The Problems With The March 2, 2022 Charges And The Hearing Board Request.**

1.  **The Charges Do Not Contain A Complete And Final List Of All Statements And Actions That Are Allegedly Sanctionable.**

The Charges use the phrase "including but not limited to" when discussing allegedly

sanctionable statements by Prof. Wax. Charges at 5 (Ex. 3). Thus, by Dean Ruger's own

admission, the Charges are incomplete. We therefore do not know all the statements and actions

that will be at play at the Hearing. That is obviously inadequate for a document which intends to

be the basis for a major sanction against a tenured professor.

That same is true for the additional charges in the Hearing Board Request, some of which

are based on events that post-date March 2, 2022.[6] The continuous addition of new and

unanticipated charges on an open-ended basis is unconscionable. It places a burden on Prof.

Wax that is impossible to meet. The piling on of charges and accusations on a continuous,

ongoing basis, and the failure to produce a complete and locked-in set of charges, violates the

fundamental promise of fairness guaranteed in the Handbook, and makes it impossible for Prof.

Wax to prepare an adequate defense.

---

[5] As explained above, because of the importance of this matter, and the number of years that have transpired, a final set of written charges should be issued now. At a minimum, the final written charges to be submitted one month before the Hearing need to correct the errors in the current Charges.

[6] The Hearing Board Request, for example, refers to an interview Prof. Wax gave to Tucker Carlson in January 2022, and released to the public in April 2022, one month after the Charges were filed; and it talks for the first time about an investigation by Quinn Emanuel.

The allegations in the Charges and the Hearing Board Request are also fragmentary, random, sketchy, and incomplete.  Despite repeated requests, Prof. Wax has never received a final, comprehensive, and complete statement of all charges lodged against her.  And she has never been provided with all the materials and evidence that the Hearing Board will consider in evaluating the Dean's request for "major sanctions."

This request is not new.  Prof. Wax has already asked for a complete, comprehensive, and detailed account of the charges that will be presented against her and all the information that Dean Ruger possesses in support of them.  She asked for this to prepare for the Handbook-mandated, May 11 Pre-Hearing Meeting.  Dean Ruger refused.  To this day, Dean Ruger continues to withhold those materials.  He has yet to turn over a comprehensive list of *all* alleged statements, comments, and remarks that are the basis for his request for sanctions against Prof. Wax.

The fundamental fairness guaranteed by the Handbook requires that the Charging Party provide Prof. Wax with a complete and comprehensive list of charges, and all evidence it has in support of those charges.

> 2.  **The Charges Are Not Presented In A Coherent And Intelligible Manner.**

The March 2, 2022 written description of charges is presented in a manner and form that makes it extremely difficult if not impossible for Prof. Wax adequately to respond to and defend herself against those charges.  The document (written by the Dean of the *Law* School) is a thrown-together, disorderly, haphazard jumble of random allegations, fragments, isolated phrases, snippets, and stray remarks.  (The same description applies to the Hearing Board Request.)  The Charges should resemble an indictment or a complaint, containing a short and plain statement of the claim showing that the Charging Party is entitled to relief, but it does not.

**Pg.102**

Instead of presenting, in numbered paragraphs, allegations containing date, time, place, content and context of allegedly sanctions-worthy statements and actions, the Charges are a tangle of half-baked, deracinated accusations, in some cases lifted from sloppy, distorted, mangled, internet comments or stale student recollections. There is no coherent, intelligible, or chronological order one would expect in a professionally crafted statement of claims. In some instances, the allegations repeat fragmentary phrases and misleading sound bites that were lifted second-hand from sensationalistic media reports. The Charges do not reflect any careful review of original source materials, and frequently mischaracterize them. (One must be concerned if this is how Penn Law teaches students to draft complaints, indictments or even pre-litigation correspondence.) Moreover, General Counsel White has repeatedly promised that all anonymous allegations would be deleted from the Charges and from all documents filed by Dean Ruger in this case. This has not been done.

The Charges have created confusion and uncertainty as to what exactly Prof. Wax is being charged with. I can only conclude, therefore, that the document is part of a war of attrition designed to impose a maximally vexatious burden on Prof. Wax with the ultimate purpose of wearing her down and driving her from Penn.

The difficulties deliberately imposed on Prof. Wax are compounded by the fact that:

- The filings contain no cross-references to the initial April 2021 complaint or the Rodriguez Report;

- There is no indication of which allegations are from the April 2021 complaint and which are new to the 2022 filings; and

- There is no comprehensive list setting forth when or where Prof. Wax supposedly made the allegedly sanctions-worthy statements, who witnessed them, or other pertinent facts about the setting in which they were purportedly made.

Similarly, the Hearing Board Request repeats many previous charges, but also adds new ones. The document does not indicate which charges are old or new and it does not cross-reference to the previous March 2, 2022 charges or the April 2021 complaint. (Prof. Wax has also never been given a complete list of the complaining parties and the Charging Party's witnesses and their contact information.)

### 3. **The Charges Unfairly Exclude Crucial Contextual Information**.

Particularly egregious is the Charge's lack of crucial contextual information essential to a full and accurate picture of the statements or comments allegedly made by Professor Wax at Penn and elsewhere. This information is absolutely necessary to evaluate the alleged comments' accuracy, veracity, legitimacy, appropriateness, and status as protected academic expression. In the case of comments made in podcasts, speeches, interviews, articles, or other extramural contexts, the remarks included in the charging documents are routinely devoid of pertinent information on the questions under discussion, the policy issues being addressed, or the arguments being made. For remarks based on student recollections, which are mostly stale, fallacious and, for reasons explained in greater detail below, simply incredible, there is little or no information on the precise setting in which they were made, who witnessed them, their relevance to the lesson, subject, or topic under discussion, or whether or by whom they are corroborated. The overall result is a dishonest, partial, twisted, distorted, and misleading picture of Prof. Wax's actual words without proper checks on the trustworthiness and accuracy of the reports.

I will not elaborate in this memorandum on each instance of the distortions contained in the Charges and Hearing Board Notice. But here is one salient example of how the Charges mischaracterize and misrepresent Prof. Wax's words by lifting phrases out of context. In

referring to a speech Prof. Wax made at a National Conservatism convention in Washington DC, the Charges allege that Prof. Wax said that "our country would be better off with more whites and fewer nonwhites." That fragmentary phrase, lifted entirely out of context, could not be more misleading.

If presented accurately, the Charge would have noted that Prof. Wax was criticizing conservatives for abandoning sound immigration policies because they were worried about being labeled racists. She was addressing immigration policies that have an *impact* on racial groups, not immigration policies that are *based* on membership in a racial group. She then noted that proponents of the policies she was advocating might nonetheless be criticized unfairly and inaccurately as believing that the United States "would be better off with more whites and fewer nonwhites." Prof. Wax, in other words, never said that the United States would be better off with more whites and fewer nonwhites. Rather, she was criticizing conservatives for abandoning their principles because they were worried about distorted accusations of racism by liberal critics. It should be obvious that urging conservatives not to be intimidated by the misguided use of race-based accusations is not sanction-worthy speech. Rather, it is a legitimate point that an academic addressing immigration policy is entitled to make. In no way could Prof. Wax's remarks be reasonably construed as endorsing so-called "white supremacy." Yet that was the import of the dishonest media reports upon which Dean Ruger carelessly relies in the Charges.

### 4. By Alleging That Prof. Wax "Crossed A Line," Dean Ruger Is Inventing A Code Of Conduct That Is Nonexistent At The University.

The allegations are also seriously unfair because they rest on a vague and undefined standard of what materials can be presented in class, and what speakers can be invited to speak at Penn Law. As a matter of fundamental fairness, it is incumbent on Penn to clarify these

**Pg.105**

standards.  In faulting Prof. Wax's decision to invited Jared Taylor to speak to her seminar on Conservative Political and Legal Thought, for example, which is discussed in additional detail below in Section V.D., the Charges refer to a supposed "line" that has been "crossed."  A "line" is not a rule, regulation, statute, or guideline that puts a tenured professor on notice as to whom she can or cannot invite.  It is, instead, a meaningless, vacuous, and conclusory cliché.  It provides no clear, principled notice or usable guidance as to what types of pedagogical choices are allowed or forbidden.

Dean Ruger does not connect this purported "line" to any Penn rule or regulation which, if violated, would result in a loss of tenure.  The standard that Dean Ruger seeks to invoke here is entirely fabricated and made up for the purpose of punishing Prof. Wax for expressing and exposing students to unpopular views.

