## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMY WAX, | |
| **Plaintiff,** | **VERIFIED** |
| | **AMENDED COMPLAINT** |
| v. | |
| THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, | |
| **Defendants.** | |

Plaintiff Professor Amy Wax ("Plaintiff" or "Professor Wax") brings this complaint against Defendants and alleges as follows:

### INTRODUCTION

1.    This suit principally challenges the speech policies of the University of Pennsylvania, which (1) are racially discriminatory, discriminating based on the race and/or protected class of both speakers and the subjects of the speech, and (2) violate core principles of the First Amendment, which the University contractually promised to abide by for its professors, including for Plaintiff here, Professor Amy Wax.

2.    Based on the content of her speech, the University of Pennsylvania (the "University" or "Penn") initiated disciplinary proceedings against Professor Wax and ultimately chose to impose academic discipline in the form of major sanctions against her, including a one-year suspension at half pay; the loss of a named chair and summer pay; a public reprimand; and a requirement that Professor Wax note in public appearances that she does not speak on behalf of Penn.

3.    The disciplinary procedures used were both grossly deficient and a wild departure from established norms governing academic discipline. The use of those kangaroo-court-like procedures violated the University's contractual obligations to Professor Wax, particularly as she enjoys tenure. In addition, those procedures violated the Americans with Disabilities Act ("ADA") by failing to accommodate reasonably—or even minimally—Professor Wax's then-ongoing cancer treatments.

4.    Notably, the abnormal and unfair processes at the heart of this Complaint were initiated by a Dean who had already publicly stated that it "sucks" that Plaintiff Wax "still works [at Penn.]"[1]

5.    Some of the speech for which Professor Wax was charged by the University, which included a long list of alleged statements, concerned African American students. In particular, the University fixated on a statement by Professor Wax that, in her experience, African American students "rarely" finish "in the top half" of their law school classes.

6.    The University has never disputed that Wax's statements about student performance were factually accurate. Instead, it sought to discipline her based on the putative "harm" that her statement caused to African American students.

7.    This rationale is demonstrably pretextual and served as a thin veneer for the University's true rationale: under its speech policies (collectively, the "Speech

---

[1] As reported at Dennis Saffran, *Professor Wax Vs. Her University*, PLANNED MAN, https://www.plannedman.com/lifestyle/professor-wax-vs-her-university/ (last visited Jan. 13, 2025), which reports remarks from a transcript of the meeting prepared by the Foundation for Individual Rights in Education from a student recording that was attached to Plaintiff's prior motion for Dean Ruger's recusal as a Charging Party.

Policy"), some races may not be criticized while other racial or ethnic groups can be—and routinely are—subjected to virulently racist speech without consequence.

8.    The University's Speech Policy discriminates based not only on the content of speech but also the racial identity of the speaker. White speakers are far more likely to be disciplined for "harmful" speech while minority speakers are rarely, if ever, subject to disciplinary procedures for the same.

9.    The enormous double standards applied by the University, as well as their absurdity, are illustrated by the speech of Dwayne Booth, a (non-tenured) lecturer whom the University has not attempted to discipline in *any* way (unlike Professor Wax).

10.    Specifically, Mr. Booth created and posted a cartoon that was a literal Blood Libel, which he aptly titled "The Anti-Semite." The drawing itself is even less subtle than its title: It depicts three Jewish individuals drinking glasses of blood, which are labeled "Gaza"—mirroring the anti-Semitic Blood Libel trope that Jews drink the blood of Christian children. In case the chalices of blood were too understated, Mr. Booth also added blood dripping from the Jewish men's lips. It further depicts those three Palestinian-blood-drinking Jews as saying: "Who invited that lousy anti-Semite?" to a dove carrying an olive branch.

11.    Mr. Booth posted this cartoon at a time when violence against Jews on Penn's campus had reached unprecedented levels, and it could reasonably be interpreted as endorsing that violence. One clear potential takeaway from that cartoon is that, because Jews are putatively engaged in activities morally equivalent

to murdering Palestinians and drinking their blood, violent "resistance" is both a moral and lawful response.

12. Although the University criticized Mr. Booth for authoring and posting that anti-Semitic cartoon, it has taken no steps to initiate disciplinary proceedings against him. Indeed, Mr. Booth has reported that he has "received no communication from the University suggesting that his job was endangered because of the cartoons." Elea Castiglione, *A Penn lecturer's political cartoons add fuel to the ongoing antisemitism discourse on campus*, THE DAILY PENNSYLVANIAN (Feb. 8, 2024), https://www.thedp.com/article/2024/02/penn-lecturer-political-cartoons-antisemitism-controversy.

13. To the extent that any purported "harm" from speech or expression might be a valid basis for any university to discipline professors/lecturers, there is no rational way to conclude that Professor Wax's statements would cause more "harm" than Mr. Booth's blood-libel cartoon. Yet the University has sought only to discipline Professor Wax, while hiding behind disingenuous paeans to free speech and a supposed commitment to academic free expression to justify its decision not to lift a finger against Mr. Booth.

14.    To put this radical double standard in context, consider the following

Table:

| Table 1: University of Pennsylvania's Speech Policy Standards | |
| --- | --- |
| Speech Completely Unworthy of Discipline and Putatively Creating No Risk of Actionable "Harm" | Speech So "Harmful" That It Demands Unprecedented Academic Discipline |
|  *"Who invited that lousy anti-Semite?"* | "I don't think I've ever seen a Black student graduate in the top quarter of the class, and rarely, rarely in the top half." |

15.    The University's racist double standards are not limited to the Booth

blood-libel-cartoon incident, which was emblematic of the University's race-based

approach to its members' speech.[2] Indeed, the University's race-based hypocrisy

---

[2] For purposes of federal anti-discrimination statutes, federal courts have held that Jews are a race protected by the prohibitions on race-based discrimination. *See, e.g., Sherman v. Town of Chester*, 752 F.3d 554, 567 (2d Cir. 2014) (holding that "Jews are considered a race for the purposes of §§ 1981 and 1982"); *United States v. Nelson*, 277 F.3d 164, 177 (2d Cir. 2002) (holding that "Jews count as a 'race' under certain civil rights statutes enacted pursuant to Congress's power under the Thirteenth Amendment"); *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 354 (S.D.N.Y. 2014) (Federal "courts have regularly found that anti-Semitic harassment and discrimination amount to racial discrimination."); *id.* ("holding that Plaintiffs are

about free speech principles is now widely recognized and subject to well-earned criticism. In particular, Governor Shapiro has rightly observed that the University has "lost its way" in its handling of antisemitic speech and use of double standards and was "willing to accept a little bit of hate over here, but no hate over here, and that's not okay."[3]

16.    To be sure, discrimination against Jews often defies simple classification—taking on elements of discrimination on the basis of race, religion, national origin, ethnicity, and ancestry. Although the most precise way to classify anti-Semitic discrimination is sometimes murky, the upshot of federal anti-discrimination law is anything but: such discrimination is squarely prohibited, regardless of how it might best be categorized. *See supra* at 5-6 n.2. As the Department of Education's Office for Civil Rights recently reiterated, for example, Title VI protections "extend to … school community members who are or are perceived because of their shared ancestry or ethnic characteristics to be Jewish." OCR, Dear Colleague Letter: Title VI and Shared Ancestry or Ethnic Characteristics

_____

within their rights to assert a claim under Title VI based on anti-Semitic discrimination.").

In any event, no matter how classified, it is well-established that Jews are protected under civil rights laws like Section 1981 because they are part of "a group that is commonly perceived as 'racial' because it is ethnically and physiognomically distinct." *Jatoi v. Hurst-Euless-Bedford Hosp. Auth.*, 807 F.2d 1214, 1218 (5th Cir. 1987). As used herein, "racial" and "race-based" discrimination includes discrimination on the basis of race, religion, national origin, ethnicity, and ancestry, unless context indicates otherwise.

[3] Novi Zhukovsky, *Governor Shapiro Says University of Pennsylvania Has "Lost Its Way" on Campus Antisemitism*, NEW YORK SUN (Dec. 18, 2024), https://www.nysun.com/article/governor-shapiro-says-university-of-pennsylvania-has-lost-its-way-on-campus-antisemitism (last accessed Dec. 19, 2024).

