**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                                          :
Amy Wax,                                              :
                                                          :
                          Plaintiff,              :
                                                          :        Civ. No. 2:25-cv-00269-TJS
                          v.                          :
                                                          :
The Trustees of the University of Pennsylvania,   :
                                                          :
                          Defendants.         :
_____—_:

<u>**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S COMPLAINT**</u>

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 2

      A.    Plaintiff's Admitted Conduct ............................................................ 3

      B.    Disciplinary Proceedings ................................................................ 5

      C.    Procedural History ......................................................................... 13

LEGAL STANDARD ................................................................................................ 13

ARGUMENT ............................................................................................................. 14

I.     The Complaint fails to state a contract claim (Count 1) because it does not plausibly allege that Defendants violated any term of any agreement. ......................... 14

      A.    Plaintiff does not plausibly allege that Defendants violated any term of the Faculty Handbook. .................................................... 16

      B.    Plaintiff does not identify any judicially enforceable obligation in any other agreement. ................................................................. 19

II.    Plaintiff fails to state a race discrimination claim (Counts 2, 3, 5) because she does not plausibly allege disparate treatment based on Plaintiff's race......................... 21

      A.    Plaintiff's allegations of disparate treatment of Plaintiff's speech about race do not support a cognizable claim of discrimination based on Plaintiff's race. ................................................................. 22

      B.    The Complaint's well-pleaded factual allegations do not support the conclusory assertion that Plaintiff was discriminated against based on her race. ............................................................................. 25

III.   Plaintiff fails to state an ADA claim (Count 6) because she does not allege that she timely filed a charge of discrimination with the EEOC, nor does she plead a cognizable claim. .............................................................. 30

      A.    Plaintiff did not timely exhaust her ADA claim. ................................. 30

      B.    Plaintiff's "reasonable accommodation" claim also fails as a matter of law. ...... 31

IV.   Plaintiff fails to state a claim for false light invasion of privacy (Count 4) because she does not plausibly allege any actionable publication or any "false light." ............... 32

      A.    The challenged publication was privileged. ........................................ 33

      B.    Plaintiff does not plausibly allege that she was placed in any false light. ........... 34

CONCLUSION .......................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*1201 W. Girard Ave., LLC v. Clarke*,
  2024 WL 4403866 (3d Cir. Oct. 4, 2024)......................................................................26

*Anderson v. Haverford Coll.*,
  851 F. Supp. 179 (E.D. Pa. 1994).................................................................................15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).......................................................................................................13

*Baker v. Lafayette Coll.*,
  504 A.2d 247 (Pa. Super. Ct. 1986), *aff'd on other grounds*, 532 A.2d 399 (Pa. 1987) .........34

*Bank v. Cmty. Coll. of Phila.*,
  2022 WL 2905243 (E.D. Pa. July 22, 2022)................................................................24

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).......................................................................................................13

*Bloch v. Temple Univ.*,
  939 F. Supp. 387 (E.D. Pa. 1996).................................................................................34

*Bradshaw v. Pa. State Univ.*,
  2011 WL 1288681 (E.D. Pa. Apr. 5, 2011) .................................................................14

*Buck v. Hampton Twp. Sch. Dist.*,
  452 F.3d 256 (3d Cir. 2006)............................................................................................3

*Burkhart v. Widener Univ., Inc.*,
  70 F. App'x 52 (3d Cir. 2003) ......................................................................................30

*Clark v. Whiting*,
  607 F.2d 634 (4th Cir. 1979) ........................................................................................16

*Cole v. Teel Plastics, Inc.*,
  2005 WL 1378911 (W.D. Wis. June 8, 2005) ..............................................................32

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
  589 U.S. 327 (2020).......................................................................................................21

*CoreStates Bank, N.A. v. Cutillo*,
  723 A.2d 1053 (Pa. Super. Ct. 1999)............................................................................14

*Datto v. Harrison*,
    664 F. Supp. 2d 472 (E.D. Pa. 2009) ..................................................................30

*David v. Neumann Univ.*,
    177 F. Supp. 3d 920 (E.D. Pa. 2016) ..................................................................14

*David v. Neumann Univ.*,
    187 F. Supp. 3d 554 (E.D. Pa. 2016) ...................................................13, 15, 17

*DeCarolis v. Presbyterian Med. Ctr. of Univ. of Pa. Health Sys.*,
    554 F. App'x 100 (3d Cir. 2014) ........................................................................23

*Del. State Coll. v. Ricks*,
    449 U.S. 250 (1980) ............................................................................................30

*DeLuca v. Reader*,
    323 A.2d 309 (Pa. Super. Ct. 1974) ...................................................................33

*Doe v. Abington Friends Sch.*,
    2022 WL 16722322 (E.D. Pa. Nov. 4, 2022) .....................................................20

*Doe v. Trs. of Univ. of Pa.*,
    270 F. Supp. 3d 799 (E.D. Pa. 2017) .................................................................21

*Donahue v. Consol. R. Corp.*,
    224 F.3d 226 (3d Cir. 2000) ...............................................................................32

*Fakhreddine v. Univ. of Pa.*,
    2025 WL 345089 (E.D. Pa. Jan. 30, 2025) ..................................................20, 21

*Farrell v. Butler Univ.*,
    421 F.3d 609 (7th Cir. 2005) ..............................................................................16

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009) ...............................................................................13

*Frith v. Whole Foods Mkt., Inc.*,
    517 F. Supp. 3d 60 (D. Mass. 2021), *aff'd*, 38 F.4th 263 (1st Cir. 2022) .........22, 23

*Graboff v. Colleran Firm*,
    744 F.3d 128 (3d Cir. 2014) ..........................................................................33, 34

*Gundlach v. Reinstein*,
    924 F. Supp. 684 (E.D. Pa. 1996), *aff'd*, 114 F.3d 1172 (3d Cir. 1997) ...............14

*Harris v. St. Joseph's Univ.*,
    2014 WL 1910242 (E.D. Pa. May 13, 2014) .....................................................14

*Houser v. Feldman*,
  600 F. Supp. 3d 550 (E.D. Pa. 2022) ....................................................................15

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ...............................................................................15

*James v. City of Wilkes-Barre*,
  700 F.3d 675 (3d Cir. 2012) .................................................................................13

*Janneh v. Westgate Hill SNF LLC*,
  2015 WL 9302907 (E.D. Pa. Dec. 22, 2015) ........................................................31

*Kazar v. Slippery Rock Univ.*,
  679 F. App'x 156 (3d Cir. 2017) ..........................................................................27

*Lacontora v. Geno Enters., LLC*,
  2022 WL 856076 (E.D. Pa. Mar. 23, 2022) ..........................................................24

*Larsen v. Phila. Newspapers, Inc.*,
  543 A.2d 1181 (Pa. Super. Ct. 1988) (en banc) ..............................................33, 34

*Ledda v. St. John Neumann Reg'l Acad.*,
  2021 WL 1035106, at *5 (M.D. Pa. Feb. 18, 2021), *R. & R. adopted*, 2021 WL 1017370
  (M.D. Pa. Mar. 17, 2021) ...............................................................................23, 24

*Maras v. Curators of Univ. of Mo.*,
  983 F.3d 1023 (8th Cir. 2020) ..............................................................................27

*Novella v. Wal-Mart Stores, Inc.*,
  459 F. Supp. 2d 1231 (M.D. Fla. 2006), *aff'd*, 226 F. App'x 901 (11th Cir. 2007) ...............32

*Papasan v. Allain*,
  478 U.S. 265 (1986) ..............................................................................................14

*Patterson v. Avery Dennison Corp.*,
  281 F.3d 676 (7th Cir. 2002) ................................................................................26

*PBGC v. White Consol. Indus., Inc.*,
  998 F.2d 1192 (3d Cir. 1993) ...............................................................................15

*Regents of Univ. of Mich. v. Ewing*,
  474 U.S. 214 (1985) ..............................................................................................16

*Ricci v. DeStefano*,
  557 U.S. 557 (2009) ..............................................................................................21

*Saunders v. Hall-Long*,
  2021 WL 5755080 (3d Cir. Dec. 3, 2021) ............................................................26

*Simko v. U.S. Steel Corp.*,
992 F.3d 198 (3d Cir. 2021).................................................................................30

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023).................................................................................................21

*Tannous v. Cabrini Univ.*,
697 F. Supp. 3d 350 (E.D. Pa. 2023) ...............................................................21, 24

*Taylor v. Phoenixville Sch. Dist.*,
184 F.3d 296 (3d Cir. 1999)....................................................................................32

*Turner v. Hershey Chocolate U.S.*,
440 F.3d 604 (3d Cir. 2006)....................................................................................32

*Waggaman v. Villanova Univ.*,
2008 WL 4091015 (E.D. Pa. Sept. 4, 2008) ..........................................................27

*Ware v. Rodale Press, Inc.*,
322 F.3d 218 (3d Cir. 2003).....................................................................................14

*Weir v. Univ. of Pittsburgh*,
2023 WL 3773645 (3d Cir. June 2, 2023) .......................................................21, 26

*Wiggins v. Universal Prot. Serv., LLC*,
2023 WL 5014082 (3d Cir. Aug. 7, 2023)..............................................................26

OTHER AUTHORITIES

*Holding Campus Leaders Accountable and Confronting Antisemitism: Hearing Before the H.
Comm. on Educ. & the Workforce*, 118th Cong. (2023), https://perma.cc/3JA8-XVG3 ........20

Oksona Mironova, *Soviet Daughter: An Interview with Julia Alekseyeva*, Lilith (Feb. 24, 2017),
https://tinyurl.com/memnhn5k...............................................................................28

Restatement (Second) of Torts......................................................................................33

## INTRODUCTION

Plaintiff Amy Wax, a Professor at the University of Pennsylvania Carey Law School ("Penn Law"), has persistently made unprofessional and offensive comments in the media and the classroom. She has, for example, described "blacks" as "a bunch of single moms with a bunch of guys who float in and out"; asserted that "the United States is better off with fewer Asians"; described women as "less knowledgeable than men"; and opined that "no one should have to live in a dorm room with a gay roommate." Plaintiff does not deny making such statements. On the contrary, the Complaint includes extensive exhibits documenting them. Plaintiff has also said that she "lost count of how many times [she has] been called a racist," and now thinks that "being a racist is an honorific" because it "means you notice reality."