Dean Ruger's depiction of Prof. Wax's pedagogical choices as worthy of sanctions is not only incoherent but it is also downright dangerous.  It is impossible for academics such as Prof. Wax, or anyone else, to know which readings, topics, or speakers will pass muster or will subject them to sanctions or penalties.  Will a Black Studies professor be sanctioned if she invites a speaker who believes that all white Americans are racists?  Would such a speaker cross Dean Ruger's fanciful "line"?  To relegate such choices to the whims of students and University administrators, without an explicit definition and the citation of authority or applicable rules, is arbitrary and capricious and violates fundamental principles of fairness.  Professors are entitled to clear prior notice of when and how they are deemed to transgress.  Without a detailed, precise, and specific description of the supposed "lines" between acceptable and unacceptable speakers, readings, and class materials, professors face the constant danger of falling into traps for the unwary.  Absent such information, every professor who deviates in the slightest from the rigid

**Pg.106**

orthodoxy of approved opinion prevalent at any moment on campus risks crossing this supposed "line" and potentially putting his or her job and career in jeopardy.

Under the regime announced in the Charges, teachers like Prof. Wax, who dare to teach a course in conservative thought in which students are informed and educated about dissident ideas and positions, would be in constant danger of falling afoul of Penn's ad hoc and arbitrary restrictions.  (And, of course, if the pendulum ever swings the other way, extreme feminist professors would face similar predicaments if, for example, they invited a speaker who believed that all consensual sex was rape.)  Indeed, the proscription against "crossing the line," whatever that means, has no limiting principle, and could potentially exclude a considerable chunk of the materials presented in many University courses.  Anyone who teaches a class where students may encounter readings, authors or ideas that could conceivably be labelled "racist" or "white supremacist" or subject to other similar descriptions, however arbitrary, would be put in jeopardy.  Assigning *Mein Kampf* or other writings by Nazis in a class on World War II would be potentially risky.  Any assignment in a class on slavery that does not condemn the practice to a student's satisfaction would risk offending or traumatizing that student.  If the political orthodoxies on campus ever change, English professors may think twice before assigning the anti-Semitic writers T.S. Eliot and Ezra Pound or asking students to read Yeats' *Leda and the Swan*, which deals with rape.  The possibilities are endless.

### 5. Prof. Wax Cannot Be Sanctioned Based On Course Content.

Moreover, to provide basic fairness and adequate notice to Prof. Wax (and anyone else who will, one day, present course content to which some people at Penn will object), it is incumbent upon Penn to conduct a comprehensive review of the contents of Prof. Wax's course on Conservative Thought, including all assigned readings and topics, before this case goes any

**Pg.107**

further.  Dean Ruger's attempt to cite Jared Taylor's appearance and the assignment of an interview with Enoch Powell as reasons to sanction Prof. Wax raises the real possibility that she will be punished for *other* items on her syllabus that Penn now believes violate its standards of political correctness.  Prof. Wax should not be left guessing if further charges will be brought against her based on her efforts to educate her students on the topic of her seminar and which items on her syllabus will next be used against her.

Penn's effort to sanction Prof. Wax for her course content presents the possibility for serious inequity.  Prof. Wax is entitled to be treated no worse than other professors at Penn: white, Black, liberal, or conservative.  It is entirely possible, and indeed likely, that other professors are committing, or have committed, infractions by presenting materials in their classes that violate Penn's supposed "standards" and which "cross" whatever (imaginary and arbitrary) "line" that Penn might choose to draw.  To safeguard Prof. Wax's interest in consistent, evenhanded, and fair treatment compared to other University faculty, it is necessary for Penn to conduct a systematic and comprehensive review of all other courses, reading lists, assignments, and syllabi at Penn and the results of that review must be made available to Prof. Wax.

**IV.**    **The Charges Fail To Put Prof. Wax On Notice Of The Specific, Non-Vague Penn Rule, <u>Regulation, Guideline, Mandate Or Condition Of Employment She Allegedly Violated</u>.**

The Charges, Hearing Board Request, and other documents filed by Dean Ruger make repeated use of subjective, vague, and undefined terms and labels, and they do not state which specific, non-vague Penn rule, regulation, guideline, mandate, or condition of employment has been violated.  This makes it impossible for Prof. Wax to respond to and defend against the Charges.

Because the Charges do not state how Prof. Wax violated a specific, non-vague Penn rule or other source of authority when she made the statements alleged in the Charges, the Charges rely on character assassination and name-calling.  The Charges slap labels on her political, cultural, and legal observations and, based on those labels, seek a major sanction.  The use of subjective, vague, vacuous, and undefined terms to attack and disparage and penalize Prof. Wax violates fundamental standards of fairness and due process which are guaranteed by the Handbook.  It offers her no notice of which utterances will subject her to the threat of sanctions at Penn.  You should, therefore, as Chair, dismiss the Charges and instruct the new Charging Party to submit a revised charging document that does not rely on such tawdry smear tactics.

For example, Dean Ruger accuses Prof. Wax of making what he describes as "derogatory" statements against individuals at Penn.  He then relies on these statements as grounds to impose "major sanctions" against her.  But, at the same time, the Dean fails to allege under what authority Prof. Wax can be sanctioned for making such "derogatory" statements.  The Charges do not state what rule, regulation, guideline, mandate, or condition of employment Prof. Wax allegedly violated by making allegedly "derogatory" statements.

Nor has Dean Ruger identified any basis for the supposed requirement to refrain from "derogatory" comments as a condition of serving as a faculty member at Penn.  That is because there is none.  There is no document at Penn that stands for the proposition that a tenured faculty member must refrain from derogatory comments about her colleagues or risk major sanctions.  On the contrary, professors are fully entitled to express critical, pejorative, or negative judgments in their role as academics and intellectuals.[7]  Such judgments are a routine and legitimate part of

---

[7] Imagine for a minute the number of charges that would be brought by the University against tenured professors for making derogatory comments about their colleagues if conversations at faculty get-togethers at the Penn Club were secretly recorded.

**Pg.109**

political, cultural, legal, and moral analysis. Basic principles of academic freedom protect such statements from penalty.

The request for sanctions based on supposed "derogatory" statements is entirely fabricated and made up for the purpose of penalizing Prof. Wax because she expressed views that are politically unpopular on campus, are critical of present University practices, and that elicit opposition from a vocal faction of left-leaning activist and minority students and outsiders who demand absolute deference and conformity. An imagined prohibition on "derogatory comments" is unjustified and illegitimate, and it cannot form the basis for any sanctions against Prof. Wax.

The Charges also use vague, open-ended, and abstract phrases like "mission," "values" and "standards" without ever offering a precise definition of those terms or citing to any specific, pertinent, and relevant rule imposed on Penn faculty. Nor is there any attempt to explain how Prof. Wax's allegedly sanctionable statements violate pertinent requirements. Likewise, Dean Ruger accuses Prof. Wax of running afoul of the "basic norms of civil and professional behavior." But he never specifies or describes with any particularity the behaviors or norms to which he is referring. The Charges do not cite to any Penn regulation that Prof. Wax allegedly violated.

The Charges, in other words, are a classic example of the application of an *ex post facto* approach to my client's legal rights. There are no rules, regulations, guidelines, mandates, or conditions of employment which put Prof. Wax on notice that she would be sanctioned if she uttered allegedly derogatory or critical comments about colleagues or members of the Penn community or made any of the other remarks cited in the charging documents. This makes

**Pg.110**

sanctioning her for these statements completely unfair and it deprives her of her rights, which is a violation of the Handbook.

The lack of definitions in the Charges also raises a host of questions about the nature of the standards imposed and how they are being applied.  For instance,

1. Does Dean Ruger's characterization of Prof. Wax as "racist, sexist, and xenophobic" count as an example of "derogatory" statements by a Penn member that justify the imposition of sanctions?

2. Do Dean Ruger's statements to students at a secret town hall meeting in September 2019 that Prof. Wax's presence at Penn Law "makes me angry, it makes me pissed off," and that it "sucks" that Prof. Wax "still works here," count as examples of "derogatory" statements by a Penn member that justify the imposition of sanctions?

3. Is the accusation that Prof. Wax promotes "white supremacy" a derogatory statement forbidden by Penn rules?  Which rules?  What is "white supremacy" in the context of academic debate and how is it defined?

4. Do student accusations against Prof. Wax, including allegations of discrimination and bias, come within the prohibition of "derogatory" statements that justify sanctioning the speaker?

5. Do comments by Penn members and students on campus bashing President Trump and his supporters, or accusing conservatives or Republicans of promoting "fascist" or "undemocratic" policies and measures count as "derogatory"?

6. Do such statements violate Penn's "behavioral" standards?

All these questions must be answered.  If not, the Charges violate Prof. Wax's right to be put on notice of what Penn rule she allegedly violated which would support a major sanction against her.