Discrimination (May 7, 2024), available at https://www.whitehouse.gov/wp-content/uploads/2024/05/colleague-202405-shared-ancestry.pdf.

17.    Other ugly incidents exemplify the discriminatory inconsistencies that pervade Penn's Speech Policy. *First*, Professor Ahmad Almallah, a Palestinian poet and artist-in-residence at Penn who also lectures at the University, reportedly led a rally in Philadelphia after the October 7, 2023, attack on Israel where, with respect to Israel and the possibility of a two-state solution in which Israel and Palestine would coexist peacefully, he chanted "[t]here is only one solution: intifada revolution."

18.    That is an *explicit* call for violence against Israelis and Jews. To the extent that speech can cause measurable "harm," Professor Almallah inflicts "harm" that is an order of magnitude (or more) greater than the speech for which the University seeks to discipline Professor Wax. But, under the University's racist Speech Policy—in which speech concerning Jews and Israelis is completely protected and immune from any possibility of discipline, even where express and literal violence is incited—the University predictably refused to initiate any disciplinary proceedings against Professor Almallah.

19.    If, during the disciplinary proceedings, Professor Wax had called for violence against Palestinians, the University would not have hesitated to add such incitement to the charges against her and seek sanctions on that additional ground. But Professor Almallah's explicit calls for violence to be inflicted upon Israelis and Jews—expressly framed as an *alternative* to a peaceful two-state solution—enjoy absolute impunity under the University's Speech Policy, both because the speech

concerns Israelis/Jews and because Professor Almallah belongs to a more-favored racial group under the Speech Policy than Professor Wax.

20.     *Second*, and more recently, Professor Julia Alekseyeva posted a video openly celebrating the fact that the alleged murderer of Brian Thompson, the CEO of UnitedHealth Group, was an alumnus of the University and called the assassin "[t]he icon we all need and deserve." Professor Alekseyeva captioned the video with a statement that she "ha[s] never been prouder to be a professor at the University of P3nnsylvania [sic]," thereby explicitly reveling in a politically motivated assassination. Annie McCormick, *University of Pennsylvania assistant professor under fire for TikTok video praising CEO murder*, 6 ABC ACTION NEWS (Dec. 11, 2024), https://6abc.com/post/university-pennsylvania-assistant-professor-fire-tiktok-video-praising-murder-unitedhealthcare-ceo/15642658/.

21.     Not only has the University taken no action to discipline Professor Alekseyeva to date, but it has previously lauded her with a Dean's Award for Mentorship. Professor Alekseyeva is thus "proud[]" of the University for producing an alumnus who committed a political assassination, while the University is proud of the values that Professor Alekseyeva is inculcating in its students through her mentorship. The University has given no indication that Professor Alekseyeva might face academic discipline for her speech, even though it is incontestably more "harmful" than the speech for which the University seeks to discipline Professor Wax.

22.     These actions by the University thus reveal that its "harm" rationale is entirely pretextual and a mere veneer for discrimination on the basis of race, ethnicity, and other protected grounds.

23.     In truth, the University's actions have nothing to do with its pretextual "harm" rationale and instead are overwhelmingly driven by the discriminatory nature of the University's Speech Policy. Under that policy, some racial and ethnic groups—such as Jews—can be criticized with absolute impunity. Even cartoons that can readily be understood as endorsing violence against them or *explicit* calls for such violence ("intifada revolution")—at a time when violence *is* being inflicted upon Jewish students on campus at unprecedented levels—draw nothing more than mild criticism mixed with false piety about free-speech principles that is used to justify the lack of any disciplinary action.

24.     But when the speech at issue concerns a group higher up the University's intersectionality pyramid, such as African Americans, the University's putative commitment to free speech quickly vanishes. Instead, the University chose to take unprecedented actions against Professor Wax, even though by any conceivable measure the supposed "harm" that her speech caused is orders of magnitude less than Mr. Booth's blood-libel cartoon, Professor Almallah's explicit call for violence in the form of "intifada revolution" instead of a peaceful two-state solution, and Professor Alekseyeva's explicit endorsement of political assassinations as a tool of advancing policy change.

25.    The University's Speech Policy discriminates not merely based on the target of the speech, but also the identity of speakers. Speakers, like Professor Wax, who are White and/or Jewish are far more likely to be disciplined for offending speech than speakers who are racial minorities (other than Jews).

26.    The University's Speech Policy thus discriminates on the basis of race and other protected grounds—both in terms of the identity of speakers and the subject of speech. This racial discrimination violates federal anti-discrimination law, including (1) Titles VI and VII of the Civil Rights Act of 1964, which prohibit racial discrimination by federal fund recipients and employers, respectively, and (2) 42 U.S.C. § 1981, which prohibits discrimination in contract formation and enforcement.

27.    In addition, a central premise of the University's Speech Policy—*i.e.*, that punishing speech based on the putative "harm" it causes is consistent with First Amendment free-speech principles—is indefensible as a matter of law. The University's punishment of Wax's alleged statements based on their putative "harms"—even if it had been done in a race-neutral manner (unlike here)—is entirely premised on the upset, offense, and objections of some listeners in response to her speech. It is based on nothing more than some people's *disapproval* and *emotional reactions* to her statements and opinions. The University's actions are equivalent in this case to punishing speech based on whether it is "offensive" to the authority with the power to impose discipline. "[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it [under the First Amendment]. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according

10

it constitutional protection." *FCC v. Pacifica Foundation*, 438 U.S. 726, 745–46 (1978). Indeed, because "one man's vulgarity is another's lyric," it has been well-established law for more than a *half century* that putative offensiveness is *not* a permissible basis to criminalize speech. *Cohen v. California*, 403 U.S. 15, 25 (1971). Instead, when a restriction on speech "reflects the [authority's] disapproval of a subset of messages it finds offensive . . . [it] is the essence of viewpoint discrimination," which the First Amendment prohibits. *Matal v. Tam*, 582 U.S. 218, 249 (2017).

28.    The University's imposition of academic discipline in the form of "major sanctions" against Professor Wax is thus illegal multiple times over. In particular: (1) the University's Speech Policy, which is the basis of that discipline, unlawfully discriminates based on the race and other protected grounds of both speakers and targets of speech, thereby violating federal anti-discrimination laws, (2) the imposition of academic discipline violates the University's contractual promise to Professor Wax to abide by the principles of the First Amendment, which its actions manifestly flouted, and (3) the disciplinary procedures used and standards applied in those procedures violate Professor Wax's contractual tenure rights.

29.    The Court should accordingly (1) enjoin the University's imposition of academic discipline against Professor Wax, (2) declare that the University's Speech Policy violates both federal anti-discrimination laws and the First Amendment principles to which the University has contractually bound itself; (3) enjoin future

enforcement of that Speech Policy, (4) and award damages and other appropriate relief.

## PARTIES

30.    Plaintiff Professor Amy Wax is a natural person and resident of Jenkintown, Pennsylvania, and is a professor employed by Defendant Penn.

31.    Defendants the Trustees of the University of Pennsylvania are primarily entrusted with governance of Penn and primarily responsible for the conduct of the University. The University of Pennsylvania is an academic institution, which includes various departments such as the Penn Carey School of Law, with its principal place of business in Philadelphia, Pennsylvania.

## JURISDICTION

32.    The Court has jurisdiction over the federal claims in this matter (Counts II-III, V-VI) under 28 U.S.C. § 1331 because those claims arise under federal civil rights statutes.

33.    The Court has jurisdiction over the state law claims (1) under supplementary federal jurisdiction, 28 U.S.C. § 1367, because both the federal and Commonwealth claims arose from the same controversy concerning the discipline of Professor Wax; and, alternatively for Count I, (2) under 28 U.S.C. § 1331, because adjudication of the state law breach of contract claim necessarily requires this Court to provide a construction of the First Amendment to the United States Constitution.