After years of complaints from students, faculty members and alumni, the Dean of Penn Law concluded that disciplinary action was necessary to address Plaintiff's "flagrant disregard of the standards, rules, or mission of the University." Penn's Faculty Handbook prescribes a detailed process for initiating and conducting disciplinary proceedings, and Plaintiff received that process in full: the Dean informally discussed the charges with Plaintiff; referred them to the Chair of the University-wide Faculty Senate, which convened a Hearing Board; a hearing was held; and the Hearing Board produced a report presenting its findings, conclusions, and recommended sanctions. Those sanctions included a public reprimand, the loss of Plaintiff's named Chair, a one-year suspension at half pay, and the loss of summer pay.

The University President at the time, Elizabeth Magill, reviewed the Hearing Board's report, also in keeping with the Handbook's procedures. President Magill found no "exceptional circumstances" to justify a departure from the findings, and she accepted the Hearing Board's recommendations. Plaintiff then appealed the President's decision to the University-wide Senate Committee on Academic Freedom and Responsibility, which similarly concluded that there was

no procedural defect and sustained the decision.  Interim University President Larry Jameson then advised Plaintiff that the sanctions would be imposed as recommended by the Hearing Board, and he announced the sanctions as required by Penn's Faculty Handbook.  Plaintiff's suspension will take effect in the academic year beginning on July 1, 2025.  She remains a tenured faculty member.

Unsurprisingly, Plaintiff objects to the sanctions.  But despite a very lengthy complaint outlining her disagreement with the decisions made by the Penn Law Dean, the Hearing Board, the Faculty Senate Committee, and the University President—16 members of the University community in total, including fellow tenured faculty members—she has never identified any departure from the procedures the Handbook prescribed.

Plaintiff asserts a breach of contract claim, but she identifies no contractual obligation that the University failed to fulfill.  Plaintiff also contends that *she* is the victim of race discrimination, mainly on the theory that she was punished for the race-related content of her speech.  But while federal antidiscrimination law forbids employers from engaging in race discrimination—taking adverse employment action because of an employee's race—it does not provide protection for hateful speech on the subject of race.  The Complaint half-heartedly pleads a backup theory that Plaintiff, as a white Jewish person, was singled out for discipline because of her race, but that conclusory assertion lacks any support in the Complaint's well-pleaded factual allegations.  Also tacked onto the Complaint are a disability discrimination claim, which was not initiated on a timely basis at the administrative level, and which is meritless in any event, and a final claim for false light invasion of privacy, which fails as a matter of law on multiple levels.  Because none of Plaintiff's allegations state a plausible claim for relief, the Complaint must be dismissed.

## **BACKGROUND**

"In evaluating a motion to dismiss," the Court "may consider documents that are attached to or submitted with the complaint" and "any matters incorporated by reference or integral to the

claim," as well as the allegations in the complaint itself. *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (citation omitted). Defendants assume the truth of the well-pleaded factual allegations in the Complaint solely for purposes of this Motion to Dismiss[1] and set aside its conclusory assertions, consistent with the Court's standard of review. *See infra* at 13-14.

### A.    Plaintiff's Admitted Conduct

In the years leading up to this dispute, Plaintiff made frequent statements in the classroom and media that were widely perceived as racist, sexist, homophobic, xenophobic, or otherwise bigoted and offensive.[2] For example:

- When asked by a Black student if she agreed with the claim that Black people are inherently inferior to white people, Plaintiff responded: "You can have two plants that grow under the same conditions, and one will just grow higher than the other." Compl. Ex. at 14; *see also id.* at 115 (disputing whether statement was derogatory without denying statement).

- Plaintiff asserted on a panel that "our country will be better off with more whites and fewer nonwhites." *Id.* at 15; *see also id.* at 105 (claiming that statement was taken out of context without denying statement).[3]

- Plaintiff told the *New Yorker* that "women, on average, are less knowledgeable than men" and "less intellectual than men." *Id.* at 15.[4]

---

[1] Penn does not concede that any of Plaintiff's allegations of discrimination or wrongful conduct are in fact true.

[2] All statements noted herein are documented in the exhibits attached to the operative Amended Complaint (cited as "Compl. Ex."), and Plaintiff does not deny having made any of them. The sources documenting these statements cited in this Memorandum are found in the exhibits attached to the complaint, with exceptions specifically noted.

[3] Transcript available at https://tinyurl.com/3zdv8y77, which supplies the full context: "Europe and the First World, to which the United States belongs, remain mostly white for now; and the Third World, although mixed, contains a lot of non-white people. Embracing cultural distance, cultural distance nationalism, means, in effect, taking the position that our country will be better off with more whites and fewer non-whites. Well, that is the result anyway."

[4] Interview available at https://tinyurl.com/yc6sna5t.

- Plaintiff publicly described Black people as having "different average IQs" than people of other races, such that "Blacks are not going to be evenly distributed throughout all occupations" and that this phenomenon is "not due to racism." *Id.* at 15.[5]

- Plaintiff asserted that "the United States is better off with fewer Asians" and that Asian people lack "thoughtful and audacious individualism." *Id.* at 15.[6]

- Plaintiff told a Black colleague that it is "rational to be afraid of Black men in elevators." *Id.* at 19.

- Plaintiff, speaking on a panel with a gay colleague, asserted that "no one should have to live in a dorm room with a gay roommate," and separately stated that same-sex relationships are selfish and not focused on family or community. *Id.* at 19.

- Plaintiff stated on a podcast that she "often chuckle[s]" at advertisements that show interracial marriages because "[t]hey never show blacks the way they really are: a bunch of single moms with a bunch of guys who float in and out. Kids by different men." *Id.* at 28.[7]

- In an appearance on *Tucker Carlson Today*, Plaintiff asserted that "Blacks" and other "non-Western groups" harbor "resentment, shame and envy" against Western people for their "outsized achievements and contributions even though, on some level, their country is a shithole." *Id.* at 56.[8]

As a result of these statements and many others that were similarly offensive, Plaintiff became widely known on campus for the views she had expressed publicly. In Plaintiff's own words: "I lost count of how many times I've been called a racist, and my view at this point is, you know, being a racist is an honorific. To be called a racist means you notice reality and to me that's a positive thing[,] not a negative thing[;] that's an occasion for praise and admiration." Compl. Ex. at 29.[9]

---

[5] Video available at https://tinyurl.com/4rmt2hzs.

[6] Open letter available at https://tinyurl.com/5fje2986.

[7] Although not linked in the exhibits, corroborating article available at https://tinyurl.com/r3ffrcpp.

[8] Although not linked in the exhibits, corroborating article available at https://tinyurl.com/4f7za5p7.

[9] Although not linked in the exhibits, video available at https://tinyurl.com/4c9m4ysa.

### B.    Disciplinary Proceedings

In 2021, a group of Penn Law alumni filed a complaint about Plaintiff's conduct, which called into question her professionalism and ability to fairly educate students of different backgrounds.  *See* Compl. Ex. at 56.  Then-Dean of Penn Law, Ted Ruger, began an investigation, and later received additional complaints from students and alumni regarding disparaging comments by Plaintiff about Asian people.  *See id.*  On March 2, 2022, Dean Ruger filed formal charges initiating the disciplinary process defined in Penn's Faculty Handbook.  Compl. ¶ 52; *see* Compl. Ex. at 56.

***Formal Charges.***  The Faculty Handbook prescribes procedures for the imposition of sanctions against Penn faculty members.  *See* Compl. ¶ 44; Banks Decl. Ex. A (hereinafter "Ex. A") at 53-56 (§ II.E.16).[10]  The Dean of the faculty member's School or the Provost of the University begins the process by discussing the possible infraction of University behavioral standards with the respondent faculty member and, if requested, must provide a written description of the charges.  Ex. A at 54.  If the Dean or Provost and respondent do not resolve the matter informally, the Dean or Provost, after consulting with several tenured faculty members, decides "whether to invoke the just cause procedures in a case involving major infractions of University behavioral standards, to impose minor sanctions directly in a case involving minor infractions of University behavioral standards, or to discontinue the matter."  *Id.*  The Handbook defines a "major infraction" as "[a]n action involving flagrant disregard of the standards, rules, or mission of the University or the customs of scholarly communities, including, but not limited to, serious cases" of various illustrative examples, including "plagiarism"; "harassment of … a member of the University community"; and "commission of serious crimes such as, but not limited to, murder,

---

[10] Because the Complaint relies on the Handbook and attaches portions as exhibits, the Court may consider the full, undisputedly authentic version submitted by Defendants.  *See infra* at 15 n.11.

sexual assault or rape." *Id.* at 53-54. A "minor infraction," by contrast, is defined as "[a]n action involving disregard of the University's standards, rules, or mission, or the customs of scholarly communities that is less serious than a major infraction." *Id.* at 54. Dean Ruger charged Plaintiff with a major infraction. Compl. ¶ 53.