Instead of identifying and specifying the rules or regulations that Prof. Wax supposedly violated, and that are claimed to require or justify major sanction against her, Dean Ruger repeatedly uses open-ended and undefined terms and labels.  The result is that Prof. Wax has not been provided with adequate notice of what exactly she must prepare to counter or refute at the

**Pg.111**

Hearing. Above all, it is never explained in the Charges which of Prof. Wax's remarks, comments, and statements warrant a penalty or sanction, and why they do. As a matter of fundamental fairness, which is guaranteed to Professor Wax as a Penn faculty member, penalties cannot be exacted upon a respondent when the rule allegedly violated is so vague. *See, e.g.*, *Johnson v. United States*, 576 U.S. 591, 595 (2015) ("[T]he Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement.").

By using undefined terms – which creates a fuzzy moving target that no one can possibly comprehend or anticipate – the Charges are a cynical, thinly disguised attempt to punish Prof. Wax her for her unorthodox positions. The accusations as stated violate basic guarantees of academic freedom of thought and expression and the protections afforded by her tenure contract at Penn. As Chair you should therefore dismiss the Charges and direct the new Charging Party to file a revised charging document which does not violate these basic legal principles guaranteed to Prof. Wax by the Handbook.

Others have noted that the Charges are not a valid legal document alleging forms of misconduct that require a major sanction. For example, in a July 18, 2022 letter from the Academic Freedom Alliance (the "AFA") to Penn President Elizabeth Magill, the AFA noted that Penn had officially acknowledged "the importance of a system of tenure for faculty members as the preeminent means of fostering and protecting academic freedom in teaching and in scholarly inquiry." (Ex. 9 at 1.) But, as the AFA concluded, the Charges are an attempt to undermine tenure "as an indispensable means of protecting academic freedom." *Id.*

**Pg.112**

In accord with Penn's pledge of tenure protections, and the contractual obligations that the grant of tenure to Prof. Wax entails, Penn's ploy to punish Prof. Wax for her speech by applying and manipulating terms and deploying non-existent information should not be allowed to succeed. The Charging Party must either define his terms in a way that provides fair notice or drop the charges against Prof. Wax.

## V. The Charges Paint An Untrue Picture Of Prof. Wax Based On One-Sided And Incomplete Information.

The University has been mistreating Prof. Wax and violating basic standards of decency for years in response to her unorthodox, conservative points of view, especially as they relate to affirmative action and immigration. At a student town hall meeting on September 19, 2019 (to which Prof. Wax was not invited), Dean Ruger told students that Prof. Wax's presence at Penn Law "makes me angry, it makes me pissed off" and also that it "sucks" that Prof. Wax "still works here."[8] (Ex. 10 at 12.) The April 27, 2021 complaint filed against her was not given to her until June 10, 2021. She was not told about the submission of the Rodriguez Report and had to track it down herself. Dean Ruger has repeated the assertion that minority students can expect Prof. Wax to be biased against them even after Prof. Rodriguez found no evidence of any such bias. For the past two years, Dean Ruger has barred Prof. Wax from serving on any faculty committees at Penn Law. She was never told about the Quinn Emanuel investigation, discussed for the first time in Dean Ruger's Hearing Board Request (Ex. 4 at 2), and wasn't interviewed by that firm. She repeatedly asked for more time because of her health and was constantly rejected. Dean Ruger has failed to mention the many laudatory letters in Prof. Wax's support that have been submitted to him by present and former students, and he has not included those materials in

---

[8] *See* https://www.plannedman.com/lifestyle/professor-wax-vs-her-university/, a story that accurately repeats remarks from a transcript of the meeting prepared by the Foundation for Individual Rights in Education from a student recording that was attached to the prior motion for Dean Ruger's recusal as a Charging Party (Ex. 10).

**Pg.113**

his charges or submissions to the Faculty Senate.  Nor has he alluded to or discussed the

University-wide Lindback teaching prize Prof. Wax received in 2015, which is an honor that has

been awarded to less than a handful of Penn Law professors.  The list goes on.

I am therefore not surprised by the incredibly one-sided, incomplete, and false picture of

my client that the Charges paint.  It is outrageous that the Dean of a law school has submitted

such charges.  The Charging Party turned what should have been an unbiased, straightforward

charging document that fairly presented the facts and the rules that Prof. Was allegedly violated

into a laundry list of character assassination labels.  It is worth noting the many ways the

charging documents in this matter have grossly manipulated the facts, taken language out of

context, and left unmentioned exculpatory evidence.  Indeed, an impartial assessment of the

Charges against Professor Wax leads to the inexorable conclusion that no charges should have

been filed at all.

### A.     The Misuse Of The Rodriguez Report.

Dean Ruger states in his Hearing Board Request that the Rodriguez Report "credited

many of the allegations made against Wax."  (Ex. 4 at 2.)  He also states that the Report

"revealed additional instances of inappropriate conduct" (*id.*), but he identifies no examples or

details.  The Dean's description of the Rodriguez Report is inaccurate, to say the least, and it

completely ignores findings that, in fact, *cast doubt* on the charges against Prof. Wax or state

conclusions in her favor.

Attached to this memorandum as Exhibit 10 is Prof. Wax's motion for the

disqualification of Dean Ruger as Charging Party.  In that document, Prof. Wax discusses in

detail the many ways Dean Ruger manipulated the Rodriguez Report.  For example, Dean Ruger

does not mention or discuss Professor Rodriguez's signal conclusion that his investigation

revealed **no instances of bias or discrimination** in Prof. Wax's actual teaching and treatment of students.  Specifically, the report states that "There was certainly **no evidence** from these interviews to suggest that [Prof. Wax] graded minority students differently, denied them access to professional opportunities over which she had some modicum of control, or singled them out for special ridicule or disparagement."  (Ex. 2 at 40-41) (emphasis added).

Dean Ruger also ignores important aspects of the Rodriguez Report by repeating accusations based on Prof. Wax's alleged stray remarks that the investigator found to be inconsequential, ambiguous, potentially inaccurate, unsupported, or exaggerated.  For example, the Charges cite anonymous student objections to a comment Prof. Wax made at a panel discussion at Penn Law held years ago that "you can have two plants that grow under the same conditions, and one will just grow higher than the other."  After analyzing the remark and its context, Prof. Rodriguez stated that he "cannot conclude that this statement was derogatory under the clear definition of that term."  (Ex. 2 at 15.)  He added that, **"What I can say is the overall contours of Professor Wax's scholarship on group difference and equality principles does not, on my best reading, support the assertion that she views Black individuals as biologically inferior to Whites."**  *Id.* (emphasis added).

Dean Ruger's filings also disregard other observations in the Rodriguez Report that cast doubt on the seriousness or credibility of accusations made against Prof. Wax.  For example, Professor Rodriguez states that "there is **no** basis to believe that Prof. Wax has in fact been discriminating against Black students in grading their exams," and that the fears expressed by Black students that Prof. Wax "will not give them a fair shake" in her classes or her evaluations are "**largely unwarranted**."  *Id.* at 21 (emphasis added).  In other words, Prof. Rodriguez found that Black students' anxiety about whether Prof. Wax would evaluate them fairly had no

**Pg.115**

objective or reasonable basis whatsoever.  This is hardly surprising.  As explained more fully below, the fears of bias are contrary to the plain evidence and are irrational and illogical considering the *blind* grading protocol that is mandated in Prof. Wax's Civil Procedure and Remedies classes.

Dean Ruger fails to mention these critical facts.  The Charges also simply ignore Prof. Rodriguez's important conclusion that there is **no** evidence that Prof. Wax is biased against minority students.  Contrary to the report's findings, and with no justification whatsoever, the Charges nevertheless repeat the nefarious accusation that Prof. Wax's statements would "lead reasonable students to conclude that they will be judged and evaluated based on their race, ethnicity, gender, or sexual orientation rather than on their academic performance."  (Ex. 3 at 7.)

Dean Ruger disregarded critical findings in the Rodriguez Report when he drafted his Charges and accused Prof. Wax of being biased against minority students.  He failed to disclose the Rodriquez Report to Prof. Wax in a timely fashion, and she only found out about the report by asking Prof. Rodriguez directly.  Dean Ruger attempted to hide the report from Prof. Wax, Penn students, and the Penn community for more than seven months.  His attempt to hide and then blackwash the Rodriguez Report was dishonorable, dishonest, and an egregious violation of Penn's pledge of fundamental fairness towards accused University members.

So, on the one hand, Prof. Rodriguez concludes that Prof. Wax is **not** biased against minority students, but Dean Ruger, on the other hand, cites the Rodriguez Report as proof that Prof. Wax **is** biased against minority students.  If we were in federal or state court, Dean Ruger would be sanctioned.