34.    The Court has personal jurisdiction over Defendants because Defendants reside in this district.

## VENUE

35.    Venue is proper in this Court because (1) Defendants reside in this district and (2) a substantial part of the events giving rise to the claims occurred in this district. 28 U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

### I.    Amy Wax and Penn enter into a contractual tenure employment relationship.

36.    Plaintiff Amy Wax is a White Jewish woman.

37.    On July 1, 2001, Plaintiff Wax joined the faculty of Penn (now Penn Carey) Law School with tenure.

38.    Plaintiff Wax was granted a named chair on July 1, 2006, as the Robert Mundheim Professor of Law at the law school.

### II.    Professor Wax engages in speech generally accepted to be protected under basic principles of academic freedom and the First Amendment.

39.    In 2017, Plaintiff Wax and Larry Alexander published an opinion essay in the Philadelphia Inquirer entitled "Paying the Price for Breakdown of the Country's Bourgeois Culture." The essay argued that the loss of that culture, due in part to the influence of elite higher education, was especially damaging to disadvantaged groups, including racial minorities.

40.    This publication triggered the events at the center of this complaint. Almost immediately, students and faculty demanded that Plaintiff Wax be fired.

41.    Plaintiff Wax engaged over the following years in speech both on campus and off campus that expanded on similar concepts and criticized academia. Some of

Plaintiff Wax's speech discussed race in higher education, such as affirmative action. Her speech explored issues of cultural and group differences and behaviors, and policies relevant to them that are legitimate subjects of academic comment and public and political discourse generally.

42.     Defendant Penn commissioned Professor Daniel Rodriguez, a former dean of Northwestern Law School, to investigate complaints against Plaintiff Wax and interview students. He did so and subsequently created the Rodriguez Report, which concluded that there "was certainly no evidence from these interviews to suggest that [Professor Wax] graded minority students differently, denied them access to professional opportunities over which she had some modicum of control, or singled them out for special ridicule or disparagement."

43.     Professor Rodriguez was instructed to only share the report with then-Dean Ted Ruger and Wendy White (legal counsel for Defendant Penn) and not to share it with anybody else, including Professor Wax and her legal counsel.

## III.    Penn had previously adopted procedures for discipline of professors.

44.     Penn's Faculty Handbook contractually guarantees Professor Wax a procedure that is fair and that protects faculty rights. Handbook § II.E.16 ("The imposition of a sanction on a faculty member of the University of Pennsylvania is a rare event. However, when situations that might lead to such an action arise, they must be handled fairly and expeditiously. It is essential to have a process that both protects the rights of faculty members and addresses the legitimate concerns of the University") (attached as Exhibit 2).

14

45.    Penn has two types of disciplinary processes: (1) Academic conduct issues ("minor infraction"); or (2) "major infraction" issues, such as sexual assault and murder.

46.    Academic issues must be heard by a standing committee, the Senate Standing Committee on Academic Freedom and Responsibility (SCAFR). Handbook § II.E.12.III.B (attached as Exhibit 1).

47.    SCAFR has a fixed membership functioning as a jury of Professor Wax's peers. Handbook § II.A (attached as Exhibit 3).

48.    "Major infractions" charges trigger the creation of an ad hoc Faculty Senate Hearing Board to adjudicate the charges.

49.    Any Charging Document must provide accused faculty with notice of the precise charges, including descriptions of which Penn rule, regulation, or other condition of employment was violated.

50.    The prescribed hearing process for "major infractions" is as follows: the Dean presents the case to Penn; the defense for the accused professor presents rebuttal evidence and rebuttal arguments; and the hearing committee is required to write a report adjudicating the issues.

51.    The Handbook requires that accused faculty have access to all information relevant to putting on defenses and evaluating statements as truthful or accurate. Handbook § II.E.16.4.D.

**IV.    Dean Ruger initiates the academic prosecution of Professor Wax.**

52.    On March 2, 2022, Dean Theodore W. Ruger filed a "Charging Document" (attached as Exhibit 4) containing formal charges against Plaintiff Wax

and condemning what he called "Wax's intentional and incessant racist, sexist, xenophobic, and homophobic actions and statements." Ruger alleged that Wax's statements "inflict harm." The charges were substantially based on comments Wax allegedly made in the media and outside Penn—extra-mural speech ordinarily receiving full protection according to established principles of academic freedom – which were in many cases lifted out of context or simply misrepresented. There were also a small number of accusations based on a few isolated, alleged "offending" comments, almost all from many years previously, claimed to be made to Penn Law students outside or inside class. Apart from the statement about patterns of student performance at Penn, none of these alleged statements were claimed to contain factual falsehoods.

53. Ruger charged Amy Wax's speech as a "major infraction" under Faculty Handbook Section II.E.16, Procedure Governing Sanctions Taken Against Members of the Faculty.

54. To put this procedural machination in context, by charging Professor Wax with a "major infraction," Dean Ruger was asserting that Professor Wax's *speech* was equivalent in kind and degree to conduct like murder or sexual assault. But despite Penn's procedures reserving "major infractions" for conduct that is typically equivalent to severe felonies, Ruger invoked the major-infractions procedures against Professor Wax.

55. Penn has never used the "major infractions" procedures for any other speech. Indeed, it has not even invoked the *minor* infractions disciplinary procedures

for any of the anti-Semitic speech or incitements to violence described in this Complaint.

56.    This manifest double standard is the direct result of the pervasively discriminatory nature of Penn's Speech Policy.

57.    Ruger levied four charges against Plaintiff Wax: (1) exploitation, harassment, and discriminatory treatment of students and creating a hostile or discriminatory classroom; (2) not evaluating each student's true merit; (3) not respecting the confidential nature of the relationship between professor and student; and (4) not showing respect for others.

58.    The Charging Document included claims or statements from students that do not clarify whether they were made in or out of the classroom, that were entirely made up or unverified or never substantiated, or that otherwise were not credible.

59.    The Charging Document repeatedly asserted that Professor Wax's comments about Black student performance were untrue but provided no evidence of the falsity of Professor Wax's statements.

## V.    Penn creates an ad hoc Hearing Board and consistently departs from procedure in its disciplinary proceedings against Professor Wax.

60.    Defendant Penn did not fix the Charging Document's error of bringing a "major infraction" procedure.

61.    Defendant Penn began assigning faculty to the ad hoc Hearing Board in June 2022.

62.    Two of the five (40%) of the ad hoc Hearing Board's chosen members were from one of Penn's dozens of departments: the Graduate School of Education, which at Penn (as at other institutions) is known to favor the worldviews and beliefs that Plaintiff Wax had been criticizing.

63.    On February 16, 2022, Professor Anita L. Allen had presented to the Faculty Senate a seminar ("Allen Presentation") that, although stating that Penn upholds the First Amendment to the United States Constitution, also asserted that the University must prospectively apply a new standard to evaluating speech in order to distinguish between "speech" and "behavior." In a nutshell, she asserted that certain categories of disfavored speech—particularly speech criticizing favored racial groups—should henceforth be treated as punishable "conduct" rather than "speech." Certain faculty, including members of the Faculty Senate who would judge Professor Wax's case, attended this presentation.

64.    The Allen Presentation represents the de facto policy of the University, which Penn's subsequent actions against Professor Wax confirm, despite its repeatedly stated commitment to First Amendment protections for members of the University community. These protections are wholly inconsistent with the de facto policy.

65.    In a letter dated July 29, 2022 (attached as Exhibit 5), Associate General Counsel Sean Burke refused to provide Professor Wax with the information, solely within Defendant Penn's control, necessary to determine whether Wax should have moved to have any of the proposed Hearing Board members disqualified for prejudice.

This included a refusal to tell Wax which potential members of the board that would hear the complaints against her (the ad hoc Hearing Board) attended the prejudicial Allen presentation.

66.    The final selection of the ad hoc Hearing Board occurred on September 13, and the ad hoc Hearing Board members all voted not to recuse themselves.

67.    The ad hoc Hearing Board held a three-day hearing in May 2023.

68.    On June 21, 2023, the ad hoc Hearing Board published its report ("Ad Hoc Report," attached as Exhibit 6) in which it concluded Plaintiff Wax engaged in "flagrant unprofessional conduct." The Hearing Board recommended sanctions of a one-year suspension at half pay, the loss of the named chair, the loss of summer pay in perpetuity, and a public reprimand.