The statement of charges provided to Plaintiff cited Plaintiff's "callous and flagrant disregard for [the] University community—including students, faculty, and staff—who have been repeatedly subjected to [her] incessant racist, sexist, xenophobic, and homophobic actions," as well as Plaintiff's "repeated[] breache[s]" of "minimum standards of civility and professionalism," among other misconduct. Compl. Ex. at 11-12. The statement included a "non-comprehensive list" of four "relevant standards for faculty conduct" that Plaintiff "breached": (1) avoiding harassment and discriminatory treatment of students, or creating the appearance of a hostile or discriminatory classroom; (2) evaluating each student's true merit; (3) respecting the confidential nature of the relationship between professor and student—a standard that Plaintiff breached by "publicly discussing [student] performance"; and (4) showing respect for others, including faculty colleagues. *Id.* at 13-18. The charging document also notes that "[p]ast attempts to address [Plaintiff's] behavior, including not assigning [her] to teach first-year law students in mandatory courses, ha[d] failed to result in a change of conduct," and that Plaintiff's "hateful disregard for members of [the] University community ha[d] only grown worse." *Id.* at 19.

***Hearing Board.*** After charging a faculty member with major infractions, the charging party (the Dean) must request that the Chair of the Faculty Senate convene a Hearing Board. Ex. A at 54. The Chair of the Faculty Senate, after consulting with the Past Chair and Chair-Elect of the Faculty Senate, selects five tenured faculty members from across the University to serve on the Board, and those five members in turn choose a Chair. *Id.* at 53; *see* Compl. Ex. at 49

(describing Board composition).  The charging party and respondent may then move to disqualify for prejudice any potential member of the Hearing Board, and the remaining members of the Board review and decide any disqualification motion.  Ex. A at 54.  Dean Ruger followed this process to convene a Hearing Board on June 23, 2022, and notice of the Hearing Board's composition was sent to both Dean Ruger (as the charging party) and Plaintiff the next day, with an option to disqualify members by a deadline of July 5.  Compl. Ex. at 56-57.  Plaintiff requested an extension due to treatment for a medical condition, and the Hearing Board extended the deadline by one week, to July 12.  *Id.* at 57.  On July 11, Plaintiff then requested an additional six-month delay of proceedings, and the Hearing Board further extended the deadline to July 22, asking Plaintiff only to indicate whether she would seek disqualification of any proposed Hearing Board members.  *Id.*

An attorney representing Plaintiff then intervened, claiming that the extended deadline violated the ADA and demanding wide-ranging information about the Hearing Board members, including searches of their professional and personal emails and text messages.  *Id.*  Counsel for the University responded, communicating that the Senate would again extend the deadline to request disqualification of Hearing Board members to August 31.  *Id.* at 21.  Counsel further explained that if Plaintiff took medical leave from the faculty (which she had not requested), disciplinary proceedings would be postponed for the duration of the leave, but that "indefinite postponement of a sanctions proceeding for someone fulfilling the essential functions of her position"—i.e., indefinitely delaying disciplinary proceedings to accommodate a medical condition that apparently did not interfere with any aspect of Plaintiff's work—"is not a reasonable request," but that the Senate and Hearing Board would "make accommodations concerning the timing and format of the proceeding."  *Id.*  Finally, University counsel denied Plaintiff's demand for additional information about Hearing Board members, noting that the Faculty Handbook does

not provide for "discovery" related to disqualification motions and that Plaintiff was free to make use of the abundant publicly available information about potential members. *Id.* at 21-22.

On August 31, 2022—the operative deadline for disqualification motions, after three extensions allegedly premised on Plaintiff's medical conditions—Plaintiff's counsel filed a 55-page memorandum with the Hearing Board, demanding an indefinite postponement of proceedings; extensive information about Hearing Board members that was previously requested and denied; disqualification of Dean Ruger as the charging party; appointment of a neutral third party to decide pre-hearing issues; forensic expert analysis of law student academic performance by race; and information in response to 29 wide-ranging, discovery-like requests. *Id.* at 89-147. Plaintiff also sought to disqualify all members of the Hearing Board. *Id.* at 58. On September 13, Faculty Senate Chair Vivian Gadsden finalized the Hearing Board membership and requested that the Board proceed. *Id.* On October 11, the Hearing Board met to consider whether any members should recuse themselves, and determined that no recusal was warranted. *Id.*

**Hearing.** The Faculty Handbook requires the Hearing Board to determine whether to hold a hearing on a charged major infraction. Ex. A at 54. The Hearing Board heard oral argument from Dean Ruger as the charging party. Compl. Ex. at 58. On October 27, 2022, the Board determined that the charges warranted consideration of a major sanction and offered Plaintiff an opportunity for a hearing. *Id.*; *see* Ex. A at 55 (requiring this notification of right to a hearing). On November 16, Plaintiff requested a "medical-related pause" to all proceedings until the start of the semester in January 2023, and the Hearing Board granted her request by extending Plaintiff's deadline to request a hearing to January 17, 2023. Compl. Ex. at 58. On January 16, however, Plaintiff's counsel filed another memorandum renewing the arguments from the prior memorandum. *Id.* The charging party responded that the matter should be resolved before the

Hearing Board and requested a hearing in early May 2023.  *Id.*  This requested date already postponed the start of the hearing beyond the Handbook's recommendation of the earliest practicable date, "ordinarily no more than three months from the notification date."  Ex. A at 55. The Hearing Board denied Plaintiff's request to suspend proceedings indefinitely, assuring Plaintiff that it would "provide reasonable accommodation throughout the remainder of the process," and scheduled a hearing for May 1-2.  Compl. Ex. at 59.  Plaintiff still had not indicated whether she would participate in the hearing.  *Id.*

On March 9, Plaintiff requested a meeting with the Vice Provost for Faculty, which then took place on March 21.  *Id.*  On March 29, Plaintiff affirmed that she would participate in a hearing, but stated that it might not be practicable due to personal commitments out of the country or otherwise away from campus in May, late June, and much of July and August.  *Id.*  Two days later, the Hearing Board reiterated to the parties its plan to hold the hearing on May 1 and 2, later adding May 3 as well, and outlined the format of the hearing.  *Id.*  Over the following weeks, Plaintiff raised objections to various aspects of the process, such as the deadline for pre-hearing submissions; Plaintiff also objected to the dates of the hearing three times in three weeks.  *Id.*

The hearing was conducted on May 1, 2, and 3, 2022.  Compl. ¶ 67; Compl. Ex. at 59.  The Hearing Board advised that, given Plaintiff's health condition, she was welcome to take whatever breaks she needed, but Plaintiff "participate[d] fully" over all three days, "including testifying, making a statement for the record, and examining witnesses" herself.  Compl. Ex. at 60.  Consistent with the Handbook's procedural requirements, *see* Ex. A at 55, both parties were represented by counsel, presented live testimony, cross-examined witnesses, and submitted declarations, expert reports, and other evidence and argument to support their positions.  Compl. Ex. at 60.  Plaintiff "presented twenty-one witnesses to the Board, including four faculty colleagues and nine students

who testified at the hearing, plus one student whose testimony was submitted in an affidavit." *Id.*
at 51.  After the live portion of the hearing concluded, Plaintiff submitted statements from seven
expert witnesses, as well as a twenty-page written closing argument.  *Id.*  The Hearing Board then
deliberated extensively, requesting and reviewing additional relevant material and transcripts of
the hearings, and prepared a report.  *Id.* at 60.  The Hearing Board submitted its final report to
Penn's President, copying the charging party and Plaintiff, on June 21.  *Id.*

   ***Report and Sanctions.***  As stated in detail in its report, the Hearing Board found that
Plaintiff had engaged in "flagrant unprofessional conduct" that "has had a detrimental impact on
equal access to educational opportunities at the Law School and on the community more broadly."
Compl. Ex. at 23.  Emphasizing that "free speech … is broadly protected," the report focused on
Plaintiff's deviations from "widely acknowledged standards of [the academic] profession."  *Id.*
The report observed that Plaintiff had repeatedly spoken publicly about her "students' grade
distributions by race," which "(irrespective of whether such statements are grounded in fact)
violates norms around grading privacy at universities around the country."  *Id.* at 25.  The Hearing
Board also noted Plaintiff's "long, persistent, and well-documented" "history of disrespectful and
dismissive treatment of various groups," "most significantly Black students, but also Asian
students, Hispanic and immigrant students, LGBTQ students and women."  *Id.* at 25.  Plaintiff's
conduct "demonstrate[d] a pattern of flagrant, even escalating disregard for University
expectations and professional norms regarding the treatment of members of the University
community," denying students the opportunity "to learn and to be treated equitably" that they
"reasonably expect."  *Id.* at 25-26.  The Board unanimously concluded that Plaintiff's conduct
amounted to "major infractions of University behavioral standards" and "created a hostile campus
environment and hostile learning atmosphere."  *Id.* at 26.  The Board recommended a public

reprimand by the University; the loss of Plaintiff's named Chair; requiring Plaintiff to note in public appearances that she does not speak for the University or Law School; a one-year suspension at half pay (but full benefits); and permanent loss of summer pay. *Id.* The Hearing Board did not recommend revoking Plaintiff's tenure. *Id.* at 60.