**Pg.116**

B.      <u>**The Misuse Of Student Allegations**</u>.

The Charges and Hearing Board Request contain numerous claims that are distorted, misleading, stale, or just plain fanciful.  Particularly egregious are remarks dating from years ago that students claim Prof. Wax made either inside or outside the classroom (it is often not clear). In many cases Prof. Wax never made the statements the students reported.  Not surprisingly, those statements have never been verified, corroborated, or substantiated.  Nor have relevant contextual details, including classroom or other setting, lessons presented, or topics under discussion, ever been revealed or explained.  Without this additional information, the credibility of these accusations cannot be accurately assessed, which will make it impossible for Prof. Wax adequately to defend herself.   Although this is not the place to refute or deal with each and every charge, Prof. Wax's need for the information requested in this memorandum in order to mount a full defense is obvious.

C.      <u>**The Omission Of Key, Material Facts**</u>.

You will not find in any of Dean Ruger's submissions a reference to the fact that many of the comments attributed to Prof. Wax were allegedly made *before* she received the Lindback Award for Distinguished Teaching in 2015.  That University-wide prize for extraordinary and outstanding performance in the classroom, which is Penn's highest teaching honor, has been awarded to less than a handful of law professors at Penn.  Prof. Wax's record was examined in detail and reviewed with a fine-tooth comb prior to presenting her with the award.  The intense and exhaustive scrutiny of Prof. Wax's record that preceded her receiving the Lindback Award, and which was conducted by Dean of Students Gary Clinton and other officials at Penn Law and at Penn's central campus, included a comprehensive review of student evaluations, interviews with a range of students, and a careful solicitation of student comments.  This thorough

**Pg.117**

examination of Prof. Wax's record did not uncover any evidence of the comments alleged in the Charges.  No students objected, either before or after the fact, to Prof. Wax receiving this award.

The allegations of supposedly objectionable comments that predate the Lindback Award therefore simply lack credibility.  They are most likely the product of faulty student recollections years after the fact, tainted and inspired by Dean Ruger's repeated criticisms, the hostility of activist students objecting to Prof. Wax's political views, and the relentless social media campaign against her.  (As Prof. Rodriguez observed in his report, it is "difficult to separate the consternation with [Prof. Wax's] expressed views themselves and the way these views affected her treatment of students.").  (Ex. 2 at 40.[9])

### D.  <u>The Baseless And False Assertions About Jared Taylor.</u>

Dean Ruger is seeking a major sanction against Prof. Wax because she invited Jared Taylor to be a guest speaker in her Conservative Political and Legal Thought seminar, which the Dean claims, "cross[ed] [a] line."  (Ex. 3 at 2.)  Dean Ruger also alleges that Mr. Taylor's views have led to "violence towards minorities in this country."  *Id.*

These assertions are meritless.  The seminar on Conservative Political and Legal Thought in which Mr. Taylor spoke is designed to educate students on the full spectrum of conservative and right-of-center positions in the United States historically and at present, from moderate conservative to the far right.  It should be obvious that the presentation of a speaker and the assignment of readings in the seminar are meant to inform and educate the students on these topics, and not to endorse a position.  It is bizarre, ludicrous, and entirely antithetical to the

---

[9] Despite the implausibility of accusations dating from before the 2015 Lindback Award, Prof. Wax is nonetheless entitled to inspect the record and files compiled by Penn Law and Gary Clinton in support of her Lindback Award, which are pertinent to the credibility of the accusations and essential to her defense in this case.

University's educational mission to suggest that students in a seminar addressing contemporary conservative thought should be barred from hearing from a leader of a sizeable conservative organization or from learning about that organization's activities and beliefs.  It is equally outlandish to seek to sanction a professor for presenting this material.  Are liberal professors treated this way when they invite speakers who espouse that all white Americans are inherently, systematically, and structurally racists?  No.

The complaints about Mr. Taylor also fail to mention the relevant fact that Prof. Wax **sought and received permission** to invite Mr. Taylor to address her class and asked for and received **reimbursement from Penn Law** for the student lunch at which Mr. Taylor spoke.  The Charges do not allege that the students in Prof. Wax's seminar objected to hearing Mr. Taylor or were disturbed, upset, "harmed," or "traumatized" by what he had to say.  In fact, the session was extraordinarily successful and resulted in a lively discussion, with students and Prof. Wax challenging many of Mr. Taylor's assertions and ideas.  But you won't read about that in the Charges.

Dean Ruger also fails to mention that Mr. Taylor has been invited to speak on many other college campuses and has also appeared frequently on numerous mainstream media programs and popular podcasts.  He has appeared and debated Black scholar Wilfred Reilly at Kentucky State University, an Historically Black University.  Professor Carol Swain, a Black professor, has invited him to address students at Vanderbilt University.  More examples can be found here: https://americanmind.org/salvo/brazen-falsehood/.  On September 2, 2022, Mr. Taylor is slated to speak at Arizona State University at the invitation of that university's chapter of the College Republicans.

**Pg.119**

Moreover, Dean Ruger has provided no evidence whatsoever to support the pejorative, groundless, and inflammatory accusation that Jared Taylor's views have led to "violence" toward minorities.  This assertion is completely unproven and unsubstantiated.  It is incumbent on Penn to produce facts and evidence to support this claim.  Relying on animadversions directed at Mr. Taylor from the Southern Poverty Law Center (not an unbiased source) is simply inadequate. Professor Wax's ability to defend herself against the Charges based on Mr. Taylor's presentation and the contents of her course requires that Penn provide critical information relevant to this charge.

**E.  <u>The Misuse Of The Enoch Powell Interview</u>.**

All the above objections apply with equal force to Dean Ruger's assertion that Prof. Wax should be sanctioned for assigning in her Conservative Thought Seminar an interview with Enoch Powell, a mid-20th century British politician and parliamentarian.  Once again, the content of the reading was squarely within the ambit of the seminar and relevant to the subject matter being presented.  This material was assigned to educate students about an historically important conservative figure's positions and thoughts on topics such as immigration and the continuity of Western societies.  The notion that the assignment of this material constitutes an infraction against supposed University "rules" or "standards" is not only baseless and nonsensical, but it constitutes educational malpractice.  What is next?  Will tenured professors at the University of Pennsylvania be terminated if, in a seminar on European twentieth- century conservative thought, they assign the writings of Sir Oswald Mosley?

**Pg.120**

**VI.    Dean Ruger Must Be Disqualified As The Charging Party Based On His Demonstrated Bias Against The Respondent.**

Dean Ruger should be disqualified as the Charging Party because he has demonstrated extreme bias and animus against Professor Wax.  This bias fatally taints his allegations against her and requires his removal.  A new Charging Party must be assigned before the process can continue.

On May 6, 2022, Prof. Wax moved for the disqualification of Dean Ruger as the Charging Party.  (Ex. 10.)  The motion explained in detail the myriad reasons why Dean Ruger cannot be the Charging Party, and why the Charges should be withdrawn; the evidence of his bias is overwhelming.

Not surprisingly, the Dean refused to disqualify himself.  It is therefore now up to you, as Chair, to determine the matter.  Because the evidence supports the disqualification of Dean Ruger as the Charging Party, the current Charges must be withdrawn, and a new Charging Party appointed.

Prof. Wax provided Dean Ruger with evidence of his bias.  That should be enough.  But, in doing so, she was at a disadvantage because she was denied access to additional facts, materials, documents, and communications regarding his bias and animus which are in the custody, possession, and control of Penn.  Specifically, the University should provide Prof. Wax with all of Dean Ruger's communications, e-mails, texts, internet posts, talks, and speeches regarding Prof. Wax.  The University should also produce any documents he helped to prepare at Penn that mention Prof. Wax and are related in any way to the charges against her.

**VII.    The Handbook's Guarantee That Prof. Wax Will Be Treated Fairly Requires That A Neutral Third-Party Be Retained To Make All Pre-Hearing Procedural Decisions.**

Section II.E.16 of the Handbook states in relevant part that the procedures for sanctioning a member of the University "must be handled *fairly*" and that it is "essential to have a process that . . . protects the *rights* of faculty members" (emphasis added).  The University is therefore contractually, legally, and morally obligated to provide Professor Wax with a process that is fair and protects her rights.

The University has not done so.  It has denied Prof. Wax's multiple requests under the ADA for a postponement of these proceedings for a sufficient period that will allow her to fully recuperate from her cancer and recover from the effects of her cancer treatment.  Dean Ruger refused to recuse himself as the Charging Party, notwithstanding his documented bias against her.  And Associate General Counsel Burke, in his July 29 letter to me, refused to disclose basic information about whether the proposed Hearing Board members are impartial, which is the *only* way Prof. Wax could make an informed decision about whether to move to disqualify them for prejudice.  (Ex. 7.)

The galling part of the process, of course, is that the University, *which is a party to the proceeding*, is the entity making these decisions.  That does not a fair and rights-protecting procedure make.  Penn cannot be both an interested party and the decisionmaker on procedural questions that are crucial to an impartial resolution of the Charges.  The University is acting as prosecutor and judge with no checks or balances on its power to make decisions critical to the conduct of the process.  The Hearing Board is both the factfinder and the tribunal determining sanctions.  This situation violates Prof. Wax's contractual right to a fair proceeding that protects her rights.