69.    The ad hoc Hearing Board sent its report to then-President Magill on June 21, 2023.

70.    The Ad Hoc Report fails to satisfy the most minimal standard of fairness or fair process. The Ad Hoc report is defective in multiple ways.  It fails to point to any rule or source for any so-called "behavioral standard" that has allegedly been violated, or how Wax's statements violate that standard.  It does not mention any of Plaintiff Wax's witnesses or arguments in rebuttal, it gives blanket credence to the University's submissions and witnesses without weighing, evaluating, or analyzing any testimony or explaining its reasoning, it credits allegations that the evidence revealed as unquestionably false, implausible, entirely lacking factual support, or contradicted by testimony and evidence presented at the hearing as well as Wax's

arguments, and it substantially recharacterized three of the four charges that were originally submitted by Dean Ruger. In announcing "major sanctions" against Professor Wax, the Report failed to resolve all the charges against Professor Wax. Rather, it listed, once again without further analysis or explanation, only a fraction of the allegations in the original complaint, thus leaving Wax and the entire Penn community completely in the dark about whether unmentioned statements or allegations against Professor Wax violated Penn rules, were objectionable or protected, or formed the basis for sanctions against her. This had the effect of inflicting harm not only on Professor Wax but on all members of the Penn community, who were left in a state of uncertainty as to what statements, comments, and speech were immune from sanction or would risk punishment.

71.     The Ad Hoc Report described Plaintiff Wax as making "sweeping and unreliable conclusions", "uncritical use of data", "unfounded declarative claims", and "unsubstantiated statements." The Report did not provide Professor Wax with specific examples or point to particular statements relied upon by the ad hoc Hearing Board to support or illustrate these vague generalities, nor did it articulate the particular applicable standards applied or their source or authority in Penn guidelines or rules, thereby thwarting Professor Wax's ability to defend herself against these accusations.

72.     The Charges and the Report created a false impression of Professor Wax based on the one-sided and incomplete nature of the published facts. For instance, it ignored or mischaracterized the Rodriguez Report's findings, credited uncorroborated

claims, and omitted key facts and timelines. Further, the Charging Document implied without any evidence that Professor Wax endorsed the views of Jared Taylor and failed to acknowledge that Professor Wax received the University's permission to host Taylor and was reimbursed by the University for the expenses of Taylor's attendance.

73.    The Report and accompanying process deviated from the normal due process procedures of the University that are contractually required, deviated from well-established norms for faculty discipline, and intentionally presented statements by Professor Wax in false or misleading ways, including as follows:

   a.  The University's failure to evaluate or even mention that one student witness against Professor Wax, who complained that Professor Wax talked about race every day in Civil Procedure, (1) gave testimony that was never verified or corroborated by any of the dozens of students in that class;  and (2) by the student's own admission was experiencing serious mental health problems, including hallucinations and dissociation, during the year in which she was in the Civil Procedure class in question. Day 1 Tr. at 192:7-199:1 (attached as Exhibit 7).

   b.  The University's failure to perform the basic due process of identifying and analyzing the witness testimony at the hearing, including discounting disputed or disproven witness testimony, instead apparently endorsing false claims and accepting them uncritically as credible, pedagogically inappropriate, or somehow "damaging". For example, one witness falsely claimed that Professor Wax used the word

"negro" in an insidiously racist manner during class. Day 2 Tr. at 312:5-318:18 (attached as Exhibit 7). Yet, as Professor Wax explained, she simply repeated the court's description of a witness as a "negro" in the case being discussed, which was decided by a Mississippi state court in 1961, when Jim Crow was still prevalent there, in order to make the pedagogical point that the case's outcome could perhaps be explained by the court's discounting of the witness's testimony. Day 3 Tr. at 12:15-13:12 (attached as Exhibit 7). Despite this entirely plausible and benign explanation, the Final Report stated that Professor Wax's speech was "demeaning and demoralizing to minority groups" and "cannot help but *inequitably* impact the learning environment" and "violate[d] behavioral professional norms." Ad Hoc Report at 2. The specific alleged incidents that were the basis for these conclusions were never revealed. Evidently the dubious complaint aired in the hearing about the use of the word "negro," and Wax's explanation demonstrating the unreasonableness of the complaint, did not warrant a mention by the Hearing Board in its sanctioning of Professor Wax.

c. The Report also claimed that Professor Wax "stat[ed]" in civil procedure class that "Mexican men are more likely to assault women." See Ad Hoc Report at 8. This was false. A student made that claim at the hearing, but in fact her own notes from the class evinced her misstatement of what Professor Wax said in class. As explained by Professor Wax in

submissions in response to the complaint against her and at the hearing (and as confirmed by the student's own notes), a generalization about Mexican men was uttered by a juror in a case Professor Wax was teaching, *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017), and Professor Wax never endorsed or asserted any such generalization as her own opinion. Rather, she made the pedagogical, legal point that it was unclear whether the scope of the "racist statement" exception to the "non-impeachment" rule forbidding inquiry into jury deliberations was properly extended to statements about national stereotypes, such as "that Germans are punctual" or the statement about Mexican men the juror made in the case under discussion. What Professor Wax actually said and the point she made in class, which was in no way prejudicial, racist, or objectionable, was nowhere discussed or noted by the Hearing Board. Rather, the Board uncritically accepted the student witness's obviously erroneous claims without even mentioning, let alone evaluating, weighing, or analyzing, the actual evidence and arguments presented.

d.  The University's failure, in the Charging Document or through the Hearing Board, to disclose or distinguish comments made on or off campus, despite the distinction's obvious, accepted, and longstanding importance in evaluating the protections accorded to statements by members of the University;

e.  The Report's failure, within its cursory conclusions, to provide any findings of fact to back up those conclusions.

f.  The Report's failure to evaluate or assess the evidentiary weight of the testimony of the witnesses against Professor Wax in any way even remotely necessary under basic due process principles;

g.  The complete failure to mention, let alone consider or evaluate, the testimony of any of Professor Wax's hearing witnesses, or her arguments at the hearing or in her numerous filings in the case.

74.  Furthermore, the University gave permission for and paid for Jared Taylor to visit Professor Wax's class. However, in 2024, the University reversed itself and has so far refused to pay for Taylor's most recent visit. The University has failed to explain this reversal, despite repeated requests.

**VI.  Then-President Liz Magill endorses the procedurally deficient and substantively absurd conclusions of the ad hoc Hearing Board.**

75.  Then-President Magill issued a decision on August 11, 2023, upholding the proposed sanctions against Plaintiff Wax. Exhibit 8.

76.  Magill concluded there was no reason to depart from the recommendations or return the case for further procedures.

77.  On September 24, 2024, Interim President Jameson, who had succeeded Magill, chose to publish Magill's letter on Penn's website. (available at https://almanac.upenn.edu/articles/final-determination-of-complaint-against-professor-amy-wax) (attached as Exhibit 11).

**VII.    Penn levies its final sanctions on Professor Wax.**

78.    Professor Wax appealed the matter to the Faculty Senate Committee on Academic Freedom and Responsibility ("SCAFR").

79.    On May 29, 2024, SCAFR issued its report in which SCAFR found no procedural defects by the ad hoc Hearing Board. Exhibit 9. On May 30, 2024, Provost Jackson sent Professor Wax a draft reprimand, which he stated he intended to release later that day.  Professor Wax then e-mailed Interim President Jameson directly, asking for a personal meeting, to which Jameson agreed. Following that meeting, which took place on June 14, 2024, settlement negotiations between Sean Burke from the Penn OGC and Wax's counsel commenced. Those negotiations reached an impasse in mid-September 2024.

80.    On September 23, 2024, Provost Jackson sent a letter to Plaintiff Wax as a "public reprimand" in accordance with the sanctions and notified Plaintiff Wax that the sanctions as recommended by the ad hoc Hearing Board would be imposed. Exhibit 10.

81.    Also on September 23, 2024, Penn published the formal reprimand and made public Penn's sanctions against Plaintiff Wax. Exhibit 11.