On June 25, four days after the Board's report, Plaintiff's counsel notified the then-President of the University, Elizabeth Magill, that Plaintiff would submit objections to the report by mid-August. *Id.* The President's Office set a deadline of July 14; Plaintiff's counsel requested a deadline of August 9; and the President's Office granted an extension until July 19. *Id.* The day before that deadline, Plaintiff's counsel requested a medical-related further extension of the deadline until July 24, which the President's Office granted. *Id.* at 61. Plaintiff submitted her objections on July 24, and the charging party responded four days later.

On August 11, 2023, President Magill issued her decision on the Hearing Board's report and recommended sanctions. *Id.* The Faculty Handbook provides that the President "shall normally accept the Hearing Board's recommendations" and "may depart from [them] only in exceptional circumstances." Ex. A at 56. President Magill, emphasizing the deference owed to "faculty members [who] are trusted to be fair-minded judges of the behavior of their colleagues" and the strong guardrails throughout the disciplinary process, found no "exceptional circumstances" that would permit a departure and thus upheld the Board's recommended sanctions. Compl. Ex. at 48-50. President Magill reviewed and attached a chronology of "the process leading to Dean Ruger's charges, the hearing, and the Board's decision," which "show[ed] the process followed to have been scrupulously fair, generous to [Plaintiff] and assiduous in its adherence to the procedures in the Faculty Handbook." *Id.* at 51. President Magill "carefully

considered each of [Plaintiff's] objections to the report" and concluded they lacked merit. *See id.* at 51-54.

**Subsequent Developments.** When, as here, the President declines a respondent's request to remand a matter to the Hearing Board, the Handbook allows the respondent to "appeal on that ground in writing" to the Senate Committee on Academic Freedom and Responsibility (SCAFR), Ex. A at 56, which consists of the Chair and nine members of the Faculty Senate, all tenured faculty, *id.* at 17. Plaintiff took this opportunity to appeal. Compl. ¶ 78. SCAFR considered the appeal and issued a letter on May 29, 2024, explaining that it "found no significant defect in procedure that would require a remand to the Hearing Board." Compl. Ex. at 62. The letter noted that the Handbook limits SCAFR's role to identifying significant procedural defects, not reweighing the merits, and explained that after closely reviewing "all relevant Faculty Handbook language, the record below, all the filed submission, and [a] letter from [Plaintiff's] counsel," SCAFR determined that Plaintiff's "allegations of procedural defect" lacked merit, and SCAFR's own "search[] [of] the record for other potential procedural defects" identified none. *Id.* at 63.

On May 30, 2024, Penn Provost John L. Jackson, implementing the sanction of a public reprimand, emailed Plaintiff a draft reprimand and explained that he intended to release it publicly. Compl. ¶ 79. Plaintiff then requested a personal meeting with Interim President of the University J. Larry Jameson, who agreed and met with Plaintiff on June 14. *Id.* Plaintiff's counsel pursued "settlement negotiations" with Penn until they "reached an impasse in mid-September 2024." *Id.* On September 23, Provost Jackson sent Plaintiff the letter of public reprimand and notified her that the recommended sanctions would be imposed. *Id.* ¶ 80. Penn then published the formal reprimand and sanctions, as well as the SCAFR report, *id.* ¶¶ 81-82; *see* Compl. Ex. at 64-69, consistent with the Handbook's requirement that, when a major sanction is imposed, the President

"shall publish in [the] *Almanac* a statement describing the case and its disposition in appropriate detail," Ex. A at 56.

### C.    Procedural History

Plaintiff filed this lawsuit on January 16, 2025.  She asserts a claim for breach of contract, three claims for racial discrimination against Plaintiff in violation of federal statutes, a claim under the Americans with Disabilities Act (ADA), and a claim for false light invasion of privacy.  The Complaint nominally focuses on the above-described disciplinary proceedings, which Plaintiff broadly attacks as "unfair."  It includes many allegations, however, that have little or no connection to those proceedings.  In particular, Plaintiff dwells at great length on allegations of anti-Semitic speech on campus in the wake of the October 7, 2023, attack on Israel by Hamas.  That attack and all speech related to it occurred after President Magill adopted the Hearing Board's report and recommendations on August 11, 2023, and Plaintiff does not allege that any of these developments on campus involved Law School faculty members or otherwise directly implicated Plaintiff in any way.  Plaintiff attempts to contrast the treatment of her speech with the treatment of this alleged speech, but none of those allegations support her claims.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The complaint must "do more than allege the plaintiff's entitlement to relief"; it must "'show' such an entitlement with its facts."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).  While the Court must "accept the factual allegations contained in the Complaint as true," the Court should "disregard rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements."  *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012); *see also David v.*

*Neumann Univ.*, 187 F. Supp. 3d 554, 557 (E.D. Pa. 2016) ("Although a plaintiff is entitled to all reasonable inferences from the facts alleged, a plaintiff's legal conclusions are not entitled to deference and the Court is 'not bound to accept as true a legal conclusion couched as a factual allegation.'" (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986))).

## ARGUMENT

### I.  The Complaint fails to state a contract claim (Count 1) because it does not plausibly allege that Defendants violated any term of any agreement.

"Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages.'" *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (brackets omitted) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).  A contract claim cannot succeed if the plaintiff "fails to identify" any of "the specific benefits he was allegedly promised, the means by which he was promised them, and the manner in which [the defendant] allegedly reneged on those promises." *Gundlach v. Reinstein*, 924 F. Supp. 684, 689 (E.D. Pa. 1996), *aff'd*, 114 F.3d 1172 (3d Cir. 1997).

Courts applying Pennsylvania law regularly dismiss claims against colleges and universities when plaintiffs broadly allege violations of handbooks, policies, or procedures without grounding their claims in specific terms.  *See, e.g.*, *David v. Neumann Univ.*, 177 F. Supp. 3d 920, 925 (E.D. Pa. 2016) (granting motion to dismiss where plaintiff "failed to set forth any specific contractual provisions that the university allegedly breached" and offered "only general references to the handbook, syllabi, and protocols"); *Harris v. St. Joseph's Univ.*, 2014 WL 1910242, at *3 (E.D. Pa. May 13, 2014) ("Conclusory allegations," without "clear averments as to what statement or regulations included in the Handbook … were violated or breached, are insufficient to survive a motion to dismiss."); *Bradshaw v. Pa. State Univ.*, 2011 WL 1288681, at *2 (E.D. Pa. Apr. 5,

-14-

2011) (granting motion to dismiss where plaintiff did "not identify in the complaint the provisions of the handbook that the defendant allegedly breached"); *Anderson v. Haverford Coll.*, 851 F. Supp. 179, 183 (E.D. Pa. 1994) (granting motion to dismiss where plaintiff failed to "indicate … specific provisions, policies, practices and procedures that defendant allegedly violated").

To determine whether Plaintiff has stated a claim for relief, the Court should independently review and construe the terms of the identified contracts.[11]  The Court must interpret "the unambiguous terms of [each alleged] contract as a matter of law," and Plaintiff's characterizations of contract terms are not entitled to any presumption of truth or deference. *Houser v. Feldman*, 600 F. Supp. 3d 550, 561 (E.D. Pa. 2022) (concluding that actual language of university policy did not create the duties that the plaintiff alleged the defendant breached, and dismissing contract claim accordingly); *see also, e.g.*, *David*, 187 F. Supp. 3d at 558-61 (similarly dismissing contract claims because language of asserted contracts did not impose the obligations the plaintiff alleged the defendant breached).

Under these principles, the Complaint in this case fails to state a claim for breach of contract.  Plaintiff gestures toward a wide range of documents but specifically addresses the language of, and thus narrows her claim to, just three: the Faculty Handbook, the "Open Expression" policy, and certain statements by former University President Liz Magill.  Compl. ¶ 108.  As detailed below, Plaintiff fails to plausibly allege a contract claim based on any of these documents.  The Complaint makes sweeping assertions about the Faculty Handbook but does not

---

[11] This memorandum addresses the portions of the asserted contracts referenced in and attached to the Complaint, but it cites to full versions of those documents, which are attached to the concurrently filed Declaration of Michael L. Banks.  The Court may review these documents without converting this motion to dismiss into a motion for summary judgment because the documents are integral to and explicitly relied on in the complaint, and the concurrently submitted copies are indisputably authentic.  *See, e.g.*, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *PBGC v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

plausibly allege a violation of any specific provision, nor does the Complaint identify any language in any other document that might give rise to any enforceable obligation.

A.    **Plaintiff does not plausibly allege that Defendants violated any term of the Faculty Handbook.**

The Faculty Handbook details at length the terms and conditions of faculty appointments, including the procedure to be followed for the imposition of sanctions on faculty members.  *See* Ex. A at 38-59 (§ II.E), 53-56 (§ II.E.16).  These procedures reflect the animating principle that "scholars are in the best position to make the highly subjective judgments related with the review of scholarship and university service." *Farrell v. Butler Univ.*, 421 F.3d 609, 616 (7th Cir. 2005). Courts recognize the importance of academic self-governance and thus refuse to "engage in 'second-guessing' … [u]niversity authorities in connection with faculty promotions." *Clark v. Whiting*, 607 F.2d 634, 640 (4th Cir. 1979).  This principle—that "judges … should show great respect for the faculty's professional judgment"—is not limited to tenure decisions, but rather extends to the wide-ranging "multitude of academic decisions that are made daily by faculty members." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225-26 (1985).  The Faculty Handbook ensures that tenured faculty themselves—not administrators, courts, or anyone else— drive the disciplinary process, and entitles faculty members to this self-governing process, not any particular result.