**Pg.122**

Therefore, to ensure fairness and demonstrate to the watching world that the University and its *Law* School are committed to procedural fairness, the University should appoint a neutral third-party to decide all pre-hearing procedural questions, including what information must be provided to Professor Wax so she can defend herself against the Charges. Having a pre-hearing neutral third-party is the only way that the issue of whether Dean Ruger should be disqualified as the Charging Party can be fairly decided, especially since he is a colleague of the Hearing Board's members. Only a pre-hearing neutral third-party can fairly decide whether proposed Hearing Board members should be disqualified and what information is required to make that call. And it should be up to a neutral third-party whether Prof. Wax's requests for information, clarification, and forensic examination of student records, as detailed in this memorandum, must be granted so that she can properly defend herself against the Charges.

If Penn does not appoint a neutral third-party to decide pre-hearing procedural issues, the process will not be fair and Professor Wax's rights will not be protected, as guaranteed in the Handbook, and required by fundamental principles of fairness. Appointing a pre-hearing neutral third-party is therefore critical to ensuring a fair hearing that protects Prof. Wax's rights. Without one, there should be no Hearing at all.

**VIII.    The University Is Obligated By The Handbook To Provide Prof. Wax With Information Relevant To Her Procedural And Substantive Rights.**

> **A.    An Independent Forensic Expert Must Be Retained To Study Student Performance At The Law School By Race.**

Section II.E.16.4.D of the Handbook states that the University must provide a Respondent with "copies of any . . . University documents that are relevant to the respondent's *procedural* and *substantive* rights in this matter" (emphasis added).

**Pg.123**

The Charges accuse Prof. Wax of making "inaccurate statements . . . about the characteristics, attitudes, and abilities" of Penn Law students.  They also allege that Prof. Wax "disseminated false information about segments of the University community."  These allegations are an obvious reference to Prof. Wax's statements about Black law student performance during a discussion of the pros and cons of affirmative action with Professor Glenn Loury (misspelled as "Lowry" in the Charges) in a blogging heads podcast in 2017.  Similarly, in his Hearing Board Request, Dean Ruger quotes Prof. Wax's statement in that podcast that "I don't think I've ever seen a Black student graduate in the top quarter of the [Penn Law School] class and rarely, rarely in the top half"; "I can think of one or two students who've graduated in the top half of my required first-year course"; and "the Law Review has a diversity mandate."  My client is also alleged to have said that "no law professor can honestly say [that] Blacks are evenly distributed throughout the class, top, middle, and bottom."

The remarks to which Dean Ruger objects fall into two categories.  First, Prof. Wax's statement on Mr. Loury's podcast about student rank in class at graduation relates to her personal observations regarding overall student performance ("I don't think I've ever seen . . . .").  This concededly is not an assertion intended to objectively reflect the overall situation at Penn Law, but only Prof. Wax's experience.  Any claim that Prof. Wax lied about her own observations is implausible.  Prof. Wax has also made positive assertions of fact about actual student performance in her Civil Procedure class which are in line with previous findings, based on actual data, about Black student performance at elite law schools.  Prof. Wax has also made statements about the Law Review's selection procedures at Penn.  Both these statements are subject to objective evaluation based on facts within the possession of Penn Law School.

**Pg.124**

Dean Ruger's repeated objections to these assertions, which he characterizes as false, are at the heart of his request for sanctions against Prof. Wax. Penn Law and Dean Ruger should not be allowed to smear and sanction Prof. Wax for allegedly speaking falsely without backing up these allegations. Fundamental fairness requires Penn to prove its allegations and to provide my client with the means to defend against such charges. Therefore, pursuant to the Handbook, Penn Law must provide Prof. Wax with statistics, facts, evidence, and information about the performance of Black students at the Law School. This is best done via a forensic analysis by an independent expert, chosen by both parties and paid for by Penn.[10] Simply put: Penn Law has the evidence that will demonstrate that Prof. Wax's remarks were accurate and truthful, and production of this information must occur before any further proceedings in this case take place.

It bears repeating that the comments to which Dean Ruger objects are in line with facts reported by many others. As noted by Robert Verbruggen in a 2018 National Review article, Richard Sander at UCLA wrote in 2004 that, "among elite schools, fewer than 10 percent of Black students ranked in the top half in terms of first-year grades; at all schools, fewer than 15 percent of Blacks made the top half of third-year cumulative grades." https://www.nationalreview.com/corner/if-amy-wax-is-wrong-lets-see-the-data/. An independent forensic expert will be able to tell us if those patterns are also at work at Penn Law.

---

[10] Individuals who can perform this analysis include economist Roland Fryer of Harvard, Peter Arcidiacano of Duke, law professor Richard Sander of UCLA, or Richard Hanania (Center for the Study of Partisanship and Ideology). An outside expert is necessary to guard against the manipulation of evidence of student grades as well as student racial identity that might obscure the actual profile of performance across groups.

**Pg.125**

**B.  An Independent Forensic Examination Of Class Performance By Race Is Needed To Test The Accuracy Of Dean Ruger's Allegations That Prof. Wax's Statements Were "False" Or "Inaccurate."**

Dean Ruger's claims that Prof. Wax's assertions are "false" or "inaccurate" are cited as a justification for sanctioning her.  But Dean Ruger has never provided *any* data on Black student performance at Penn Law to back up his accusation.  Indeed, he has stated on at least one occasion that the law school keeps no records by race of student performance – a statement that is entirely inconsistent with his insistence that Prof. Wax's assertions are false and inaccurate![11] If it is true that the law school does not keep records on student performance by race, then no Charging Party can sustain the burden of proving that Prof. Wax's statements were "false" or "inaccurate."  If it is *not* true, and the law school *does* keep records on student performance by race (or they can be determined), then Dean Ruger has been lying and the school has the information necessary for Prof. Wax to mount a defense.

**C.  An Independent Forensic Examination Of Academic Performance By Race Will Also Demonstrate That Dean Ruger Breached The University's Confidentiality Rules By Accusing Prof. Wax Of Making "False" Or "Inaccurate" Statements.**

Dean Ruger also accuses Prof. Wax of breaching the University's rules on confidentiality by making observations about Black student performance at Penn Law.  If that is the case (and our position is to the contrary), then someone needs to bring charges against Dean Ruger because he is breaching those same confidentiality rules by stating that Prof. Wax's statements are false. Those alleged rules make no distinction between types of assertions revealing information about student performance, whether positive or less so.  The double standard here is manifest and glaring.  Moreover, by commenting on the caliber of Black student performance at Penn Law

---

[11] *See* Email From Dean Ruger to Members of the Penn Law Community, dated March 13, 2018 ("Penn Law does not . . . collect, sort, or publicize grade performance by racial group.").  Even if it is accurate that Penn Law has not, in the past, collected and sorted performance by racial group, there is no barrier to gathering and analyzing the pertinent data now.

and asserting the inaccuracy of Prof. Wax's claims, Dean Ruger has waived any confidentiality objections to our requested independent expert and third-party examination and disclosure of the pattern of student grades by race in these proceedings.

### D. The Independent Forensic Expert Will Also Study Facts Relevant To Whether Professor Wax Is "Biased" Against Minority Students Relative To Other Professors.

The Charges also allege that "reasonable" minority students harbor the fear that Prof. Wax is biased against them, and that she will not evaluate them objectively or fairly. (Ex. 3 at 5.) These contentions were used to strip Prof. Wax of her mandatory first year Civil Procedure class as well as to justify creating redundant parallel classes for other courses she teaches.

However, as already noted, Prof. Rodriguez reviewed the allegations from the April 27, 2021 complaint that Black students could not get a "fair shake" in Prof. Wax's class and found them "largely unwarranted." (Ex. 2 at 21.) He ultimately concluded that minority and Black students' fears that Prof. Wax would be biased against them were unreasonable and unfounded. First, there was absolutely no evidence of bias by Prof. Wax against anyone. *Id.* In addition, the law school uses a *blind grading policy* for first-year classes, which Prof. Rodriguez found that Prof. Wax had never breached. *Id.* at 21. Prof. Rodriguez concluded that "there is ***no basis*** to believe that Prof. Wax has in fact been discriminating against Black students in grading their exams." *Id.* (emphasis added). The degree of dishonesty shown by Dean Ruger's failure to mention the blind grading policy in any of his filings in this case is staggering.

The blind grading protocol, which is mandatory for all first-year classes, prevents professors from seeing the identity of students before submitting grades and permits minimal adjustment of grades thereafter. Because of this practice, Prof. Wax was never aware of the race of her Civil Procedure students when assigning grades in the course, which were based

**Pg.127**

exclusively on their final examination score.  Moreover, Prof. Wax never adjusted grades up or

down – even slightly – for class participation or other factors after the names were revealed.