82.    On September 24, 2024, Interim President Jameson chose to publish the SCAFR        Report        on        Penn's        website.        (Available        at https://almanac.upenn.edu/articles/final-determination-of-complaint-against-professor-amy-wax). Exhibit 11. Simultaneously, Penn Carey Law School Dean Sophia Lee sent an e-mail to Professor Wax reiterating the imposition of sanctions including loss of her named chair, a one-year suspension at half pay with benefits

intact, and loss of summer pay "in perpetuity."  The e-mail arrived after Professor

Wax had already commenced teaching courses, including a year-long seminar, for the

2024-2025 academic year.  The message stated that the one-year suspension would

operate "beginning July 1, 2025 through June 30, 2026."

83.    The imposition and publishing of the sanctions against Professor Wax

and the supposed infractions on which they are based, which contained many false

and/or misleading assertions and penalized clearly protected forms of expression, has

harmed Professor Wax's reputation in academia.

84.    SCAFR Member Jules van Binsbergen wrote a Report ("van Binsbergen

Report" attached as Exhibit 12) for SCAFR, arguing that "the procedure against

Professor Wax did not appropriately protect her rights."

85.    Van Binsbergen pointed to the following "major procedural errors":

(i) that the case against Professor Wax, based almost entirely on examples of speech

occurring outside the classroom or the University, was entirely inconsistent with

Defendant's statements in congressional testimony, public interviews, and on Penn's

official websites; (ii) the post hoc introduction of a new professional conduct standard

creating a dichotomy between protected speech and behavior; (iii) the retroactive

application of the new standard to Professor Wax's past behavior; (iv) the use of the

"major infraction" article reserved for rape and misappropriation instead of the

"minor infraction" standard that should have been used; (v) the "intentional initial

suppression and later misrepresentation of a report [the Rodriguez Report] largely

favorable to the accused by (then) law school Dean Professor Ted Ruger and the legal

counsel of the university"; (vi) the decision not to provide Professor Wax with the information she needed to challenge and exclude certain candidates for the ad hoc Hearing Board based on conflict of interest / bias; (vii) the "guilty-by-association mechanism" to falsely imply that Professor Wax shares all the views of Jared Taylor, painted by Ruger in the Charging Document as a "renowned white supremacist"; and (viii) the "inappropriate conduct of Penn's legal counsel by pretending to SCAFR that they are impartial in this matter which, given their actions described in the previous points, is clearly false."

86.    Beyond the stripping of her title, Professor Wax has experienced serious harm to her reputation as a direct result of these sanctions. For example, an interview with Professor Wax scheduled to be broadcast on WHRW, the student-run radio station of Binghamton University, was canceled in early November 2024 after a last-minute vote by the radio station's Board. In a statement, the General Manager explicitly referenced the "harmful nature of Amy Wax's statements, which have led to the University of Pennsylvania sanctioning her."  Likewise, a number of student organizations at Yale attempted to cancel an appearance and speech by Professor Wax, scheduled for November 6, 2024, citing Penn's decision to sanction her.  For instance, one organization, in urging that the Law School Dean at Yale block her speech, noted expressly that "a panel of her faculty peers voted to sanction her earlier this year."

**VIII. At all times, Penn employed a Speech Policy that allowed antisemitic speech.**

87.    Defendant Penn has created a de facto Speech Policy at the University by refusing to punish offensive speech targeting Jews, both on and off campus.

88.    Perhaps most famously, Penn was one of the many campuses with an "encampment," a gathering of anti-Israel protestors using campus property to protest the continued war against Hamas terrorists. In May 2024, the Faculty Senate Executive Committee at Penn voted against disbanding the encampment, despite a request from Governor Shapiro to do so in the name of public safety. Even Interim President Jameson conceded that the encampment featured serious harassment, particularly of Jewish students.

89.    Other reports were made of terrorist flags, weapons, and vandalism on campus at Penn. Much of this went unpunished. The encampment was not disbanded for months, until May 10, 2024, when Penn finally allowed Philadelphia police to come on campus and arrest 33 persons.

90.    Defendant Penn declined to sanction Anne Norton, professor and employee and member of the Faculty Senate Executive Committee, who posted on Twitter/X that "the debate is over" regarding whether Hamas committed sexual atrocities against Jewish women, meaning that such allegations against Hamas were false.

91.    This absurd denial by Professor Norton of the sexual violence that Hamas committed on October 7, 2023, is self-evidently more "harmful" than any of the speech for which the University disciplined Professor Wax. But, once again, because the speech concerned Israelis and Jews and sought to incite or legitimize

violence against them, it enjoyed absolute immunity under the University's Speech Policy.

92.    Anne Norton has further complained on social media that "Young Jews" are persuaded that "they are always already victims."

93.    Had Professor Norton publicly expressed the same categorical generalizations and expounded similar racist stereotypes about racial groups that enjoy preferential status under the Speech Policy, Professor Norton would likely be facing disciplinary proceedings. But under Penn's Speech Policy, stereotyping some racial groups is protected speech, while for other racial groups it is somehow unprotected "conduct." This Orwellian doublespeak is the official policy of the University.

94.    Professor Huda Fakhreddine, an associate professor of Arabic literature at Penn's Middle East Center, similarly has a history of antisemitic speech, including praising Hamas's October 7 terrorist attack, endorsing that Israelis are "legitimate military targets", and bringing antisemitic speakers to campus. Fakhreddine was "criticize[d] [] by name for her statements about Israel" in a January 24, 2024, letter to Penn from the House Committee on Education and the Workforce "expressing the Committee's 'grave concerns regarding the inadequacy of Penn's response to antisemitism on its campus.'"[4]

_____

[4] *Fakhreddine v. Univ. of Pa.*, No. 24-CV-1034, 2024 WL 3106186, at *1 (E.D. Pa. June 24, 2024). After this letter was sent, Fakhreddine—along with Penn Professor Eve Troutt Powell and an association called Penn Faculty for Justice in Palestine— "sued Penn to stop it from complying with a request for documents" in the letter. *Id.* The lawsuit has since been dismissed for lack of standing. *See id.*

95.    Penn has not only ignored and permitted Fakhreddine's antisemitic speech and conduct. It has actually institutionalized and rewarded that speech and conduct by allowing Fakhreddine to teach a course subtitled "Resistance from Pre-Islamic Arabia to Palestine" in the semester immediately following the October 7 attacks, an attack Fakhreddine had praised with that same term "resistance."[5] Given Professor Fakhreddine's prior public statements, Penn was amply aware that she considered the murder, torture, rape, and kidnapping of Jews to be legitimate "resistance." Yet Penn still devoted University resources to providing a platform for her hateful views—which unambiguously are more "harmful" than the speech for which Penn seeks to punish Professor Wax.

96.    Unsurprisingly, Professor Fakhreddine's course on Palestinian "resistance" drew severe public criticism. Penn's response to that criticism? Certainly not to institute any disciplinary actions against Professor Fakhreddine for praising and implicitly endorsing the commission of terrorist actions against Jews. Instead, Penn allowed Professor Fakhreddine to continue teaching the same course, but simply modified the previously revealing subtitle to the more innocuous "Arabic

---

[5] Middle Eastern Languages & Cultures, *ARAB4050 – Arabic Readings in Belles-Lettres: Resistance from Pre-Islamic Arabia to Palestine*, PENN ARTS & SCIS., https://melc.sas.upenn.edu/node/1526 (last visited Jan. 7, 2025).

Grammar and Rhetoric."[6] Despite the whitewashing of the course's title, the course's description is *identical* to the prior course on Palestinian "resistance."[7]

97.    If any professor at Penn proposed a course that similarly justified acts of terror against other minority groups as legitimate "resistance," Penn would have never approved the proposal, and would have likely instead have imposed discipline for speech praising the commission of murder, rape, torture, and kidnapping of those other minority groups. Fakhreddine, however, has been permitted to teach her course, and to continue to explicitly and implicitly endorse violence against Jews, with impunity because (1) she belongs to a more-favored racial group than Professor Wax under Penn's Speech Policy, and (2) the Speech Policy does not punish hateful speech against Israelis/Jews.