Plaintiff received all of the process to which she was entitled under the Handbook. Critically, she does not plausibly allege otherwise.  Plaintiff characterizes the process as "unfair," but the Handbook, not Plaintiff, defines the agreed-upon terms governing the disciplinary process. The Complaint, despite its many generalized assertions, specifically discusses only a few provisions of the Handbook and does not plausibly allege a violation of any:

***Handbook § II.E.16.1.A.***  This prefatory section reads: "The imposition of a sanction on a faculty member of the University of Pennsylvania is a rare event.  However, when situations that might lead to such an action arise, they must be handled fairly and expeditiously.  It is essential to have a process that both protects the rights of faculty members and addresses the legitimate concerns of the University."  Ex. A at 53.  The Complaint quotes this provision without alleging any specific violation of it.  Compl. ¶ 44.  Regardless, "Plaintiff identifies no terms" in this provision "that are sufficiently definite" for a court to enforce them; rather than "contractually guaranteeing a right to specific types" of disciplinary procedures, this provision "declare[s] the University's aspirational approach" to the disciplinary process as a whole.  *David*, 187 F. Supp. 3d at 560.  This statement of aspiration is "not definite enough to be enforced" and thus cannot support a contract claim.  *Id.*

***Handbook § II.E.12.III.B.***  When a faculty member files a complaint with the Faculty Grievance Commission, if the Commission's "Chair believes that the faculty member's claims raise issues of academic freedom, or if the grievant so asserts, the Chair will send a copy of the grievance to the Senate Committee on Academic Freedom and Responsibility (SCAFR), which will promptly determine whether the grievance raises significant questions of academic freedom."  Ex. A at 49.  The Complaint discusses this provision but does not allege any violation of it.  Compl. ¶ 46 ("Academic issues must be heard by [SCAFR].").

***Handbook § II.A.***  This section elaborates on SCAFR's membership, the selection of its members, and SCAFR's responsibilities.  Ex. A at 17.  The Complaint cites this section for the proposition that "SCAFR has a fixed membership functioning as a jury of [Plaintiff's] peers," Compl. ¶ 47, but does not allege any violation of this section.

-17-

**Handbook § II.E.16.4.D.**  This section requires a charging party to provide enumerated documents to the Hearing Board, and in turn requires the Chair of the Hearing Board to provide those documents to the respondent:

> One month prior to the hearing, the charging party shall supply to the Hearing Board a summary statement of the evidence to be presented by the charging party, including a list of witnesses, a detailed summary of the testimony expected from each witness, copies of relevant extracts from the Statutes and standing resolutions of the Trustees of the University of Pennsylvania, a copy of these procedures, and copies of any other University documents that are relevant to the respondent's procedural and substantive rights in this matter.  The Chair of the Hearing Board shall immediately furnish these documents with the notice [of the date and place of the hearing] to the respondent.

Ex. A at 55.  Plaintiff mischaracterizes this provision as creating a much broader right to information, Compl. ¶ 51, but does not and could not plausibly allege that she was denied any of the specific documents to which she was entitled under this provision.  *See* Compl. Ex. at 59 (noting that "counsel for the Charging Party[] submit[ted] documentation for the hearing to the Hearing Board and Respondent," as required); *id.* at 63 (SCAFR rejecting Plaintiff's "allegations of procedural defect," and finding no "other potential procedural defects" after independently "search[ing] the record").

**Handbook § II.E.16.B.**  Plaintiff cites this section in support of her assertion that she should not have been charged with a "major infraction."  Compl. ¶¶ 53-55.  This section defines the term "major infraction" as follows: "Major infraction of University behavioral standards: An action involving flagrant disregard of the standards, rules, or mission of the University or the customs of scholarly communities, including, but not limited to, serious cases of" various enumerated examples.  Ex. A at 53.  The non-exhaustive list of examples includes "serious crimes, such as, but not limited to, murder, sexual assault or rape," as Plaintiff emphasizes, but also identifies "harassment of … a member of the University community" as an example, among a half-

-18-

dozen other illustrations.  *Id.* at 53-54.  Plaintiff contends that she should not have been charged

with a "major infraction," Compl. ¶¶ 53-55, because her conduct was not "equivalent in kind and

degree to conduct like murder or sexual assault," *id.* ¶ 54.  But the Handbook states that "major

infractions" are *not* limited to those crimes.  Plaintiff was charged with, and found to have

exhibited, "flagrant disregard of the standards, rules, or mission of the University," which qualifies

as a major infraction by the Handbook's express terms.  Compl. Ex. at 19, 23.  Plaintiff cannot

plausibly allege otherwise by selectively quoting the most extreme examples from the Handbook's

non-exhaustive list.

**B.    Plaintiff does not identify any judicially enforceable obligation in any other agreement.**

Even assuming for purposes of this Motion only that the "Open Expression" policy and

President Magill's statements are contractual in some respects, Plaintiff does not plausibly allege

a breach of either.

**"Open Expression" Policy.**    Plaintiff emphasizes Penn's "Open Expression" policy.

Compl. ¶¶ 121-26.  That policy includes some specific guarantees; for example, it requires the

University to "publish [open expression] Guidelines at least once each academic year."  Banks

Decl. Ex. B (hereinafter "Ex. B"), § III.A.1.  Yet Plaintiff does not point to or claim a breach of

that specific guarantee or any other.  Instead, the only specific provision of the policy that Plaintiff

invokes is its preface, in which the University

> affirms, supports and cherishes the concepts of freedom of thought, inquiry, speech,
> and lawful assembly.  The freedom to experiment, to present and examine
> alternative data and theories; the freedom to hear, express, and debate various
> views; and the freedom to voice criticism of existing practices and values are
> fundamental rights that must be upheld and practiced by the University in a free
> society.

-19-

Compl. ¶ 122 (quoting Ex. B, § I.A).  Plaintiff alleges that Penn violated this provision, *id.* ¶ 121, although she does not specify how.  Nor can she because this statement does not confer a contractual obligation.

Another court in this District recently dismissed a breach of contract claim based on this exact provision, rejecting the plaintiffs' argument that "this guideline creates a contractual duty." *Fakhreddine v. Univ. of Pa.*, 2025 WL 345089, at *7 (E.D. Pa. Jan. 30, 2025).  "Rather," the court properly concluded, "the Guideline contains 'mere aspirational language not sufficiently definite to create an enforceable obligation.'"  *Id.* (brackets and internal quotation marks omitted) (quoting *Doe v. Abington Friends Sch.*, 2022 WL 16722322, at *3 (E.D. Pa. Nov. 4, 2022)).  Plaintiff, seemingly anticipating that problem, alleges that the policy "includes 'Enforcement' provisions to ensure that the rights given to University professors under the 'Open Expression' policy are applied."  Compl. ¶ 123.  But the "enforcement" provisions Plaintiff invokes include specific instructions for how the Vice Provost or their delegate should respond to certain meetings or demonstrations—not anything relevant to Plaintiff or the Complaint.  Ex. B, § V.  Here too, Plaintiff does not identify any language in the policy definite enough to confer any rights that could be judicially enforced.

***President Magill's statements.***  Finally, Plaintiff quotes President Magill's testimony to Congress that Penn's "free speech policies are *guided by* the United States Constitution."  Compl. ¶ 126 n.9 (emphasis added).[12]  Plaintiff does not explain how President Magill's congressional

---

[12] The Court should focus on President Magill's actual quoted statement in the Complaint's footnote rather than what appears to be an inaccurate description of that statement in the body of the Complaint.  Compl. ¶ 126 (asserting that President Magill "stated that Penn's policy is substantively identical to and governed by the First Amendment to the United States Constitution").  The Complaint does not cite any source for that purported statement, and the full transcript of the congressional hearing does not contain either that statement or any other statement by President Magill closely resembling it.  *See Holding Campus Leaders Accountable and Confronting Antisemitism: Hearing Before the H. Comm. on Educ. & the Workforce*, 118th Cong. (2023), https://perma.cc/3JA8-XVG3.

testimony could create a legally binding contract to which Plaintiff is a party. Regardless, President Magill's description of broad principles that inspire more specific policies reflects at most aspirational language that is not sufficiently definite to create an enforceable obligation. *See Fakhreddine*, 2025 WL 345089, at \*7.

## II.    Plaintiff fails to state a race discrimination claim (Counts 2, 3, 5) because she does not plausibly allege disparate treatment based on Plaintiff's race.

Plaintiff asserts race discrimination claims under Section 1981, Title VI, and Title VII, all of which require her to allege plausibly that **she** was subjected to intentional discrimination because of **her** race. *See, e.g.*, *Weir v. Univ. of Pittsburgh*, 2023 WL 3773645, at \*2 (3d Cir. June 2, 2023) (collecting cases discussing requirements to state a claim under all three statutes); *Doe v. Trs. of Univ. of Pa.*, 270 F. Supp. 3d 799, 829-30 (E.D. Pa. 2017) (dismissing Section 1981 and Title VI claims where plaintiff "fail[ed] to allege circumstances that give rise to an inference of intentional racial discrimination"); *Tannous v. Cabrini Univ.*, 697 F. Supp. 3d 350, 360-62 (E.D. Pa. 2023) (dismissing Section 1981 and Title VII claims for same reason). The most basic requirement for a race discrimination claim under these statutes is that the defendant discriminated against the plaintiff based on *the plaintiff's race*. *See, e.g.*, *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020) (Section 1981 is violated "if the defendant would have responded differently but for *the plaintiff's race*" (emphasis added)); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 208 (2023) (Title VI claim presented question "whether a university may make admissions decisions that turn on *an applicant's race*" (emphasis added)); *Ricci v. DeStefano*, 557 U.S. 557, 579 (2009) (describing "Title VII's command that employers cannot take adverse employment actions because of *an individual's race*" (emphasis added)).