Therefore, it was simply impossible for Prof. Wax to have exercised any bias in her grading or

evaluation of students.  This was the conclusion of Prof. Rodriguez.

In sum, there is no basis whatsoever to conclude that Prof. Wax was biased against

minority students in grading exams for the simple reason that Penn's blind grading policy makes

that impossible.  Nonetheless, Dean Ruger continues to repeat, as a basis for sanctioning Prof.

Wax, that "reasonable" minority students could conclude that she will be biased against them

and will treat them unfairly.  (Ex. 3 at 7.)  To discredit these scurrilous claims and conclusively

demonstrate their lack of any reasonable or objective basis, a forensic expert must be retained to

study the grades handed out to Prof. Wax's students by race or minority status.  The expert will

compare the grades assigned in Professor Wax's classes to those assigned in other mandatory

Civil Procedure classes, as well as in other first-year blind graded courses in other subjects.

### E.  The Law School Must Produce All Information On How Members Of The Law Review Are Chosen And The Extent To Which Race Is A Factor.

Dean Ruger has also faulted Prof. Wax for suggesting, allegedly falsely, that the Penn

Law Review practices some form of racial affirmative action.  The Dean's accusation is puzzling

given Penn Law Review's own public admission that the Law Review has used race as a factor

in choosing student members and leaders, as documented in a 1995 New York Times article.  *See*

https://www.nytimes.com/1995/07/07/us/law-review-masks-diversity-in-a-new-admission-

system.html?smid=em-share.

No evidence has been offered that the Law Review's policies or practices have changed

since that admission.  To clarify whether Penn Law Review continues to use affirmative action in

**Pg.128**

selecting members and editors, Prof. Wax is entitled to have evidence pertinent to that question made available for analysis and examination.

### F.  <u>What The Independent Forensic Analysis Will Entail.</u>

The analysis by an independent forensic expert will be based on a review of student grades, class rank, and class honors at Penn Law by race, with a focus on Black versus non-Black student performance for the years 2001-2022 (Prof. Wax's years teaching at Penn Law). Names will be redacted, and the focus will be on first-year, blind graded classes, but it will also include grades from upper years, both blind graded and not.  Upper year classes that are not blind graded should be analyzed separately because they might be less probative of actual racial differences in academic achievement in light of trends in grade inflation and the potential efforts of instructors to try to create more racially equalized results.  The analysis will also include Black versus non-Black student GPA and class rank at graduation.

Relevant information for the analysis can be gleaned in part from documents listing graduating students by class rank that have been prepared yearly for use by the Penn Law Clerkship committee on which Prof. Wax served for many years.  Those rank lists can then be matched up with information on students' race from admissions files and other sources of information.  (The outside forensic expert will apply his expertise to the question of how best to perform the analysis.)  Other pertinent sources of information in Penn Law records must also be made available so that a complete and comprehensive analysis can be performed.

The forensic expert will also compare the academic records and credentials of Black versus non-Black law review members from 2001-2022.  The analysis will focus on first year grades in blind-graded classes, which is the most important information available to the Law

**Pg.129**

Review at the time membership decisions are made.  But it will also include scrutiny of the

overall records of Law Review members by race for all three law school years.

The forensic analysis will also include (but will not be limited to) the following:

1.  A statistical comparison of the grades of Black students versus non-Black students in all first-year blind graded classes from 2001-2022, including an analysis of whether Black students are uniformly represented throughout the grade distribution in each class on each subject and, if not, the extent to which their grades deviate from an expected uniform distribution of Black students for each class in each subject and overall.  This should include specific information on the percentage of Black students' final grade rankings in each segment of each first-year class, including all deciles, the top half, and in the top quarter of each class.

2.  An analysis of whether the distribution of Black student grades in Prof. Wax's first year Civil Procedure class from 2001-2018 (when the Dean stripped her of first-year teaching responsibility) differs or deviates from the distribution for classes taught by other Civil Procedure professors, and by other professors in other first-year subjects.  This analysis is necessary to determine whether there is any objective evidence that Prof. Wax is "biased" in her evaluation of Black students compared to other first year professors in Civil Procedure and other subjects.

3.  Data on the distribution from 2001-2022 of graduating Black students in the law school class, including their ranking compared to other students and the percentage of Black students who receive honors at graduation compared to their presence in the class overall.  This would include, but would not be limited to, documents listing graduating students' class rank prepared yearly for the faculty Clerkship Committee at Penn Law.

4.  The first-year grades and GPA, final all-year GPA, and final class rank of Black versus non-Black student editors and editorial board members of the Penn Law Review for 2001-2022.

**G.  Now Is The Time To Release Information About Grade Performance By Race At The Law School.**

Prof. Wax's demand for a forensic analysis of class performance by race is an issue of

fundamental fairness, the protection of rights, and fidelity to the Handbook which guarantees

Prof. Wax access to information concerning her substantive rights.  ***The University cannot seek
to sanction Prof. Wax for her comments on Black student performance at Penn Law while, at
the same time, refusing to provide information about Black student performance at Penn Law***.

As Robert Verbruggen bluntly puts it in his article: "if Penn Law is different" from the outcomes at elite schools like UCLA that also practice affirmative action, "let's see some numbers." Indeed. Let's see some numbers. Those numbers are essential to my client's defense; the production of those numbers is guaranteed by the Handbook; and the fairness guaranteed by the Handbook mandates their production.

It is also long past time for Penn to reveal the factual basis and underlying evidence pertinent to the accusation that Prof. Wax spoke inaccurately about the racial pattern of student performance at Penn Law, that "reasonable" minority students can expect her to be biased against them, and that Prof. Wax falsely asserted that Penn Law Review takes race into account in choosing its members and editors. The disclosure and examination of all materials pertinent to these allegations are essential to my client's ability to defend herself against charges that are grievously injurious to her reputation and that the Dean is relying on in his request for "major sanctions" against her.

The evidence relevant to these claims and essential to Prof. Wax's defense is solely in the possession, custody, and control of Penn Law. Therefore, the Law School and Dean Ruger must permit and arrange for a thorough and comprehensive forensic examination and analysis by an outside expert of the data, evidence, and facts pertinent to those accusations. A person agreed upon by both parties must be appointed at Penn's expense.

In sum, fundamental fairness requires that Professor Wax be given evidence pertinent to her affirmative defenses to the Charges. That can only be done, in this case, by an independent forensic analysis approved by both parties. The University's failure to provide the evidence requested would violate basic principles of justice and fairness. Fidelity to fairness and Prof. Wax's rights are guaranteed by the Handbook. They are also Penn *Law* School values that it

pledges to honor and uphold, and that are essential to the standards that the Law School sets for its students. Without Penn's disclosure of the necessary data and information, Prof. Wax will be unable to mount a defense to the Charges. It would be as if a prosecutor refused to provide exculpatory *Brady* material but went full steam ahead with a trial. It's unconscionable. Under such circumstances, any hearing would be a show trial worthy of Stalin.

If Penn fails to either provide the information requested, or retain an agreed-upon forensic expert, Prof. Wax will continue to suffer from the unsubstantiated and unproven accusations that she spoke falsely about student performance and the Law Review admission process. Failure to provide the information means that the University will be keeping from her evidence that only it has and that will categorically rebut the charge that she is biased against minority students. And all of this will transpire while grievous damage is done to her academic and personal reputation. The situation must be rectified.

### H. Ramifications Of Not Producing The Information Requested.

If the University refuses to provide Prof. Wax with information about grade performance at the Law School by race, then Dean Ruger must publicly retract his statement that Prof. Wax spoke falsely and inaccurately about Black Penn Law student performance. Failure to produce the material would also require that Dean Ruger publicly retract his statement that "reasonable" Black Penn Law students can expect and fear that Prof. Wax will be biased against them. He would also have to publicly retract his assertion that Prof. Wax spoke falsely about the Penn Law Review's use of race-conscious methods to select editors. Finally, he would have to restore Prof. Wax's prerogative to teach first year Civil Procedure and ensure that she has the option to do so in fulfillment of her teaching duties.

Conversely, if the data *is* made available and it *does* prove that Professor Wax's observations about Black Penn Law student performances were accurate and true (and not "inaccurate" and "false"), then, obviously, the Charges must be withdrawn, and the Dean must make the public statements outlined above. This is because accusing a professor of "racism" without proof or validation is not only unfair, unjust, and contrary to basic principles of due process, but it is also libelous. If Penn Law and the Dean fail to provide evidence requested or, in the alternative, fail publicly to retract the charges against Prof. Wax, then Penn Law and Dean Ruger will be subject to a libel claim.