98.    Professor Ahmad Almallah, a Palestinian poet and artist in residence and lecturer at Penn, reportedly led a rally in Philadelphia where he chanted "There is only one solution: intifada revolution" regarding Israel. *3 Contentious Exchanges at the College Antisemitism Hearing*, NY TIMES (Dec. 6, 2023), https://www.nytimes.com/2023/12/06/us/harvard-mit-penn-presidents-antisemitism-hearing.html. Congressman Jim Banks raised this to then-President Magill during a congressional hearing in early December 2023 at which she appeared, asking why

---

[6] The course is currently called ARAB4050, Arabic Readings in Belles-Lettres: Arabic Grammar and Rhetoric, but has an identical course description to the Spring 2024 version. *See id.*; Middle Eastern Languages & Cultures, *Courses for Spring 2025*, PENN ARTS & SCIS., https://melc.sas.upenn.edu/index.php/course-list/2025A/all/all (last visited Jan. 7, 2025).

[7] *Id.*

Penn did not discipline Almallah, to which President Magill replied that Penn's speech policy "is guided by the United States Constitution," by which she inarguably meant Professor Almallah was not punished because Professor Almallah's speech was protected by the First Amendment.

99.    Then-President Magill's invocation of the First Amendment to protect Professor Almallah's incitement of violence, but complete refusal even to attempt to square the imposition of academic discipline against Professor Wax with First Amendment principles, demonstrates the racially discriminatory nature of the University's Speech Policy.

100.    Similarly, as explained above, Defendant Penn declined to sanction Dwayne Booth, an employee of Penn, for cartoons depicting Jews as Nazis drinking the blood of Palestinians, which was a modern recasting of the Medieval Blood Libel that Jews engage in the drinking of the blood of Christian children.

101.    After the October 7, 2023, massacre of Israelis by Hamas terrorists, the librarian at the Penn law school, Jill Richards, posted on Facebook "I <3 Hamas" (*i.e.*, "I love Hamas" translated from emoticon). She also received no discipline for expressing her love for a terrorist group that had recently tortured and murdered Jews.

102.    Penn Health employee Ibrahim Kobeissi has likewise denied sexual assault by Hamas on October 7, suggested Netanyahu orchestrated October 7, and referred to members of Congress as "retards" for supporting Israel.

103.    Had Professor Wax used such "offensive" speech in comments about certain minority groups, the University would not have hesitated to impose discipline against her. But both because (1) Mr. Kobeissi belongs to a racial classification higher up on the University's intersectionality pyramid and (2) the offensive speech concerned supporters of Israel/Jews, rather than some other more favored group, Mr. Kobeissi also has not been sanctioned.

104.    On the anniversary of the October 7 attack, a crowd of Penn faculty and students gathered to call for an attack against Tel Aviv.

105.    Penn's recurring decisions not to punish these employees for their speech, but to punish Professor Wax for hers, is a product of the University's discriminatory Speech Policy, which this suit challenges.

## FIRST CAUSE OF ACTION
### Breach of Contract

106.    Plaintiff incorporates by reference all previous allegations.

107.    Plaintiff Wax and Defendant Penn entered into a tenure contract on July 1, 2001.

108.    Tenure contracts are rarely distilled into a single document. Here, the Tenure Contract is comprised of an appointment letter (Ex. 13), the Faculty Handbook (pertinent sections provided in Exs. 1-3), the "Open Expression" policy (Ex. 14), and other statements by Defendants concerning protections for faculty speech and expression incorporated into the contract, including by then-President Liz Magill before Congress under oath (Ex. 15), that Penn honors the protections accorded by the United States Constitution, which includes the First Amendment.

109.    The Tenure Contract's essential terms include: tenure's widely-accepted protections against disciplinary actions, including for academic-related speech; the contractual rights given to professors via the "Open Expression" policy; and the "Terms and Conditions of Faculty Appointments," including the procedures for disciplinary processes, as described in the Faculty Handbook.

110.    The Tenure Contract was created by an intentional and deliberate decision by Penn to induce Professor Wax to enter into a long-term contractual relationship by which Penn would benefit from Plaintiff Wax's scholarship and teaching and Plaintiff Wax would benefit from certain protections given by Penn as described in the preceding paragraph.

111.    Defendant Penn's grant of tenure to Plaintiff Wax was an offer to fulfill the general promises set forth in the Faculty Handbook, in the Open Expression policy, and elsewhere, including statements by Penn officials, such as former Penn President Liz Magill's assertion under oath before Congress that Penn abides by Constitutional and First Amendment principles in its treatment of its faculty, including tenured faculty, and other university members.  This promise includes protection for views and positions that may not accord with the University's supposed "mission," or, to quote Interim-President Jameson in commenting on Dwayne Booth's cartoons," that some at the University may find "loathsome."

112.    The Handbook for Faculty and Academic Administrators is part of the Tenure Contract, because by its own terms it "is a set of policies governing faculty life at Penn" and because it functioned as part of the inducement for Professor Wax to

34

enter into her original contractual relationship with Penn and eventually into the Tenure Contract.

113.    Penn breached the Tenure Contract by punishing Professor Wax for speech protected under the contract and for sanctioning her through a process that violated her due process rights under the contract.

114.    Professor Wax has experienced both monetary damages in the form of the sanctions and loss of income, as well as reputational damages through the loss of her title, the smearing of her professional reputation, and the imposition of a one-year suspension.

115.    Many of the harms that Penn's unlawful actions have inflicted are irreparable and cannot adequately be addressed by legal remedies. Notably, the sanctions Penn has announced and imposed have caused and will continue to cause irreparable harm to Professor Wax by being invoked and used to block invitations, speaking engagements, and public appearances, in derogation of Professor Wax's professional reputation and activities. In addition, Professor Wax's inability to teach students during Penn's proposed suspension is a harm for which money damages cannot provide adequate relief.

116.    Courts in Pennsylvania will adjudicate and vacate internal disciplinary proceedings of an institution of higher education when the defendant institution has clearly violated its own procedures.

117.    Penn departed from its own procedures during the disciplinary proceedings against Professor Wax and engaged in a pattern of bad faith conduct.

118.    Penn departed from its normal procedures and acted in bad faith in contravention to the widely-accepted procedures for academic discipline, including in the following ways: (1) The bad faith attempt to manipulate the process and evade proper procedures by mischaracterizing the alleged conduct of Professor Wax as analogous to criminal conduct such as rape instead of academic conduct with the purpose of evading the normal procedures afforded to professors under Penn's rules for academic freedom; (2) Dean Ruger's refusal to produce documents and information related to his Charges and allegations against Professor Wax and stating "it sucks" that Professor Wax "still works [at Penn]"; (3) Penn's refusal to order Dean Ruger to produce said documents; (4) Penn's intentional suppression of the Rodriguez Report, which flatly contradicted many of the charges asserted against Professor Wax, (5) Penn's interference with the Tenure Contract right to move to disqualify Faculty Senate Hearing Board members for prejudice; and (6) Penn's bad faith attempt to manipulate the process and evade proper procedures by mischaracterizing Professor Wax's speech, including but not limited to accusations of invidious racism without engaging in even the most rudimentary and basic evaluation or examination of any of the allegations, claims, or testimony on that issue, without defining terms such as "racism" with any specificity, and by mischaracterizing her speech as "behavior"; and (7) the ultimate imposition of "major sanctions" for academic speech.

119.    One of the members of SCAFR, Jules van Binsbergen, has acknowledged that Penn substantially departed from its own procedures during the Wax process. See ¶¶ 84–85.

120.    Pursuant to the facts alleged above, Penn violated the Tenure Contract through the unfair proceedings, causing Plaintiff Wax the resultant damages.

121.    Defendant Penn also breached the contract by sanctioning Professor Wax in violation of Penn's "Open Expression" policy.[8]

122.    Penn's "Open Expression" policy is a written provision, governing the relationship between administrators, professors, and students, that "affirms, supports and cherishes the concepts of freedom of thought, inquiry, speech, and lawful assembly. The freedom to experiment, to present and examine alternative data and theories; the freedom to hear, express, and debate various views; and the freedom to voice criticism of existing practices and values are fundamental rights that must be upheld and practiced by the University in a free society."

123.    Defendant Penn includes "Enforcement" provisions to ensure that the rights given to University professors under the "Open Expression" policy are applied.