Plaintiff claims race discrimination under two different theories.  Each fails.  The Complaint's primary theory is that "Penn's Speech Policy discriminates on the basis of race … because it punishes some speakers," "but does not punish other speakers," "due to the racial content of their speech."  Compl. ¶ 136.  Plaintiff cannot state a claim on that theory because Section 1981, Title VI, and Title VII prohibit treating individuals differently based on their race; they do not prohibit treating individuals differently based on what they say about race.  Plaintiff also asserts a fallback theory—that "Penn's Speech Policy also discriminates based on the race or other protected ground of the speaker," *id.* ¶ 137—but she does not cite any direct or circumstantial evidence to support her conclusory assertion that Defendant discriminated against her based on her race.  Plaintiff's discrimination claims, therefore, should be dismissed.

**A.  Plaintiff's allegations of disparate treatment of Plaintiff's speech about race do not support a cognizable claim of discrimination based on Plaintiff's race.**

The discrimination claims are grounded primarily in allegations that Defendant treated Plaintiff differently from other individuals based on "the racial content of their speech."  Compl. ¶ 136; *see also, e.g.*, *id.* ¶ 7 (alleging that "under [Penn's] speech policies," "some races may not be criticized while other racial or ethnic groups can be"); *id.* ¶¶ 23-24 (alleging that "[u]nder that policy, some racial and ethnic groups … can be criticized," but not "when the speech at issue concerns a group higher up the University's intersectionality pyramid"); *id.* ¶ 93 (alleging that "under Penn's Speech Policy, stereotyping some racial groups is protected speech, while for other racial groups it is somehow unprotected 'conduct'").  Even assuming the truth of these allegations and construing them in Plaintiff's favor, they do not support a cognizable claim under the statutes Plaintiff invokes.

Federal law prohibits discrimination based on a person's race, not a person's statements about race.  *See Frith v. Whole Foods Mkt., Inc.*, 517 F. Supp. 3d 60, 70-71 (D. Mass. 2021), *aff'd*,

38 F.4th 263 (1st Cir. 2022). The plaintiffs in *Frith* alleged that the defendant employer violated Title VII by disciplining employees for wearing clothing communicating a message about race (conveying support for the Black Lives Matter movement and "a demand for better treatment of Black employees"), but not disciplining employees for wearing clothing communicating other messages related to protected characteristics or politics, like "LGBTQ+ messaging" or "National Rifle Association ('NRA') messaging." *Id.* at 66. The plaintiffs there, like Plaintiff here, thus argued that punishing expression based on its racial content amounts to prohibited race discrimination. The court disagreed: "Title VII prohibits race-based discrimination," and the plaintiffs had alleged that the defendant employer had "disciplined employees, regardless of race," for certain expression *about* race. *Id.* at 70-71. Allegedly disparate treatment of certain expression about race "does not constitute a Title VII violation because it is not race-based discrimination and because Title VII does not protect free speech in a private workplace." *Id.* at 71. The same conclusion follows here. Section 1981, Title VI, and Title VII all prohibit discrimination based on a person's race, not what a person says about race. *See supra* at 21.

Consistent with the court's analysis in *Frith*, courts in the Third Circuit reject race discrimination claims that rest on allegations of disparate treatment based on the plaintiff's speech or conduct related to race, rather than disparate treatment based on the plaintiff's own race. *See, e.g.*, *DeCarolis v. Presbyterian Med. Ctr. of Univ. of Pa. Health Sys.*, 554 F. App'x 100, 104 (3d Cir. 2014) (affirming summary judgment for defendant on Title VII claim where plaintiff asserted that reverse discrimination motivated her termination after she sent an email that "racially offended at least one colleague," because plaintiff failed to show her termination "was related to [her] race as opposed to her conduct"); *Ledda v. St. John Neumann Reg'l Acad.*, 2021 WL 1035106, at *5 (M.D. Pa. Feb. 18, 2021) (dismissing "reverse discrimination claim" where "the well-pleaded

-23-

allegations in the complaint focus[ed] on alleged racism, as opposed to race, as the basis for [the plaintiff's] discharge"), *R. & R. adopted*, 2021 WL 1017370 (M.D. Pa. Mar. 17, 2021); *Lacontora v. Geno Enters., LLC*, 2022 WL 856076, at \*4 (E.D. Pa. Mar. 23, 2022) (dismissing race discrimination claim where plaintiff alleged "he was fired because of the remark he made" about race, because that did not support inference "that he was treated less favorably than other employees because he is a Caucasian man").  Conduct and status are different, and allegations of disparate treatment based on race-related conduct do not support a race discrimination claim even when the plaintiff alleges their race affected the defendant's perception of that conduct.  *See, e.g.*, *Bank v. Cmty. Coll. of Phila.*, 2022 WL 2905243, at \*5 (E.D. Pa. July 22, 2022) (dismissing race discrimination claim based on allegedly adverse treatment based on conduct perceived as racist, notwithstanding that plaintiff alleged his conduct was perceived as racist only because he was white); *Tannous v. Cabrini Univ.*, 697 F. Supp. 3d at 360, 362 (same, where plaintiff alleged he was terminated based on speech perceived as anti-Semitic, notwithstanding that plaintiff alleged his speech was perceived as anti-Semitic only because he was Palestinian).

Plaintiff here, like the plaintiffs in these other cases, "wrongfully conflates the ideas of race and racism."  *Lacontora*, 2022 WL 856076, at \*4.  Plaintiff alleges that the consequences she faced for her speech about race are "unfair or incorrect," but that "does not give rise to a cognizable claim" of race discrimination "because it is not based on [her] status as a protected minority."  *Tannous*, 697 F. Supp. 3d at 360.  Plaintiff's theory would distort federal statutes "designed to prevent real discrimination based upon race" into a prohibition of "adverse actions based upon … racist conduct."  *Ledda*, 2021 WL 1035106, at \*7.  The Court should reject that untenable result, and rule that the allegations about racially tinged speech fail to state a viable race discrimination claim under Section 1981, Title VI, or Title VII.

-24-

**B.    The Complaint's well-pleaded factual allegations do not support the conclusory assertion that Plaintiff was discriminated against based on her race.**

The gravamen of Plaintiff's discrimination claim is that she was disciplined "[b]ased on the content of her speech," Compl. ¶ 2.  But Plaintiff hedges her bets with a fallback assertion. She contends, in conclusory form, that Defendants "also discriminate[d] based on the race or other protected grounds of the speaker."  *Id.* ¶ 137; *see also, e.g.*, *id.* ¶ 8 ("White speakers are far more likely to be disciplined for 'harmful' speech while minority speakers are rarely, if ever, subject to disciplinary procedures for the same."); *id.* ¶ 25 (alleging that speakers "who are White and/or Jewish are far more likely to be disciplined for offending speech than speakers who are racial minorities (other than Jews)").  Plaintiff's theory seems to be that disciplinary proceedings would not have been initiated in response to her racist and offensive comments but for the fact that she is a white woman.  That is not only facially implausible, but also wholly unsupported by any factual assertions that would raise even an inference of discrimination.

Plaintiff does not identify any direct evidence suggesting that the initiation or conduct of disciplinary proceedings against her was motivated by her race.  Instead, she attempts to muster circumstantial evidence—that the lack of disciplinary proceedings against other individuals who have made troubling comments reflects disparate treatment.  Specifically, she cites a few examples of faculty members in other schools who have made isolated remarks that some may have found offensive, noting that these other faculty members were not disciplined.  Quite clearly, however, none of these other faculty members are legitimate comparators, nor do their situations have any bearing on the disciplinary proceedings initiated against Plaintiff by the Law School Dean.

To state a discrimination claim based on a comparison with the treatment of other employees, a plaintiff must allege facts showing that the asserted comparators are "similarly situated" to the plaintiff, meaning "'directly comparable to the plaintiff in all material respects.'"

*Weir*, 2023 WL 3773645, at *3 (quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)) (affirming dismissal of title VII claim where complaint failed to adequately alleged that asserted comparator was similarly situated); *see, e.g.*, *Wiggins v. Universal Prot. Serv., LLC*, 2023 WL 5014082, at *3 (3d Cir. Aug. 7, 2023) (affirming dismissal of discrimination claims where complaint "included no allegations that [the plaintiff's] potential comparators were 'similarly situated,'" and reiterating that "comparators must be similarly situated in all respects") (citation omitted); *Saunders v. Hall-Long*, 2021 WL 5755080, at *2 (3d Cir. Dec. 3, 2021) (affirming dismissal of equal protection claim where plaintiff "compare[d] generally the commutation process of certain African-American and Caucasian prisoners," but "fail[ed] to sufficiently allege facts from which a court could find that he was 'similarly situated' to Caucasian prisoners who were treated differently"); *1201 W. Girard Ave., LLC v. Clarke*, 2024 WL 4403866, at *2 (3d Cir. Oct. 4, 2024) (affirming dismissal of equal protection claim based on plaintiff's "fail[ure] to identify a 'similarly situated' comparator who is alike in all relevant aspects") (citation omitted).  Allegations of different treatment of different individuals do not support a reasonable inference of race discrimination unless those individuals are similarly situated in all respects other than race.