## IX.    Other Information Which The University Must Provide Before Prof. Wax Can File An Answer.

Prior to any further proceedings in this case, Prof. Wax must be provided with complete, comprehensive, and detailed information and clarification on all the allegations against her, and the materials and documents pertinent to those allegations. These are absolutely necessary for Prof. Wax to provide an affirmative defense and to fulfill Penn's contractual guarantee of treating her fairly and protecting her rights, as memorialized in the Handbook. Prof. Wax must also be given ample time to investigate and prepare for any subsequent hearing.

Therefore, to streamline the process and create a useable record for the Hearing Board and any tribunal which may review the process, we also request that you, as Chair, instruct the University to provide the following:

**Pg.133**

1. A revised charging document that:

    a. Presents the charges in an orderly, chronological, and accessible format to which we can provide an Answer;[12]

    b. Includes the dates on which Prof. Wax's alleged statements were made, provided in chronological order and with cross references between documents for each statement;

    c. Contains a complete statement of all allegations, accusations, and charges that will be presented to the Hearing Board;

    d. Includes an accurate and complete explanation of the context for the alleged remarks cited in the Charges and that honestly and accurately captures the content of the argument or point Prof. Wax was making or position she was stating; and

    e. Attaches as exhibits all supporting materials and pertinent reports for each allegation.

2. All evidence upon which the new charges are based.

3. A list identifying every individual who lodged complaints against Prof. Wax, their years attending Penn Law School, if pertinent, and their current contact information.

4. All memoranda, transcripts, reports, and all other documents prepared by Professor Daniel Rodriguez in connection with his investigation.

5. Precise, specific, and particularized definitions of the terms "racist, sexist, xenophobic, and homophobic," "white supremacist" and "white supremacy."

---

[12] Ideally, a revised charging document would resemble a complaint or indictment with numbered paragraphs to enable Prof. Wax to prepare an answer and affirmative defenses.

6. A statement that, in connection with those terms, provides Prof. Wax with the following information:

   a. Where those definitions are found in materials governing the speech and expression by University members;

   b. The official policy, procedure, guideline, manual, or other written communication containing those definitions and forbidding statements meeting the definitions;

   c. How and whether those definitions apply to each alleged statement, comment, or remark by Prof. Wax as set forth in the revised charging document; and

   d. The reasons that those statements serve as justification for officially penalizing or sanctioning Prof. Wax, and the source of authority for such sanctions in the materials governing faculty speech.

7. A precise definition and explanation of the "mission, values and standards" of the University, and a statement of the official policy, procedure, guideline, manual, or other written communication setting forth those definitions.

8. A precise definition and explanation of the "basic norms of civil and professional behavior" which Professor Wax allegedly violated, and a copy of any University policy, procedure, guideline, manual, or other written communication which sets forth those "behavioral norms" in precise, particularized, and specific terms that provide ample and adequate notice to University members enabling them to determine which pronouncements violate those standards.

9. Based on the definitions provided in the items above, a precise and detailed explanation of why each of the alleged statements or remarks made by Prof. Wax, as

**Pg.135**

listed in the revised charging document, meets the definitions, and how, exactly, those statements violate the "missions, values and standards" of the University and the applicable "basic norms of civil and professional behavior."

10. A definition of the term "derogatory" as applied to Prof. Wax's statements; the source of the prohibition against making "derogatory" statements; an explanation of how the term, as defined, applies to her supposedly offending statements; and an explanation of whether the term, as defined, applies to and renders actionable statements by University members accusing Prof. Wax of "racism, sexism, xenophobia, homophobia" or otherwise criticizing her supposed remarks or statements, such as Dean Ruger's comments at the September 19, 2019 secret Town Hall meeting with students. (Ex. 10 at 3.)

11. A precise definition and explication of the "core values" of the University and any official document, policy, guideline, memorandum, procedure, or other written communication which memorializes what the "core values" of the University are.

12. All other statements by Penn members that have ever been found by Penn to be:

    a. "racist, sexist, xenophobic, and homophobic";

    b. "white supremacist";

    c. violative of the "mission, values and standards" of the University;

    d. violative of the "basic norms of civil and professional behavior";

    e. violating a prohibition on "derogatory" comments that Penn has deemed actionable or the basis for sanctions against a Penn University member.

13. The name of any University member who was sanctioned or terminated by the University for undermining the "core values" of the University or for making "racist,

**Pg.136**

sexist, xenophobic, and homophobic," or "white supremacist" statements, or who was found to have violated the "mission, values and standards" of the University, or the "basic norms of civil and professional behavior," or to have made "derogatory" comments about Penn members or others.

14. In connection with any of the findings and violations listed in items 12 and 13 above, provide as well:

    a. The contact information for the individual(s);

    b. The charges in each instance;

    c. The evidence presented in each instance;

    d. Any written documents generated in connection with each instance; and

    e. The disposition of any charges and the sanction imposed, if any.

15. All records related to the Quinn Emanuel investigation, including amounts invoiced and paid, reports, memoranda, transcripts, and other documents, as well as names and contact information for every person interviewed or consulted by the law firm in this matter. [13]

16. All evidence that the Charging Party intends to introduce in support of the allegation that Jared Taylor's views have led to violence towards minorities.

17. All letters and correspondence that Dean Ruger has ever received from students and other individuals that are critical of Penn's treatment of Prof. Wax and that have been submitted in support of her, her teaching, her role in the University, her right to free expression, her opinions, or are otherwise relevant to the charges against her.

---

[13] That Prof. Wax was never informed of the Quinn Emanuel investigation and never interviewed by that firm is shocking.

18. All evaluations, including student comments and ratings, in courses Prof. Wax has taught at Penn Law from 2001-2022.

19. The complete file and materials relevant to Prof. Wax's 2015 Lindback Award, including documents prepared, materials collected, and interviews conducted by Dean Gary Clinton as well as all communications, documents, and reports prepared by other University officials in connection with the decision to award the Lindback Award to Prof. Wax.

20. Any study, document, or analysis of which Penn or Dean Ruger is either aware or which is in their possession, custody, and control, which demonstrates or supports the claim that Jared Taylor's views have incited or caused "violence towards minorities in this country."

21. The name and contact information of any individual who was the victim of violence that Penn claims was caused by the views expressed by Jared Taylor when he was on campus; and any evidence that Mr. Taylor's appearance as a speaker in Prof. Wax's Conservative Thought seminar caused harm to any student or University member, including students in Prof. Wax's Conservative Thought class.

22. A comprehensive, point by point review addressing the statements, findings, and conclusions in the Rodriguez Report regarding the charges filed against Prof. Wax in April 2021, and an adjustment of charges in accordance with his findings on bias and other relevant matters.

23. A detailed, precise, and specific definition and description of the "line" that Professor Wax's invitation to Jared Taylor to speak to her Conservative Thought seminar allegedly "crossed," the source(s) in the Handbook or elsewhere for the definition and

**Pg.138**

description of that "line," and the basis in the University's rules or regulations for imposing on Penn members the obligation not to "cross" such a "line."

24. The results of conducting an item-by-item review of Prof. Wax's Conservative Thought seminar syllabus and reading lists for all the years she has taught the course at Penn, with a full evaluation and explanation of whether each item has or has not "crossed a line" as defined by Penn.

25. Complete information on whether and when other syllabi and courses at Penn and Penn Law have been examined and reviewed for "crossing the line" or for other infractions and offenses of supposed "standards" or "values" of the University.  The information must include, but is not limited to, a comprehensive report on whether Penn has reviewed and evaluated other course syllabi for items or readings by individuals who, for example, have expressed any negative opinions of minority groups or have ever held views that Penn defines or characterizes as "racist," "sexist," "xenophobic," "white supremacist," "homophobic," "derogatory" or in violation of Penn's supposed "values," "mission," or "behavioral standards."

26. For each statement, remark, or comment allegedly made by Prof. Wax as reported by a student, faculty member, or other person affiliated with Penn:

    a.  Whether the comment was made in class or out of class.

    b.  For alleged in-class comments:

        i.  In which course it was made, and on what date;

        ii.  What lesson was being presented in that session and what topic addressed;

**Pg.139**

    iii.  How the supposed statement was relevant to the topic, and how it came up or was introduced in discussing the topic;

    iv.  Whether and when the student complaining of the remark reported the remark to Dean Gary Clinton or to any other staff member at Penn Law;

    v.  A list of all students and individuals who were present when the alleged remark was made;

    vi.  A list of other students who were present and who have corroborated the remark; and

    vii.  A list of the other students who were present and who reported the remark to Dean Gary Clinton or other staff members at Penn.

c.  For out of class remarks:

    i.  The date of the supposed statement, remark, or comment;

    ii.  The occasion or context for the alleged remark – *e.g.*, a formal panel discussion, academic presentation, social gathering, meal or coffee with students, informal conversation in a Penn building or elsewhere, during Prof. Wax's office hours. etc.;

    iii.  The topic or issue being addressed and how the remark related to those or came up in the proceeding or conversation;

    iv.  A list of students or others who heard or witnessed the supposed comment or remark;

**Pg.140**

      v.   A list of other students or individuals present when Prof. Wax made the supposed remark or comment and who have corroborated them; and

     vi.   When or whether the other students or individuals present reported the comment or remark to Dean Gary Clinton or other staff at Penn.