124.    Penn's "Open Expression" policy binds University professors and administrators.

125.    The "Open Expression" policy is a part of Defendant Penn's contract with Plaintiff Wax.

126.    This "Open Expression" policy was described by then-President of the University Liz Magill in sworn testimony to Congress under the penalty of perjury, in which she stated that Penn's policy is substantively identical to and governed by

---

[8] Available at https://catalog.upenn.edu/pennbook/open-expression/#text.

the First Amendment to the United States Constitution.[9] No one at Penn has ever repudiated Magill's assertion.

127.    By punishing Professor Wax for engaging in speech that would be protected by the First Amendment, Penn violated the Tenure Contract and caused Plaintiff Wax the resultant damages.

## SECOND CAUSE OF ACTION
### Violation of 42 U.S.C. § 1981

128.    Plaintiff incorporates by reference all previous allegations.

129.    Section 1981 of the Civil Rights Act states: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981.

130.    Professor Wax was fully qualified for her rank as tenured professor and was entitled to the protections thereof.

---

[9] Then-President Magill: "[Penn's] free speech policies are guided by the United States Constitution." Congressional Testimony Reported by Danielle Wallace, UPenn president torched over antisemitic speakers, teachers allowed on campus but not Trump ICE director, Fox News (Dec. 5, 2023), https://www.foxnews.com/politics/upenn-president-torched-antisemitic-speakers-teachers-allowed-campus-not-trump-ice-director.
Then-President Magill's Submitted Testimony: "Penn's approach to protest is guided by the U.S. Constitution." Available on the University's website at https://magill-archived.www.upenn.edu/content/congressional-hearing-written-testimony.

131.    Professor Wax suffered adverse action in the form of the sanctions Penn imposed upon her.

132.    The application of the Speech Policy directly affected Plaintiff Wax's right to enforce her Tenure Contract as described above and as protected by Section 1981.

133.    Penn's disciplinary actions against Professor Wax occurred under circumstances giving rise to an inference of intentional discrimination in the form of deliberate indifference.

134.    Penn maintains substantial control over the speech policies on campus that apply to the speech of students and professors.

135.    Penn's Speech Policy discriminates on the basis of race, ethnicity, and other protected grounds. *See also supra* at 5-6 n.2.

136.    Penn's Speech Policy discriminates on the basis of race and other protected grounds because it punishes some speakers due to the racial content of their speech but does not punish other speakers who engage in speech of the same or materially similar content—depending on what racial, religious, national origin, or ethnic group is the subject of the speech at issue.

137.    Penn's Speech Policy also discriminates based on the race or other protected ground of the speaker.

138.    Anti-Jewish speech is not subject to the same discipline under the Speech Policy as speech alleged to target other racial groups.

139.    The racially discriminatory Speech Policy has created and facilitated a racially hostile environment at Penn because antisemitic speech is given special solicitude, while academic speech discussing race in ways that Penn finds unacceptable, such as Plaintiff Wax's, is punished.

140.    At all times, Defendant Penn had actual knowledge of the antisemitic speech it allowed on campus by both students and professors.

141.    Defendant Penn chose not to punish antisemitic speech or prevent a racially hostile environment.

142.    The hostile environment facilitated or created by Penn through the Speech Policy contributed to the violation of Professor Wax's Section 1981 rights under her contract.

143.    Penn's disciplinary actions against Professor Wax are a direct result of Penn's discriminatory Speech Policy.

144.    Penn tolerated speech targeting Jews while punishing Professor Wax for speech about affirmative action and other racial topics.

145.    Penn's actions against Plaintiff Wax were triggered by Professor Wax's speech on affirmative action and other comments involving the topic of race and were intended to punish her for engaging in speech Penn disfavored. At the same time, Penn did not punish any antisemitic speech.

146.    Race therefore was a but-for cause of the decision to discipline Plaintiff Wax.

147.    Accordingly, the denial of Professor Wax's right to enforce her Tenure Contract was directly caused by Penn's racially discriminatory Speech Policy.

### THIRD CAUSE OF ACTION
### Violation of Title VI, 42 U.S.C. §§ 2000d - 2000d-7

148.    Plaintiff incorporates by reference all previous allegations.

149.    Title VI states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000(d).

150.    By its plain text, Title VI is not limited to discrimination based on the race of the plaintiff, but instead prohibits *all* relevant actions taken "on the ground of race, color, or national origin" by recipients of federal funds.

151.    Penn receives federal financial assistance.

152.    Penn engaged in discrimination on the basis of race, color, and/or national origin through the Speech Policy as alleged above. (As explained above, the use of "race" in this Complaint includes, as appropriate, national origin, ethnicity, and ancestry, as it relates to Jews. *See supra* at 5-6 n.2.)

153.    Professor Wax was qualified for the benefit of her tenure at Penn as alleged above.

154.    Defendant Penn's actions give rise to an inference of intentional discrimination because of Penn's deliberate indifference to the racially hostile nature of the Speech Policy, as described above.

155.    Race was a but-for cause of the decision to discipline Plaintiff Wax.

156.   Title VI protects professors when the employment discrimination complained of necessarily causes discrimination against the intended beneficiaries of the federal funding.

157.   Penn's employment practices, including but not limited to the Speech Policy, tend to exclude individuals from participation, to deny them the benefits, or to subject them to discrimination at Penn.

158.   Penn's Speech Policy—including its race-based double standards—applies to students and other members of the University community, rather than just professors. If, for example, the students perpetrating the unlawful encampments at the University had been calling for violence against African Americans rather than Jews, there can be no doubt that the University would have quickly disbanded the encampment and initiated disciplinary proceedings against the offending students.

159.   The University's race-based Speech Policy is thus one of general applicability. For the speech of both professors and students, the University discriminates on the basis of the speaker's race as well as the race of the group being discussed in the speech.

160.   Penn's Speech Policy, as applied in academic disciplinary proceedings, also has the downstream effects of chilling speech involving the topic of race of all professors and students, who are the intended beneficiaries of Title VI.

161.   Penn's racial double standards and its resulting actions implementing those double standards have also created a hostile environment for Jewish students and professors.

## FOURTH CAUSE OF ACTION
### False Light Invasion of Privacy

162.   Plaintiff incorporates by reference all previous allegations.

163.   Pennsylvania law offers redress for publication of matters that are selectively publicized in a manner creating a false impression, even if the selectively chosen matters are in some sense "literally" true.

164.   Defendant Penn's publication of the final reports announcing the sanctions against Professor Wax, published online September 23 and 24, 2024, portrayed her as a racist and described her speech as harmful to the Penn community.

165.   Plaintiff Wax is not a racist, nor does her speech create harm.

166.   Penn's final reports cherry-picked, misrepresented, or outright misstated certain statements by Professor Wax, the result of which was to portray Professor Wax in a false light, namely, that she is a virulent racist.

167.   Racism is highly offensive to a reasonable person, and portraying any person as a racist without reasonable basis to do so is a highly offensive action.

168.   Defendants knew that Professor Wax was and is not a racist, or acted at the very least in reckless disregard of the fact, yet published the reports painting her as such anyway.

169.   Defendants, through the Charging Document, the Reports, and their publication, further placed Professor Wax in a false light by repeatedly accusing her of lying about Black student performance, but Defendants provided no evidence of the falsity of Professor Wax's statements. The publication and accompanying sanctions work to portray Professor Wax not only as a racist but a liar.

170.    During the hearing and accompanying briefing, as well as in other submissions to Penn in the disciplinary proceedings and in public presentations, Professor Wax supported her statements which Defendants alleged (without providing any evidence whatsoever) were false, by drawing on her personal observations and experiences during decades of teaching at the law school. Accordingly, the University was on notice that the allegations of false statements were untrue, but went forward with the discipline and publication nonetheless.

171.    Defendants knew that Professor Wax was not providing untrue statements as to student performance, or Defendants acted at the very least in reckless disregard of the fact, yet published the reports painting her as a liar anyway.

## FIFTH CAUSE OF ACTION
### Violations of Title VII, 42 U.S.C. §§ 2000e et seq.

172.    Plaintiff incorporates by reference all previous allegations.

173.    Title VII states that "It shall be an unlawful employment practice for an employer—(1) to … otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.