Here, however, Plaintiff fails to allege that any of the purported comparators in other schools were similarly situated to her in any meaningful respect.  That is readily apparent when one focuses on the decisions that are alleged to be discriminatory, beginning with the initiation of disciplinary proceedings by the Penn Law Dean.  Compl. ¶ 133; *see also, e.g.*, *id.* ¶ 21 (alleging that Plaintiff was treated less favorably than another professor who has not "face[d] academic discipline for her speech"); *id.* ¶ 93 (similarly alleging disparate treatment of Plaintiff relative to another professor who is not "facing disciplinary proceedings").  Plaintiff (accurately) alleges that

Dean Ruger initiated disciplinary actions against her in his capacity as Dean of the Law School, *id.* ¶ 52, consistent with the Faculty Handbook, which authorizes only "[t]he Provost, a dean of a school, or a Provost's or dean's designee" to bring disciplinary charges, Ex. A at 53-54. The entire disciplinary process flowed from Dean Ruger's charges: the Hearing Board adjudicated those charges, and the President then reviewed the Hearing Board's report. Significantly, Dean Ruger, not the Hearing Board or the President, made the decision to bring disciplinary charges. Accordingly, Plaintiff cannot plausibly allege that her race motivated the Law School Dean's initiation of disciplinary proceedings against her by comparing herself to professors from different schools, because the Law School Dean would have no ability to initiate proceedings against those professors at all. *Cf., e.g.*, *Maras v. Curators of Univ. of Mo.*, 983 F.3d 1023, 1029 (8th Cir. 2020) (asserted comparators in denial-of-tenure case not similarly situated where one "was in a completely different department," and the "ultimate decisionmaker" for the plaintiff "did not review any of the comparators' applications"); *Kazar v. Slippery Rock Univ.*, 679 F. App'x 156, 162 (3d Cir. 2017) (asserted comparators not similarly situated because they "were hired into an entirely different school [within the university,] where their annual review was conducted by different faculty members"); *Waggaman v. Villanova Univ.*, 2008 WL 4091015, at *13 (E.D. Pa. Sept. 4, 2008) ("[I]t must be noted that comparisons between members of different departments are of diminished value."). Plaintiff does not allege that any the purported comparators was a law school professor or someone for whom Dean Ruger could have brought charges,[13] and she therefore fails to identify a comparator similarly situated to her in all material respects.

---

[13] *See, e.g.*, Compl. ¶ 9 ("Dwayne Booth, a (non-tenured) lecturer" at the Annenberg School for Communication, https://tinyurl.com/ms8fcndj); *id.* ¶ 17 ("Professor Ahmad Almallah, a Palestinian poet and artist-in-residence who also lectures at the University," in its School of Arts and Sciences, https://tinyurl.com/4w8a92sa); *id.* ¶ 20 ("Professor Julia Alekseyeva," of the School of Arts and Sciences, https://tinyurl.com/mrr8bfzk); *id.* ¶ 90 ("Anne Norton, professor" in the School of Arts and Sciences, https://tinyurl.com/4b6mvrxw); *id.* ¶ 94 ("Professor Huda Fakhreddine, an associate professor of Arabic

Plaintiff also cannot support a reasonable inference of racial discrimination based on her allegations about these purported comparators in other schools because, for most of them, she does not even identify their race.  *See* Compl. ¶¶ 9-14 (never alleging Mr. Booth's race); *id.* ¶¶ 20-21 (never alleging Prof. Alekseyeva's race[14]); *id.* ¶¶ 90-92 (never alleging Prof. Norton's race); *id.* ¶ 101 (never alleging Librarian Jill Richards's race).  Plaintiff cannot plausibly allege racial discrimination based on comparisons to these individuals without even alleging their races.  The Complaint likewise does not allege the race of either Professor Almallah or Penn Health employee Ibrahim Kobeissi, and absent such allegations, the Court should ignore the Complaint's conclusory assertions that those purported comparators benefit from racial preference.  *See id.* ¶ 97 (asserting without explanation that Professor Almallah "belongs to a more-favored racial group" than Plaintiff); *id.* ¶ 103 (similarly asserting without explanation that Mr. Kobeisi "belongs to a racial classification higher up on the University's intersectionality pyramid").  The closest that the Complaint comes to identifying the race of an alleged comparator is that "Professor" Almallah is "Palestinian," which is not a race.  *Id.* ¶¶ 17, 98.  Though the Complaint uses the title "Professor," it specifically alleges that Mr. Almallah is a "poet and artist in residence and lecturer," not a professor.  *Id.*  The Complaint alleges that Mr. Almallah has a different position from Plaintiff, at a different school, and engaged in different conduct.  It does not allege that he is similarly situated in all relevant respects.

Nor does Plaintiff allege that any of the conduct by the purported comparators was materially similar in all relevant respects.  Plaintiff identifies between one and three acts or

---

literature at Penn's Middle East Center," also in the School of Arts and Sciences, https://tinyurl.com/bddchw4t).

[14] It appears that Professor Alekseyeva, like Plaintiff, is a white Jewish woman.  *See* Oksona Mironova, *Soviet Daughter: An Interview with Julia Alekseyeva*, Lilith (Feb. 24, 2017) (Prof. Alekseyeva describing her "Jewish identity" as "an ethnic identity"), https://tinyurl.com/memnhn5k.

statements by each alleged comparator, all occurring after Hamas's attack on Israel on October 7, 2023, and all relating to Israel or other current events (not Penn students). *See* Compl. ¶¶ 9-14 (alleging that Mr. Booth drew one cartoon); *id.* ¶¶ 17-19 (alleging that "Prof." Almallah made one statement at a rally); *id.* ¶¶ 20-21 (alleging that Prof. Alekseyeva posted one video about the murder of UnitedHealth Group CEO Brian Thompson); *id.* ¶¶ 90-92 (alleging that Prof. Norton made two social media posts); *id.* ¶¶ 94-97 (asserting that Prof. Fakhreddine "has a history of antisemitic speech," but specifically alleging only that she made two statements); *id.* ¶ 101 (alleging that Ms. Richards made one social media post); *id.* ¶ 102 (alleging that Mr. Kobeissi made at most three statements).

By contrast, Dean Ruger's statement of charges surveys repeated acts and conduct by Plaintiff over the five preceding years, dating back to 2017, and explains that Dean Ruger deemed it necessary to seek sanctions in part because "[p]ast attempts to address [Plaintiff's] behavior, including not assigning [her] to teach first-year law students in mandatory courses, ha[d] failed to result in a change of conduct." Compl. Ex. at 11-20. The Hearing Board appended to its final report a non-exhaustive list of 26 disrespectful, offensive, or unprofessional acts and statements by Plaintiff. *Id.* at 28-30. Even assuming the asserted comparators' conduct and statements were materially similar in nature to Plaintiff's, Dean Ruger expressly stated that a yearslong course of conduct by Plaintiff prompted him to bring charges; individuals who allegedly said or did one, two, or at most three things over a short time frame are not similarly situated to Plaintiff in all relevant respects.

In short, Plaintiff fails to identify any comparator who is similarly situated to her. She therefore fails to identify circumstantial evidence that might support a reasonable inference of racial discrimination. Accordingly, the discrimination claims should be dismissed.

III.    **Plaintiff fails to state an ADA claim (Count 6) because she does not allege that she timely filed a charge of discrimination with the EEOC, nor does she plead a cognizable claim.**

Plaintiff contends that Defendants violated the Americans with Disabilities Act (ADA) by denying her request for a purportedly "reasonable accommodation"—an indefinite delay of the disciplinary proceedings until Plaintiff completed ongoing medical treatment.  Compl. ¶¶ 192-94; *see* Compl. Ex. at 92-93.  This claim fails for two reasons: (1) Plaintiff did not file a timely charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC"); and (2) her request for an indefinite delay of disciplinary proceedings did not implicate a "reasonable accommodation" within the meaning of the ADA.

A.    **Plaintiff did not timely exhaust her ADA claim.**

A prospective ADA plaintiff must file a charge of discrimination with the EEOC "within 300 days of the challenged employment action."  *Simko v. U.S. Steel Corp.*, 992 F.3d 198, 204 (3d Cir. 2021).  If the plaintiff does not timely initiate administrative proceedings, her ensuing federal court ADA claim must be dismissed.  *See id.* at 216 (affirming dismissal for failure to timely exhaust).

An ADA claim accrues when the allegedly "discriminatory act occurs, not when the consequences of that act become painful."  *Burkhart v. Widener Univ., Inc.*, 70 F. App'x 52, 53 (3d Cir. 2003).  The 300-day period thus begins to run when the employer makes the challenged decision and communicates it to the plaintiff, not when the plaintiff experiences any allegedly resulting harm.  *See Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) (holding that claim for national origin discrimination accrued "at the time the tenure decision was made and communicated to [the plaintiff] … even though one of the *effects* of the denial of tenure—the eventual loss of a teaching position—did not occur until later"); *Datto v. Harrison*, 664 F. Supp.