27. All communications on whether Penn has ever imposed any type of sanction, including "major sanctions," on any other professor or University member for engaging in speech or expression in or outside of class allegedly in violation of "university standards."

28. All communications regarding whether other University members have been found to have committed a "major infraction" or to have evinced a "disregard" for the Penn Community, and whether any of those individuals have been sanctioned for their speech, opinions, or expression.

29. For the years 2000 to 2022:

    a.   The name of any individual who was alleged to have committed a major or minor infraction of "University standards" and, in connection therewith, provide as well:

        i.   The charges;

       ii.   The evidence presented against this individual; and

      iii.   Any documents generated in connection with the charges.

    b.   The name of any individual who was terminated by the University for committing a major infraction of "University standards" and, in connection therewith, provide as well:

**Pg.141**

       i.   The charges;

      ii.   The evidence presented against this individual; and

     iii.   Any documents generated in connection with the charges.

**X.**    **Prof. Wax's Offer To Resolve The Matter.**

Dean Ruger wrote to Prof. Wax that he intended to file charges with the Faculty Senate unless "a mutually agreed resolution of the issues presented" could be reached, as mandated by the Handbook. (Ex. 3 at 10.) But he has never made a concrete offer of settlement. Instead, he has simply informed Prof. Wax of the option of retiring on the same terms available to other Professors of her age and experience. That is not a settlement offer.

Professor Wax believes that a settlement in this matter is possible. The charges against her bring to the fore critical issues of academic freedom and expression. The crux of the dispute concerns alleged statements and comments that Dean Ruger and Penn tar as "racist, sexist, xenophobic, and homophobic" or otherwise find worthy of sanctions. Some of those allegations are simply false and some deliberately or carelessly misrepresent her remarks and positions, but others refer to Prof. Wax's actual words. Prof. Wax considers the statements she actually made to be protected speech, fact-based opinions, and the expression of positions and views on sometimes controversial topics that were arrived at through research, teaching, reading, and observation. Under fundamental principles of academic freedom, Prof. Wax is fully entitled to say what she said without penalty or sanction.

The charges against Prof. Wax, and the University's justifications for those charges, are also relevant to the adequate training of lawyers. Penn Law graduates must operate within an adversary system that requires them to hear and deal with a wide range of positions and opinions, including many with which they adamantly disagree. They must also operate within a free

society in which large numbers of citizens do not share their assumptions, attitudes, beliefs, or values.  It is vital to the quality of education at Penn and Penn Law that the members of the University community be able to discuss a range of ideas pertinent to law and policy freely and openly without fear of discipline, punishment, or penalty.

Dean Ruger and members of the Penn Law community, including many students and alumni, have evinced a dismaying lack of understanding of the core axioms and tenets of free expression, the meaning of the University's declared commitments to freedom of thought and speech for faculty and other members, the obligation to show tolerance toward a wide range of dissenting ideas, and the contractual guarantees and protections afforded faculty by tenure. Instead of correcting this ignorance and these misunderstandings, Dean Ruger has reinforced and perpetuated them.  On the Penn law website, Dean Ruger is quoted as stating that, "A great law school should reflect the diversity of opinion and background that exists in the outside world." In a presentation to the Faculty Senate in February 2022, Law Professor Anita Allen acknowledged that Penn is committed to upholding the principles and practices enshrined in the First Amendment of the Federal Constitution.  However, in bringing charges against Prof. Wax for her expressed beliefs, opinions, and statements, Penn has ignored and contravened these commitments, to the distress and confusion of many Penn members and students.

A well-established tenet of First Amendment doctrine, designed to protect the expression of a "diversity of opinion" that the Dean states is a core principle of Penn Law School, is the oft-repeated precept that a listener's offense, upset, hurt, distress, or other negative emotional or psychological response, cannot be allowed to silence speakers or form the basis of any sanctions or formal penalty imposed on them. This is known as the "heckler's veto" principle.  Penn Law School has egregiously failed to inform and instruct students that giving in to a "heckler's veto"

**Pg.143**

on campus is a grievous threat to free speech practices and academic values more generally.  To the contrary, Penn Law and Dean Ruger have flouted this basic, central principle by encouraging and permitting students and others to exercise a "heckler's veto" over Prof. Wax.  By giving in to students' untutored, uninformed, emotional reactions and whims, and by uncritically indulging indiscriminate claims of "offense," "harm," and emotional "trauma," Dean Ruger and Penn Law are using a "heckler's veto" to suppress unpopular ideas on campus by attempting to punish Prof. Wax for her unapproved opinions.  By doing this, Dean Ruger and Penn Law have repudiated long-standing and vital protections for dissenting voices and betrayed fundamental principles of academic free speech and expression.

Penn Law's abandonment of the responsibility to teach and enforce the basic democratic principles of free expression and tolerance calls out for correction.  The mishandling of Professor Wax's case represents a "teachable" moment for the students, faculty, Penn Law alumni, and the public.  Prof. Wax therefore proposes that the Charges against her be withdrawn, and that Penn Law set up a series of tutorials and presentations on classic free speech principles, defenses, political roots, and educational and democratic benefits.  These tutorials would look at past and present defenses of free expression on campus, including but not limited to the Yale Woodward Report, the Chicago Principles, the Kalven Report, and the American Association of University Professors' statements defending professors' expressive rights.  *See, e.g.*, the 1994 AAUP statement On Freedom of Expression and Campus Speech Codes, stating that, "On a campus that is free and open, no idea can be banned or forbidden.  No viewpoint or message may be deemed so hateful or disturbing that it may not be expressed."

Some of the tutorials should present the positions put forward in a document posted on the Heterodox Academy website on August 5, 2022, entitled Merit, Fairness, and Equality by

**Pg.144**

Dorian Abbot, Ivan Marinovic, Richard Lowery, and Carlos Carvalho, which eloquently and candidly explains the basis for a principled opposition to current illiberal, "woke" practices on campus, and argues for an alternative approach centered on free expression and the search for truth.

Members of the Penn community and others would be invited to address and explore, among other things, the importance and benefits of a free and open exchange of ideas in the context of educating young people, with an emphasis on training attorneys to function within an adversary system in which they must hear, consider, and deal with all sides of important legal and policy questions.

The program would include presentations and seminars on substantive topics related to Prof. Wax's statements and positions and conservative opinion generally.  Such presentations would ensure that members of the Penn Law community hear conservative perspectives and points of view that are rarely if ever articulated or fully explored on campus today.  Professor Wax's course in Conservative Political and Legal Thought provides a usable blueprint for the topics and ideas to be covered by these presentations.  Hearing those viewpoints is essential to the proper education of Penn Law students and students at Penn more generally.

<u>Conclusion</u>

I respectfully request that you postpone these proceedings until Prof. Wax's cancer treatment is completed.  You are putting her health at danger.

I cannot know whether to move to disqualify proposed Hearing Board members if the University does not give me basic information about whether they have been compromised by, for example, the Anita Allen presentation.  Please have the University provide that information.

A new charging document, filed by a new Charging Party who is not biased against my client and that corrects the defaults in the Charges, should be ordered.  As Chair, it is your job to make sure that there is an even playing field for Prof. Wax.  Given the severity of the charges, and the fact that the University is both charging party *and* investigative officer *and* judge, it is necessary that you retain a neutral third-party to determine pre-hearing issues.  Please do so.

The University has in its possession, custody and control, access to information which demonstrates the falsity of some of the allegations against Prof. Wax.  Especially important is the retention of an independent forensic expert to analyze law student performance by race. Likewise, the University must provide information and clarification relevant to its decision to seek sanctions for instances of speech and expression or for comments Prof. Wax has allegedly made.  Please instruct the University to retain the requested expert and provide the other information requested.

Finally, I have presented a good-faith settlement proposal which will make the University of Pennsylvania the gold standard in how to deal with preserving academic freedom against claims of allegedly sanctionable speech.  I encourage you to give it serious attention.

Dated: August 31, 2022

By:   _____
David J. Shapiro

Shapiro Litigation Group PLLC
1406 Broadway, Suite 7019
New York, NY 10036
`                    dshapiro@shapirojuris.com
Office: (212) 265-2870
Fax: (917) 210-3236

*Counsel for Respondent*
*Prof. Amy Wax*

**Pg.147**