174.    Plaintiff Wax was fully qualified for her rank as tenured professor and was entitled to the protections thereof.

175.    Professor Wax suffered adverse action in the form of the sanctions taken against her.

176.    Penn's disciplinary actions against Professor Wax occurred under circumstances giving rise to an inference of intentional discrimination in the form of deliberate indifference.

177.    Penn maintains substantial control over the speech policies on campus that pertain to the speech of students and professors.

178.    Penn's Speech Policy discriminates on the basis of race, as well as other protected statuses. *See supra* at 5-6 n.2.

179.    Penn's Speech Policy discriminates on the basis of race because it punishes some speakers due to the racial content of their speech but does not punish other speakers that engage in speech of the same or materially similar racial content—depending on what racial group is the subject of the speech at issue.

180.    Notably, subsection (m) of Title VII prohibits actions where "race was a motivating factor for any employment practice," without any limitation to the race of the Title VII plaintiff. 42 U.S.C. § 2000e-2(m). By its plain text, Title VII prohibits actions in which "race was a motivating factor for *any* employment practice." *Id.* (emphasis added). Subsection (m) "unambiguously states that a plaintiff need only 'demonstrate' that an employer used a forbidden consideration with respect to 'any employment practice.'" *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98–99 (2003) (quoting subsection (m)).

181.    Congress's use of the modifier "any" particularly underscores the breadth of Title VII's prohibition on the use of race in employment decisions. *See*, *e.g.*, *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (The word "'any' has a well-

established "expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" (citation omitted)); *accord Babb v. Wilkie*, 140 S. Ct. 1168, 1174 n.3 (2020) ("We have repeatedly explained that 'the word 'any' has an expansive meaning.'").

182.    Title VII also prohibits secondary discrimination—*i.e.*, where the discrimination is on the basis of the race of someone besides the plaintiff. In particular, "an employer may violate Title VII if it takes action against an employee because of the employee's association with a person of another race."). *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Kengerski v. Harper*, 6 F.4th 531, 538 (3d Cir. 2021) ("On the merits, we agree with our sister circuits that associational discrimination is well grounded in the text of Title VII."). Title VII thus prohibits employers from taking actions based on the negative associations with some racial groups but not others.

183.    Penn's Speech Policy also discriminates based on the race of the speaker.

184.    Anti-Jewish speech is not subject to the same discipline under the Speech Policy as speech alleged to target other racial groups.

185.    Defendant Penn chose not to punish antisemitic speech.

186.    Penn's disciplinary actions against Professor Wax are a direct result of Penn's Speech Policy.

187.    Penn tolerated speech targeting Jews while punishing Professor Wax for speech about affirmative action and other racial topics.

188.    Penn's disciplinary policy discriminated based on the race of both speakers and the racial subjects of the speech.

189.    Penn's actions against Plaintiff Wax were triggered by Professor Wax's speech on affirmative actions and other topics involving the race and were intended to punish her for engaging in speech Penn disfavored. At the same time, Penn did not punish any antisemitic speech made by persons of various other non-White races and ethnicities.

190.    Race therefore was a but-for cause of the decision to discipline Plaintiff Wax.

191.    Accordingly, the adverse employment actions taken against Professor Wax were directly caused by Penn's racially discriminatory Speech Policy.

### SIXTH CAUSE OF ACTION
### Violations of the ADA, 42 U.S.C. § 12101 et seq.

192.    On August 31, 2022, Professor Wax, through counsel, sent a request to the University, stating, inter alia, that Professor Wax was battling cancer, and Professor Wax requested "A Reasonable Accommodation Of a Postponement of These Proceedings." See Memorandum of August 31, 2022, Exhibit 16.

193.    The August 31 Accommodation Request Letter attached letters from Professor Wax's physicians documenting that she was too ill to meet the rushed arbitrary deadlines of the proceedings enacted by the ad hoc Hearing Board.

194.    The University was on notice as of August 31, 2022, that Professor Wax would be inhibited from mounting a full defense due to the cancer treatments.

195.    The University denied Professor Wax's request to delay the disciplinary proceedings until after her treatment.

196.    The Americans with Disabilities Act (ADA) requires: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

197.    Penn is a "covered entity" under the ADA.

198.    Professor Wax's cancer qualifies as a disability under the ADA because, as documented in the two doctor statements that were sent to the University, Professor Wax's life has been materially impaired by her cancer and its debilitating treatment. Specifically, the treatments prevent her from discharging all of her duties as a professor while simultaneously defending herself against the disciplinary proceedings.

199.    Professor Wax was entitled to participate in the disciplinary proceedings fully, i.e., by defending herself to the fullest extent possible.

200.    The rushed proceedings without a reasonable accommodation in part caused the harm under the ADA. But for the denial of the postponement of the proceedings, Professor Wax would have been able to present a more detailed, effective, and comprehensive defense.

201.    This harm culminated in the formal imposition of the sanctions in September of 2024.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Amy Wax prays for the following relief:

A.    A declaratory judgment stating that the University's Speech Policy violates both federal anti-discrimination laws and the First Amendment principles to which the University has contractually bound itself.

B.    A preliminary injunction ordering Defendant University of Pennsylvania to:

    1.    Immediately stop imposing the racially discriminatory Speech Policy at the University of Pennsylvania pursuant to Counts II and III;

    2.    Immediately refrain from imposing any of the announced sanctions against Professor Wax, including the one-year suspension at half pay; the loss of a named chair and any future summer pay; the public reprimand; and the requirement that Plaintiff Wax note in public appearances that she does not speak on behalf of Penn pursuant to Counts I, II, and III; and

    3.    Immediately restore Professor Wax's title pursuant to Counts I, II, and III.

C.    A permanent injunction ordering Defendant University of Pennsylvania to:

    1.    Vacate all disciplinary sanctions against Professor Wax pursuant to Counts I, II, and III;

2.      Immediately stop imposing the racially discriminatory Speech Policy at the University of Pennsylvania pursuant to Counts II and III;

3.      Immediately refrain from imposing any of the imposed sanctions, including the one-year suspension at half pay; the loss of a named chair and summer pay; the public reprimand; and the requirement that Plaintiff Wax note in public appearances that she does not speak on behalf of Penn pursuant to Counts I, II, and III; and

4.      Immediately restore Professor Wax's title pursuant to Counts I, II, and III.

D.      Pursuant to Counts I and IV, compensatory damages, including for all wages lost due to the sanctions and for damage to Professor Wax's professional reputation.

E.      Pursuant to Counts II and III, attorneys' fees for the civil rights claims pursuant to 42 U.S.C. § 1988(b); and

F.      Any other relief the Court deems appropriate.

Dated: February 28, 2025                    Respectfully submitted,

/s/ Caleb Acker
Caleb Acker
PA Bar No. 330399
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
15405 John Marshall Hwy
Haymarket, VA 20169
cacker@holtzmanvogel.com
540-341-8808

Jason B. Torchinsky*
D.C. Bar No. 976033 HOLTZMAN
VOGEL BARAN TORCHINSKY &
JOSEFIAK
2300 N Street NW,
Suite 643
Washington, D.C. 20037
jtorchinsky@holtzmanvogel.com
Phone: (202) 737-8808

Susan Greene
NY Bar No. 4687349 HOLTZMAN
VOGEL BARAN TORCHINSKY &
JOSEFIAK
5360 Genesee Street, Suite 203
Buffalo, NY 14026
sgreene@holtzmanvogel.com
Phone: (716) 647-6103

Samantha K. Harris
PA Bar No. 90268
ALLEN HARRIS PLLC
P.O. Box 673
Narberth, PA 19072
(610) 634-8258
sharris@allenharrislaw.com

*Attorneys for Plaintiff Professor Amy Wax*

*\* pro hac vice*

51

# <u>VERIFICATION</u>

I, Amy Wax, declare:

I am the Plaintiff in the above-captioned action.

I have the read the foregoing **AMENDED COMPLAINT** on file herein and know the contents thereof. The same is true of my own knowledge, except as to any matters therein stated on information and belief, and, as to any such matters, I believe them to be true.

I declare under penalty or perjury under the laws of the Commonwealth of Pennsylvania that the foregoing is true and correct.

Executed at Jenkintown, Pennsylvania, on February 28, 2025.

Signed by:

*Amy Wax*

B455A697A7184DD...

_____

Amy Wax