-30-

2d 472, 485 (E.D. Pa. 2009) (holding that the plaintiff's ADA "cause of action arose when the initial decision was communicated to him").

Applying these principles here, Plaintiff failed to file a timely charge of discrimination. Plaintiff alleges that she requested an ADA accommodation—an indefinite delay of her disciplinary proceedings—on August 31, 2022.  Compl. ¶¶ 192-94; *see* Compl. Ex. at 92-93.  She alleges further that Penn "denied [her] request," without specifying when.  Compl. ¶ 195.  But the President's August 11, 2023 Decision, attached to and thus embraced by the Complaint, states that on February 16, 2023, "[i]n a letter to [Plaintiff], the Hearing Board decline[d] to suspend the proceedings indefinitely."  Compl. Ex. at 59, ¶ 30.  The Hearing Board thus made the decision that Plaintiff challenges and communicated it to her, and Plaintiff's ADA claim accrued, on February 16, 2023.

If Plaintiff believed that the denial of her request for a postponement of the hearing was a failure to accommodate her disability, she was required file a charge with the EEOC within 300 days, i.e., by December 13, 2023.  But the charge that Plaintiff filed with the EEOC is dated January 31, 2025—more than 700 days after the claim accrued (and more than 500 days after the President's Decision).  Banks Decl. Ex. C.[15]  Plaintiff's EEOC charge was untimely, and her ADA claim must therefore be dismissed.

### B.    Plaintiff's "reasonable accommodation" claim also fails as a matter of law.

Plaintiff's ADA claim would fail even if she had filed a timely EEOC charge.  To state a failure-to-accommodate claim under the ADA, a plaintiff must allege plausibly "that a specific, reasonable accommodation would have allowed her to perform the essential functions of her job."

---

[15] Plaintiff's EEOC charges are integral to and incorporated by reference in the Complaint.  *See Janneh v. Westgate Hill SNF LLC*, 2015 WL 9302907, at *3 n.3 (E.D. Pa. Dec. 22, 2015) ("[T]he Court may consider the EEOC charges and right-to-sue letters, as they are integral to Mr. Janneh's claim.").

*Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 320 (3d Cir. 1999). The requested accommodation must be "designed to help [the plaintiff] perform an essential duty of the job." *Donahue v. Consol. R. Corp.*, 224 F.3d 226, 232 (3d Cir. 2000). "Whether a job duty is an 'essential function' turns on whether it is 'fundamental' to the employment position," meaning a core aspect of the employee's regular work. *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 612 (3d Cir. 2006) (citation omitted).

Plaintiff fails to state a cognizable failure-to-accommodate claim because participating in disciplinary hearings is not an "essential function" of a law school professor's work. Courts consistently reject ADA claims based on requested accommodations related to disciplinary proceedings because the resolution of disciplinary issues is not an essential function of employment. *See, e.g.*, *Novella v. Wal-Mart Stores, Inc.*, 459 F. Supp. 2d 1231, 1234-35 (M.D. Fla. 2006), *aff'd*, 226 F. App'x 901 (11th Cir. 2007) ("Terminating an employee without giving him a hearing does not violate the ADA. Because Plaintiff's disciplinary meeting was not part of his essential job functions, Defendant was under no obligation to provide him with an interpreter."); *Cole v. Teel Plastics, Inc.*, 2005 WL 1378911, at *18 (W.D. Wis. June 8, 2005) ("[T]erminating an employee without giving him a hearing to plead his case does not violate the ADA simply because the employee happens to be disabled."). If Plaintiff's ADA claim proceeded, the evidence would show that it is utterly baseless. But even accepting the Complaint's allegations as true and giving Plaintiff the benefit of every doubt, her ADA claim is not even hypothetically viable and thus should be dismissed.

### IV.    Plaintiff fails to state a claim for false light invasion of privacy (Count 4) because she does not plausibly allege any actionable publication or any "false light."

Although the exhibits attached to the Complaint reflect that Plaintiff enthusiastically expressed her views in interviews, podcasts, and other media, she claims that Defendants thrust

her into the public eye and cast her in a false light. "Pennsylvania has adopted the definition of false light invasion of privacy from the Restatement (Second) of Torts, which imposes liability on a person who [1] publishes material that '[2] is not true, [3] is highly offensive to a reasonable person, and [4] is publicized with knowledge or in reckless disregard of its falsity.'" *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014) (quoting *Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181, 1188 (Pa. Super. Ct. 1988) (en banc)). This claim fails on every level—it challenges a publication that is not actionable, and it fails to allege that Plaintiff was portrayed in a false light.

### A.    The challenged publication was privileged.

Publications consented to or required by law, including those required by a plaintiff's contract, are absolutely privileged against claims for false light invasion of privacy. *See* Restatement (Second) of Torts § 583 (stating general rule that "the consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation"); *id.* § 592A ("One who is required by law to publish defamatory matter is absolutely privileged to publish it."); *id.* § 652F ("The rules on absolute privileges to publish defamatory matter … apply to the publication of any matter that is an invasion of privacy."); *id.* § 652E (defining "false light invasion of privacy" as a tort sounding in "invasion of … privacy"); *see also DeLuca v. Reader*, 323 A.2d 309, 313 (Pa. Super. Ct. 1974) (cited in the *Restatement*) (applying absolute privilege to publication of report required by union contract).

Here, Plaintiff's false light claim is based on "Defendant Penn's publication of the final reports announcing the sanctions against [Plaintiff], published online September 23 and 24, 2024." Compl. ¶ 164; *see* Compl. Ex. at 66-69 (exhibit of publication). The exhibit attached to the Complaint includes a hyperlink that reflects that Plaintiff challenges the publication of these statements on the website of the University of Pennsylvania *Almanac*. Compl. Ex. at 66 (linking to    https://almanac.upenn.edu/articles/final-determination-of-complaint-against-professor-amy-

wax).  Yet the Faculty Handbook—which Plaintiff asserts is a legally binding contract—specifically requires publication in the *Almanac*.  *See* Ex. A at 56 (§ II.E.16.6.D: "If the respondent has been subjected to a major sanction, the President, after informal discussion with the Chair, Past Chair and Chair-elect of the Faculty Senate, shall publish in the *Almanac* a statement describing the case and its disposition in appropriate detail.").  Because the publication that Plaintiff challenges was required by the Faculty Handbook—and Plaintiff does not allege otherwise—it is absolutely privileged and cannot support Plaintiff's claim.  *See Baker v. Lafayette Coll.*, 504 A.2d 247, 249 (Pa. Super. Ct. 1986) (affirming dismissal of professor's defamation claims because his allegedly defamatory performance evaluations were required by Faculty Handbook and thus absolutely privileged), *aff'd on other grounds*, 532 A.2d 399 (Pa. 1987); *Bloch v. Temple Univ.*, 939 F. Supp. 387, 397 (E.D. Pa. 1996) (dismissing professor's defamation claim based on absolute privilege recognized in *Baker*).

### B.    Plaintiff does not plausibly allege that she was placed in any false light.

Even if not privileged, the publication does not present Plaintiff in a false light.  "A plaintiff can establish" the required "falsity by showing that a defendant 'selectively printed or broadcast true statements or pictures in a manner which created a false impression.'  Thus, even where a publication is literally true, 'discrete presentation of information in a fashion which renders the publication susceptible to inferences casting one in a false light entitles the grievant to recompense for the wrong committed.'"  *Graboff*, 744 F.3d at 136-37 (quoting *Larsen*, 543 A.2d at 1189).

The challenged publication here accurately and fairly described the disciplinary proceedings and their results, without selectively presenting only one side of the story.  For example, then-President Magill's letter specifically addressed Plaintiff's "objections" to the process that she reiterates in her Complaint.  *See* Compl. Ex. at 51-54.  Plaintiff does not identify any specific statements that supposedly placed Plaintiff in any particular false light.  Although the

Complaint broadly accuses Defendants of misrepresentations and misleading statements, it identifies only one allegedly misleading statement: that the "publication and accompanying sanctions work to portray [Plaintiff] not only as a racist but a liar" "by repeatedly accusing [Plaintiff] of lying about Black student performance" without "evidence of the falsity of [Plaintiff's] statements." Compl. ¶ 169. The published material itself, however, refutes that allegation, because it does not include any such statement. *See* Compl. Ex. at 49 (noting finding that Plaintiff "breach[ed] the requirement that student grades be kept private by publicly speaking about the grades of law students by race and continuing to do so even after cautioned by the dean that it was a violation of University policy"). The materials attached to the Complaint thus foreclose Plaintiff's only specific allegation of a false statement. Absent any other identification of a false statement, Plaintiff fails to state a claim for false light invasion of privacy.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiff's Complaint, in full, with prejudice.

Dated: March 12, 2025

MORGAN, LEWIS & BOCKIUS LLP

By: */s/ Michael L. Banks*

Michael L. Banks (Bar No. 35052)
A. Klair Fitzpatrick (Bar No. 309329)
Arielle H. Steinhart (Bar No. 331886)
2222 Market Street
Philadelphia, PA  19103-3007
+1.215.963.5000
michael.banks@morganlewis.com
klair.fitzpatrick@morganlewis.com
arielle.steinhart@morganlewis.com

TUCKER LAW GROUP
Joe H. Tucker (Bar No. 56617)
1801 Market Street, Suite 2500
Philadelphia, PA  19103
+1.215.875.0609

-35-

jtucker@tlgattorneys.com

*Counsel for Defendants the Trustees of the
University of Pennsylvania*