# EXHIBIT A

# TABLE OF CONTENTS

Faculty Handbook ................................................................. 3

   I. University Structure .......................................................... 3

      I.A. Introduction ............................................................. 3

      I.B. The Trustees ............................................................ 3

      I.C. The Central Administration .......................................... 4

      I.D. The Faculties and the Schools ..................................... 5

      I.E. General Provisions Concerning a Faculty ......................... 6

      I.F. Organization and Responsibilities of Graduate Groups ......... 6

      I.G. Policies Concerning Academic and Administrative Officers ..... 7

      I.H. The University Council, the Faculty Senate, and University Committees .................................................................. 12

      I.I. Academic Planning and Budget Committee ..................... 15

      I.J. The Ombuds ........................................................... 16

      I.K. Equal Opportunity and Affirmative Action ..................... 16

   II. Faculty Policies and Procedures ...................................... 17

      II.A. Academic Freedom and Responsibility ......................... 17

      II.B. Structure of the Academic Staff ................................ 17

      II.C. Tenure System at the University of Pennsylvania ............. 33

      II.D. Appointments and Promotions .................................. 35

      II.E. Terms and Conditions of Faculty Appointments ............... 38

   III. Policies and Procedures Concerning Faculty Research ........... 59

      III.A. Guidelines for the Conduct of Sponsored Research ......... 59

      III.B. Procedures Regarding Misconduct in Research ............... 61

      III.C. Procedures Regarding Misconduct in Research for Non-faculty Members of the Research Community ......................... 64

      III.D. Policy Relating to Copyrights and Commitment of Effort for Faculty ...................................................................... 67

      III.E. Patent and Tangible Research Property Policies and Procedures .................................................................. 68

      III.F. Policy on Conflicts of Interest Related to Research .......... 79

      III.G. Consulting and Outside Activities Policies and Procedures ................................................................. 84

      III.H. Guidelines for Student Protection and Student Access to Information Regarding Sources of Financial Support ............... 87

      III.I. Policy Concerning the Exclusion of Foreign Nationals from Specific Research Areas ................................................ 87

      III.J. Guidelines for Research in the Community ..................... 87

      III.K. Human Research Protection Program ........................... 88

      III.L. Policy Regarding Human Subject Research in the Sociobehavioral Sciences .............................................. 89

      III.M. Standard Operating Procedures and Policies of the University of Pennsylvania Institutional Animal Care and Use Committee (IACUC) ...................................................... 91

   IV. Procedures Regarding Admission and Instruction of Students ................................................................................. 91

      IV.A. Guidelines for Admissions Policies and Procedures ......... 91

      IV.B. Code of Academic Integrity ..................................... 93

      IV.C. Charter of the University Student Disciplinary System ...... 94

      IV.D Faculty Authority to Assign Grades and Academic Integrity ................................................................................. 106

      IV.E. School Policies and Practices .................................. 107

      IV.F. Rules Governing Final Examinations .......................... 107

      IV.G. Reporting of Final Grades ...................................... 107

      IV.H. Policy on Secular and Religious Holidays ..................... 108

      IV.I. Guidelines for Addressing Academic Issues of Students with Disabilities ................................................................ 108

      IV.J. Policy on the Confidentiality of Student Records ............ 110

   V. Policies Related to Information ........................................ 113

      V.A. Guidelines on Open Expression ................................ 113

      V.B. Confidentiality of Employee Records .......................... 116

      V.C. Confidentiality of Health Information under HIPAA .......... 118

      V.D. Closed Circuit Television Monitoring and Recording of Public Areas for Safety and Security Purposes ............................. 119

      V.E. Relationships Between Members of the University Community and Intelligence Organizations ............................ 121

      V.F. Photocopying for Educational Use .............................. 123

      V.G. Protocols for the University Archives and Records Center ................................................................................. 125

      V.H. Policy on Acceptable Use of Electronic Resources .......... 127

      V.I. Policy on Privacy in the Electronic Environment ............... 130

      V.J. Policy on Security of Electronic Protected Health Information (ePHI) ...................................................................... 132

      V.K. Information Systems Security Incident Response Policy ................................................................................. 133

      V.L. Policy on Unauthorized Copying of Copyrighted Media .... 133

      V.M. Confiscation of Publications .................................... 133

      V.N. Policy on Computer Disconnection from PennNet .......... 133

   VI. Other Policies ........................................................... 134

      VI.A. Use of University Name Policy ................................. 135

      VI.B. Acceptance of Gifts, Grants and Contracts .................. 135

      VI.C. Acceptance of Conditional Gifts ............................... 136

      VI.D. Gift Policy ......................................................... 136

      VI.E-F. Sexual Misconduct Policy, Resource Offices and Complaint Procedures .................................................... 136

VI.F. Consensual Sexual Relations Between Faculty and Students ................................................................... 155

VI.G. The University Alcohol and Other Drug Policy ................. 156

VI.H. Drug-Free Workplace Policy ............................................. 161

VI.I. Procedures for the Evaluation and Certification of the English Fluency of Undergraduate Instructional Personnel ................. 162

VI.J. Policy Prohibiting Workplace Violence ............................. 164

VI.K. Social Security Number Policy ........................................ 166

Appendix A ............................................................................ 168

FAQs ..................................................................................... 170

Index ..................................................................................... 173

# FACULTY HANDBOOK

The Handbook for Faculty and Academic Administrators is a set of policies governing faculty life at Penn.

Download the Faculty Handbook (PDF) (http://catalog.upenn.edu/pdf/2022-2023-facultyhandbook.pdf) - Last Updated August 1, 2022

## I. University Structure

- I.A. Introduction (p. 3)
- I.B. The Trustees (p. 3)
- I.C. The Central Administration (p. 4)
- I.D. The Faculties and the Schools (p. 5)
- I.E. General Provisions Concerning a Faculty (p. 6)
- I.F. Organization and Responsibilities of Graduate Groups (p. 6)
- I.G. Policies Concerning Academic and Administrative Officers (p. 7)
- I.H. The University Council, the Faculty Senate, and University Committees (p. 12)
- I.I. Academic Planning and Budget Committee (p. 15)
- I.J. The Ombuds (p. 16)
- I.K. Equal Opportunity and Affirmative Action (p. 16)

## I.A. Introduction

The University of Pennsylvania is a non-profit corporation chartered under the laws of the Commonwealth of Pennsylvania. Under the Charter, the Trustees are charged with the ultimate responsibility for the course of the University. The administrative management of the University, on the other hand, is delegated by the Trustees to the President. The University's faculties participate in the decision-making process through two major bodies advisory to the President and administration—the University Council and the Faculty Senate. Non-faculty employees and students also participate with the faculty in the University's governance through their membership in the University Council and in an extensive number of advisory groups and committees. In addition, the University has a policy on consultation that articulates procedures for involving faculty, staff and students in decision-making where the administration has final or primary responsibility.

Organizationally, the University is divided into twelve schools. Each school is under the direction of a dean. Some schools are further subdivided into departments.

## I.B. The Trustees

*(Source: Statutes of the Trustees, 1969; revised, April 28, 1980; revised, April 15, 1981; revised, June 17, 1983; revised, October 20, 1995; revised, June 21, 1996; revised, June 15, 2007 (https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-2007/june-15/#Resolutions); revised, June 17, 2011 (https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-2011/june-17/); revised, Office of the Provost, November 21, 2022)*

The Statutes classify the trustees as follows:

1. Trustees Ex Officio *(Non-voting):* The Governor of the Commonwealth of Pennsylvania and the President of the University during their respective terms.
2. Charter Trustees *(Voting):* Up to ten in number, elected to serve until retirement from among persons who have served as trustees for a period of not less than five years.
3. Term Trustees *(Voting):* Up to thirty in number, elected to serve for terms of five years. A term trustee may serve only two terms, which would ordinarily be successive, for a total of ten years' service. Prior service in any other voting class will also be applied toward this ten-year maximum.
4. Alumni Trustees *(Voting):* Up to fourteen in number, to include the President of Penn Alumni during their term of office and up to thirteen trustees elected by the alumni in accordance with rules established by Penn Alumni with the concurrence of the trustees, to serve for terms of five years, from among those persons who have received degrees from the University. Alumni trustees may not succeed themselves in office, but may be elected in another class.
5. Trustees Emeriti *(Non-voting):* Charter Trustees shall be designated as Trustees Emeriti upon attaining the age of seventy (70), or as early as age sixty-five (65), if they so choose. Other trustees who have been elected to two five-year terms in any class shall be eligible for election as trustees emeriti upon attaining the age of seventy (regardless of the age at which their ten-year term of service ends or the time remaining in their second term if they turn seventy before its conclusion) or, in rare circumstances, at an earlier age.
6. Commonwealth Trustees *(Voting):* Four non-elected officials appointed by the following representatives of the Pennsylvania General Assembly: the President Pro Tempore of the Senate, the Leader of the Senate, the Minority Speaker of the House of Representatives, and the Minority Leader of the House of Representatives, each of whom shall have the power to appoint one Commonwealth Trustee in accordance with Act No. 1994-25A.
7. Special Trustees *(Voting):* Up to two in number, to serve for a term determined by the Chair and approved by the Trustees Executive Committee, as defined at the time of their election, and whose service is in the best interests of the University to meet a particular need or purpose.

The Executive Committee of the Trustees exercises all of the powers and authority of the trustees, except for those cases where the Statutes specify action by the full board. The Executive Committee is elected annually by the trustees and shall normally be comprised of no fewer than ten voting trustees. The trustees may form such boards and committees as they see fit for any of the purposes and activities of the University. The standing committees are: Academic Policy; Audit and Compliance; Budget and Finance; Compensation; Development; Facilities and Campus Planning; Honorary Degrees and Awards; Local, National, & Global Engagement; Nominating; and Student Life. There is also an Investment Board.

The trustees annually elect the chair of the trustees and one or more vice chairs, who also serve as members of and as chair and vice chairs of the Executive Committee. The trustees hold two-day meetings three times a year, normally in the spring, fall, and winter. The meetings consist primarily of committee sessions and culminate in a stated meeting of the trustees. The Executive and Budget and Finance Committees are scheduled to meet at additional times throughout the year, and the other standing committees may have additional meetings if necessary. In accordance with Pennsylvania law, formal action on resolutions is taken

in stated meetings open to any member of the University community, subject to space.

Each standing committee is staffed by a University administrator who assists the chair in planning agendas and preparing background material for meetings. Six of the standing committees currently have faculty and student liaisons elected by the Faculty Senate, the Graduate and Professional Student Assembly, and the Undergraduate Assembly, who help represent the University community in committee discussions.

Ten of the schools and six University centers have boards of overseers composed of informed laypersons who act in an advisory capacity to the trustees, the President, the Provost, and the dean of a school or director of a center.

Copies of the Statutes and more detailed information about the trustees are available on the web site of the Secretary of the University (https://secretary.upenn.edu/).

# I.C. The Central Administration

*(Source: Statutes of the Trustees (https://secretary.upenn.edu/trustees-governance/statutes-trustees/), Article 2, 1969; revised, Article 3, June 19, 1981; revised June 19, 2009; revised, Office of the Provost, November 21, 2022)*

## I.C.1. The Officers

The officers of the University shall be the President, the Provost, the Vice Presidents, the Secretary, the Treasurer, the Comptroller, and the General Counsel.

Subject to the policies of the University, all officers except the President shall be elected by the Trustees upon nomination by the President and shall be suspended or terminated by the Trustees upon the recommendation of the President.

The President may appoint a temporary successor or substitute to act as required because of the death, absence, disability, suspension, or termination of any officer of the University other than the President, but such temporary appointments shall be effective only until the next meeting of the Trustees or the Executive Committee, at which time a successor shall be nominated and elected either on an acting or a permanent basis.

With the consent of the President and subject to the policies of the University, officers may appoint such associates and assistants and assign them such duties as they shall deem appropriate.

## I.C.2. The President

The President shall hold office upon such terms as the Trustees shall determine.

### Functions and Duties of the President

As the Chief Executive Officer of the University, the President is its educational and administrative head. The President is responsible to the Trustees for the conduct, coordination, and quality of the University's programs and for their future development. The President shall have the authority to perform all acts that are necessary to make effective the policies and actions of the Trustees unless a resolution of the Trustees specifically grants such authority to another person or entity. As a liaison between the Trustees and the faculty, the President shall inform each

of the views and concerns of the other relating to the programs and administration of the University.

The President shall hold the academic rank of Professor, shall be a member of every Faculty of the University, and may at their discretion call a meeting of any Faculty.

The President is assisted in the management of the University by several Vice Presidents. The current Vice Presidents who report directly to the President are: the Executive Vice President; the Executive Vice President of the University for the Health System; the Senior Vice President and General Counsel for the University of Pennsylvania and Penn Medicine; the Vice President and Chief of Staff, Office of the President; the Vice President for Development and Alumni Relations; the Vice President for Government and Community Affairs; the Vice President of Institutional Affairs; and the Vice President for University Communications. Vice Presidents who report to the President through the Executive Vice President are the Vice President for Budget and Management Analysis; the Vice President for Business Services; the Vice President for Facilities and Real Estate Services; the Vice President for Finance and Treasurer; the Vice President for Human Resources; the Vice President for Information Systems and Computing, who also reports to the Provost; the Vice President for the Division of Public Safety; the Associate Vice President for Audit, Compliance and Privacy; and the Chief Investment Officer.

### Election of the President

When it becomes necessary to elect a new President, the Chair of the Board of Trustees shall convene a Consultative Committee, composed of trustees, deans, faculty, staff, and students, to advise in the selection process by identifying priorities, issues, challenges, candidate qualifications and other factors important to the constituencies represented by the members of the Consultative Committee. The Chair shall also convene a Search Committee, whose members will be selected primarily from among those of the Consultative Committee, to be responsible for the identification, recruitment, and selection of candidates for recommendation to the Executive Committee. The composition of and procedures governing the Consultative Committee and the Search Committee shall be specified in a Standing Resolution of the Trustees and can be found in section I.G.1 of this handbook, Consultation for the Election of a President.

The Executive Committee shall, at a closed meeting, review the report of the Search Committee and shall present a final nomination of one candidate to be voted upon by the Trustees.

At least ten days prior to the stated or special meeting of the Trustees at which the election of the President is proposed, the Secretary shall give to each trustee notice stating that the election of the President shall be held at such a meeting and giving the name of the person who has been nominated by members of the Executive Committee. No such election shall be valid unless a nominee shall receive the affirmative votes of at least two-thirds of the number of trustees then in office.

### Removal of the President

The President may be removed only after consultation with representatives of the faculty and by the affirmative vote of trustees actually present at a stated or special meeting equal to at least two-thirds of the number of trustees then in office. Notice of such proposed action must be included in the notice of the meeting.

The Executive Committee shall appoint a temporary successor or substitute to act in case of the death, extended absence, disability, or

removal of the President. The President may appoint an officer of the University to act for him/her during a period of temporary absence.

## I.C.3. The Provost

The Provost shall be the officer responsible for the conduct, coordination, and quality of the University's academic programs and for the planning of their future development. Hence, the Provost is crucially involved in the recruitment and maintenance of a faculty of the highest distinction in research and teaching. The Provost also is concerned with maintaining a student body of superior quality and thus exercises oversight over academic program standards and over the admissions process. All deans report to the Provost, and under the President, the Provost has ultimate authority for all academic budgets.

The Provost shall hold the academic rank of Professor, shall be a voting member of every Faculty of the University, and may at their discretion call a meeting of any Faculty. In the performance of their duties, the Provost shall consult with representatives of the Faculty.

The Provost is assisted in his role by several administrators with considerable responsibilities in their areas of expertise. The Vice Provost for Education has primary responsibility for the oversight of graduate and undergraduate education and other such educational programs and policies as the Provost may designate. The Vice Provost for Faculty manages the academic personnel process, including recruitment of faculty, appointments, promotions, tenure cases and grievances. The Senior Vice Provost for Research is responsible for the development and implementation of policies and procedures that promote excellence in research across the University and for the overall operation of the University's extensive research enterprise, as well as for the development and implementation of Penn's strategy for technology transfer and entrepreneurial initiatives and the University's corporate relations and regional economic development strategy. The Vice Provost for University Life is responsible for all nonacademic aspects of student life. This includes addressing a wide array of student concerns in order to improve the quality of campus life for students and other members of the University community. The Vice Provost and Director of Libraries administers the University library system and plays an important role in the dissemination of information on campus.

(Almanac, May 2, 2017 (https://almanac.upenn.edu/articles/wendell-pritchett-penns-30th-provost/))

## I.C.4 The Secretary

The Secretary of the University shall attend and keep minutes of the meetings of the Trustees, shall act as secretary of all boards and committees of the Trustees, and shall be custodian of communications, reports, and other documents of importance presented to the Trustees. The Secretary shall give notice to Trustees and to members of boards and committees of all stated and special meetings. The Secretary shall have custody of the Seal of the Corporation, shall affix it to such instruments as require its use, and when so affixed, shall attest it by signature.

The Secretary shall prepare all diplomas and certificates of study, shall have charge of official convocations of the University, and shall have such other powers and duties as may be conferred from time to time by the Trustees. Any minute books, documents, and records of the University not yet deposited in the Archives shall be open at all times to the inspection of trustee boards and committees, to any trustee, and to authorized University officers.

## I.C.5. The Treasurer

The Treasurer shall have custody of all evidences of ownership of real or personal property owned by the University or pledged to it, other than those evidences in the custody of the Investment Board. The Treasurer also shall have custody of all policies of insurance, and shall have the authority to accept receipt for the same on behalf of the Trustees, and under their supervision shall arrange for the safekeeping thereof.

The Treasurer shall collect and receive all monies due and payable to the University and deposit them in the name of the University in such banking institutions as the Trustees may approve and shall discharge all debts or other obligations of the University when due and payable. The Treasurer shall keep a complete set of accounts showing in detail the financial transactions of the Treasurer's Office, and these shall be open at any time to the inspection of any trustee. The Treasurer shall furnish such financial statements compiled from their accounts as from time to time may be required by the proper University officers, Trustee boards and committees, or any trustee.

## I.C.6. The Comptroller

The Comptroller shall maintain a complete set of accounts, except those maintained by the Treasurer, showing in detail the business and financial transactions of the University. The Comptroller shall be responsible for the proper keeping of accounts of every department of the University and shall have authority to direct the methods, including audit and control, by which such accounts are kept. The Comptroller shall compile and furnish such financial or statistical reports or information as may be required by the proper University officers, Trustee boards and committees, or any trustee. The Comptroller shall approve all vouchers before they are submitted to the Treasurer for payment; such approval shall be evidence that the charge has been recorded against an approved budget on file, and that it is within the appropriation of the budget against which it is charged.

## I.C.7. The General Counsel

The General Counsel shall represent the University in legal matters. All matters requiring legal advice or legal action shall be referred to the General Counsel.

# I.D. The Faculties and the Schools

*(Source: Statutes of the Trustees, Article 7, January, 1956; revised, 1979; revised, Article 9, June 17, 1983; revised as Article 10, November 2, 2001; revised, February 11, 2005; revised, September 18, 2008 (https:// secretary.upenn.edu/trustees-governance/statutes-trustees/#ten))*

There shall be such faculties and such schools as authorized by the trustees. The Trustees recognize the following (listed in the order of their origin):

Faculty of Arts and Sciences
The School of Arts and Sciences, including the College of Arts and Sciences as its undergraduate division, the Graduate Division of Arts and Sciences, and the College of Liberal and Professional Studies, as its lifelong learning program.

Faculty of Medicine
The Perelman School of Medicine

Faculty of Law
The School of Law

Faculty of Engineering and Applied Science
The School of Engineering and Applied Science

Faculty of Design
The Stuart Weitzman School of Design

Faculty of Dental Medicine
The School of Dental Medicine

Faculty of the Wharton School
The Wharton School

Faculty of Veterinary Medicine
The School of Veterinary Medicine

Faculty of Education
The Graduate School of Education

Faculty of Social Policy and Practice
The School of Social Policy and Practice

Faculty of Nursing
The School of Nursing

Faculty of Communication
The Annenberg School for Communication

# I.E. General Provisions Concerning a Faculty

*(Source: Statutes of the Trustees, Article 7, January, 1956; revised, Article 9, June 17,1983; became Article 10, November 2, 2001; revised, June 20, 2003 (https://secretary.upenn.edu/trustees-governance/statutes-trustees/ #ten); revised, Office of the Provost, November 21, 2022)*

The faculty of a school consists of the members of the Standing Faculty, the Standing Faculty-Clinician-Educator, the Associated Faculty, and the Academic Support Staff. The voting faculty of a school (hereinafter referred to as the Faculty) shall consist of the members of the Standing Faculty and the Standing Faculty-Clinician-Educator and such other persons who have been granted the right to vote by that faculty. The Standing Faculty and the Standing Faculty-Clinician-Educator comprise the core of the academic staff. The term "Standing Faculty," used alone, shall refer only to those faculty members with tenure or in tenure-probationary status.

There shall be a Dean and a Secretary of each Faculty. The Dean shall be appointed or removed by the Trustees, upon recommendation by the President and the Provost, and according to policies and procedures promulgated by the President and the Provost. The Dean shall preside at meetings of the Faculty; shall sign all diplomas, certificates, and other official papers on behalf of their Faculty; and serve as the official means of communication between the Faculty and the Provost. The Secretary shall be elected by the Faculty and shall serve for such a time as determined by the Faculty.

Each Faculty shall meet at stated times and also at the call of its dean or of the President, the Provost, or other designated officer. Each Faculty shall also adopt provisions governing the call of meetings by its members. Except for the standing Committee on Academic Freedom and Responsibility, which shall be elected annually, committees of each Faculty shall be appointed by the Dean, or elected, as prescribed by the procedures adopted by each Faculty.

Upon recommendation of the President, the Trustees may authorize the establishment, merging, or closing of departments, divisions, or similar entities in schools that do not have departments. The chair of each department shall be appointed or removed by the President, upon the recommendation of the Dean with the advice of the Faculty, and with the approval of the Provost or the Provost's designee. A department chair shall serve according to policies and procedures established by the President and the Provost.

Subject to general policies established by the Trustees, the responsibility for determining the quality of the student body shall rest with the Faculty of that school. Each Faculty shall articulate the criteria for selection of applicants for admission and shall establish a written admissions policy that describes these criteria. Each Faculty shall also monitor implementation of its admissions policy and amend it when necessary.

Subject to general policies established by the Trustees, and in a manner consistent with general University policies, each Faculty shall also set its regulations for instruction of students and requirements for recommendations for degrees in course and in faculty.

Subject to general policies established by the Trustees, and in a manner consistent with general University policies, each Faculty shall set its own procedures for governance and determine the qualifications for membership in the Faculty.

# I.F. Organization and Responsibilities of Graduate Groups

*(Source: Office of the Provost, Almanac, September 29, 1981; revised, Almanac, March 19, 1996 (http://www.upenn.edu/almanac/v42/n24/ grad.html); revised, Office of the Provost, November 21, 2022)*

## I.F.1. Introduction

In the University of Pennsylvania, graduate programs leading to the Ph.D. and related master's degrees are carried out by associations of faculty members called "graduate groups." Many of these groups are based in individual departments. In such groups, all members of the Standing Faculty in that department are *ipso facto* members of the graduate group, but the group also may include faculty who come from other departments or schools. There are, in addition, a significant number of graduate groups that are not based in any one department and are composed of faculty from several departments or schools.

The graduate group structure provides the adaptability necessary to mount graduate programs in newly developing areas of intellectual endeavor or to phase out programs in areas of declining vigor, without disrupting the underlying structure of the traditional departments and schools. The price paid for this adaptability is continuing vigilance over the academic quality and vigor of each graduate program, particularly those that are not based in a single disciplinary department or school. The purpose of the sections that follow is to outline the organization and responsibilities of the faculty who are members of graduate groups, and of the group chairpersons.

## I.F.2. Graduate Group Faculty

Only members of the Standing Faculty, the Associated Faculty and Emeritus Faculty are eligible for membership in graduate groups. Members of the Academic Support Staff—for example, Instructors, Lecturers and Research Associates—are not eligible, nor are Visiting Faculty unless they have an appointment in the Associated Faculty. It

should be noted that while members of the Research Faculty may serve on a graduate group, according to a Provostial memorandum dated August 5, 1983, they may not take responsibility for courses or seminars nor may they supervise theses or dissertations unless the prior approval of the Provost is obtained for each such activity.

The fundamental responsibility for the academic quality and effectiveness of a graduate program rests with the faculty of the appropriate graduate group. The essential duties of this faculty include:

- Design of an academic program that meets the requirements of the student and of the University for depth, breadth and academic quality of the highest order. Equally important is the continuous adaptation of this program in response to the challenges by and opportunities for new developments in its scholarly field.
- Establishment of well defined academic standards and requirements that are rigorous yet flexible and that ensure quality and encourage the free development of the scholarly abilities of each student. students. These standards and requirements must be consistent with the intellectual style and spirit of the field and also with the minimum requirements of the University, as established by the Graduate Council of the Faculties.
- Establishment and operation of graduate admissions programs that will attract and admit students of the highest quality. Admissions standards and procedures must be consistent with those established by the Graduate Council of the Faculties, the Council of Graduate Deans or the Associate Provost for Education.
- Wise and intensive counseling of graduate students in matters both academic and nonacademic, to encourage their rapid progress toward their academic goals.
- Active participation in the quest for financial resources for support of graduate students and in the allocation of available resources so as to optimize the quality of the program and its students.
- Active assistance in the placement of the program's graduates in positions where their abilities and training are utilized to the fullest degree possible.

At least half of the members of Ph.D. examination and dissertation committees must be members of the graduate group at the time of appointment to the committees. Faculty who are not members of the graduate group may serve only with the written approval of the graduate group. The authority to approve membership on committees may be delegated to the graduate chair. The chairs of dissertation committees and of all examination committees must be members of the Standing Faculty in the graduate group.

If the chair of a dissertation committee leaves the Standing Faculty before the dissertation is completed, then a new chair from the Standing Faculty must be appointed as chair. The dissertation committee chair is responsible for convening committee meetings, advising the student on graduate group and university expectations, and assuring the graduate group chair that the group's requirements have been met. The committee chair does not have to be the primary dissertation adviser.

Instructors in courses that satisfy the requirements for the Ph.D. must hold the Ph.D. degree or be members of the Standing Faculty or the Associated Faculty. No one may teach a required core course for more than one semester without becoming a member of the Standing Faculty or the Associated Faculty.

The selection and appointment of faculty to membership in a graduate group are the responsibility of the appropriate dean, in consultation with members of the graduate group and such other faculty groups or individuals and academic administrators as may be appropriate. The standards and criteria to be used in selection and appointment of members of the Standing Faculty or Associated Faculty to graduate groups are established by the dean in consultation with the dean's faculty and include academic excellence and commitment to the academic goals of the program.

In cases where a graduate group is based in an academic department or school, appointment to membership in the graduate group accompanies and is implicit in a primary appointment to the Standing Faculty in the department or school and is for the same term. In all other cases, appointment to membership in a graduate group is for a term specified at the time of appointment.

All appointments to membership in a graduate group carry full voting rights in the deliberations of the group unless otherwise specified at the time of appointment.

All appointments to membership in a graduate group must be reported to the Office of the Provost at the time of appointment by making a record in the Faculty Information System.

The procedure for appointment of a faculty member to membership in a graduate group not based in the faculty member's department or school differs from and is independent of two other types of intra-university "linking" appointments:

> Interlocking faculty appointments, made by the Provost to facilitate interaction between the faculties of the several schools.

> Secondary faculty appointments, made by the Trustees following the normal academic appointment process.

These two types of appointments, as well as all appointments to other than Standing Faculty positions, do not automatically carry with them appointment to a graduate group.

# I.G. Policies Concerning Academic and Administrative Officers

*(Revised, Office of the Provost, November 21, 2022)*

## I.G.1. Consultation Procedures for the Election of a President

Article 3.2.b. of the Statutes of the University states: "When it becomes necessary to elect a new President, the Chair of the Board of Trustees shall convene a Consultative Committee, composed of trustees, deans, faculty, staff, and students, to advise in the selection process by identifying priorities, issues, challenges, candidate qualifications, and other factors important to the constituencies represented by the members of the Consultative Committee. The Chair shall also convene a Search Committee, whose members will be selected primarily from among those of the Consultative Committee, to be responsible for the identification, recruitment and selection of candidates for recommendation to the Executive Committee. The composition of and procedures governing the Consultative Committee and the Search Committee shall be specified in a Standing Resolution of the Trustees.

The Executive Committee shall, at a closed meeting, review the report of the Search Committee and shall present a final nomination of one candidate to be voted upon by the Trustees.

At least ten days prior to the stated or special meeting of the Trustees at which the election of the President is proposed, the Secretary shall give to each trustee notice stating that the election of the President shall be held at such a meeting and giving the name of the person who has been nominated by members of the Executive Committee. No such election shall be valid unless a nominee shall receive the affirmative votes of at least two thirds of the number of trustees then in office."

A Consultative Committee to advise the Executive Committee will be formed, chaired by the Chair of the Board of Trustees (or the Chair's designee) and comprised of trustees, faculty, deans, undergraduate students, graduate /professional students, and staff. The size and exact composition of the Consultative Committee will be determined by the Executive Committee, provided, however, that the Consultative Committee shall include in addition to the chair at least four current trustees, four faculty members, one dean, one undergraduate student, one graduate/professional student, and one member of the university staff. The faculty members will be selected by the Faculty Senate Executive Committee in consultation with the Consultative Committee Chair. All other members of the committee will be selected by the Chair.

The Chair will charge the Consultative Committee members with the responsibility for seeking the advice of their respective constituencies on issues relevant to the search process, such as challenges a new president might face, strategic priorities, and recommended strengths and experience for the new President. The Consultative Committee shall meet to discuss and review the recommendations and will provide a summary of its findings to the Chair.

A Search Committee, whose chairman and members will be appointed by the Chair of the Board of Trustees primarily from among the members of the Consultative Committee, will be convened to initiate the search process and review the Consultative Committee's guidance. The size of the Search Committee will be determined by the Chair of the Board of Trustees, but shall include at least two trustees and two faculty members, and shall not exceed a total of eight members, in addition to the Committee Chairman. The Search Committee will be responsible for the identification, recruitment and selection of candidates to be interviewed, will conduct the interviews of the candidates, and will endeavor to recommend at least three candidates in rank order to the Executive Committee. The Search Committee will keep the Consultative Committee apprised of its progress during the interview process, without disclosing any personal information about particular candidates.

Based on the recommendation of candidates by the Search Committee, the Executive Committee will then present a final nomination of one candidate to the Board of Trustees for approval.

All proceedings of the Consultative Committee, the Search Committee, the Executive Committee, and the Board of Trustees will be confidential and no member of any body will disclose the deliberations to any other person, except as expressly authorized by the Chair in the course of the selection process.

## I.G.2. Consultation Procedures for the Appointment and Reappointment of Deans and University-wide Administrators

*(Source: Proposed Consultation Procedures, University Council Steering Committee, Almanac, February 17, 1981; revised, Offices of the President and Provost, Almanac, September 15, 1981 (https://almanac.upenn.edu/archive/v28pdf/n02/091581.pdf))*

The University administration, before recommending the appointment of certain officers, typically seeks the advice of ad hoc committees composed of faculty and students. The offices subject to this practice include all those having a significant influence in academic affairs. While the application of this criterion is clear when positions such as the Provost and deans are in question, it is difficult to draw a precise line of demarcation for subordinate positions or for major administrative posts not directly in academic affairs. This is in part because influence on academic affairs is not an "either/or" question for many of these positions, but a matter of degree which, given the changing nature of the University's problems, is sometimes difficult to gauge in advance. Another complication is that new posts with different titles may be created from time to time.

These procedures take cognizance of these difficulties by providing for consultative input that is graduated according to the degree of influence that a post seems likely to have in the academic life of the University. Thus, where the post is one that involves little direct authority or influence, the consultative process should be informal and should give great scope to the preferences of the administration. For such a position, the appointing officer may consult faculty and student leaders individually about a candidate proposed by the appointing officer. For non-academic appointees whose duties have a more substantial impact on academic affairs or on campus life, consultation may proceed through a small advisory faculty-student committee, which gives advice concerning one or more candidates proposed by the administration. For subordinate academic officers, such an advisory committee may both offer its own suggestions and react to suggestions of the administrator for whom an aide is being chosen. Finally, where the post is one in which major academic authority is exercised, more formal consultative procedures should be followed. In these procedures a consultative committee is established for the purpose of conducting a search and drawing up a list of recommended candidates. Such a consultative committee receives its charge from the President or Provost and may meet from time to time with one or both of these officers during its deliberations. The committee does not confine itself to suggestions made by the President or Provost. Both advisory and consultative committees make their decisions in executive session.

In selecting members for consultative and advisory committees, consideration should be given to diversity of membership, including affirmative action concerns, range of interests and rank, as well as quality of membership. In addition, the affirmative action policy of the University requires that searches be conducted so as to identify potential candidates from within the broadest possible pool, including women and members of minority groups. Acceptance of appointment to a consultative committee implies a commitment to making such a search, and no one who does not share this commitment should accept appointment to the committee.

Spelled out below are specific consultative procedures for the appointment and reappointment of deans and certain University-wide academic officers, as well as a mechanism—the University Committee

on Consultation—for resolving questions regarding the appropriate level of consultation in doubtful cases. Unless otherwise provided, the composition of consultative committees should conform to the principle that "the normal maximum proportion of students on the consultative committee shall not exceed one-quarter of the membership of the committee, except in the case of a consultative committee for offices in the area of student affairs, in which case, the proportion of students shall not exceed one-third of the membership."

## University Committee on Consultation

Where doubt exists about the appropriate level of consultation for any given post that the administration wishes to fill, the President or Provost should seek the advice of the University Committee on Consultation. This committee is composed of the Chair, Past Chair and Chair-Elect of the Faculty Senate and the chairpersons of the Undergraduate Assembly and the Graduate and Professional Student Assembly. The University Committee on Consultation shall respond quickly to the President's or Provost's request for an opinion, indicating the nature of the procedure that it recommends. The President and Provost should err on the side of inclusiveness in seeking opinions from the committee.

## Consultation for University-wide Academic Offices
### Provost

When a vacancy has occurred or is expected to occur in the office of Provost, an ad hoc consultative committee composed of twelve faculty members, two undergraduate students, and two graduate or professional students shall be established by the President. The President shall request from the Senate Executive Committee, through its chair, nominations of six faculty members. The President shall appoint to the consultative committee those nominated by the Senate Executive Committee and shall appoint an equal number of other faculty members.

The committee shall meet with the President and/or the Provost for the purpose of obtaining information and views concerning the responsibilities of the position and the qualifications of the person to be sought. The committee may develop additional qualifications in consultation with the President and/or the Provost. The President and/or the Provost shall be free to submit names of candidates at the initial meeting or at any subsequent time prior to the completion of the work of the consultative committee. In the case of a person from outside the University, a consideration of academic appointment in a school and department will normally be appropriate. If this is the case, the department, school, and administration should act expeditiously.

It is understood that the role of the ad hoc committee shall be an advisory one; the final authority for the appointment rests with the President and the Trustees. In those cases in which the President wishes to appoint a person not considered by the ad hoc committee, the committee shall be asked to review the qualifications of that person and determine if they wish to recommend that person for the position.

### Deputy, Associate, and Vice Provosts

With respect to the selection of Deputy, Associate, and Vice Provosts, more flexibility in the consultative arrangements is appropriate, depending on the particular circumstances at the time the vacancy exists. It is also necessary to ensure that the Provost have aides in these posts with whom the Provost can establish a close personal rapport. Before an ad hoc committee is appointed, the Provost should consult with the University Committee on Consultation regarding the appropriate size for the committee, the relative proportion of faculty, undergraduate and graduate or professional students to serve on the committee, the

extent of the search to be undertaken, the timing of the appointment, and similar questions.

## Appointment of Deans, Associate Deans and Vice Deans

The Statutes of the Corporation (10.4) state that the Dean shall be appointed or removed by the Trustees, upon recommendation by the President and the Provost, and according to policies and procedures promulgated by the President and Provost.

When a vacancy has occurred or is expected to occur for a dean of a faculty, the Faculty concerned, by its own procedures, shall nominate to the President four members of its own faculty. The President shall appoint those four persons and shall also appoint four other faculty members to a committee to nominate a new dean. The President shall also appoint two students from that school of whom one shall be an undergraduate if the school has an undergraduate as well as a graduate program. These students shall be nominated by the students according to their own procedures. When appropriate, the President may designate one or two alumni advisers to the committee. In special circumstances or where the faculty of the school is very small, exceptions to the numerical limitations above may be made. The committee shall meet with the President and/or the Provost for the purpose of obtaining information and exchanging views concerning the responsibilities of the position and the qualifications of the person to be sought. The final appointment of a dean is made by the Trustees upon the recommendation of the President of the University. In the case of a person from outside the University, a consideration of academic appointment in the school concerned will normally be appropriate.

In the selection of associate deans and vice deans, the dean of a Faculty should seek advice from the school's faculty and student body. Should doubts or issues arise about the procedure for obtaining such advice, guidance should be sought from the University Committee on Consultation.

## Renewals of Terms of Office
### Provost

The initial term of office of the Provost shall be no longer than seven years and the total length of service normally no more than twelve years. If, when the initial term of the Provost expires, the President favors the continuation of the Provost in office, the President shall determine whether the incumbent is willing to accept further service. If a reappointment or extension is contemplated by the President, the President, with the advice of the University Committee on Consultation, shall appoint an ad hoc committee to ascertain and report on faculty and student opinion, and advise the President with respect to the proposed reappointment or extension.

### Deans

Deans shall normally serve no more than twelve years with an initial term of no more than seven years. A consultative review committee shall be established in the sixth year of the initial term of a deanship if a reappointment (i.e., an extension of more than two years) is contemplated. The Faculty of the school shall choose four of its own members for this committee, to be matched by up to an equal number chosen by the President and the Provost, who will make sure that there are faculty representatives from within the University but outside the school. Students will select two student members from the student body of the school, one of whom shall be an undergraduate if the school has an undergraduate as well as a graduate program. There will be one non-voting alumni representative. The consultative committee will advise the President and the Provost on the desirability of reappointment. In

addition, each member of the Standing Faculty of that school shall have the opportunity to give advice and views to the President and the Provost. The President and the Provost will consult as well with knowledgeable colleagues and officials of the school. When the school has been recently reviewed by an outside accreditation organization or by some other means, the findings will be considered pertinent in the decision whether to recommend reappointment.

A school or the President and the Provost are free to propose another consultative path for the reappointment of a dean after an initial term, but any such alternative path would require the concurrence of the appropriate elected committee of the school involved, of the President and Provost, as well as review by the University Committee on Consultation.

If an extension for only one or two years is proposed, the Provost may constitute a faculty and student committee by inviting faculty and student members currently holding elective office, such as members of the school's academic freedom committee, University Council representatives, or members of the school's council (where such an elective body exists), to serve on a consultative body.

### Removal of a Dean

*(Source: Offices of the President and Provost, Almanac,* September 5, 1995 *(https://almanac.upenn.edu/archive/v42/n2/handbook.html))*

The procedure for the removal of a dean prior to the expiration of the dean's term may be initiated by the President and the Provost. It may also be initiated by a faculty vote of no confidence taken at a meeting in accordance with the bylaws of the school. The vote of no confidence must be confirmed by a majority of the Standing Faculty in a subsequent mail ballot. In either case, the Provost shall appoint, in consultation with the Senate Committee on Consultation, an advisory committee of at least five faculty members, a majority of whom shall be from outside of the school. The committee shall be charged by the Provost and the President to gather information relevant to the issues specified in the charge, including interviews with the faculty and dean. The committee shall forward its recommendations, with supporting documents, to the Provost, the President, and the dean, within four weeks of its appointment. The committee shall report its recommendations to the faculty of the school.

### Appointments of Acting Administrators

When there is a need to appoint a person to occupy a position temporarily, the University Committee on Consultation and, in the case of a school administrator, the appropriate elected school committee, should be consulted. The University Committee on Consultation may, according to the circumstances, decide to propose other arrangements to insure adequate consultation.

### Reports about Searches

In the case of a University-wide post, the President and the consultative committee, before its discharge, shall submit a final report to the University Council, the Faculty Senate, the Undergraduate Assembly and the Graduate and Professional Student Assembly, and shall publish the report in Almanac. The report shall include, but not be limited to, the following:

1. The nature of the search, including goals and objectives;
2. The consensus on policy issues;
3. A copy of the job description and/or advertisement, if any;
4. Information concerning the candidates, including:

a. Characteristics of the individuals (such as ethnic background, sex, etc.),
b. Number of names considered,
c. How many candidates were from within the University,
d. Specifically, was the person selected to fill the position, if it was filled, recommended by the consultative committee, and
e. Any additional relevant information.

Should there be disagreement between the President and the consultative committee, separate reports should be submitted.

In the case of the election of a new dean, the ad hoc committee shall submit a report along similar lines to the faculty and the students of the school involved. The report or a summary of it shall be published in Almanac.

### Confidentiality on Search Committees

Confidentiality of much of the material handled during a consultation is essential to the process. Acceptance of appointment to a committee entails full acceptance of the conditions of confidentiality as follows: the name, background, personality and character of any candidate and the proceedings of the committee shall be maintained in strictest confidence by all members of the committee and by administrative personnel who have access to the names. This principle, of course, does not preclude the revelation of names of candidates in officially authorized efforts to obtain outside appraisals.

The committee shall have the option to keep confidential any other items it deems necessary for its functioning by roll call vote requiring a two-thirds majority of the committee members present and voting. Each letter of appointment to an advisory or consultative committee should make plain the obligation to maintain confidentiality, and the chair of the committee shall remind the members of this obligation. Anyone who cannot accept those conditions should be asked by the chair to resign or, failing this, should automatically be removed from membership of the committee.

### Administrative Support for Search Committees

Administrative and secretarial assistance shall be provided to advisory and consultative committees for deans and University-wide administrators.

# I.G.3. Appointment of Department Chairs

*(Source: Offices of the President and Provost, Almanac, October 18, 1977; revised, 1983)*

All department chairs are appointed by the President upon recommendation of the Provost and the Dean and with the advice of faculty both inside and often outside the department. Responsibility for initiating the appointment of a new department chair and the charge to any nominating/search/selection body, including criteria and number of persons to be recommended, rests with the Dean. The Dean should state from the outset whether there is available a position in the Standing Faculty to allow consideration of external candidates. The means by which nominations are secured and reviewed will vary from school to school, but should be regularized and clearly stated for each school.

In all cases, the Dean should play an active role, either as a participant in the departmental review, or by requiring two or three names from which to choose. A change in department chairs should normally be preceded by a review of the direction, quality, and plans of the department. Such a review may be initiated by the Dean, Provost, President, or members

of the department and should be planned cooperatively by all parties. Reviews with external evaluators should take place as a matter of course in departments at regular intervals, but preferably at such times as to be helpful to new departmental leadership.

A recommendation for appointment as a department chair takes the form of a letter from the Dean to the Provost, accompanied by a current curriculum vitae of the nominee and other information about the selection process, including names of others considered. The letter should set forth the proposed period of appointment (most often five years, renewable, but may be less and occasionally more according to prevailing school practice). The letter is sent to the Provost, who will transmit it to the President for final approval and preparation of the appointment letter.

# I.G.4. Responsibilities of Department Chairs

*(Source: Offices of the President and Provost, 1969 Handbook for Faculty and Administration; revised, 1979)*

## To the Administration

It is the responsibility of the department chair to execute within the department the policies of the University concerning teaching and research, fiscal affairs, and other administrative business.

The chair has the responsibility, after consultation with appropriate members of the department, for securing and retaining staff and faculty members of high caliber and recommending those to whom tenure should be granted and to whom promotions should be awarded. It is the duty of the chair to submit departmental recommendations in these matters, including the names of those consulted, to the administration for consideration, and a separate statement giving the chair's personal opinion.

The chair is responsible, after conferring with faculty and students, for ensuring the appropriateness of the courses and adequacy of the program offered by the department in accord with educational policies established by the faculties concerned. The chair should have the courses staffed so as to promote teaching that is as effective and stimulating as possible in content and in presentation.

The chair has a general responsibility for promoting the quality of the scholarly and research activities of the department. The chair reviews applications for research projects for appropriateness and transmits those approved to the administration, making sure that the human, fiscal, and space demands of all such projects are in the best interests of both the department and the University as a whole.

## To the Department

The chair is the department's executive officer. In aid of the development and maintenance within the department of collegial respect for the educational enterprise, the chair is responsible not only to the dean but also to the department as a collectivity for the conduct of its affairs. The chair is responsible for the administration of its teaching, academic advising, and research functions and also the implementation of its policies.

The chair has the obligation to foster the welfare of the department's entire staff and to encourage and facilitate their work and professional development. The chair should take the initiative in reporting the needs and championing the legitimate causes of the department to the Dean. The chair carries the basic responsibility for obtaining merited

recognition by the University for the department's staff members with respect to promotions, and for making recommendations concerning faculty salaries and salary increases to the Dean and Provost, who supervise this area. Each faculty member has the right to discuss with the chair that faculty member's own salary, status, requests for academic leaves, and applications for research projects. If the faculty member is dissatisfied after consultation with the chair, the faculty member may discuss these matters with the Dean.

# I.G.5. Appointment and Responsibilities of Graduate Group Chairs

*(Source: Offices of the President and Provost, Almanac, October 18, 1977; revised, Office of the Provost, 1983; revised, Office of the Provost, Almanac, March 19, 1996 (https://almanac.upenn.edu/archive/v42/n24/grad.html))*

The chair of a graduate group is charged with the responsibility of leading and coordinating the work of the graduate group faculty in the discharge of their responsibilities. This is an important task requiring academic and personal abilities of a high order.

Graduate group chairs are appointed by the Provost upon recommendation of the appropriate dean or deans and other appropriate officials such as the Associate Provost for Education. The letter from the Dean to the Provost transmitting the recommendation should refer to the selection process (e.g. department chairs and other deans consulted, procedure for self-selection by the graduate group) and the proposed term of appointment (generally three to five years, renewable).

In cases where a graduate group is based in an academic department, the graduate group chair reports to the department chair and may carry a title such as "Associate Chair for Graduate Affairs." In all other cases, the graduate group chair reports directly to the appropriate dean or delegate. (The latter may carry a title such as "Associate Dean for Graduate Studies and Research.") The Dean determines the appropriate reporting channel.

# I.G.6. Reappointment of Department and Graduate Group Chairs

*(Source: Office of the Provost, Almanac,* September 7, 1982 *(https://almanac.upenn.edu/archive/v29pdf/n02/090782.pdf))*

The following procedures shall guide the reappointment of department and graduate group chairs.

1. No department chair shall be reappointed under circumstances such that their total term shall exceed six years unless a review of their performance is made. Ideally this review should be combined with a review of the department, since an evaluation of an incumbent chair inevitably involves an evaluation of the department's evolution during the chair's tenure.
   In the event that a full-scale review of the department is untimely or particularly inconvenient when a reappointment is being considered, a review committee, chosen by whatever formal mechanisms have been adopted by the school or department and accepted by the Dean, should be convened to evaluate the chair's performance and recommend appropriate action to the Dean. In the event the department has no formal procedures, the following procedures should be used:
   The review committee will consist of three faculty members selected by the tenured faculty in the absence of the chair, one untenured faculty member (if any exist), and two other faculty members, who may be from other departments or schools,

selected by the Dean. The chair of the review committee will be selected by the Dean from among the six (or five) members. Total service in excess of twelve years as chair should be rare and should not occur in the absence of compelling reasons. Exceptions to this limit should be approved in advance by the President and Provost after consultation with the Chair, Chair-Elect, and Past Chair of the Faculty Senate.

2. Where graduate groups are generally based within a single department, the graduate group chair will either be the department chair, in which case the above procedures apply, or report to the chair, in which case independent review mechanisms are not necessary. However, when the graduate group is not based within a single department, the guidelines below should be followed.

No graduate group chair shall be reappointed under circumstances such that their total term shall exceed six years unless a review of their performance is made. Ideally, this review should be combined with a review of the graduate group, since evaluation of an incumbent graduate group chair inevitably involves an evaluation of the group's evolution during the chair's tenure. In the event a full-scale review of the graduate group is untimely or particularly inconvenient when a reappointment is being considered, a review committee, chosen by whatever formal mechanisms have been adopted by the graduate group and accepted by the relevant dean or deans, should be convened to evaluate the graduate group chair's performance and recommend appropriate action to the dean or deans. In the event the group has no formal procedures the following procedures should be used:

The review committee shall consist of three faculty members selected in the absence of the chair by the tenured faculty members of the group, one untenured faculty member (if any exist) selected by the untenured faculty members of the group, and two other faculty members, who may be from other groups or schools, selected by the dean or deans. The chair of the review committee will be selected by the dean or deans from among the six (or five) members.

Total services in excess of twelve years as graduate group chair should be rare and should not occur in the absence of compelling reasons. Exceptions to this limit should be approved in advance by the President and Provost after consultation with the Chair, Chair-Elect, and Past Chair of the Faculty Senate.

(See page 3 - Almanac, September 7, 1982 (https://almanac.upenn.edu/archive/v29pdf/n02/090782.pdf))

# I.H. The University Council, the Faculty Senate, and University Committees

There are two University-wide deliberative bodies: the University Council and the Faculty Senate. The University Council was established in 1963, was modified in 1969, and assumed its present form in 2007. The Faculty Senate was established in 1952 and assumed its present function through reorganization in 1962.

## I.H.1. The University Council

*(Source: University Council Bylaws, 1969; revised, Almanac, September 23, 2003; revised,* Almanac, February 28, 2007 (https://almanac.upenn.edu/archive/volumes/v53/n27/pdf_n27/insert.pdf))

*(The text below is an abbreviated description of the* University Council's bylaws *(*https://secretary.upenn.edu/univ-council/bylaws-university-council/)*.)*

## I. Scope and Purpose

The University Council is a deliberative and broadly representative forum that exists to consider the activities of the University in all of its phases, with particular attention to the educational objectives of the University and those matters that affect the common interests of faculty, staff and students. It may recommend general policies and otherwise advise the President, the Provost, and other officers of the University. It is authorized to initiate policy proposals as well as to express its judgment on those submitted to it by the administrative officers of the University and its various academic divisions. It is also empowered to request information through appropriate channels from any member of the University administration.

## II. Membership

The University Council shall be composed of administrative officers and elected representatives of the faculty, students, and staff as follows:

Forty-five members of the Executive Committee of the Faculty Senate. The Faculty Senate shall insure that each faculty is represented and that at least three assistant professors serve on the Council.

One full-time lecturer and one full-time member of the Research Faculty to be selected to serve two-year terms by vote of the full-time lecturers and research faculty, respectively. Eleven administrative officers, including the President, the Provost, and nine members of the administration to be appointed annually by the President, at least five of whom shall be deans of faculties.

Fifteen graduate and professional students elected as members of the Graduate and Professional Student Assembly. The Graduate and Professional Student Assembly shall insure that, to the extent possible, each school is represented.

Fifteen undergraduate students elected as members of the Undergraduate Assembly. The Undergraduate Assembly shall insure that, to the extent possible, each undergraduate school is represented.

Two elected representatives of the Penn Professional Staff Assembly.

One elected representative of the Librarians Assembly.

Two elected representatives of the Weekly-Paid Professional Staff Assembly.

One elected representative of the United Minorities Council.

## III. Positions

The President of the University is the presiding officer of the Council. Each year, with the advice of the Steering Committee and the consent of the Council, the President shall appoint a Moderator of the Council, who shall become a non-voting member of the Council. The President, or in the

absence of the President, the Provost, shall open each meeting and shall normally turn the conduct of the meeting over to the moderator.

The President shall each year appoint a Parliamentarian, in consultation with the Steering Committee. It is the parliamentarian's duty to advise the moderator and the presiding officer in the application of *Robert's Rule of Order Revised*, as modified by special rules of the Council.

The Secretary of the University or the Secretary's designee shall be Secretary of the Council.

# IV. Steering Committee

## Duties

The Steering Committee shall prepare the agenda for meetings of the Council. Resolutions that committees elect to place on the Council agenda should be submitted to the Council through the Steering Committee. The Steering Committee may give its advice concerning such resolutions to the Council whenever the Steering Committee believes that its advice would be helpful.

The Steering Committee shall publish an annual report to the University community. This report, to be published early in the academic year, shall include a review of the previous year's Council deliberations (highlighting both significant discussions and the formal votes taken on matters of substance) and a survey of major issues to be taken up by the Council during the coming year.

## Composition

The Steering committee shall consist of the President of the University; the Provost; the Chair, the Chair-Elect and the Past Chair of the Faculty Senate; the Chair of the Undergraduate Assembly; the Chair of the Graduate and Professional Student Assembly; the Chair of the Penn Professional Staff Assembly; and the Chair of the Weekly-Paid Professional Staff Assembly.

Drawn from the Council membership there shall be in addition four faculty members, one graduate/professional student, and one undergraduate student elected by the respective governing bodies, as well as one additional member of the Penn Professional Staff Assembly, and one additional member of the Weekly-Paid Professional Staff Assembly, each elected by their representative assemblies The Chair of the Faculty Senate shall be the Chair of the Steering Committee. The Council Moderator will be an official observer at meetings of the Steering Committee.

The Secretary of the Council shall serve as secretary of the Steering Committee. Members of the Steering Committee may attend the meetings of Council committees.

# V. Committees

Any member of the University may be asked to serve on committees of the University Council, which include standing committees, subcommittees of standing committees, special committees created by the Council from time to time, and the independent committees; only members of the University shall be eligible for membership on these committees. All committee members are eligible for reappointment, if mutually agreeable, for a maximum of four years total consecutive service. To provide continuity, chairs-elect may be designated. Committee chairs, in consultation with their committee, may invite guests to attend committee meetings.

To the extent possible, each committee shall normally include at least one faculty member, one undergraduate student and one graduate student who are members of the Council.

1. **Standing Committees**
   The standing committees of the Council are those whose activities are directly instrumental in advancing the work of the Council. The President, Provost, Chair and Chair-Elect of the Faculty Senate, Chair of the Graduate and Professional Student Assembly and Chair of the Undergraduate Assembly (or their designees) shall be entitled to attend meetings of all standing committees of the Council and to participate in the discussions.
   Each standing committee (except as otherwise specified below shall consist of not fewer than five and not more than eight faculty members, two representatives of the Penn Professional Staff Assembly, two representative of the Weekly-Paid Professional Staff Assembly, two graduate/professional students, and two undergraduate students.
   a. **Committee on Academic and Related Affairs.** The Committee
      i. shall have cognizance over matters of recruitment, admissions, and financial aid that concern the University as a whole and that are not the specific responsibility of individual faculties, including the authority to carry out studies on existing recruitment and admissions procedures and their relationships with existing policies on admissions and financial aid and to recommend changes in policy to the Council;
      ii. shall consider the purposes of a University bookstore and advise the Council and the management of the University bookstore on policies, development, and operations;
      iii. shall review and monitor issues related to the international programs and other international activities of the University, including advice and policy recommendation in such areas as services for international students and scholars, foreign fellowships and studies abroad, faculty, staff and student exchange programs and cooperative undertakings with foreign universities;
      iv. shall advise the Vice Provost and Director of libraries on the policies, development, and operation of the University libraries;
      v. shall have cognizance over recreation and intramural intercollegiate athletics and their integration with the educational program of the University, including the planning and provision of adequate facilities for various sports and recreational activities; and (vi) shall have cognizance of all matters of policy relating to research and the general environment for research at the University, including the assignment and distribution of indirect costs and the assignment of those research funds distributed by the University, and shall advise the administration on those proposals for sponsored research referred to it because of potential conflict with University policy.
   b. **The Committee on Campus and Community Life.** The Committee
      i. shall have cognizance over the University's communications and public relations activities in their various formats and media including electronic, audio (the telephone system), video and printed copy, and it shall monitor the University's internal communications, the operations of the University Communications Office, communications to alumni, and the interpretation of the University to its many constituencies;

ii. shall advise the Council on the relationship of the University to the surrounding community and the relevant University policies, work to ensure that the University develops and maintains a constructive relationship with the community, and monitor pending real estate activities of concern to the community;

iii. shall have cognizance of the conditions and rules of undergraduate and graduate student life on campus, including gathering and analyzing information concerning student life and student affairs and making recommendations to Council; and responding as appropriate to requests from and reporting information and recommendations concerning student life and student affairs to the Vice Provost for University Life and other appropriate administrative officers; and.

iv. shall advise the President, the Vice President of Public Safety, and the administrators or directors of specific buildings, offices, or projects on all matters concerning safety and security in the conduct of their operations, including consideration and assessment of means to improve safety and security on the campus.

c. **Committee on Committees.** The Committee on Committees, on behalf of the Steering Committee, shall monitor all Council standing and ad hoc committees to assess their continuing usefulness. It shall familiarize itself with the work and performance of committees and present recommendations to the Steering Committee for such changes in the structure, charges and number of members as it thinks appropriate.

The Committee on Committees shall receive nominations from the various constituencies for membership on the standing committees and the independent committees with the exception of the Committee on Open Expression. It shall transmit those nominations together with recommendations for committee chairs to the Steering Committee.

The Committee shall consist of six faculty members (including the Chair-Elect of the Faculty Senate). They shall nominate faculty members for the various committees on behalf of the Faculty Senate. In addition there shall be a representative from each of the following: the Penn Professional Staff Assembly, the Weekly-Paid Professional Staff Assembly, the Graduate and Professional Student Assembly, and the (undergraduate) Nominations and Elections Committee. The Chair-Elect of the Faculty Senate shall be a voting ex officio member of the committee.

d. **Committee on Facilities.** The Committee shall be responsible for keeping under review the planning and operation by the University of its physical plant and all services associated therewith, including transportation and parking.

Committee on Personnel Benefits. The Committee shall have cognizance over the benefits programs for all University personnel. The Committee shall consist of eight faculty members (of whom one shall be a member of the Senate Committee on the Economic Status of the Faculty), three representatives of the Penn Professional Staff Assembly, and three representatives of the Weekly-Paid Professional Staff Assembly. The Vice President for Human Resources, Associate Provost for Faculty Affairs, and Director of Benefits shall serve as nonvoting ex officio members.

e. **Committee on Diversity and Equity.** The Committee aids Penn in fostering and taking full advantage of its diversity as well as in strengthening ties across all boundaries to enrich and enliven the campus community. The Committee shall advise the offices of the President, Provost, the Executive Vice President, and the Vice Provost for University Life on ways to develop and maintain a supportive atmosphere on campus for the inclusion and appreciation of pluralism among all members of the University community. The Committee shall review and provide advice regarding the University's equal opportunity and affirmative action programs and policies. The areas in which the Committee shall report to the Council include diversity within the educational and work settings, integration of staff and faculty into the larger campus community, and ways to foster a campus environment that is inclusive and supportive of difference. The Committee also shall advise the administration on specific diversity issues that may arise on campus.

2. **Subcommittees**

Any standing committee shall have the power to delegate specific tasks or functions to subcommittees whose members shall include one or more members of the parent committee. In addition, as issues arise, subcommittees of standing committees may be constituted, appointed, and given specific charges by the Steering Committee or, in consultation with the Steering Committee, by the Chair of the Faculty Senate, the Committee on Committees, or the chair of a standing committee. The membership of a subcommittee is not limited to members of the relevant standing committee, but to the extent possible members of subcommittees shall include at least one member of that standing committee. Where appropriate a subcommittee may be a joint subcommittee of more than one standing committee.

3. **Special Committees**

The Council may create special committees to undertake specific tasks or functions. The membership of special committees shall be specified in the charges detailed by the Council in creating such committees.

4. **Independent Committees**

The Council takes cognizance of several University committees, which it does not directly charge but which may be called upon to report to the Council on specific issues within their purview.

a. Committee on Open Expression. This Committee has as its major task: monitoring the communication processes to prevent conflicts that might emerge from failure of communication, recommending policies and procedures for improvement of all levels of communication, investigating alleged infringements of the right of open expression of any member or members of the University community, advising administrative officers where appropriate, and participating in evaluation and resolution of conflicts that may arise from incidents or disturbances on campus.

The Committee shall consist of seventeen members: eight faculty members, two representatives of the Penn Professional Staff Assembly, one representative of the Weekly-Paid Professional Staff Assembly, three undergraduate students, and three graduate/professional students. The faculty and representatives of the Penn Professional Staff Assembly are appointed to two-year terms, staggered so that in each year either two or three faculty members are appointed, and one representative of the Penn Professional Staff Assembly is appointed. The student members are appointed to one-year terms.

The chair of the Committee shall be selected by the Committee on Committees from among the members. The jurisdiction of and procedures of the Committee shall follow the Guidelines on Open Expression.

b. Committee on Honorary Degrees. The Committee solicits nominations from faculty and staff members and students for honorary degrees to be awarded by the University at Commencement and at special convocations and submits a slate of nominees for action by the trustees. It may make recommendations to the President regarding Commencement speakers and the conduct of special convocations. The Committee shall consist of eight faculty members, two graduate/professional students, two undergraduate students, one representative of the Penn Professional Staff Assembly, and one representative of the Weekly-Paid Professional Staff Assembly.

## I.H.2. The Faculty Senate

*(Source: Manual of the University Senate, 1969; revised, Office of the Faculty Senate, 1981; revised, 2006)*

The Statutes of the Trustees (Article 9) state that "there shall be a Faculty Senate composed of members of the Standing Faculty and the Standing Faculty-Clinician-Educator holding the rank of Professor, Associate Professor, or Assistant Professor. The Senate shall provide opportunity for its members to discuss and express their views upon any matter that they deem to be of general interest to the faculty, and to make recommendations and pass resolutions with respect thereto. It shall have power to make recommendations directly to the President, the Provost, and the Trustees, and to request reports from the University administration.

The officers of the Senate are the Chair, the Past Chair, the Chair-Elect, the Secretary, and the Secretary-Elect. The Chair of the Senate is the principal executive officer, calls meetings of the Senate and of the Executive Committee, prepares agendas, and presides at meetings. The Senate Chair also serves simultaneously as the chair of the University Council's Steering Committee.

The Senate Executive Committee consists of the officers of the Senate, thirty-six faculty members elected by separate faculty constituencies, twelve at-large faculty members, three Assistant Professors elected by the faculty as a whole, and one nonvoting representative from the Penn Association of Senor and Emeritus Faculty (PASEF). The Executive Committee meets once each month during the academic year and may act for the Senate on substantive policy issues.

The Committee on Academic Freedom and Responsibility, the Committee on the Economic Status of the Faculty, and the Nominating Committee are standing committees of the Senate whose members are elected by the entire Senate. The Senate Consultation Subcommittee consists of the Chair, Chair-Elect, and Past Chair and regularly meets with the President and Provost during the academic year to discuss matters of concern to the faculty. Other standing committees, appointed by the Executive Committee, are the Committee on the Faculty and Administration, the Committee on Faculty and the Academic Mission, the Committee on Students and Educational Policy, the Committee on Publication Policy for the Almanac, the Committee on Faculty Development, Diversity and Equity and the Committee on Committees. Further information and copies of the *Manual of the Faculty Senate* may be obtained through the Office of the Faculty Senate.

# I.I. Academic Planning and Budget Committee

*(Source: Office of the President, Almanac, April 21, 1981 (http://www.upenn.edu/almanac/v27pdf/n30/042181.pdf); revised, Office of the*

*Provost, September 22, 1998 (http://www.upenn.edu/almanac/v45/n04/councilinsert.html#comm); revised, Office of the Provost, April 30, 2001; revised, Office of the Provost, November 21, 2022)*

The purpose of the Committee shall be:

1. to provide to the administration advice on the composition of the annual budget and on multi-year financial plans for the University;
2. to take into account, study, and report on long-range implications of current budget issues and alternatives;
3. to provide systematic thought about the evolving educational mission and educational needs of the University, and their present and future budgetary implications;
4. to provide useful early warnings of potential problems and early information on potential opportunities; and
5. to clarify means-ends relationships regarding programs and resources, including a reasoned basis for proposed priorities.

In addition to the general charge to the Committee, the President may from time to time give more specific charges to the Committee. Preferably, such periodic charges will be given at the beginning of the academic year, but the President may frame an *ad hoc* charge on matters that are either more specific or that are more immediate than the charge given at the beginning of each year. The Committee may, of course, develop its own agenda apart from the President's charges, based upon the Committee's interpretation of the general charge in the context of the University's situation at a given time.

It is to be understood that in regard to major reallocations that would change the character of an academic or other center or school, the President will seek and/or receive advice from other duly constituted advisory and consultative bodies according to the provisions and practices obtaining at the time.

The Committee's work shall be confidential, and it shall be empowered to promise corresponding confidentiality to those with whom it interacts. The requirement of confidentiality applies only to the proceedings of formal business meetings, including documents and information provided for or at such meetings. It does not apply to open hearings or other non-business formats that the Provost as chair wishes to employ.

The Provost will implement and administer this rule of confidentiality not as an end in itself, but as a means towards the larger ends of the Committee. As such, the Provost will develop, in and through the Committee's practices, the practical accommodations necessary to foster a necessary openness to the University community on the one hand and the confidentiality of the Committee's actual deliberations on the other hand. The practical goal in mind will be to reconcile properly all three of the following principles: openness to information and opinion from outside the Committee; the protection of ongoing deliberations and developing individual positions within the Committee; and the communication of the positions of the Committee as a whole after they have been achieved. In order to achieve this goal, the Committee shall provide progress reports and information on items on the agenda with the aim of facilitating communication between the Committee and the University community.

The Provost, on behalf of the Committee, shall communicate with the President through whatever means and at whatever times are appropriate. In addition, the Provost shall periodically, but at least annually, inform the University community about the advice the Committee has given the President and its reasons.

The Committee shall have fourteen members and two alternate members: nine faculty members, two graduate or professional students (one member, one alternate), two undergraduate students (one member, one alternate), two representatives of the Penn Professional Staff Assembly, and the Provost. The nine faculty shall be chosen as follows: four faculty shall be chosen by the President and five shall be chosen by the Faculty Senate Executive Committee. The two student members and two alternates shall be chosen as follows: one graduate or professional student member and one alternate by the Graduate and Professional Student Assembly; one undergraduate student member and one alternate by the Undergraduate Assembly. The two representatives of the Penn Professional Staff Assembly shall be named by the President each year. The Provost shall serve *ex officio,* and shall serve as chair.

The nine faculty members, chosen as above, may be appointed by the Faculty Senate or the administration for initial single three-year terms. Faculty members who have served previously may be appointed for one additional term after an interval of at least three years. When vacancies occur due to faculty leaves, resignations, etc., replacement members will be appointed to full three-year terms. It has been the practice that the Past Chair of the Faculty Senate serve a one-year term as a Senate appointee. This one year of service will not be counted as a term. The two student members, and the student alternates, shall serve one-year renewable terms. A student alternate may be renewed as a student member if a vacancy exists and vice versa. In order that there be the potential for partial faculty membership rotation annually, the nine initial faculty appointments shall include three one-year and three two-year appointments which may be renewed as three-year appointments.

The fourteen members shall each have a vote; the Provost as chair shall vote only to resolve a tie. The two alternates may attend all proceedings of the Committee, may be privy to all its information and deliberations, but shall not have voting power, except when a primary student member (undergraduate or graduate or professional) is absent for a particular vote; then the respective alternate may vote in the student's stead.

# I.J. The Ombuds

*(Source: Office of the Ombudsman, 1971; revised, Office of the Provost, November 21, 2022)*

The Ombuds is appointed by the President and has the following duties:

- To advise members of the University community concerning the authority, actions, and procedures of the University, and the various grievance mechanisms that may be available. The University Community includes faculty, students, alumni, and administrative and staff employees;
- To help resolve grievances of members of the University community on a confidential, informal basis, except where the issues involved are subject to a collective bargaining agreement; and,
- To recommend changes in the policies and procedures of the University that appear desirable so as to assure that, first, members of the University are treated fairly and with respect, and, second, that the principles on which decisions are based are sound.

The Ombuds is independent of the University's administrative structures and does not make decisions or set policy. The Ombuds may investigate the facts underlying individual grievances and determine the nature of relevant policies and regulations. In the course of such investigations, the Ombuds has access to relevant University records and to all members of the University community. When the complainant concerned has granted permission to do so, the Ombuds' findings and recommendations may be presented to officers of the University and, if deemed appropriate, to the community at large.

# I.K. Equal Opportunity and Affirmative Action

*(Source: Office of Equal Opportunity, 1979; revised, Office of Affirmative Action, 1982; revised,* Almanac, January 20, 2009 *(https://almanac.upenn.edu/archive/volumes/v55/n18/aapolicy.html))*

## I.K.1. Equal Opportunity/Affirmative Action Policy

The University of Pennsylvania's special character is reflected in the diversity of the Penn community. Diversity is prized at Penn as a central component of its mission and helps create an educational and working environment that best supports the University's commitment to excellence in teaching, research, and scholarship. We seek talented faculty, students, and staff who will constitute a vibrant community that draws on the strength that comes with a substantive institutional commitment to diversity along dimensions of race, ethnicity, gender, sexual orientation, age, religion, disability, veteran status, interests, perspectives, and socioeconomic status.

Grounded in equal opportunity, nondiscrimination, and affirmative action, Penn's robust commitment to diversity is fundamental to the University's mission of advancing knowledge, educating leaders for all sectors of society, and public service. The University of Pennsylvania prohibits unlawful discrimination based on race, color, sex, sexual orientation, gender identity, religion, creed, national or ethnic origin, citizenship status, age, disability, veteran status, or any other legally protected class.

Penn is committed to ensuring that its academic, social, recreational programs and services as well as opportunities for admission and employment are available on an equitable and nondiscriminatory basis without regard to an individual's legally protected class status. Penn also has written affirmative action programs to address the underrepresentation of women, minorities, people with disabilities, and qualified covered veterans. The Office of Affirmative Action and Equal Opportunity Programs, in collaboration with the Division of Human Resources and the Office of the Provost, oversees the implementation and administration of the University's equal opportunity, affirmative action, and nondiscrimination policies and programs.

The University recognizes the right of members of the community to raise questions and pursue complaints of discrimination and adheres to a strict policy that prohibits retaliation for doing so. Questions, complaints of alleged discrimination, or concerns regarding these policies or their implementation may be directed to the Executive Director, Office of Affirmative Action and Equal Opportunity Programs, Sansom Place East, Suite 228, 3600 Chestnut Street, Philadelphia, PA 19104-6106, (215) 898-6993 (Voice) or (215) 898-7803 (TDD).

## University of Pennsylvania Nondiscrimination Statement

*(To be used in University publications; revised August 28, 2023)*

The University of Pennsylvania values diversity and seeks talented students, faculty and staff with diverse backgrounds, experiences, and perspectives. The University of Pennsylvania does not discriminate on the basis of race, color, sex, sexual orientation,

gender identity, religion, creed, national or ethnic origin, citizenship status, age, disability, veteran status or any other legally protected class status in the administration of its admissions, financial aid, educational or athletic programs, or other University-administered programs or in its employment practices. Questions or complaints regarding this policy should be directed to the Executive Director of the Office of Affirmative Action and Equal Opportunity Programs, Franklin Building, 3451 Walnut Street, Suite 421, Philadelphia, PA 19104-6106; or (215) 898-6993 (Voice).

## I.K.2. Affirmative Action Office

The Office of Affirmative Action exists organizationally under the Office of the President. It is headed by the Director of Affirmative Action and is responsible for the development and functioning of the University's Affirmative Action Program and for providing a formal liaison between the federal, state, and city compliance agencies and the University. The responsibilities include coordinating affirmative action implementation, programs for the handicapped, and overseeing the mechanism for resolving non-academic employee grievances as they relate to equal opportunity and affirmative action.

# II. Faculty Policies and Procedures

- II.A. Academic Freedom and Responsibility (p. 17)
- II.B. Structure of the Academic Staff (p. 17)
- II.C. Tenure System at the University of Pennsylvania (p. 33)
- II.D. Appointments and Promotions (p. 35)
- II.E. Terms and Conditions of Faculty Appointments (p. 38)

# II.A. Academic Freedom and Responsibility

*(Source: Resolution of the Executive Board of Trustees, February 13, 1953; revised, Statutes of the Trustees, Article 10, June 17, 1983; revised as* Article 11, November 2, 2001 (https://secretary.upenn.edu/trustees-governance/statutes-trustees/#eleven)*; revised, Office of the Provost, November 21, 2022)*

The University recognizes the importance of a system of tenure for faculty members as the preeminent means of fostering and protecting academic freedom in teaching and in scholarly inquiry.

There shall be a Senate Committee on Academic Freedom and Responsibility of ten members, consisting of the Faculty Senate Chair-Elect and nine members of the Faculty Senate, three of whom are selected each year in accordance with the Rules of the Senate. This committee shall advise and consult with each faculty's Committee on Academic Freedom and Responsibility, and with administrative officers, on the establishment of appropriate procedures to be followed in the event of a claim of violation of academic freedom or responsibility. At the beginning of each year, the Senate Committee on Academic Freedom and Responsibility shall distribute the "Procedural Principles for Handling Complaints Concerning Academic Freedom and Responsibility" to the members of each faculty's Committee on Academic Freedom and Responsibility. The Committee shall have power to make investigations, reports, and recommendations on any matter relating to academic freedom and responsibility within the University. The Committee shall be governed in its responsibilities and procedures by rules established by the Faculty Senate.

Each faculty shall have a standing Committee on Academic Freedom and Responsibility that shall be elected annually. Each faculty's Committee on Academic Freedom and Responsibility shall, subject to review by the faculty, and to the extent provided in the relevant procedures, including the Procedures Governing Sanctions Taken Against Members of the Faculty adopted on June 20, 1997, and as they may be hereafter amended, represent the faculty in all proceedings that involve temporary exclusion of or imposition of a major sanction on a faculty member; suspension or termination of the appointment of a faculty member, some matters arising from financial exigency proceedings, or other questions concerning an individual faculty member's claim of violation of their academic freedom. The committee shall have power to make investigations, reports, and recommendations on any matter relating to academic freedom and responsibility within the school that may affect one or more faculty members.

Each faculty's Committee on Academic Freedom and Responsibility shall consist of not less than three members. The faculty shall also elect one or more alternate members to serve in the event of the resignation or disqualification of a Committee member. A faculty's Committee on Academic Freedom and Responsibility shall not contain department chairs or administrators. Exceptions, if necessary in small schools, should be allowed with the approval of the Senate Committee on Academic Freedom and Responsibility. Most members of a faculty's committee should be tenured faculty. Such committees shall be elected annually, and in accordance with the bylaws of a faculty, by those faculty members who are members of the Standing Faculty. Elections shall be held not later than the beginning of the academic year. The dean shall report to the Provost, not later than October 15 of each year, giving the names of the members of the faculty Committee on Academic Freedom and Responsibility that is currently in existence. Each faculty Committee on Academic Freedom and Responsibility shall elect its own chair.

It is the policy of the University of Pennsylvania to maintain and encourage freedom of inquiry, discourse, teaching, research, and publication and to protect any member of the academic staff against influences, from within or without the University, which would restrict a member of the academic staff in the exercise of these freedoms in their area of scholarly interest. The teacher is entitled to freedom in research and in the publication of results, subject to the adequate performance of their other academic duties, and to the institutional policies and procedures as set forth in the research policies of the University. Research for pecuniary return should be based upon an understanding with the authorities of the institution.

The teacher is entitled to freedom in the classroom in discussing their subject. The teacher is a member of a learned profession and of an educational institution. When speaking or writing as an individual, the teacher should be free from institutional censorship or discipline, but should note that a special position in the community imposes special obligations. As a person of learning and a member of an educational institution, the teacher should remember that the public may judge the profession and the institution by their utterances. Hence the teacher should at all times show respect for the opinions of others, and should indicate when they are not speaking for the institution.

# II.B. Structure of the Academic Staff

## II.B.1. Standing Faculty

*(Source: Standing Resolution of the Trustees, June 4, 1976; revised, September 9, 1983 and Statutes of the Trustees, Article 9, 1983; revised as Article 10, November 2, 2001 (https://secretary.upenn.edu/trustees-*

*governance/statutes-trustees/#ten); revised, Office of the Provost, June 13, 2019; revised, Office of the Provost, November 21, 2022)*

The essential requisite for membership in the Standing Faculty is a commitment to both the advancement and the communication of knowledge. The Standing Faculty is composed of all faculty members with tenure or in tenure-probationary status. Permissible ranks in the Standing Faculty are Professor, Associate Professor, and Assistant Professor.

## Professor

The title of Professor signifies that the holder is a mature scholar whose achievements have won outstanding approval both by scholars outside the University and by their faculty colleagues, and whose presence on the faculty enhances the prestige of the University. Appointment to this rank is not merely a recognition of length of service, but also of outstanding quality. Such an appointment is for an indefinite term.

## Associate Professor

Appointment to this rank is made only to a person who has demonstrated the personal and intellectual qualities that with increased maturity are expected to lead to appointment to a professorship. Appointment to the rank of Associate Professor may be for a fixed or indefinite term.

## Assistant Professor

Appointment as Assistant Professor is accorded to a person who has completed their final earned degree or other professional certification relevant to their discipline and who has given evidence of superior potential for development in academic stature. As most persons in this rank are passing through an early period of their scholarly growth, departmental and school policies should provide a variety of educational experiences, including the opportunity to conduct original research and to participate in undergraduate, graduate, and professional levels of instruction. Appointment in this rank provides a period during which an individual has an opportunity to confirm their own interest and motivation to assume University faculty responsibilities, and also one in which senior faculty may assess the promise and the competence of the faculty member's performance in both instruction and scholarly productivity. Appointment to the rank of Assistant Professor is always for a fixed term.

# II.B.2. Standing Faculty-Clinician-Educator

*(Source: Standing Resolution of the Trustees, June 4, 1976; revised as Article 10, Statutes of the Trustees, November 2, 2001 (https://secretary.upenn.edu/trustees-governance/statutes-trustees/#ten); for dates of specific resolutions regarding the adoption of this rank by various University schools, see paragraph two below; revised by Resolution of the Trustees, June 20, 2014 (https://almanac.upenn.edu/archive/volumes/v61/n01/clinician-educator.html#sthashJV3oVbvodpuf).)*

The category of Clinician-Educator is maintained within the University's four health schools—the School of Dental Medicine, the Perelman School of Medicine, the School of Nursing and the School of Veterinary Medicine. This track is intended for full-time faculty whose responsibilities include clinical activities, scholarship and teaching.

For each of the health schools, appropriate Trustee action has been taken. In the School of Dental Medicine, the Clinician-Educator category was established in 1981; in the Perelman School of Medicine, in 1976; and in the Schools of Nursing and Veterinary Medicine, in 1983. The

Clinician-Educator guidelines for the four health schools were clarified in 2013.

The sections that follow below combine the present rules governing appointment and promotion in the Clinician-Educator category in each of the four schools. Candidates for appointment or promotion in the Clinician-Educator faculty are urged to consult their department chair or Dean for additional school-specific information concerning membership in such faculty.

## 1. Appointment

All appointments of Clinician-Educators are full-time untenured appointments to the Standing Faculty. Thus procedures governing appointments to the Standing Faculty shall be followed.

In the Schools of Dental Medicine, Medicine, Nursing and Veterinary Medicine a proposal to appoint or promote is initiated by a recommendation from the department. The review and approval process is carried out by the appropriate school committee responsible for faculty actions.

Criteria for Clinician-Educator appointments in the four health schools include clinical activities, scholarship and education. The scope and proportion of these responsibilities for an individual faculty member are defined by each school. Time for scholarship, an expectation of the Clinician-Educator role, is determined by each school. It is understood that every effort is made to assure appropriate time and support for that scholarship. Funding for scholarly time is required at all ranks, ideally from extramural sources. The criteria for appointment, reappointment and promotion will reflect the differential effort dedicated to clinical activities, scholarship and educational programs that will be defined by each school.

In all cases, further review is carried out by the Provost's Staff Conference with appointment or promotion being made by the Trustees upon recommendation of the President.

## 2. Title

In all four health schools a clear and correct modifier must be attached to the title as follows: Assistant Professor, Associate Professor or Professor of (clinical specialty) at the (school or appropriate department, hospital, teaching unit or other base facility). This title is to be written in full whenever used in documents, in listings of University personnel and in correspondence.

## 3. Conditions of Employment

As is the case with other faculty categories, all Clinician-Educators receive a clear statement of their conditions of employment. This includes a definition of expectations with respect to clinical activities, scholarship, support for scholarship, participation in educational programs and administrative duties of the school; use of facilities and access to patients/animals; the responsibilities of the school or other budgetary unit for payment of salary and specified benefits; the right of persons to due process by mechanisms available to all University faculty in the event of grievances or alleged failure to protect the individual rights accorded a faculty member; and the circumstances under which the appointment may be terminated. This statement shall be part of the document governing the appointment. The clinical activities of Clinician-Educators shall be located in facilities under the auspices of, or approved by, the respective school.

## 4. Salary and Benefits

Clinician-Educator salaries shall conform to school policies. All Clinician-Educators are entitled to the same faculty benefits from the University as other members of the Standing Faculty. Scholarly leaves of absence are not an unconditional benefit. They shall be granted only when conforming to the University's general policy on leaves and when determined on an individual basis to be in the interest of both the faculty member and the school.

## 5. Professional Activity

A Clinician-Educator shall be required to devote their full professional time to activities on behalf of the clinical, scholarly, and educational missions of the respective school. The faculty member shall be subject to the University's policy on conflict of interest (see section II.E.10). The one-in-seven-day rule shall apply except that Clinician-Educators shall not be permitted to devote any time to employment in extramural clinical activities. All clinical income of Clinician-Educators must be returned to and managed by the school.

## 6. Rights and Privileges

Except for the untenured and non-tenure probationary nature of the appointment, and the stipulation that they do not vote on matters of tenure, Clinician-Educators share in all the rights and privileges of the Standing Faculty of the University. Should grievances arise that are not resolved administratively, appointees may seek adjudication available to the Standing Faculty through the established mechanisms of the school and the University.

## 7. Limitations on Size of the Clinician-Educator Faculty

The size of each school's Clinician-Educator track shall be congruent with each school's clinical, scholarly and teaching missions. Each school will set a cap for its Clinician-Educator track as a percentage of the Standing Faculty that aligns with its missions. The caps will be reviewed every five years effective July 1, 2014. The review process will begin in the schools, and it will require input from the Provost's Office and approval of the University Faculty Senate if changes are sought. It is expected that each school will not exceed its cap and that the Provost's Office will enforce the caps. Schools are required to maintain a record of percentages of Clinician-Educator and tenure track faculty, which will be reported regularly to the Vice Provost for Faculty Affairs' Office. In each school there are restrictions on the size of the Clinician-Educator faculty as follows:

*School of Dental Medicine:* The percentage of Clinician-Educators in the faculty may not exceed 50 percent of the number of Standing Faculty in the school.

*Perelman School of Medicine:* The percentage of Clinician-Educators in the faculty may not exceed 70 percent of the number of Standing Faculty in the school.

*School of Nursing:* The percentage of Clinician-Educators in the faculty may not exceed 40 percent of the number of Standing Faculty in the school.

*School of Veterinary Medicine:* The percentage of Clinician-Educators in the faculty may not exceed 50 percent of the number of Standing Faculty in the school.

## 8. Timing of Appointments and Shifts of Faculty Category

*Health Schools.* In the health schools, there are three Standing Faculty categories at the rank of Assistant Professor: a seven-year tenure probationary category, a ten-year tenure probationary category and a ten-year Clinician-Educator category which is probationary but does not involve the awarding of tenure. Currently, all Assistant Professors in the Schools of Dental Medicine, Medicine and Veterinary Medicine have initial three-year appointments, while in the School of Nursing the initial appointment is either for three or four years. In all four health schools, new Assistant Professors enter one of the three categories at the time of their initial appointment.

### Seven-year probationary category

Assistant Professors in the seven-year probationary category must make a decision before the end of the third year of the initial appointment to remain in the category to which they were initially appointed or to transfer to one of the other two categories if such a position is available. No shift from the seven-year category shall be allowed after the third year.

Those electing the seven-year tenure-probationary category shall be reviewed for promotion to the rank of Associate Professor with tenure not later than the sixth year. Under extenuating circumstances, the review can occur in the terminal year. The decision can only result in either promotion to the rank of Associate Professor with tenure or termination of appointment and separation from the University subject to the terms of the then existing appointment.

### Ten-year tenure probationary or Clinician-Educator categories

Assistant Professors in either the ten-year tenure probationary or Clinician-Educator categories shall be reviewed for promotion to the rank of Associate Professor during the ninth year (or earlier, if appropriate). In each case, the decision can only result in either promotion to the rank of Associate Professor or termination of the appointment and separation from the University subject to the terms of the then existing appointment. A grant of tenure must accompany promotion in the ten-year tenure probationary category; tenure cannot be attained in the Clinician-Educator category.

Assistant Professors in the ten-year probationary categories can change categories no later than five years after their initial appointment. Actions required to approve timely category changes must be completed by the end of the Assistant Professor's second three-year reappointment. The time accrued in the initial category will apply to the probationary period in the new category. National searches are not required if an appropriate search was performed at the time of the initial faculty appointment. Specifically, the following shifts may occur providing an appropriate position exists to transfer into and the candidate's dossier has been reviewed and approved by the school's committee responsible for faculty actions:

- ten-year tenure probationary category to the Clinician-Educator category.
- ten-year tenure probationary category to the Academic Clinician category.
- ten-year Clinician-Educator probationary category to the ten-year tenure probationary category.
- ten-year Clinician-Educator probationary category to the Academic Clinician category.

Having achieved the rank of Associate Professor, transfer between tenure status and Clinician-Educator status may be made rarely and only if, upon

review by the faculty committee responsible for quality and qualifications of faculty and by the Provost's Staff Conference, the individual is found to have met all criteria appropriate to the receiving category at the proposed rank. Transfer from the Clinician-Educator category to the tenure category at the rank of Associate or Full Professor requires a full national search.

## 9. Termination

Termination of employment of persons who have chosen and entered the Clinician-Educator Faculty shall be made only because of

1. failure to secure promotion to Associate Professor by the end of the probationary period, which shall not exceed ten years (see item 8, above);
2. retirement;
3. failure to provide appropriate practice income commensurate with responsibilities assigned by the appropriate department, director or section chief; or
4. for "just cause" as customarily determined within the University.

The term "practice income" means income derived from professional practice or related professional activities of Clinician-Educators that is collected and disbursed within the University. The five schools have amplified point (3) in several respects as follows:

In the health schools, Clinician-Educators must generate a level of practice income appropriate to the level of patient-related activity; in the case of the School of Social Policy and Practice, clinician-educators are expected to pay a stipulated portion of their salary through grants, contracts, or equivalent sources, such as income from clinical practice.

In the four health schools, levels of patient-related activity are assigned to Clinician-Educators by department or section chairs after consideration of the individual's academic activities, administrative activities, and other obligations. The practice income generated must be sufficient to cover an appropriate portion of the academic base salary, benefits, and overhead. In cases where patient care is the predominant activity of clinician-educators, the appropriate portion may be the entire amount. In other cases, the appropriate portion may be less than the entire amount because of the type of patient being seen, the time and effort necessary to develop clientele, or other academic duties assigned within the department or section. Clinician-Educators shall be informed annually in writing of their clinical responsibilities and the amount of practice income they will be expected to generate each year.

In order to establish that a clinician-educator has not generated the appropriate level of practice income, a period of observation of a year's duration is required. Written notice of the initiation of a twelve-month period of observation and of potential termination at the end of that twelve-month period must be provided by the department or section chair to the clinician-educator. In the Schools of Dental Medicine, Medicine and Veterinary Medicine, the department chair also notifies the dean of the initiation of such a period; in the School of Nursing, the Dean and the program director participate with the section chair in notifying the clinician-educator and the notice is provided by April 1 based on the activities of the preceding twelve months.

This notice must include a statement of the amount of practice income that the clinician-educator shall be obligated to generate during the subsequent year of observation. If, at the end of the year of observation, the department or section chair finds that this income has not been generated, the chair (in the School of Nursing, the chair in collaboration with the Dean) must give written notice to the clinician-educator if termination of the appointment is planned. This notice shall include the

reasons for termination, a description of the appropriate appeal process, and a statement that termination shall occur at the end of the next twelve-month period.

A one-year extension of the observation period is possible. Extension for a second twelve-month period may be given by the department or section chair not later than three months prior to the termination of the first twelve-month period of observation if, in the judgment of the chair, there has been sufficient improvement in the amount of practice income generated. If an extension for a second twelve months of observation is given, by the end of the sixth month of the second twelve-month period of observation the department or section chair, with the concurrence of the dean, must notify the clinician-educator in writing either of termination at the end of the second twelve months of observation or of cancellation of the notice of termination.

In the Schools of Dental Medicine, Medicine, and Veterinary Medicine, if a clinician-educator believes that a determination by the department chair that the clinician-educator has not generated the appropriate level of practice income is incorrect, that the amount of income required to be generated is excessive, or that the clinician-educator has been or may be prevented from earning the appropriate level of income by discriminatory patient-care assignments, the clinician-educator may, at any time after the commencement of the observation period, but not later than one month after the termination notice, file a written appeal with the dean and the chair of the appropriate faculty committee.  In the School of Dental Medicine, this is the Committee of Professors; in the Perelman School of Medicine, the Steering Committee of the Medical Faculty Senate; and in Veterinary Medicine, the Committee on Academic Freedom and Responsibility.  Within one month of receipt of such written appeal, this committee shall appoint from its membership an ad hoc committee of five, which shall elect its own chair. The ad hoc committee shall investigate and report in writing to the clinician-educator, the chair of the department and the chair of the appropriate faculty committee within one month of its appointment whether termination is or would be in accordance with the standards and procedures set forth  above.  Either the department chair or clinician-educator can request review of the ad hoc committee's conclusion by the appropriate faculty committee, which shall conduct such a review within one month. The decision of the ad hoc committee or the appropriate faculty committee (where this committee has reviewed the ad hoc committee's decision) shall be transmitted in writing to the dean.

In the School of Nursing, the following appeal mechanism shall apply: should the clinician-educator either contest the level of practice income set by the section chair and the dean or assert that the clinician-educator has generated the appropriate level of practice income, the clinician-educator may, not later then one month after the last day of the period of observation and possible termination notice, file a written appeal with the Dean and the Chair of the School Personnel Committee.  Within one month of receipt of such written appeal, the Personnel Committee shall appoint from its membership an ad hoc committee of three that shall elect its own chair.  The ad hoc committee shall investigate and report in writing to the clinician-educator, the section chairperson, the program director, the chair of the personnel committee and the Dean within one month of its appointment whether termination is or would be in accordance with the standards and procedures set forth in the initial letter of appointment and in this document.

# II.B.3. Associated Faculty

Members of the Associated Faculty play varied and important roles in the teaching, research, and professional programs of the University. However,

they do not acquire tenure. Permissible ranks in the Associated Faculty are those used in the Standing Faculty preceded by one of the descriptive modifiers "Research," "Clinical," "Adjunct," "Visiting," "Visiting Executive," "Practice" or "Wistar Institute." Artists-in Residence are also members of the Associated Faculty.

# 1. Research Faculty

*(Source: Standing Resolution of the Trustees, June 4, 1977 and Handbook for Faculty and Administration, 1977; revised, Office of the Provost, Almanac, September 13, 1983; revised, Standing Resolution of the Trustees, June 17, 2005)*

The purpose of Research Faculty appointments is to increase the quality and appointment of scholars to the faculty on a non-tenure basis in order to collaborate with the research efforts of other faculty and/or carry out independent research. Salaries over the period of the appointment are mainly derived from research grants or other external funds. Compensation for the limited teaching effort permissible to the Research Faculty is derived from sources other than research grants.

An individual on the research track should not be supported for an extended period of time from funds derived from the unrestricted budget.

Members of the Research Faculty do not acquire tenure. The Research Faculty will be appointed in the Associated Faculty on a full-time basis only. Part-time appointments in the Research Faculty are not offered.

The Research Faculty is composed of individuals who hold a terminal degree and who choose to concentrate on research. Appointees are not part of the teaching faculty, although invitations to present guest lectures may be accepted. Members of the Research Faculty may not take responsibility for courses or seminars in their home departments or in other departments of the University, nor may they supervise theses or doctoral dissertations unless prior approval of the Provost is obtained for each such activity. However, if the individual wishes to participate in the training of students in an area of expertise in which the individual is uniquely qualified, the department chair may permit a limited teaching assignment in a course or seminar for which a faculty member with a tenure-significant appointment holds responsibility. Over the term of an appointment, course and seminar teaching by a member of the Research Faculty may not exceed ten percent of the expected course and seminar teaching load of a member of the Standing Faculty in the school and in any one year no more than ten percent of the course and seminar teaching in a department may be done by research faculty. Supervision of theses or doctoral dissertations or other laboratory supervision is regarded as part of the research enterprise and the proportion of effort devoted to such supervision is not included in this limitation, although, as noted above, such supervision is first subject to approval by the Provost. Under no circumstances may a member of the Research Faculty be continuously engaged over an extended period in the same activities as faculty members having tenure or serving in a probationary period for tenure. Appointments to the Research Faculty should not be made to displace or make unnecessary the appointment of individuals in the tenure-significant ranks.

Permissible ranks are: Research Professor, Research Associate Professor, and Research Assistant Professor. These titles are to be written in full whenever used on documents, in listings of University personnel, and in correspondence. All appointments are for the term specified, or for the duration of the external financial support, whichever is shorter. Research Professors and Research Associate Professors may be appointed for terms of up to five years and may serve without limit of time through successive reappointments. Research Assistant Professors may be

appointed for terms up to four years, but in no case may a person hold that rank for more than ten years.

Initial appointments may be made as Research Assistant Professor. An individual appointed initially as Assistant Professor in the Standing Faculty may request review for transfer to the research faculty prior to reappointment. Time served in the tenure probationary appointment shall be counted as part of the ten-year maximum period for Research Assistant Professors. In the ninth year of the single-track or combined-track appointment, Research Assistant Professors are subject to a mandatory review for promotion to Research Associate Professor. Failure to obtain promotion requires termination of the faculty appointment at the end of the tenth year assuming external funding is available for the terminal year appointment.

Members of the Research Faculty do not normally move to positions on the Standing Faculty, and they may do so only in conjunction with a national search. If a Research Assistant Professor moves to an untenured position on the Standing Faculty, time served in the rank of Research Assistant Professor shall be counted as part of the seven year tenure probationary period for appointment as Assistant Professor in the Standing Faculty. If the move occurs within a school, the tenure probationary period may not be extended. If the move involves a change of schools, a maximum of two additional years in the tenure probationary period may be granted with the Provost's approval. Under no circumstances shall appointment to the Associated Faculty be used as a device to extend the tenure probationary period.

Because appointments to the Research Faculty are contingent upon external funding and may be terminated when the funding ceases, indefinite continuity of appointment at any rank should not be assumed. For that reason, all initial appointments and reappointments shall specify the sources of funding. The dependence of research appointments on grant funding reflects the University's policy to limit guaranteed long-term appointments to faculty who contribute in significant measure to the educational and research mission of the University. Research Faculty appointments are for enhancement of research programs, particularly in those areas where unique expertise is required.

Promotion to the Associate Professor rank in the research track requires collaborative or independent research of high quality with a distinctive, original, and expert intellectual contribution that is recognized by external reviewers. Promotion to professorial rank requires independent research of high quality, which may be in addition to collaborative research.

While imposition of a firm limit on the relative size of the Research Faculty may be harmful in its application to a particular program, the number of Research Faculty in a school may not exceed twenty percent of the combined Standing Faculty and Standing Faculty-Clinician-Educator in the school, or five positions, whichever is larger.

The faculty of a school may grant the Research Faculty voting rights in the school's faculty. Voting rights in the appointees' home departments are at the discretion of the respective departments. Members of the Research Faculty may not vote on matters related to Standing Faculty appointments and promotions, or on matters concerning the teaching mission of the school. Members of the Research Faculty may serve on promotions committees as nonvoting members. Members of the Research Faculty may not serve on committees concerned with teaching (i.e., curriculum, student advising, academic standards, etc.). Individuals in the research track enjoy all the rights and privileges of academic freedom and responsibility and have access to the grievance procedures of the University.

As noted above, failure to secure promotion to Research Associate Professor by the end of the nine-year probationary period shall result in a one-year terminal reappointment provided external funding is available.

Although continued funding may be available, reappointment may be denied for the following reasons: 1) lack of suitable facilities; 2) inconsistency with the research priorities of the department or school; or 3) failure to maintain excellence in the quality of research and productivity. In such instances, the individual should be given a one-year advance notice in writing that, at the conclusion of the term appointment, the individual will not be recommended for reappointment or promotion. However, in most cases of programmatic change, appointment shall normally be maintained to the expiration date of current grant support if a research track faculty member has independent funding. An appointment can be terminated prior to the expiration of its term only if the source of external funding for the research faculty member has ended. In that event, the individual should be notified immediately of the cessation of funding. An attempt may be made to carry the individual on other funding sources, either to the conclusion of the term appointment or for a reasonable period in which the individual may attempt to secure other employment. When there is reason to believe that the individual may be eligible for transfer of employment to another University research group, efforts should be made to effect such placement.

Research Faculty are subject to termination for "just cause" as customarily determined within the University.

At the time a research faculty position is offered to a candidate, the relevant dean shall inform the candidate in writing of the conditions and limitations on such appointments.

(See page 25 - Standing Resolution of the Trustees, June 17, 2005 (https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-2005/june-17/#Resolutions))

## 2. Academic Clinician – Health Schools

*(Source:* Standing Resolution of the Trustees, February 20, 2004 *(https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-2004/february-20/#Resolutions); revised, Standing Resolution of the Trustees, January 22, 2015)*

The Perelman School of Medicine, the School of Dental Medicine, and the School of Veterinary Medicine have found it desirable to make long-term faculty appointments to individuals whose responsibilities are in clinical practice and patient/animal care and in the instructional programs of the University. These faculty members are called "Academic Clinicians." Such a group is essential for assuring program stability and continuing excellence of clinical practice and patient/animal care.

1. Appointments
Appointments of Academic Clinicians are untenured appointments to the Associated Faculty. Hence, procedures governing appointments to the Associated Faculty shall be followed.
This track is available to faculty at the clinical facilities of each school.

2. Title
To assure conformity with approved nomenclature, appointees in the Academic Clinician track shall hold modified titles as Assistant Professor of Clinical (department). This title is to be written in full whenever used in documents, in listings of University personnel, or in correspondence.

3. Conditions of Employment

As is the case with other faculty categories, all Academic Clinicians shall receive a clear statement of their conditions of employment. This includes a statement of expectations with respect to clinical practice and patient/animal care functions; participation in educational programs; administrative duties of the institution; performance evaluations; use of appropriate facilities and access to patients/animals. Additionally they must be informed about the responsibilities of the school or other budgetary unit for payment of salary and specified benefits; the right of persons to due process by mechanisms available to all University faculty in the event of grievances or alleged failure to protect the individual rights accorded a faculty member; and the circumstances under which the appointment may be terminated. This statement shall be part of the document governing the appointment.

4. Salary and Benefits
Academic Clinician salaries shall conform to school policies. Academic Clinicians shall receive the same benefits as other full-time members of the faculty, but they are not entitled to scholarly leaves of absence or income allowance for early retirement.

5. Professional Activity
Academic Clinicians are expected to devote their effort primarily to clinical practice/animal care and/or teaching. The minimum expected teaching requirement will be defined by each school. Excellence in clinical practice/animal care and innovation in delivery of care, quality improvement initiatives, and regional patient referral base are desirable. Excellence in teaching, including curriculum development, innovative teaching materials and methods, and mentoring of junior faculty, is also expected. Research and scholarship are not discouraged but may not detract from teaching and clinical care required by a department or school. Service to the community, such as serving on academic and hospital committees, is encouraged and expected at senior ranks. Academic Clinicians may not vote on promotions of standing faculty. Academic Clinicians are subject to University and school specific policies on conflict of interest and extramural activities (see *Conflict of Interest Policy for Faculty Members*). The one-in-seven day rule shall apply except that the Academic Clinician shall not be permitted to devote any time to employment in extramural clinical practice or patient/animal care. All clinical practice or patient/animal care patient-derived income of Academic Clinicians must be returned to and managed by the school.

6. Rights and Privileges
Academic Clinicians share in all of the rights and privileges of other full-time members of the Associated Faculty. They may be permitted, by their schools, to vote in their school's Faculty Senate or other governing bodies. As associated faculty, they may not vote on matters pertaining to tenure and clinician-educator faculty promotions or on matters relevant to research. They may hold administrative positions related to clinical care and be eligible for leadership positions in hospital or clinical service related committees. They may serve on advisory committees related to teaching and clinical issues as well as personnel committees as appropriate. They are not members of the University Senate. Should grievances arise that are not resolved administratively, appointees may seek adjudication through the established mechanisms of the School and the University.

7. Limitations on Size of the Academic Clinician Faculty
The size of each school's Academic Clinician track shall be congruent with each school's clinical and teaching missions. Each school will set a cap for its Academic Clinician track as a percentage of the Standing Faculty that aligns with its missions. The caps will be reviewed every five years effective July 1, 2015. The review process

will begin in the schools, and it will require input from the Provost's office and approval of the University Faculty Senate if changes are sought. It is expected that each school will not exceed its cap and that the Provost's Office will enforce the caps. Schools are required to maintain a record of percentages of Academic Clinician, Clinician-Educator and Tenure Track faculty, which will be reported regularly to the Vice Provost for Faculty. In each school there are restrictions on the size of the Academic Clinician faculty as follows:

*School of Dental Medicine*: The number of Academic Clinicians in the faculty may not exceed sixty percent of the number of Standing Faculty in the school.

*Perelman School of Medicine*: The number of Academic Clinicians in the faculty may not exceed seventy percent of the number of Standing Faculty in the school.

*School of Veterinary Medicine*: The number of Academic Clinicians in the faculty may not exceed sixty percent of the number of Standing Faculty in the school.

8. Timing of Appointments and Shifts of Faculty Category
*Timing of Appointments*
Ranks in the Academic Clinician track shall be at the Assistant Professor, Associate Professor, and Professor level.

Appointment at the Assistant Professor level shall generally be for three years. Persons may serve as Academic Clinicians at the Assistant Professor rank without limit of time through successive three-year appointments. A decision not to renew the appointment may be made for such reasons as (1) failure to maintain excellence in quality of clinical practice or teaching; (2) inadequate opportunity to teach (3) inadequate clinical productivity; (4) change in the clinical priorities of the department or school; or (5) loss of a sufficient funding source. After a decision to terminate, an Academic Clinician shall have a terminal year of employment.

Assistant Professors in the Academic Clinician category shall be eligible for promotion to Associate Professor after six years; outstanding performance could be recognized by earlier promotion. There will be no "up or out" decision at the end of this 6-year period. Faculty who are not promoted to Associate Professor may continue to serve at the rank of Assistant Professor and may apply for promotion in any subsequent year.

Promotion to Associate and Full Professor on the Academic Clinician track shall require excellence in teaching and/or clinical practice, as defined by the school. Promotion to Full Professor rank typically shall occur no less than five years after promotion to the Associate Professor level, but could be earlier in outstanding cases. Community service, including participation on school committees and administrative accomplishments shall be considered supporting credentials for promotion. Local recognition in one's primary roles and responsibilities will be expected for promotion to Associate or Full Professor. After promotion to or appointment at Associate or Full Professor rank a faculty member in the Academic Clinician track generally shall be offered successive re- appointments with the frequency determined by the schools. The process and timing for reappointment will be established by each school. The decision on reappointment shall normally be made before the end of the year prior to the final year of the term. Reasons for non-renewal of appointment shall be the same as those enumerated above for the Assistant Professor rank. The year following a decision of non-renewal shall be a terminal year.

*Shifts of Faculty Category*
After an appropriate national search, conversions from the Academic Clinician track to the Clinician-Educator track are permitted with support from departmental and school committees governing faculty actions. The probationary period for promotion on the Clinician-

Educator track commences at the time of transfer into the Clinician-Educator track rather than at the time of the original appointment to the Academic Clinician track. Faculty who hold senior rank (Associate or Full Professor) on the Academic Clinician track would generally lack sufficient research accomplishment to justify appointment at these ranks on the clinician-educator track.

Assistant Professors in the Clinician Educator track can change categories no later than the end of the fifth year after their initial appointment providing an appropriate position exists to transfer into and the candidates' dossier has been reviewed and approved by the schools committee responsible for faculty actions. Actions required to approve timely category changes, must be completed by the end of the Assistant Professor's second three-year reappointment. No Assistant Professor may make a change of category after their second reappointment. The time accrued in the initial category will apply to the promotion criteria for the Academic Clinician track. Assistant Professors in the tenure track may theoretically change to the academic clinician track, but it is unlikely that a scientist could have accumulated the required clinical credentials.

Standing Faculty who are the rank of Associate and Full Professor may transfer into the academic clinician track at any time with departmental support. Such transfers into the Academic Clinician track shall usually be at the same rank, but appointment at a different rank may be justified by clinical and teaching evaluations. A faculty member must meet the same requirements for appointment at senior ranks as for promotion to these ranks. Track change and rank must be approved by departmental and school committees governing faculty actions.

# 2a. Academic Clinician—Part-time – Perelman School of Medicine

*(Source: Faculty Senate Executive Committee, May 9, 2012)*

## Purpose

Appointments in the Academic Clinician track, including full-time and part-time, are for individuals whose primary responsibilities are in patient care and in the instructional programs of the University and not in research activities. Academic Clinicians are essential for assuring program stability and continuing excellence of patient care.

## Appointment

Appointments will be regular part-time; i.e., they will be designated as a percentage full-time position, i.e., less than 50% time. Details of the schedule will be incorporated into the offer letter and academic plan and will be subject to renewal on an annual basis. The number of faculty in this track may not exceed 20% of the total number of full-time Academic Clinicians.

## Title

Appointees in the Academic Clinician—Part-time track will hold modified titles of the form *Assistant Professor of Clinical (department)*. This title is to be written in full whenever used in documents, in listings of University personnel, or in correspondence. For the purpose of official University appointment records, the designation of part-time will be added to the title and *Academic Clinicians*, Part-time will be tracked separately from full-time Academic Clinicians.

## Conditions of Employment

As is the case with other faculty categories, all Academic Clinicians— Part-time receive a clear statement of their conditions of employment.

## Salary and Benefits

Academic Clinicians—Part-time salaries shall conform to Perelman School of Medicine policies. They have limited access to participation in University benefits programs and are generally not eligible for University contributions to benefits programs.

## Professional Activity

Academic Clinicians, whether full-time or part-time, shall be required to devote their full professional time to activities on behalf of the educational and patient care functions of Penn Medicine. Academic Clinicians will not be permitted to devote any time to employment in extramural patient care. All patient-derived income of Academic Clinicians must be returned to and managed by the school.

They are expected to teach and will devote at least 10% of their adjusted effort to this activity. Excellence in teaching, including curriculum development, innovative teaching materials and methods, and mentoring of junior faculty, is also expected. Excellence in clinical practice, including innovation in delivery of care, quality improvement initiatives, and regional patient referral base is expected. They may participate in research, for example, by recruiting patients for research studies or publishing case reports or clinical experience; but research scholarship is not required and is not a criterion for promotion. The faculty member will be subject to University and UPHS policies on conflict of interest and extramural activities.

## Rights and Privileges

Academic Clinicians—Part-time share in all of the rights and privileges of other full-time members of the Associated Faculty. They may vote in the Medical Faculty Senate. As Associated Faculty they may not vote on matters pertaining to tenure and CE faculty promotion nor on matters relevant to research.

## Terms of Appointments

Ranks in the Academic Clinician—Part-time track will be at the Assistant Professor, Associate Professor, and Professor level. Appointment at the Assistant Professor will generally be for three years. Persons may serve as Academic Clinicians—Part-time at the Assistant Professor rank without limit of time through successive three-year appointments. A decision not to renew the appointment may be made for reasons including the following:

1. failure to maintain excellence in quality of clinical practice or teaching;
2. inadequate clinical productivity;
3. change in the clinical priorities of the Department or School.

After a decision to terminate, an Academic Clinician—Part-time will have a terminal year of employment which may be the final year of the appointment if the terminal year notice is processed through the Provost before the end of the penultimate year of the current appointment period.

Faculty in the AC PT track may convert to full-time status if a full-time position is available and if the conversion is supported by their department.

Requirements for promotion will be the same as those for Academic Clinicians who are full-time.

## Track changes

Faculty in the full-time Academic Clinician track or in the Clinician-Educator track may transfer into the Academic Clinician—Part-time track

at any time with departmental support. Faculty members who transfer into the Academic Clinician—Part-time track are urged to consult with Human Resources concerning the impact on eligibility for participation in benefits programs.

## Track Review

Perelman School of Medicine will work with the Office of the Provost to develop a plan to implement the Academic Clinician—Part-time track. The Academic Clinician—Part-time Track will be re-evaluated in year three and then re-evaluated every five years to ensure that it continues to meet the institutional goals of Penn Medicine and the University of Pennsylvania. During the first 3 years, appointments in this track will be limited to conversions from other tracks.

## 3. Clinical Faculty

*(Source: Standing Resolution of the Trustees, September 9, 1983; revised, June 16, 2000; revised, June 15, 2001)*

Composed of persons who are members of the Faculties of the Schools of Medicine, Dental Medicine, Nursing or Veterinary Medicine, Clinical Faculty provide professional services and participate in educational programs on a full- or part-time basis. The professional careers of the Clinical Faculty are primarily independent of their University affiliations, with the exceptions noted below. Persons may serve in full- or part-time status in the Clinical Faculty without limit of time through successive reappointments. The University does not assure continuity of appointments for any person in the Clinical Faculty. Academic ranks in the Clinical Faculty are Clinical Professor, Clinical Associate Professor, and Clinical Assistant Professor; e.g., Clinical Professor of (specialty) in the Faculty of (school). These titles are to be written in full whenever used on documents, in listings of University personnel and in correspondence.

In the Schools of Medicine, Nursing, and Dental Medicine, the professional careers of the Clinical Faculty may be in University-owned clinical practices. In the School of Dental Medicine, the Clinical Faculty may not exceed twenty percent of the Standing Faculty.

(See page 18 - Standing Resolution of the Trustees, June 15, 2001 (https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-2001/june-15/))

## 4. Adjunct Faculty

This group is composed of faculty members whose primary careers are outside the University faculty, whether self-employed or with other institutions of higher education, business or non-profit organizations, or government agencies. Such persons may be appointed to part-time academic status in the University while continuing their principal associations or careers elsewhere.

Appointment to the Adjunct Faculty may also be used for academically qualified persons employed by the University for nonacademic or administrative duties. They may serve in the Adjunct Faculty without limit of time through successive reappointments. The University does not assure continuity of appointment for any person in the Adjunct Faculty. Academic ranks in the Adjunct Faculty are Adjunct Professor, Adjunct Associate Professor, and Adjunct Assistant Professor. These titles are to be written in full whenever used on documents, in listings of University personnel and in correspondence.

## 5. Visiting Faculty

The title of Visiting Faculty normally is confined to persons who are temporarily appointed by the University but who have continuing academic appointments in another institution of higher education, or have continuing associations with business, non-profit organizations, or government agencies. A Visiting Faculty member is a full-time member of the University while on leave from the other institution, organization or agency with which the Visiting Faculty member is affiliated. Full-time appointment as a Visiting Professor is limited to three consecutive years, although normally such appointments are for one year or less. Academic ranks in the Visiting Faculty are Visiting Professor, Visiting Associate Professor, and Visiting Assistant Professor.

## 6. Visiting Executive Professor

The title of Visiting Executive Professor is reserved for Full Professors in the Wharton School who have held very senior positions in business or government. and can be expected to impart real-world knowledge to students and serve as role models and advisors as well. Appointments are made for terms of up to five years, with no appointee serving beyond five years. No more than five appointments in this faculty category may be current at any one time.

## 7. Practice Faculty

*(Source: See dates in third paragraph below for the various Standing Resolutions of the Trustees)*

The rank of Practice Professor is confined to a small number of untenured full-time professorships in the schools of Annenberg School for Communication, Arts and Sciences, Design, Education, Engineering and Applied Science, Law, Nursing, Social Policy and Practice, and Wharton. This track permits the addition to the faculty of distinguished, highly experienced individuals who have achieved success in their fields and whose skills and knowledge are essential to the educational process at both the undergraduate and graduate levels. The primary activity of a practice professor is to teach. As appropriate, such faculty may also supervise independent studies and internships, serve on committees and attend school faculty meetings. Such faculty shall not vote on appointments or promotions. Eligibility to vote on matters other than appointments and promotions shall be determined by the Standing Faculty in the relevant school or department in which the practice faculty member is appointed.

All appointees to the practice faculty are members of the Associated Faculty of the University without tenure or tenure-probationary status, and are subject to all University and school policies. They are entitled to full University faculty benefits. Leaves of absence shall be granted in accordance with the University policy applicable to the Standing Faculty, with the exception of *scholarly* leaves of absence, which are not applicable.

For each of these schools, appropriate trustee action has been taken. The Practice Professor category was established in the Wharton School, September 9, 1983; revised, June, 20, 1997; in the Law School on January 18, 1985, revised October 30, 1992; in the Graduate School of Education on October 20, 1995, revised November 16, 2016 (https://almanac.upenn.edu/volume-63-number-15/#faculty-senate-executive-committee-actions); in the School of Design, June 20, 1997, revised June 16, 2000; in the School of Engineering and Applied Science, May 17, 2001, revised November 13, 2013 (https://almanac.upenn.edu/archive/volumes/v60/n14/sec.html) and May 10, 2017 (https://almanac.upenn.edu/volume-63-number-35/#faculty-senate-executive-committee-actions4); in the School of Nursing, June 17,

2005, revised February 21, 2023 (https://almanac.upenn.edu/articles/from-the-senate-office-faculty-senate-executive-committee-actions-v69-n24/); in the School of Arts and Sciences, June 16, 2016; in the School of Social Policy and Practice on January 18, 2017 (https://almanac.upenn.edu/volume-63-number-20/#from-the-senate-office4); and in the Annenberg School for Communication on January 18, 2017 (https://almanac.upenn.edu/volume-63-number-20/#from-the-senate-office4).

Policies and procedures concerning practice professorships vary from school to school, and while some of these differences are noted below, full descriptions should be obtained from the office of the dean in each of the schools having the practice professorship rank.

### Annenberg School for Communication

The Practice Professor track is designed to permit the addition to the ASC faculty a distinguished, highly experienced practitioner whose expertise is critical to our teaching, research, and/or service missions, but which the standing faculty are not qualified to provide. Responsibilities can include teaching, mentoring, research, and/or service. Candidates must demonstrate significant professional accomplishment, substantive knowledge, excellence in teaching, and/or distinction in research-related activities, as appropriate to the assigned responsibilities.

Appointment as a Practice Professor can be at the Associate Professor or Full Professor level. Appointments at the Associate Professor level would be for an initial three year term, renewable for one three-year term. Appointment as or promotion to Full Professor would be made for an initial term of up to five years and would be renewable for successive five-year terms without limit. This appointment can be made on a full- or part-time basis, acknowledging that the individual in this role may be maintaining professional duties in their field. Appointment to this position, as well as reappointment, and promotion shall require the approval of the Dean and the Provost Staff Conference.

Consistent with University policy, a Practice Professor may, as appropriate, supervise independent studies and internships, serve on committees, and attend school faculty meetings. Such faculty shall not vote on appointments or promotions. Eligibility to vote on matters other than appointments and promotions shall be determined by the ASC Standing Faculty.

### School of Arts and Sciences

Effective June 16, 2016, the School of Arts and Sciences adopted a Practice Professor faculty track in the Associated Faculty. This track permits the addition to the faculty of the school a small number of distinguished, highly experienced practitioners whose expertise is critical to SAS teaching and research activities but which the standing faculty are not qualified to provide. Examples of such situations include but are not limited to: the School's expanding suite of professional master's degrees, which are firmly rooted in the arts and sciences but have an added dimension of professional practice; and areas where individuals with advanced, highly-specialized technical expertise play a long-term role that complements the knowledge of standing faculty in group research efforts (such as in the natural sciences) and/or broad teaching efforts.

Candidates must demonstrate professional accomplishment, excellence in teaching, important contributions in curriculum development, and where appropriate, distinction in research-related activities. The ranks available in the SAS track are Associate Practice Professor and Full Practice Professor. Eligibility for appointment at the rank of Associate Professor of Practice would normally require prior service as a Lecturer

in SAS; the initial term would be three years, renewable for one three-year term. Appointment as or promotion to Full Professor of Practice would be made for an initial term of five years and would be renewable for successive five-year terms without limit. These appointments would be made on a full- or part-time basis, acknowledging that the individuals in these roles will be maintaining their professional duties in their fields. The total number of Practice Faculty cannot exceed three percent of the SAS standing faculty at any one time.

Appointments to the Practice Faculty would be made in a department, interdisciplinary program, or center. Appointments, reappointments, and promotions associated with interdisciplinary programs or centers must be made in a manner consistent with that of departments, i.e., by a permanent advisory or governing committee composed of standing faculty members. All Practice Professor and Associate Practice Professor appointments, reappointments, and promotions shall require the approval of the Dean and the Provost Staff Conference.

Consistent with University policy, Practice Faculty may supervise independent studies, serve on selected committees, and attend School faculty meetings. They may not vote on faculty appointments and promotions. Their eligibility to vote on other matters is at the discretion of the individual department, program, or center.

## School of Design
In accordance with the Trustees resolution adopted in June 2000, this rank includes Associate Professors of Practice and Full Professors of Practice whose appointments may be made for terms of up to five years, renewable. The number of appointments is limited to no more than thirty percent of the number of standing faculty in the school, and may not exceed the number of standing faculty in any academic department.

## Graduate School of Education
The Practice Faculty includes the ranks of Associate and Full Professors of Practice, with the initial term of appointment as Full Professor for no more than five years, renewable for terms of five years; and the initial term of appointment as Associate Professor for three years, renewable for a second three-year term. Associate Practice Professors may be promoted, but may serve no more than six years total as a full-time Associate Practice Professor. The number of practice faculty appointments shall be limited to ten at any given time, never to exceed thirty percent of the Standing Faculty.

## School of Engineering and Applied Science
The Practice Faculty includes the ranks of Assistant Professor of Practice, Associate Professor of Practice, and Professor of Practice. The modified title "Professor of Practice" must be written in full in listings of University personnel, in electronic media, and in correspondence.

Practice Faculty are expected to have achieved success in their fields through extensive experience in the practice of their profession or through demonstrated educational qualifications and experience in academic settings. Members of the Practice Faculty may not serve as primary supervisors of theses or doctoral dissertations.

Appointment criteria include an expectation of excellent teaching, outstanding leadership in educational programs, and relevant experience in an area of targeted need. Reappointments shall be proposed by the Standing Faculty and recommended by the Faculty Personnel Committee, using a standard of continuing need, past performance, and an expectation of continued professional growth and recognition. The scope and limits of privileges and responsibilities, a career mentoring plan, and performance review criteria are specified in writing by the Department Chair at the time of each appointment and reappointment.

Assistant Professors of Practice are appointed to a three-year term, and may be reappointed once to a second three-year term. After six years, an Assistant Professor of Practice may not be further reappointed (except for a terminal one-year appointment at the discretion of the voting faculty and the Dean) unless promoted to Associate Professor of Practice. A person appointed as Assistant Professor of Practice after having first served three years as a Lecturer may serve in that rank for no more than three years and shall be ineligible for further reappointment without promotion to Associate Professor of Practice.

The initial term as Associate Professor of Practice or Professor of Practice shall be for not more than five years, with successive reappointments permitted for terms of up to five years each. Continued reappointments are expected provided that the individual maintains their professional competence, and that the academic need continues to exist.

Senior Lecturers may be considered for appointment to the Professor of Practice track at the appropriate rank based on experience qualifications and academic need.

The total number of Practice Faculty may not exceed ten percent of the Standing Faculty in the School.

## Law School
Appointees in the Practice Faculty shall hold the title of Practice Professor, Practice Associate Professor or Practice Assistant Professor. The modified title must be written in full whenever used in documents, in listings of University personnel and in correspondence. The initial term as Practice Professor shall be for not more than five years, and that for Practice Associate Professor or Practice Assistant Professor for three years. Successive reappointments of Practice Professors for terms of five years are permitted until retirement.

Practice Associate Professor and Practice Assistant Professors may be reappointed once to a three-year term, but may not be further reappointed (except to a terminal one-year appointment) unless promoted to Practice Professor; a person appointed as Practice Assistant Professor or Practice Associate Professor after having served at least three years as a Lecturer shall be deemed appointed to a second such term, and shall be ineligible for further reappointment (except for a terminal year) without promotion to Practice Professor. The number of practice faculty members shall not exceed twenty percent of the number of standing faculty that the Law School may from time to time be authorized to fill.

## School of Nursing
Academic ranks in the Practice Faculty are Practice Professor, Practice Associate Professor and Practice Assistant Professor. The initial term of appointment as Practice Professor shall be five years, with successive five year terms possible. Practice Associate Professors and Practice Assistant Professors shall be appointed to a five-year term as well, and may be reappointed once to another five-year term, but may not be further reappointed unless promoted to either the rank of Practice Professor or Practice Associate Professor.

Practice Professors are eligible for membership in the Faculty Senate of the School of Nursing, with voting rights on curriculum and instructional matters. The number of such faculty shall be limited to no more than thirty percent of the Standing Faculty.

## School of Social Policy and Practice

The Practice Professor track will enable the School of Social Policy and Practice to add distinguished, highly experienced individuals who have achieved success in their fields and whose skills and knowledge are essential to the educational processes of the programs in the school. For this reason, it is increasingly essential that the school has the ability to bring in highly successful professionals from within these arenas as Practice Professors for time-limited appointments of three years. The cap for the Practice Professor track, as voted on by the standing faculty, is a maximum of three lines, with a recommended term of three years.

The appropriate program's governance committee members (in consultation with the Dean and the Associate Dean for Academic Affairs) will design an individualized evaluation mechanism based on the practice professor's background, expertise and performance in relation to the elements specified at the time of appointment. Evaluation will take place annually and at least 3 months in advance of the preparation for reappointment.

### Wharton School

The Practice Faculty consists of full-time Practice Professors, Practice Associate Professors, and Practice Assistant Professors. The modified title must be written in full whenever used in documents, listings of University personnel, electronic media and in correspondence. The initial term of appointment as Practice Professor shall be for not more than five years, with successive reappointments for terms of up to five years possible until retirement. The initial term of appointment for Practice Associate Professor shall be for three years, with one additional reappointment of three years possible. Practice Associate Professors may not be further reappointed (except to a terminal one-year appointment) unless promoted to Practice Professor. The initial term of appointment for Practice Assistant Professor shall be for three years, with an additional three-year term possible, but may not be further reappointed (except to a terminal one-year appointment) unless promoted to Practice Associate Professor.

Persons who currently hold appointments in the Standing Faculty are not eligible to transfer their appointment to the Practice Faculty. A person who has previously held a Standing Faculty appointment at the University shall not be eligible for appointment to the Practice Faculty for three years after leaving the Standing Faculty.

The number of persons appointed in the Practice Faculty shall not exceed ten percent of the number of Standing Faculty that the Wharton School may at any given time be authorized to fill.

### 8. Wistar Institute Appointments

*(Source: Standing Resolution of the Trustees, May 6, 1983; revised, September 9, 1983)*

Appropriate members of the Wistar Institute's scientific staff may be appointed to the Associated Faculty of the University when proposed and approved through the customary University personnel procedures relevant to such appointments, including approval of the Provost's Staff Conference and the University's Board of Trustees. Such faculty shall hold University titles of appropriate rank prefixed by the modifier "Wistar Institute" and shall be eligible to teach University students.  They also shall be eligible for membership in graduate groups and, if appointed to a group, may participate in graduate education, including the direction of doctoral dissertations.

(See page 7 - Standing Resolution of the Trustees, September 9, 1983 (https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-1983/september-9/))

### 9. Artist-in-Residence

*(Source: Standing Resolution of the Trustees, February 24, 2006)*

The position of Artist-in-Residence in the Associated Faculty is intended to promote the presence of distinguished creative artists – writers, composers, performing artists, and filmmakers – in the School's intellectual community. While these individuals may not necessarily possess traditional academic credentials, their record of artistic contribution, as evidenced through an established body of creative work, should be one of great originality and accomplishment that is widely recognized by peers in the field.

Artists-in-Residence may be appointed either to a department or to an interdisciplinary program. The latter category covers many of the programs that would be most likely to benefit from this position, such as Creative Writing, Cinema Studies, and Theatre Arts. Proposals for appointments to interdisciplinary programs must be made in a manner consistent with that of departments, i.e., by a permanent advisory or governing committee composed of standing faculty members.

These appointments may be made on a full- or part-time basis for a term of at least one semester and up to five years. Reappointments are permitted, provided that performance meets expectations, that the individual maintains the level of their creative work, and that the academic need for services exists. The individual is expected to have ongoing contact with students; formal responsibilities (such as teaching and performance) shall be specified by the department or program. All Artist-in-Residence appointments and reappointments shall require the approval of the SAS Personnel Committee and the Provost's Staff Conference.

The total number of Artists-in-Residence in the School of Arts and Sciences shall not exceed three percent of the SAS Standing Faculty at any one time.

(See page 49 - Standing Resolution of the Trustees, February 24, 2006 (https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-2006/february-24/#Resolutions))

# II.B.4. Academic Support Staff

Members of the Academic Support Staff include many individuals who participate in the University's teaching, research, or clinical services, but who are not eligible for appointment to the Standing or Associated Faculty. Each appointment to the Academic Support Staff is for a term of years and is without tenure or tenure significance.

**1. Lecturer.** The rank of Lecturer is flexible, denoting eminent scholars whose appointments at the University are temporary or part-time, scholars still in professional training, or persons who do not possess the normally expected scholarly credentials but nevertheless provide valuable instructional services. Appointments are for one year or less, but may be renewed. Full-time service in the rank of Lecturer is limited to three consecutive years, except where additional appointments are approved by the Provost.

**2. Senior Lecturer.** (*Source: Resolution of the Trustees, May 6, 1983; Resolution of the Trustees Academic Policy Committee, February 19, 2004; revised Faculty Senate Executive Committee, March 21, 2007; revised Faculty Senate Executive Committee, December 16, 2009; revised Faculty Senate*

*Executive Committee, March 27, 2012, revised,* Faculty Senate Executive Committee, February 11, 2015 *(https://almanac.upenn.edu/archive/volumes/v61/n23/sec.html), revised,* Resolution of the Trustees, June 17, 2016 (https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-2016/june-17/#Resolutions).)

A limited number of lecturers in the Schools of Annenberg School for Communication, Arts and Sciences, Design, Education, Engineering and Applied Science, Law, Social Policy and Practice, and Wharton who have completed four years of full-time service in that rank may be considered for appointment as a Senior Lecturer. Appointments to the rank of Senior Lecturer shall be for periods of no more than four years, but successive appointments are allowed.

Key provisions of the rank are noted below; however, because policies and procedures concerning Senior Lecturers vary from school to school, faculty are urged to consult their department chair or dean for information specific to their school.

1. Like other Lecturers, Senior Lecturers are members of the Support Staff. Thus Senior Lecturers never hold tenure nor accrue time toward tenure.
2. Persons appointed to this rank normally shall not possess the scholarly credentials expected of members of the Standing Faculty.
3. No Senior Lecturer may be appointed from the ranks of the Standing Faculty.
4. A recommendation for an initial appointment as a Senior Lecturer must clearly demonstrate that:
   - The proposed candidate is performing an instructional service that is exceptionally difficult (or impossible) to obtain from members of the Standing Faculty.
   - The proposed candidate performs this service at a very high level of competence, as judged by faculty, peers and students.
   - The service provided by the proposed candidate is an essential part of the school's academic program.
   - The proposed candidate cannot be readily replaced by other persons of similar competence.

## ANNENBERG SCHOOL FOR COMMUNICATION

Senior Lecturers in Annenberg are responsible for undergraduate teaching and contributing to academic programs that are a priority for the school. Their responsibilities include design and delivery of undergraduate courses, evaluating students' academic performance; collaborating with faculty and staff colleagues to provide a supportive learning environment for students; and participating in mentoring and advising activities. The scope of responsibilities for the Senior Lecturer position will be specified in writing by the Associate Dean of Undergraduate Studies at the time of each appointment/reappointment.

Senior Lecturers may not teach graduate classes, serve on dissertation committees, or act as primary academic advisors to graduate students. All appointments in this category are without tenure or tenure-probationary status. No Senior Lecturer may be appointed from the ranks of the Standing Faculty. Persons appointed to this rank will normally have a Ph.D. or other terminal degree but need not possess the scholarly credentials expected of members of the Standing Faculty.

Prior exemplary service as a full-time Lecturer at Annenberg is a standard prerequisite for, though not a guarantee of, promotion to the rank of Senior Lecturer. Undergraduate teaching and academic advising at a very high level of competence, as judged by faculty, peers, and students, are the main criteria for appointment.

Professional skills and conduct will also be considered. At the Dean's discretion, a Senior Lecturer with significant pedagogical and professional expertise gained outside of Penn may be appointed. Invited candidates will be prepare a dossier consisting of a personal statement that functions as a self-appraisal of contributions and performance, course evaluations, and, where relevant, external letters of recommendation. The dossier is forwarded to the Undergraduate Studies Committee for evaluation, followed by a vote and recommended action to the Dean.

Appointments to the rank of Senior Lecturer shall be for periods of no more than four years, but successive appointments are allowed. Reappointments are expected provided that the individual maintains a high level of performance and that academic need continues to exist. Recommendations for reappointment must be received by the start of the fourth year of the candidate's appointment. In the absence of such a recommendation, the Dean may recommend, at their discretion, termination, or reappointment for one additional year.

Senior Lecturers are expected to uphold the highest standards for professional conduct and ethical behavior and to adhere to applicable University and Annenberg School policies and procedures. Senior Lecturers shall be eligible for whatever University benefits are offered to full-time members of the Academic Support Staff. Employment for persons appointed in this category may be terminated prior to the end of their contract because of failure to satisfy the standards for reappointment; because of reduction in course offerings by the Annenberg School in the subject area(s) taught by the individual; or for "just cause" as customarily determined with the University under its policies.

The number of Senior Lecturers may not exceed fourteen percent of the Standing Faculty in the School. It will be the Dean's responsibility to ensure that the number of Senior Lecturers does not exceed the maximum allowed.

(Faculty Senate Executive Committee, May 10, 2023)

### School of Arts and Sciences and the School of Design

Appointment and reappointment shall be proposed by a department and require a vote by all members of its Standing Faculty, review by the school's Personnel Committee, and approval by the Dean and the Provost. Continued reappointments are expected provided that the individual maintains their professional competence and that the academic need continues to exist. Any reappointment must be approved prior to the end of the penultimate year of an appointment. The primary criterion for reappointment in the School of Design is based on an evaluation of teaching performance.

Although not members of the Standing Faculty, the total number of Senior Lecturers in the School of Arts and Sciences shall never exceed eight percent of the total number of Standing Faculty, and the total number of Senior Lecturers in the School of Design shall never exceed twenty percent of the total number of Standing Faculty.

### Graduate School of Education

*Senior Lecturers in the Graduate School of Education.* In accordance with the Trustees Resolution of May 2008 there shall be Senior Lecturers who are members of the Academic Support Staff in the Graduate School of Education of the University. Appointees will have a high level of educational achievement. Appointment criteria include excellent teaching, commitment to collegial service, and relevant experience in an area of targeted need. This position may serve as an entry position or as a promotion from full-time Lecturer in education. Reappointments shall

be proposed by the faculty and recommended by the Faculty Personnel Committee. All appointments in this category are without tenure or tenure probationary status, and no Senior Lecturers may be appointed from the ranks of the standing faculty.

Senior Lecturers are responsible for teaching and contributing to academic programs, especially in areas where relevant expertise cannot be sustained by the standing faculty.  They shall plan, supervise and evaluate students' performance; work with faculty and staff to provide a supportive learning environment; contribute to course development and revisions; teach in their area of expertise; and participate in advising and recruitment activities.

Senior Lecturers may serve as voting members of dissertation committees. Upon the review and approval of the Faculty Personnel Committee, they may serve as primary academic advisors to Ed.D. students and as chairs of Ed.D. dissertation committees.  Voting privileges may be extended at the Divisional level by a vote of the Standing Faculty of that Division. Scope and limits of privileges and responsibilities are specified in writing by the Dean at the time of each appointment and reappointment.

### Promotion Criteria
Promotions from Lecturer to Senior Lecturer may be made when a Lecturer gains significant experience in relevant fields, or significant recognition from external authorities, or when the Lecturer's performance is particularly important to the School.  Cases supporting promotion must cite excellent teaching, extensive service, and a reasonable expectation of continued growth in professional skill, productivity, and recognition. Past performance is assessed through examination and analysis of annual self-appraisal reports, course evaluations, and evaluations by the Division Chair.  Appointments, reappointments and promotions are forwarded to the Faculty Personnel Committee for evaluation of the candidate's dossier, and an action is recommended to the Dean.

### Evaluation
The first professional review of the Senior Lecturer will take place prior to the end of the fifth year of service, at which time a division may decide to make the fifth year a terminal year of appointment or to recommend continuation for five additional years.  Senior Lecturers will be reviewed on the basis of performance, and the service provided by the proposed candidate must continue to be essential to the school's academic program.

The initial appointment and extensions require an evaluation by the division, the Standing Faculty, the Faculty Personnel Committee, and the Dean. It will be the Dean's responsibility to ensure that the number of Senior Lecturers across the school does not exceed the maximum allowed. A recommendation for the Dean to continue an appointment beyond the fifth year will require approval of the Provost. Subsequent reviews will take place using the same format, including Provost approval, at five-year intervals.

While the number of people serving as Senior Lecturer may vary depending on enrollments, that number will not exceed 20 percent of the standing faculty. Senior Lecturer appointments are made for five years, are subject to reappointment review at five-year intervals, and may be renewed as long as academic needs persist.

(Faculty Senate Executive Committee, January 10, 2018 (https:// almanac.upenn.edu/volume-64-number-19/#faculty-senate-executive-committee-actions-wednesday-january-10-2018))

## School of Engineering and Applied Science
Senior Lecturers are responsible for teaching and contributing to academic programs. They shall plan, supervise and evaluate students' performance; work with faculty and staff to provide a supportive learning environment; contribute to course development and revisions; teach in their area of expertise; and participate in undergraduate advising and recruitment activities.  Senior Lecturers may not serve on dissertation committees, or as primary academic advisors or mentors to graduate students.

A Lecturer in the School of Engineering and Applied Science will have typically completed three years of full-time service in that rank to be considered for appointment as a Senior Lecturer.  Individuals who have at least three years of teaching experience at a rank equivalent to that of Lecturer at another institution may also be considered for appointment as Senior Lecturers.  Persons appointed to this rank will normally have a Ph.D, but need not possess the scholarly credentials expected of members of the Standing Faculty.

Performing instructional service at a very high level of competence, as judged by faculty, peers, and students, is considered the main criterion for appointment as Senior Lecturer.  Appointments shall be made for periods of no more than four years, but successive reappointments are permitted.   Reappointments shall be proposed by the faculty and recommended after evaluation by the Faculty Personnel Committee to the Dean and Provost for consideration.  Continued reappointments are expected provided that the individual maintains their professional competence, and that the academic need continues to exist. The scope and limits of privileges and responsibilities, a career mentoring plan, and performance review criteria are specified in writing by the Department Chair at the time of each appointment and reappointment.

The number of Senior Lecturers may not exceed ten percent of the Standing Faculty in the School. It will be the Dean's responsibility to ensure that the number of Senior Lecturers across the school does not exceed the maximum allowed.

(revised Faculty Senate Executive Committee, May 10, 2017 (https:// almanac.upenn.edu/volume-63-number-35/#faculty-senate-executive-committee-actions4))

## School of Law
Like other Lecturers, a Law School Senior Lecturer is a member of the Support Staff.  Thus a Senior Lecturer never holds tenure and never accrues time toward tenure.

No Senior Lecturer may be appointed from the ranks of the Standing Faculty or from the clinical faculty.

A recommendation for an initial appointment as a Senior Lecturer must clearly demonstrate that:

1. The proposed candidate is performing an instructional service which is exceptionally difficult (or impossible) to obtain from members of the Standing Faculty.
2. The proposed candidate performs this service at a very high level of competence, as judged by faculty, peers and students.
3. The service provided by the proposed candidate is an essential part of the academic program in the Law School.
4. The proposed candidate cannot be readily replaced by other persons of similar competence.

Appointments to the rank of Senior Lecturer shall be for terms of no more than four years, but successive appointments to additional terms of not

more than four years each are allowed. A qualified individual may be appointed either as Lecturer or as Senior Lecturer. Consideration for the initial appointment as Senior Lecturer shall be submitted by the Faculty Appointments Committee or the Committee on Tenure and Promotion of the Law School to a vote by the Standing Faculty of the Law School and be approved by the Provost. Any reappointment after the initial appointment as Senior Lecturer should be approved prior to the end of the penultimate year of the term.

As the purpose of the position of Senior Lecturer in the Law School is to retain exceptionally qualified legal research and writing teachers therefore:

• Lecturers in the Legal Research and Writing Program shall not be hired with the expectation or representation that they will advance to Senior Lecturer after a period as Lecturer.
• The position of Senior Lecturer shall be limited to no more than six individuals or 15% of the standing faculty, whichever is less, who show significant promise to perform exceptionally as instructors of legal research and writing and who consequently would be difficult to replace.

(Faculty Senate Executive Committee, March 21, 2007; revised Faculty Senate Executive Committee, February 11, 2015 (https://almanac.upenn.edu/archive/volumes/v61/n23/sec.html))

### School of Social Policy and Practice
Senior Lecturers are responsible for teaching and contributing to one or more academic programs at SP2, especially in areas that are required and a priority for the School. Their responsibilities are to plan/prepare course materials, evaluate students' academic performance; work with faculty and staff to provide a supportive learning environment for students; contribute to course development and revisions; teach in their area of expertise; and participate in mentoring, advising, and recruitment activities.

The scope of responsibilities for the Senior Lecturer position will be specified in writing by the Associate Dean of Academic Affairs at the time of each appointment and reappointment.

#### Promotion Criteria from Lecturer to Senior Lecturer
Promotions from Lecturer to Senior Lecturer may be made if the School has a need for this position, when a Lecturer has completed the final term as full-time Lecturer, when the Lecturer's performance is outstanding, and the if teaching area is essential to SP2. Criteria for promotion include: excellent teaching, extensive service on sequence/governance committees and/or academic initiatives, and continued growth in professional knowledge and skill. The candidate prepares a dossier which consists of a personal statement that functions as a self-appraisal of contributions and performance, course evaluations, and letters of recommendation. This information is reviewed by the Associate Dean for Academic Affairs. It is forwarded to the appropriate program governance committee for evaluation, followed by a vote and recommended action to the Dean.

#### Evaluation
The first professional review of the Senior Lecturer will take place prior to the end of the third year of service, at which time the appropriate governance committee may decide to make the third year a terminal year of appointment or to recommend continuation for three additional years. The Senior Lecturer may be renewed as long as academic need exists in the School. Senior Lecturers will be reviewed on the basis of

performance, provided that the candidate continues to be essential to the School's academic goals.

Reappointments for an additional term of three years require an evaluation by the appropriate governance committee, the Standing Faculty, and the Dean. Final approval is given by the Provost. It will be the Associate Dean for Academic Affairs' responsibility to ensure that the number of Lecturers and Senior Lecturers across the School does not exceed 20% of the standing faculty.

(Faculty Senate Executive Committee, January 18, 2017 (https://almanac.upenn.edu/volume-63-number-20/#from-the-senate-office4))

### WHARTON SCHOOL
Senior Lecturers shall be responsible for teaching and contributing to academic programs. They shall plan, supervise and evaluate students' performance; work with faculty and staff to provide a supportive learning environment; contribute to course development and revisions; teach in their area of expertise; and may participate in student advising and recruitment activities. Senior Lecturers may not serve on dissertation committees, or as primary academic advisors or mentors to graduate students.

All appointments in this category are without tenure or tenure-probationary status. Thus Senior Lecturers never hold tenure nor accrue time toward tenure. No Senior Lecturer may be appointed from the ranks of the Standing Faculty. A qualified individual may be appointed either as Full-Time Lecturer or as a Full-Time Senior Lecturer. Prior service as a lecturer, at either Wharton or Penn, is not a requirement for appointment as a Senior Lecturer at Wharton. An appointment to the rank of Senior Lecturer requires significant pedagogical expertise as a major criterion for the appointment. Persons appointed to this rank will normally have a Ph.D. or other terminal degree, but need not possess the scholarly credentials expected of members of the Standing Faculty.

Performing instructional service at a very high level of competence, as judged by faculty, peers, and students, is considered the main criterion for appointment as Senior Lecturer. Professional conduct, as well as teaching, will be considered as part of the evaluation for reappointment. Appointments and reappointments require the approval of the department faculty, the Wharton Personnel Committee, Dean, and Provost.

Appointments to the rank of Senior Lecturer shall be for terms of three to five years. Successive appointments to additional terms of not more than five years each are allowed. There is no limit on the length of service in this rank and continued reappointments are expected provided that the individual maintains their professional competence and that the academic need continues to exist. Reappointment is at the discretion of the Wharton School. Recommendations for reappointment must be received prior to the start of the penultimate year of the candidate's appointment. In the absence of such a recommendation, the Dean may recommend, at their discretion, termination or reappointment for one additional year.

Senior Lecturers shall not have voting rights on items submitted to the Wharton faculty for a vote. Senior Lecturers shall not have voting rights on items submitted to department faculty for a vote. Additionally, Senior Lecturers may not vote on any faculty appointments, reappointments, or promotions. At the discretion of the appropriate body, Senior Lecturers may serve on department or School committees where matters other than faculty appointments/promotions are considered.

Senior Lecturers are expected to uphold the highest standards for professional conduct and ethical behavior. All Senior Lecturers are expected to adhere to applicable University and Wharton School policies and procedures. Senior Lecturers shall be eligible for whatever University benefits are offered to full time members of the Academic Support Staff.

Employment for persons appointed in this category may be terminated prior to the end of their contract because of failure to satisfy the standard for reappointment; because of reduction in course offerings by the Wharton School in the subject area taught by the individual; or for "just cause" as customarily determined with the University under its policies.

The number of Senior Lecturers may not exceed ten percent of the Standing Faculty in the School. It will be the Dean's responsibility to ensure that the number of Senior Lecturers does not exceed the maximum allowed.

(Faculty Senate Executive Committee, November 10, 2020)

### 3. Lecturer in Foreign Languages and Senior Lecturer in Foreign Languages in the School of Arts and Sciences. *(Source: Standing Resolution of the Trustees, October 11, 1996)*

Initial appointment as Lecturer in Foreign Languages shall be for one year only. At the end of the first year, it is expected that the appointment shall be extended an additional two years on the basis of current excellent performance provided the academic need for the services continues to exist. This initial appointment and extension requires approval of the dean upon recommendation of the department.

The first professional review in this track shall take place prior to the end of the second year of service, and if the appointment is continued, a second professional review shall take place prior to the end of the fifth year of service. If the appointment is continued, a third professional review shall take place prior to the end of the eighth year. If the appointment is continued, all subsequent reviews shall be conducted prior to the end of the fourth of each five-year cycle with either a recommendation for termination after an additional year or recommendation for an additional five years. The number of Lecturers in Foreign Languages shall not exceed fifteen percent of the Standing Faculty.

In order to recognize and encourage outstanding performance in both language pedagogy and language research and scholarship, the School shall consider appointment of outstanding foreign language teachers to the rank of Senior Lecturer in Foreign Languages. Language teachers employed as Lecturers in Foreign Languages are eligible for appointment as Senior Lecturer at the end of their eighth year of service or subsequently. The number of Senior Lecturers in Foreign Language shall not exceed eight percent of the Standing Faculty.

No one who has previously been a member of the Standing Faculty may be appointed to the rank of Lecturer or Senior Lecturer in Foreign Languages.

(See page 9 - Standing Resolution of the Trustees, October 11, 1996 (https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-1996/october-11/))

### 3.1 Lecturer in Critical Writing and Senior Lecturer in Critical Writing in the School of Arts and Sciences. *(Source: Standing Resolution of the Trustees, June 16, 2016)*

Regular lecturer positions provided for in II.B.4.1 are the most suitable position for many critical writing instructors, especially those in the early

stages of their careers. As they develop fluency in writing practices and current research in writing and become fully effective, knowledgeable writing instructors, a longer period of service may be desirable. In such cases, the position of Lecturer in Critical Writing is available. Oversight of the Lecturers in Critical Writing, including all evaluations in the professional reviews described below, will be performed by an oversight committee, appointed by the Dean, which includes standing faculty from the School of Arts and Sciences and the director of the Critical Writing Program.

Initial appointment as Lecturer in Critical Writing will be for three years. The first professional review in the lecturer track will take place prior to the end of the second year of service, at which time the oversight committee may decide to make the third year a terminal year or to recommend continuation for five additional years for a total of eight years. Performance and academic needs are critical factors in any appointment or reappointment. A recommendation of the Dean to continue an appointment beyond the third year will require approval of the Provost's Office. All subsequent reviews will be conducted prior to the end of the fourth year of each five-year cycle, with either a recommendation for termination after the fifth year or recommendation for reappointment for an additional five years. The structure of the review and the approval mechanism are as specified for the initial review.

The position of Senior Lecturer in Critical Writing is intended to recognize and encourage outstanding performance in both writing pedagogy and writing research and scholarship. Writing teachers employed as Lecturers in Critical Writing are eligible for appointment as Senior Lecturer in Critical Writing at the end of their eighth year of service or subsequently. Candidates must demonstrate excellence in teaching, important contributions in curriculum development and supervision, and professional accomplishment in the wider community of critical writing teaching professionals.

Appointment to Senior Lecturer in Critical Writing requires an evaluation by the oversight committee and approval of the Dean and the Provost's Staff Conference. Appointment does not entail tenure, but rather an assumption of continuation, provided the individual maintains the level of their professional performance and that the academic need for the services continues to exist. Appointment as Senior Lecturer in Critical Writing is subject to review on a five year cycle throughout the remainder of the individual's career. The review process is similar to the original appointment process.

While the number of people serving as Lecturer in Critical Writing may vary depending on enrollments in writing courses, that number will not exceed fifteen percent of the Standing Faculty in the School of Arts and Sciences. The number of Senior Lecturers in Critical Writing will not exceed eight percent of the Standing Faculty in the School of Arts and Sciences.

No one who has previously been a member of the Standing Faculty may be appointed to the rank of Lecturer in Critical Writing or Senior Lecturer in Critical Writing.

### 4. Lecturer in Educational Practice in the Graduate School of Education.

The initial appointment as a Lecturer in Educational Practice shall be for one year only. At the end of the first year, it is expected that the appointment shall be extended for an additional two years on the basis of performance and on the academic need for such services continuing to exist. The initial appointment and extension require the approval of the Dean upon the recommendation of the division.

The first professional review of the Lecturer in Educational Practice shall take place prior to the end of the second year of service, at which time a division may decide to make the third year a terminal year of appointment or to recommend continuation for four additional years for a total of six years. Again, performance and academic need are the critical factors. A recommendation for continuation requires an evaluation by the division, the Faculty Personnel Committee, and the Dean. A recommendation from the Dean to continue an appointment beyond the third year shall require approval of the Provost's Staff Conference.

The second professional review of the Lecturer in Educational Practice shall take place prior to the end of the fifth year of service, at which time a division may decide to make the sixth year a terminal one or to recommend continuation for three additional years for a total of nine. At this and all subsequent reviews, continued reappointments are to be based on professional performance and the academic need for services. The fifth year review and all subsequent reviews are as specified for the original second-year review.

The third professional review of the Lecturer in Educational Practice shall take place prior to the end of the eighth year, at which time a division may decide to make the ninth year terminal or to recommend extension for an additional five years for a total of fourteen. The eight year review and approval will be similar to that conducted in the second year.

All subsequent reviews of the Lecturer in Educational Practice shall be conducted prior to the end of the fourth year of each five-year cycle, with either a recommendation for termination after an additional year or recommendation for an additional five years. The structure of the reviews and the approval mechanism are as specified for the original second year review.

While the number of people serving as Lecturer in Educational Practice may vary depending on enrollments in the professional education courses, that number will not exceed fifteen percent of the Standing Faculty.

**5. Lecturers, Senior Lecturers and Advanced Senior Lecturers in the School of Nursing.** *(Source:* Standing Resolution of the Trustees, June 17, 2005 *(*https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-2005/june-17/#Resolutions)*; revised* Faculty Senate Executive Committee, December 11, 2014 *(*https://almanac.upenn.edu/archive/volumes/v61/n17/sec.html)*)* Individuals in these categories may be eminent scholars whose appointments at the University are temporary or part-time, scholars still in professional training, or persons who do not possess the normally expected scholarly credentials but provide valuable services. They must have at a minimum the Master's degree. Individuals in these categories are not eligible for appointment to the Standing or Associated Faculty.

Lecturers, Senior Lecturers and Advanced Senior Lecturers are responsible for the classroom teaching and course content of didactic and/or clinical courses. They plan, supervise and evaluate nursing students' performance in the clinical setting; teach clinical content and work with agency staff to provide a supportive learning environment; contribute to course development and revisions; lecture in area of expertise; and participate in advising and recruitment activities. Appointments may be for nine or twelve months and are without tenure or tenure significance.

Full-Time Positions:

*Lecturer N*—appointments are for one year or less, with service limited to three consecutive years. Under unusual circumstances, an appointment

may be extended to a fourth year with the approval of the Dean and the Provost's Staff Conference.

*Senior Lecturer A*—entry position or promotion from full-time Lecturer N. Appointment shall be for terms of no more than four years, but successive appointments to additional terms of not more than four years each are allowed. There is no limit on the length of service in this rank and continued reappointments are expected provided that the individual maintains their professional competence and that the academic need continues to exist.

*Advanced Senior Lecturer A*—entry position or promotion from full-time Senior Lecturer A. Appointments to the rank of Advanced Senior Lecturer A shall be for terms of no more than four years, but successive appointments to additional terms of not more than four years each are allowed. There is no limit on the length of service in this rank and continued reappointments are expected provided that the individual maintains their professional competence and that the academic need continues to exist.

The total number of Senior Lecturer A and Advanced Senior Lecturer A positions in the School of Nursing shall never exceed forty percent of the total number of Standing Faculty.

*Lecturer B*—Entry position, which is for one year or less, but may be renewed. There is no limit on the length of part-time service in this rank. This is a part-time position.

*Senior Lecturer B*—Entry position or promotion from Lecturer B. There is no limit on the length of part-time service in this rank.  This is a part-time position.

*Advanced Senior Lecturer B*—Entry position or promotion from Senior Lecturer B. There is no limit on the length of part-time service in this rank.  This is a part-time position.

**6. Lecturers in the Law School Clinical Program.** A Lecturer may be appointed in the Law School's clinical program for a term of two years or less, and through successive reappointments may serve in this rank for a maximum of seven consecutive years.  Details are given in a resolution of the Trustees adopted on June 18, 1982.

**7. Instructor.** Used primarily for part-time clinical personnel in the health professional schools; there is no limit to the length of part-time service in this rank. In addition, the instructor rank is occasionally used in some schools for full-time appointments of scholars still in professional training. In this case appointments are limited to three consecutive years, except where additional appointments are approved by the Provost.

**8. Research Associate.** Research Associates work in sponsored research programs and must hold the appropriate terminal professional degree in their disciplines.  Full time service in this position may not exceed three years, except with approval of the Provost.

**9. Clinical Associate.** Clinical Associates work in clinical programs of the health schools and must hold the appropriate terminal degree in their disciplines.  The professional careers of Clinical Associates are primarily independent of their University affiliations, with the exceptions noted below.  They participate on a full- or part-time basis in the educational programs of their respective schools.  They may serve without limit of time through successive annual appointments, but the University does not assure continuity of appointment for any Clinical Associate.

In the Schools of Nursing, Medicine and Dental Medicine, the professional careers of Clinical Associates may be in University-owned clinical practices.

**10. Senior Fellow.** A Senior Fellow of the University is a distinguished scholar who holds an appointment outside the Standing Faculty at the University for teaching or research, for a limited period of time.

## II.B.5. Postdoctoral Trainees

*(Source:  Office of the Provost, Almanac, May 7, 2002; revised, Almanac, September 7, 2004; revised,* Almanac, January 15, 2008 (https://almanac.upenn.edu/archive/volumes/v54/n17/policy.html))

The title of Postdoctoral Trainee is accorded to individuals holding the degree of Ph.D, M.D. or the equivalent, who are engaged in a temporary and defined period of mentored advanced training to enhance their professional skills and research independence needed to pursue their chosen career path. An individual who has been designated as a Postdoctoral Trainee by their school receives training conducted in an apprenticeship mode under the supervision of an established faculty member who serves as a mentor. As dictated by the nature of the program, the trainee may be undertaking scholarship, research, service, and teaching activities, all of which provide training essential for career development.

There are three categories of postdoctoral trainees, based upon funding source: postdoctoral researcher (supported from a research grant), NRSA-postdoctoral fellow (supported by an individual or institutional National Research Service Award), and postdoctoral fellow (supported by a private foundation, non-profit charitable organization, or other source).  Funding sources may have their own guidelines governing participation in their programs. In instances where these guidelines differ from University policy, the guidelines of the funding source take precedence.

Postdoctoral appointments are for one year, and may be renewed annually based on satisfactory performance and availability of funding. Under current University policy, no person may be a Postdoctoral Trainee for more than five years.

A complete description of the University's Postdoctoral Trainee Policy, which covers appointment and resignation, benefits and leaves, obligations and responsibilities, and training, may be found at the following link: http://www.upenn.edu/almanac/volumes/v54/n17/policy.html

## II.B.6. Staff Appointments of Graduate and Professional Students

The following appointments are limited to persons registered for full time study in the graduate or professional programs of the University of Pennsylvania. Service-related appointments are for one year or less; however, they may be renewed. Service-related appointments cannot require more than twenty hours of service per week. All teaching assistants, teaching fellows, research assistants and research fellows must receive letters of appointment that state the length of the appointment, the level of funding, and the services expected.

### Teaching Assistant

A teaching assistant teaches or guides students under the direction of a faculty member. The teaching assignment is not required of all graduate students in the degree program.

### Teaching Fellow

A teaching fellow teaches or guides students under the direction of a faculty member. The teaching assignment is directly related to the area in which the teaching fellow's degree is to be conferred and equivalent teaching (with respect to duration and the nature of the assignment) is required of all candidates as a condition for receiving such a degree.

### Research Assistant

A research assistant aids the research of an investigator or a member of the faculty.

### Research Fellow

A research fellow is appointed for research under the direction of a faculty member whose research is directly related to the area in which the fellow's degree is to be conferred and in which equivalent research is required of all candidates as a condition for receiving such a degree.

### Pre-doctoral Trainee

A pre-doctoral trainee receives a fellowship that is paid from external grants but does not require service of the student for the term of the appointment.

### Educational Fellow

An educational fellow receives a fellowship that is paid from University of Pennsylvania funds, such as a dean's account or the University Fellowship Fund, and requires no service of the student for the term of the appointment.

## II.B.7. Emeritus Faculty

Emeritus status is conferred upon Professors and Associate Professors in the Standing Faculty and upon Standing Faculty—Clinician-Educators at the time of their retirement.  Retiring faculty members have the option of using or not using the modifier "Emeritus" or maintaining their "Professor" title. The same rights and restrictions to being retired apply. (See also section on Retirement (p. 44), which provides information on faculty transition programs, continuing University benefits in retirement and the rights and privileges of retired faculty members.)

# II.C. Tenure System at the University of Pennsylvania

## II.C.1. Purpose of the Tenure System

The protection of the academic freedom of individual teachers and scholars is the instrument by which society at large is protected from hindrances to the search for knowledge and from limits on the dissemination of knowledge. The statutes of the University hold that a system of tenure for faculty members is the preeminent means of fostering and protecting academic freedom of the faculty in teaching and in scholarly inquiry.

The tenure system consists of rules and procedures that establish an essentially self-regulated body of scholars enjoying the continuity of existence and economic security within which academic freedom is both fostered and protected. The protections of academic freedom are extended to all members of the faculty during their terms of appointment. The rights and privileges embodied in the tenure system are extended to all members of the Standing Faculty during their terms of appointment. Certain of these rights and privileges are also extended to members of the Associated Faculty during their terms of appointment.

The concomitant responsibility of faculty members, benefited and encouraged by the tenure system, is to use the opportunities thus provided for the advancement of the purposes of the University and of the communities it serves. These purposes include teaching and scholarship. Members of the Standing Faculty are obliged to share in the teaching mission so that their students may advance in learning. They are also obliged to push forward the frontiers of knowledge through study and research. These activities go hand in hand, for scholarship is unavailing if its results are not communicated, and a lively stimulus to learn is best imparted by one who is adding to our store of knowledge.

(See page 11 - Standing Resolution of the Trustees, September 9, 1983 (https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-1983/september-9/))

# II.C.2. Basic Principles of the Tenure System

A faculty member who has received tenure has a continuous appointment that extends to retirement unless terminated sooner by resignation, death, or by action of the Trustees under the provisions for removal for just cause or by reason of financial exigency.

Only members of the Standing Faculty are eligible to be appointed with tenure. Members of the Standing Faculty—Clinician-Educator, the Associated Faculty or the Academic Support Staff do not acquire tenure; service in any of these three classes is without tenure significance. Each decision creating tenure status for a faculty member is made, upon recommendation of the faculty, the Provost and the President, only by positive action of the Trustees, except in the case of the "rare instances" mentioned below.

No faculty member shall be appointed or promoted to the rank of Professor in the Standing Faculty without a simultaneous affirmative grant or confirmation of tenure status.

The faculty of any school of the University may adopt a resolution asking the Provost's approval for promotion of members of the Standing Faculty to the rank of Associate Professor without simultaneous affirmative grant of tenure. After receiving the advice of the Senate, the Provost may authorize this type of promotion for the school in question. The school may then recommend individual members of the Standing Faculty for promotion to the rank of Associate Professor without affirmative grant of tenure by the usual process. In such cases, the faculty member may serve without tenure for the remainder of the probationary period established for the faculty member's previous appointment as Assistant Professor. In schools whose faculty have not received authorization for this type of appointment from the Provost, promotion to the rank of Associate Professor must be accompanied by simultaneous grant of tenure.

An initial appointment of a faculty member from outside the University, or a transfer from the Associated Faculty, to the rank of Associate Professor is permissible without conferral of tenure status. In no case, except that of faculty who have not previously held appointments at other institutions, can the total probationary period as Associate Professor in the Standing Faculty exceed five years.

There shall be definite limits upon the length of time any faculty member can serve as a member of the Standing Faculty without tenure. For members of the Standing Faculty initially appointed as Assistant Professor, the probationary period is seven years, except for members of the faculty in the health professional schools who have substantial clinical duties and thus are eligible for and elect a probationary period of ten years. Faculty appointed from outside the Standing Faculty to the rank of Associate Professor without tenure have a probationary period of five years except that faculty appointed to the rank of Associate Professor who have not previously held faculty appointments at other institutions may elect a probationary period of seven years. In cases where a proposed untenured appointment to the Standing Faculty is substantially different from the present appointment of an untenured faculty member, the Provost is authorized to decide, after consultation with the Senate Committee on Academic Freedom and Responsibility, that the probationary period for the present appointment should not be considered as probation for the proposed appointment because of the degree of professional dissimilarity and to determine whether or not the new untenured appointment would preserve academic freedom. If the Provost decides that the new appointment may be untenured, the new tenure probationary period will be measured without regard to any probationary period already served at the University by the faculty member.

For faculty members serving with reduced duties on a half-time basis, the probationary period shall be extended by one year for each two years spent in such half-time service, except that the total extension cannot exceed three years. For faculty with a normal seven-year probationary period, the total tenure probationary period including the time spent in reduced duties cannot exceed ten years. For faculty with substantial clinical duties, who elect a probationary period of ten years, the total tenure probationary period, including time spent in reduced duties, cannot exceed thirteen years.

The University expects that each recommendation for a tenure appointment shall be made only after the most careful and searching inquiry by the faculty concerned, and thorough review by the Provost and President of the attainments and the capabilities of the candidate in light of the University's perceived academic needs and plans, and in the context of a financial plan commensurate with the new commitment proposed to be undertaken.

## Tenure in Part-Time Status

In very rare instances prior to July 1, 1976, the University granted tenure to persons serving on a part-time basis. In such cases the University's financial commitment has only been for corresponding partial salary. Since July 1, 1976, part-time service, has never been considered tenure-probationary except for faculty who after appointment to tenure probationary status received approval for a reduced load (See Reduction in Duties (p. 40)).

## Tenure of Title and Limited Tenure

The University reserves the right to employ individuals to whom rank in the Associated Faculty is accorded without accepting responsibility for the continuation of their salaries beyond the termination of the contract or grant supporting them, but in such cases the letter of appointment or the Trustees' minute must contain a specific statement to this effect.

Prior to July 1, 1976 appointments were sometimes made of the form "Tenure of Title," "tenure limited to" or "indefinite tenure of academic rank salary limited to" in which the appointments or salary commitments were limited to funds from research grants or contracts, clinical practice funds, or funds from certain administrative appointments. The terms and limitations of the appointments made prior to July 1, 1976 shall continue to be observed. All new appointments made after July 1, 1976 and before July 1, 1989 with such limitations shall be without tenure significance and to the Associated Faculty. Commencing with July 1,

1989, all existing "Tenure of Title" and Limited Tenure appointments shall be in the Standing Faculty.

(See page 11 - Standing Resolution of the Trustees, September 9, 1983 (https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-1983/september-9/))

# II.D. Appointments and Promotions

## II.D.1. Procedures for Academic Appointments and Promotions

(Source: Standing Resolution of the Trustees, September 9, 1983 (https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-1983/september-9/); *revised, Office of the Provost, November 21, 2022*)

### Uniformity of Procedures

The diversity of professions and disciplines within the academic community of the University and the valued traditional customs of the several faculties preclude wholly uniform procedures for appointments and promotions at the school level. The primary responsibility for developing and maintaining a high quality faculty rests with the individual discipline. Each faculty shall adopt bylaws prescribing procedures for review of proposals for appointments or promotions within the faculty. Each faculty shall also establish procedures for the appointment of a school personnel committee. Uniform procedures should be followed when appointments and promotions are considered at the University level under the aegis of the President and Provost. Consistent with policies adopted by the Trustees, additional procedures concerning academic appointments and promotions may be promulgated by the President and Provost.

Where the President and Provost propose to recommend an appointment or grant of tenure without the approval of the faculty concerned, they shall inform the dean, the body responsible for articulating the opinion of that faculty in personnel matters and the Committee on Academic Freedom and Responsibility of that faculty. These bodies shall be provided an opportunity to respond before the proposed appointment is submitted to the Trustees.

Every recommendation for Trustee action shall specify the date of commencement and the duration of the employment relationship thereby created; whether the faculty member is a member of the Standing Faculty, the Standing Faculty—Clinician-Educator, or the Associated Faculty; and whether the faculty member already has tenure, is receiving tenure by this action, is in a tenure probationary position, or is in a position without tenure significance.

Every recommendation for Trustee action of appointment or promotion of a faculty member to a tenure probationary position shall indicate the date (month, day and year) that the probationary period began and the latest date by which such faculty member shall be reviewed for purposes of a timely tenure decision (hereafter referred to as the date of mandatory review).

The Secretary of the University and the Provost shall arrange for suitable means of notifying each faculty member and the respective dean of such action. The notice shall contain the minutes entered in the records of the Trustees.

## Reappointments and Promotions

### 1. Reappointments and Promotions of Faculty Members on Term Appointments in the Standing Faculty and Standing Faculty-Clinician-Educator.

When a faculty member's initial term appointment is for three years or more and has not been previously modified, consideration of the faculty member's continued employment on a new term appointment should occur no later than the penultimate year of the term. Renewal of such term appointments should be made only after systematic serious evaluation of the faculty member's qualifications, the programmatic needs to be met by continuation, and the resources available.

Occasionally term appointments are made in the Standing Faculty for terms of less than three years. Consideration of such a faculty member's continued employment on a new term appointment should occur as soon as practicable in light of the nature of the faculty member's role and responsibilities to the faculty concerned.

No single term appointment or combination of such appointments shall exceed the appropriate maximum period of time permitted in a tenure-qualifying position in the Standing Faculty. Where a faculty member's total years of actual service in one or more term appointments approaches the maximum period, a timely decision on promotion to tenured status shall be made. Such consideration shall be no later than the date of mandatory review; that is, at the end of the academic year preceding the last year of the permitted period.

If a faculty and its dean determine not to recommend continued employment of a faculty member on a term appointment, the faculty member should be so advised as soon as possible, in order to enable him/her to explore other employment opportunities. A faculty member who has served more than two years in the Standing Faculty should be given by the dean one full year's notice of non-reappointment. A faculty member who has served fewer than two years in the Standing Faculty should be so informed by the Dean on or before March 1 of the final academic year of the term. In the rare instances where certain time limits on notification of termination are not followed, a faculty member may acquire tenure. A faculty member who is in tenure probationary status approved by the Trustees, if not notified on or before the date of mandatory review that the appointment will be terminated, will be granted tenure in his or her present rank after the date, provided that the faculty member has been notified in writing not later than November 1 that he/she is due for mandatory review prior to the following July 1, or, if this does not occur, the faculty member has notified the dean and the Provost in writing no later than February 1 that the faculty member believes that review is required before the following July 1.

A faculty member who is not notified of forthcoming tenure review, as in the above, and who does not notify the dean and Provost as in the above, and who does not receive notification of a tenure decision, shall not receive tenure after the date of mandatory review. Such a faculty member shall automatically receive an additional one-year appointment still in tenure probationary status at their current rank. The above procedures and obligations of notification shall then again apply in this additional year, and if not observed, still another year in tenure probationary status shall be automatically granted. If, however, the faculty member is not notified either of tenure or termination within two years after the expiration of the normal probationary period (i.e., by the end of nine years for Assistant Professor, or Associate Professor with no previous academic experience, and twelve years for faculty with substantial clinical responsibilities in tenure probationary status) the faculty member will receive tenure at the current rank.

## 2. Reappointments and Promotions of Faculty Members in the Standing Faculty-Clinician-Educator Rank

There shall be a limit of ten years on the length of full-time service as Assistant Professor-Clinician-Educator in accordance with procedures set by the faculty. Clinician-Educators with the rank of Professor or Associate Professor shall have continuing appointments, subject to their generation of income to support their appointments and subject to satisfactory performance of their responsibilities. Action to terminate members of the Standing Faculty-Clinician-Educator at the rank of Professor and Associate Professor for failure to generate appropriate levels of practice funds shall be carried out according to policies and procedures promulgated by the President and Provost.

## 3. Reappointments and Promotions of Faculty Members in the Associated Faculty or Academic Support Staff

The University assumes no obligation of continuing appointment to faculty members in the Associated Faculty or Academic Support Staff. Some appointments in these categories are self-limiting with no expectation of renewal. Others are expressly conditional on the availability of funds such as research grants or clinical practice funds, or are subject to changing plans of the school or department. In all appropriate cases, the University through the deans of the faculties should seek to provide notice as soon as possible to any faculty member whose employment will not be continued. The timing of such notice of termination depends in part on the nature of the reason for the decision. Where the basis is loss of funding for a project of research or service, the length of notice to affected faculty members is dependent on the date of the announcement of the decision of the funding agency.

(See page 16 - Standing Resolution of the Trustees, September 9, 1983 (https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-1983/september-9/))

# The Appointments Process

*(Source: Resolution of the University Council, February, 1973; the practices of the Provost's Staff Conference since 1973 and subsequent Provost's memoranda)*

The procedure for making all appointments to and/or promotions within the Standing Faculty at the University of Pennsylvania involves the following steps:

1. In the case of a new appointment, a search conducted in compliance with the University's policy on affirmative action.
2. Initiation of a proposal for appointment or promotion by an academic department (or school, if without department structure) after review of its faculty needs, academic plans, and objectives.
3. Review by the school personnel committee to determine the academic qualifications of the candidate for membership on the faculty at the rank proposed.
4. Evaluation of the qualified candidate's credentials by the dean for consistency with the academic standards, plans, priorities, and budget of the school.
5. Review by the Provost's Staff Conference to advise the Provost that University-wide academic standards are being met, that the proposal is consistent with approved academic and financial plans of both the school and the University, and that it is in accord with statutory provisions.
6. Approval by the University Trustees, upon the recommendation of the President, and following approval by the Provost.

In general, the appointments and promotions process is initiated by the department (or school, if without departmental structure). A department can initiate the process on the basis of consultation within the department and with other knowledgeable persons in its faculty and in the University. The initial decision as to whether a particular person is to be appointed or promoted should be made by faculty members having rank equal to or higher than the position being considered; faculty members without tenure cannot vote on appointments or promotions to tenured ranks. Whenever the department does not have at least three faculty eligible to vote, the dean can establish a school-wide or University-wide faculty ad hoc committee to initiate the process. Departmental review committees should provide mechanisms to obtain student opinion on the candidate's teaching performance. The department chair is obligated to forward to the Dean any positive recommendations of the review committee even when the department chair might be personally opposed to it. In such a case, of course, the department chair can also transmit their personal opinion on the merits of the case. The department chair should also communicate to the dean any minority opinion that dissents from the positive recommendation. The dean and, at the dean's request, the school personnel committee can review any negative decision of a department that would have the effect of terminating an individual's appointment.

The department's recommendations for appointments and promotions should be reviewed by a personnel committee appointed according to procedures established by the faculty of the school in which the department is situated. The committee should be composed entirely of faculty members, with none currently serving in an administrative position. The vote required for a positive recommendation should be established by each school. The positive recommendations of the school personnel committee should be forwarded to the Provost's Staff Conference by the dean, who may choose to concur with or dissent from the proposal.

The overriding objective of the faculty appointment and promotion policy and procedures should be the recruitment and retention of a distinguished faculty. While the means to this end may vary, particularly in some of the professional schools, generally the objective will be met by stressing intellectual leadership as the chief criterion. Accordingly, a high degree of excellence is expected in both research and teaching. The relative weight given to research and teaching varies from case to case and should be determined by the individual faculties, but always with significant achievements in research if they are to be assigned teaching responsibilities. An acceptable standard of competence in research should be required even of outstanding teachers, and at a research institution such as the University of Pennsylvania an acceptable standard in research is very high indeed. The initial determination of competence in research should be made by scholars in the same or closely related disciplines, subject to review at the school and University levels. In identifying good teaching, it is essential to make use both of carefully tested forms for evaluation by current and former students and also of some type of peer evaluation. Teaching evaluation forms may differ from school to school.

In matters of appointment and promotion, some weight should also be given to unusual service in such "citizenship" activities as University governance, curriculum development, service to the profession, editing of professional journals, or academic programs carried out in residences.

## II.D.2. Documentation of Promotion and Appointment Proposals

*(Source: Office of the Provost, 1979)*

Some of the components of current promotion or appointment proposals are:

- A curriculum vitae of the candidate containing information on past educational and professional experience and a bibliography of published work.
- Letters of evaluation from current University faculty familiar with the candidate and with the candidate's work.
- Letters of evaluation from experts outside of the University.
- Evaluations of the candidate's teaching. Some of these evaluations should be by students.
- An affirmative action statement, indicating how the appropriate pools of potential minority and female candidates were reviewed.
- An assessment by the department chair giving an evaluation of the research, teaching, and service of the candidate, and the academic purposes to be served by the appointment or promotion.
- An evaluation by experts within the University who are familiar with the candidate's field.
- A statement from the school personnel committee stating that the candidate meets high academic standards.
- A statement from the dean summarizing their evaluation of the research, teaching, and service of the candidate, the academic purpose to be served by the appointment or promotion, and budgetary support for the proposal.

Proposals for tenure should be submitted to the Provost as early as possible in the academic year so that all aspects of the required review may be completed by the end of the spring term.

## II.D.3. Appointment to More than One Department

*(Source: 1969 Handbook for Faculty and Administration; revised, Office of the Provost, 1979; revised, Almanac, March 28, 2006 (https://almanac.upenn.edu/archive/volumes/v52/n27/sec-actions.html))*

Every faculty member has a single home department although cooperative undertakings by individual faculty members with other departments are encouraged. In some instances, formal appointments are made to second departments. The rank of this appointment to a second department will usually be the same as the rank of the faculty member in their home department. Except in the case of interdisciplinary appointments, such secondary appointments are never for an indefinite period. Unless specific arrangement is made to the contrary, no appointment at any rank in a second department shall be for a longer term than three years. In no case shall the term of the appointment extend beyond the terminating date of the existing appointment in the home department. Reappointments in second departments are generally made as long as the faculty member continues to participate significantly in the work, symposia, and other affairs of that department. Departments may as a collectivity set a general policy on secondary appointments. However, the specific recommendation as to whether an individual faculty member is to have voting rights in the second department should be made by faculty members in the second department having a rank equal to or higher than that of the individual being considered. At the time a chair of the second department recommends to his dean a secondary appointment or reappointment, the chair shall also state whether the action is expected to confer voting rights in the second department. The Provost's Staff Conference shall make the question of voting rights a matter of record whenever a secondary appointment or reappointment is approved.

In cases of interdisciplinary appointments, a faculty member may hold a tenured appointment, or a secondary appointment of longer than three years, in two or more schools in accordance with the policies of those schools. The responsibility for faculty holding joint appointments will be shared. The deans of the schools in which the faculty member will hold tenure must reach agreement on how the responsibilities are to be shared. The deans should set down in writing the agreements that have been reached with regard to salary, research funding and research space, teaching obligations, committee service, and leave entitlements. One school should also be designated the administering school, indicating that it has primary responsibility for ensuring that administrative actions are taken. At the time of the initial appointment of a faculty member with tenure in more than one school, the formal appointment process should for the most part mirror the appointment process in each of the schools. The faculty of each school is expected to follow its own processes and to vote on whether the candidate should be offered an appointment in their school.

## II.D.4. Appointment of Non-U.S. Personnel

*(Source: Office of International Programs, July 20, 1978; revised, Provost Memorandum, No.81-8, November 3, 1981; revised, Office of International Programs, 1983; revised, 2005)*

The University community is enriched by the presence of scholars, short-term visitors, visiting professors and researchers, as well as longer-term and permanent appointees from other countries. In this regard, certain guidelines must be followed with respect to immigration regulations.

The hiring of foreign faculty members at Penn, while usually not difficult, requires careful advance planning. All departments contemplating the hiring of a foreign faculty member should work closely with International Student & Scholar Services (ISSS), which is the officially designated signatory for the University in immigration matters. Please note that other University offices and departments may not authorize outside counsel to represent the University in immigration matters. Ideally, a foreign candidate being interviewed on campus should consult directly with an ISSS staff member during the campus visit to explore the visa ramifications of the potential faculty appointment.

A determining factor in employability is the individual's immigration status, not citizenship. Various non-immigrant visas allow foreign nationals to work in the United States on a temporary basis. Non-immigrant visas (J-1's, H-1B's, or occasionally others, depending on circumstances) can also be used for faculty positions that are not tenured from the outset. With the University's support, the individual can be adjusted to permanent resident status at a later date. Faculty positions that are tenured from the outset require that the individual have permanent resident status prior to taking up the position. This status can take one or more years to obtain. *Please note that tenure cannot be awarded to individuals until they have established citizenship or permanent residency.* They can be appointed to a tenure-track position, but tenure may be granted by the Board of Trustees only to individuals who have been classified as citizens or permanent residents of the United States.

No offer to a foreign national should be made without stating that the offer is contingent on that person's obtaining the appropriate visa.

Any department wishing to hire a faculty member from another nation should contact International Student & Scholar Services for assistance with the administrative aspects of the appointment. They can be reached at 3701 Chestnut Street, Suite 1W, Philadelphia, PA 19104-3199. Telephone: (215) 898-4661. Their website is: https://global.upenn.edu/isss (https://global.upenn.edu/isss/)

# II.E. Terms and Conditions of Faculty Appointments

*(Revised, Office of the Provost, November 21, 2022)*

## II.E.1. Statement on Faculty Responsibility

*(Source: Office of the Provost, Almanac, October 7, 1980 (*https://almanac.upenn.edu/archive/v27pdf/n07/100780.pdf*))*

An appointment to the Standing Faculty of the University of Pennsylvania implies the recognition of a teacher-scholar's professional achievements and promise. Although the final authority for the conduct of University affairs is vested in the Board of Trustees, much of that authority is delegated to the various faculties whose policies and decisions play the key role in determining the character of the University as an educational institution. Working with their deans, the Provost and the President, the faculties conduct the affairs of their schools and departments to the mutual advantage of their students, the University, and the scholarly community.

Traditionally, professional men and women have chosen university teaching posts partly because they allow for a flexible scheduling of time and an opportunity to pursue intellectual interests relatively free from distraction. In a research university, which has as its main functions the advancement and imparting of knowledge, teaching and scholarship may be said to have equal rank and to be interdependent. At the same time it must be recognized that the University is an institution of great complexity that requires a large expenditure of faculty time for its successful governance and operation. It is the purpose of this statement to indicate in a general way the minimum obligations of a faculty member toward the students and the institution. More specific obligations will be found in the policy statements of the various schools. Unless otherwise authorized by the University administration, all members of the Standing Faculty of the University of Pennsylvania will be expected to abide by the principles stated herein.

### Teaching and Related Activities

Except for official leaves of absence, release time provided by research grants or administrative appointments, special *ad hoc* arrangements that permit teaching to be concentrated in one term during a particular academic year, or other official exemptions, faculty are expected to participate fully in the teaching program during each regular term of the academic year. Teaching loads, which may vary from time to time, are determined by the dean of each school in consultation with the faculty, the department chair and the Provost.

The teaching of students at all levels is to be distributed among faculty members without regard to rank or seniority as such. Basic-level courses are not deemed the exclusive province of the junior faculty nor advanced courses the unique domain of the senior faculty. It is important that undergraduates, including freshmen and sophomores, have significant opportunities to learn from eminent scholars. And junior faculty members should not be called upon to bear a disproportionately heavy share of the responsibility for large and pedagogically demanding basic-level courses. This is not to say that teaching assignments should be unrelated to research interests or teaching strengths. On the contrary, the marriage of teaching and research greatly enhances both enterprises. Moreover, to the extent that some professors are more adept at teaching small classes than large ones, or at leading discussions rather than lecturing, those comparative advantages are an appropriate consideration in allocating teaching responsibilities. Naturally, teachers should be flexible enough to offer courses outside narrow fields of specialization. A teacher whose class must be cancelled because of under enrollment is normally expected to make up this deficiency in scheduling. In addition to their formal course loads, faculty members are also expected to bear their fair share of the responsibility for supervising student research and independent study.

### Availability

Becoming a member of the Standing Faculty of the University implies a willingness to accommodate oneself to the reasonable scheduling of courses, laboratories, faculty meetings, and committee assignments. Faculty members are expected to be available for advising and individual student conferences throughout the term by means of regularly scheduled office hours or appointments or both unless prevented by conflicting professional activities. Moreover, faculty members are also expected to be easily available to their colleagues. Only compelling personal or professional reasons should prevent faculty members from holding all classes at the scheduled times and places.

Every effort should be made to reschedule classes missed because of a teacher's absence. Formally scheduled final examinations are to be given only during the time periods officially announced (*see* Rules Governing Final Examinations *(*p. 107*) and* Administration of Examinations on Religious Holidays *(*p. 108*))*.

### Research

Appointments are made to the Standing Faculty of teacher-scholars whose research and publications are expected to continue throughout their active careers. Teaching loads at the University of Pennsylvania generally reflect the assumption that a significant part of the faculty member's time will be devoted to research.

### Service

Another aspect of faculty activity is service to the department, the school, and the University. The faculty is involved in all decisions affecting courses, curricula, degrees, appointments and promotions, and in many other choices affecting the physical plant and the multifarious aspects of University life and activities. Thus, service as administrators and committee members is an important part of faculty life.

All three activities—teaching, research, and service—are of major importance, and all may be considered in determining salary levels and eligibility for promotion. Since some members may be called upon for extraordinary effort in one or more of these areas, such effort is consistent with adjustment in the others. Thus, exceptionally heavy administrative duties are often balanced by a reduction in teaching load. Taken in their entirety, faculty activities usually involve a total commitment of one's professional time and efforts (*see* Conflict of Interest Policy *(*p. 45*))*.

(See page 5 - Almanac, October 7, 1980 (https://almanac.upenn.edu/archive/v27pdf/n07/100780.pdf))

# II.E.2. Faculty Leaves of Absence

*(Source: Resolution of the Executive Committee of the Trustees, January 22, 1965; revised, December 17, 1981)*

The two main types of leaves of absence available to the faculty of the University of Pennsylvania are scholarly leave and leave for employment elsewhere. All leaves require the approval of the relevant department chair, school dean and the Provost. Combinations of these types of leave are possible; however, such arrangements are governed by the principle that no faculty member will be on leave for more than four semesters during any six years that include the period of a requested leave without the explicit approval of the Provost, President and Trustees.

## Scholarly Leaves

It is appropriate that members of the Standing Faculty, Standing Faculty—Clinician-Educators, and full-time Research Faculty periodically be granted scholarly leaves for study and research. A scholarly leave is a means of recognizing a faculty member's high academic performance while at the University, future potential for growth, and an opportunity to make a major contribution to knowledge. It is intended to extend and to accelerate intellectual growth and to enable a faculty member to pursue without distraction a project designed to this end including the advancement of personal knowledge or competence in the faculty member's current or potential areas of specialty.

A scholarly leave is also intended to benefit the general academic community and the University. Therefore, a scholarly leave normally will be granted only to a faculty member who will have a continuing appointment with the University after the end of the leave and who, at the time of notification of approval for the leave, has not made a commitment inconsistent with return to the University. Exceptions to this requirement will be made for faculty members who plan to retire at the end of their proposed scholarly leave.

A scholarly leave is granted only to a faculty member who has presented an appropriate private program of study or research. It is recognized, however, that scholarly leaves for faculty members in the arts and professions can be based upon programs designed to increase professional competence even though these may not normally be interpreted as research programs.

Approval of an application for scholarly leave is contingent upon adequate fiscal and personnel resources being available to meet instructional assignments and other departmental responsibilities. If exigencies require, it may become necessary to postpone leaves.

Scholarly leave is normally not granted to University faculty members holding term appointments. In special cases where a faculty member on a term appointment is granted a scholarly leave, the leave will be counted as part of the time accumulated toward tenure, unless the formal action approving the leave expressly provides otherwise.

Scholarly leaves may be with or without salary from the University.

## Scholarly Leaves without Salary

Scholarly leaves without salary are occasionally granted. In these cases, the faculty member does not receive remuneration in the form of salary from the University of Pennsylvania or from any other organization. To the extent that personnel benefits are not financed under this arrangement, the faculty member may request that the University make

contributions toward the cost of these personnel benefits as permitted by law and University benefits policies, provided that the faculty member continues individual contributions to the employee benefits plans.

## Scholarly Leaves with Salary

*(Revised, Office of the Provost, Almanac, January 10, 1989; clarification, Almanac, February 7, 1989)*

Normally, an initial scholarly leave with salary is granted to a University faculty member holding the rank of Associate Professor or Professor after a period of six or more consecutive years of full-time service in the Standing Faculty, Standing Faculty— Clinician-Educator, or Research Faculty at the University. Additional paid scholarly leave may be granted periodically.

Eligibility for consideration for up to a maximum of two semesters of leave at full academic base salary may be accrued at the rate of one semester of leave at up to half academic base salary (or equivalent) for each six semesters of full-time service (accumulation cannot begin before July 1, 1982):

| Full-time Service | Leave Eligibility |
|---|---|
| Six semesters | One semester at up to half academic base salary |
| Twelve semesters | One semester at up to full academic base salary or two semesters at up to half academic base salary |
| Eighteen semesters | One semester at up to full academic base salary and one semester at up to half base salary |
| Twenty-four semesters | Two semesters at up to full academic base salary |

Faculty members may not be granted scholarly leave with salary for more than two consecutive semesters. Faculty members on twelve-month appointments will accrue eligibility for leave at full or half academic base salary for six months or twelve months after full-time service for corresponding six month (rather than semester) periods. There is a 24-unit cap on the number of scholarly leave credits that may be accrued. Faculty do not receive compensation for scholarly leave credits that are unused at the time of retirement or departure from the University. A faculty member who resigns their position and then returns to the University does not regain any sabbatical credits that were unused at the time of departure from the prior appointment. Faculty do not accrue scholarly leave credits when they are on scholarly leave or on leave for employment elsewhere.

The University shall administer all types of scholarly leave with flexibility, allowing faculty members to take advantage of special opportunities such as prestigious fellowships. In such cases, when a leave is granted earlier than would be expected, the interval between this leave and any subsequent leave will be adjusted to make the faculty member's leaves conform, on the average, to the guidelines above.

Faculty members are encouraged to seek outside support wherever possible to permit them to take advantage of the full year leave option without loss of income. Total salary during the leave cannot exceed the normal academic salary for that period; if the outside support is such that the total would exceed the normal academic salary, the University contribution shall be appropriately reduced. Payments specifically designated by a supporting agency for travel or living expenses are

exempt from this limitation; such payments may also be made from departmental or school budgets, but not from the benefits pool.

It is the responsibility of an applicant for a scholarly leave to inform the University fully concerning the financial circumstances surrounding the leave, including any grant, fellowship, stipend or other compensation that is received during the leave period so that the University may make arrangements for appropriate financial support. Such information shall be presented as soon as it is available.

A faculty member may not accept paid employment during a scholarly leave with salary except as provided within the University's policy governing extramural activity for compensation (*see* Policy on Extra Compensation (p. 42)). During a paid leave, personnel benefits are continued to the extent permitted by law and by University benefits policy, provided the faculty member continues normal benefits contributions.

(See page 2 - *Almanac, February 7, 1989*)

## Leaves for Employment Elsewhere

A leave of absence may be granted to a faculty member who wishes to accept a temporary post at another university, in governmental service, or in a private institution, agency, industry or firm. Such leaves are granted only when clear benefits in terms of scholarly opportunity or professional development derive from the leave and support the activities of the University. They are granted only when the personnel resources of the University are adequate to maintain the programs with which the faculty member is concerned in the faculty member's absence.

Normally a leave of absence for employment elsewhere will be for a period of one year. If there is sufficient justification, a second year of leave may be approved. A leave of absence for employment elsewhere will never be extended beyond two years with the single exception of leave to accept a Presidential appointment to a high level position in the federal government. In this one case, leave may be extended for a period as long as four years. The appointment of a faculty member who does not return to their duties at the University at the end of a leave for employment elsewhere will be terminated as of the end of the leave period.

Normally the University does not contribute toward the salary or benefits of a faculty member on leave for employment elsewhere. Frequently employers will provide their own benefits plan to the faculty member or will reimburse the University in order to maintain University benefits coverage for the individual in question. However, the University urges the faculty member to retain appropriate benefits coverage while on leave and to make any necessary arrangements with the Office of Human Resources prior to the leave period.

## Other Leaves

The University recognizes that occasions may arise when faculty members may wish, or be forced, to request leaves of absence for purposes other than scholarly study or employment elsewhere. It will endeavor to be as generous as possible in granting these requests when they are compatible with the best interests of the faculty members, the students, and the University. If such a leave is granted to a member of the Standing Faculty on a term appointment, this leave will be counted as part of the time accumulated toward tenure unless expressly provided otherwise in the formal action approving the leave. Additional information on leaves is included in the University of Pennsylvania's Division of Human Resources Policy Manual.

## Reduction in Duties

*(Source: 1989 Handbook for Faculty and Academic Administrators; revised, Office of the Provost, Almanac, February 5, 1991; revised, Almanac, February 28, 2006; revised, Almanac, May 8, 2007 (https://almanac.upenn.edu/archive/volumes/v53/n33/or.html))*

Members of the Standing Faculty, the Research Faculty and Academic Clinicians may request a reduction in duties for a period not to exceed six years. Such a reduction is granted only for whole years and requires Provost approval prior to the start of a reduction in duties. The Provost's approval of a reduction in duties is for renewable terms of one year, although faculty who are aware they will require a reduction in duties of more than one year should indicate the anticipated period of reduction in their initial request. A reduction in duties will generally be granted for good and sufficient reason such as serious illness or injury, care of an ill family member, care of dependent children, or elder care. A reduction in duties is for a percentage of full duties not to exceed fifty percent. Reduction in duties is always accompanied by a proportional reduction in salary and in those benefits, such as life insurance and retirement contributions, that are salary-based.

For untenured members of the Standing Faculty on the tenure track, assistant professors on the Standing Faculty-Clinician-educator track, and assistant professors on the Research track, the probationary period shall be extended, subject to Policy on Extension of the Probationary Periods, as follows:

1. A reduction of duties of fifty percent for two years results in the extension of the probationary period by one year; or
2. A reduction of duties of less than fifty percent (.50) may result in extension of the probationary period if the sum of the proportion of reduction multiplied by the number of years for which the reduction is taken equals or exceeds one.
   For example, all of the following would allow a one year extension: 33 percent (0.33) reduction for three years; 25 percent (0.25) reduction for four years; 40 percent (0.40) reduction for three years; 30 percent (0.30) for four years; and 40 percent (.40) for one year and 30 percent (.30) for two years. An extension of the probationary period by one year does not take effect until the reduction taken equals one. The timing of any scheduled reappointment review shall be adjusted as appropriate, subject to the approval of the Provost. *(The policy on reduction in duties in anticipation of retirement is found in section Phased Retirement.)*

## Inactive Status

Special arrangements whereby faculty members are released from academic duties for periods of time shorter than a single semester are not called leaves. Such arrangements require the approval of the dean and are handled within the several schools; they do not involve the University benefits pool.

## Resignation While on Leave

If a faculty member accepts an appointment to another institution while on leave, it is customary among institutions of higher learning for the new institution to reimburse the former institution for sums paid to the faculty member. The University of Pennsylvania generally observes this practice in its own appointment procedures, and it expects that faculty members who resign from the University of Pennsylvania while on leave will cooperate in seeking such reimbursement for the University from their new institutions.

(See page 3 - Resolution of the Executive Committee of the Trustees, December 17, 1981 (https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-1981/december-17/))

## II.E.3. Policy on Extension of the Probationary Periods that Apply to Granting of Tenure or Promotion to Associate Professor

*(Source: Offices of the President and Provost, Almanac, March 18, 1997; revised, Almanac, April 27, 1999; revised, Almanac, February 28, 2006 (https://almanac.upenn.edu/archive/volumes/v52/n24/pdf_n24/supp.pdf); revised November 6, 2019)*

A. A non-tenured member of the Standing Faculty shall be eligible for an extension of the tenure probationary period, and a Standing Faculty-Clinician-Educator or member of the Research Faculty shall be eligible for an extension of the promotion review period corresponding to the semester or year during which any of the following events occurred:

 1. **New Child in Home.** A child is born, adopted, or placed for foster care, into the faculty member's household and the faculty member is the primary or co-equal parental caregiver;

 2. **Caregiver.** By reason of a serious health condition (as defined in Section 2611(11)[1] of the Family and Medical Leave Act of 1993) persisting for a substantial portion of the period for which the extension is sought, the faculty member is required to act as the primary or co-equal caregiver for a parent, child, spouse, or domestic partner (as defined in the domestic partner benefits policy); or

 3. **Serious Health Condition.** By reason of a serious health condition (as defined in Section 2611(11)[1] of the Family and Medical Leave Act of 1993) persisting for a substantial portion of the period for which the extension is sought, the faculty member is unable to perform the functions of their position.

 4. **Catastrophic Event.** The University recognizes that rare and unusual situations may occur in which a faculty member in a probationary period will be the victim or survivor of an unforeseen, catastrophic event. A "catastrophic event" is defined under this policy as either a personal event or a professional event:

    i. **Personal Event.** An adverse and extraordinary personal event or condition persisting for a substantial period of time for which the extension is sought, including

       1. bereavement (due to the death of a spouse, child, or parent);

       2. loss of primary residence due to, for example, fire, flood or natural disaster;

       3. survivorship of a crime of violence, including domestic violence and sexual assault.

    ii. **Professional Event.** The destruction, loss, or unavailability of, or interference with access to, materials, data or research opportunities necessary for completion of a research project, such that the research project is unable to proceed or is disrupted for at least sixty days; or unforeseen interruptions in the availability of building facilities or suspension of laboratory operations that deprive the faculty member or appropriate members of the research team of access to a laboratory or the availability of other essential supports for at least sixty days. It is understood that a "catastrophic event" has a serious impact on the faculty member's ability to pursue their area of scholarly focus or activity in a customary and timely fashion and occurs through no fault of the faculty member.

 5. **Military Service.** A faculty member who must perform mandatory military service may be granted probationary period extension.

B. The length of each extension shall be one year. Up to three extensions for any combination of grounds included in above paragraph A (1) − (5) may be approved.  For untenured members of the Standing Faculty on the tenure track, the total probationary period cannot exceed ten years. For assistant professors on the Standing Faculty-Clinician-Educator track, and assistant professors on the Research track, the total probationary period cannot exceed thirteen years.

C. The faculty member shall complete the Notification of Extension form and transmit it, through their department chair or dean, to the Provost's office within one year of the start of conditions enumerated in paragraph A (1)-(5), above. However, faculty seeking extensions due to catastrophic events as defined in A (4), above, must also comply with procedures described in paragraph I, below   Deans and department chairs are responsible for promptly transmitting faculty extension requests to the Vice Provost for Faculty.

D. Extensions of the tenure probationary period shall be without prejudice to the obligation of the University to provide faculty members with twelve months' notice of termination.

E. A faculty member approved for an extension under this section, may waive an approved extension and revert to an earlier mandatory review year. The faculty member must make a written request for reversion to their department chair or, if none, their dean, before July 1 of the desired mandatory review year.

F. When a faculty member who has taken an extension under this section is being reviewed for tenure or promotion to associate professor, the dean, in the letter soliciting evaluations from external reviewers, should explicitly state that the candidate has taken an extension pursuant to this policy. The dean should further state that the policy of the University of Pennsylvania is to evaluate the productivity of each candidate who has been granted an extension as if the candidate had been in probationary status for the normal duration, so that the candidate is not penalized for having received the extension.

G. If both spouses or partners are co-equal caregivers, then both may obtain extensions of the tenure probationary period.

H. Upon being notified of a faculty member's application for a one-year extension of the probationary period, the University will approve the application unless specific and compelling factors require its denial. The action of the Provost shall be communicated in writing to the faculty member and shall specify the revised date of tenure review and termination date of the probationary period and (in the event that the request is denied) shall specify the grounds for the denial.

I. In order to determine if the faculty member is eligible for an extension of the probationary period due to a personal or professional catastrophe, the following rigorous review and evaluation shall apply:

 a. Personal Event. The faculty member shall compose a confidential letter identifying the circumstances of the catastrophe and shall complete the Notification of Extension form. The faculty member should transmit both documents through their department chair or dean to the Office of the Provost, or, may transmit them directly to the Vice Provost for Faculty. The event should be reported, and the extension requested as soon as feasible, but in any event no later than one year after the catastrophic event occurs or commences.

Events, including the birth of a child, that occur within a year prior to hire are eligible for extensions if timely requested.

b. Professional Event. The faculty member shall report that an event or condition has occurred that qualifies the faculty member for an extension of the probationary period to their department chair, or if none, their dean as soon as feasible, but in any event no later than thirty days following the catastrophic event or the discovery of the catastrophic event.

   i. The faculty member must submit a written report of the event to the dean or department chair, documenting the loss and including any supporting materials, such as insurance claims, statements from collaborators, witnesses, and University reports, as well as a request for an extension of the probationary period.

   ii. The faculty member's report, supporting materials, and a statement of support for the extension shall be reviewed by the dean of his/her school.

   iii. The dean shall appoint a committee to review and evaluate the request and to provide a written report and recommendation within twenty-one days. The committee shall be comprised of three senior standing faculty who are not from the home department of the faculty member making the request; in the schools where there is an Associate or Vice Dean for Research and/or Research Training, that person will serve ex officio.

   iv. The committee shall review the details of the event, evaluate the impact on the ability of the faculty member to pursue the faculty member's area of scholarly focus or activity, suggest a plan for amelioration, and a timeline for completion. The committee members should interview faculty and staff who may have information pertinent to the event.

   v. The committee shall submit a report and recommendation to the dean. In those cases where the dean recommends an extension, the dean will submit the report, any additional documentation, and a recommendation to the Vice Provost for Faculty.

   vi. The Vice Provost shall review the report with the subcommittee of the Provost's Staff Conference who will serve as advisors to the Vice Provost in making the determination. Each case shall be judged on its own merits and shall not create a precedent for future determinations. The decision of the Vice Provost and/or Provost shall be final and binding.

[1]  N.B. The statute defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves"—"(A) inpatient care in a hospital, hospice, or residential medical care facility" or "(B) continuing treatment by a health care provider." "Health care provider" is defined as: "(A) a doctor of medicine or osteopathy who is authorized to practice medicine or surgery (as appropriate) by the State in which the doctor practices or "(B) any other person determined by the Secretary [of Health and Human Services] to be capable of providing health care services."

## II.E.4. Faculty Parental and Teaching Leave Policy

*(Source: Offices of the President and Provost, Almanac, March 18, 1997; revised, Almanac, February 28, 2006 (https://almanac.upenn.edu/archive/volumes/v52/n24/pdf_n24/supp.pdf); revised, Faculty Senate, May*

21, 2015 (https://almanac.upenn.edu/archive/volumes/v61/n35/sec-actions.html); revised, Office of the Provost November 6, 2019)

The arrival of a new child into a family, either at the time of birth or adoption, typically requires that parents devote substantial time to child care duties. The assumption of these substantial child care duties often is incompatible with the time required by a faculty member's full time University obligations.

A. All full-time Standing and Non-Standing Faculty: Under a university employee benefits policy (https://www.hr.upenn.edu/policies-and-procedures/policy-manual/time-off/paid-parental-leave-policy/#:~:text=The%20University%20of%20Pennsylvania%20will,employee%20in%20connection%20with%20adoption) adopted in September 2018, full time Penn faculty and staff who meet applicable service requirements and are caregivers of children newly arrived in their homes are eligible for four consecutive weeks of paid parental leave for purposes of bonding.  Faculty members are required to notify their department chair and/or Dean in writing of their preferred leave schedule at an early date so that appropriate arrangements can be made to cover their responsibilities.

B. Four consecutive weeks of parental leave is not always practical for faculty with responsibilities for teaching semester-long courses or the equivalent. In lieu of four consecutive weeks of paid parental leave, schools may grant faculty full semesters or the equivalent without teaching duties.

C. Standing Faculty Only: A member of the Standing Faculty, whose main responsibility is teaching, who is the caregiver of a child newly arrived in their home through birth or adoption, is entitled, without reduction in pay, to parental leave in the form of an academic semester (approximately 14 weeks) without teaching duties. In addition, a member of the Standing faculty who gives birth is entitled to an additional semester corresponding to the semester in which the birth occurs.

   1. The date of the birth or adoption and the faculty member's teaching schedule will determine the appropriate timing for the leave.  Semesters without teaching duties will commence within twelve months of the baby's birth or the child's arrival in the home.

   2. The faculty member is required to notify the department chair and/or dean in writing of their preferred teaching schedule at an early date so that appropriate arrangements can be made to cover their teaching.

D. Where both parents are faculty members at the University, each parent is entitled to paid parental leave or teaching relief as otherwise outlined in this policy.

E. University scholarly leaves and leaves for employment elsewhere may not be taken immediately after a parental leave, without the prior approval of the faculty member's Dean.

## II.E.5. Policy on Extra Faculty Compensation

*(Source: Office of the President, May 2, 1963; revised, 1969 Handbook for Faculty and Administration)*

Faculty should not receive extra compensation from the University for undertaking research during the academic year. Similarly, extra

compensation should not be provided for undertaking unusually heavy teaching responsibilities in the regular academic programs of the University. Such unusual overload should be offset by corresponding lighter loads in a future semester.

Extra compensation may be provided when a faculty member:

1. Has been appointed to an administrative post in addition to a faculty appointment and for which additional salary has been authorized by the dean or Provost;

2. Holds a nine-month appointment and teaches in summer programs of the University;

3. Holds a nine-month appointment and receives a summer salary from the University for other than teaching purposes, in which case the faculty member may receive up to one-ninth of the faculty member's academic base salary times the number of months spent in full-time service on the project during the months of June, July, and August. The normal pattern is two-ninths additional salary for two months' work and one month's vacation. In some cases, if the granting agency approves and the faculty member takes no vacation three-ninths may be paid, but in no case will payments exceed one-third of the base academic salary.

4. Teaches in evening, extension, and specialized or supplemental programs which may be established from time to time provided:
   a. They are conducted by a faculty or a school of the University; or
   b. The function of the program serves an extramural purpose for which the need is broadly recognized;

5. Engages in clinical practice in an established group practice within the University, the University hospital, and affiliated hospitals.

6. Is asked to engage in "internal consulting" where services essentially of an intramural consulting nature are required for very short periods of time within a semester and where reduction in departmental loads is not feasible. The rule excluding extra compensation may be waived by the Provost. Extra compensation may be paid only in cases that meet all the following criteria:
   a. The time involved would be limited to approximately four days per project during an academic year, and the total time for all intra-university consulting or research (for extra compensation) would be limited to eight days per academic year.
   b. The work must not interfere with the regular work of the department or of the individuals concerned.
   c. The work must either have been unforeseen at the time the faculty member's duties for the period were planned, or no feasible alternative means could be found for absorbing it into the faculty member's work schedule.
   d. The administration of such arrangements must include an exchange of correspondence between the chairs of the departments involved prior to the start of the work as well as approval by the Provost.

In addition, home department chairs or other appropriate immediate superiors should be made aware of all activities undertaken by faculty members for extra compensation, with a view to preventing conflicts of interest and to avoid excessive overall commitments.

## II.E.6. Financial Obligations of the University to Faculty Members

*(Source: Standing Resolution of the Trustees, October 16, 1959 and 1979 Handbook for Faculty and Administration; revised, Standing Resolution of the Trustees, September 9, 1983)*

### Death

Accelerated payment of a portion of life insurance equal to one-fourth of the insured's annual benefits base is available through the Benefits Office in accordance with the Group Life Insurance policy as published in The University of Pennsylvania Personnel Policy Manual.

### Illness

Policies regarding absence for illness are covered by the University sick leave policy as published in *The University of Pennsylvania Division of Human Resources Policy Manual.*

### Absenteeism

The University is not obligated to pay an individual holding tenure or a term appointment for periods of absence without leave. When a faculty member is recurrently absent from classes to a degree that interferes with the proper conduct of the course in the opinion of the department chair, and fails to provide evidence for the necessity of the absence that is satisfactory to the chair or the dean, the dean may, after one written warning to the faculty member, reduce the faculty member's salary by the amount actually expended to employ a substitute for the remainder of the course, without raising any question of termination. At the end of this period the reduced salary would be restored subject to the possibility of either suspension or *permanent removal determined as outlined above.*

(See page 29 - Standing Resolution of the Trustees, September 9, 1983 (https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-1983/september-9/))

## II.E.7. Resignation

Resignation should be made by letter to the appropriate dean and submitted to the department chair.

Faculty members in tenure probationary status who intend to terminate their services at the end of their appointments should notify their department chairs by letter one year in advance, if possible, and no later than February 1 of the last year of the appointment.

A faculty member with tenure should also notify their department chair by letter one year in advance of resignation.

## II.E.8. Acceptance of Appointments Elsewhere

*(Source: Office of the Provost, Almanac, December 5, 1989 (https://almanac.upenn.edu/archive/v36pdf/n15/120589.pdf))*

Any full-time member of the Standing Faculty, Associated Faculty or Academic Support Staff who accepts a full-time position at another institution must notify their department chair and dean of that act at the time it takes place. Unless a leave of absence has been granted, the appointment at Penn terminates as of the beginning of the new appointment.

In the case of tenured faculty who wish to accept a full-time tenured position elsewhere, Penn will not grant leaves of absence for periods after the acceptance of the new appointment.

# II.E.9. Retirement

*(Source: Office of the Provost, 2004; revised, Almanac, September 5, 2023 (https://almanac.upenn.edu/volume-70-number-4/#revised-faculty-income-allowance-policy))*

Faculty members who consider retirement should make a careful assessment of their financial needs and resources. The primary retirement benefit to faculty members is provided through the University's Tax Deferred Retirement Plan. More detailed information about the plan is available from the website of the Office of Human Resources (https://www.hr.upenn.edu/PennHR/benefits-pay/retirees/). In addition to these resources, TIAA/CREF and the Vanguard Group, the carriers for the plan, present frequent seminars on retirement issues and provide opportunities for individual counseling. Schedules for the seminars and information on making individual appointments can be found at the Office of Human Resources website or by contacting the carrier directly. To make an appointment for a counseling session with a TIAA/CREF representative, visit their website at http://www.tiaa-cref.org/moc (http://www.tiaa-cref.org/moc/). To make an appointment for a counseling session with a Vanguard representative visit their website at www.meetvanguard.com (http://www.meetvanguard.com)

## A. Transition Programs

Two programs are available to faculty members who wish to ease the transition from full-time employment to retirement:

1. Faculty Income Allowance Program—The Faculty Income Allowance Program (FIAP) provides a transitional income allowance to members of the Standing Faculty and of the Standing Faculty—Clinician-Educator who qualify for the program. This allowance, which is paid during the first twenty-four months of a faculty member's retirement, is typically somewhat greater than eighty percent of the faculty member's pre-retirement monthly salary. Details of the program are available at: https://www.hr.upenn.edu/docs/default-source/benefits/fiap_benefits_summary.pdf.

2. Phased Retirement—Phased retirement is available for faculty members who wish to move gradually from full-time employment to full retirement. During the period of phased retirement, which may extend up to six years, a faculty member's responsibilities and salary are reduced by a maximum of fifty percent. All benefits are continued during the period of phased retirement, but those benefits linked to salary are proportionately reduced. Participation in the program requires

   a. agreement between the faculty member and the chair of the faculty member's department and

   b. agreement to move to full retirement at the end of the period of phased retirement.

   At the end of the period of phased retirement a faculty member who meets the requirements of FIAP may begin full retirement with the benefits of that program.

## B. Continuing University Benefits in Retirement

The University currently provides subsidized retiree medical coverage and continued dependent tuition benefits to faculty members. Effective January 1, 2006, eligibility for these benefits required that the "Rule of 75" be met: the age and years of service of the faculty member must total seventy-five. In addition, the current eligibility requirements of age fifty-

five with fifteen years of service or age sixty-two with ten years of service must also be met and service must be full-time and continuous. There is a grandfathering provision for three years ending December 31, 2008 under which individuals who meet the current eligibility requirements during the three-year period between January 1, 2006 and December 31, 2008 shall be eligible for the benefits without having to meet the Rule of 75.

More information on current policies concerning retirement benefits is available from the website of the Office of Human Resources, www.hr.upenn.edu (https://www.hr.upenn.edu/).

## C. Rights and Privileges of Retired Faculty Members

*(Source: Provost's Memorandum No. 9-69, March 25, 1969; revised, No. 6-72, Almanac, April 18, 1972; revised, Office of the Provost, 2008)*

The University views retirement from the Standing Faculty as one stage of an academic career. The University encourages retired faculty members to remain involved with the University, their schools and their departments. Though no faculty member acquires new rights or privileges upon retirement, certain of those rights and privileges to which the faculty member was entitled prior to retirement are still extended. (The term "retired faculty" is used throughout this section to refer to those individuals who have retired from the Standing Faculty.)

1. Emeritus status can be conferred upon professors and associate professors in the Standing Faculty and upon Standing Faculty clinician-educators at the time of their retirement (see Emeritus Faculty). A faculty member may continue to use the title Professor or may choose to use the title "Professor Emeritus/a". The election of which title to use should be made at the time of retirement and a representative of the faculty member's department so notified. The department should then notify the Provost's Office of the election.

2. Retired faculty members may seek office and research space and support staff for their scholarship. The department shall provide such space and support to the extent that it is available and not required by members of the Standing and Associated faculties.

3. Retired faculty members may file research or travel grant applications. The consent of the relevant department chair or dean must be obtained prior to submission to the Vice Provost for Research. Such applications shall be transmitted further only if the Vice Provost believes the project to be of significance, if there is probability of its being completed and if necessary office and laboratory space is available. If there is a shortage of such space, first priority must go to members of the Standing and Associated Faculties.

4. Retired faculty members may attend meetings of their school faculties and may participate in the work of committees of those faculties if invited.

5. Retired Standing Faculty members are, by the rules of the Faculty Senate, members of the Faculty Senate and have the same rights and privileges as other members, but are not entitled to vote.

6. The library use privileges enjoyed by members of the Standing Faculty are continued for retired faculty members, who may apply for faculty studies in the library if such facilities are required.

7. Retired Standing Faculty members may choose to be listed in the online directory.

8. Retired faculty may receive mail at the University and may use the University as a mailing address.

9. The right of continued membership in the University Club is extended to retired faculty members.

10. The privilege of receiving the *Almanac*, the *Pennsylvania Gazette*, and special reports is continued.
11. Certain employee benefits are available as described in the University of Pennsylvania Division of Human Resources Policy Manual.
12. Faculty staff scholarship benefits are continued to those eligible for such benefits at the time of retirement.
13. Retired faculty members are entitled to retain a PennCard with all the privileges that entails (e.g., admission to the libraries and recreational facilities).

https://provost.upenn.edu/pasef/rights-and-privileges-retired-faculty (https://provost.upenn.edu/pasef/rights-and-privileges-retired-faculty/)

## D. Associations of Senior and Retired Faculty

The Penn Association of Senior and Emeritus Faculty (PASEF) is open to all standing faculty within the University who are fifty-five years of age or older and to former members of the Standing or Associated faculty who have retired.

The aim of PASEF is to initiate and coordinate activities that encourage retired and senior faculty members to maintain connections among themselves and with the intellectual and social life of the University. Such activities include lectures, discussion groups, dinners, and social functions that provide fellowship and interaction among members and with the scholarly community on campus; familiarizing members, especially those planning retirement, with issues relating to retirement and retired life; and promoting opportunities for members to render volunteer service to the University and its surrounding community. From time to time, PASEF may take an advocacy position on issues of vital interest to its members. Thus, PASEF celebrates the careers of retired faculty members by encouraging them to remain a part of the life of the University in new and interesting ways and by facilitating the transition to retired status as the culminating phase of an academic career.

PASEF maintains an office in 111 Duhring Wing. For further information about PASEF and its activities, visit its website: www.upenn.edu/emeritus (http://www.upenn.edu/emeritus/).

In addition to PASEF, individual schools may have an association of emeritus and senior faculty. Currently, the Perelman School of Medicine is the only school that has such an organization.

The Association of Senior and Emeritus Faculty (ASEF) is open to all standing faculty within the Perelman School of Medicine who are fifty-five years of age or older and to former members of the standing or associated faculty who have retired.

ASEF serves to enhance the careers of the emeritus faculty by encouraging them to remain a part of the community of scholars in the Perelman School of Medicine. ASEF also serves to support the senior faculty by raising awareness of the full range of retirement options available to them, whether they are planning to retire within two years or two decades.

ASEF has an office at 328 Anatomy-Chemistry Building, 3620 Hamilton Walk. For additional information about ASEF and its activities, visit its website:

https://www.med.upenn.edu/asef/, or send email to: asef@mail.med.upenn.edu.

# II.E.10. Conflict of Interest Policy for Faculty Members

*(Source: 1979 Handbook for Faculty and Administration; revised, Office of the Provost, Almanac, March 8, 1983; revised 1991)*

*(See also: Human Resources Policy Manual, Policy No. 003 (https://www.hr.upenn.edu/policies-and-procedures/policy-manual/other-policies/uses-of-university-resources/) on Use of University Property.)*

## I. Introduction

This policy applies in full to all Standing Faculty, Standing Faculty-Clinician-Educators, and all full-time members of both the Associated Faculty and Academic Support Staff, hereinafter simply designated as "faculty members." Parts of it also apply to those with part-time faculty appointments; these cases are noted in the appropriate sections. The details of this policy derive from the following general obligations:

- All employees are required to conform to the mores and ethical standards of the University and the rules promulgated to enforce them.
- Employment as a faculty member presumes a primary commitment of time and intellectual resources to the academic mission of the University and its functioning as a community.

The following sections cite specific types of activity that have commonly been found to conflict with these obligations, and the procedures and regulations that have been devised to identify and resolve such conflicts. They are intended to serve as examples and not as a comprehensive compilation. Situations not covered by them will be judged in the light of the above general obligations.

Examples of actions that run counter to the first general obligation include nepotism, discrimination on the basis of irrelevant characteristics, inappropriate use of the University's name, and exploitation of any aspect of association with the University for unacceptable purposes or private gain. They are proscribed at all times for all faculty members, extending to those in part-time employment as noted in the relevant sections of this document. Excessive commitment of time or mental effort to extramural engagements or other non-University activities during the academic year constitutes a violation of the second general obligation. As used in this policy, the academic year is defined for each faculty member as that portion of the year during which the faculty member receives a salary from the University for services.

## II. Conflict of Interest in the Allocation of Time and Effort to Extramural Activities

The University recognizes that its faculty members are not employees in the usual sense, and that a precise allocation of academic time and effort is inappropriate. Their pursuit of knowledge in their areas of competence is presumed to be a lifelong commitment. A limited association of faculty members with government, professional agencies, and public or private organizations is appropriate, especially when it may enhance their competence as scholars.

### Policy on Extent of Extramural Activities

Forms of extramural activity include part-time engagement for a fee as a technical or professional consultant or practitioner and formation or association with business enterprises or non-profit organizations.[2] In principle, both such associations are approved under the following conditions:

1. Faculty members should not engage in such extramural associations to an extent that detracts significantly from their availability for normal academic duties. These commitments in aggregate should not exceed one day per seven-day week during the academic year. Exceptions to this shall be permitted only in unusual circumstances and require the specific approval of the President or Provost, the academic dean and the department chair.

2. Faculty members shall make known to their department chairs and academic deans the prospect of each continuing engagement, including, at least, all engagements expected to extend for a substantial portion of an academic term. Faculty members should decide to enter a relationship only if, after discussion with their department chairs and academic deans, there is concurrence that the proposed engagement will not conflict with the faculty members' professional obligations to the University, or with the University's outstanding or prospective commitments for teaching and research.

3. In addition to the prospective disclosure cited above, all faculty members must report on the extent of their extramural activities of all types as detailed below.

## III. Conflict of Financial Interest between the University and Extramural Organizations

Members of the faculty or of their immediate families (including parents, children, siblings, spouse) may have significant investments or interests or hold official positions in extramural business organizations, whether or not they have undertaken to perform continuing work or services for them. Such economic or official relationships are of concern if:

1. The organizations are engaged in activities that parallel activities in which the University is currently or prospectively engaged, and in which faculty members play (or might appropriately play) a role in their academic capacity; or

2. The organizations have a present or prospective relationship with the University, e.g., as suppliers of goods or services or as parties to research contracts, and the conduct of those relationships may involve faculty members in their academic capacities; or

3. The engagements undertaken by faculty members under the aegis of extramural business organizations might be suitable and appropriate activities for execution within the University.

### A. Policy on Disclosure of Relationships with Organizations that are Suppliers or Potential Competitors of the University

In any of the situations outlined above, faculty members shall be required to report the facts and circumstances of the potential conflict to their department chairs and academic deans so that appropriate steps may be taken to avoid conflicts of interest, especially ones in which faculty members may benefit from a knowledge of confidential information.

It is generally assumed that those with part-time faculty appointments shall not normally participate in University decisions that could engender conflicts of interest for them. Where part-time faculty might encounter a conflict, the policy stated above extends to them. Furthermore, in any circumstances in which part-time faculty members are engaged in externally sponsored research projects contracted with the University, or where they stand to benefit from knowledge of confidential information, full disclosure of their relationships with relevant extramural organizations and of the facts pertaining to any potential conflict is required.

### B. Policy on Acceptance of Engagements through Extramural Organizations

Faculty members with positions or connections in extramural organizations who wish to undertake engagements through those organizations rather than through the University are obliged to offer first to the University each such engagement (grant, contract, client, etc.) in which they would assume one or both of the following relationships to the engagement:

1. Owner, executive or other principal decision-making position responsible for the conduct of that business enterprise; and/or

2. Principal investigator or other substantial responsibilities for the satisfaction of the engagement.

By requiring that each engagement be offered to the University, the following ends are served:

1. The disclosure of the type, scope and extent of extramural activities is achieved, in accordance with University policy;

2. The decision as to whether an engagement is appropriately undertaken as a University or extramural activity is shared with the University administration, thereby avoiding possible conflicts of interest, and the appearance of such conflicts.

Faculty members intending to conduct engagements in business enterprises with which they are associated shall disclose in writing to their department chairs and deans:

1. The nature and terms of the proposed enterprise, and

2. The reasons why it should be conducted as an extramural activity.

If the chairs and deans agree that the engagements are not appropriate as a University activity, and if they conclude that the other conditions of the extramural consulting policies of the University will be met, then they will advise the faculty members to proceed. Otherwise, they may require that the engagements be conducted within the University.

## IV. Disclosure of University Affiliation in Publications of Extramural Organizations

Faculty members who form or associate with extramural business enterprises or nonprofit organizations should exercise particular care that their University affiliation is appropriately cited in publications of such organizations. Problems that can arise from failure to observe this injunction include:

1. Such an organization, by reason of the participation of faculty members, might be considered to have some formal or informal relationship to the University.

2. Faculty members by reason of their positions in such organizations might be expected to discharge duties and responsibilities for those organizations that would be inconsistent with their primary duty to the University.

### A. Disclaiming University Relationships

A business enterprise or non-profit organization with which a faculty member has a connection may release to the public from time to time publications concerning itself and its activities. In all such publications it may be desirable and, in many cases, required by law that a faculty member's affiliation with the University be disclosed.

The impact of such disclosure will depend on the circumstances. At one extreme a faculty member might serve as a member of the board of directors of an established business or non-profit organization,

where there is not even a remote implication that such organization is in any way connected with the University of Pennsylvania. At the other extreme, all or a large number of the principals of an organization (officers, directors, promoters and substantial shareholders) may be faculty members. In such cases, there is a strong implication that the organization may be connected with the University of Pennsylvania, even that the University bears some responsibility for its activities and success. In these cases, an express statement of the form,

The _____ has no connection, directly or indirectly, with the University of Pennsylvania.

in prominent type, should be included in all publications released by such organization. The Provost shall have the power to require that such a statement be included in all organizational publications that refer to faculty members, when it is necessary in the Provost's judgment.

The foregoing rules extend to part-time faculty members, when their association with the University is mentioned in an organizational publication.

### B. Affirmation of Obligations to the University

A faculty member may have a position of responsibility (continuing or temporary) with an extramural business organization. In such cases it should be made clear in any publications of the organization that the obligations, in terms of both time and responsibility, of the faculty member to the extramural organization are limited by and subject to the policy of the University of Pennsylvania. This alerts both the public and the faculty member's business associates that duties to the extramural organization are thus limited. This is especially necessary in the case of corporate officers who are normally regarded as owing a comprehensive fiduciary duty to the corporation and its shareholders. The suggested format for such a disclosure is:

J. Smith, a Vice President of this corporation, is a member of the faculty of the University of Pennsylvania and as such is subject to limitations by the University on the time that may be devoted to the affairs of this corporation. In any instance where the interest of this corporation may conflict with the interest of the University of Pennsylvania, J. Smith will resolve such conflict in favor of the University of Pennsylvania.

The Provost shall have the power to require such a disclosure in any instance where they adjudge it necessary.

## V. Conflict of Interest in Externally Sponsored Research

Regulations concerning sponsored research may be found in the *Sponsored Projects Handbook*. (See http://www.upenn.edu/researchservices/, available from the Office of Research Services, and Guidelines for Extramural Activities of Faculty of the University of Pennsylvania Medical Center and Health System. The Office of Research Services can be reached at 3451 Walnut Street, Room P-221, Philadelphia PA 19104-6205, tel: 215-898-7293.)

The University encourages its faculty members, including those in part-time employment, to participate in externally sponsored research projects, whether supported by government agencies, foundations, associations, or other non-profit organizations; or by corporations, partnerships or other for-profit entities. In any sponsored project, faculty members are expected to avoid use of the project for their private financial gain other than in the form of salary support or of royalties resulting from commercialization of intellectual property rights in accordance with University policies. However, there may be unusual circumstances under which the interests of the University would be served if a faculty participant in a sponsored project were to assume

an entrepreneurial role; for example, if a faculty member participates directly in a private enterprise providing funds to Penn in support of the project. Assumption of such a role would not be a violation of these guidelines if approved in advance and reviewed periodically by the relevant dean and the Vice Provost for Research. Examples of situations from which conflicts of Interest may arise include, but are not limited to, the following:

1. Undertaking or orientation of sponsored research to serve the needs of a private agency or enterprise in which a responsible staff member has an interest.

2. Purchase of major equipment, instruments, materials or other items for externally sponsored research from any agency or enterprise in which a responsible staff member has an interest.

3. Acceptance of any limitations on the free publication of and access to the results of any sponsored research. Exceptions may be granted by the Provost for privileged information, but only in the form of a delay in the release of such information. The delay shall only on rare occasions exceed three months. Those wishing to engage in research of a kind whose results cannot be so disseminated may only do so as an extramural consulting activity under the conditions previously described.

4. Transmission to any private agency or enterprise, use for personal gain, or other unauthorized use of the work product, results, materials, records, or information gathered from sponsored research that is not made generally available through publication or other free access.

5. Acceptance of gratuities or special favors from a private agency or enterprise with which the University conducts business in connection with a sponsored research project.

### A. Disclosure to Responsible University Officials

Before participating in any sponsored research project, all faculty members must give written notice of their extramural consulting relationships or other sponsored research projects that may relate in any way to the project to the appropriate department chairs and through them to the deans and Vice Provost for Research. Any significant financial or managerial interests that may relate in any way to the project must be disclosed in writing to the Vice Provost.

Any faculty members engaged in sponsored research projects must disclose in the same manner any change in their outside activities or interests. In the light of such disclosures, the University shall take appropriate steps to neutralize or eliminate potential conflicts of interest.

### B. Distribution of Effort

The sponsoring agency supporting research must not be misled as to the amount of intellectual effort that faculty members are actually devoting to these research projects. A system of precise time accounting is incompatible with the inherent character of the work of faculty members, because the various functions that they perform are closely interrelated and do not conform to any meaningful division of a standard work week. However, if externally sponsored research agreements provide that faculty members shall devote a definite fraction of effort to the projects, or if it is agreed that they shall assume specified responsibilities in relation to such research, demonstrable relationships between the stated efforts or responsibilities and the actual extent of their involvement are to be expected. Each faculty member, in such circumstances, shall confirm the fraction of effort devoted to the projects in the effort reports required of all faulty members who are so engaged.

### C. Advice and Guidance

Any questions concerning potential conflicts of interest, appropriate distribution of effort, or other problems associated with externally sponsored research, should be addressed to the office of the Vice Provost for Research.

## VI. Requirements for Reporting Extramural Activities and Obligations

At the end of each academic year, each faculty member shall submit to their department chair and dean a report of the faculty member's extramural activities during that year, containing the following information:

1. Number of days (or hours, if preferred) of extramural activities for fee (include consulting, professional practice, and outside teaching commitments).
2. Names of organizations (government agencies, private firms, partnerships) for which the extramural activities conducted represented a continuing engagement.
3. Number of days (or hours, if preferred) of extramural activities on behalf of business enterprises in which the faculty member has a financial interest or official position.
4. Names of business organizations in which the faculty member is a significant owner, partner, officer, director, or staff member.

The last item shall also be reported by all part-time faculty members for whom any of the following conditions obtain:

1. The organization is a supplier of the University and the part-time faculty member participates in the decision to engage its services.
2. The organization supplies goods or services to the University to be used in the performance of externally sponsored research projects in which the part-time faculty member participates.
3. The part-time faculty member is privy to confidential University information that could be used to the business advantage of the organization.
4. The affiliation of the part-time faculty member with the University may be mentioned in any publication of the organization.

Forms for the reporting of extramural activity are available from the Office of the Provost.

All faculty members must also report on a continuing and timely basis to the appropriate administrators the relevant circumstances, as noted in the sections cited, whenever any of the following conditions are met:

1. They have or wish to initiate a relationship with an extramural business organization that is or may become a supplier or competitor of the University (see section II.E.10.A. on Policy on Disclosure of Relationships with Organizations that are Suppliers or Potential Competitors of the University).
2. They wish to undertake an engagement (grant, contract, client, etc.) through an extramural organization (see section II.E.10.B. on Policy on Acceptance of Engagements through Extramural Organizations).
3. They intend to participate in a sponsored research project that may be related to their other sponsored research projects, to any of their extramural consulting relationships, or to any organization in which they have significant managerial or financial interests (see section II.E.10 on Policy on Acceptance of Engagements through Extramural Organizations).

## II.E.11. Decreases in Salary

*(Source: Standing Resolution of the Trustees, October 16, 1959; revised September 9, 1983; revised, Office of the Provost, Memorandum No. 190, June 8, 1990 (https://www.upenn.edu/provost/images/uploads/Decreases_in_Salary_(revised_1990).pdf))*

Academic base salaries of faculty members may be decreased only in accordance with an expressed agreement between the faculty member and the University or because of financial exigency. Decreases for financial exigency shall be limited to the following:

- Simultaneous uniform percentage decreases in the academic base salaries of all faculty members in the University; and
- Simultaneous uniform percentage decreases in the academic base salaries of a class of faculty members such as a particular rank, department or school.

No decrease for financial exigency shall be made except after consultation, initiated by the President, with the Executive Committee of the Faculty Senate or with representatives selected by the class of faculty members subject to a proposed decrease. Consultation shall cover such issues as the existence in fact of a financial exigency, the appropriateness of the selection of the particular class for salary decrease, alternative actions and the like.

If after such consultation the academic base salaries of faculty members are decreased, with or without the concurrence of the Senate or the representatives of the class of faculty members, the President shall notify the affected faculty members, in writing, of

1. the fact that the academic base salaries of all of the faculty members in the University, or of a described class of faculty members, have been simultaneously decreased,
2. the formula applied uniformly to determine the amount of the decrease, and
3. the reasons for the action taken.

## II.E.12. Faculty Grievance Procedure

*(Source: Offices of the President and Provost, Almanac, November 21, 1978; Addenda, Almanac, December 5, 1978; revised, Office of the Provost, Almanac, August 30, 1988; revised, Almanac, May 24, 1994 (https://almanac.upenn.edu/archive/v40pdf/n34/052494.pdf); revised, Almanac, August 26, 2014 (https://almanac.upenn.edu/archive/volumes/v61/n02/faculty-grievance-procedure.html).)*

### I. Applicability

This grievance procedure is available to any member of the standing faculty, standing faculty-clinician-educator, associated faculty, academic support staff, or compensated emeritus faculty at the University of Pennsylvania (members of these classes are referred to in this document as "faculty" or "faculty members").

A grievance is a claim that action has been taken that involves a faculty member's personnel status or the terms or conditions of employment and that is:

1. arbitrary or capricious;
2. discriminatory with regard to race, color, sex, sexual orientation, gender identity, religion, creed, national or ethnic origin, citizenship

status, age, disability, veteran status or any other legally protected class status; or

3. not in compliance with University procedures or regulations.

## II. Faculty Grievance Commission

The Faculty Grievance Commission (the Commission) will be composed of three members of the standing faculty holding the rank of Professor. They will be appointed by the Senate Executive Committee for staggered three-year terms expiring June 30. These three members will serve serially as Chair-elect, Chair, and past-Chair of the Commission.

The Chair of the Commission will serve as the primary administrator of the Faculty Grievance Procedure, and will be the Presiding Officer at any grievance hearings during the Chair's service in that position. The Chair-elect will observe the functions of the Commission, and additionally will serve as one of three hearing panel members should a complaint proceed to a hearing. The past-Chair will observe the functions of the Commission and serve as an alternate to the Chair and the Chair-elect in the roles described above. Each member of the Commission may substitute for any other member when a member is unable to serve. If for any reason a member of the Commission is unable to serve, the Commission, with the advice of the Chair of the Faculty Senate, may replace its missing members with former Commission members who still hold compensated faculty appointments.

There will be an independent Legal Officer to assist the Commission in its operations. The Legal Officer's appointment and terms of employment will be jointly determined by the Chair of the Faculty Senate and the Provost. Once appointed, the Legal Officer's professional responsibility will be to the Commission.

There will be a hearings list consisting of at least 30 persons selected by the Senate Executive Committee (SEC) from members of the standing and associated faculties. The list should be broadly representative of these faculties and include women and members of underrepresented minorities. The hearings list may not include faculty members holding administrative appointments at the level of department Chair or above. Faculty members will serve on the hearing list for three-year terms expiring on June 30. Appointments should be arranged so that the terms of approximately one-third of the members will expire each year. Replacements will be selected by SEC as needed.

## III. Pre-Hearing Procedures

A. Before filing a grievance with the Commission, a faculty member must first review the complaint with their Department Chair or Dean, or, alternatively, the Vice Provost for Faculty in a case in which the grievance involves the dean. Every effort should be made to bring about an equitable resolution among the parties. If a resolution is not reached, the Department Chair, Dean, or the Vice Provost for Faculty, upon request of the grievant, must provide the grievant with a written statement of the reasons for the actions which are the subject of the complaint.  Before filing a grievance with the Commission, the faculty member is advised to consult with the University Ombuds, to determine whether the Ombuds' office can be of assistance in resolving the dispute, and whether the Commission is the appropriate body to hear the potential complaint.

If after these consultations, the faculty member still wishes to file a complaint, the faculty member may initiate a grievance with the Commission. The faculty member must submit written notice of the complaint, and the request for a hearing will be submitted to the Commission through its Chair. The faculty member must provide copies to the Provost and the Department Chair or Dean.

Since grievances may be cumulative, a faculty member may base their grievance on prior as well as current events or conditions. The grievance must be initiated not later than two years after the grievant becomes aware of the initial event complained of and not later than four months after the end of the faculty member's compensated faculty appointment.

B. After the filing of a complaint, the grievant and the Chair of the Commission (or an individual the Chair designates for this role) will meet to discuss the grounds for the grievance. If the Chair believes that the faculty member's claims raise issues of academic freedom, or if the grievant so asserts, the Chair will send a copy of the grievance to the Senate Committee on Academic Freedom and Responsibility (SCAFR), which will promptly determine whether the grievance raises significant questions of academic freedom. If so, the Commission will not hear the matter until SCAFR has resolved such questions. SCAFR will communicate its findings to the Commission which will accept SCAFR's findings with respect to the academic freedom portions of the complaint. If the complaint that is concerned with academic freedom is brought against a University administrator, Dean, or involves more than one school or University policies of general interest, SCAFR will have jurisdiction. If the complaint concerns matters occurring in one school, the chair of SCAFR will forward the grievance to the chair of the appropriate school committee on academic freedom and responsibility, which will have jurisdiction in this matter.

C. For complaints not deemed to be significantly concerned with academic freedom, the Chair will respond to the complaint by discussing with the grievant possible options for resolution. The Chair or the Chair's designee may also meet with the parties against whom the grievance has been filed to pursue possible resolution. The Chair may also arrange a meeting with the grievant and the person(s) against whom s/he is bringing the grievance in an attempt to mediate the dispute. The Chair, at their discretion, may include someone trained in formal mediation procedures from the university in such discussions. The Chair may gather such information and documentation from both parties and from other sources as the Chair deems useful to aid in the resolution of the complaint.

D. If a resolution to the complaint cannot be reached, the Commission will evaluate whether a hearing is warranted based on the information available. The Commission may decide not to proceed with a hearing, for example, because the claim is deemed not to be a grievance as defined under Section I, because the matter at issue has been the subject of a previous grievance, or because the grievance is of so little consequence or merit that no panel should be created.
Once the Commission has decided to proceed with the grievance hearing, the Chair will so inform in writing the grievant, the dean, or department chair, as well as the Provost. This document will ask the Provost to name the University's representative (the respondent) who will act on behalf of all the persons complained of. The grievant and the respondent may each designate a University colleague to act as advisors during the hearing. The grievant's colleague may be any member of the standing, associated, or emeritus faculty; the respondent's colleague must be selected from the group of persons eligible to serve on panels. A colleague may not serve as a legal advocate, but may aid the grievant and the respondent in preparation and presentation of their respective cases. Neither the grievant nor the University may have counsel present in the hearing room; both parties may consult with attorneys outside of the hearing.

E. For each hearing, the Chair will form a hearing panel of three persons, including

1. the Chair-elect of the Commission, and
2. two faculty members from the hearings list selected by the Chair with due regard for relevant subject matter expertise, balance, and representativeness, and other considerations the Chair may deem important. As soon as possible after receiving notice from the Chair of the initial panel membership, either party may move the Commission to disqualify individuals from service on the hearing panel for cause, such as conflicts of interest due to personal relationships with individuals involved. In addition, both the grievant and the respondent may exercise one peremptory strike to remove a member of the hearing panel without cause, although neither of the parties may move to strike the Chair-elect. A party choosing to exercise this right must inform the Chair in writing within one week of learning of the proposed composition of the panel. Replacements for disqualified panel members will be selected by the Chair of the Commission from the list of potential hearing members.

## IV. Hearings

Hearings should begin within two months after the acceptance of a grievance by the Commission. Hearings will be convened and organized by the Chair of the Commission, assisted by the Legal Officer who may advise the Chair on procedural and evidentiary matters. The decision on the merits of a grievance will be made by the panel after hearings in which the grievant and the respondent have the opportunity to present their cases. Where consistent with confidentiality rules outlined in this section, each party should submit evidence and arguments in written form for prior distribution to the other side and to the panel. The Chair, as Presiding Officer, has the power to call witnesses and to introduce documents and obtain expert opinion from inside or outside the University. Each side will have the right to address questions to witnesses, and members of the panel may question witnesses during the hearing.

The hearings will be audio-recorded, and such recording will be kept in the custody of the Commission. The hearing panel, the grievant, the respondent, and their advisors will have reasonable access to this recording during the processing of a grievance. No copies of the whole or part of any such recording may be made without express permission of, and supervision by, the Commission. Such permission will be granted to the Provost and the grievant upon request.

A hearing will follow an agenda prepared by the Chair that is based on demonstration of relevance by the grievant or the respondent. The Chair may seek advice from the Legal Officer as to the admissibility or relevance of issues, oral statements, and other evidence presented. However, the final decision on admissibility or relevance will be made by the Chair.

The Commission will have access to all documentary evidence that is in the custody of or under the control of the person or persons who took the action complained of or of the grievant and that is deemed by the Commission to be relevant to the grievance, with the exception of such evidence that was prepared specifically in connection with the Chair's efforts to mediate and resolve the complaint described in Section III.b above. The Presiding Officer has the authority to obtain additional documents including the dossiers of other comparable members of the same department, or if none exists, comparable members of the same school who are alleged to have recently or currently received more favorable treatment. Such dossiers will be examined and held in accordance with the confidentiality procedures described below in subsection e. Notice is to be given to those faculty members whose

dossiers are to be examined. The panel may request the Presiding Officer to obtain expert opinion from inside or outside the University.

If documentary evidence is needed by the grievant or the respondent in the preparation of their case, or by the panel in the course of its deliberations, application will be made to the Presiding Officer. The Presiding Officer will determine whether the evidence requested is relevant. The Presiding Officer will then obtain all relevant evidence. All such evidence will be available to the panel, the respondent, the colleagues, and, subject to the restrictions of confidentiality set forth below, to the grievant.

The confidentiality of peer evaluation materials, including letters of recommendation and evaluation, is integral to the tenure process. Accordingly, while the Commission may obtain peer evaluation materials, if during the hearings, the grievant asks that such materials be presented to the panel, the Presiding Officer will consider the following factors to determine whether disclosure to the panel is appropriate. The Presiding Officer will take into account, among other things, whether the grievant has shown cause to believe that the grievance is sufficiently well-founded to justify examination of confidential peer evaluation materials, and whether examination of confidential peer evaluation materials is essential to reach a judgment concerning the substance of the grievance.

If the Presiding Officer decides that peer evaluation materials are relevant and essential to reaching a judgment concerting the substance of the grievance, the Presiding Officer will make such materials available for examination by the hearing panel. Under no circumstances may such confidential materials be provided by the Grievance Commission or hearing panel to either the grievant or the respondent or their advisors.

Like all other members of the faculty, members of departmental or school personnel committees may testify in grievance hearings, although they will not be required to testify in any such proceeding. Members of such committees who agree to appear in grievance hearings may testify specifically about their own participation in committee deliberations, present the committee's vote, and give a general characterization of its discussion. They are explicitly prohibited from disclosing direct quotations, positions, or votes of other individuals on these committees.

Unreasonable delays by either side may subject the offending party to sanctions. In cases where primary blame for the delay may be attributed to one side, the Commission has the right to suspend or terminate proceedings and recommend that the panel send to the Provost an accusatory report including reasons for this suspension or termination and recommendations for action. A copy of this document will be sent to the Chair of the Faculty Senate.

The Commission may establish further rules and procedures to govern its operations. Where procedures have not been adopted, the Presiding Officer may rule on the matter and may seek the advice of the Legal Officer in making such rulings. Appeals from rulings established in this way may be presented to the SEC to be decided by majority vote. Procedures adopted under this provision should be included in the Commission's annual report.

## V. Findings

Upon conclusion of the hearings and after consultation with the Presiding Officer and the Legal Advisor concerning the format of the report, the panel will prepare a written report to the Provost which may include a minority opinion. The report will state each element of the grievance and in separate, clearly labeled sections record the findings of fact and the recommendations for action by the Provost.

As part of its recommendations, the panel may propose remedies. In cases where reappointment, promotion or tenure has been denied, it may recommend a full review and reevaluation of the case. The panel may also suggest to the Provost procedures that might be followed in such a reevaluation, but the choice of procedures remains with the Provost.

However, a panel will not have the responsibility or the authority to evaluate professional competence either in the case of an individual or in comparison with other individuals. If the Provost, on receiving the panel's report, decides that a reevaluation will be carried out, the Provost will ensure that the recommendations of the panel and the relevant supporting documentation are included in the documents considered in that reevaluation.

The Presiding Officer will distribute the panel's report to the Provost, the dean, the grievant, the respondent, the person or persons who took the action complained of, and the Chair of the Faculty Senate. If the Provost wishes to consult with the Presiding Officer to obtain more information about the case, the Presiding Officer will provide details and make available the full documentation, including a copy of the hearing recording.

If the grievance is withdrawn or settled prior to the completion of the hearings, the Presiding Officer will dismiss the panel with thanks, and no report will be prepared. However, if the hearings are completed and the panel submits a report to the Provost, the Presiding Officer will be informed by the Provost when final action on the grievance has been taken within the University. The Presiding Officer will then dissolve the panel.

After the receipt of the panel's final report, the Presiding Officer will return all borrowed documents to their owners and turn over to the Commission a complete file of the case for secure retention — including one complete set of documents and the audio-recording of the hearings. The Presiding Officer will destroy all other copies of the documents used by the panel. The confidentiality of peer evaluation materials, including outside letters, will be preserved by the Commission. Except when the Chair of the Commission determines otherwise, the complete file will be sent to the archive for permanent storage according to the University archives policy for six years after the grievance has terminated. However, the panel's report will be kept permanently on file along with the Provost's response.

Although the panel's report is to be accorded great weight, it is advisory and not binding upon the Provost. The Provost's decision will be communicated in writing without undue delay to the Chair of the Commission, the grievant, and the respondent.

In the event the Provost declines to implement one or more of the Commission's recommendations, the written communication will include the detailed reasons for the failure to adopt the relevant recommendation and will be sent also to the Chair of the Faculty Senate.

If the grievance proceeding identifies an administrative action or practice that seemingly violated University procedures or otherwise led to inequitable treatment, the Commission on behalf of itself or the panel should bring the matter to the attention of the Provost and the Chair of the Faculty Senate. The Provost and the Chair of the Faculty Senate should examine the matter and see to it that appropriate corrections are made if needed. Within six months they will inform the Senate Executive Committee concerning the problem and its resolution.

## VI. Confidentiality

The work of the Commission and its panels requires the highest level of sensitivity to the privacy of all concerned. Members of the Commission,

members of panels, grievants, respondents, colleagues, witnesses and all other concerned parties have the professional obligation to maintain confidentiality with respect to oral and documentary evidence presented and deliberations occurring during the processing of grievances (except as necessary for the preparation of a grievance or as subject to legal process, or as otherwise noted in this document). Any breaches of confidentiality will be reported by the Chair of the Commission to the Provost and the Chair of the Faculty Senate. In the event of a breach of confidentiality, the Commission has the right to terminate proceedings. In such a case it may advise the panel that it should send to the Provost its recommendations in a report.

Except as otherwise provided in this document or as authorized by the Provost or the Chair of the Faculty Senate, the report of a panel will be treated as confidential by all participants in a grievance hearing and by all members of the University community.

## VII. Hearings by Senate Committee on Academic Freedom and Responsibility

In cases in which reappointment, promotion, or tenure has been denied to the grievant, and in which the Provost has declined or failed to implement the recommendations of the panel, within one month after the issuance of the Provost's response, the grievant may request a hearing before SCAFR to review the Provost's decision. The report of the panel and the Provost's decision will be made available to SCAFR which will then decide whether to hold its own hearing on the matter. SCAFR will also have access to all evidence presented to the panel and to the records of the grievance hearings.

SCAFR will follow the procedures outlined in Part IV of these Grievance Procedures, except that the parties will not be permitted to introduce evidence before SCAFR. The findings of fact made by the panel will be binding on SCAFR, except to the extent SCAFR finds from the records that the Commission's findings are not substantially supported by the evidence. SCAFR will issue an opinion as to whether the Provost's action in declining or failing to implement the recommendations of the panel was reasonable. If, however, SCAFR finds that there is significant evidence not previously available to the panel, SCAFR may return the case to the Presiding Officer for reconsideration by the panel.

SCAFR will promptly report its findings and recommendations to the President, with copies to the Provost, the Chair of the Commission, the panel, the Chair of the Faculty Senate, the grievant and the respondent, and the Almanac for publication.

## VIII. Expenses

The Commission's appropriate expenses for processing a grievance, including compensation for the Legal Officer, will be met from University resources. It will be the responsibility of the Presiding Officer to determine what is appropriate; such expenses will not include any per diem expenses, released time charges, or travel expenses for any participant in the hearings. To the extent possible, administrative and secretarial services will be provided by the office of the Senate. Services that cannot be provided in this way and other appropriate expenses should be charged to the Faculty Senate. These charges will be under the administration of the Chair of the Grievance Commission.

## IX. Annual Report

At the end of each academic year, the Commission will write a report describing its activities and giving a summary account of the cases completed or in progress. The report will be sent to the president, the Provost, and the Chair of the Faculty Senate. The Commission must

send a separate report to the Almanac for publication. This report must be written with due regard for the maintenance of confidentiality of any involved parties, and should contain only a brief summary of the matters addressed or decided.

# II.E.13. Transfers of Faculty Members or Terminations of Faculty Appointments Resulting from Discontinuation of Programs

*(Source:* Standing Resolution of the Trustees, September 9, 1983 *(https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-1983/september-9/))*

Where a faculty or school is discontinued for valid academic or financial considerations in accordance with University procedures, an attempt to relocate members of the Standing Faculty and the Associated Faculty within the University shall be made. In considering any transfer of a faculty member from one faculty to another, the rights of the faculty as expressed in the Statutes of the Trustees shall not be impaired. The University's obligation to those faculty members whose academic base has been terminated must be balanced with the considered opinion of the receiving faculty on the suitability of any transfer. The final decision on any transfer from one faculty to another is made by the Trustees on the recommendation of the President and Provost.

Where a program or department within a faculty is discontinued for valid academic or financial considerations, in accordance with University procedures, the faculty concerned, and its dean, shall attempt to relocate members of the Standing Faculty and Associated Faculty in other programs or departments within the faculty. If suitable intrafaculty transfer cannot be effected, the possibility of transfer to another faculty shall be pursued in accordance with the above paragraph.

If, after full exploration of the opportunities for transfer, no suitable appointment within the University can be found for faculty members affected by the discontinuation of a school, department or program, and if the continuation of their salaries would become an undue burden on the University, proceedings to terminate academic tenure under the financial exigency provisions may be implemented.

(See page 21 - Standing Resolution of the Trustees, September 9, 1983 (https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-1983/september-9/))

# II.E.14. Procedures for the Establishment, Merger and Closing of Departments, Divisions and Similar Entities within Schools

*(Source: Offices of the President and Provost, Almanac, September 5 1995; proposed, for comment, Almanac, April 30, 2002 and approved, Almanac, September 3, 2002; revised, as* Article 10, Statutes of the Trustees, November 2, 2001 *(https://secretary.upenn.edu/trustees-governance/statutes-trustees/#ten))*

According to the Statutes of the Trustees of the University of Pennsylvania, "Upon recommendation of the President and Provost, the Trustees may authorize the establishment, merging, or closing of departments, divisions or similar entities in schools that do not have departments." Subject to the statutes of the University, these procedures govern the establishment, merger and closing of departments, divisions and similar entities (hereinafter "departments") within the schools of the University.

Although the organization of a school into departments is an administrative decision, the dean should make a recommendation concerning the establishment, merger or closing of a department only after careful study and consultation with involved faculty inside and outside the school, including discussion in a meeting of the faculty of the school. The process leading to such recommendations requires special care in reviewing possible courses of action, special efforts to consult early and often with interested parties, and special sensitivity to the legitimate interests of faculty who may be affected.

## Careful Study

The decision to establish, merge or close a department should be based upon academic considerations and priorities as determined by the faculty as a whole or appropriate committees hereof. Accordingly, there should be early and meaningful faculty involvement in the process leading to decisions relating to the creation, reorganization or reduction of instructional and research programs.

Schools having a departmental structure should have regular reviews of departments. Departmental reviews should be used to provide departments with timely notice of any shortcomings and the need for improvement and to provide school decision-makers with information essential to a sound evaluation of the department. Such reviews also provide formal and informal opportunities to alert departments to the school's plans. Departmental reviews should not be triggered by specific proposals for closing or making other adverse changes to a department. However, when a closing is being considered, there should be a timely external review.

## Consultation

1. Most, if not all, schools, and the University as a whole, have faculty committees charged with responsibility to review planning and budget decisions. Such committees should be involved in the process leading to decisions to establish, merge or close departments. However, such reviews are not substitutes for early and frequent consultation with the faculty of the affected departments themselves and/or with the faculty as a whole. Consultation should include the opportunity for thorough discussion at a meeting of the faculty of the school. Consultation also will require soliciting an advisory vote, in favor of or against the proposed course of action, from those members of the faculty of the school with voting privileges. Although such vote is advisory only, in most circumstances the dean should act in accordance with the advice received.

2. Action to establish, merge or close departments within one school may have serious implications for the activities and resources of departments in other schools. At such time as a dean initiates consultation with the faculty of the school directly affected, the dean should send a communication to all other deans requesting that they bring the possibility of the action to the attention of their colleagues who may be interested and inviting comment.

## Informing Departments of Recommendations to Close

1. Given that department closings typically follow a protracted period during which the department in question receives limited resources, school administrations have ample time to explain the implications of such action for the future. Departments that are at risk should be so informed promptly and provided with a full, frank and detailed explanation of the reasons.

2. Faculty members of a department facing closure must be informed well before a formal recommendation is publicly announced. At that time, they must be given information regarding their future at the University and the procedures the school has initiated to find a new University affiliation for them.

## Academic Freedom

1. Although decisions regarding departmental structure may be made for reasons that would not justify adverse action against an individual faculty member, ordinarily they do not for that reason give rise to an academic freedom violation. However, even if all appropriate review and consultation procedures have been followed, structural decisions concerning a department may present delicate and difficult questions of academic freedom.

2. In cases where academic freedom issues appear to be raised, the dean should seek the advice of the committee on academic freedom and responsibility of the school or the Faculty Senate at a sufficiently early stage for that advice to be considered before the dean makes a recommendation.

3. Aggrieved faculty members have the right to complain of the dean's action to the appropriate committee on academic freedom and responsibility.

# II.E.15. Extension of Faculty Appointments When a School is Being Discontinued

*(Source:* Standing Resolution of the Trustees, January 13, 1978 *(https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-1978/january-13/))*

Notwithstanding other provisions of the University's policies on faculty appointments and tenure, non-tenured faculty in schools which are to be discontinued may continue to serve beyond expiration of their normal tenure probationary periods without acquiring tenure, provided:

- The Trustees of the University have formally adopted a resolution to discontinue the school, and have set a date for the closing of the school.
- The faculty of the school has formally adopted a resolution to the effect that extensions of the appointments of non-tenured faculty are necessary in order to maintain appropriate academic standards in the programs to be discontinued.
- Each faculty member for whom such extension is proposed has formally requested the extension in writing to the dean, and has clearly indicated their understanding and acceptance of the fact that the extended appointment will not convey tenure.
- The extensions of appointments are not more than five years from the June 30 following the resolution of the Trustees authorizing the closing of the school.

If the appointment of a faculty member is extended under these provisions and the decision to close the school is rescinded after the expiration of the probationary period for that individual, the faculty member shall be deemed to have acquired tenure.

If during the term of an extended appointment, a faculty member from the school to be closed is appointed to a standing faculty position in another school in the University, the probationary period shall be measured

without regard to these provisions, and if that period has expired, the new appointment must be with tenure.

(See page 2 - Standing Resolution of the Trustees, January 13, 1978 (https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-1978/january-13/))

# II.E.16. Procedure Governing Sanctions Taken Against Members of the Faculty

*(Source: Standing Resolution of the Trustees, October 16, 1959; revised, June 21, 1991; revised, June 20, 1997 and Almanac, October 21, 1997; revised, October 19, 2007 and* Almanac, November 6, 2007 *(https://almanac.upenn.edu/archive/volumes/v54/n11/ofrecord.html))*

## 1. Introduction and Definitions

### A. Introduction

The imposition of a sanction on a faculty member of the University of Pennsylvania is a rare event. However, when situations that might lead to such an action arise, they must be handled fairly and expeditiously. It is essential to have a process that both protects the rights of faculty members and addresses the legitimate concerns of the University. This policy replaces the previously existing "Procedure Governing Sanctions Taken Against Members of the Faculty" *(Standing Resolution of the Trustees, June, 1991 and Almanac, October 21, 1997).*

Any cases initiated after this policy is in force, even if the alleged actions preceded its adoption, shall be governed by the procedures prescribed here.

### B. Definitions

1. Charging party: The Provost, a dean of a school, or a Provost's or dean's designee who shall be a faculty member of the University, or a Group for Complaint.

2. Complainant: Individual bringing to the attention of a dean or the Provost a situation that may call for a sanction against a faculty member. The complainant may be a student or faculty or staff member of the University, or any individual outside the University.

3. Faculty Member: A member of the Standing Faculty, or a Standing Faculty-Clinician-Educator.

4. Counsel: An advisor, who may be an attorney.

5. Group for Complaint: A charging party elected by the Standing Faculty of a school, by majority vote, from its own tenured professors.

6. Hearing Board: The body, selected by the Chair of the Faculty Senate, in consultation with the Past Chair and Chair-Elect of the Faculty Senate from the University Tribunal *(see definition of the Tribunal below)*, that adjudicates a just cause matter. It serves both an investigative and deliberative function. The Board shall consist of five members, with a chair chosen by and among the members. If feasible, one member of the Hearing Board should be on the faculty of the Respondent's school. Should any Hearing Board member become unable to serve or to satisfy their responsibilities on the Board as the matter progresses, the Chair of the Faculty Senate shall select a substitute from the University Tribunal.

7. Major infraction of University behavioral standards: An action involving flagrant disregard of the standards, rules, or mission of the University or the customs of scholarly communities, including, but not limited to, serious cases of the following: plagiarism; misuse of University funds; misconduct in research; repeated failure to meet classes or carry out major assigned duties; harassment of, improperly providing controlled substances to, or physical assault upon, a

member of the University community; the bringing of charges of major or minor infractions of University standards against a member of the University community, knowing these charges to be false or recklessly indifferent to their truth or falsity; flagrant or knowing violation of the University's conflict of interest policy or commission of serious crimes such as, but not limited to, murder, sexual assault or rape.

8. Major sanction: Serious penalties that include, but are not limited to, termination; suspension; reduction in academic base salary; zero salary increases stipulated in advance for a period of four or more years.

9. Minor infraction of University behavioral standards: An action involving disregard of the University's standards, rules, or mission, or the customs of scholarly communities that is less serious than a major infraction.

10. Minor sanction: Penalties less serious than a major sanction that may include, but are not limited to, a private letter of reprimand, a public letter of reprimand, monitoring the manner and conditions of specific future research, teaching, or supervision of students, provided they relate to the infraction.

11. Respondent: The Faculty Member against whom a complaint is lodged.

12. University Tribunal: A body comprised of past and present tenured faculty members on the Senate Committee on Academic Freedom and Responsibility, the school committees on academic freedom and responsibility, and if necessary, past and present members of the Senate Executive Committee.

## 2. Suspension or Termination for Just Cause

### A. Preliminary Procedures

Should a question arise regarding the possible infraction of University behavioral standards, the dean or Provost shall interview the respondent, normally in the presence of any department chair concerned, and may afford the respondent the opportunity for informal resolution of the matter under appropriate circumstances.

The dean or Provost shall provide a written description of the charges to the respondent, if requested by the respondent in writing. If the matter is resolved informally to the satisfaction of the dean or Provost and the respondent, no further proceedings shall be invoked by them. An informal resolution must be consistent with all existing University policies and behavioral standards, and does not derogate from a complainant's right to invoke procedures subsumed under these policies and standards.

If the matter is not adjusted informally, the dean or Provost shall consult with several tenured members of the University faculty. Relying on these consultations, the dean or Provost shall decide whether to invoke the just cause procedures in a case involving major infractions of University behavioral standards, to impose minor sanctions directly in a case involving minor infractions of University behavioral standards, or to discontinue the matter. If the decision is to discontinue the matter, the dean or Provost shall notify the respondent and any complainant in writing.

### B. Formation of a Group for Complaint

If the dean or Provost decides to discontinue the matter or impose a minor sanction, no further proceedings shall be initiated with the single exception of the standing faculty's prerogative to form a Group for Complaint. If formed, the Group shall promptly conduct an investigation and, based on this investigation, may a) initiate proceedings for

imposition of a major sanction, b) recommend imposition of a minor sanction, or c) determine not to proceed further.

## 3. Minor Sanction

### A. Imposition by Dean or Provost

If, having consulted several members of the tenured faculty, the dean or Provost concludes that the situation involves a minor infraction of University behavioral standards, the dean or Provost shall impose a minor sanction on the respondent. The dean or Provost shall notify the respondent in writing of this decision and take the steps necessary to put the sanction into effect.

### B. Application for Relief to Faculty Grievance Commission

The respondent may apply to the Faculty Grievance Commission for relief from any minor sanction imposed by the dean or Provost.

## 4. Major Sanction

### A. Charging Party Requests Formation of Hearing Board

If the charging party believes that a major infraction of University standards has occurred, the charging party shall promptly request that the Chair of the Faculty Senate convene a Hearing Board. The Dean or Provost shall notify the respondent in writing of this decision.

### B. Disqualification of Potential Members of Hearing Board

The charging party and the respondent each shall be given the opportunity to move to disqualify for prejudice any potential member of the Hearing Board designated by the Chair of the Faculty Senate. Such motion shall set forth, in writing, the reasons therefore and shall be delivered to the Chair of the Faculty Senate.

Motions to disqualify Hearing Board members shall be decided by the remaining members of the Board (with a tie to be broken by the Chair of the Faculty Senate). If the remaining members decide that disqualification is proper, an alternate member shall be designated by the Chair of the Faculty Senate.

### C. Hearing Board Determines Whether to Proceed

1. Once the composition of the Hearing Board is determined, the charging party shall promptly send to the Chair of the Hearing Board, the respondent, the dean and Provost a written statement that sets forth in as much detail as is practicable the grounds for the complaint and for the recommendation of a major sanction. In the case of misconduct in research, the report of the formal investigation committee issued under the Misconduct in Research Procedures shall be included. To determine whether formal hearings shall take place, the Hearing Board shall immediately consider the statement from the charging party, consult the relevant documents, and afford the charging party opportunity to present oral and written arguments, but shall not hold a hearing to receive evidence.

2. If the Hearing Board concludes that the grounds stated, if true, would clearly not constitute just cause for imposition of a major sanction, it shall issue a report to that effect, sending copies to the charging party, the President, any complainant, and the respondent. The substance of the complaint shall not be the basis of any further proceedings with respect to major sanctions. However, the Hearing Board may remand the case to the dean or Provost for further proceedings or actions that relate to a minor sanction.

3. If the Hearing Board concludes that the grounds stated, if true, might constitute just cause for the imposition of a major sanction, and it believes that there is probable cause that in further proceedings the grounds stated shall be found to be true, it shall conduct such proceedings as hereinafter provided.

## D. Notification of Right to a Hearing

If further proceedings are conducted, the Chair of the Hearing Board shall send to the respondent written notice that the respondent may preserve and elect the right to a hearing by promptly notifying the Chair of the Hearing Board in writing. If the respondent requests a hearing before the Hearing Board, the Chair of the Hearing Board shall notify the charging party and the respondent in writing of the date and place of the hearing. One month prior to the hearing, the charging party shall supply to the Chair of the Hearing Board a summary statement of the evidence to be presented by the charging party, including a list of witnesses, a detailed summary of the testimony expected from each witness, copies of relevant extracts from the Statutes and standing resolutions of the Trustees of the University of Pennsylvania, a copy of these procedures, and copies of any other University documents that are relevant to the respondent's procedural and substantive rights in this matter. The Chair of the Hearing Board shall immediately furnish these documents with the notice to the respondent.

## E. Hearing Board Procedure in the Absence of Participation by Respondent

If the respondent does not request a hearing, the charging party shall nevertheless present evidence to the Hearing Board. The Hearing Board shall then make a written report of its findings, conclusions and recommendations and send a copy of its report to the charging party and the respondent. If the Hearing Board concludes that the charging party has not shown clear and convincing evidence of just cause for the imposition of a major sanction, no major sanction may be imposed, and the substance of the complaint shall not be the basis for any further proceedings with respect to major sanctions. However, based on clear and convincing evidence of a minor infraction, the Hearing Board may recommend that the dean or Provost impose a minor sanction and the dean or Provost will normally implement that recommendation. If the Hearing Board concludes that the charging party has shown clear and convincing evidence of just cause for the imposition of a major sanction, the Hearing Board shall promptly send to the President a copy of its report recommending the major sanction.

## F. Hearing Board Procedure when Respondent Participates

The hearing shall be held at the earliest date that is practicable to the respondent, charging party and Hearing Board, and ordinarily no more than three months from the notification date. Two weeks prior to the date of the hearing, the respondent shall provide to the Chair of the Hearing Board a written answer to the charging party's statement of the grounds for the complaint and for the recommendation of a major sanction. At that time the respondent shall also provide to the Chair of the Hearing Board a list of witnesses, a detailed summary of the testimony expected from each witness, copies of relevant extracts from the statutes and standing resolutions of the Trustees of the University of Pennsylvania, and copies of any other University documents that are relevant to the respondent's procedural and substantive rights in this matter.

## G. Procedures During a Hearing

Hearings shall be private with two exceptions. The respondent shall have the right to invite as observers, representatives of national professional academic associations concerned with matters of academic freedom and tenure. Other observers may be invited to attend if the charging party, the respondent and the Chair of the Hearing Board consent in advance of the hearing. A transcript of the hearing shall be made available to the parties at the expense of the University.

The charging party has the burden of proving by clear and convincing evidence that there is just cause for imposition of a major sanction against the respondent. Both the respondent and the charging party may

appear personally throughout the hearing; both may have the assistance of counsel. The Hearing Board shall afford the respondent and the charging party the opportunity to present oral and written argument. The respondent and the charging party shall have the right to confront any witnesses, each of whom shall have the right not to incriminate himself or herself in answer to any question, and to question them personally or through counsel. They may call witnesses and shall receive the cooperation of the University administration in securing the attendance of such witnesses and the production of such documents as may be relevant.

The extent of document production shall be determined by the Hearing Board. The Chair of the Hearing Board, in consultation with the other Board members, shall rule on any procedural or substantive issues complained of by either the charging party or respondent. The Hearing Board shall have the discretion to limit the number of witnesses in order to prevent overly repetitious or cumulative testimony. It shall not be bound by formal rules of evidence, and may elect to admit any evidence it deems to be of probative value in evaluating the issues. The Hearing Board may permit the use of electronic or other means of remote communication, such as telephone conference calls, in lieu of the appearance of witnesses.

## H. Report of Hearing Board and Objections of Respondent

1. Upon concluding the hearings, the Hearing Board shall deliberate privately, and determine whether or not the charging party has established by clear and convincing evidence that a major infraction has occurred. If so, the Hearing Board shall recommend what the major sanction should be. Decisions shall require a majority of the members participating. The Hearing Board may, in its discretion, recommend a minor sanction instead if it determines that a minor infraction has occurred.

2. The Hearing Board shall conclude its deliberations promptly and send to the President a written report in which it shall set forth its findings, conclusions, recommendations, and a transcript of the hearings. Copies of these documents shall also be sent to the respondent, the charging party, and the dean and/or Provost.

3. The respondent may request reconsideration of the sanction by submitting a written statement to the Chair of the Hearing Board within five days of the receipt of the Hearing Board's recommendation. In the event of such a request, the Chair shall reconvene the Hearing Board as soon as possible and hear statements from both the complainant and the respondent, delivered either personally or through counsel. The Hearing Board may, by majority vote, change its recommendation, but only if there is new evidence or there are new arguments to be presented. If there is a change in the recommendation, the Chair of the Hearing Board shall communicate it to the President, the Dean and/or Provost, and to the respondent promptly.

4. The respondent may send to the President, within a reasonable time, any objections to the findings, conclusions or recommendations of the Hearing Board.

## I. The President's Actions

1. The President, relying only upon the materials forwarded by the Hearing Board and objections submitted by the respondent, shall normally accept the Hearing Board's recommendations.

2. The President may depart from the Hearing Board's recommendations only in exceptional circumstances, and only to reduce the severity of recommended sanctions or to dismiss the charges for failure of proof. Any departure may be made only after consulting the individuals then serving as the Chair, Past Chair

and Chair-elect of the Faculty Senate ("the three Chairs"). When a departure is proposed, the President shall send to the three Chairs all of the documents received from the Hearing Board and the respondent and shall secure their views before taking action. Should any of the three Chairs be unable to serve, the other two Chairs shall select a replacement from the available former Chairs of the Faculty Senate.

3. Without limit to the right of departure, the President may request reconsideration of the decision recommended by the Hearing Board by submitting a written statement to the Chair of the Hearing Board within a reasonable time. In the event of such a request, the Chair shall reconvene the Hearing Board promptly and hear statements from both the President and the respondent, delivered either personally or through counsel. The Hearing Board may, by majority vote, elect to adopt or reject the recommendation of the President.

4. The President may also remand the matter to the Hearing Board because there has been a significant defect in procedure. The Hearing Board shall reconvene, take steps to repair any procedural defects, and hold an additional hearing, if needed. The Hearing Board shall then send a second report to the President, along with the transcript of any second hearing, with copies to the respondent by certified mail, and to the charging party and the dean and/or Provost.

5. After all proceedings of the Hearing Board have been concluded, including any reconsideration proceedings, the President shall render a decision and send it, together with the reasons for the decision. The President's decision, except a decision that is subject of an appeal as described below, is final within the University.

### J. Appeal of the President's Decision

If the respondent objects that there has been a significant defect in procedure but the President declines to remand the matter to the Hearing Board, the respondent may appeal on that ground in writing to SCAFR. The President shall promptly forward to SCAFR all of the documents upon which the decision was made. SCAFR shall review the documents forwarded by the President and the respondent's written statement of appeal and shall decide the appeal promptly. If SCAFR finds that there has been a significant defect in procedure, it shall remand the matter to the Hearing Board for further proceedings in accordance with paragraph I(4).

### K. Termination

If the Hearing Board recommends that the respondent's appointment be terminated, it shall also recommend a date of termination and a date of termination of salary, benefits, and other privileges of employment which cannot be more than one calendar year after the date of the President's final action.

### L. Hearing Board Records

On the completion of the case the Hearing Board shall transfer all of its records to the Office of the General Counsel. These records shall be stored in a locked file. The Chair, Past Chair and Chair-elect of the Faculty Senate are responsible for obtaining and maintaining these records.

## 5. Interim Suspension

A faculty member shall not be suspended prior to the conclusion of proceedings under this policy unless continuance of employment poses a threat of immediate harm to the faculty member or others, or seriously threatens to significantly disrupt the academic or research activities of the University. Any such suspension shall be with salary. A dean's decision to suspend a faculty member shall be accompanied by a concise statement of the factual assumptions on which it is based

and the grounds for concluding that the faculty member's continuance threatens immediate harm. Such a decision should be made only after consultation with the school's Committee on Academic Freedom and Responsibility, which should, whenever possible, afford the faculty member an opportunity to be heard, and to present evidence of why interim suspension should not be imposed. (See also, II.E. 18, Temporary Suspension or Exclusion of a Faculty Member.)

## 6. General Matters

### A. No Public Statements When Proceedings Are in Progress

To preserve the integrity of the process, members of the University community shall avoid public statements about charges and proceedings that involve minor or major sanctions until the proceedings have been completed.

### B. Actions When Charges Are Unfounded

If final action completely exonerates the respondent, and a determination is made that the allegations were without any foundation or were filed in bad faith, the University shall reimburse that individual for the reasonable costs and expenses, including attorney fees, incurred in their defense. In that event, the administration should also attempt to ameliorate any damage wrongly done to the reputation of the respondent or of any complainant, provided that the complainant acted in good faith. If it appears that the complainant did not act in good faith, the administration shall investigate and take appropriate action.

### C. Statements Following a Minor Sanction

If the respondent has been subjected to a minor sanction, the dean or Provost, after consultation with the President and discussion with the Chair of the Faculty Senate, may publicize this fact.

### D. Statements Following a Major Sanction

If the respondent has been subjected to a major sanction, the President, after informal discussion with the Chair, Past Chair and Chair-elect of the Faculty Senate, shall publish in *Almanac* a statement describing the case and its disposition in appropriate detail.

### E. Modification of Time Periods

The time periods contained in these procedures may be modified by the Hearing Board in its discretion.

### F. Timeliness

If the President determines that the Hearing Board is untimely in pursuit of its charge, thereby detrimentally affecting the legitimate interests of the University, the President may disband the existing Hearing Board. The President shall then promptly request that the Chair of the Faculty Senate reconstitute the Hearing Board.

# II.E.17. Removal of Faculty by Reason of Financial Exigency

*(Source: Standing Resolution of the Trustees, October 16, 1959; revised, September 9, 1983; revised, 1991)*

A. If the administration of the University proposes to curtail an activity of the University that might involve the removal of faculty members, it shall initiate consultation with the Executive Committee of the Senate on the issues of the existence in fact of a financial exigency, the appropriateness of the selection of the particular segment of the faculty for removal, possible alternative actions and the like, at least thirty days before it proposes to send to the affected faculty members the notice described in paragraph b. below.

B. If after such consultation the administration determines to take action to curtail an activity of the University with or without the concurrence of the Senate, the administration shall make an attempt to continue those faculty members who will be affected by such action, by transfer to other faculty positions so far as feasible. If such transfer is not deemed feasible by the administration, the President shall send the following written notice to (1) each faculty member whose employment the University proposes to terminate and who either has tenure at the time such notice is given or, by the operation of the University's tenure principles, will have tenure at the time of the proposed termination and (2) each faculty member on term appointment whose employment the University proposes to terminate prior to the expiration of such term. The President's notice shall state that the University is engaged in proceedings that may result in termination of the faculty member's employment; that, if it is finally decided that the faculty member's employment will be terminated, such termination will become effective not less than one year from the date of receipt of such notice; and that the faculty member may request a hearing before the Committee on Academic Freedom and Responsibility of their faculty (unless the administration proposes to terminate the employment of an entire faculty, in which case the notice shall state that the faculty member may request a hearing before the Senate's Committee on Academic Freedom and Responsibility).

C. Each faculty member so notified may request a hearing by sending a written request therefore to the chair of the appropriate committee within thirty days of the faculty member's receipt of the President's notice. The faculty member's failure to request a hearing before the committee shall be a waiver of the faculty member's right to request the hearing before the committee. The faculty member shall accompany the request with a statement in which they may make one or more of the following charges:

- that the administration is not acting in good faith to remove the faculty member on the grounds of financial exigency;
- that it is possible for the faculty member to be assigned to other duties, the nature of which shall be described in the faculty member's statement.

  In the statement, the faculty member shall specify in as much detail as is practicable the reasons for their charge or charges. The faculty member shall send a copy of the statement to the President. The President shall furnish the faculty member and the committee with a written answer to the faculty member's charges.

D. If the faculty member charges that the administration is not acting in good faith, the President shall send a written notice to each faculty member affected by the proposed curtailment, stating that the recipient may join in the hearing. The President shall also furnish each such faculty member with a copy of the charges made by the faculty member initially requesting the hearing and a copy of the answer thereto. A faculty member who receives such notice and who does not, within ten days following receipt of such notice, deliver to the chair of the committee a written statement of the faculty member's intention to join in the hearing and of their reasons therefore, shall thereby waive their right thereafter to request a hearing on the charge that the administration is not acting in good faith. A faculty member's failure to join in such a hearing shall not be a waiver of the faculty member's right to request a hearing on the possibility of their own reassignment.

Promptly after the expiration of the period within which faculty members may state their intention to join in the hearing, the chair of the committee shall notify the parties in writing of the date and place of the hearing, which shall be held not less than three weeks from the date the chair shall send to the parties notice of such date and place.

E. Any faculty member requesting or joining in the hearing, and the administration, shall be entitled to move to disqualify, for prejudice, any member of the committee. Such motion shall be made in writing, which shall set forth the reasons therefore, and shall be delivered to the chair of the committee no later than ten days prior to the date set for the hearing. Such motion shall be decided by the remaining members of the committee. If the remaining members decide that disqualification is proper, an alternate member, if any, shall serve as a substitute for the disqualified member. If an alternate member is not available, the parties may agree that the hearing shall be held by the remaining members or that the remaining members shall select a substitute. In the event of failure to agree, a substitute shall be elected by the faculty (if the committee is a faculty committee), or shall be selected by the Executive Committee of the Senate (if the committee is a Senate committee).

F. If a hearing is held at the request of a faculty member on a charge that the administration is not acting in good faith, the administration shall have the burden of proving by a preponderance of the evidence that it is acting in good faith in seeking to remove the faculty member on the grounds of financial exigency. If a hearing is held at the request of a faculty member on a charge that it is possible for the faculty member to be assigned to other duties, the faculty member shall have the burden of proving by a preponderance of the evidence that such assignment is possible, and shall not be deemed to have met such burden unless the faculty member shall introduce testimony, supporting such assignment, by faculty members from the department or school to which such assignment is proposed to be made. A transcript of the hearing shall be kept by a stenographer furnished by the University. Both the faculty member and the representatives of the administration may appear throughout the hearing; both may have the assistance of counsel. Both shall have the right to be confronted by the witnesses against them and to question the witnesses personally or through counsel. Each party may call witnesses on their own behalf; the faculty member shall receive the assistance of the administration in securing the attendance of witnesses on the faculty member's behalf. The committee shall afford the faculty member and the administration opportunity to present oral and written argument.

G. After the hearing, the committee shall deliberate privately. It shall determine solely on the basis of the information presented at the hearing whether or not the administration has proved by a preponderance of the evidence that it is acting in good faith in seeking to remove the faculty member on the grounds of financial exigency, or whether or not the faculty member has proved by a preponderance of the evidence that it is possible for the faculty member to be assigned to other duties. The committee shall send to the faculty member and (through administrative channels) the President a transcript of the proceedings and a copy of its report, in which it shall set forth its findings, recommendations and reasons therefore.

H. If the committee concludes that the administration is not acting in good faith, or that it is possible for the faculty member to be assigned to other duties, the administration shall not proceed with action to terminate the faculty member's employment. If the committee concludes otherwise, the faculty member may appeal to the board by sending to the Secretary of the University within thirty days following receipt of the committee's report, a written request that the faculty member be accorded the hearing before the board. The board shall then afford the faculty member, the administration and the committee

an opportunity to appear before it. The faculty member and the administration may have the assistance of counsel.

I. The board may direct that action to terminate the faculty member's employment be discontinued, may take action based on the committee's conclusions, or, if it decides that additional evidence should be received or that further proceedings are otherwise required, shall remand the matter to the committee. In the event of such remand, the committee may receive additional evidence, shall send the parties written notice of hearings at least one week before they are to be held and shall accord the parties the procedural rights provided in paragraph C. above. The faculty member may again appeal to the board as provided in paragraph H. above. The board shall furnish all parties with copies of a report of its decision, in which it shall set forth its reasons therefore.

J. If the employment of a faculty member is terminated by reason of financial exigency, the faculty member's salary shall be continued for one year from the date of their receipt of the President's notice described in paragraph B. above. Until such termination date the faculty member shall continue to work in their own field or on some other activity mutually agreed upon. If the employment of a faculty member who has tenure is terminated by reason of financial exigency, the released faculty member's place shall not be filled by a replacement within a period of two years from the date of termination, unless the released faculty member has been offered reappointment with tenure and has declined.

K. A decision by the board made pursuant to these procedures shall be final within the University.

(Page 26 - September 9, 1983 (https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-1983/september-9/))

## II.E.18. Temporary Suspension or Exclusion of a Faculty Member

*(Source: Standing Resolution of the Trustees, September 9, 1983; revised, October, 19, 2007 and Offices of the President and Provost, Almanac, October 30, 2007 (https://almanac.upenn.edu/archive/volumes/v54/n10/policy.html))*

The President or Provost may temporarily suspend a faculty member from teaching or other University duties, or exclude the faculty member from University facilities, under the following two conditions:

1. There is a substantial risk of immediate harm to persons, equipment or other property from the faculty member's continuation in their University functions or from the faculty member's continued presence at the University, or 2. The faculty member has been charged under the law with an offense based on conduct recognized as criminal in the United States.

2. In cases under the second category, the faculty member may only be suspended or excluded if the offense charged, if proven, would indicate the faculty member's inability or unfitness to perform their University duties. Before taking action to suspend or exclude the faculty member in such cases, the President or Provost shall seek the advice of the Senate Committee on Academic Freedom and Responsibility (SCAFR).

A temporary suspension or exclusion must not exceed fifteen working days. The President or Provost, however, may extend the suspension or exclusion if the original conditions warranting temporary suspension or exclusion continue to exist, but only upon consultation and in agreement with two-thirds of the members, present and voting, of SCAFR. In no

instance should a temporary suspension or exclusion continue when the stated grounds for the suspension or exclusion no longer exist. Compensation of a faculty member shall not be discontinued as a result of a temporary suspension or exclusion.

Immediately upon invoking the powers of temporary suspension or exclusion, the President or Provost must inform the Chair of SCAFR that action has been taken under this provision. The President or Provost shall thereafter furnish the faculty member with a written explanation of the basis for the suspension or exclusion within two working days. The faculty member must also receive written notice and explanation for any extension of the temporary suspension or exclusion within two days of any such extension. The faculty member must be invited to respond in writing to any notification of suspension or exclusion, or any extension thereof, and should furnish SCAFR with a copy of such response.

## II.E.19. Policy on Safeguarding University Assets

*(Source: Trustees Internal Audit Committee, March 13, 1995 and Policy 002 in the Human Resources Policy Manual (https://www.hr.upenn.edu/policies-and-procedures/policy-manual/other-policies/safeguarding-university-assets/))*

### A. Introduction

University and Health System management at all levels are responsible for safeguarding financial and physical assets and being alert to possible exposures, errors and irregularities. Management must be aware of internal control weaknesses that can lead to or permit misuse, misappropriation or destruction of assets. The University policy regarding the safeguarding of assets and the investigating, processing and reporting of suspected misappropriations and similar irregularities applies to all areas of the University and Health System. These include the schools, service and resource centers, central administrative departments, auxiliary enterprises, subsidiaries, the Clinical Practices (CPUP) and the Hospital (HUP), Clinical Care Associates (CCA), and any wholly-owned subsidiaries of the University.

### B. Objectives:

- To ensure the protection of the University and Health System assets and to ensure that such assets are not misappropriated, misused, damaged or destroyed.
- To provide a policy for the investigations of known or suspected misappropriations and other irregularities.
- The objectives of investigating suspected misappropriations and similar irregularities are to determine whether the suspected irregularity occurred; to ascertain the source and the amount of funds involved; to identify the individual(s) responsible for the loss; to adequately document fraudulent activities; and, to provide a sound basis for any subsequent corrective action.

### C. Responsibilities

All supervisors and managers should be familiar with the types of irregularities involving misuse of University and Health System resources that might occur in their respective areas and be alert for symptoms that an impropriety is or was in existence in their respective areas. Any individual who detects or suspects a misappropriation shall notify their supervisor immediately.

The Director of Internal Audit, has the primary responsibility for the investigation of all cases of misappropriation, fraud, and other misuse of University and Health System assets. The Director is available and

receptive to relevant information concerning suspected fraudulent activities on a confidential basis. All audits shall be conducted in a thoroughly professional manner.

The Director of Internal Audit, shall consult with and coordinate the investigative activities with other University and/or Health System offices as appropriate. All University and Health System employees shall cooperate fully with and provide support to the Director as requested during such investigations and reviews.

The Internal Audit Department shall be given free, unlimited and unrestricted access to all books, records, files, property and to all personnel of the University and the Health System during such investigations. The Director of Internal Audit shall have the authority, after consultation with the Executive Vice President of the University, the Executive Vice President of the University for the Health System, when applicable, and with the Provost when a member of the faculty is thought to be involved and with other senior officials as appropriate, to:

1. Take control of and/or gain full access to all University and Medical Center premises, whether owned or rented; and
2. Examine, copy and/or remove all or any portion of the contents, physical or electronic, of all files, desks, cabinets and other storage facilities that are located on such premises without the prior knowledge or consent of any individual who may use or have custody of such premises or contents. When an auditor removes any files or materials from desks or offices, a record will be established and maintained. The record must be as complete as practicable, and a copy will be deposited with the Executive Vice President of the University and with the person from whose office the files or materials were removed.

The powers described in 1 and 2, above, shall be exercised with due regard for privacy, property, and academic freedom of the occupant of the premises, or the owner of the materials being searched. The Director, moreover, will make every reasonable effort to confine the investigation to areas, files, and papers that seem likely to yield relevant evidence.

When a member of the faculty is thought to be involved, the Provost:

1. Shall inform the Chair of the Faculty Senate, if the Chair is available, prior to the search being undertaken, and seek the Chair's opinion.
2. Shall report the completion of the search and the justification for that search as soon as practicable after the event to the Chair, the Past Chair, and the Chair-Elect of the Faculty Senate.

### D. Reporting

The results of investigations by the Internal Audit Department shall be disclosed only to those who have a legitimate need to know such results in order to perform their duties.

Internal Audit shall report the results of the investigation and/or audit to the General Counsel and the Executive Vice President of the University; the Executive Vice President of the University for the Health System when applicable, and to the Provost when a member of the faculty is involved. In addition, Internal Audit shall report the results as appropriate to the Executive Vice President of the University for the Health System, and to the Associate Vice President for Legal Affairs of the University. The Executive Vice President shall report all cases of fraud to the President. Copies of all investigation and/or audit reports shall be sent concurrently to the senior official responsible for the area.

All documented cases of fraud shall be reported to the Board of Trustees' Committee on Audit by the Director of Internal Audit.

To meet requirements of granting agencies or other external funding sources, the Director of Internal Audit shall, as appropriate, report information concerning misappropriations to granting agencies or other external funding sources.

Information concerning misappropriations may be released to the news media only as authorized by the President of the University.

# III. Policies and Procedures Concerning Faculty Research

- III.A. Guidelines for the Conduct of Sponsored Research (p. 59)
- III.B. Procedures Regarding Misconduct in Research (p. 61)
- III.C. Procedures Regarding Misconduct in Research for Non-faculty Members of the Research Community (p. 64)
- III.D. Policy Relating to Copyrights and Commitment of Effort for Faculty (p. 67)
- III.E. Patent and Tangible Research Property Policies and Procedures (p. 68)
- III.F. Policy on Conflicts of Interest Related to Research (p. 79)
- III.G. Consulting and Outside Activities Policies and Procedures (p. 84)
- III.H. Guidelines for Student Protection and Student Access to Information Regarding Sources of Financial Support (p. 87)
- III.I. Policy Concerning the Exclusion of Foreign Nationals from Specific Research Areas (p. 87)
- III.J. Guidelines for Research in the Community (p. 87)
- III.K. Human Research Protection Program (p. 88)
- III.L. Policy Regarding Human Subject Research in the Sociobehavioral Sciences (p. 89)
- III.M. Standard Operating Procedures and Policies of the University of Pennsylvania Institutional Animal Care and Use Committee (IACUC) (p. 91)

# III.A. Guidelines for the Conduct of Sponsored Research

*(Source: 1977 Research Investigators Handbook; revised, Office of the President, Almanac, April 7, 1981 (https://almanac.upenn.edu/archive/v27pdf/n28/040781.pdf); revised, Office of the Provost, November 21, 2022)*

## 1. Roles and Responsibilities of the University and Its Faculty

The University imposes no limitation on the freedom of the faculty in the choice of fields of inquiry or upon the media of public dissemination of the results obtained. It is the obligation of faculty members to make freely available to their colleagues and to the public the significant results achieved in the course of their inquiries.

By providing financial support, physical facilities, and especially an intellectual environment conducive to research, the University encourages scholarly inquiry by its faculty. In doing so the University recognizes its responsibility to the faculty to maintain a research

environment in which unrestricted scholarship and freedom of inquiry may continue to thrive.

The University recognizes that its faculty consists of self-motivated scholars and scientists; their participation in scholarly or scientific controversies does not involve the University beyond its general support. Such support is predicated on the University's confidence that its essential functions are best accomplished by freely permitting capable scholars to follow the search for truth wherever it may lead.

## 2. Sponsored Research Projects

An interdependent relationship between the University and the research skills of its faculty becomes manifest whenever the University becomes involved as a corporate entity in the administration of research. In pursuing a policy of encouraging free inquiry the University affirms its reliance on its faculty in all matters of judgment concerning the intellectual merits of a project.

For its part, as the beneficiary of gifts and as the recipient of grants and contracts, the University must reserve the right to accept only that support which does not in any way compromise the freedom of inquiry of its faculty, the integrity of its scholarship or its commitment to the policy of non-discrimination.

In its role as a degree-granting institution, the University views the substantial participation of graduate students in sponsored research as altogether appropriate to its educational mission.

The University administration does not distinguish between research activities that acquire new knowledge and research activities that apply existing knowledge. It leaves the decision of how to balance these two elements to the judgment of those who perform research and to their academic supervisors.

## 3. Academic Evaluation of Sponsored Programs

Approval of proposals for grants, contracts and other cooperative agreements by the appropriate department chair and/or Dean is an indication that a favorable evaluation for academic merit has been made.

Where research programs lie outside the normal departmental or school structure, the Provost, or a designated member of the Provost's staff, has a special responsibility to ensure that an appropriate academic review has been made.

## 4. Administrative Requirements for Sponsored Programs

The following seven conditions must govern any research agreement entered into by the University and a sponsor in order for a favorable evaluation to be made.

- Open identifications of sponsors and the actual sources of funding must be present in the agreement. Exception is made for anonymous sponsorship when, in the judgment of the Provost, such a condition is not harmful to the University nor to the integrity of the research and is essential for the award to be given.
- Unrestricted dissemination of all findings and conclusions derived from the project must be an integral part of the agreement, except where the privacy of an individual is concerned. The University regards any infringement on complete access to research findings as detrimental to free inquiry. It therefore neither seeks nor accepts security clearance for itself or any administrative unit. The decision of whether to seek clearance is an individual one to be made by each faculty member according to their judgment. Such decisions will not

be influenced or judged in any way by the University and must be made in each instance on the basis that the benefit of clearance will balance its academic shortcomings. Exception may be granted by the Provost for privileged information but only in the form of a delay in the release of such information. The delay will only on rare occasions exceed three months.

- The resources or data sources on which research is wholly dependent must be free of control by the sponsor. The University views such control as incompatible with free inquiry and accepts exceptions to this condition only when no alternative source exists. Exceptions may be granted by the Provost for projects that are conducted abroad and subject to the legal restraints of foreign governments and their agencies.
- No conditions may be attached to the gift, grant or contract that would in any way jeopardize the University's commitment to the principle of nondiscrimination on the basis of race, color, sex, sexual or affectional preference, age, religion, national or ethnic origin or handicap.
- Academic appointments made with the support of gifts, grants, or contracts shall be made only in accord with established University procedures. A sponsor shall not ordinarily participate in the selection of persons to work on a project, and individuals employed by the University shall not be excluded by a sponsor from participation in a project for any reason other than when necessary because of insufficient competence or when required to protect privileged information.
- No financial obligations by the University in the present or at any time in the future can be implied other than those stated in the contract. When uncertainty exists in the Provost's judgment, the Provost or a designated member of the Provost's staff shall consult with appropriate officers of the University to ensure that this condition is met prior to the final approval of the agreement.
- The University relies primarily on the discretion of its faculty to limit the commercial aspects of research sponsorship, such as advertising and publicity. Contracts must not allow the use of the University's name for commercial purposes unless such use has been specifically approved by the President of the University. Agreements must not permit the names of University investigators to be exploited for advertising purposes or permit reprint distribution to be made part of a publicity campaign.

## 5. Administrative Review of Sponsored Programs

Approval by the Provost or a designated member of the Provost's staff indicates that the evaluation of compliance with the University's administrative requirements has been favorable.

Grants and contracts which, in the judgment of the Provost, have features that pose potential embarrassment to the University or raise serious non-technical questions of compliance with this policy will require further review. This review is to be accomplished by the University Council Committee on Academic and Related Affairs.

Concurrently with the call for consultation, notice of the project shall appear in *Almanac*.

Failure to conform to the Guidelines is expected only on rare occasions marked by special circumstances, such as the exceptional public need of a national, regional or local emergency. On these occasions it is required that the President of the University, in consultation with appropriate faculty, shall give approval to such action.

(See page 4 - Almanac, April 7, 1981 (https://almanac.upenn.edu/archive/v27pdf/n28/040781.pdf))

# III.B. Procedures Regarding Misconduct in Research

*(Source: Vice Provost for Research, Almanac, December 12, 1989; revised, Office of the Provost, Almanac, September 3, 1991; revised, Almanac, September 9, 1997; revised, Almanac, May 6, 2003 (https://almanac.upenn.edu/archive/v49/n32/OR-misconduct.html); revised, Office of the Provost, November 21, 2022)*

The University relies on its faculty to establish and maintain the highest standards of ethical practice in academic work including research. Misconduct in research is forbidden and represents a serious breach of both the rules of the University and the customs of scholarly communities.

Although instances of research misconduct are relatively rare, the University has a responsibility to detect and investigate possible misconduct and to resolve cases of possible misconduct fairly and expeditiously. The primary responsibility for maintaining integrity in research must rest with those who perform it. In light of this responsibility, the University expects each faculty member:

- To maintain and further the highest standards of ethical practice in research. Especially important are integrity in recording and reporting results, care in execution of research procedures, and fairness in recognition of the work of others.
- To be responsible for the integrity of the research carried out under their supervision, no matter who actually performs the work or under what circumstances.
- To accept that a claim of authorship implies a definable major contribution to the work and an acceptance of responsibility for the methods and findings of the work.
- To keep thorough and verifiable records of research and to insure that exact copies of these records are preserved by the unit in which the work is done.
- To report suspected research misconduct to the appropriate dean.

The University must also establish certain standards to assure a healthy environment for research. These standards include procedures for dealing with alleged research misconduct.

These procedures are applicable to members of the University of Pennsylvania standing faculty, standing faculty-clinician-educator, associated faculty, academic support staff, and emeritus faculty when acting as such.

## Research Misconduct Defined

Research misconduct is defined as fabrication, falsification, plagiarism, or other serious deviation from accepted practices in proposing, performing, or reviewing research, or in reporting research results.

- Fabrication is making up data or results and recording or reporting them.
- Falsification is manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record.
- Plagiarism is the appropriation of another person's ideas, processes, or results, or works without giving appropriate credit.

- Serious deviation from accepted practices includes but is not limited to stealing, destroying, or damaging the research property of others with the intent to alter the research record; and directing or encouraging others to engage in fabrication, falsification or plagiarism. As defined here, it is limited to activity related to the proposing, performing, or reviewing of research, or in the reporting of research results and does not include misconduct that occurs in the research setting but that does not affect the integrity of the research record, such as misallocation of funds, sexual harassment, and discrimination, which are covered by other University policies.

The research record is the record of data or results that embody the facts resulting from scientific inquiry, and includes, but is not limited to, research proposals, laboratory records, both physical and electronic, progress reports, abstracts, theses, oral presentations, internal reports, and journal articles.

Some forms of misconduct, such as failure to adhere to requirements for the protection of human subjects or to ensure the welfare of laboratory animals, are governed by specific federal regulations and are subject to the oversight of established University committees. However, violations involving failure to meet these requirements may also be covered under this policy or possibly by other University policies when so determined by the responsible committees or institutional officials.

Research misconduct does not include honest error or differences of opinion.

## Findings of Research Misconduct

A finding of research misconduct requires that:

- There be a significant departure from accepted practices of the relevant research community; and
- The misconduct be committed intentionally, or knowingly, or recklessly; and
- The allegation be proven by a preponderance of evidence.

## Procedures for Handling Alleged Research Misconduct

The following procedures recognize the need to protect the rights and reputations of all individuals, including those who are alleged to have engaged in misconduct and those who report the alleged misconduct. These procedures also recognize that ethical standards are not only an individual obligation but represent a responsibility to the institution, to scientific communities, and to the public.

All committees and parties to an inquiry or investigation have the obligation to maintain maximum confidentiality throughout the proceedings. Exceptions to this obligation are those noted for the dean and Provost in Section 4. All persons concerned have the obligation to cooperate and furnish all requested information. If any party refuses to do so, the committees of inquiry and investigation will note this in their reports to the dean.

Charges of misconduct must be resolved expeditiously in a fair and objective manner, protecting the rights of the person or persons against whom a complaint has been filed (the respondent), the person or persons filing the complaint (the complainant), and persons serving as informants or witnesses.

The making of knowingly false or reckless accusations regarding research misconduct violates acceptable norms of behavior for members

of the University community and may result in formal charges being brought against the person making such accusations under University procedures (e.g. Procedure Governing Sanctions Taken against Members of the Faculty).

# 1. Preliminary Inquiry

1.1 Before filing a complaint of research misconduct, an individual is encouraged to review the matter with their department chair, dean, and/or University Ombuds, to seek advice from trusted individuals, and through such consultation to determine whether the matter should be pursued. Inquiry into research misconduct should be initiated by written complaint filed with the dean of the school in which the respondent has their primary appointment. The complainant can be any individual, whether or not affiliated with the University. to the extent possible, the complaint should be detailed, specific and accompanied by appropriate documentation. Upon receipt of the complaint, the dean will notify the Provost. The dean and the Provost have the responsibility to protect the position and reputation of the complainant and any informants or other witnesses, and to protect these individuals from retaliation, so long as their allegations were made in good faith. The Provost will notify the Chair of the Faculty Senate that a complaint has been filed and the nature of the complaint, but will not identify the complainant, any informant, or the respondent, in order to preserve maximum confidentiality at this very preliminary stage of inquiry.

1.2 Upon receipt of a properly documented complaint, the dean will inform the respondent of the nature of the charges, making every effort to avoid identifying the complainant or any informant. The dean shall outline to the respondent and to the complainant, their rights and obligations by reference to this and other relevant University procedures. The dean will take steps to secure all documents, data and other materials that appear to be relevant to the allegations. The respondent is obligated to cooperate fully in all such efforts. The materials will be copied and the copies provided to the respondent. The originals will be retained as specified in Section 4.12. Every effort will be made to minimize disruption to the respondent's research during this and subsequent phases of the inquiry subject to Sections 4.4 - 4.7. The dean will also appoint a preliminary inquiry committee consisting of at least three individuals, none of whom is a member of the same department as, or a collaborator with, or has a conflict of interest with the complainant or respondent. The members of the committee should be unbiased and have appropriate backgrounds to investigate the issues being raised. They may but need not be members of the faculty of the University. Upon appointment of the preliminary inquiry committee, the dean will notify the complainant and the respondent of the names of the committee members. The dean will also make every effort to protect the identities of both complainant and respondent with respect to the larger community. The appointment of the preliminary inquiry committee will ordinarily be completed within two weeks of the receipt of a properly documented complaint.

1.3 The preliminary inquiry committee will gather information and determine whether the allegation warrants a formal investigation. The committee will then submit a written report of its findings to the dean with a copy to the Provost, the complainant and the respondent. The report should state what evidence was reviewed, summarize relevant interviews and include the committee's recommendation, which will be decided by simple majority of the committee; any dissenting opinion will be noted. This report will ordinarily be submitted within thirty calendar days of receipt of the written complaint by the dean. The respondent will be given the opportunity to make a written reply to the report of the preliminary inquiry committee within fifteen calendar days following submission of the report to the dean. Such reply will be incorporated by

the dean as an appendix to the report. The entire inquiry process should be completed within forty-five calendar days of the receipt of a properly documented complaint by the dean unless circumstances clearly warrant a delay as determined by the dean in consultation with the Provost. In such cases the record of inquiry will detail reasons for the delay.

1.4 If the report of the preliminary inquiry committee finds that a formal investigation is not warranted, the dean may (i) drop the matter, (ii) not initiate a formal investigation, but take such other action as the circumstances warrant, or (iii), in extraordinary circumstances, initiate a formal investigation. The decision of the dean will be reviewed by the Provost, who will either concur or require that it be changed. The decision and its review should be completed within twenty-five calendar days of the receipt by the dean of the report (ten days following a response, if any). The dean will inform the concerned parties of the decision. In the event that a formal investigation is not initiated, the dean and the Provost will, as appropriate, use diligent efforts to restore the reputation of the respondent and to protect the position and reputation of the complainant unless the complaint was found not to be made in good faith. The Provost will notify the Chair of the Faculty Senate that the case has been dropped.

1.5 If no formal investigation of the respondent is conducted, sufficient documentation will be maintained for at least three years following the inquiry to permit a later assessment of the reasons that a formal investigation was not deemed warranted (see Section 4.12).

1.6 If the report of the preliminary inquiry committee finds that a formal investigation is warranted, or the dean or Provost decides the matter should be pursued through a formal investigation, the dean will initiate a formal investigation as provided in Section 2. The Provost will inform both the Senate Consultation Subcommittee and the appropriate government agency or source funding the research, in writing, that a formal investigation has been initiated and will identify the respondent to the agency or source.

# 2. Formal Investigation

2.1 To initiate a formal investigation, the dean will appoint a formal investigation committee of not less than three individuals, none of whom has been a member of the preliminary inquiry committee but whose appointment will be subject to the same provisions governing appointment of the preliminary inquiry committee as described in Section 1.2. A majority of the formal investigation committee must be members of the standing faculty. One of the appointed members will be designated chair of the committee by the dean. The formal investigation will be initiated by the committee as soon as possible and usually within thirty calendar days after the report of the preliminary inquiry committee has been received by the dean. The formal investigation will be divided into four phases:

a. (i) investigation and development of an initial factual record,
b. (ii) draft report of the findings,
c. (iii) hearing, if requested, and
d. (iv) final report of the findings.

> The Office of the General Counsel will provide guidance in procedures appropriate to the case and may have a representative present at any or all meetings of the committee. The representative will not participate directly in the proceedings except when and as requested to do so by the committee.

2.2 Investigation and development of an initial factual record. The formal investigation committee will be provided with copies of the complaint,

the report of the preliminary inquiry committee and any other materials acquired by the preliminary inquiry committee during the course of its inquiry. The formal investigation committee will undertake a thorough examination of the allegations, including, without limitation, a review of all relevant research data and proposals, publications, correspondence, and records of communication in any form. Experts within or outside the University may be consulted. The formal investigation committee will also investigate any possible acts of research misconduct by the respondent that come to light during its investigation, and will include them in its findings. Whenever possible, interviews will be conducted with the complainant and respondent, as well as with others having information regarding the allegations. Tapes will be made of all interviews and saved for reference. Summaries of the interviews will be prepared, provided to the interviewed party for comment or revision, and included as part of the investigatory file. When appearing before the committee the respondent and the complainant may each be accompanied by an adviser, who may be a lawyer but who may not participate directly in the proceedings except when and as requested to do so by the committee. The committee will not conduct formal hearings at this point. Except in unusual cases, the respondent and the complainant will not appear before the committee at the same time.

2.3 Draft report of the findings. Following development of the initial factual record, the formal investigation committee will prepare and provide a written draft report of its proposed findings to the respondent, to the complainant, and the Office of General Counsel. The report will describe the allegations investigated, how and from whom information was obtained, the proposed findings and their basis, and will include texts or summaries of the interviews conducted by the committee.

2.4 Hearing. If the respondent contests any material finding of fact made by the committee in the draft report, the respondent may request a hearing before the committee. The request must be made to the committee in writing within fifteen calendar days following receipt of the draft report. Any such request must specify findings the respondent asserts are erroneous, the basis for the claimed error, identify each witness the respondent may desire to examine at the hearing, and specify the purpose for calling such witness and the nature of the testimony expected. Upon receipt of such a request, the committee will promptly schedule a hearing. The committee will use reasonable efforts to secure the attendance at the hearing of any witness requested by the respondent who may have information relevant to the disputed finding of fact. The committee may also request the attendance of witnesses in addition to those requested by the respondent, in which case the respondent will be provided with a list of these witnesses at the time the request is made. At the hearing, the respondent and committee will each have an opportunity to examine each witness. The respondent may be accompanied by an advisor, who may be a lawyer but may not participate directly in the proceedings except when and as requested by the committee. The committee will have full authority to determine all matters concerning the conduct of the hearing, including the number of witnesses, the amount of time allocated for questioning each witness, and the duration of the hearing. The committee may require that it pose questions on behalf of the respondent.

2.5 Final report of the findings. Following completion of the hearing, if any, the committee will submit a written final report to the dean with copies to the Provost, the complainant, and the respondent. This report should describe the policies and procedures under which the investigation was conducted, how and from whom information was obtained, the allegations investigated, the findings and the basis of the findings, and should include texts or summaries of the interviews and hearing, if any, conducted by the committee. The committee will

state that it finds the charge(s) made by the complainant or otherwise emerging during the course of its proceedings to be unsubstantiated or substantiated by a preponderance of evidence. For each charge considered, the vote of a majority of the committee will constitute the decision of the committee. The vote will be recorded. If the vote is not unanimous, a statement of any dissenting opinion will be included in the report. If the committee finds that a violation of University policy in addition to or other than research misconduct might have been committed, a description of the possible violation will be included for consideration by the dean under other procedures. The final report will ordinarily be submitted within ninety days of the appointment of the formal investigation committee. The respondent and complainant will each be permitted to make a written reply to the dean with a copy to the Provost within fifteen calendar days of submission of the report. The dean will ask the committee to respond in writing to any replies from the respondent or complainant within seven calendar days. All such responses and replies will be incorporated as appendices to the report of the formal investigation committee.

## 3. Adjudication

3.1 The dean will consider the final report and replies. If the dean in consultation with the Provost determines that there has been procedural error that is likely to have affected the committee's findings, or that any material finding is unsupported by a preponderance of evidence, the dean will remand the matter to the committee for further proceedings. Upon acceptance of the report by the dean, the Provost will report the outcome of the investigation to the Chair of the Faculty Senate and the appropriate government agency or source funding the research. The Provost will also provide a copy of the report to the appropriate government agency or source funding the research, as required. The entire formal investigation process should be completed within 120 calendar days of its initiation, unless circumstances clearly warrant a delay as determined by the dean in consultation with the Provost. In such cases the reasons for a delay will be documented.

3.2 If the final report of the formal investigation committee finds the charges to be unsubstantiated, the Misconduct in Research procedure will be terminated and the concerned parties will be informed. The dean and the Provost have the responsibility to take an active role to repair any damage done to the reputation of the respondent or the complainant (provided the complainant acted in good faith), and to take appropriate action should they determine that the accusation was knowingly or recklessly false.

3.3 If the report of the formal investigation committee finds the charges against a faculty member to be substantiated, the dean in consultation with the Provost will take whatever actions are appropriate to the level of intent of the misconduct, the consequences of the behavior, and other aggravating and mitigating factors in accordance with University procedures and which consider the previous record of the respondent. The dean in consultation with the Provost will determine whether there is substantial reason to believe that just cause exists for suspension or termination, and will take other steps as may be appropriate under the University's Procedure Governing Sanctions Taken Against Members of the Faculty. In any subsequent proceeding commenced under such procedure, the final report of the formal investigation and all replies and responses thereto will form part of the record and be accorded appropriate weight.

## 4. Other Actions and Procedures

4.1 The dean may designate the associate or vice dean if a member of the Standing Faculty to represent him/her in the administration of any

case of misconduct. The Provost may similarly designate a member of his staff if a member of the Standing Faculty to represent him/her.

4.2 If the respondent feels that any action of the dean, preliminary inquiry committee, or formal investigation committee violates procedures set forth in this document or otherwise introduces an unfair bias into the proceedings, the respondent may submit to the dean, preliminary inquiry committee, or formal investigation committee, respectively, in writing the nature of the action and the reasons why the action may influence either the material findings of fact or the conduct of the proceedings. The complaint to the dean or respective committee must be made promptly. If the dean or respective committee finds that the complaint does not merit action, or if the respondent is not satisfied with the nature of any corrective action, the respondent may appeal to the Provost. The Provost will decide the matter and will have the authority to take corrective action. Proceedings will not be delayed during consideration of the respondent's claim by the Provost unless the Provost determines that a delay is essential for fair consideration.

4.3 Any final action taken by the dean under Section 3.3, and any administrative action taken under Sections 4.4, 4.5, 4.6, or 4.7 may be reviewed under other established University grievance and appeal procedures to the extent such review is within the stated jurisdiction of such procedures. All other actions taken, proceedings conducted and reports prepared under this procedure are not subject to review or consideration under the Faculty Grievance Procedure.

4.4 The dean in consultation with the Provost will, during the course of the inquiry or formal investigation, take administrative action, as appropriate to protect the welfare of animal or human subjects.

4.5 At any time during the preliminary inquiry or formal investigation, the dean and Provost will immediately notify the relevant funding agency(ies) if public health or safety is at risk; if agency resources or interests are threatened; if research activities should be suspended; if there is reasonable indication of possible violations of civil or criminal law; if Federal action is required to protect the interests of those involved in the investigation; if the University believes the preliminary inquiry or formal investigation may be made public prematurely so that appropriate steps can be taken to safeguard evidence and protect the rights of those involved; or if the research community or public should be informed.

4.6 Subject to Section 4.5, the dean and Provost will, during the course of the inquiry and formal investigation, take administrative action, as appropriate to protect funds for sponsored research and ensure the purpose of any external financial assistance.

4.7 The dean in consultation with the Provost will, during the course of the inquiry and formal investigation, take administrative action, as appropriate to ensure an acceptable working environment for individuals under the direction of, or working with the respondent. The Provost and dean will also notify individuals, programs, or institutions of allegations or developments that would necessitate immediate action in order to prevent the likelihood of substantial harm.

4.8 The Chairs of the preliminary inquiry and formal investigation committees will inform the dean of any issues relevant to Sections 4.4, 4.5, 4.6, and 4.7 arising during the course of the proceedings.

4.9 Inadvertent failure to tape any interview under Section 2.2 will not be considered a procedural defect requiring correction.

4.10 If the final report of the formal investigation committee finds charges have been substantiated, the Provost will take appropriate steps to correct any misrepresentations resulting from the misconduct in question upon acceptance of the report by the dean. Collaborators, and other affected individuals, organizations, or institutions will be informed. If misrepresented results have been submitted for publication, already published, or otherwise disseminated into the public domain, appropriate journals and other sponsors will be notified.

4.11 If the dean is the complainant or respondent or in any other way has a conflict of interest or the appearance of a conflict of interest, the dean is obligated to remove themself from the case during the preliminary inquiry and formal investigation and to transfer to the Provost responsibility for carrying out these procedures. In carrying out the latter the Provost will assume the role specified for the dean and the President that specified for the Provost in sections 1, 2, 3, and 4.

4.12 Complete records of all relevant documentation on cases treated under the provisions of this policy will be preserved by the offices of the dean and the Provost in a manner consistent with the Protocols for the University Archives and Record Center. In cases adjudicated under Section 3, records will be preserved for a minimum of ten years following completion of all proceedings. Records of cases that are dropped under the provisions of sections 1.4 or 3.1 will be preserved for at least three years following the initial inquiry, but not as part of the personnel record of the respondent.

4.13 The University may act under these procedures irrespective of possible civil or criminal claims arising out of the same or other events. The dean, with the concurrence of the Provost, after consulting with the General Counsel, will determine whether the University will, in fact, proceed against a respondent who also faces related charges in a civil or criminal tribunal. If the University defers proceedings, it may subsequently proceed irrespective of the time provisions set forth in these procedures.

# III.C. Procedures Regarding Misconduct in Research for Non-faculty Members of the Research Community

*(Source: Vice Provost for Research,* Almanac, July 13, 2004 *(https://almanac.upenn.edu/archive/volumes/v51/n01/OR-research.html))*

## Introduction

The University relies on all members of its research community to establish and maintain the highest standards of ethical practice in academic work, including research. Misconduct in research is prohibited and represents a serious breach of both the rules of the University and the customs of scholarly communities.

The following procedures are applicable to non-faculty members of the University of Pennsylvania research community including students, postdoctoral fellows, and staff.

## Research Misconduct Defined

Research misconduct is defined as fabrication, falsification, plagiarism, or other serious deviation from accepted practices in proposing, performing, or reviewing research, or in reporting research results.

- Fabrication is making up data or results and recording or reporting them.

- Falsification is manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record.
- Plagiarism is the appropriation of another person's ideas, processes, or results, or works without giving appropriate credit.
- Serious deviation from accepted practices includes but is not limited to stealing, destroying, or damaging the research property of others with the intent to alter the research record; and directing or encouraging others to engage in fabrication, falsification or plagiarism. As defined here, it is limited to activity related to the proposing, performing, or reviewing of research, or in the reporting of research results and does not include misconduct that occurs in the research setting but that does not affect the integrity of the research record, such as misallocation of funds, sexual harassment, and discrimination, which are covered by other University policies.

The research record is the record of data or results that embody the facts resulting from scientific inquiry, and includes, but is not limited to, research proposals, laboratory records, both physical and electronic, progress reports, abstracts, theses, oral presentations, internal reports, and journal articles.

Some forms of misconduct, such as failure to adhere to requirements for the protection of human subjects or to ensure the welfare of laboratory animals, are governed by specific federal regulations and are subject to the oversight of established University committees. However, violations involving failure to meet these requirements may also be covered under this policy or possibly by other University policies when so determined by the responsible committees or institutional officials.

Research misconduct does not include honest error or differences of opinion.

# Findings of Research Misconduct

A finding of research misconduct requires that:

- There be a significant departure from accepted practices of the relevant research community; and
- The misconduct be committed intentionally, or knowingly, or recklessly; and
- The allegation be proven by a preponderance of evidence.

# Jurisdiction and Applicable Process

There are a number of University policies and procedures for responding to allegations of misconduct by students, postdoctoral fellows, or staff. This policy is intended to be invoked only in instances where research misconduct (i.e. activity related to the proposing, performing, or reviewing of research, or in the reporting of research results and which therefore may have an impact on the integrity of the research record) is involved. Questions of jurisdiction and the applicability of the appropriate University procedure will be decided by the responsible administrative entity (such as the Office for Student Conduct, Office for Postdoctoral Programs, or the Office of Human Resources), in consultation with the Vice Provost for Research. Allegations of misconduct not involving the research process or the integrity of the research record will be resolved by the disciplinary process ordinarily applicable.

## 1. Inquiry

1.1 Allegations of research misconduct should be directed in the first instance to the Vice Provost for Research who, along with the responsible administrative entity, will determine jurisdiction and which process

is applicable to resolve the allegation. If the Vice Provost determines that this process is properly invoked, the Vice Provost will forward the complaint—which must be in writing—to the Dean of the School where the research is being performed

1.2 Upon receipt of a properly documented complaint, the Dean will inform the respondent of the nature of the charges, and will provide the respondent with a copy of these procedures. The Dean will also take steps to secure relevant documents, data and other materials

The Dean will appoint one or more unbiased, impartial individuals with appropriate expertise who will conduct a preliminary inquiry to determine whether a full investigation is warranted.

1.3 The inquiry committee will gather information and determine whether there is sufficient, credible basis to warrant a formal investigation. The committee shall offer the respondent an opportunity to provide them with relevant information regarding the allegations. The committee will submit a written report of its assessment to the Dean and the respondent, and to the complainant where appropriate. The report should state what evidence was reviewed, summarize relevant interviews, and include the committee's recommendation. This report will ordinarily be submitted within 30 calendar days of receipt of the written complaint by the Dean.

1.4 If the report of the inquiry committee determines that a formal investigation is not warranted, the Dean may (i) drop the matter, or (ii) not initiate a formal investigation, but take such other action as the circumstances warrant, or (iii), in extraordinary circumstances, nonetheless initiate a formal investigation. The Dean will inform the concerned parties of the decision.

1.5 If the inquiry committee determines that a formal investigation is warranted, the Dean will initiate a formal investigation as provided in Section 2. The Provost (Vice Provost/designee) will inform the appropriate government agency or source funding the research, in writing, that a formal investigation has been initiated and will identify the respondent to the agency or source (1).

## 2. Formal Investigation

2.1 To initiate a formal investigation, the Dean will appoint a formal investigation committee of not less than two disinterested individuals with sufficient expertise, one or more of whom may have served on the preliminary inquiry committee.

2.2 Investigation. The formal investigation committee will be provided with copies of the complaint, the report of the initial inquiry and any other materials acquired during the preliminary inquiry. The formal investigation committee will undertake a thorough examination of the allegations, including, without limitation, a review of relevant research data and proposals, publications, correspondence, and records of communication in any form. Experts within or outside the University may be consulted. The Committee shall have authority to investigate, pursue and document any related research misconduct by the respondent, even if such misconduct was not covered by the initial complaint. Whenever possible, interviews will be conducted with the complainant, as well as with others having information regarding the allegations. The Committee must allow the respondent an opportunity to be interviewed at this formal investigation stage. When being interviewed by the committee the respondent and the complainant may each be accompanied by an adviser, who may be a lawyer but who may not participate directly in the proceedings except when and as requested to do so by the committee.

2.3 Reporting the findings. Following its investigation, the formal investigation committee will prepare and provide a written report of its

findings to the respondent, to the Dean, to the Provost, and, if appropriate, to the complainant. The report will describe the allegations investigated, how and from whom information was obtained, the findings and basis of the findings, and will include texts or summaries of the interviews conducted by the committee. The report will conclude with a clear statement regarding which charges have been considered and what its findings are with respect to each charge the committee considered. If the committee finds that a violation of University policy in addition to or other than research misconduct might have been committed, a description of the possible violation will be included.

The committee will indicate whether each charge considered during the course of its proceedings is unsubstantiated or substantiated by a preponderance of evidence. If the matter involves a respondent who would be subject to University sanctions for misconduct only if the evidence met a clear and convincing standard, the Committee will make an additional determination as to whether that standard has also been met (2).

The final report will ordinarily be submitted within 90 days of the appointment of the formal investigation committee. The respondent will be permitted to make a written reply to the Dean with a copy to the Provost, and Vice Provost for Research, within 15 calendar days of submission of the report. The Dean may ask the committee to respond in writing to any replies from the respondent. The Dean may also ask the complainant to respond to the report if deemed appropriate. All such responses and replies will be incorporated as appendices to the report of the formal investigation committee.

## 3. Disposition of Final Report and Findings

3.1  The Dean will consider the final report and replies. Upon acceptance of the report by the Dean, the Provost (Vice Provost/designee) will submit a copy of the report containing the outcome of the investigation to the appropriate government agency or source funding the research, if such action is required by regulation or otherwise appropriate. The entire formal investigation process should be completed within 120 calendar days of its initiation, unless documented circumstances warrant a delay.

3.2 If the final report of the formal investigation committee finds the charges of research misconduct against a respondent not to be substantiated, the research misconduct proceeding is terminated and the concerned parties will be informed. A finding that a charge of research misconduct has not been substantiated shall not preclude the University from taking other appropriate action against the respondent if the respondent's behavior or actions violate another University policy or rule.

3.3  If the report of the formal investigation committee finds the charges of research misconduct against a respondent to be substantiated, the matter will then be referred to the responsible administrative entity within the University to determine the appropriate University sanctions, if any, to be imposed for the misconduct (3).

## 4. Other Actions and Procedures

4.1  The Dean in consultation with the Provost will, during the course of the inquiry or formal investigation, take administrative action, as appropriate to protect the welfare of animal or human subjects.

4.2  At any time during the inquiry or formal investigation, the Dean and Provost will immediately notify the relevant funding agency(ies) if public health or safety is at risk; if agency resources or interests are threatened; if research activities should be suspended; if there is reasonable indication of possible violations of civil or criminal law; if Federal action is required to protect the interests of those involved in the

investigation; if the University believes the inquiry or formal investigation may be made public prematurely so that appropriate steps can be taken to safeguard evidence and protect the rights of those involved; or if the research community or public should be informed.

4.3  If the final report of the formal investigation committee finds charges have been substantiated, the Provost or Dean will take appropriate steps to correct any misrepresentations resulting from the misconduct. If, at any time during the inquiry or investigatory stages, the respondent admits to the alleged misconduct, the Dean will take the necessary steps to complete the inquiry in order to correct the scientific record. If misrepresented results have been submitted for publication, already published, or otherwise disseminated into the public domain, appropriate journals and other sponsors will be notified. In addition, collaborators, and other affected individuals, organizations, institutions, and sponsors will be informed.

4.4  Complete records of all relevant documentation on cases treated under the provisions of this policy will be preserved by the offices of the Dean and the Provost in a manner consistent with the Protocols for the University Archives and Record Center. In cases adjudicated under Section 3, records will be preserved for a minimum of ten years following completion of all proceedings. Records of cases which are dropped will be preserved for at least three years following the initial inquiry. When students are involved in these procedures, the confidentiality provisions applicable to educational records will govern the disclosure of the records.

4.5  The University may act under these procedures irrespective of possible civil or criminal claims arising out of the same or other events. The Dean, in consultation with the Provost and the General Counsel, will determine whether the University will proceed against a respondent who also faces related charges in a civil or criminal tribunal. If the University defers proceedings, it may subsequently proceed irrespective of the time provisions set forth in these procedures.

## Endnotes

1.  The decision to initiate a formal investigation must be reported to the Office of Research Integrity, Department of Health and Human Services, if the research has been supported by a grant from DHHS, according to DHHS regulations.

2.  There is a discrepancy between University regulations, which use the standard of "clear and convincing" evidence, and regulations of the Office of Research Integrity, which use the lower standard of "preponderance of evidence". Therefore, if there is a finding of fault, the inquiry must explicitly state whether the higher University standard is met, to inform the University administrative entity which is responsible for determining possible sanctions.

3.  The intent of this policy is that the appropriate administrative entity will take responsibility for determining and implementing sanctions.

For instance, if the respondent is an undergraduate student any disciplinary sanctions will be determined by the Office of Student Conduct (OSC) in accordance with its amended Charter procedures dealing with research misconduct findings. In order to determine sanctions, the findings and accompanying documents should be forwarded to the Office of Student Conduct. Upon review of all findings, including all submissions by the respondent etc., the Office of Student Conduct will propose appropriate sanctions to the respondent. The respondent would then have an opportunity to accept, reject or propose alternative sanctions. If either the original

sanction or an alternative sanction is accepted and agreed upon, the OSC then has primary responsibility for implementing and monitoring sanctions. If the respondent rejects the sanction, the respondent may appeal the nature and severity of the sanction only to the Disciplinary Appellate Officer within the Student Disciplinary System. If the decision of the appellate officer is to uphold the proposed sanction, the sanction will be imposed, with no further levels of review.

Likewise, if the respondent is a graduate student, postdoctoral fellow, or staff member, the responsible administrative entity would consider the information and determine sanctions.

# III.D. Policy Relating to Copyrights and Commitment of Effort for Faculty

*(Source: 1977 Research Investigator's Handbook; revised, 1978; revised, Resolution of the Trustees, February 16, 2001 and Offices of the Provost and Faculty Senate,* Almanac, February 27, 2001 (https://almanac.upenn.edu/archive/v47/n24/ORcopyright.html)*; revised, Office of the Provost, November 21, 2022)*

## 1. Policy Statement on Copyrights

The Trustees of the University of Pennsylvania, subject to the exceptions declared in Sections 1.A., 1.B. and 1.C. affirm the academic custom that creators of intellectual property own the copyright to works resulting from their research, teaching and writing and have the individual right to apply for; own all right, title and interest to enforce, profit by and transfer to other parties, such as publishers, copyrights in their works under the laws of the United States and other jurisdictions. Computer software and courseware (the tools and technologies used to present courses), to the extent not protected by patent law, are governed by this policy. With respect to works such as journal articles and other similar publications, when an author transfers an interest in these copyrightable works, the author should use reasonable efforts to secure for the University the right to reproduce such works, royalty free, for all traditional, customary or reasonable academic uses. With respect to computer software and courseware, the University shall enjoy a permanent, non-exclusive, royalty free license to make all traditional, customary or reasonable academic uses of these works.

A. Sponsored Research. Exceptions to this custom may arise when works are made under government-sponsored research, industry-sponsored research, and certain grants in which the University assumes specific obligations with respect to a copyrightable work resulting from a given sponsored program. To the extent necessary, where the sponsored program agreement provides that the sponsor will acquire rights to copyrightable works produced under the program, the University will own all right, title and interest to the copyrightable works created under such sponsored programs.

A.1 In accordance with such obligations, the University will use reasonable efforts to secure an acknowledgment from the authors of the copyrightable work prior to the commencement of the sponsored program. Authors who are also principal investigators and have responsibility for other authors will use reasonable efforts to secure acknowledgment from said authors prior to the commencement of the sponsored program.

A.2 The University shall negotiate a license with the sponsor in accordance with applicable provisions of the sponsored research agreement. Net revenues realized from said sponsored

research agreements will be distributed in accordance with the procedures for the distribution of patent royalties described in Section 2.3 of the Patent and Tangible Research Property Policies and Procedures, except that the 30 percent research foundation share will be maintained as a copyright fund share. The copyright fund will be administered by the Office of the Provost to support the development of pedagogical innovation. When negotiating sponsored research agreements, to the extent that University ownership is not necessary to fulfill its obligations to a sponsor the University shall, whenever practicable, make reasonable efforts to protect the ownership rights of the authors.

B. Works Made for Hire. Exceptions to this custom also arise when authors create works considered to be "works made for hire." Such works are the property of the University. For purposes of this policy, "works for hire" are those works that are prepared by the author pursuant to the express direction of a supervisor, prepared pursuant to the specific provisions incorporated within a position description, or prepared in the performance of any administrative duty. Works created by authors in the course of their instructional or research activities shall not be considered "works made for hire."

B.1 Prior to the preparation of the "work made for hire," the University may request, and if so the authors shall provide, an assignment or other declaration of the University's ownership of that work. Authors who are also principal investigators and have responsibility for other authors will secure assignments from said authors prior to the preparation of a "work made for hire." Failure to secure assignment does not negate the University's ownership of the work. In the event of subsequent disagreement over ownership of a "work made for hire," the case shall be referred to the committee noted in 4.B.

B.2 Net revenues realized from the commercialization of "works made for hire" will be distributed as in A.2.

B.3 The University will have the authority to waive the "work for hire" claim where it judges that doing so is in the interest of the University.

C. Exceptions to this policy arise when the faculty create works that make substantial use of the services of University non-faculty employees or University resources. When such support is provided the works produced shall belong to the University unless there is explicit agreement otherwise. The faculty member(s) and the units providing such support shall agree in writing on the ownership of such works prior to the provision of the support. Notwithstanding the above, the faculty member(s) may subsequently petition the University to waive its ownership. The determining official for this action is the Provost, or at the Provost's designation, the dean of the school in which the faculty member has their primary appointment(s); or the Provost in the case where a dean is the creator. In the event of subsequent disagreement over the use of University resources in the creation of a work, the case shall be referred to the committee noted in 4.B.

C.1 The reference to "substantial use of the services of University non-faculty employees or University resources" means the use of University funds, facilities, equipment, or other resources significantly in excess of the norm for educational and research purposes in the department or school in which the creator(s) hold their primary appointment(s). Academic year salary, office, usual library resources, usual secretarial and administrative staff resources or usual computer equipment, among other things,

are not regarded as constituting "substantial use of services of University non-faculty employees or University resources." Any question about what constitutes substantial resources should be referred to the committee noted in 4.B.

C.2 Net revenues realized from the commercialization of such works will be distributed as in A.2.

D. A given intellectual property may be protected in some cases inclusively by United States patent, copyright and trademark laws, and in some cases by only one or two such intellectual property laws, with each body of law protecting a different feature of the given intellectual property. Consequently, definitions in the Patent and Tangible Research Property Policies and Procedures and the Copyright Policy and Procedures will at times overlap. When a single license agreement incorporates more than one type of intellectual property protection, prior to the execution of said license agreement, a written agreement shall be executed by the University and the authors stipulating which University intellectual property policy is applicable.

## 2. Commitment of Effort *(See also Conflict of Interest Policy, II.E.10)*.

A full-time faculty member's primary commitment in teaching and research is to the University of Pennsylvania. Any substantial teaching carried out in another setting, regardless of medium, for which students receive academic credit, must receive prior approval of the faculty member's dean. Any teaching, research or other activity in which the faculty member's department or school is actively engaged will presumptively claim the faculty member's primary effort, and carrying out these activities in another setting will also require a specific release from such commitment by the dean. The dean and faculty of each school should decide upon those academic activities (currently engaged in or reasonably likely to be engaged in by the school in the foreseeable future) other than teaching and research that are subject to the above restrictions.

## 3. Audio-Visual Works

Any videotapes or other recordings of classes or courses intended for students at the University of Pennsylvania belong to the University and may not be further distributed without permission from the appropriate school dean. Such audio-visual works may not be used commercially without the permission of everyone who appears in the final program.

A. This policy is not intended to apply to audio-visual works or recordings that have a specific short term use such as videotapes of lectures by job candidates, audio-visual works used to provide an alternative lecture when students may miss class because of a religious holiday, or audio-visual works used in teacher development programs.

B. Net revenues realized from the commercialization of audio-visual works and recordings using other media will be distributed as in 1.A.2.

## 4. Procedures for the Administration and Management of Copyrightable Works

A. Periodic Review of Policy. The Policy Statement on Copyrights and Commitment of Effort shall be reviewed on a periodic basis by a review committee appointed by the Provost in consultation with the Faculty Senate to determine whether it is accomplishing

its intended purposes; is in conformity with federal and state laws, including intellectual property laws; and, is consistent with prevailing norms in university-industry relationships. The review committee shall make recommendations to the Provost who shall confer with the President.

B. The Provost and Faculty Senate jointly shall annually appoint a faculty committee to resolve any disputes involving the interpretation or administration of the Policy Statement on Copyright and Commitment of Effort. The committee may, through procedures of its own design, review, mediate, and decide any such dispute brought before it. The Intellectual Property Officer shall provide staff support for the committee. Any decision of the committee may be appealed to the Provost, who will make a final decision for the University.

## 5. Appeal Mechanisms

This policy does not preclude a faculty member's access to appeal mechanisms, such as the Committee on Academic Freedom and Responsibility, Faculty Grievance Procedure, or the Provost.

## Additional Definitions

### Assignment

In addition to Section 5.0.2 of the Patent and Tangible Research Property Policies and Procedures, the execution of a formal document that transfers the right, title and interest of an author of a copyrightable work.

### Authors

The University faculty who would be considered authors under copyright laws of the United States and other jurisdictions, for such works as books, journals, articles, text, administrative reports, studies or models, glossaries, bibliographies, study guides, instructional materials, laboratory manuals, syllabi, tests, proposals, lectures, musical or dramatic compositions, films, film strips, charts, transparencies, video or audio recordings or broadcast, computer software, CD ROMS, circuitry, microprocessor designs and other works that may be copyrightable under laws of the United States and other jurisdictions. In the context of computer software, for purposes of this policy, authorship refers to those persons who conceive and make significant intellectual contributions to the development of such computer software, as well as to those persons who author source code, object codes, masks, patterns and the like who would be considered authors under the copyright laws of the United States and other jurisdictions.

### Copyrightable Work

A work fixed in tangible medium that may be copyrightable under laws of the United States and other jurisdictions.

### Computer Software

The source code and the object code, and related documentation, of computer programs and designs of computer circuitry and microprocessor chips.

# III.E. Patent and Tangible Research Property Policies and Procedures

*(Source: Resolution of the Trustees, January, 1966; revised, June 18, 1993 and Offices of the President and Provost, Almanac, March 15, 1994; revised, Resolution of the Trustees, February 11, 2005 and Offices of the Provost and the Faculty Senate, Almanac, February 22, 2005; revised, Office of the*

*Provost, Almanac, February 7, 2006; revised, Resolution of the Trustees, June 18, 2010 and Office of the Provost, Almanac, July 13, 2010; revised, Office of the Provost, Almanac, April 21, 2015 (https://almanac.upenn.edu/archive/volumes/v61/n31/pdf/042115-supplement.pdf); revised, Office of the Provost, Almanac, February 4, 2020 (https://almanac.upenn.edu/uploads/media/Patent_Policy_Supplement.pdf); revised, Office of the Provost, Almanac, August 10, 2021 (https://almanac.upenn.edu/uploads/media/081021-supplement.pdf); revised, Office of the Provost, December 16, 2022; revised, Office of the Provost, Almanac, October 10, 2023 (https://almanac.upenn.edu/volume-70-number-9/#patent-and-tangible-research-property-policies-and-procedures-of-the-university-of-pennsylvania-v70-n9))*

*The University periodically revises and updates its policies and procedures regarding patents and tangible research property, to ensure that these policies and procedures continue to meet the needs of the Penn community. The updated policy, effective **October 1, 2023**, contains an adjustment to the distribution of commercialization revenue as described in section 4.0.14: INITIAL DEDUCTION. This adjustment expands the range of the INITIAL DEDUCTION of GROSS PCI REVENUES from 5%-25% to 0%-25% and allows changes to be implemented at any time of the fiscal year. A reduction of the INITIAL DEDUCTION results in increased revenue distributions to the inventors, schools, and university. The Executive Committee of the Penn Center for Innovation approved the adjustment, and the Council of Deans and the Faculty Senate Executive Committee were notified.*

*—John L. Jackson, Jr., Provost*

*—Dawn Bonnell, Senior Vice Provost for Research*

*(Note: Words appearing in capital letters are defined in Article 4, unless they are defined in the document itself.)*

# Article 1. Preamble

**1.0** The Trustees of the University of Pennsylvania (the University) affirm the following principles as the basis for governing the intellectual property created by faculty, employees, students, and guest scholars of the University:

**1.1** The mission of the University includes the stimulation of basic and applied research activities of faculty, employees, and students of the University and the dissemination of the results of their research for the purpose of adding to the body of knowledge and serving the public interest.

**1.2** The purpose of this policy is to encourage and enable faculty, employees and students to translate new knowledge into social good and provide a framework within which the University can support and facilitate these actions.

**1.3** The University endeavors, where it deems appropriate, to secure intellectual property protection for the products of such research and to encourage commercial investment in and development of University intellectual property for the benefit of the public.

**1.4** The community has endowed the University with certain privileges, resources, and assets in the expectation that no single party will derive sole benefit or be unjustly enriched from what the community has endowed to the University.

**1.5** The University as a non-profit organization endeavors to marshal its resources and exploit its assets to serve the public interest and in so doing reinvests in the research enterprises of its faculty, employees, and students. Members of the University community share in the

University's responsibility to serve the public interest and have a duty to disclose and assign their inventions.

**1.6** The University is regularly the recipient of grants from the government, foundations or commercial enterprises for the support of research and is subject to legal and contractual obligations imposed by these entities.

**1.7** The University wishes to share the economic benefits of inventions or other intellectual property with the creators of such works in a way that is consistent with the research and educational mission of the University and conforms to the University's obligations to regulatory authorities, research sponsors, and licensees.

**1.8** In protecting and managing its intellectual property assets, the University insists that the academic freedom of its faculty and students be preserved and that collegiality and the open expression of ideas by and among members of the University community be encouraged.

# Article 2. Policy and Procedures on Inventions and Patents

**2.0 Policy Statement on Inventions and Patents.** It is the policy of the University that all INVENTIONS, together with associated MATERIALS, which are conceived or reduced to practice by INVENTORS in the course of employment at the University, or result from work directly related to professional or employment responsibilities at the University, or from work carried out on University time, or at University expense or with SUBSTANTIAL USE OF UNIVERSITY RESOURCES under grants or otherwise, are the property of the University, effective immediately as of the time such INVENTIONS are conceived or reduced to practice. INVENTORS hereby irrevocably assign to the University all right, title and interest in and to the INVENTIONS, MATERIALS and related patent applications and patents, and shall cooperate fully with the University in the preparation and prosecution of patent applications and patents. Patents, as they may be available on such INVENTIONS, may be applied for in any country by the University. The University will exercise its ownership and management of such INVENTIONS, with or without economic benefit, with due regard for the principles set forth in the Preamble (Article 1) of this PATENT POLICY. Procedures for implementation of this PATENT POLICY, including a PARTICIPATION AGREEMENT, shall be developed and promulgated by the President of the University.

**2.1 Procedures for the Administration and Management of Inventions and Patents.** The following procedures have been approved by the President as of the EFFECTIVE DATE:

**2.1.1 Participation Agreement.** All faculty, emeritus faculty, visiting faculty or other visitors using research facilities (including but not limited to individuals on sabbatical from another university or research facility), researchers, adjunct faculty, postdoctoral employees and trainees, graduate students and undergraduate students participating in research as employees or otherwise, and all salaried employees, shall execute a PARTICIPATION AGREEMENT (Appendix A) as a condition of employment, matriculation, participation in research or use of University resources. Notwithstanding the above, an individual acknowledges that they are bound by this PATENT POLICY by accepting or continuing University employment or by using University resources or facilities, and acknowledges that they hereby irrevocably assigns all right, title and interest in and to INVENTIONS, together with associated MATERIALS, and patent applications  and patents which may issue, effective as of

their first date of employment, matriculation, participation in research or use of any University resources, whichever occurs first, regardless of whether they execute or have executed a PARTICIPATION AGREEMENT. All students shall be advised of the University's intellectual property policies and procedures through publication and dissemination in the Penn Book (https://catalog.upenn.edu/pennbook/) and elsewhere.

**2.1.2 Disclosure and Review.** INVENTORS shall file INVENTION DISCLOSURES for all INVENTIONS covered by the PATENT POLICY promptly with the PENN CENTER FOR INNOVATION (PCI) at the University. PCI shall direct the review and management of the INVENTIONS under procedures and practices monitored by the EXECUTIVE COMMITTEE. PCI will undertake the review of the INVENTION DISCLOSURE within thirty (30) business days after the submission is completed, or, if requested by one or more INVENTORS, PCI will use reasonable efforts to undertake the review sooner if necessary to facilitate an upcoming publication, presentation or other public disclosure which could adversely affect whether to pursue patent protection. PCI will convey its determination of whether the University wishes to retain title to and pursue a patent application on an INVENTION as soon as practicable, in writing, after completing its review of a completed INVENTION DISCLOSURE submission and use reasonable efforts to convey such decision to all INVENTORS within three (3) months after receiving a complete INVENTION DISCLOSURE submission. If the University wishes to retain title to an INVENTION, upon the request of the INTELLECTUAL PROPERTY ADMINISTRATOR (IPA), an INVENTOR shall sign all documents necessary for the University to protect an INVENTION, file patent application(s), comply with applicable law in connection with such INVENTION and confirm in writing the INVENTOR'S prior assignment to the University of all right, title and interest in and to such INVENTION.

**2.1.3 Inventions Outside the PATENT POLICY.** If a faculty member, emeritus faculty, visiting faculty, other visitor using research facilities, researcher, adjunct faculty, postdoctoral employee or trainee, graduate student, undergraduate student, or salaried employee (an INDIVIDUAL) believes that a given INVENTION was made outside the scope of the PATENT POLICY, the INDIVIDUAL shall provide the IPA with a written statement of the circumstances leading to the making of the INVENTION. If, after reviewing the facts, the IPA determines that the INVENTION falls outside the scope of the PATENT POLICY, the IPA shall confirm in writing within thirty (30) days after receiving such written statement that the University has no right, title and interest to the INVENTION. If the facts are equivocal, or if the IPA believes that such INVENTION falls under the PATENT POLICY, the matter of ownership will be referred by the IPA or the INDIVIDUAL to the APPEALS BOARD, and the APPEALS BOARD shall make a recommendation to the President concerning ownership. Nothing in this PATENT POLICY is intended to imply or assume that an emeritus faculty member is making or has made a SUBSTANTIAL USE OF UNIVERSITY RESOURCES or imply or assume that an emeritus faculty member's invention falls under or outside the scope of this PATENT POLICY.

If an INDIVIDUAL makes an INVENTION which is outside the scope of the PATENT POLICY, and the IPA (or, if appealed, the President) agrees that such INVENTION is outside the scope of the PATENT POLICY, such INDIVIDUAL may request in writing to use the services of PCI in connection with the assessment, protection and/or commercialization of such INVENTION. PCI, in its sole discretion, may decline or may elect to use its personnel and services with respect to such INVENTION, on the condition that: (1) the INDIVIDUAL makes ASSIGNMENT to the University in a writing deemed sufficient by PCI; and (2) the INDIVIDUAL shall be deemed to be an INVENTOR and such invention shall be deemed to be an INVENTION within the scope of this PATENT POLICY, for all purposes

(including but not limited to distributions), effective as of the date of ASSIGNMENT. The use of PCI shall be deemed to be a SUBSTANTIAL USE OF UNIVERSITY RESOURCES. PCI's decision to decline shall not be reviewable by the APPEALS BOARD

**2.1.4 Student Inventions.**

**2.1.4.1** INVENTIONS made by students will remain the property of the students except:

**[a]** when an INVENTION is made in the course of employment at the University, or

**[b]** when an INVENTION results from work directly related to employment responsibilities at the University, or

**[c]** when an INVENTION results from work or research performed under a grant or other sponsorship where the grant or sponsorship requires ASSIGNMENT to the University, or

**[d]** when an INVENTION is created with another INVENTOR who has a duty to make or has made ASSIGNMENT to the University.

In such instances, students are hereby deemed to have irrevocably transferred and assigned all of their right, title and interest in and to such INVENTION, effective as of the first date conceived or reduced to practice, regardless of whether or when such student executes a PARTICIPATION AGREEMENT or other written agreement confirming assignment, and such undergraduate student shall be deemed an INVENTOR for purposes of sharing in distributions and otherwise pursuant to this PATENT POLICY.

**2.1.4.2** INVENTIONS created by or resulting from research carried out in University laboratories as part of a post-baccalaureate or postdoctoral degree or non-degree program shall be subject to this PATENT POLICY. In such instances, the individual shall be deemed to have hereby irrevocably made ASSIGNMENT to the University effective as of the first date of matriculation and will be deemed an INVENTOR for purposes of distributions and otherwise pursuant to this PATENT POLICY, regardless of whether or when such individual executes or executed a PARTICIPATION AGREEMENT or other written agreement confirming assignment.

**2.1.5 Return of Inventions.**

**2.1.5.1 Inventions Made without Outside Sponsorship.** If an INVENTION is made without sponsorship of the federal government or other sponsor, and the University does not wish to pursue a patent application in the United States or other jurisdiction, or elects to abandon a pending patent application, or does not wish to own an issued patent on a given INVENTION, the IPA may, after consultation with and subject to the approval of the Vice Provost for Research, return all of the University's right, title and interest to the INVENTION, patent application or issued patent to the INVENTORS, subject to and upon the terms and conditions set forth in Section 2.1.5.3.

**2.1.5.2 Inventions Made with Outside Sponsorship.** If an INVENTION is made with sponsorship of the federal government or other sponsor, and the University does not wish to pursue a patent application in the United States or other jurisdiction, or elects to abandon a pending patent application, or does not wish to own an issued patent on a given INVENTION, and the United States Government or other sponsor waives ownership rights, if any, the IPA may, after consultation with and subject to the approval of the Vice Provost for Research, return all of the University's right, title and interest to the INVENTION, patent application

or issued patent to the INVENTORS, subject to any other rights retained by the United States Government or other sponsors and subject to and upon the terms and conditions set forth in Section 2.1.5.3. If the INVENTION was made with sponsorship of the federal government, the INVENTORS are responsible for obtaining written approvals from the appropriate federal government representatives allowing the University to transfer the University's right, title and interest to the INVENTION to the INVENTORS and providing such written approvals to PCI prior to any return to the INVENTORS. If the INVENTION was made with sponsorship of the federal government, to the extent applicable under then-current law, the INVENTOR shall use reasonable efforts to arrange for development and commercialization opportunities for the INVENTION, and otherwise comply with all laws regarding the INVENTION and any additional requirements imposed by the federal government when approving the transfer to the INVENTORS.

**2.1.5.3 Conditions Regarding Return of Inventions.** Prior to the University transferring its right, title and interest to an INVENTION and any related patent(s) and/or patent application(s), each INVENTOR and PCI shall enter into a written agreement including at least the following terms:

**2.1.5.3.1** If the University elects to return an INVENTION made by more than one INVENTOR, the University will return an undivided interest in the whole, as defined by prevailing United States patent law, to each INVENTOR, unless directed otherwise in writing by all INVENTORS.

**2.1.5.3.2** In every case in which an INVENTION is returned to an INVENTOR, the University hereby reserves a royalty free, non-exclusive, irrevocable right to practice the INVENTION for research, educational and clinical care purposes, and to permit other academic institutions and not-for-profit research institutions to do the same. The University may seek reimbursement for any INVENTION ASSESSMENT COSTS incurred before the return from the INVENTOR. After the effective date of the return of the INVENTION, the University shall not be responsible for paying any ongoing INVENTION ASSESSMENT COSTS or other costs or expenses in connection with the returned INVENTION and any patents or patent applications for the returned INVENTION.

**2.1.5.3.3** The INVENTOR or INVENTORS jointly and severally, shall pay the University five percent (5%) of all GROSS COMPENSATION and report non-confidential information at least annually to PCI regarding efforts to commercialize the returned INVENTION and GROSS COMPENSATION received.

**2.1.5.3.4** Each INVENTOR shall represent and warrant that the INVENTOR has disclosed to PCI, as part of the INVENTION DISCLOSURE or otherwise: the best mode contemplated by the INVENTOR for carrying out the INVENTION; all facts and circumstances relevant to assessing the INVENTION DISCLOSURE and INVENTION; and has answered each question or inquiry from PCI about the INVENTION DISCLOSURE and INVENTION truthfully, to the best of the INVENTOR's knowledge and belief.

**2.1.5.3.5** INVENTORS have the obligation to disclose to the IPA, and make ASSIGNMENT of, improvements on returned INVENTIONS at the time such improvements are conceived or reduced to practice, if such improvements are conceived or reduced to practice under circumstances subject to the PATENT POLICY.

**2.1.5.3.6** Each INVENTOR shall acknowledge that the transfer of the University's interest in the INVENTION may raise issues under applicable University policies, including without limitation its conflict-of-interest policies and restrictions on use of University facilities and assets for private purposes and that the return of an INVENTION does not

constitute a waiver of any term in any University policy or its applicability to the INVENTOR. The INVENTOR will agree not to use University resources, personnel, time, facilities or assets to further develop, protect or commercialize the returned INVENTION, unless permitted after review by the University's Conflict of Interest Standing Committee and approved by the Vice Provost for Research.

**2.1.5.3.7** Each INVENTOR will and will cause any licensees or third persons participating in the development and commercialization of the INVENTION, to indemnify the University from any claims arising out of or resulting from or in connection with the INVENTION and its development and commercialization. The University will transfer its right, title and interest as is, without warranties.

**2.2 Conveyance of Rights to Inventions.**

**2.2.1 Licensing.** The University may convey rights to its INVENTIONS through license agreements under the terms of which the University retains all right, title and interest in and to its INVENTIONS, while granting to a commercial entity the right to make, use and/or sell products based on the INVENTION(S).

**2.2.1.1** INVENTORS or other University faculty or employees involved in the licensing of an INVENTION to a prospective licensee shall disclose any fiduciary or financial interest in or contractual relationship with the prospective licensee to their Deans and Chairs, or their relevant administrative supervisor, in accordance with the applicable University policy on conflicts of interest. In addition, INVENTORS or other University faculty or employees involved in the licensing of an INVENTION to a prospective licensee shall disclose any fiduciary or financial interest in that prospective licensee to the IPA, who shall refer consideration of the matter to the EXECUTIVE COMMITTEE.

**2.2.1.2** PCI will use reasonable efforts to notify INVENTORS of prospective licensees in an early stage of the negotiation process. The final decision on whether to license an INVENTION, to whom to license an INVENTION, the terms in the agreements and otherwise how to proceed with the license rests with PCI and is not appealable to the APPEALS BOARD or otherwise.

**2.2.2 Exceptions to Licensing.** Exceptions to the requirement that rights be conveyed through a license agreement shall be considered only in extreme or unusual circumstances and shall require approval by the President of the University.

**2.3 Distributions.** (For a hypothetical illustration of the distributions set forth in Sections 2.3.1 and 2.3.2, see Appendix C. Definitions for ADJUSTED PCI REVENUES FOR AN INVENTION, NET PCI INCOME FOR AN INVENTION and other key definitions are in Article 4).

**2.3.1 Distribution of Adjusted PCI Revenues.** Unless otherwise required by law or contract, ADJUSTED PCI REVENUES for the INVENTION (defined in Section 4.0.1, but generally described as the PRO RATA SHARE of GROSS PCI REVENUES [defined in Section 4.0.13] minus the INITIAL DEDUCTION [defined in Section 4.0.14]), shall be distributed as follows:

**2.3.1.1** The INVENTORS PERSONAL SHARE shall be thirty percent (30%) of the ADJUSTED PCI REVENUES for the INVENTION (see Sec. 2.3.4).

**2.3.1.2** The INVENTORS RESEARCH ACTIVITY SHARE shall be twelve and one-half percent (12.5%) of the ADJUSTED PCI REVENUES for the INVENTION (see Sec. 2.3.5).

**2.3.2 Distribution of Net PCI Income.** NET PCI INCOME for the INVENTION (defined in Section 4.0.23, but generally described as the amount remaining after distributions in Section 2.3.1, minus the PRO RATA SHARE of AGGREGATE PCI OPERATING COSTS [defined in Section 4.0.3]) shall be distributed as follows:

**2.3.2.1** The SCHOOLS OF INVENTORS SHARE shall be sixty percent (60%) of the NET PCI INCOME for the INVENTION (see Sec. 2.3.6).

**2.3.2.2** The UNIVERSITY RESEARCH SHARE shall be forty percent (40%) of the NET PCI INCOME for the INVENTION (see Sec. 2.3.7).

**2.3.3 Allocation of the EQUITY POOL.** (Procedures governing licensing transactions for EQUITY are set forth in Appendix B.) Under license agreements for which the University has negotiated an EQUITY POOL, where, in accordance with Appendix B.4, EQUITY will be issued directly to the INVENTOR(S), the INVENTORS shall receive thirty percent (30%) of the EQUITY POOL, unless one or more INVENTORS receive EQUITY from the licensee outside of the EQUITY POOL. An INVENTOR who receives EQUITY from the licensee outside of the EQUITY POOL shall not receive EQUITY from the EQUITY POOL except with approval of the University. The IPA shall make a recommendation in this regard to the Vice Provost for Research, who shall make a determination in consultation with the relevant Deans. Furthermore, if one or more INVENTORS receive EQUITY outside of the EQUITY POOL, the portion of the EQUITY POOL to be received by the other INVENTORS shall be reduced in proportion to the contribution to the licensed INVENTIONS, as determined by PCI, made by the INVENTORS who receive EQUITY outside of the EQUITY POOL.

**2.3.3.1** INVENTORS receiving EQUITY from the EQUITY POOL or outside the EQUITY POOL may also receive INVENTORS PERSONAL SHARE of ADJUSTED PCI REVENUES FOR THE INVENTION. An exception to this may arise in certain circumstances, such as when INVENTORS receive founders EQUITY, EQUITY for consulting services or other consideration from the licensee. In such cases, the University may determine that such INVENTORS shall not receive some or any of the INVENTORS PERSONAL SHARE of ADJUSTED PCI REVENUES for the INVENTION. The IPA shall make a recommendation in this regard to the Vice Provost for Research, who shall make a determination in consultation with the relevant Dean(s).

**2.3.3.2 Non-cash Component of License.** Any tangible, noncash considerations (except EQUITY) in licenses will be distributed by PCI on a case-by-case basis, in consultation with the INVENTOR(S), Vice Provost for Research and the relevant Dean(s).

**2.3.4 Rules Governing the INVENTORS PERSONAL SHARE**
. The INVENTORS PERSONAL SHARE of ADJUSTED PCI REVENUES for the INVENTION, under Section 2.3.1.1, shall be distributed among all INVENTORS (if more than one), as the INVENTORS unanimously designate in writing to the IPA. If the INVENTORS fail to make such unanimous written designation before the license agreement is executed, the INVENTORS PERSONAL SHARE of ADJUSTED PCI REVENUES shall be distributed among all INVENTORS as PCI, in its sole discretion, shall designate, and shall not be appealable to the APPEALS BOARD. The INVENTORS share of the EQUITY POOL under Section 2.3.3 shall be distributed among all INVENTORS entitled to share in the EQUITY POOL (if more than one), as such INVENTORS unanimously designate in writing to the IPA. If the INVENTORS entitled to share in the EQUITY POOL fail to make such unanimous written designation before the license agreement is executed, the INVENTORS share of the EQUITY POOL shall be distributed among INVENTORS entitled to share in the

EQUITY POOL as PCI, in its sole discretion, shall designate, and shall not be appealable to the APPEALS BOARD .

**2.3.4.1** If an INVENTOR ceases employment at and association with the University, the INVENTORS designated portion of the INVENTORS PERSONAL SHARE of ADJUSTED PCI REVENUES under Section 2.3.1.1 and of the INVENTORS share of the EQUITY POOL under Section 2.3.3 shall remain payable to such INVENTOR. If an INVENTOR dies, the INVENTORS designated portion of the INVENTORS PERSONAL SHARE shall remain payable to the INVENTOR's estate.

**2.3.5 Rules Governing the Inventors Research Activity Share.** The INVENTORS RESEARCH ACTIVITY SHARE, when the INVENTORS are faculty, shall be used only for research purposes approved by the department chair(s) of the relevant department(s).

**2.3.5.1** The INVENTORS RESEARCH ACTIVITY SHARE shall be divided among the INVENTORS (if more than one) in the same proportion as the INVENTORS PERSONAL SHARE is divided among the INVENTORS (the "DESIGNATED PROPORTION"), unless the INVENTORS unanimously request in writing, and the dean(s) of the relevant school(s) and Vice Provost for Research approve, some other distribution.

**2.3.5.2** If a sole faculty INVENTOR is no longer employed by or associated with the University, the INVENTORS RESEARCH ACTIVITY SHARE shall be distributed to the INVENTOR'S school at the University to support research in the school. If there is more than one faculty INVENTOR, and one of those INVENTORS is no longer employed by or associated with the University, that share shall be distributed evenly to support the research activity of the INVENTORS who remain. If no faculty INVENTORS remain employed by or associated with the University, the INVENTORS RESEARCH ACTIVITY SHARE will be distributed to the INVENTORS school(s) to support research in the school(s).

**2.3.5.3** When an INVENTOR is an undergraduate student, the INVENTORS RESEARCH ACTIVITY SHARE shall be distributed to the University's Center for Undergraduate Research and Fellowships (CURF) or its successor organization, or if no successor organization, to the Provost's Office to be used to further and support research by undergraduate students, through a budget approved by the Provost. When INVENTORS are graduate students or postdoctoral employees or trainees, the corresponding INVENTORS RESEARCH ACTIVITY SHARE shall be distributed to the laboratory to which they are primarily assigned or in which they primarily conducted the research leading to the INVENTION. If such INVENTORS do not have a primary laboratory affiliation, their corresponding INVENTORS RESEARCH ACTIVITY SHARE shall be distributed to their school. Amounts so distributed shall be used to further the education and research activity of the INVENTOR while at the University and/or for other research purposes through a budget approved by the department chair(s) of the relevant department(s) or dean.

**2.3.5.4** When an INVENTOR is an emeritus faculty member at the time of the INVENTION, the INVENTORS RESEARCH ACTIVITY SHARE shall be distributed to the INVENTOR'S last school before assuming emeritus status, unless that emeritus faculty INVENTOR, and the emeritus faculty INVENTOR's dean, agree in writing upon a different distribution. Such different distribution may include, without limitation, payment of all or a portion of such INVENTORS RESEARCH ACTIVITY SHARE to the emeritus faculty as part of the INVENTORS PERSONAL SHARE. Any such proposed different distribution of an INVENTORS RESEARCH ACTIVITY SHARE for an emeritus faculty INVENTOR is subject to review and approval by the Vice Provost for Research. The emeritus faculty INVENTOR may appeal

the inability to reach an agreement upon a different distribution, or any disapproval by the Vice Provost for Research, to the APPEALS BOARD. Amounts received by the school shall be used for research purposes only through a budget approved by the dean(s) of the relevant school(s)..

**2.3.6 Rules Governing the Schools of Inventors Share.** The SCHOOLS OF INVENTORS SHARE may be used for any research purpose designated by the dean(s) of the school(s). At the discretion of the dean(s), any portion of the SCHOOLS OF INVENTORS SHARE may be distributed to department(s), research centers, and/or research institutes to support research. The dean(s) will develop a process within each school, that is reasonably calculated to incentivize units, such as departments, to support research at various stages of development.

**2.3.6.1** If an INVENTION is made by INVENTORS from different schools, the SCHOOLS OF INVENTORS SHARE shall be divided among the schools in the DESIGNATED PROPORTION. A school will retain its portion of SCHOOLS OF INVENTORS SHARE if an INVENTOR from that school is no longer employed by or associated with the School or the University.

**2.3.7 Rules Governing the University Research Share.** The UNIVERSITY RESEARCH SHARE shall be used for the general support of research at the University as determined by the Provost. The Provost will release periodic reports describing the use of these funds.

**2.3.8 Periodic Reports of Use of Funds to Support Research.** The deans of each school that receive funds during the FISCAL YEAR as SCHOOLS OF INVENTORS SHARES should submit a report to the Vice Provost for Research at least once during the subsequent FISCAL YEAR describing the process to determine the distribution and use of these funds for research purposes and the support of research.

**2.3.9 Invention Revenue Distribution for Non-Academic Inventors.** When an INVENTOR is other than a faculty member, emeritus faculty, employee of an academic laboratory, student or postdoctoral employee or trainee, the distribution of ADJUSTED PCI REVENUES FOR THE INVENTION (other than the INVENTORS PERSONAL SHARE) and NET PCI INCOME for the INVENTION shall be determined by the Vice Provost for Research on a case-by-case basis with a recommendation from the IPA.

**2.3.10 INVENTORS with Joint Appointments.** If an INVENTOR has joint appointments in two or more schools and there is no primary appointment (for example only, a Penn Integrates Knowledge professor), the deans shall determine an equitable apportionment of that INVENTOR's portion of the INVENTORS RESEARCH ACTIVITY SHARE, and SCHOOLS OF INVENTORS SHARE, unless the Deans of such schools had previously agreed on an allocation for such INVENTOR.

**2.4 Implementation of Procedures for Distributions.**

**2.4.1 Inventions Disclosed and Licensed After the Effective Date.** Distributions from all INVENTIONS disclosed and licensed on or after the EFFECTIVE DATE shall be governed by the procedures in Section 2.3.

**2.4.2 Inventions Disclosed Before the Effective Date but Licensed After the Effective Date.** Distribution of income from all INVENTIONS disclosed before the EFFECTIVE DATE, but not yet subject to a license agreement as of the EFFECTIVE DATE, shall be governed by the procedures in Section 2.3.

**2.4.3 Inventions Disclosed and Licensed Before the Effective Date.** All distributions during and after the FISCAL YEAR that the revised PATENT POLICY becomes effective, including distributions for an INVENTION

whose disclosure or licensing was completed prior to the EFFECTIVE DATE of the revised PATENT POLICY, will be made according to the revised PATENT POLICY and shall thus be governed by the procedures in Section 2.3.

**2.5 Administration of Distributions and Reporting.** Distributions, with a report outlining how the amounts were calculated, shall be made to each recipient within sixty (60) days after the end of the FISCAL YEAR. PCI will use reasonable efforts to distribute the INVENTORS PERSONAL SHARE more frequently than once each year. The University will not pay interest on amounts received and held by the University pending distribution.

**2.6 Use of Outside Facilities.** Faculty members, employees or students who use research facilities at another institution or a corporation (including, without limitation, when on sabbatical from the University or as visiting faculty or visiting researchers) shall contact the IPA prior to commencing such use, for assistance in evaluating the policies of the host institution or corporation as appropriate. Graduate students who are conducting research in commercial research facilities should obtain a written assurance of their right to publish the results of their research. Faculty members, employees or students who engage in outside employment or consulting agreements are referred to the Consulting and Outside Activities Policies and Procedures of the University of Pennsylvania (CONSULTING POLICY).

# Article 3. Policy and Procedures Relating to Tangible Research Property

**3.0 Policy Statement on Tangible Research Property.** TANGIBLE RESEARCH PROPERTY made by INVESTIGATORS in the course of employment at the University, or work or research directly related to professional, educational or employment responsibilities, or work or research carried out on University time, or at University expense or with SUBSTANTIAL USE OF UNIVERSITY RESOURCES under grants or otherwise, is the property of the University. INVESTIGATORS hereby irrevocably assign to the University all right, title and interest in and to the TANGIBLE RESEARCH PROPERTY and shall cooperate fully with the University in the preparation and prosecution of patents or other intellectual property protection, if available and applicable. The University and INVESTIGATORS will endeavor to make such property available to the research community on a reasonable basis, consistent with other University policies, procedures and legal obligations and pursuant to a written agreement in a form approved by the Office of General Counsel, including but not limited to a materials transfer agreement, license agreement, deposit to a research or data bank repository or other form of agreement.

**3.1 Disclosure to PCI.** INVESTIGATORS shall disclose new TANGIBLE RESEARCH PROPERTY promptly to PCI.

**3.2 Revenues from Transfer of Tangible Research Property.** Unless otherwise required by law or contract, for TANGIBLE RESEARCH PROPERTY which is defined as an INVENTION, distributions will be calculated in accordance with Section 2.3. For TANGIBLE RESEARCH PROPERTY which is not defined as an INVENTION, distributions will be calculated as follows, unless otherwise required by law or contract: PCI shall determine the GROSS PCI REVENUES for the TANGIBLE RESEARCH PROPERTY. Then, PCI shall determine, in conjunction with the INVESTIGATORS and the appropriate University staff, the applicable TANGIBLE RESEARCH PROPERTY DIRECT GENERATION COSTS. The TANGIBLE RESEARCH PROPERTY DIRECT GENERATION COSTS shall be reimbursed to the University account(s) of the INVESTIGATOR(S) and/ or such other school, department or other

accounts from which portions of the TANGIBLE RESEARCH PROPERTY DIRECT GENERATION COSTS were paid. The amount remaining, if any, after deducting the TANGIBLE RESEARCH PROPERTY DIRECT GENERATION COSTS from the GROSS PCI REVENUES for the TANGIBLE RESEARCH PROPERTY, and after deducting the applicable INITIAL DEDUCTION, shall be defined as the ADJUSTED PCI REVENUES for such TANGIBLE RESEARCH PROPERTY. The ADJUSTED PCI REVENUES for the TANGIBLE RESEARCH PROPERTY or NET PCI INCOME for the TANGIBLE RESEARCH PROPERTY (as the case may be) shall be distributed in accordance with Section 2.3 above (substituting the INVESTIGATOR(S) for the INVENTOR(S) and the TANGIBLE RESEARCH PROPERTY for the INVENTION, where application in applying this PATENT POLICY):

**3.2.1** Thirty percent (30%) of ADJUSTED PCI REVENUES for the TANGIBLE RESEARCH PROPERTY as the INVESTIGATORS PERSONAL SHARE (see Sec. 2.3.1.1).

**3.2.2** Twelve and one-half percent (12.5%) of ADJUSTED PCI REVENUES for the TANGIBLE RESEARCH PROPERTY as the INVESTIGATORS RESEARCH ACTIVITY SHARE (see Sec. 2.3.1.2).

**3.2.3** Sixty percent (60%) of NET PCI INCOME for the TANGIBLE RESEARCH PROPERTY as the SCHOOLS OF INVENTORS SHARE (see Sec. 2.3.2.1).

**3.2.4** Forty percent (40%) of NET PCI INCOME for the TANGIBLE RESEARCH PROPERTY as the UNIVERSITY RESEARCH SHARE (see Sec. 2.3.2.2).

**3.3. Program Income and Sponsored Awards.** INVESTIGATORS and PCI shall report any GROSS PCI REVENUES from TANGIBLE RESEARCH PROPERTY to the Office of Research Services for a determination whether such revenues must be reported to a funding agency or sponsor as program income. In those circumstances in which GROSS PCI REVENUES from the TANGIBLE RESEARCH PROPERTY may be considered program income under federal law, or grant, award or contract terms, or where the distribution formula set forth in Section 3.2. would be prohibited by law or applicable contract, the UNIVERSITY will equitably share any ADJUSTED PCI REVENUES for such TANGIBLE RESEARCH PROPERTY, if any, while remaining in compliance with its legal obligation.

# Article 4. Definitions and Miscellaneous

**4.0.1 TOTAL ADJUSTED PCI REVENUES** means GROSS PCI REVENUES minus the INITIAL DEDUCTION. **ADJUSTED PCI REVENUES FOR AN INVENTION** means the PRO RATA SHARE of the TOTAL ADJUSTED PCI REVENUES.

**4.0.2 ADJUSTED PROCEEDS FOR AN INVENTION** means ADJUSTED PCI REVENUES FOR AN INVENTION, minus the INVENTORS PERSONAL SHARE and minus the INVENTORS RESEARCH ACTIVITY SHARE.

**4.0.3 AGGREGATE PCI OPERATING COSTS** means all of PCI's internal or out-of-pocket expenses to operate PCI, as allocated to and determined by the University, during a FISCAL YEAR, including, without limitation: salaries, benefits and other personnel costs; expenses related to licensing and distribution, and attempts to license and/or distribute, INVENTIONS, TANGIBLE RESEARCH PROPERTY, copyrightable works, and trademarks; fees and expenses paid to third persons (excluding REIMBURSED IP EXPENSES); overhead expense; finder's fees or commissions; EQUITY or other consideration paid or due to patent management organizations; expenses in connection with the sale, investment or management of EQUITY or the EQUITY POOL; litigation or dispute resolution costs and expenses; and consideration paid or

due third persons as a result of settlement of or judgment in a dispute; applicable taxes (if any) and other operating expenses the University allocates to PCI. AGGREGATE PCI OPERATING COSTS includes all UNREIMBURSED IP EXPENSES.

**4.0.4 APPEALS BOARD** is empowered to resolve disputes arising from the interpretation or administration of this PATENT POLICY, as described in Section 4.2. The APPEALS BOARD comprises nine (9) voting members (seven [7] standing members and two [2] ad hoc members). The seven standing members shall be comprised of: one (1) voting chair, appointed by the Faculty Senate and who shall be a Standing Faculty member; four (4) administrators (each appointed by the Vice Provost for Research); and two (2) term faculty appointed by the Faculty Senate. The two (2) ad hoc members shall be faculty selected for expertise by the dean(s) of the relevant school(s) or the chair(s) of the relevant departments(s), except that if one or more of the individuals involved in the appeal is an emeritus faculty, the two ad hoc voting members selected by the dean(s) or department chair(s) shall be emeritus faculty and if one or more of the individuals involved in the appeal is a graduate student, the two ad hoc voting members selected by the dean(s) or department Chair(s) shall be graduate students. In addition, the APPEALS BOARD shall include one nonvoting member ex officio, who shall be an attorney from the Office of General Counsel and appointed by the General Counsel. The APPEALS BOARD shall be staffed by the Office of the Vice Provost for Research.

**4.0.5 ASSIGNMENT** means the execution of a written agreement by an INVENTOR assigning all of the INVENTOR'S right, title and interest in and to an INVENTION or TANGIBLE RESEARCH PROPERTY. INVENTIONS are deemed automatically and irrevocably assigned, effective as of the time they are conceived or reduced to practice, regardless of whether or when such individual executes a PARTICIPATION AGREEMENT or other written agreement confirming assignment.

**4.0.6 PENN CENTER FOR INNOVATION (PCI)** means the administrative unit, under the direction of the INTELLECTUAL PROPERTY ADMINISTRATOR, which is responsible for the receipt, review, management and administration of intellectual property matters of the University.

**4.0.7 EFFECTIVE DATE** means the earlier of October 1, 2023, or the date this version of this PATENT POLICY was adopted by the Trustees of the University.

**4.0.8 EQUITY** means ownership interests or securities, including but not limited to shares of stock or securities; stock options; warrants or any other rights to purchase stock or securities; debt instruments; partnership interests in a general or limited partnership; or membership interests in a limited liability company or partnership.

**4.0.9 EQUITY POOL** means the total allotment of EQUITY negotiated by the University as consideration for a license of the University's interests in an INVENTION or TANGIBLE RESEARCH PROPERTY.

**4.0.10 EXECUTIVE COMMITTEE** provides oversight and steering of the technology transfer process, including assisting in setting the operating budget for the PCI. The EXECUTIVE COMMITTEE is appointed by the Provost in consultation with the Vice Provost for Research and chaired by the Vice Provost for Research or a Dean designated by the Vice Provost for Research. The EXECUTIVE COMMITTEE is comprised of the INTELLECTUAL PROPERTY ADMINISTRATOR, ex officio; the Vice Provost for Research; the dean of the Perelman School of Medicine or the Dean's designee; one faculty from each of the School of Arts and Sciences and the School of Engineering and Applied Science; one at-large faculty;

and an attorney from the Office of the General Counsel selected by the General Counsel, who shall be non-voting and ex officio.

**4.0.11 FISCAL YEAR** means the period from July 1 through June 30 (or, should the University adjust its fiscal year, the same period as the University's then-current fiscal year for federal tax purposes).

**4.0.12 GROSS COMPENSATION** means all cash or other compensation received or to which someone is entitled due to or arising out of or related to or in connection with the licensing, sale, development, commercialization or other exploitation of the INVENTION, including without limitation royalties, sales receipts, upfront payments, option fees, milestone payments, equity proceeds, other securities or investments, infringement or settlement proceeds or other forms of monetization or compensation.

**4.0.13 GROSS PCI REVENUES** means all gross revenues actually received by PCI during the FISCAL YEAR from all agreements arising out of or related to or in connection with the licensing, development, commercialization or other exploitation of an INVENTION or TANGIBLE RESEARCH PROPERTY, or intellectual property related to an INVENTION or TANGIBLE RESEARCH PROPERTY, whether involving patents, know-how, trademarks, copyrights and/or other forms of intellectual property, but excluding: (1) payments made to the University under sponsored research agreements or research awards, grants and contracts; (2) revenues payable to a third party sponsor or funder pursuant to a funding agreement, where performance of the sponsored or funded research directly gave rise to the INVENTION or TANGIBLE RESEARCH PROPERTY; (3) revenues related to the licensing of a University or Penn Medicine trademark (e.g., trademark royalties in connection with Penn-branded apparel, etc.) and unrelated to the licensing, development or other exploitation of an INVENTION or TANGIBLE RESEARCH PROPERTY; (4) consideration payable to a university or other third party related to co-inventor(s) or contributors to INVENTIONS or TANGIBLE RESEARCH PROPERTY having a duty to assign to such university or other third party (for example only, revenues payable to another institution due to joint inventorship or inter-institutional arrangements); and (5) accrued interest. GROSS PCI REVENUES includes, without limitation: license fees; license maintenance fees; minimum royalties; sublicense payments; milestone payments; option fees; royalties on sales of products and services; proceeds realized from the sale or other disposition of EQUITY from an EQUITY POOL; dividends and other monetary distributions related to EQUITY from an EQUITY POOL; and settlements of lawsuits or intellectual property disputes with third parties related to an INVENTION DISCLOSURE, INVENTION or TANGIBLE RESEARCH PROPERTY. GROSS PCI REVENUES does not include REIMBURSED IP EXPENSES.

**4.0.14 INITIAL DEDUCTION** means a percentage of GROSS PCI REVENUES for an INVENTION, and a percentage of GROSS PCI REVENUES for TANGIBLE RESEARCH PROPERTY which is not defined as an INVENTION, in each case where such percentage is approved by the EXECUTIVE COMMITTEE. The percentage amount of the INITIAL DEDUCTION will be reviewed and may be adjusted, at least once each five (5) years, by the EXECUTIVE COMMITTEE. The EXECUTIVE COMMITTEE may recommend adjusting the INITIAL DEDUCTION percentage to an amount no greater than twenty five percent (25%) and not less than zero percent (0%) for INVENTIONS and/or to an amount no greater than seven percent (7%) and not less than zero percent (0%) for TANGIBLE RESEARCH PROPERTY which is not defined as an INVENTION. Any adjustment to the INITIAL DEDUCTION recommended by the EXECUTIVE COMMITTEE and approved by the President will take effect as of the first day of the FISCAL YEAR following the President's approval and will be announced broadly prior to the start of such FISCAL YEAR,

unless the adjustment benefits the faculty and the schools in which case the change can be implemented at any time during the FISCAL YEAR. Effective as of July 1, 2023, INITIAL DEDUCTION means zero percent (0%) of GROSS PCI REVENUES for an INVENTION, and zero percent (0%) of GROSS PCI REVENUES for TANGIBLE RESEARCH PROPERTY which is not defined as an INVENTION.

**4.0.15 INTELLECTUAL PROPERTY ADMINISTRATOR (IPA)** means the Executive Director of PCI (or Executive Director's successor, as designated by the Vice Provost for Research).

**4.0.16 INVENTION** means and includes discoveries and inventions and related technical information, trade secrets, developments, knowhow, methods, techniques, formulae, data and processes; TANGIBLE RESEARCH PROPERTY upon which a patent has issued, or a patent application has been filed and is still pending; and other proprietary matter.

**4.0.17 INVENTION DISCLOSURE** means the written submission to the IPA, on standard invention disclosure forms available from PCI, of a written description of any INVENTION that an INVENTOR believes the INVENTOR has made.

**4.0.18 INVENTORS** means University faculty, emeritus faculty, visiting faculty or researchers, adjunct faculty, postdoctoral employees or trainees, or other employees, or students, or others who individually or jointly make an INVENTION subject to the PATENT POLICY and who meet the criteria for inventorship under United States patent laws and regulations.

**4.0.19 INVENTION ASSESSMENT COSTS** means all historic out-of-pocket costs and expenses related to the review, assessment and protection of the INVENTION DISCLOSURE and the INVENTION, including without limitation patent and copyright application costs and expenses, legal fees, filing fees, search fees, fees for legal opinions, patent fees, IP EXPENSES, and other out-of-pocket transactional costs attributable to the INVENTION DISCLOSURE and the INVENTION.

**4.0.20 INVESTIGATOR** means any University faculty member, emeritus faculty, visiting faculty or researcher, adjunct faculty, postdoctoral employee or trainee, or other employee, or an undergraduate or graduate student engaged in sponsored or unsponsored research.

**4.0.21 IP EXPENSES** means all out-of-pocket expenses incurred or accrued during the FISCAL YEAR by PCI arising out of or related to or in connection with the review, assessment, protection, licensing, defense, enforcement or audit of intellectual property rights related to INVENTION DISCLOSURES, INVENTIONS, TANGIBLE RESEARCH PROPERTY and copyrightable works, or the defense, enforcement or audit of licenses or other agreements related to INVENTION DISCLOSURES, INVENTIONS, TANGIBLE RESEARCH PROPERTY or copyrightable works, including but not limited to: outside legal and patent agent fees and expenses; search fees and expenses; application fees; fees for legal opinions; government filing and maintenance fees; legal fees to defend or enforce intellectual property, license agreements, option agreements, confidentiality agreements, or other agreements related to the INVENTION DISCLOSURE, INVENTION, TANGIBLE RESEARCH PROPERTY or copyrightable work; fees and expenses to audit licensees and related agreements; and other out-of-pocket transactional costs related to patent, copyright, trademark and other intellectual property protection or licensing anywhere in the world. **REIMBURSED IP EXPENSES** means IP EXPENSES for which PCI received or accrued payment or reimbursement from a licensee, INVENTOR or third person before the end of the FISCAL YEAR. **UNREIMBURSED IP EXPENSES** means all of the IP EXPENSES minus

the REIMBURSED IP EXPENSES at the end of the FISCAL YEAR, as shown in the accounting records of PCI (excluding accrued payments or reimbursements).

**4.0.22 MATERIALS** means lab notebooks, records, drawings, sketches, photographs, radiographs or other images, models, biological specimens, chemical samples or other materials needed to support the preparation, submission, prosecution, defense or enforcement of a patent in the United States or other applicable jurisdictions.

**4.0.23 NET PCI INCOME FOR AN INVENTION** means the ADJUSTED PROCEEDS FOR AN INVENTION, minus the PRO RATA SHARE of the AGGREGATE PCI OPERATING COSTS. If zero or a negative number, then there is no NET PCI INCOME FOR AN INVENTION. (As an example, if the ADJUSTED PROCEEDS FOR AN INVENTION equals $273,125, the PRO RATA SHARE is five percent (5%), and the AGGREGATE PCI OPERATING COSTS equals $4,500,000, the NET PCI INCOME FOR AN INVENTION equals [$273,125 minus (0.05 x $4,500,000)], or $48,125).

**4.0.24 PATENT POLICY** means this Patent and Tangible Research Property Policies and Procedures of the University of Pennsylvania, with any amendments.

**4.0.25 PARTICIPATION AGREEMENT** means a written agreement substantially in the form of Appendix A to the PATENT POLICY, setting out rights and responsibilities of University faculty, emeritus faculty, visiting faculty and researchers, adjunct faculty, postdoctoral employees and/or other salaried employees, students and others under the University's policies and procedures, and confirming the automatic assignment of ownership of INVENTIONS covered under the PATENT POLICY, to the University.

**4.0.26 PRO RATA SHARE** means the ratio (expressed as a percentage) of the GROSS PCI REVENUES directly generated by and attributable to an INVENTION and/or TANGIBLE RESEARCH PROPERTY, as determined by PCI, compared to the entire GROSS PCI REVENUES, during a FISCAL YEAR. (As an example, if the GROSS PCI REVENUES directly generated by and attributable to an INVENTION total $600,000 in a FISCAL YEAR and the GROSS PCI REVENUES total $12,000,000 in a FISCAL YEAR, the PRO RATA SHARE is five percent (5%).)

**4.0.27 SIGNIFICANT EQUITY INTEREST** means any EQUITY or other financial interest that when aggregated for the individual and the individual's spouse and dependent children exceeds $25,000 in value, as determined through reference to public prices or other reasonable measures of fair market value and does not represent more than five percent (5%) ownership interest in any single entity.

**4.0.28 STAKEHOLDERS** means shareholders, owners, members, general partners, limited partners or other owners or investors in an entity.

**4.0.29 SUBSTANTIAL USE OF UNIVERSITY RESOURCES** means the use of University funds, facilities, equipment, or other resources significantly in excess of the norm for educational or research purposes in the department or school in which the faculty member(s) holds their primary appointment(s) or in which a staff member or student is enrolled or employed. Academic year salary, office, usual library resources, usual secretarial and administrative staff resources or usual computer equipment, among other things, are not regarded as constituting "substantial use of University resources." Any question about what constitutes substantial use of University resources should be referred to the Vice Provost for Research.

**4.0.30 TANGIBLE RESEARCH PROPERTY** means unique research products or tools, such as biological materials or chemical moieties, whether or not patentable or otherwise protectable using intellectual property laws. Categories of biological material include organisms, cells, viruses, cell products, cloned DNA, as well as DNA sequences, mapping information and crystallographic coordinates. Some specific examples of biological materials include specialized and/or genetically defined cells, including normal and diseased human cells; monoclonal cell lines; hybridoma cell lines; microbial cells and products; viruses and viral products; recombinant nucleic acid molecules; DNA probes; nucleic acid and protein sequences; and transgenic mice or other animals. Categories of chemical moieties or engineered products include sample compounds, reagents, intermediates, models, sensors, devices, equipment, computer hardware or firmware, diagrams or computer media.

**4.0.31 TANGIBLE RESEARCH PROPERTY DIRECT GENERATION COSTS** means all of the documented and verifiable direct costs and expenses attributable or  allocated to the generation of the quantities of TANGIBLE RESEARCH PROPERTY distributed which led to the receipt of GROSS PCI REVENUES from such TANGIBLE RESEARCH PROPERTY. As an example, only the costs of raw materials, supplies, reagents, specialized equipment, and other direct costs and expenses necessary to generate the quantity of TANGIBLE RESEARCH PROPERTY constitutes TANGIBLE RESEARCH PROPERTY DIRECT GENERATION COSTS. Salaries, overhead and equipment which is otherwise used for teaching or numerous research purposes is not part of TANGIBLE RESEARCH PROPERTY DIRECT GENERATION COSTS. (Any disagreement among the INVESTIGATORS and PCI regarding the calculation of TANGIBLE RESEARCH PROPERTY DIRECT GENERATION COSTS may be appealed to the APPEALS BOARD).

**4.1 Review of Policies and Procedures.** The EXECUTIVE COMMITTEE together with the Vice Provost for Research shall review the PATENT POLICY (including Appendix B), from time to time to determine whether it is accomplishing its intended purposes and is in conformity with applicable laws and regulations, including intellectual property laws. The EXECUTIVE COMMITTEE shall make recommendations for amendments or other changes to the Provost and the Faculty Senate, who shall confer with the President. The President may amend the PATENT POLICY including but not limited to an adjustment to the INITIAL DEDUCTION, upon consultation with the Faculty Senate, and the Vice Provost for Research.

**4.2 Disputes Under Policies and Procedures.** Except as expressly set forth otherwise in this PATENT POLICY, disputes arising from the interpretation or administration of the PATENT POLICY may be referred by any interested party to the Chair of the APPEALS BOARD and the Office of the Vice Provost for Research, who will promptly notify the IPA. The APPEALS BOARD shall first determine whether it has jurisdiction to hear any such dispute before proceeding. The APPEALS BOARD shall provide an equitable mechanism for the review and resolution of disputes brought before it and shall have the authority to make a judgment with respect to such disputes. The APPEALS BOARD shall use reasonable efforts to make a judgment with respect to any dispute within thirty (30) days after having any such dispute referred to it. Any judgment of the APPEALS BOARD may be appealed by any interested party to the Vice Provost for Research. The Vice Provost for Research shall consider the matter de novo and shall use reasonable efforts to review any such appeal and make a judgment with respect to any appeal, within thirty (30) days after having any such dispute referred to them. Any judgment of the Vice Provost for Research may be appealed to the President, who will make a final decision for the University.

**4.3 No Change to Relationships.** Nothing in this PATENT POLICY or the actions taken in connection with INVENTIONS, TANGIBLE RESEARCH PROPERTY or EQUITY, is intended to or shall be interpreted or deemed to create a fiduciary, trust or agency relationship between the University or any of its units or personnel, and any faculty, staff, student or INVENTOR.

# Appendix A. Participation Agreement

In order that the University may fulfill legal and contractual obligations to sponsors of research, including but not limited to the federal government, and in consideration of my employment by the University, or my participation in sponsored research, or my use of funds, facilities, or other resources provided by the University, I hereby agree as follows:

I have read, and I understand and agree that I am bound by, the terms of the *Patent and Tangible Research Property Policies and Procedures of the University of Pennsylvania*, as well as by the terms of any revisions or amendments adopted by the President and/or the Trustees of the University of Pennsylvania (collectively, the "PATENT POLICY"), effective retroactively to the first date of my employment, appointment or matriculation, and/or participation in sponsored research and/or SUBSTANTIAL USE OF UNIVERSITY RESOURCES ("Start Date"). I understand that words appearing as all capitalized letters in this Agreement are used as defined in the PATENT POLICY.

I agree to promptly and completely report to the INTELLECTUAL PROPERTY ADMINISTRATOR ("IPA") any INVENTION which is conceived or reduced to practice in the course of my employment at the University, or from work directly related to professional or employment responsibilities at the University, or from work carried out on University time, or at University expense, or with SUBSTANTIAL USE OF UNIVERSITY RESOURCES under grants or otherwise. **I hereby irrevocably assign to The Trustees of the University of Pennsylvania all right, title and interest in and to any and all such INVENTIONS, effective retroactively to my Start Date.**

I acknowledge that any TANGIBLE RESEARCH PROPERTY, whether or not patentable, which is made in the course of employment at the University or from work directly related to professional or employment responsibilities at the University, or from work carried out on University time, or at University expense, or with SUBSTANTIAL USE OF UNIVERSITY RESOURCES under grants or otherwise is the property of the University. **I hereby irrevocably assign to The Trustees of the University of Pennsylvania all right, title and interest in and to any and all such TANGIBLE RESEARCH PROPERTY, effective retroactively to my Start Date.**

I understand that the University incurs binding obligations to sponsors, including the federal government, companies or foundations, under the terms of sponsored research, or grant agreements. When I participate in research, I understand that it is my responsibility to ascertain and abide by the terms of the research agreement as it relates to me. In particular, when engaged in outside activity, such as consulting, I recognize my duty to protect the University's obligations to its research sponsors and funders and the University's rights pursuant to the PATENT POLICY.

I also understand that on occasion University policy or the University's obligations to research sponsors may require that I assign my interest in copyrightable materials to the University. **In such cases, I hereby irrevocably assign all right, title and interest in and to such materials and the copyrights therein, if any, to The Trustees of the University of Pennsylvania, effective retroactively to my Start Date.** I further

understand that, in agreements with research sponsors, the University seeks to retain copyrights for its faculty.

I will cooperate fully with the University in the preparation, filing and prosecution of patents, in the registration of copyrights and in the preparation and execution of all documents necessary or incidental thereto, including but not limited to any additional written assignments deemed desirable by the University to further evidence my legal assignment of ownership or otherwise facilitate protection of the intellectual property or the establishment of the federal government's rights in inventions funded by the federal government.

I accept the provisions for the sharing of amounts and EQUITY in the PATENT POLICY and the then-current *Policy Relating to Copyrights and Commitment of Effort for Faculty* (the "Copyright Policy").

I am under no obligation to any person, organization or corporation with respect to any INVENTION(S), TANGIBLE RESEARCH PROPERTY or copyrightable materials which are, or could be reasonably be construed to be, in conflict with this Agreement, except as set forth in writing in the signed attachment to this letter (if any).

This Agreement and the assignments and obligations are effective as of my Start Date and apply to any INVENTION(S), TANGIBLE RESEARCH PROPERTY, and copyrightable materials made during the time I am employed by the University, hold an appointment, continue to matriculate, participate in sponsored research or otherwise make a SUBSTANTIAL USE OF UNIVERSITY RESOURCES.

*Signature:* _____

*Printed Name:* _____

*Penn ID Number:* _____

*Date:* _____

# Appendix B. Rules Governing EQUITY Transactions

**B.1 Licenses in Consideration of EQUITY.** The principal purpose of licensing by the University is to promote the development of technologies to serve the public interest. If after a diligent effort to identify prospective licensees, the IPA determines that the public interest is best served by a license in consideration of EQUITY, the IPA may negotiate such a license on behalf of the University, following consultation with the Vice Provost for Research, the INVENTORS, the General Counsel (or the General Counsel's designee), the Treasurer (or the Treasurer's designee) and the University Conflict of Interest Standing Committee. The IPA should be satisfied that the licensee can demonstrate management and technical capability and that it has the financial resources necessary to meet its developmental objectives and its obligations to the University. The IPA may accept EQUITY in the licensee for the University in lieu of or in addition to license or other fees, provided that the EQUITY represents a fair valuation for the technology. The IPA shall include in each license measures of performance that must be met in order to maintain the license granted by the University.

**B.2 Disclosure of EQUITY.** The University will require the prospective licensee to disclose all EQUITY offered to the University (and other institutions or individuals which may co-own an INVENTION with the University) in consideration for the license agreement. In addition, the prospective licensee will be required to disclose in writing to the IPA and the Treasurer the specific terms and conditions associated with

such EQUITY and the current and pro forma capital structure of the venture. Furthermore, the prospective licensee and the INVENTORS must disclose to the IPA and the Treasurer in writing the EQUITY to be issued to INVENTORS for their role as founders, consultants or otherwise.

**B.3 Conflicts of Interest in License Agreements Involving EQUITY.** License agreements involving EQUITY must be structured to protect the University and faculty members from liability and to avoid conflicts of interest. Prior to the University executing any agreement, the INVENTOR(S) shall disclose to the IPA and the University Conflict of Interest Standing Committee, any existing or proposed consulting agreement between the INVENTOR(S) and the prospective licensee or any other consulting agreements with other entities that have potential for conflicts of interest. Upon the recommendation of the Vice Provost for Research, the University and the relevant deans may impose limitations on the proposed license agreement, associated sponsored research agreement, consulting agreement between the INVENTOR and the licensee or other agreements. In addition, the University, deans or chairs may create an oversight mechanism for the relevant INVENTORS.

**B.3.1 Board Participation and Fiduciary Roles.** In general, the University will not accept a position on the board of directors (or other comparable governing entity) of the licensee but may accept and exercise observer rights on such boards or comparable governing entities. Exceptions to this policy require the approval of the Executive Vice President of the University in consultation with the IPA and the General Counsel. As a matter of policy, INVENTORS may not serve on the board of directors (or other comparable governing entity) of the licensee or in any other fiduciary capacity. In general, INVENTORS may accept a seat on scientific advisory boards providing that membership on such a board does not create a fiduciary responsibility to the licensee or any of its STAKEHOLDERS.

**B.3.2 Minority Ownership.** The INVENTORS (and members of their families) together may not be majority STAKEHOLDERS of the venture at the time the license agreement is negotiated and thereafter.

**B.3.3 Licensee Representation.** In license negotiations with the University, the prospective licensee must be represented by a party other than an INVENTOR or a member of the INVENTOR'S family.

**B.4 University versus Direct Personal Ownership of EQUITY.** EQUITY allocated to INVENTORS from the EQUITY POOL generally will be issued directly to the University. INVENTORS may request in writing that such EQUITY be issued directly to them at the time the EQUITY is issued if reasonably feasible, which will be considered by the IPA in consultation with the INVENTORS. The INVENTORS will be responsible for retaining their own business advisors, legal counsel and tax counsel. INVENTORS are responsible for all financial, tax and legal consequences related to the EQUITY they receive. The University Conflict of Interest Standing Committee reserves the right to require that any EQUITY issued to INVENTORS by the licensee be held in a "blind trust" for a defined period of time. An INVENTOR who receives EQUITY from the EQUITY POOL or from the licensee outside of the EQUITY POOL generally will receive a reduced INVENTORS PERSONAL SHARE of ADJUSTED PCI REVENUES for the INVENTION, pursuant to Section 2.3.3.1 above, to avoid an unintended incentive to structure transactions whereby the INVENTORS retain 100% of the proceeds from their share of the EQUITY POOL and obtain 30% of the proceeds to the University when the University liquidates EQUITY held by the University. The University may agree to accept all shares of the EQUITY POOL including INVENTORS shares, provided that all INVENTORS and other institutions release the University in writing from any liability associated with the management,

investment and ownership of the EQUITY. When the University accepts shares of the EQUITY POOL including INVENTORS shares, the Investment Board of the University will control the EQUITY and make all decisions regarding the management, investment and ownership of the EQUITY, in its sole discretion. Any income received by the University from EQUITY held on behalf of INVENTORS will be distributed among INVENTORS in accordance with Section 2.3.4 of the Patent and Tangible Research Policies and Procedures.

**B.5 Management of EQUITY.** Any EQUITY received by the University under a license agreement will be held by the Office of the Treasurer until such time that the University's Investment Board decides to liquidate such EQUITY.

# Appendix C:  Hypothetical Example

**GROSS PCI REVENUES** for FY 2022 equals $12,000,000.

**GROSS PCI REVENUES** for FY 2022 attributable to the XYZ INVENTION equals $600,000.

The **PRO RATA SHARE** equals 5% ($600,000 divided into $12,000,000 equals 0.05).

The **INITIAL DEDUCTION** equals 5% of GROSS PCI REVENUES, or $600,000 (0.05 times $12,000,000 equals $600,000). Thus, **TOTAL ADJUSTED PCI REVENUES** equals $11,400,000 ($12,000,000 minus the **INITIAL DEDUCTION** of $600,000 equals $11,400,000).

The **PRO RATA SHARE** of the **INITIAL DEDUCTION** attributable to the XYZ INVENTION equals $30,000 (0.05 times $600,000 equals $30,000).

Thus, the **ADJUSTED PCI REVENUES for the XYZ INVENTION** equals $570,000 ($600,000 minus $30,000 equals $570,000).

The **INVENTORS PERSONAL SHARE** equals 30% of ADJUSTED PCI REVENUES for the XYZ INVENTION, **or** $171,000 ($570,000 times 0.3 equals $171,000).

The **INVENTORS RESEARCH ACTIVITY SHARE** equals 12.5% of **ADJUSTED PCI REVENUES** for the XYZ INVENTION, or $71,250 ($570,000 times 0.125 equals $71,250).

The **ADJUSTED PROCEEDS** for the XYZ INVENTION equals $327,750 ($570,000 minus $171,000 and minus $71,250).

**AGGREGATE PCI OPERATING COSTS** for FY 2022 equals $4,500,000.

The **PRO RATA SHARE of AGGREGATE PCI OPERATING COSTS** attributable to the XYZ INVENTION equals $225,000 (0.05 times $4,500,000 equals $225,000).

Thus, the **NET PCI INCOME** for the XYZ INVENTION equals $102,750 ($327,750 minus $225,000).

The **SCHOOLS OF INVENTORS SHARE** equals 60% of the **NET PCI INCOME** for the XYZ INVENTION, or $61,650 ($102,750 times 0.6 equals $61,650).

The **UNIVERSITY RESEARCH SHARE** equals 40% of the **NET PCI INCOME** for the XYZ INVENTION, or $41,100 ($102,750 times 0.4 equals $41,100).

# III.F. Policy on Conflicts of Interest Related to Research

*(Source: Vice Provost for Research, Almanac, October 17, 2017 (https://almanac.upenn.edu/uploads/media/101717-supp.pdf); revised, Office of the Provost, November 21, 2022)*

## Introduction

As an institution committed to academic excellence, innovative research, and the highest quality clinical care, the University of Pennsylvania consistently generates new knowledge with the potential to link theory with practice in ways that enhance and transform our society. Penn's dedication to excellence, discovery, and collaboration lead our faculty, students, and staff to opportunities for engaging the world around us.

We support an environment in which faculty and staff are able to pursue teaching, research, and patient care responsibilities in ways that enrich their work and further the University's mission. Faculty involvement with external entities—in academia, government, the nonprofit sector, and industry—offers many positive benefits consistent with the University's goals, including the practical application of new scientific discoveries and the ability to obtain research funding.

We must recognize, however, that these opportunities also introduce the potential for conflicts of interest that could affect one's responsibilities and activities as a member of the Penn community. Involvement with external entities may create the risk that these relationships could bias the work performed by our faculty. Identifying, understanding, and responding to conflicts of interest are of primary importance to protecting the credibility and objectivity of our work, the professional reputations of our faculty and staff, and respect for the role of the University as educator, care-giver, and researcher.

The purpose of this policy is to set forth the framework for identifying, evaluating, and managing financial conflicts of interest related to University research activities to control their ability to create bias and to maintain integrity, credibility, and respect for the work of Penn researchers.

This policy is applicable to all research being conducted under the University's auspices, regardless of whether the research is externally or internally funded, including proposals and applications made by University researchers to external sponsors, protocols submitted to the University's Institutional Review Board or Institutional Animal Care and Use Committee, research funded by the University's Centers and Institutes, material transfer agreements, nonmonetary collaborative agreements, and similar types of research agreements.

## I. Definitions

As used in this policy, the following terms shall have the meaning ascribed to them below:

*Clinical trial* shall have the same meaning as prescribed from time to time by the World Health Organization.[1]

*Clinical trial intellectual property* means an *Investigator's* interest in intellectual property that is the subject of a copyright, issued patent, or a patent application (regardless of whether the intellectual property has been patented, licensed, or assigned to the University) if such intellectual property is being tested, evaluated, or developed in, or if its commercial value could be affected by, the *Clinical trial* in which the *Investigator* is engaged or proposes to engage.[2]

*Excluded payer* means a Federal, state, or local government agency, a United States institution of higher education, an academic teaching hospital, a medical center, or a research institute that is affiliated with an institution of higher education. By way of example, the University, the University of Pennsylvania Health System, Children's Hospital of Philadelphia, the Philadelphia Veterans Affairs Medical Center, the Howard Hughes Medical Institute, and Wistar Institute are *Excluded payers*.

*Family member* means an *Investigator's* spouse or dependent child, or persons having such other relationships to the *Investigator* as the *Institutional official* may determine from time to time.

*FCOI report* means the University's report of a financial conflict of interest required by law or otherwise by agreement to be made to a research sponsor or other oversight agency.

*Fiduciary role* means membership on the governing board of an entity, including service on its board of directors, or having a position of authority or responsibility to act in the best interest of the entity, including being an officer, manager, partner, or limited liability company member with management responsibility.

*Financial conflict of interest (FCOI)* means a *Significant financial interest* that could directly and significantly affect the design, conduct, or reporting of the Research.

*Financial interest* means anything of monetary value, whether or not the value is readily ascertainable.

*Institutional official* means the Vice Provost for Research or such other person as the Provost appoints from time to time as the individual within the University responsible to oversee the University's compliance with conflict of interest regulations and policies.

*Institutional responsibilities* means an *Investigator's* professional or employment-related responsibilities on behalf of the University or any of its Schools, which may include *Research*, *Research* consultation, teaching, professional practice, institutional committee memberships, and service on panels such as Institutional Review Boards or Data and Safety Monitoring Boards.

*Investigator* means the project director or principal investigator and any other person, regardless of title or position, who is responsible for the design, conduct, or reporting of *Research*, whether externally or internally funded, or proposed for such funding, which may include, for example, collaborators or consultants.

*Outside organization* means any organization other than the University, University of Pennsylvania Health System and its corporately-owned entities (e.g., Clinical Care Associates and Clinical Practices of the University of Pennsylvania) or other *Excluded payer*.

*Research* means a systematic investigation, study or experiment designed to develop or contribute to generalizable knowledge. The term encompasses basic and applied research (e.g., a published article, book, or book chapter) and product development (e.g., of a diagnostic test or drug).

*Senior/key personnel* means the project director or principal investigator and any other person identified as senior/key personnel by the University

in a grant application, progress report, or any other report submitted to the sponsor related to the *Research*.

***Significant financial interest (SFI)*** means one or more of the following of the Investigator (or the Investigator's Family member) that reasonably appear to be related to the *Investigator's Institutional responsibilities*:

i. With regard to any publicly traded *Outside organization*, an SFI exists if the value of any remuneration received from the *Outside organization* in the 12 months preceding the disclosure plus the value of any equity interest in the *Outside organization* as of the date of disclosure, when aggregated, exceeds $5,000. Remuneration includes salary and any payment for services not otherwise identified as salary (e.g., consulting fees, honoraria, paid authorship); equity interest includes any stock, stock option, or other ownership interest, as determined through reference to public prices or other reasonable measures of fair market value;

ii. With regard to any non-publicly traded *Outside organization*, an SFI exists if the value of any remuneration received from the entity in the 12 months preceding the disclosure, when aggregated, exceeds $5,000, or if the *Investigator* or *Family member* holds any equity interest (e.g., stock, stock option, or other ownership interest);

iii. Intellectual property rights and interests (e.g., patents, copyrights) not assigned to the University, upon receipt of any income related to such rights and interests;

iv. *Clinical trial intellectual property* rights (and royalties or other remuneration, if any, paid with respect to such rights); or

v. Any *Fiduciary role* in an *Outside organization*.

A *Financial interest* is related to an *Investigator's Institutional responsibilities* if, for example, it arises from extramural activities that derive from the Investigator's professional standing or that are within that *Investigator's* expertise in the Investigator's professional field(s) of discipline, such as consulting, serving on a scientific advisory board, providing continuing professional education services, or serving as an expert witness for an *Outside organization* that, to the best of the Investigator's knowledge, conducts or seeks to conduct business related to the *Investigator's* field of discipline. Moreover, equity in, or serving in a Fiduciary role for, an Outside organization that, to the best of the *Investigator's* knowledge, conducts or seeks to conduct business related to the Investigator's field of discipline, is related to the *Investigator's Institutional responsibilities*.

Notwithstanding the foregoing, unless arising from the *Investigator's Clinical trial intellectual property*, SFI does not include:

• salary, royalties, or other remuneration paid by the University to the *Investigator* if the *Investigator* is currently employed or otherwise appointed by the University;

• rights in intellectual property assigned to the University, including the right to participate in the University's royalties or in the University's equity pool if the equity interest is held and controlled by the University under the *Patent and Tangible Research Property Policies and Procedures of the University of Pennsylvania*, as amended from time to time;

• equity in or income from investment vehicles, such as mutual funds and retirement accounts, as long as the *Investigator* does not directly control the investment decisions made in these vehicles; or

• income from seminars, lectures, or teaching engagements sponsored by, or income from service on advisory committees or review panels for, an *Excluded payer*.

# II. Investigator's Duty to Disclose Significant Financial Interests and Travel

**Disclosure of Significant financial interests:** At least annually, each *Investigator* must submit to designated offices at the Investigator's School a disclosure of *Significant financial interests (SFI)* and such other information as the *Institutional official* or the *Investigator's* School shall require. This disclosure must be updated at the time of submission of a proposal for sponsored *Research*,[3] upon submission of a protocol, upon being added (in a capacity that meets the definition of *Investigator*) to an ongoing Research project, and also within 30 days of the Investigator's discovering or acquiring a new *SFI*. The means and format of the disclosure will be prescribed by the School and University from time to time and communicated to the University research community[4]. In addition to the disclosure of *SFIs*, the *Investigator* must provide requested information to assist in the assessment of whether any of the *Investigator's SFIs* are related to the *Investigator's Research*.

**Disclosure of travel:** *Investigators* who are funded or proposed to be funded by the Public Health Service or other sponsor designated from time to time by the University, must also disclose the occurrence of any reimbursed or sponsored travel (i.e., travel which is paid on behalf of the Investigator and not reimbursed to the *Investigator* so that the exact monetary value may not be readily available), related to the *Investigator's Institutional responsibilities* during the previous 12 months, other than travel reimbursed or sponsored by an *Excluded payer*. Travel disclosures must include the purpose of the trip, the identity of the trip's sponsor or organizer, the trip's origin and destination, and the duration of the trip. In addition, the University or *Investigator's* School may request other information about the trip as necessary to evaluate whether the travel may constitute a *Financial conflict of interest (FCOI)*.

# III. Assessment of Disclosures

**Review by the School:** Each School shall appoint a Conflict of Interest (COI) Office/Officer to review disclosures of SFIs and, where applicable, travel, and the *Investigator's* assessment of relatedness of *SFIs* to the *Research* in which the *Investigator* engages or proposes to engage. The School COI Office/Officer shall review the disclosures and reasonably determine whether any of the disclosed *SFIs* or travel payments could be affected by the *Research* or are in an entity whose *Financial interest* could be affected by the *Research*. The determination of relatedness to the *Research* will be made based on both the *Investigator's* assessment of relatedness and on other facts reasonably deemed relevant by the COI Office/ Officer or the *Institutional official*.

**Review by the Institutional official:** The *Institutional official* is responsible to make the ultimate determination regarding whether a related *SFI* constitutes an *FCOI* and, if so, whether the *FCOI* is amenable to management. If the School COI Office/Officer determines that one or more disclosed SFIs or travel relate to the *Research*, the School shall direct the *Investigator* to submit information regarding those related *SFIs* to the University's Office of the Vice Provost for Research (OVPR), using such means of disclosure as prescribed by the OVPR from time to time and communicated to the University's research community. The University may utilize several forms of review to reasonably determine *FCOIs*. The type of review to be utilized and review standards may be prescribed from time to time through guidance from the *Institutional official* based generally upon the nature and value of the disclosed interests, as well as other factors.

**Recommendations by the Conflict of Interest Standing Committee:** A Conflict of Interest Standing Committee (CISC) shall serve in an advisory

capacity to the *Institutional official*, providing recommendations related to whether an *SFI* constitutes an *FCOI*, whether the *FCOI* is manageable, and if so, the management plan. The primary scope of inquiry of the CISC is to review matters involving *SFIs* and their potential to affect the objectivity of specific *Research*. Matters involving other types of conflicts of interest (*e.g.*, proponent, conflict of commitment) will be referred to the Schools and/or other University offices, depending on the nature of the conflict.

The CISC will consist of approximately 10-20 members (or such number of members as the Institutional official may determine from time to time) of the standing faculty appointed by the *Institutional official*. Efforts will be made to have faculty representation on the CISC reflective of the volume of disclosures submitted by each School. In addition, the *Institutional official* may from time to time appoint one or more member(s) drawn from the community external to the University. The external member(s) shall comply with the same standards of conduct and duties applicable to participation by University-affiliated members of the CISC relative to their participation on the committee. Only appointed CISC members who are faculty and the external member(s), if any, shall have voting rights in CISC decisions. *Ex-officio*, non-voting members will include the Associate Vice Provost for Research; Associate Vice Provost Office of Research Services; the Associate Vice Provost for Research and Executive Director, Penn Center for Innovation; the Director, Human Research Protections;[5] and an attorney from the Office of the General Counsel. Other non-voting participants may be appointed at the discretion of the *Institutional official*.

The recommendations of the CISC require approval by a majority of the voting members present during the meeting. A member may be present at a meeting either in person or by electronic means, such as telephone or internet conferencing, allowing participation in the meeting. A quorum of six voting members present, or such other quorum requirement as may be determined from time to time (and applied prospectively) by the *Institutional official*, is required for a meeting. A CISC voting member shall not vote on a particular case if: the case involves a member of the same departmental division, or if the department has no divisions or fewer than six divisions, the same department; the CISC member has a personal interest because of inter-departmental relationships, such as collaboration with the faculty member whose case is under consideration; or the CISC member has a financial or other relevant interest related to the case under discussion. Disclosure of any of the above conditions must be made by the CISC member prior to the beginning of the discussion. The Chair has discretion to request that a CISC member not participate in a discussion based on the above conditions.

In general, the following types of *SFIs* related to *Research* will be reviewed by the CISC, as they are likely to constitute an *FCOI* unless there are factors that would reasonably prevent any direct or significant effect on the design, conduct, or reporting of the *Research*:

i. Equity in a privately held *Outside organization* that is actively conducting or seeking to conduct business related to the *Research*;

ii. Equity with a value greater than $50,000 or greater than 5% ownership in a publicly traded *Outside organization* that is actively conducting or seeking to conduct business related to the *Research*;

iii. Payments greater than $25,000 in the preceding 12 months from an *Outside organization*;

iv. *Fiduciary role* on behalf of an *Outside organization* that is actively conducting or seeking to conduct business related to the *Research*;

v. Intellectual property interest (not assigned to the University or other *Excluded payer*) if any income has been received from such intellectual property interest in the preceding 12 months; or

vi. *Clinical trial intellectual property*.

The *Institutional official* may also choose to submit for CISC review other types of *SFIs* not listed above or instances where an *Investigator* has more than one type of *SFI* related to the Research.

Prior to commencement of a *Research* project, review and assessment of *FCOIs* shall be conducted within the timeframes required by law or otherwise by agreement with the sponsor and, where applicable, shall be concluded prior to the expenditure of funds from the sponsor. During an ongoing *Research* project, should an Investigator who is new to the project disclose an SFI or should a current *Investigator* disclose a new *SFI*, the disclosure will be reviewed in the manner described above to determine whether the *SFI* relates to the *Research* and constitutes an *FCOI*.

# IV. Determination and Management of FCOI

Whether or not submitted for review by the *CISC*, an *SFI* may be found by the *Institutional official* to constitute an FCOI and may be subjected to a requirement that the *FCOI* be managed (including elimination of the *Financial interest*, where appropriate) as a condition to the *Investigator's* participation in the *Research* to which it is related. The determination of whether an *FCOI*, including an *FCOI* involving a *Clinical trial*, is manageable without elimination of the Financial interest should take into account relevant factors such as the nature and design of the Research; the magnitude and nature of the *Financial interest*; the extent to which the *Financial interest* could be influenced by the *Research*; the uniqueness of the *Investigator's* position with respect to the study (for example, whether safety or other factors will be diminished if the *Investigator* does not participate); whether the interest is amenable to management; and in addition, with respect to Clinical trials, the degree of risk to human subjects, the role of the *Investigator* in the study, and the degree of *Investigator's* influence upon the recruitment and enrollment of subjects or the results of the study.

**Management plan:** Where appropriate, a plan to manage the *FCOI* may be developed and recommended to the *Institutional official*. The *Institutional official* will have the authority to accept, modify, or reject the recommendations or to refer the *FCOI* to the *CISC* for additional consideration. The *Institutional official* will communicate the findings and elements of the management plan to the *Investigator* and other University personnel as appropriate. The *Investigator* will be granted the opportunity to review the management plan and must acknowledge in writing their acceptance of the obligation to abide by the plan.

**Reconsideration:** If the *Investigator* objects to the terms of the management plan, the *Investigator* may submit promptly[6] to the *Institutional official* a written request for reconsideration, specifying the basis for the objection. The *Institutional official* has discretion to refer the matter back to the CISC for further review and recommendations, but is not required to do so. The *Institutional official* also has the option to consult with the relevant School officials. If the *Investigator* is not satisfied with the decision of the *Institutional official* after such reconsideration, the *Investigator* may appeal to the Provost, whose determination is final.

**Reporting:** Once the management plan has been finalized, OVPR staff will prepare, if applicable, *FCOI reports* required to be submitted to the

research sponsor or oversight agency. The *FCOI reports* shall contain information required by law or otherwise by the sponsor.[7] The *Investigator* should be aware that information pertaining to *FCOIs* may be disclosed to sponsors or oversight agencies and, in some cases, to the public and may contain such details as the value and nature of the *Financial* interest and elements of the management plan.

**Monitoring:** Establishment of a management plan also initiates responsibility for monitoring compliance with the plan until the completion of the *Research* project. As part of finalizing the management plan, the OVPR, *Investigator's* School or other designee will establish an ongoing monitoring program to ensure compliance with requirements of the management plan.

# V. Investigator's Obligation to Complete Training

As part of the responsibility for participating in *Research* at the University, *Investigators* must receive training from the University related to *Research*-related *FCOI* prior to engaging in *Research* at the University and at least every four years thereafter. *Investigators* new to the University shall undergo training promptly after commencement of employment. In addition, each *Investigator* must undergo training within a reasonable period of time following any substantive change to this policy that affects the requirements for *Investigators*, and must be retrained if it is determined that the *Investigator* has not complied with this policy or with a management plan related to their activities. Training shall include a description of this policy, the *Investigator's* disclosure responsibilities, an overview of the relevant Public Health Service regulation, and such other topics as the *Institutional official* shall determine from time to time.

# VI. Investigator's General Obligation to Cooperate

The *Investigator* is required to cooperate fully with the University in all aspects of the administration of this policy. This includes, among other things, providing all information as required to allow the University to understand and assess the *Investigator's* disclosure of *SFI* and the relatedness of the *SFI* to the *Investigator's Research*, assisting in the conduct of retrospective reviews where appropriate, and responding promptly and appropriately to implementation and monitoring of management and mitigation plans or corrective action.

# VII. Public Accessibility

This policy will be made available to the public via posting on the University's website. In addition, to the extent required by law or otherwise by the terms and conditions of a *Research* award or as otherwise determined by the *Institutional official*, the University will make available to the public certain information regarding *FCOIs* of *Senior/key personnel* affiliated with the University (and to the extent reported to the University, *Senior/key personnel* at other institutions). In response to a written request submitted to the OVPR for information related to *FCOIs* held at the time of the request by *Senior/key personnel* of the particular *Research* project specified in the request, the University will, within five business days, provide as to such project: the *Investigator's* title and role with respect to the *Research* project; the name of the entity in which the *SFI* is held; the nature of the *SFI*; and the approximate value of the *Financial interest* reported in ranges ($0−$4,999; $5,000−$9,999; $10,000−$19,999; amounts between $20,000−$100,000 by increments of $20,000; amounts above $100,000 by increments of $50,000) or a statement that the interest is one whose value cannot be readily determined through reference to reasonable measures of fair market value.

The written request to the University must identify the project in sufficient detail to permit identification of the specific grant or contract.[8]

In lieu of response to individual requests as described above, the *Institutional official* may in the future determine to employ postings on the University's website as the means of communication of information regarding *FCOIs* of *Senior/key personnel* to the public. In the event that the website is used for that purpose, the website will contain the information described above and shall be updated with the frequency and maintained for the periods required by law.

# VIII. Response to Non-compliance

**Review of untimely disclosures:** Should the University identify an *SFI* that, for any reason, was not disclosed by an *Investigator* within the required timeline or was not previously reviewed by the University during an ongoing *Research* project, the *Investigator's* School and the University will, within 60 days where required by law or by the terms of the *Research* award and in any event promptly as the circumstances allow, perform their respective responsibilities to review the *SFI*, determine whether it is related to the *Research* project, and determine whether an *FCOI* exists. If the *Institutional official* determines that the *SFI* constitutes an *FCOI*, the University shall implement a management plan describing the actions that have been and will be taken to manage the *FCOI*.

**Retrospective review and mitigation:** In addition, if an *FCOI* (including *FCOIs* of subrecipients) is not identified or managed within the designated timeframe for any reason, where required by law or by the terms of the *Research* award or otherwise as may be appropriate in the view of the *Investigator's* School or the University, the University shall direct the School (or subrecipient, as applicable) to conduct in consultation with the University a retrospective review of the *Investigator's* activities and the *Research* project to determine whether any portion of the *Research* conducted during the time period of the noncompliance was biased in the design, conduct, or reporting of such Research. This retrospective review shall be completed within 120 days of the determination of non-compliance where required by law or by the terms of the *Research* award and in any event promptly as the circumstances allow.

Documentation of a required retrospective review will include the project number; project title; project director/principal investigator or contract project director/principal investigator; name of the *Investigator* with the *FCOI*; name of the entity with which the Investigator has an *FCOI*; the reason(s) for conducting the retrospective review; detailed description of the methodology used for the retrospective review; and the findings and conclusions of the review.

As appropriate, the University will provide an updated *FCOI report*, specifying actions that will be taken to manage the financial conflict of interest going forward. If the retrospective review finds bias related to the *Research* project, the University will notify the research sponsor as appropriate. As required by law or agreement or as otherwise appropriate, this notification shall include a mitigation report including the key elements documented in the retrospective review above, a description of the impact of the bias on the *Research* project, and the University's plan for eliminating or mitigating the effect of the bias.

**Sanctions for violation:** If it is suspected that an *Investigator* has violated this policy, the *Institutional official*, in conjunction with the applicable Deans and other administrative officials of the University, will make appropriate inquiry regarding the matter. If after such inquiry a violation is

found, suitable corrective action may be taken. Such action may include the initiation of proceedings under other University policies, including the University's *Procedures Governing Sanctions Against Members of the Faculty* and relevant Human Resources policies.

If the University determines that an *Investigator* has failed to comply with this policy or an *FCOI* management plan and that the non-compliance appears to have biased the design, conduct, or reporting of the *Research*, the University shall promptly notify the research sponsor as required by law or agreement or as otherwise appropriate, of the corrective action taken or to be taken. Among other actions, in the event that the Department of Health and Human Services determines that a clinical *Research* project funded by the Public Health Service (including the National Institutes of Health) with the purpose of evaluating the safety or effectiveness of a drug, medical device, or treatment has been designed, conducted, or reported by an *Investigator* with an *FCOI* that was not managed or reported by the University as required by Federal regulations, the University shall among other things require the Investigator involved to disclose the FCOI in each public presentation of the results of the *Research* and to request an addendum to previously published presentations.

# IX. Responsibilities for Research Subrecipients

If required under the terms and conditions of a sponsored *Research* project, the University will require any written subaward agreement with any organization to include terms establishing the applicable *FCOI* policy governing the subrecipient's work, whether it is the University of Pennsylvania policy or the policy of the subrecipient institution. The subrecipient will be required to provide certification that its policy is established in accord with sponsor requirements or, if unable to provide such certification, the University policy will be applicable to all subrecipient *Investigators*. (As a rule, the University will require subrecipient institutions to maintain and administer their own *FCOI* policies and will only in exceptional circumstances assume primary responsibility for directly soliciting and reviewing subrecipient personnel disclosures that enable the University to directly identify and manage identified *FCOIs* from the *SFI* disclosures of subrecipient personnel.) In addition, the written subaward agreement will establish timelines and information requirements that will allow sufficient time for the University to evaluate, as applicable, subrecipient disclosures or subrecipient *FCOI reports* in order for the University to meet any applicable sponsor reporting requirements.

# X. Record Retention

In general, records related to the identification, evaluation, and response to *FCOI* in *Research* shall be retained for three years following the date that the final Research expenditure report has been submitted to the research sponsor or for a longer period when specified by applicable governmental[9] or University requirements.

# XI. Oversight by the Institutional Official

The *Institutional official* is responsible for:

- communicating the expectations of the University's *FCOI* policy to the research community;
- providing access to appropriate *FCOI* training;
- designating tools and procedures for *Investigator* disclosure of *SFIs*;
- creating policies and guidelines for the determination of whether an *FCOI* exists;

- developing processes for the review of *SFI* disclosures, the evaluation of *FCOIs*, and the development and monitoring of management plans;
- establishing a process for providing *FCOI reports* to the research sponsor or other oversight agencies as appropriate;
- implementing a procedure to provide required notification to the research sponsor if bias is found in the design, conduct, or reporting of *Research* and to submit any required mitigation plan to the sponsor;
- establishing a procedure for notifying research sponsors of non-compliance with this policy as appropriate;
- establishing procedures for the maintenance of *FCOI*-related records in accordance with University and Federal record retention guidelines;
- establishing appropriate enforcement mechanisms, including actions to promote
- *Investigator* compliance;
- establishing procedures to implement that subrecipient agreements specify the use of University or subrecipient *FCOI* policies;
- making this policy publicly accessible; and
- establishing a process for making information related to *FCOIs* held by *Senior/key personnel* publicly available, where required, in the applicable timeframes.

These responsibilities may be delegated to other University or, in consultation with the applicable Dean, School personnel as necessary and appropriate to promote adherence with this policy and applicable sponsor guidelines.

# XII. Related Authority

This policy implements the requirements of the Public Health Service, including the National Institutes of Health as set forth in *Promoting Objectivity in Research*, 42 CFR 50, Subpart F and *Responsible Prospective Contractors*, 45 CFR 94, and describes the University's approach to meeting the requirements of other sponsors.

This policy was originally adopted as of August 24, 2012 and revised as of August 14, 2017. When originally adopted in August, 2012, the policy superseded and replaced two policies: *Financial Disclosure Policy for Research and Sponsored Projects*, February 6, 2001, *Almanac*, Volume 47, No. 21, and *Financial Disclosure and Presumptively Prohibited Conflicts for Investigators Participating in Clinical Trials*, July 17, 2007, *Almanac*, Volume 54, No. 1.

[1]  As of the date of this policy, the WHO definition reads:
…a clinical trial is any research study that prospectively assigns human participants or groups of humans to one or more health-related interventions to evaluate the effects on health outcomes. Clinical trials may also be referred to as interventional trials. Interventions include but are not restricted to drugs, cells and other biological products, surgical procedures, radiologic procedures, devices, behavioural treatments, process-of-care changes, preventive care, etc. This definition includes Phase I to Phase IV trials.

[2]  Engaging in a trial includes, but is not limited to, serving as a Principal Investigator, Co-Investigator, regulatory sponsor/IND holder or in any other role responsible for the design, conduct, or reporting of the trial (including reporting results to the FDA); performing any other subject-related activity specific to the trial, such as the recruitment, selection, or enrollment of subjects, obtaining informed consent, providing subject treatment and care specific to the trial, or performing study procedures; or collecting, analyzing, or interpreting data.

3   This includes proposals to transfer existing awards from another institution in connection with the commencement of an Investigator's employment by the University.

4   As of the time of preparation of this policy, it is anticipated that the full implementation of the disclosure procedures in this policy will occur in stages, as necessary software and other resources are deployed to help support this process. Initial emphasis will be first assure compliance with federal regulation and thereafter additional procedures will be phased in. The University will provide notice from time to time to its research community to advise of the specific means by which to submit disclosures.

5   The foregoing titles may be changed from time to time.

6   The request for reconsideration must be made with sufficient time to allow the University to respond to the objection and comply in a timely manner with reporting requirements under applicable law.

7   Current Public Health Service regulation requires that such reports be made prior to the expenditure of funds, within 60 days of identifying a new FCOI for an existing Investigator or appointing a new Investigator with an FCOI to the Research project, at least annually and in conjunction with progress reports or renewals, or when necessary to update a previously submitted report.

8   Requests must be submitted in writing to the Office of the Vice Provost for Research, Attention FCOI Request Department, 1 College Hall Room 118, Philadelphia, PA 19104-6303. FCOI information required to be furnished under this section shall remain available for the period required by applicable law.

9   Including where applicable, 45 CFR 74.53(b) and 92.42, and 48 CFR part 4, subpart 4.7

# III.G. Consulting and Outside Activities Policies and Procedures

*(Source: Resolution of the Trustees, January, 1966; revised, June 18, 1993 and Offices of the President and Provost, Almanac, March 15, 1994; revised, Resolution of the Trustees, February 11, 2005 and Offices of the Provost and the Faculty Senate, Almanac, February 22, 2005; revised, Office of the Provost, Almanac, February 7, 2006; revised, Resolution of the Trustees, June 18, 2010 and Office of the Provost, Almanac, July 13, 2010; revised, Office of the Provost and Resolution of the Trustees, Almanac, April 21, 2015; revised, Office of the Provost, Almanac, July 12, 2016 (https://almanac.upenn.edu/uploads/media/071216-supplement.pdf); revised, Office of the Provost, November 21, 2022)*

## Article 1. Preamble

**1.0** The Trustees of the University of Pennsylvania affirm the following principles as the basis for governing the intellectual property created by faculty, employees, students and guest scholars of the University:

**1.1** The mission of the University includes the stimulation of basic and applied research activities of faculty, employees and students of the University, and the dissemination of the results of their research for the purpose of adding to the body of knowledge and serving the public interest.

**1.2** The purpose of this policy is to encourage and enable faculty, employees and students to translate new knowledge into social good and provide a framework within which the University can support and facilitate these actions.

**1.3** The University endeavors, where it deems appropriate, to secure intellectual property protection for the products of such research and to en-

courage commercial investment in and development of University intellectual property for the benefit of the public.

**1.4** The community has endowed the University with certain privileges, resources and assets in the expectation that no single party will derive sole benefit or be unjustly enriched from what the community has endowed to the University.

**1.5** The University as a non-profit organization endeavors to marshal its resources and exploit its assets to serve the public interest, and in so doing reinvests in the research enterprises of its faculty, employees and students. Members of the University community share in the University's responsibility to serve the public interest, and have a duty to disclose and assign their inventions.

**1.6** The University is regularly the recipient of grants from the government, foundations or commercial enterprises for the support of research, and is subject to legal and contractual obligations imposed by these entities.

**1.7** The University wishes to share the economic benefits of inventions or other intellectual property with the creators of such works in a way that is consistent with the research and educational mission of the University, and conforms to the University's obligations to regulatory authorities, research sponsors and licensees.

**1.8** In protecting and managing its intellectual property assets, the University insists that the academic freedom of its faculty and students be preserved, and that collegiality and the open expression of ideas by and among members of the University community be encouraged.

## Article 2. Policy and Procedures Relating to Consulting and Outside Activities

**2.1 Consulting Policy.** As stated in the University policy entitled "Conflict of Interest Policy for Faculty Members" (Section II.E.10 of the *Handbook for Faculty and Academic Administrators)*, the University recognizes the value to the institution and to its faculty of permitting the faculty to engage in extramural consulting activities. These activities offer the potential of strengthening the competence and expertise of the faculty as scholars, as well as the potential of developing the intellectual property owned by the University. In all circumstances where consulting activities may result in the creation of an INVENTION, the following procedures and principles apply:

**2.1.1** To ensure that the consulting activities are consistent with faculty members' professional obligations to the University, responsibilities with respect to the avoidance of conflicts of interest, and to their commitments for teaching and research, faculty members should comply with the provisions of Section II.E.10 of the *Handbook* which include both the prospective disclosure of the potential consulting activities to their Department Chairs and School Deans, as well as written reports on such activities as set forth in the *Handbook*, or other related procedures established by their School or Department.

**2.1.2** In any case where the faculty member, Department Chair, or Dean believes that there is a potential conflict of interest or conflict of commitment, the matter shall be referred to the University Conflict of Interest Standing Committee. The Committee shall review the matter and make recommendations to the Provost, or the Provost's designee, who has the authority to approve, modify, or disapprove any consulting arrangement that raises a potential conflict. In determining whether

review by the Conflict of Interest Standing Committee is appropriate, the faculty member, Department Chair, or Dean may consult with the General Counsel.

**2.1.3** In all consulting relationships, faculty members have the duty to protect any intellectual property owned by the University and the ability of the University to fulfill its obligations to government funding agencies and commercial and non-commercial sponsors of research.

**2.2 Consulting Agreements.** Except to the extent set forth in Section 3.4 below, faculty members contemplating entering into a consulting agreement shall ensure that their obligations under the PATENT POLICY are not compromised and the University's rights are protected. Specifically, faculty members have the responsibility to ensure that the following terms are not part of any consulting agreement: (l) confidentiality provisions that prevent the individual from publishing research or from reporting results of University research to research sponsors; (2) confidentiality provisions that prevent the individual from providing TANGIBLE RESEARCH PROPERTY or other deliverables to a University research sponsor or other entity as required by federal law, federal regulation, or by sponsor agreement; (3) intellectual property provisions that preclude the consultant from assigning any inventions that arise out of the consulting relationship to the University; and (4) any provisions that are designed to circumvent University policies and procedures for the disclosure, review and approval of sponsored research projects or other University policies concerning intellectual property. Moreover, in the context of academic research, it may be difficult to avoid commingling of research activity or resources with services provided under the consulting agreement. It is the obligation of the faculty member in negotiating the consulting agreement to ensure that any consulting relationship entered into protects against any such commingling of research or resources.

**2.2.1** Faculty members may seek the assistance of the IPA in determining whether a proposed agreement conforms to these guidelines. Such assistance should not be construed to be advice or counsel as to the faculty member's personal interests in the consulting agreement.

**2.3 Consulting Activity with a Company Providing Sponsored Research.** In addition to the procedures set forth above, if a faculty member contemplates a consulting relationship with a company that sponsors research for that individual at the University, the proposed consulting agreement shall be disclosed to the IPA, along with an explanation of the nature and scope of the individual's anticipated activities. The IPA shall refer the matter to the University Conflict of Interest Standing Committee, with copies of all applicable documentation to relevant Deans, Department Chairs and the General Counsel, or the General Counsel's designee, for review. The Committee shall make recommendations to the Provost, or the Provost's designee, who shall have the authority to approve, modify or disapprove any such proposed agreements.

**2.4 Exception to the General Consulting Policy.** Notwithstanding the policies articulated in Article 2.0 above, and in the general consulting policy set forth above, the University recognizes that faculty members may seek to undertake consulting engagements, at the direction of a firm or entity other than the University, that may require that any resulting INVENTIONS be assigned to the sponsor of the engagement. While not providing the University with ownership of the INVENTION, these consulting engagements may nevertheless provide significant benefits to faculty members and to the University. For this reason, it is the policy of the University to authorize a Dean, in the Dean's discretion, to permit

these consulting engagements, without claiming any ownership interest in the INVENTION for the University, under the follow conditions.

**2.4.1 Conditions for Consulting Engagements.** In order for a faculty member and the faculty member's particular proposed consulting engagement to be eligible for consideration under this exception to the consulting policy: (1) The engagement must be consistent with the policy on "Conflict of Interest Policy for Faculty Members" (*Handbook for Faculty and Academic Administrators*, II.E.10); (2) no undergraduate or graduate students may be involved in the engagement; (3) the faculty member must be compensated in cash, and the compensation must be fixed and not variable, must reflect the fair market value of the consulting to be performed, and must not vary according to the perceived value of INVENTIONS assigned. (The faculty member may not be compensated with EQUITY or any form of contingent or variable compensation, including but not limited to options, warrants, royalties, or a payment that varies based upon the sales, revenues or other perceived success of an INVENTION or product or service based upon such INVENTION); (4) the faculty member may not have a SIGNIFICANT EQUITY INTEREST in the sponsoring entity or an affiliate of that entity; (5) performance of the engagement may not involve the use of any University facilities, personnel, equipment or assets, except for *de minimus* amounts or uses; and (6) the terms of the engagement must not conflict with any existing commitments under sponsored research or otherwise for ownership of resulting inventions, and shall not make assignment of ownership of any future INVENTION not conceived and reduced to practice during the term of, and as a direct and sole result of performing, the consulting engagement.

**2.4.2 Procedures for Disclosing Consulting Engagements.** To qualify for consideration under Section 3.4 and allow for meaningful advance review, the specific terms of the proposed agreement must be disclosed to the Department Chair and the Dean at a reasonable time prior to the commencement of the engagement and, in all circumstances, prior to the faculty member entering into any legally binding agreement to engage in the engagement. The engagement and its terms must be reported to the Department Chair and the Dean, in writing, on an annual basis. If the Dean determines, after consultation with the Department Chair and the IPA that criteria set forth in Section 3.4.1 have been met, the Dean may approve the engagement, in the Dean's discretion, but is not required to approve the engagement. If the Dean determines that the criteria set forth in Section 3.4.1 have not been met, or otherwise declines to approve the engagement, the Dean should so notify the faculty member, who may then seek review of the decision by the APPEALS BOARD. The Dean should notify the faculty member of the decision promptly, and if possible, within thirty (30) days of receipt of the disclosure.

**2.4.3 Procedures for Waiver of Conditions.** Should a faculty member seek to undertake a consulting engagement that is neither within the general consulting policy, nor satisfies the criteria of Section 3.4.1, the faculty member may request a waiver from the Dean to permit the faculty member to enter into the consulting arrangement. In order to request a waiver, the faculty member must comply with Section 3.4.2 as well as disclose the proposed consulting engagement to the *Conflict of Interest Standing Committee* (CISC) as required under the *Policy on Conflicts of Interest Related to Research*. After the review by CISC, the Dean, in consultation with the General Counsel, the Provost or the Provost's designee and the IPA—may grant the waiver. If the Dean determines that, under the facts and circumstances of the particular case, the waiver would undermine the principles underlying the PATENT POLICY, violate any legal or regulatory requirement, present an unmanageable conflict of interest or otherwise violate University policy, the Dean should deny the waiver and notify the faculty member. The decision should be made

and communicated to the faculty member as promptly as possible, generally within fifteen (15) days of receipt of the waiver request. Should the waiver be denied, the faculty member may appeal the decision to the APPEALS BOARD. Approval of a waiver under the PATENT POLICY shall not constitute approval under or waiver of other University policies, such as the *Policy on Conflicts of Interest Related to Research*.

Waivers will ordinarily be granted to allow for EQUITY compensation in cases in which the amount of EQUITY is fixed based on the fair market value of the consulting services at the time delivered, and it does not involve a form of contingent or variable compensation, including but not limited to options, warrants, or a conditional grant of EQUITY that varies based upon the sales, revenues or other perceived success of an INVENTION or product or service based upon an INVENTION.

**2.4.4 Liability when Consulting.** Faculty members entering into consulting engagements should understand that they are undertaking personal responsibilities and may be assuming certain personal risks of liability. For that reason, all faculty members may wish to seek personal legal counsel, at their own expense, for the purpose of reviewing proposed consulting agreements so as to protect their personal interests. To the extent, however, that faculty members are availing themselves of this exception to the PATENT POLICY, they are doing so entirely at their own risk and are not, in any way, protected by the University. For this reason, faculty members are well advised to seek personal legal advice before entering into such a consulting relationship.

**2.5 Application of the Consulting Policy and Procedures to Administrators and Staff.** The University recognizes the value to the institution and of permitting administrators and staff, as well as faculty, to engage in extramural consulting activities, under certain circumstances. Except as specifically set forth below, the above policy applies to administrators and staff who seek to enter into consulting engagements.

**2.5.1** Staff and administrators who contemplate entering into consulting engagements are subject to the "Guidelines for Extramural Activities, Associations, and Interest for Staff" (*Human Resources Policy Manual*, Policy No. 006 (https://www.hr.upenn.edu/policies-and-procedures/policy-manual/other-policies/guidelines-for-extramural-activities-associations-and-interest-for-staff/), effective 2/1/1990) and should follow the procedures for disclosure and clearance of potential conflict of interest issues set forth in those guidelines.

# Article 3. Definitions and Miscellaneous

**3.0.1** The **APPEALS BOARD** is empowered to resolve disputes arising from the interpretation or administration of this CONSULTING POLICY, as described in Section 3.2. The APPEALS BOARD comprises nine (9) voting members (seven [7] standing members and two [2] ad hoc members). The seven standing members shall be comprised of: one (1) voting Chair, appointed by the Faculty Senate and who shall be a Standing Faculty member; four (4) administrators (each appointed by the Vice Provost for Research); and two (2) term faculty appointed by the Faculty Senate. The two (2) ad hoc members shall be faculty selected for expertise by the Dean(s) of the relevant School(s) or the Chair(s) of the relevant Departments(s), except that if one or more of the individuals involved in the appeal is an emeritus faculty, the two ad hoc voting members selected by the Dean(s) or Department Chair(s) shall be emeritus faculty and if one or more of the individuals involved in the appeal is a graduate student, the two ad hoc voting members selected by the Dean(s) or Department Chair(s) shall be graduate students. In addition, the APPEALS BOARD shall include one nonvoting member ex officio, who shall be an

attorney from the Office of the General Counsel and appointed by the General Counsel. The APPEALS BOARD shall be staffed by the Office of the Vice Provost for Research.

**3.0.2 CONSULTING POLICY** means this Consulting and Outside Activities Policies and Procedures of the University of Pennsylvania, with any amendments.

**3.0.3 EQUITY** means ownership interests or securities, including but not limited to shares of stock or securities; stock options; warrants or any other rights to purchase stock or securities; debt instruments; partnership interests in a general or limited partnership; or membership interests in a limited liability company or partnership.

**3.0.4 EXECUTIVE COMMITTEE** provides oversight and steering of the technology transfer process, including assisting in setting the operating budget for the PENN CENTER FOR INNOVATION (PCI). The EXECUTIVE COMMITTEE is appointed by the Provost in consultation with the Vice Provost for Research and chaired by the Vice Provost for Research. The EXECUTIVE COMMITTEE is comprised of the INTELLECTUAL PROPERTY ADMINISTRATOR (IPA), ex officio; the Vice Provost for Research; the Dean of the School of Medicine or his/ her designee; one faculty from each of the School of Arts and Sciences and the School of Engineering and Applied Science; one at-large faculty; and an attorney from the Office of the General Counsel selected by the General Counsel, who shall be nonvoting and ex officio.

**3.0.5 INTELLECTUAL PROPERTY ADMINISTRATOR** (IPA) means the Executive Director of PCI (or the Executive Director's successor, as designated by the Vice Provost for Research).

**3.0.6 INVENTION** means and includes discoveries and inventions and related technical information, trade secrets, developments, knowhow, methods, techniques, formulae, data and processes; TANGIBLE RESEARCH PROPERTY upon which a patent has issued or a patent application has been filed and is still pending; and other proprietary matter.

**3.0.7 INVENTORS** means University faculty, emeritus faculty, visiting faculty or researchers, adjunct faculty, postdoctoral employees or trainees, or other employees, or students, or others who individually or jointly make an INVENTION subject to the PATENT POLICY and who meet the criteria for inventorship under United States patent laws and regulations.

**3.0.8 PATENT POLICY** means the Patent and Tangible Research Property Policies and Procedures of the University of Pennsylvania, with any amendments.

**3.0.9 PENN CENTER FOR INNOVATION** (PCI) means the administrative unit, under the direction of the INTELLECTUAL PROPERTY ADMINISTRATOR (IPA), which is responsible for the receipt, review, management and administration of intellectual property matters of the University.

**3.0.10 SIGNIFICANT EQUITY INTEREST** means any EQUITY or other financial interest that when aggregated for the individual and the individual's spouse and dependent children exceeds $25,000 in value, as determined through reference to public prices or other reasonable measures of fair market value, and does not represent more than five percent (5%) ownership interest in any single entity.

**3.0.11 TANGIBLE RESEARCH PROPERTY** means unique research products or tools, such as biological materials or chemical moieties,

whether or not patentable or otherwise protectable using intellectual property laws. Categories of biological material include organisms, cells, viruses, cell products, cloned DNA, as well as DNA sequences, mapping information and crystallographic coordinates. Some specific examples of biological materials include specialized and/ or genetically defined cells, including normal and diseased human cells; monoclonal cell lines; hybridoma cell lines; microbial cells and products; viruses and viral products; recombinant nucleic acid molecules; DNA probes; nucleic acid and protein sequences; and transgenic mice or other animals. Categories of chemical moieties or engineered products include sample compounds, reagents, intermediates, models, sensors, devices, equipment, computer hardware or firmware, diagrams or computer media.

**3.1 Review of Policies and Procedures.** The EXECUTIVE COMMITTEE together with the Vice Provost for Research shall review the CONSULTING POLICY, from time to time to determine whether it is accomplishing its intended purposes and is in conformity with applicable laws and regulations, including intellectual property laws. The EXECUTIVE COMMITTEE shall make recommendations for amendments or other changes to the Provost and the Faculty Senate, who shall confer with the President.

**3.2 Disputes under Policies and Procedures**. Except as expressly set forth otherwise in this CONSULTING POLICY, disputes arising from the interpretation or administration of the CONSULTING POLICY may be referred by any interested party to the Chair of the APPEALS BOARD and the Office of the Vice Provost for Research, who will promptly notify the IPA. The APPEALS BOARD shall first determine whether it has jurisdiction to hear any such dispute before proceeding. The APPEALS BOARD shall provide an equitable mechanism for the review and resolution of disputes brought before it and shall have the authority to make a judgment with respect to such disputes. The APPEALS BOARD shall use reasonable efforts to make a judgment with respect to any dispute within thirty (30) days after having any such dispute referred to it. Any judgment of the APPEALS BOARD may be appealed by any interested party to the Vice Provost for Research. The Vice Provost for Research shall consider the matter de novo and shall use reasonable efforts to review any such appeal and make a judgment with respect to any appeal, within thirty (30) days after having any such dispute referred to the Vice Provost for Research. Any judgment of the Vice Provost for Research may be appealed to the President, who will make a final decision for the University.

# III.H. Guidelines for Student Protection and Student Access to Information Regarding Sources of Financial Support

*(Source: Offices of the President and Provost,* Almanac, October 21, 1986 *(https://almanac.upenn.edu/archive/v33pdf/n09/102186.pdf); revised, Office of the Provost, November 21, 2022)*

Participation in sponsored research may be an important part of a student's undergraduate or graduate education, as well as an important source of financial support. The University recognizes that the student must be protected in cases where the terms of the research project conflict with the student's academic progress, and affirms that the student has the right to reject such funding if the student chooses to do so. The University recognizes the sensitivity of these issues, since they pertain directly to the relationship of personal trust which exists between

a student and the student's faculty sponsor; they are also fundamental to the development of the student's intellectual and moral integrity. Therefore, the University adopts the following policy:

The University recognizes the central role of sponsored research in fostering educational opportunities for students at all levels and in every discipline, and encourages the involvement of students in research projects. On rare occasions, the terms of a research agreement may contain limitations that may inhibit the participation of students, such as delays in publication of results that might conflict with a student's academic schedule. In such cases, the University requires that careful consideration be given to the appropriateness of student participation and that the faculty sponsor or Principal Investigator assure in advance that students are fully aware of any such restrictions.

The University affirms the student's right to know the source(s) of financial support for the student's educational and living expenses, individual research projects, or the research activities of a faculty sponsor in which the student is involved and from which the student obtains financial support. It is the responsibility of the faculty sponsor to make this information known to the student.

Should a student choose to reject financial assistance, the University affirms and upholds the student's right to do so.

(See page 5 - Almanac, October 21, 1986 (https://almanac.upenn.edu/archive/v33pdf/n09/102186.pdf))

# III.I. Policy Concerning the Exclusion of Foreign Nationals from Specific Research Areas

*(Source: Offices of the President and Provost, Almanac, February 23, 1988)*

Members of the University research community shall not be subject to discrimination based on citizenship with respect to their participation in research activities. While funding agencies may limit their financial support to particular groups (such as U.S. citizens), they may not prohibit the participation of others in University research.

Where a research contract deviates from this policy an exception may be granted by the Vice Provost for Research after review by the University Council Committee on Research.

(See page 6 - Almanac, February 23, 1988 (https://almanac.upenn.edu/archive/v34pdf/n23/022388.pdf))

# III.J. Guidelines for Research in the Community

*(Source: Office of the Provost, Almanac, May 19, 1998 (https://almanac.upenn.edu/archive/v44/n34/orresguide.html))*

A significant number of Penn faculty and students are engaged in research that involves the study of the Philadelphia community, and, in particular, West Philadelphia, or that involves community members as research subjects. As in all research conducted under the auspices of the University, such research should adhere to the appropriate protocols for the protection of human subjects and must be approved by the University's Institutional Review Board.

Although the Institutional Review Board does an excellent job of protecting individual subjects, community-based research raises additional questions about research protocols and approaches. The populations studied are often Penn's neighbors, and as such, the approaches undertaken should reflect the importance of that relationship to Penn, and the values of mutual respect and trust that should guide all of our collaborative activities with the community. The University also recognizes that mutual respect and trust are necessary preconditions for the honest and open exchange of ideas that is essential to genuine learning and the advancement of academic inquiry.

The University views its relationship with the Philadelphia community as a partnership. Accordingly, and to the extent possible, Penn faculty and students should engage the community in helping to plan research projects. Also, the findings should be shared with the community so that all parties can benefit.

1. As in all research involving human subjects, undertaken under University auspices, research in the community must be approved by the Institutional review Board, and meet all of the required protections of human subjects.

2. Whenever possible, researchers investigating community issues should work with community-based organizations to discuss all aspects of the research process, including problem definition, hypothesis generation, study design, data analysis, and dissemination.

3. Whenever possible, researchers should have a dissemination plan that includes distribution or presentation of results to community members and organizations, particularly those who participated in the research.

4. Researchers should determine if other projects are underway in a community, and whenever possible, coordinate efforts with other research projects to minimize disruption and maximize positive impacts on community members and organizations.

5. In the spirit of mutual learning and benefit, researchers should consider how study results could be used to the benefit of the community whenever possible, and should make extra efforts to communicate those recommendations to appropriate community members.

# III.K. Human Research Protection Program

*(Source: Office of the Provost,* Almanac, July 11, 2006 *(https://almanac.upenn.edu/archive/volumes/v53/n01/or.html))*

The University of Pennsylvania is committed to maintaining a comprehensive program to protect human subjects engaged in research conducted or supported by the University and the University of Pennsylvania Health System.

The institution adheres to the ethical principles and guidelines for the protection of human subjects in research enumerated in the Belmont Report, produced by the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research (April 1979). The University has provided the Department of Health and Human Services' Office for Human Research Protections (OHRP) a Federal-wide Assurance of compliance with the ethical principles and regulations governing research with human subjects. This Federal-wide Assurance is written documentation of Penn's commitment to comply with local and federal laws and regulations governing human research.

The Vice Provost for Research is empowered by the Board of Trustees through the Provost to coordinate the overall human research protection program and has direct authority over the key components of that program. The responsibilities of the Vice Provost for Research include:

• Ensuring protection of human research subjects.

• Ensuring compliance with local, state and federal laws and regulations.

• Ensuring the independence of the Institutional Review Boards (IRBs).

• Ensuring the number of IRBs is appropriate for the volume and types of human research reviewed, and that reviews are accomplished in a thorough and timely manner.

• Responding to allegations of scientific misconduct.

The Vice Provost for Research has the authority to:

• Create and approve policies and procedures governing the human research protection program.

• Create an annual budget for the human research protection program.

• Allocate resources within the program.

• Suspend or terminate research.

• Place administrative sanctions on investigators for noncompliance, such as suspension or termination of research privileges; requiring investigators or research staff to undergo additional training as a condition of continuing research; and mandating independent monitors for ongoing research.

The Vice Provost for Research may not approve a study that has been disapproved by one of the IRBs.

The Vice Provost for Research has established an oversight committee known as the Human Research Advisory Committee (HRAC). The HRAC represents all the offices of the University with interest in the conduct of human research including the Office of Regulatory Affairs; the Office of Research Services; the Office of General Counsel; the Office of Audit, Compliance and Privacy; representatives of the schools conducting research as well as faculty members. This committee advises the Vice Provost for Research on the need for and implementation of policies and procedures governing human subject research. Upon the recommendation of the HRAC, the University shall conduct periodic reviews of the human research protection program and budget support for the various components of the program, either through independent mechanisms or as part of a scheduled accreditation process.

Prior to initiating any research on human subjects, investigators at the University of Pennsylvania must first obtain the approval of one of the University IRBs through their established policies and procedures. The University supports eight IRBs through the Office of Regulatory Affairs (ORA). IRB is composed of scientists, nonscientists and members who are unaffiliated with the University of Pennsylvania. The Director of the ORA reports directly to the Vice Provost and informs the Vice Provost for Research of the IRB actions to approve, withhold approval, disapprove, terminate or suspend human subject research.

All personnel—faculty, research fellows, students and staff—engaging in human research must have documented education regarding human subject protection, in accordance with certification standards defined by the Vice Provost for Research. Training for investigators engaged in biomedical research is available through a webbased program developed by the Perelman School of Medicine's Office for Human Research. Researchers engaged in social and behavioral research are offered web-

based training through the Office of the Vice Provost, in cooperation with the IRB.

In addition, the Perelman School of Medicine Office for Human Research (OHR) maintains high level support for medical researchers conducting trials including those where the faculty member has a role as sponsor-investigator. The OHR also provides monitoring of investigator compliance for the University.

Any individual with questions concerning human research or noncompliance with regulations may contact the Office of Regulatory Affairs at (215) 898-2614. Allegations of noncompliance may also be reported to the Office of Audit, Compliance and Privacy using 1-888-BEN-TIPS. All allegations are investigated with appropriate protections of the rights of the complainant.

This notice shall be published periodically as a reminder to the University community or when the various components of the human research program are materially changed.

# III.L. Policy Regarding Human Subject Research in the Sociobehavioral Sciences

*(Source: Office of the Provost,* Almanac, October 3, 2006 *(https://almanac.upenn.edu/archive/volumes/v53/n06/or-hsresearch.html))*

## Scope

This policy is applicable to all employees, students, trainees, faculty, and other persons working for or in facilities owned and operated by the University of Pennsylvania and conducting sociobehavioral research. This policy is meant to apply University-wide to all research involving human subject data, and inclusive of research protocols applying sociobehavioral techniques (e.g., survey research). Depending on the type of research, other policies (e.g., those pertaining to biomedical research) may apply as well. Relevance is determined by the involvement of living human subjects in observational or experimental research, or in the use of records or specimens that may conceivably place the subjects of these records at risk, as per the Common Rule.

The term "sociobehavioral sciences" (or the term "social and behavioral sciences") must be understood as a shorthand term for the set of inquiries involving human subjects not otherwise subsumed under the biomedical sciences. It includes fields of research specifically defined as behavioral and social sciences in federal manpower reports; that is, "anthropology, demography, the non-clinical fields of psychology, sociology, and the speech and hearing sciences." It also includes human subject research in economics, business, education, and history, among others (see the Common Rule). Thus, the proposed policy applies to all sociobehavioral research irrespective of its institutional setting within the University or its source of funding. Note that disciplinary predilections—for example, rejection of the rubric "science"—are insufficient warrant for self-abstention from the policy promulgated here.

## Regulatory Background

In the context of Institutional Review Board (IRB) oversight of human subject research, the Common Rule specifies three levels of review of proposed research, which can be summarized as follows:

1. *full board review*—a convened IRB committee must approve the proposed research, applying criteria set forth in the Common Rule, before the research can be conducted;
2. *expedited review*—certain kinds of research involving no more than minimal risk, as well as minor changes in approved research, can be approved by an administrative mechanism not requiring a convened IRB committee;
3. *exempt from review*—minimal risk research activities in a number of specified categories, involving human subjects not from vulnerable populations, are exempt from full review as per the Common Rule.

These three levels of review require submission of a research protocol to the IRB. Specific submission requirements for each category can be found at the IRB website.

At the University of Pennsylvania, "expedited review" is typically performed by Office of Regulatory Affairs personnel. The University is also required to have a mechanism in place for determining whether a proposed research protocol is "exempt from review." As per the federal-wide assurance (FWA) that the University has in place, this determination is made by an administrative mechanism6 similar to that for "expedited review." In addition, there are certain kinds of research not covered by the Common Rule. Such research does not require any involvement of the IRB, even at the level of "exempt from review."

This policy clarifies that specific activities in the social behavioral sciences do not require IRB involvement. As a category distinct from "exempt from review," it is referred to as "*not under the purview of the IRB.*"

## Implementation

Implementation of the policy outlined below will be the responsibility of the Office of the Vice Provost for Research. In consultation with the Schools and their faculty, the Vice Provost will create a training program, and a certification process documenting successful completion of the training program. Any sociobehavioral research activities involving human subjects or human subject data will require prior official certification once this policy becomes effective.

## Policy

### Education and Certification

All personnel—faculty, research fellows, students and staff—engaging in sociobehavioral research must have documented discipline-appropriate education regarding human subject protection, in accordance with certification standards defined by the Vice Provost for Research.

The training program and certification process are to be kept current under the auspices of the Vice Provost for Research and in consultation with the Schools and their faculty.

### Survey Research

Survey research, which includes face-to-face or telephone interviewing, or self-administered questionnaires (as through the mail or via the Internet), generally has a low cost of participation, since it usually requires only a small amount of subjects' time. According to the Common Rule, such research is "exempt from review" and does not require written consent, as clarified below.

*2a. Survey research is exempt from review if the survey is anonymous or protection of the confidentiality of research subjects is adequately demonstrated, and if all other applicable criteria for exempt from review*

*are fulfilled (e.g., research must not involve vulnerable populations or put subjects at more than minimal risk).*

*2b. For research that is exempt from IRB review, human subjects responding to a survey are automatically considered to have given informed consent.*

In order to qualify for a default waiver of written consent as per policy item 2b, an exemption form5 must be presented to the IRB showing that:

i.   human subjects will be informed of all applicable elements of consent prior to responding to the survey; and
ii.  all criteria for "exempt from review" are fulfilled.

## Secondary Data Analysis

Secondary data analysis is the (usually statistical) investigation of individual-level data records collected in another study, with the following characteristics:

1.   no direct contact with or experimental manipulation of human subjects;
2.   no new data collection; and
3.   no identification of individual research subjects. In agreement with recommendations 1 and 6 of the Draft Recommendations Regarding Public Use Data Files issued by the National Human Research Protections Advisory Committee (NHRPAC), this policy states that such research may either be "exempt from review" or "not under the purview of the IRB," as clarified below.

3a. Research on a public-use data file, which contains only non-identifiable data or data for which a breach of confidentiality is not an issue (e.g., public business statements), is not considered human subject research for the purpose of IRB review and as such is not under the purview of the IRB.

3b. Research on a non-public-use data file—that is, non-identifiable data in a non-publicly available or proprietary file—is exempt from review, unless vulnerable populations are involved. Non public use data files may be submitted by a School to the IRB for approval. If approved, with the appropriate maintenance of safeguards, studies using these data sets are no longer human subject research and as such are not under the purview of the IRB.

Investigators must agree not to attempt to re-identify the human subjects.

Investigators planning to study non-public-use data files must demonstrate to the IRB that confidentiality of research subjects is protected, by providing direct evidence of protection procedures or by showing that the data supplier already received IRB approval in which non-identifiability was considered and confirmed. The latter does not necessarily require submitting to the IRB the survey instrument or consent form used in the research that yielded the data.

Researchers operating in one of the categories of the Health Insurance Portability and Accountability Act (HIPAA) should refer to the HIPAA regulations that contain a definition of identifiability.

## Evolving Research

Evolving research is a class of research in the sociobehavioral sciences in which the questions that are posed evolve in the course of investigation. An example is ethnography, where research questions may only be clarified after a period of observation and where current findings drive the next steps in the study. This class of research typically involves

studying human behavior in non experimental settings, with or without active participation by the investigator; but it can also occur in more structured observational settings (e.g., oral histories, focus groups). In specific cases, such research does not pose more than minimal risk to human subjects and is considered to be "exempt from review," as stated below. An approved mechanism is necessary for presenting to the IRB a research protocol that will evolve in the course of investigation. This policy institutes such a mechanism via certification.

4a. Research involving only non-interventionist observation of behavior occurring in public (including domains of the Internet clearly intended to be publicly accessible), for which no identifying information is recorded, is exempt from review.

4b. Investigators are allowed to use their certification, as per policy item 1, as a reference for describing evolving research activities to the IRB in lieu of a fixed research protocol.

This policy eliminates the need for investigators doing evolving research to spell out the details of a dynamic research protocol. The IRB can be assured that the research will be conducted in an ethically appropriate fashion, with full protection of human subjects, when certified investigators attest that their pre-registered research plan will be conducted within the ethical framework laid out in the training program for which they are certified.

Note that different studies by the same investigator(s) must be submitted to the IRB as separate research protocols. These must not be viewed as a single study evolving from one investigation into another.

## Feasibility Assessment

Feasibility assessment (or exploratory research) is understood to involve the conceptualization or refinement of a research question through harmless observation, casual conversation, and browsing of extant data. The Common Rule applies only to generalizable research. Therefore, feasibility assessment is "not under the purview of the IRB" if a number of strict conditions are met, as specified below.

5. Feasibility assessment is not under the purview of the IRB, if and only if the following conditions are met:

a.   the assessment involves no more than minimal risk;
b.   the assessment does not involve any vulnerable populations, including prisoners, minors, pregnant women and fetuses, mentally impaired or disabled persons, terminally ill patients, the very elderly, and anyone incapable of self-determination;
c.   the human subjects are not identifiable from any of the information acquired;
d.   the assessment does not involve any deceptions;
e.   the assessment data and results are not disclosed or published;
f.   there is no systematic collection of data, or any systematic data collection serves only to calibrate a research instrument that involves no more than minimal risk.

If at any time any of these conditions cannot be satisfied, the project must be submitted to the IRB for review.

## Adverse Effects

This policy prescribes the documentation of possible negative effects on human research subjects and how they can be reversed.

6. For research involving manipulations or deceptions of human subjects that may cause harmful or undesirable effects, research protocols

submitted to the IRB must specifically describe the recovery or debriefing procedures of the study, and address how the effectiveness of these procedures will be assessed.

When a research study may have foreseeable untoward effects on human subjects, the investigator must explain in the research protocol how these effects will be mitigated.

The IRB must be informed of the occurrence of any adverse events that take place during the research study or as a result of the research study. For research protocols that are reviewed by the IRB in one of the three review categories (full board review, expedited review, or exempt from review), adverse events must be reported for the annual continuing review. Research protocols "not under the purview of the IRB" require reporting of any adverse events within a month of occurrence, as such events may change the review status of the study. Unanticipated events or effects on human subjects that may change the interpretation of the risk of the protocol must be reported to the IRB as soon as they are identified.

## III.M. Standard Operating Procedures and Policies of the University of Pennsylvania Institutional Animal Care and Use Committee (IACUC)

*(Source: Office of the Vice Provost for Research, March 9, 2000; revised, May 2002; revised, June 2003; revised, July 2004)*

The University of Pennsylvania recognizes the scientific and ethical responsibility for the humane care and use of animals involved in research and education and enjoins all individuals involved to maintain the highest standards of animal care and consideration. This concern extends to investigators to protect the animals as well as comply with the specific requirements established and regulated by the sponsors of their research, University Policies and/or federal regulations.

The University of Pennsylvania recognizes and supports fully The Institutional Animal Care and Use Committee (IACUC), as the agent for The University of Pennsylvania in its obligations for the humane care and use of animals.

The University of Pennsylvania and the IACUC shall:

1. Assure all activities (involving animals) meet the ethical and legal requirements for the humane care and use of animals
2. Maintain and promote an open and cooperative relationship with investigators and faculty, and the greater university community.
3. Educate the University of Pennsylvania community concerning the ethical and regulatory considerations for the humane care of animals.

The full text of the University's Institutional Animal Care and Use Committee's standard operating procedures and policies is available at the following URL: https://iacuc.upenn.edu/node/6 (https://iacuc.upenn.edu/node/6/)

## IV. Procedures Regarding Admission and Instruction of Students

- IV.A. Guidelines for Admissions Policies and Procedures (p. 91)
- IV.B. Code of Academic Integrity (p. 93)
- IV.C. Charter of the University Student Disciplinary System (p. 94)
- IV.D Faculty Authority to Assign Grades and Academic Integrity (p. 106)
- IV.E. School Policies and Practices (p. 107)
- IV.F. Rules Governing Final Examinations (p. 107)
- IV.G. Reporting of Final Grades (p. 107)
- IV.H. Policy on Secular and Religious Holidays (p. 108)
- IV.I. Guidelines for Addressing Academic Issues of Students with Disabilities (p. 108)
- IV.J. Policy on the Confidentiality of Student Records (p. 110)

## IV.A. Guidelines for Admissions Policies and Procedures

*(Source: Office of the Provost, Almanac, February 14, 1980 (https://almanac.upenn.edu/archive/v26pdf/n23/021480.pdf))*

### Summary of the Guidelines

This document describes the way in which the admissions policies of the University of Pennsylvania should be formulated and implemented. It prescribes neither particular policies nor the details of the admissions process. The purpose of these guidelines is to protect the integrity of the admissions process.

The admissions function may be divided into three parts. First, the *legislative function* establishes the substantive provisions of an admissions policy, i.e., standards and goals describing the qualities of the students sought that can be applied to the applicant pool. Second, the *administrative function* translates admissions standards and goals into procedures for attracting a suitable body of qualified applicants, for differentiating among them and for persuading those who best fit the admission criteria to attend the University. Third, the *monitoring function* involves regular evaluation both of the validity of the norms set in admissions policies and the efficacy of administrative practices in fulfilling the normative standards and goals. Accordingly, the responsibility for this function rests mainly with the several faculties.

The *legislative function* is essentially a determination of educational policy. Accordingly, the guidelines place responsibility for this function on the several faculties after appropriate consultation with administrators and student groups. Each faculty's policy is subject to any overriding University policy.

The *administrative function* is a responsibility of academic administrators. For graduate and professional schools and programs, the Dean is the officer charged with executing the admissions policy. For the Ph.D. programs and those master's degree programs managed by the graduate groups, the Provost, working with the relevant deans and graduate group chairpersons, is the responsible officer. The Provost is also ultimately responsible for the administrative function for joint degree programs in cases where at least one of the degrees of concern is the Ph.D. The administrative function of other joint degree programs at the graduate level is the joint responsibility of the relevant deans. In the admission of undergraduate students, a centralized office, reporting to the Provost and working with the undergraduate deans, serves all the schools and colleges.

The *monitoring function* is, in major part, a responsibility of each faculty. Regular review of prior experience provides a basis for possible amendment of the admissions policy and assures that the prevailing

policy's standards are being carried out faithfully. The University Council through its Committee on Academic and Related Affairs also participates in the monitoring function.

To assure that the various admissions functions are carried out with integrity, the University relies upon two familiar safeguards. The first is a required *formality* of action. In adopting an admissions policy, a faculty should endorse by formal resolution a written statement of its policy that can be publicly disseminated. Administrative staff members, in developing and evaluating the files of applicants, should preserve a written record that includes the source of any item of relevant information. Though confidentiality is an important element of any application, the preservation of a written record enables consideration, either in the decision-making process or during a monitoring review, of all actions taken by others.

The second safeguard of the integrity of the process is *collective action*. The relevant voting faculty should participate in final adoption of any admissions policy statement. A final decision to accept or reject an applicant should be made by an appropriately constituted group of persons. Educational values are primary in the establishment of any admissions policy. Matters of institutional concern may also be reflected in any admissions policy.

# Responsibility of the Legislative Function

The admissions process is integral to the educational mission of the University. Primary responsibility for that process is vested in the several faculties of instruction, the bodies best suited to decide matters of educational concern. For the undergraduate programs, this function lies with the several undergraduate faculties. For the Ph.D. programs and the master's degree programs administered by graduate groups, this function is carried out by the Council of the Graduate Faculties and the various graduate groups. For the professional degree programs, this function is carried out by the faculties of the individual schools. Policies of general applicability to admissions may be adopted by the Trustees after careful study by the appropriate faculty bodies and administrative offices.

The Office of the Provost is the primary focus of University-wide actions to oversee the fulfillment of the legislative function of the faculties of instruction. Accordingly, the Provost should be kept informed of actions by the faculties; in return he or she will disseminate to the faculties general University policies on admissions.

# General Standards for Faculty's Policies

While the primary responsibility for developing admissions policies is delegated to the faculties of instruction, there are certain University-wide principles or regulations that govern these bodies:

1. The admissions policy for each school should be consonant with the overall policies of the University.
2. The criteria for admission of applicants to a degree program, or to a non-degree program, should be related to and derived from the educational mission of the school or college and its cognate activities.
3. In determining the admissions policy for a school or college, a faculty should consider the relationship among the several schools and colleges and avoid unnecessary parochialism in admissions criteria. Among the undergraduate schools and colleges, common admissions policies should be followed. There are also common minimum standards for admissions to the University's Ph.D. programs. The Provost working with the undergraduate deans should provide

coordinating services in the case of undergraduate admissions; for graduate admissions this function should be carried out by the Provost working with the graduate deans.
4. Admissions policies for all schools and colleges should conform to any obligations or constraints imposed by laws of the United States or of the Commonwealth of Pennsylvania.
5. An admissions policy statement should be sufficiently complete and precise that those persons charged with its implementation can carry out their responsibilities faithfully.
6. The selection of individuals for admission to any academic program may not be delegated to any extra-University group.

# Procedures for Each Faculty's Action

An admissions policy statement can be adopted or amended through formal action by the voting faculty of a school or graduate group. Assistance may be rendered by staff members, by faculty committees or by coordinating councils within the University.

The prevailing admissions policy statement for a school or graduate group should be generally available within the University and, as appropriate, in the larger community. Upon adopting or amending a policy statement, a faculty should promptly forward a copy to the Provost through its dean. The bulletin or other equivalent publication of a school or college should contain an accurate description of the admissions policy.

# Responsibility for the Administrative Function

The decentralization of admissions policy to the several faculties implies concomitant distribution of administrative responsibility. While the Provost, as chief academic officer of the University, oversees the administration of admissions throughout the University, the deans of schools and colleges are its primary administrators.

In the undergraduate sector, the Dean of Admissions, who reports to the Provost, supervises the implementation of admissions policies for all of the schools. For doctoral program admissions, the Vice Provost for Education or equivalent University officer performs this function. Professional schools maintain separate admissions offices.

# Procedures for the Administration of Admissions Programs

In most schools and colleges applications are sufficiently numerous that they cannot be efficiently processed without the assistance of a special staff functioning under the supervision of a dean or the Provost. The following practices should guide the admissions staff in the processing of individual applications:

1. It is the responsibility of the applicant to ensure the completeness of his or her file as regards requirements for admission. All applicants should be assured that whatever the decision on their application, each will receive full and equitable consideration under the prevailing admissions policy. All written communications about an applicant must be placed in the applicant's file; a record of oral messages must also be filed in each case where such messages are taken into consideration in the admissions decision. Communications from applicants that require a response should be acknowledged promptly. Admissions staff members may give applicants a preliminary estimate of the probable final decision on their applications.

2.  The contents of an applicant's admissions file are subject to the University's guidelines on the confidentiality of student records. Each dean shall identify in writing those individuals who, under the guidelines, may have access to admissions files without the consent of an applicant; the Provost shall do so in the case of the undergraduate admissions office. All members of a graduate group have access to the files of applicants to that group.
    The protection of individual privacy does not extend to actions on behalf of the University in processing applications. Thus final decisions to accept or reject applications, as well as preliminary estimates of the probable final decisions, are matters that can be disclosed through the informed discretion of authorized University personnel without violating the principle of confidentiality.

3.  Persons other than applicants are normally involved in the completion of an application. When a response is appropriate, admissions staff members should reply to communications from these persons promptly and courteously. In all responses to correspondents about applicants, staff members should be mindful of the general policy of confidentiality of admissions information. Examples of several common types of communications follow:

    a.  Various persons send letters of appraisal about applicants. In many instances, admissions procedure requires applicants to arrange for submissions of this type; in other instances, individuals may volunteer information about applicants. Both types of communications must be placed in the applicant's file.

    b.  University staff members assigned to recruit potential groups of applicants and to assist them through the admissions process, regularly communicate with admissions personnel on behalf of such applicants. These staff members usually act on behalf of programs for the enrollment of specific categories of students identified by the admissions policy statements. They have access to applicants' files if and only if their names appear on the approval list for such access. Since they are filling an advocacy role, they should be sensitive to the partisan aspect of their functions.

    c.  Persons related to the University often express interest in the application of a candidate. Communications of this kind may come from a wide variety of sources. The weight of these endorsements in the ultimate decisions is determined by the admissions policy statements. In instances where this seems appropriate, the admissions staff may notify the Dean or an appropriate University officer of the communication. These officials may respond to queries from such interested outside parties, but they should avoid taking the initiative in such interchanges prior to the admissions notification.

4.  University officials not engaged in the admissions process may receive inquiries concerning admissions applicants. Ordinarily these communications can be referred to the appropriate admissions staff persons for proper response. If the University official concludes that it is desirable to have additional response by the Dean or by some other University officer, a suggestion to this effect should be made and acted upon. A response may be transmitted through the University official initially contacted.

5.  Final decisions on applicants are made in accordance with stated admissions policies. Whenever possible, two or more individuals should participate in the evaluation process leading to each admissions decision. Exceptions may be made for preliminary screening activity in those schools that receive large numbers of applications and for final decisions in faculties admitting small numbers of students, such as certain graduate groups. In these cases, it may be appropriate for a single individual to make the

decision. Participation by faculty members throughout the decision process can be valuable in assuring conformity with the criteria adopted by the responsible faculty; each faculty should determine how faculty members should be selected for this purpose. A complete record for each application should identify the decision reached, the persons who participated in that judgment and the basis for the decision in applicable criteria. No one having any personal interest in the disposition of an application should take part, directly or indirectly, in the final decision-making process. Persons with advocacy responsibilities should avoid involvement at this stage.

6.  In all cases, notification of the final decision on an application must be sent to the applicant first. Thereafter, the dean of a school or college or other appropriate University officer may, in the exercise of informed discretion, disclose to others the decision reached. When a disclosure is made, record should be made in an applicant's files of the person authorizing the communication and the person to whom the information is being given.

7.  The files of applicants for admission, as of matriculants, should be retained for at least three years beyond the matriculation date stated in the application. Confidential letters of appraisal in the admissions files of students who have matriculated should not be merged with records pertaining to those students that are used for purposes other than admissions. Admissions files should be available to representatives of the faculties or to the University official charged with responsibility for reviewing the implementation of admissions policies.

## Responsibility for the Monitoring Function

Responsibility for assuring that the admissions process is reaching its goals and operating within the limits set by appropriate authorities exists at all levels of University governance. Regular procedures should exist for examination and review of prior actions taken. Through such auditing, those charged with establishing the content of admissions policy statements can ascertain that existing policies are valid or that amendments to admissions policies should be developed. Likewise, procedures should exist for periodic accounting by those who bear responsibility for the administrative function. Primarily, oversight of administrative actions is the responsibility of the respective faculties. Within the University as a whole, the Office of the Provost coordinates efforts to protect the integrity of the admissions process.

(See page 4 - Almanac, February 14, 1980 (https://almanac.upenn.edu/archive/v26pdf/n23/021480.pdf))

# IV.B. Code of Academic Integrity

*(Source: Office of the Provost, Almanac, April 25, 1972; revised, Almanac, December 2, 1980; revised, Almanac, May 4, 1982; revised, Almanac, May 26, 1992; revised, Almanac, September 10, 1996 (https://almanac.upenn.edu/archive/v43/n03/codechar.html))*

Since the University is an academic community, its fundamental purpose is the pursuit of knowledge. A commitment to the principles of academic integrity is essential to the success of this educational mission. Every member of the University community is responsible for upholding the highest standards of honesty at all times. Students, as members of the community, are also responsible for adhering to the principles and spirit of the following Code of Academic Integrity.

# Academic Dishonesty Definitions

Activities that have the effect or intention of interfering with education, pursuit of knowledge, or fair evaluation of a student's performance are prohibited. Examples of such activities include, but are not limited, to the following definitions:[1]

1. Cheating: using or attempting to use unauthorized assistance, material, or study aids in examinations or other academic work or preventing, or attempting to prevent, another from using authorized assistance, material, or study aids. Examples: using a "cheat sheet" in a quiz or exam, altering a graded exam and resubmitting it for a better grade.
2. Plagiarism: using the ideas, data, or language of another without specific or proper acknowledgment. *Examples:* copying another person's paper, article, or computer work and submitting it for an assignment; cloning someone else's ideas without attribution; failing to use quotation marks where appropriate.
3. Fabrication: submitting contrived or altered information in any academic exercise. *Examples:* making up data for an experiment, fudging data, citing nonexistent articles, contriving sources.
4. Multiple submission: submitting, without prior permission, any work submitted to fulfill another academic requirement.
5. Misrepresentation of academic records: misrepresenting or tampering with or attempting to tamper with any portion of a student's transcripts or academic record, either before or after coming to the University of Pennsylvania. *Examples:* forging a change of grade slip, tampering with computer records, falsifying academic information on one's resume.
6. Facilitating academic dishonesty: knowingly helping or attempting to help another violate any provision of the Code. *Example:* working together on a take-home exam.
7. Unfair advantage: attempting to gain unauthorized advantage over fellow students in an academic exercise. *Examples:* gaining or providing unauthorized access to examination materials, obstructing or interfering with another student's efforts in an academic exercise, lying about a need for an extension for an exam or paper, continuing to write even when time is up during an exam, destroying or keeping library materials for one's own use.

[1]  If a student is unsure whether his/her action(s) constitute a violation of the Code of Academic Integrity, then it is that student's responsibility to consult with the instructor to clarify any ambiguities.

# IV.C. Charter of the University Student Disciplinary System

*(Source: Office of the Provost, Almanac, December 2, 1980; revised, Almanac, September 4, 1984; revised, Almanac, May 26, 1992; revised, Almanac, September 10, 1996; revised, Almanac, April 27, 2010 (https://almanac.upenn.edu/archive/volumes/v56/n31/senate.html))*

## Preamble

In response to increasing concern about sexual assault and its consequences, the U.S. Department of Education, Office for Civil Rights (OCR) issued a new "guidance" document concerning compliance with Title IX of the Education Amendments of 1972. Title IX prohibits discrimination on the basis of sex in educational programs, including sexual misconduct. In this context, the Office of Student Conduct and the Office of the General Counsel, working closely with other University student affairs professionals, prepared amendments to the Charter of the Student Disciplinary System. As required by the Charter, the amendments have been approved by the Council of Deans, the Faculty Senate and the Provost and are in effect.

*Andrew N. Binns, Vice Provost for Education*
*Susan Herron, Director, Office of Student Conduct*

**Changes**

The significant points of OCR's guidance include the following:

- Once a school knows or reasonably should know of possible sexual misconduct, it must take immediate and appropriate action to investigate or otherwise determine what occurred.
- If sexual misconduct has occurred, a school must take prompt and effective steps to end the sexual violence, prevent its recurrence, and address its effects, whether or not the sexual violence is the subject of criminal investigation.
- A school must take steps to protect the complainant as necessary, including interim steps taken prior to the final outcome of the investigation.
- A school must provide a procedure for students to file complaints of sex discrimination, including complaints of sexual misconduct. These procedures must include an equal opportunity for both parties to present witnesses and other evidence and the same appeal rights.
- A school's procedures must use the preponderance of the evidence standard to resolve complaints of sexual misconduct. [1]

With the guidance in mind, we developed some special procedures for handling sexual misconduct cases and added a section in the Charter describing these. For the full text of these amendments, please refer to Section II.J. of the amended Charter. The amendments also include other minor clean-up revisions, such as correction of scrivener's errors.

[1] U.S. Department of Education, Office for Civil Rights, Dear Colleague Letter: Sexual Violence, Background, Summary and Fast Facts, April 4, 2011

Introduction

The Charter of the Student Disciplinary System sets forth the procedures under which alleged violations of the University's Code of Student Conduct, Code of Academic Integrity, and other policies, rules, and regulations are resolved.

The Code of Student Conduct sets forth the responsibility of all students at the University of Pennsylvania to exhibit responsible behavior regardless of time or place. This responsibility includes, but is not limited to, the obligation to comply with all provisions of the Code of Student Conduct; with all other policies and regulations of the University, its schools, and its departments; and with local, state, and federal laws.

The Code of Academic Integrity, and similar codes adopted by some of the University's schools, set forth the standards of integrity and honesty that should be adhered to in all student academic activities at the University of Pennsylvania.

Violations of the Code of Academic Integrity or school regulations are also violations of the University's Code of Student Conduct. Further, violations of local, state, and federal laws may be violations of the Code of Student Conduct. Therefore, throughout the Charter references to

violation(s) or alleged violation(s) of the Code of Student Conduct include violations of these other policies and laws.

The University disciplinary process at Penn may involve the following stages:

- Bringing a complaint to the Office of Student Conduct
- Resolving a complaint by mediation
- Investigating a complaint
- Filing charges by the University against a student
- Resolving charges by voluntary agreement to sanctions
- Resolving charges by disciplinary hearing
- Appealing the decision of a hearing panel
- Imposing sanctions on a student
- Fulfilling sanctions imposed by the University

Under the University's Student Disciplinary System, charges are brought on behalf of the University, not on behalf of the complainant(s) who brought the matter to the Office of Student Conduct (OSC) or the party(ies) who may have been directly or indirectly harmed by the alleged violation of University regulations. Therefore, complainants who wish to maintain greater control over the investigation and resolution of their complaints, such as is sometimes appropriate in cases of sexual offenses or in cases involving serious cultural or communicative differences, or those who wish merely to create a record of their complaint without necessarily beginning a formal disciplinary process, may wish to bring their complaint to other University resource offices, particularly the Office of the Ombudsman, which are equipped to handle cases in this manner. Such offices may, when appropriate and helpful in an individual case, consult with relevant campus communities or other resource offices in the process of investigating and resolving a complaint and are able to work closely with both complainants and respondents in resolving such matters. If such efforts fail to arrive at a satisfactory resolution, the complainant still has the option of bringing a complaint to the OSC.

Through the University Honor Council, students play a major role in the Student Disciplinary System by advising the Director of the Office of Student Conduct and the Provost on matters of policy and the operation of the System, and by sitting as members of disciplinary hearing panels. Students also serve as advisors and mediators within the System.

The System places great emphasis on the mediation of disputes, as is appropriate in a University.

# IV.C.1. The Student Disciplinary System

## A. Statement of Purpose

The purpose of the Student Disciplinary System is to further the educational mission of the University of Pennsylvania by providing a fair and effective mechanism for investigating and resolving disputes involving students and alleged violations by students of the University's rules, regulations, and policies.

## B. Jurisdiction of the Student Disciplinary System

1. Through the Office of Student Conduct (OSC), the Student Disciplinary System handles complaints from members of the University community— trustees, faculty, staff or registered students —about alleged violations of the Code of Student Conduct, the Code of Academic Integrity, or other University policies.

2. Except as provided below, the Student Disciplinary System has jurisdiction in all disciplinary matters arising under the regulations of the University against registered students, whether they be undergraduates, graduate or professional students, or others, including students who are on unexpired leaves of absence. Approved or unapproved absence from the University is not a bar to the conduct or completion of disciplinary proceedings under this Charter.

3. In general, a student is any individual who has been admitted, matriculated, enrolled, or registered in any academic program or other educational activity provided by the Trustees of the University of Pennsylvania.

4. The Student Disciplinary System does not handle complaints against graduate and professional students when such cases lie within the jurisdiction of a hearing board or other disciplinary body established by the school of the University in which the student is enrolled. When such a school-based disciplinary procedure exists, it should be the recourse of first resort for the resolution of an alleged violation of University or school regulations, unless the OSC decides, in consultation with the Provost, that it is appropriate in light of the circumstances for the Student Disciplinary System to handle the matter. Schools with such procedures are encouraged to refer disciplinary matters (excluding academic integrity matters) to the University Mediation Program whenever appropriate. When an alleged violation of University regulations by a graduate or professional student is not within the jurisdiction of a disciplinary system established by the student's school, the Student Disciplinary System shall have jurisdiction over the matter.

5. The Student Disciplinary System does not handle alleged violations of the University's parking regulations.

6. Alleged violations of the University's Residential Living policies and contracts are ordinarily handled under the procedures of the Office of College Houses and Academic Services (CHAS) but, if serious enough to warrant sanctions beyond those which the CHAS is authorized to impose, may be referred by the Director of CHAS to the Office of Student Conduct. The fact that proceedings have been held and sanctions imposed under CHAS policies does not preclude proceedings under this charter.

7. The Director of the Office of Student Conduct decides all questions of jurisdiction of the Student Disciplinary System arising under this Charter, consulting with the Provost (or designee) and with the University's General Counsel when necessary. When appropriate, the Office of Student Conduct may refer a complaint to another University office or disciplinary process.

## C. General Principles of the Disciplinary System

1. The University's Student Disciplinary System is not a legal system, and University disciplinary proceedings are not civil or criminal litigation. Thus, they operate under different rules, standards, and procedures, and seek to achieve ends different from criminal or civil proceedings.

2. Any member of the University community—trustees, faculty, staff or registered students—may bring a complaint about student conduct or academic integrity to the attention of the Office of Student Conduct. Doing so in no way limits a complainant(s)'s rights or obligations to bring such matters to the attention of other University offices, officers, or resources, including the Office of the Ombudsman and appropriate deans, or to seek recourse outside the University through civil or criminal legal proceedings.

3. In all cases, the University reserves the right to determine how to process a disciplinary complaint. Once a complaint is brought to the

attention of the Office of Student Conduct, the OSC, on behalf of the University, will decide how the complaint will be handled, including whether disciplinary charges should be brought against a student.

4. It is expected that most matters brought to the OSC can and should be resolved through mediation and will not result in charges or disciplinary hearings. However, because of their seriousness within an academic community, alleged violations of the Code of Academic Integrity will not be referred for mediation. Thus, except in academic integrity matters and matters that warrant treatment as serious violations of the Code of Student Conduct or other University policies, the initial response by the OSC may be to refer the complainant and respondent to the University's mediation program. Only if mediation fails or is inappropriate will the OSC begin the more formal disciplinary processes outlined in this charter.

5. All members of the University community—trustees, faculty, staff or registered students—are required to cooperate with the Student Disciplinary System. Those individuals who may be interviewed or called as witnesses in a disciplinary matter (including respondents and complainants) are obligated to provide honest and complete statements to the OSC and to the Hearing Panel. While in some circumstances a respondent may choose not to answer questions or provide information because of pending civil claims or criminal charges arising out of the same or other events, the respondent's decision not to answer questions or provide information will not be a reason to delay or defer an investigation or proceedings under this Charter. A student who fails, without good cause, to appear for a hearing after receiving notice, or to cooperate with the investigation conducted by the OSC, may be charged with a violation of the Code of Student Conduct. Repeated disruption of disciplinary hearings or the disciplinary process by a student or the student's advisor may result in charges against the student of non-cooperation with the Student Disciplinary System or exclusion of the student or advisor from disciplinary proceedings including disciplinary hearings. Such exclusion is not a bar to the completion of disciplinary proceedings involving that student.

## D. Organization of the Disciplinary System

1. Office of Student Conduct
   The Office of Student Conduct is the central office responsible for resolving alleged violations of University policies by students. The duties of the OSC include determining whether complaints warrant action by the OSC, referring complaints for mediation or resolution by other University offices, investigating complaints, determining whether to charge a student with violations of University policies, resolving complaints by voluntary agreements to sanctions, bringing charges of violations to a disciplinary hearing, presenting evidence at hearings, monitoring and enforcing the fulfillment of sanctions imposed pursuant to voluntary agreements or after disciplinary hearings, maintaining records of all disciplinary matters, providing administrative support for all aspects of the disciplinary process (including hearings), and preparing reports and compiling statistics.

2. University Mediation Program
   The University Mediation Program (UMP) recruits, screens, and trains members of the University community to serve as mediators. The UMP uses the volunteer services of faculty, students, and staff members who have been trained in mediation and dispute resolution and may also use resources available in the University's Law School, in University resource offices such as the Office of the Ombudsman, or outside the University.

3. University Honor Council

The University Honor Council (UHC) educates students, faculty and staff regarding both the standards of academic integrity and of behavioral conduct of the University community. The UHC provides independent advice to the Provost and the Office of Student Conduct regarding policies of academic integrity and of conduct, as well as their implementation; the operation of the University Disciplinary System in the areas of academic integrity and student conduct; the general handling of academic integrity and of conduct cases; and the effectiveness and implementation of the University's Code of Academic Integrity and its codes of conduct. Members of the University Honor Council also sit on Disciplinary Hearing Panels for cases of alleged violations of the Code of Academic Integrity, the Code of Student Conduct and related policies.

The UHC meets regularly with the Director of the Office of Student Conduct and may also meet with appropriate administrators and students, faculty or administrative groups or committees to discuss academic integrity and conduct issues. The UHC also initiates and participates in educational programs in the areas of academic integrity and of student conduct.

The University Honor Council consists of a minimum of twenty undergraduate students, recommended by the Nominations and Elections Committee (NEC) in cooperation with the current members of the UHC, and appointed by the Provost for renewable terms of one year. The NEC and UHC are encouraged to ensure that nominees represent a broad cross section of the undergraduate student body. The UHC selects a chair from among its members by a majority vote of the current members. Faculty members and graduate students designated by the Faculty Senate or the Graduate and Professional Student Assembly to sit on Disciplinary Hearing Panels may participate in the work of the UHC at the mutual convenience of the UNC and the faculty member or graduate student.

4. Disciplinary Hearing Officer
   The Faculty Senate shall appoint a tenured member of the Standing Faculty of the University of Pennsylvania as Disciplinary Hearing Officer (DHO), preferably from among those faculty who have experience with the Student Disciplinary System. The DHO selects members to serve on Disciplinary Hearing Panels; determines the time and location of hearings; and presides over all disciplinary hearings held under this charter. The DHO is responsible for overseeing the procedural integrity of disciplinary hearings. The DHO shall, for example: consider and resolve pre-hearing challenges to the authority or procedures of a Disciplinary Hearing Panel; rule on all disqualification requests and objections to individual panel members; assist parties to adhere to the basic principles of fairness prior to, during, and subsequent to disciplinary proceedings; and may consult at any time with students, faculty members, the University's General Counsel, or others about procedural issues. The DHO also participates in the training of prospective faculty and student members of Disciplinary Hearing Panels. The DHO serves and may be reappointed at the discretion of the Provost, but his/her removal or reappointment may not occur without prior consultation with the UHC and the chairs of the Faculty Senate.

5. Disciplinary Appellate Officer
   Every two years, the Provost, after consultation with the UHC and the chairs of the Faculty Senate, shall appoint a tenured member of the Standing Faculty of the University of Pennsylvania as a Disciplinary Appellate Officer (DAO), preferably from among those faculty who have experience with the Student Disciplinary System. The DAO decides appeals of findings and recommended sanctions made by Disciplinary Hearing Panels based on the record of such proceedings and written submissions from the relevant parties. The DAO serves

and may be reappointed at the discretion of the Provost, but his/her removal or reappointment may not occur without prior consultation with the UHC and the chairs of the Faculty Senate.

6. Disciplinary Hearing Panels
   a. Disciplinary matters are heard by Disciplinary Hearing Panels of five members each. The Disciplinary Hearing Officer randomly selects the undergraduate members of Disciplinary Hearing Panels from the membership of the University Honor Council for academic integrity violations. The Disciplinary Hearing Officer randomly selects the graduate and professional student members of Hearing Panels from lists of thirteen or more graduate and professional students provided annually to the DHO by GAPSA. The Disciplinary Hearing Officer randomly selects the faculty members of Hearing Panels from lists of thirteen or more faculty provided annually to the DHO by the Faculty Senate Executive Committee. GAPSA and the Faculty Senate Executive Committee are encouraged to ensure that nominees represent a broad cross-section of graduate and professional students and faculty, respectively.
   b. In all disciplinary matters except those involving alleged violations of the Code of Academic Integrity, the Disciplinary Hearing Panel is composed of two faculty members and three students of the same category (undergraduate or graduate) as the respondent. If a disciplinary matter involves both undergraduate and graduate respondents, the panel shall include at least one undergraduate and at least one graduate student and two faculty members; the fifth panel member shall be an undergraduate or graduate student selected by the DHO.
   c. In disciplinary matters involving alleged violations of the Code of Academic Integrity, the Disciplinary Hearing Panel is composed of three faculty members and two students of the same category (undergraduate or graduate) as the respondent. If a disciplinary matter involves both undergraduate and graduate respondents, the panel shall consist of one undergraduate student, one graduate student, and three faculty members.
   d. Except for participation on the University Honor Council, no one designated to serve on Disciplinary Hearing Panels may serve simultaneously in any other capacity within the Student Disciplinary System.
   e. If any nominating body chooses fewer than thirteen members to serve on Disciplinary Hearing Panels or cannot make additional members available when needed, the Provost shall make the necessary appointments to fill the complement of the appropriate group. If any member is unable to serve for any reason, a replacement is selected in the same manner that the original member was chosen.
   f. Student members of Disciplinary Hearing Panels must be in good academic and disciplinary standing, as defined by their schools. The University Honor Council, as appropriate, by a vote of two-thirds of its members, may remove a member who fails to perform his or her duties. When a member ceases to be in good standing or is removed by the UHC, a replacement from the same category shall be chosen in the same manner that the original member was chosen.

7. Advisors
   a. Advisors help students involved in disciplinary proceedings to understand the disciplinary process, respect and comply with the provisions of this Charter, and deal with all aspects of the process. Any University faculty member, staff member, or student in good academic and disciplinary standing may serve as an advisor. The OSC maintains lists of individuals who are willing to serve as advisors and who have received training in the operation of the Student Disciplinary System.
   b. Upon receiving notice of a complaint and the accompanying list of trained advisors, a respondent may select an advisor from this list or choose any other University faculty member, staff member, or student in good academic and disciplinary standing to advise the respondent during the disciplinary process. If criminal charges are pending against a respondent or, in the judgment of the Office of the University's General Counsel, are reasonably in prospect, the respondent's advisor may be an attorney who is not a member of the University community. In such instances, the attorney shall be expected to observe the procedures of this Charter and comply fully and promptly with decisions of the DHO or other University officials or bodies charged with the administration of this Charter in the same manner expected of members of the University community.
   c. An advisor may accompany any complainant, witness, or respondent to, and may participate in, any meeting regarding a disciplinary complaint. Advisors also may accompany complainants, respondents, and witnesses to hearings, but generally may not participate directly in such hearings (except as provided in section IV.C.2.F.4.f below). Advisors to respondents may, however, quietly advise the respondent(s) during the hearing and may also make a brief statement at the conclusion of the hearing, before the panel begins its deliberations.
   d. Any advisor who fails to observe the procedures of this Charter or comply fully and promptly with decisions of the DHO may, after appropriate warning, be disqualified by the DHO from continuing to serve. In the event of such disqualification, the hearing may proceed whether or not a replacement advisor is available or it may be rescheduled, at the sole discretion of the DHO. Any person disqualified from serving as an advisor shall be ineligible to serve as an advisor for a period of two years. Repeated disruption of disciplinary hearings or the disciplinary process by an advisor may result in charges against the advisee of non-cooperation with the Student Disciplinary System. If the advisor is a member of the student body, faculty, or staff of the University, disciplinary charges may be brought against the advisor in the appropriate forum.

# IV.C.2. The Disciplinary Process
## A. Bringing a Complaint to the Office of Student Conduct

1. Any student, faculty or staff member who believes that a student has violated University rules, regulations or policies may file a complaint, which must be in writing, with the OSC. A complaint asks the OSC to consider the matter for possible referral or investigation. Students, faculty, or staff members also may consult informally with the OSC staff to determine whether they wish to file a complaint. Complaints made to other University offices or personnel also may be referred to the OSC.

2. The OSC promptly evaluates each complaint it receives to determine whether the University's Code of Student Conduct, Code of Academic Integrity, or other applicable rules, regulations, or policies may have been violated. When the OSC determines that no such violation may have occurred, it may dismiss the matter without further investigation, or it may refer the parties to the University Mediation Program or elsewhere to resolve their dispute. When the OSC determines that a violation may have occurred, it may refer the matter

for mediation or undertake an investigation that may lead to the filing of formal charges against a student or students.

3. A complaint is not a charge that a student has violated University regulations. Charges against a student are only made by the University (not by complainants) following an investigation. Until there is a determination to the contrary by voluntary agreement to sanctions or by a Disciplinary Hearing Panel, there is a presumption that an accused student has not violated University rules, regulations, or policies.

4. When a complaint is filed, the OSC promptly gives written notice of the complaint and its allegations to the student(s) alleged to have violated University rules. A copy of the Charter shall be included with the notice, as well as a list of potential advisors who have received training from the OSC.

## B. Resolving a Complaint by Mediation

1. The University encourages informal mediation whenever practical and appropriate. If the parties agree, at any time the OSC may refer any disciplinary matter other than an alleged violation of the Code of Academic Integrity to the University Mediation Program (UMP) or other resources for mediation. Members of the University community —Trustees, faculty, staff or registered students— may also contact the University Mediation Program directly.

2. It is within the sole discretion of the OSC to determine whether a disciplinary complaint is suitable for mediation. If mediation fails or new information comes to light about an unresolved matter then in mediation, the OSC may proceed with an investigation and the filing of disciplinary charges. The OSC may also set a date after which it will begin to investigate the original complaint or file charges if a matter has not been successfully mediated.

3. If the OSC refers a complaint for mediation and both parties to the dispute agree to participate, the UMP will assign a trained mediator and advise the complainant(s) and respondent(s) in advance of the date, time and place set for mediation. In order to resolve a disciplinary matter by mediation, both the complainant and the respondent must agree, first, to participate in the mediation and, second, to the proposed resolution.

4. If a student fails to comply with the terms of a mediation agreement, the OSC may take steps to enforce the agreement (including use of a Disciplinary Hold or the filing of new charges under the Code of Student Conduct) or may investigate the original complaint and bring disciplinary charges under this Charter.

## C. Investigating a Complaint

1. If, after a preliminary evaluation of a complaint, the OSC determines that a violation of the Code of Student Conduct may have occurred and if the complaint is inappropriate for mediation or mediation fails, the OSC shall investigate the complaint and determine whether to bring charges of a violation.

2. In the course of its investigation, the OSC may interview any witnesses, including the respondent(s) or potential respondent(s). The OSC shall inform each witness that anything they say in such interviews may be introduced as evidence at a hearing.

## D. Filing Charges by the University Against a Student

In light of its investigation of a complaint, the OSC may file charges against a student(s) of a violation(s) of the University's Code of Student Conduct, Code of Academic Integrity, or other University rules, regulations, or policies. The OSC also may add charges beyond the scope of the original complaint, may add additional students as respondents,

or may dismiss the original complaint as unfounded. If the OSC decides to charge a student with a violation of University regulations, the OSC must inform the respondent(s) of the charges in writing, identifying the University rules, regulations, or policies alleged to have been violated. The OSC shall inform both respondent(s) and complainant(s) whether charges have been filed.

## E. Resolving Charges by Voluntary Agreement to Sanctions

1. Following the notice that charges have been filed against a student, the OSC may discuss with the respondent and the respondent's advisor what disciplinary sanction(s) would be appropriate to resolve the matter by voluntary agreement to sanctions. The respondent may accept, reject, or propose an alternative to the proposed sanction(s), and may be accompanied and assisted by an advisor, who may participate in these discussions. Statements made during discussions about whether a respondent will enter into a voluntary agreement to sanctions may not be introduced as evidence at any subsequent hearing, but may provide a basis for further investigation by the OSC.

2. A resolution by voluntary agreement to sanctions may be entered into by written agreement at any time after a complaint has been filed and prior to a disciplinary hearing. All sanctions allowed under this Charter are available to the OSC as part of a resolution by voluntary agreement to sanctions. By agreeing to such a resolution, a respondent waives further proceedings under this Charter.

3. Complainants and complainants' advisors are not parties to voluntary agreements to sanctions.

4. If, in the judgment of the OSC, a voluntary agreement to sanctions is not reasonably in prospect, or if the respondent(s) reject a proposed sanction, the OSC may bring the disciplinary matter to a hearing.

## F. Resolving Charges by Disciplinary Hearing

1. Scheduling Disciplinary Hearings
    a. If disciplinary charges are not resolved by a voluntary agreement to sanctions, the Disciplinary Hearing Officer promptly begins the process of scheduling the Disciplinary Hearing, with due regard for the time required for all parties to prepare for the hearing. The DHO shall provide reasonable advance notice in writing to the complainant(s), respondent(s), and witnesses of the date, time, and place of the hearing and of the names of the panel members assigned to hear the disciplinary matter.

    b. Hearings normally take place as soon as possible after the filing of charges. Upon a showing of good cause by the OSC or the respondent(s), the DHO may grant a reasonable extension of any time limit set forth in the Charter.

    c. The DHO may expedite a Disciplinary Hearing in appropriate circumstances, including disciplinary matters involving students who have been placed on mandatory temporary leave of absence or conditional attendance, graduating students, or students who are about to take a leave of absence or to leave campus to study elsewhere.

2. Disqualification of Hearing Panel Members
    a. Members of the Hearing Panel selected by the DHO should disqualify themselves from hearing a disciplinary matter if they believe in good faith that their capacity for making an objective judgment in the disciplinary matter is, or may reasonably appear to be, impaired. Members should not disqualify themselves for any other reason.

b. The respondent(s) or the OSC may object for specific cause to any panel member selected by the DHO. The objection must be in writing and must be received by the DHO at least 48 hours in advance of the date and time set for the hearing.

c. The DHO will rule upon all disqualification requests and objections to panel members. If the DHO decides that a challenge is valid, or if there is a voluntary disqualification, the DHO, after notifying the respondent(s) and the OSC, will replace the disqualified member with another panel member randomly selected from the same category.

3. Pre-Hearing Exchanges and Testimony

a. Before the hearing, the OSC and the respondent(s) shall exchange among themselves and with the DHO copies of all exhibits to be presented, the names of witnesses to be called, and a brief summary of the substance of testimony expected to be presented to the Hearing Panel.

b. When the DHO believes that it will contribute to the expedition and fairness of a Disciplinary Hearing, he/she may (but need not) ask the OSC to prepare a written statement of its case against the respondent(s) and give the respondent(s) a reasonable opportunity to prepare a written response. The OSC and respondent(s) also may submit statements at their own initiative. The statements and any accompanying exhibits may be considered by the Hearing Panel, in addition to testimony, arguments, or evidence presented at the actual hearing.

c. In exceptional circumstances, when a witness or exhibit does not become known or available until immediately before the hearing, the DHO may, at his/her discretion, permit the evidence to be presented or may reschedule the hearing to a later time.

d. If a respondent or the OSC anticipates that a key witness will be unavailable for a hearing, they may ask the DHO to preserve the testimony of the witness on tape and present it as evidence at the hearing. The OSC and the respondent(s) must be notified in advance of the date, time and place of the taping. All parties who would be permitted to question such a witness at a hearing may question the witness at the taping.

4. Conduct of Hearings

a. Disciplinary hearings are not trials, and they are not constrained by technical rules of procedure, evidence, or judicial formality. They are designed to encourage open discussion among the participants that promotes the hearing panel's understanding of the facts, the individuals involved, the circumstances under which the incident occurred, the nature of the conduct, and the attitudes and experience of those involved. The rules of evidence applicable to legal proceedings do not apply to disciplinary hearings. Information, including hearsay evidence, may be considered if it is relevant, not unduly repetitious, and the sort of information on which responsible persons are accustomed to rely in the conduct of serious affairs.

b. The DHO presides over all hearings and decides all questions about the admissibility of evidence and the conduct of hearings. While the DHO may be present for the Hearing Panel's discussions to answer procedural questions, the DHO does not deliberate or vote with the Panel regarding its findings or its recommendation of sanctions.

c. Disciplinary hearings are held in private unless the respondent(s) and the complainant(s) agree in writing to an open hearing. The DHO may limit attendance at a hearing to ensure fair and orderly proceedings. If a hearing is opened in accord with this procedure, the DHO may, when necessary to maintain order or

to protect the rights of participants, declare the hearing closed to the public. In a case involving important privacy interests, the DHO may close a hearing or part of a hearing that has been opened upon determining that the privacy rights of a participant may be jeopardized.

d. Upon a showing that the required notice was provided, the hearing against a respondent(s) may proceed in his/her absence.

e. At the hearing, the OSC presents the results of the its investigation of the complaint, calls witnesses to testify and presents the University's evidence against the student(s). Members of the Hearing Panel may also call witnesses to testify and may question any witness appearing before it. Respondents may also call witnesses to testify and ask questions of all witnesses.

f. A respondent is responsible for presenting his/her own case before the Hearing Panel. However, at the discretion of the DHO, the respondent's advisor may be permitted to question witnesses on behalf of a respondent or to address the Hearing Panel. The DHO's exercise of discretion in this matter will be guided by the principles that govern disciplinary hearings, specifically, fairness, the need for orderly procedures, and the Hearing Panel's duty to understand the facts and parties in the disciplinary matter.

g. Complainants may attend the hearing, testify if they wish to do so, and may be accompanied by an advisor. Neither complainants nor their advisors may call witnesses or present evidence or arguments.

h. At the conclusion of the hearing the OSC and the respondent(s) or their advisor(s) may make brief statements. At the discretion of the Disciplinary Hearing Officer, the complainant(s) or their advisor(s) may be permitted to make a brief statement. The time allowed for such statements shall be set by the DHO.

i. The OSC shall arrange for a verbatim transcript or recording to be made of all disciplinary hearings. The transcript or recording is the property of the University of Pennsylvania and becomes part of the record of the disciplinary proceedings.

5. Findings and Recommendations of the Hearing Panel

a. Only evidence presented at the hearing shall be considered by the Hearing Panel. The Hearing Panel shall presume a respondent innocent unless proven responsible for a violation by clear and convincing evidence. All decisions of the Hearing Panel require a majority vote.

b. Following the hearing, the members of the Hearing Panel meet to discuss in private their findings, which consist of two parts: 1) a determination of whether the respondent is responsible for any violation; and 2) if so, a recommendation of sanction(s).

c. The OSC may recommend to the Hearing Panel a sanction to be imposed if the Hearing Panel finds the respondent(s) responsible for a violation. The respondent(s) may respond to the OSC's proposed sanction(s). Before the Panel makes its recommendation on sanctions, it shall review any previous disciplinary offenses by and sanctions against the respondent(s).

d. If the Hearing Panel determines that the respondent(s) is not responsible for a violation, no sanction may be recommended against the respondent(s) and the respondent may not be subject to further proceedings under this Charter on the same charge(s).

e. If the Hearing Panel finds that a student is responsible for a violation of University rules or regulations, it shall recommend to the Provost appropriate sanctions. Only the Provost (or designee), acting on behalf of the University, may actually impose a sanction on a student. The Provost (or designee) shall not impose a

sanction until after any appeal of the Hearing Panel's decision has been decided by the DAO.

6. Notice of Hearing Panel Decision
The Hearing Panel shall promptly transmit its decision, including its findings and recommendation regarding sanctions, in writing to the DHO, the OSC, the respondent(s) and the Provost as soon as possible after the end of the hearing.

## G. Appealing a Hearing Panel's Decision

1. The Disciplinary Appellate Officer (DAO) has exclusive jurisdiction to decide appeals. Appeals are based solely on the record of the disciplinary hearing and the written submissions and responses of the respondent(s) and the OSC.

2. Only respondent(s) may appeal the Hearing Panel's findings of responsibility except where applicable laws or regulations may extend this right to complainants. Both the respondent(s) and the OSC may appeal the Hearing Panel's recommendation of sanction(s). An appellant must submit any appeal to the DAO in writing within 10 days after the Hearing Panel has rendered its opinion. The appeal must state in detail the specific grounds upon which it is based and must be sent to the OSC or respondent(s), as appropriate.

3. When the appeal is received, the OSC provides the Disciplinary Appellate Officer with a copy of the respondent's charge letter, a copy of the Hearing Panel's findings, a verbatim transcript or tape recording of the Disciplinary Hearing, and any exhibits considered by the panel in reaching its recommendations. The respondent and the OSC have ten days from the date of the appeal to submit to the DAO a written response to the appeal.

4. Appellate review is limited to allegations of material and prejudicial procedural error in the conduct of hearings, error in the interpretation or application of relevant University regulations, consideration of new evidence sufficient to alter the Hearing Panel's findings or severity of the recommended sanctions. If the DAO finds sufficient basis, he/she may reverse or modify the Hearing Panel's findings or proposed sanctions, or may remand the disciplinary matter for further investigation by the OSC or a new hearing before a new Hearing Panel. However, the DAO may not recommend a more severe sanction(s) unless the OSC has appealed the sanction(s) recommended by the Hearing Panel.

5. After considering an appeal, the Disciplinary Appellate Officer shall promptly issue his/her decision in writing and shall provide copies to the OSC, the DHO, the Provost, and the respondent(s).

## H. Imposing Sanctions on a Student

1. Sanctions recommended against a respondent by a Hearing Panel or the DAO are imposed by the Provost, or his designee, and may include any reasonable sanction, including, but not limited to, the following:
Warning--A warning is a written admonition given by the OSC on behalf of the University in instances of minor misconduct.
Reprimand --A reprimand is written censure for violation of the University's rules, regulations, or policies, given by the OSC on behalf of the University, which includes notice to the student that continued or repeated conduct violations shall result in the imposition of more serious sanctions.
Fine--A monetary fine may be levied as a disciplinary sanction and is payable to the Trustees of the University of Pennsylvania. (not appropriate in cases of academic integrity violations).
Restitution--Restitution is reimbursement for the damage, loss, or misappropriation of University, private or public property or compensation for injury to individuals. Restitution may take the form of monetary payment, property, or appropriate service (not appropriate in cases of academic integrity violations).
Disciplinary Probation--Disciplinary Probation may be imposed for a specified period or indefinitely (i.e., for as long as and whenever a student is a full- or part-time student at the University of Pennsylvania). Probation may be imposed for a single instance of misconduct or for repeated minor misconduct. Any future misconduct or academic integrity violation by a student on Disciplinary Probation, found to have occurred during the probationary period, may be grounds for suspension or, in especially serious instances, expulsion from the University.
Withdrawal of Privileges--Withdrawal of privileges is the denial of specified privileges or the ability to participate in specified activities for a designated period of time.
Suspension--Suspension is the termination of student status and separation from the University until a specified date. Suspension means the loss of all rights and privileges normally accompanying student status. While on disciplinary suspension, students may not obtain academic credit at Penn or elsewhere toward completion of a University of Pennsylvania degree. Students are eligible to return to the University after the specified suspension term has elapsed. Suspension is imposed in instances of serious misconduct; it is generally the minimum sanction imposed for a violation of the Code of Academic Integrity.
Indefinite Suspension--An indefinite suspension is termination of student status and separation from the University for an unspecified period, without an automatic right of return to the University as a student (though specific conditions for return as a student may be specified). When the conditions of an indefinite suspension have been fulfilled, the student must make a formal request, as specified in the conditions, to return to student status. Indefinite suspension is imposed in instances of extremely serious misconduct or in instances of continued serious misconduct following the imposition of probation or suspension for a specified period.
Expulsion--Expulsion is a permanent termination of student status and permanent separation from the University of Pennsylvania. Expulsion is imposed in instances of the most serious misconduct or in instances of continued serious misconduct following the imposition of probation or suspension.

2. In addition to the sanctions defined above, students may be required to perform a designated number of hours of University or other community service or to utilize University or other educational or counseling services related to the nature of the misconduct.

3. Sanctions may be imposed alone or in combination with other sanctions. The Disciplinary Hearing Panel or the DAO may recommend whether the sanctions should appear on the transcript of a respondent, and, if so, for how long.

4. After the imposition of sanctions, a faculty member involved in an academic integrity matter shall be informed of the outcome of the disciplinary proceedings. If the student has been found not to be responsible for an academic integrity violation, the instructor should re-evaluate and assign a grade (which may differ from the grade originally assigned) based on the student's academic performance in the course. If the student has been found responsible for an academic integrity violation, the instructor may assign any grade the instructor deems appropriate. In the event that the student believes the final grade is unfair or fails to take account of the outcome of the disciplinary proceeding, the student may appeal the grade through the existing academic grievance procedure for

the evaluation of academic work established by each school and academic department.

## I. Fulfilling Sanctions Imposed by the University

1. Under the Code of Student Conduct, students are required to comply with all disciplinary sanctions. Failure to do so constitutes a violation of the Code and is itself subject to disciplinary proceedings by the OSC.

2. The OSC monitors the implementation and fulfillment of sanctions. In performing this duty, the OSC shall have the cooperation of the Division of University Life, the respondent(s)'s dean, and other appropriate University offices. No sanction shall be enforced while an appeal is pending.

# IV.C.3. Additional Matters

## A. Administration of the Disciplinary System

1. The Provost is responsible for implementation of this Charter, administrative oversight of the Student Disciplinary System, including the OSC, and ensuring that the Student Disciplinary System functions fairly and in furtherance of the educational mission of the University. The Provost may instruct the OSC regarding the handling of special cases, but he/she may not so instruct the DHO, the DAO, or the members of Disciplinary Hearing Panels.

2. When circumstances warrant, the OSC may take such administrative steps as may be necessary and feasible to effect the prompt resolution of a disciplinary matter, including, but not limited to, tape recording the testimony of witnesses who may be unavailable at the time of hearing; making special arrangements to ensure the attendance of complainants, respondents, witnesses, or other participants at a hearing; and scheduling hearings outside of the normal academic year.

3. In any disciplinary matter in which a member of the Student Disciplinary System cannot perform her/his duties under this Charter, an alternate may be designated by the Provost using the procedures appropriate to that individual's position in the system. In addition, when the Provost determines that circumstances warrant, such as (but not limited to) when a conflict of interest or a particularly complex or controversial disciplinary matter arises, the Provost may appoint a special OSC staff member, a special Disciplinary Hearing Officer, or a special Disciplinary Appellate Officer using the procedures appropriate to the position.

## B. Reports to the University Community

1. Subject to the limitations imposed by law and the University's policies on the confidentiality of student records and information, the OSC, in consultation with the Provost, the University Conduct Council, and the University Honor Council, shall make periodic reports to inform the University community about the character and extent of the work of the Disciplinary System, including the nature of violations of University rules and regulations and the sanctions imposed. The reports of the OSC shall deal both with disciplinary matters that go to hearing and with disciplinary matters that are resolved before hearing, and shall include such information as the total number of disciplinary matters handled during the preceding year broken down by type of resolution (e.g., mediation, voluntary agreement to sanctions, hearing), by type of violation, by type of sanction(s) imposed, and by whether or not the respondent(s) were found responsible for a violation.

2. With the approval of the Provost, the OSC may also make extraordinary reports to the University community concerning the

outcome of certain exceptional disciplinary matters, subject to the limitations imposed by law and the University's policies on the confidentiality of student records and information.

## C. Disciplinary Holds

At any time after the filing of a complaint, the OSC, after consulting with the student's academic dean, may place a "Disciplinary Hold" on the academic and/or financial records of any student for the purpose of preserving the status quo pending the outcome of proceedings, enforcing a disciplinary sanction, or ensuring cooperation with the Student Disciplinary System. A Disciplinary Hold may prevent, among other things, registration, the release of transcripts, and the awarding of a degree.

## D. Mandatory Leave of Absence and Conditional Attendance

In extraordinary circumstances, when a student's presence on campus is deemed by the University to be a threat to order, health, safety, or the conduct of the University's educational mission, the Provost (or designee), in consultation with the student's dean or associate dean, may place the student on a mandatory temporary leave of absence or impose conditions upon the student's continued attendance, pending a hearing of disciplinary charges. When reasonably possible, the student shall be provided with an opportunity to be heard before a decision is made by the Provost (or designee) to impose a mandatory temporary leave of absence or conditions on the student's attendance. At the respondent's request, and where feasible, the OSC may expedite the investigation of a complaint and the disciplinary hearing against a student placed on a mandatory temporary leave of absence or conditional attendance.

## E. Civil or Criminal Proceedings

The University may proceed with disciplinary proceedings against a student under this Charter regardless of possible or pending civil claims or criminal charges arising out of the same or other events. The OSC, with the concurrence of the Provost and after consultation with the University's General Counsel, shall determine whether to proceed with charges against a student who also faces related charges in a civil or criminal tribunal. If the University defers proceeding with disciplinary charges against a student in light of related charges in a civil or criminal tribunal, the University may at any subsequent time proceed with disciplinary proceedings against that student under this Charter irrespective of the time provisions set forth in this Charter.

## F. Disciplinary Records

1. Maintenance of Records
   Except as may be otherwise provided by applicable law, records of all complaints, disciplinary proceedings, mediations, and voluntary agreements to sanctions are maintained by the OSC in accordance with the University's Protocols for the University Archives and Records Center and University policies on the confidentiality and maintenance of student records.

2. Confidentiality
   Except as may be otherwise provided by applicable law, all disciplinary proceedings, the identity of individuals involved in particular disciplinary matters, and all disciplinary files, testimony, and findings are confidential, in accordance with University policies and federal law concerning the confidentiality of student records. However, no provision of this Charter or the University's own confidentiality shall be interpreted as preventing a student from seeking legal advice.

3. Violation of Confidentiality

Failure to observe the requirement of confidentiality of a disciplinary hearing by any member of the University community, other than the respondent, constitutes a violation of University rules and may subject the individual to the appropriate procedures for dealing with such violations. The respondent may disclose confidential information pertaining to him/herself, but may not violate the confidentiality of others. If the respondent discloses, causes to be disclosed, or participates in the disclosure of information that is confidential, any person whose character or integrity might reasonably be questioned as a result of such disclosure shall have the right to respond in an appropriate forum, limited to the subject matter of the initial disclosure.

## G. Release of Information on Disciplinary Proceedings

1. To provide students involved in disciplinary matters with appropriate liaison with their school offices in regard to their academic work, the dean or appropriate associate dean of the school(s) of the respondent(s) shall be confidentially-informed when a complaint is filed, when a sanction is imposed, or when a disciplinary complaint is otherwise resolved by the Student Disciplinary System. When a sanction is imposed, the Director of Career Planning and Placement may be informed by the OSC if the sanction(s) is reportable outside the University. When a transcript notation is required as part of a sanction, the University Registrar is also informed and required to implement the sanction as directed by the OSC on behalf of the Provost.

2. As required by law, in disciplinary matters involving allegations of sexual offenses, the complainant(s) shall be informed of the outcome of disciplinary proceedings, including voluntary agreements to sanctions.

## H. Reportability of Sanctions

1. Subject to applicable law and the University's policies on the confidentiality of student records and information, any disciplinary sanction may be reportable outside the University of Pennsylvania, subject to specific policies governing the reporting of sanctions adopted by the Council of Undergraduate Deans for undergraduate students and the Council of Graduate Deans for graduate and professional students.

2. Resolution of disciplinary charges by voluntary agreement to sanctions is treated like a finding of responsibility and is reportable in the same manner as sanctions imposed following a Disciplinary Hearing.

## I. Amendment of the Charter

Amendments to this Charter may be recommended by the University Honor Council, the Office of Student Conduct, University Council, Faculty Senate Executive Committee, or other appropriate members of the University community and proposed by the Provost. Amendments take effect upon the approval of the Council of Deans, except that the Council of Deans may at its discretion refer proposed amendments to the deans and faculties of the individual schools for approval.

## *Applicability of the New Code and System*

*The Code of Academic Integrity and the Charter of the Student Disciplinary System apply to all undergraduates in the School of Arts and Sciences, including the College of Liberal and Professional Studies; the School of Engineering and Applied Science; the Nursing School; and the Wharton School.*

*They also apply to all graduate students in the Annenberg School for Communication, the School of Arts and Sciences, the School of Design, the Graduate School of Education, the Nursing School and the School of Social Policy and Practice and to Ph.D. students in the Wharton School. MBA students in the Wharton School are covered by their own code of conduct.*

*The Schools of Law, Medicine, Dental Medicine and Veterinary Medicine have their own codes and disciplinary systems, as does the Biomedical Graduate Studies program.*

# IV.C.4. Student Disciplinary Procedures for Resolving Complaints of Sexual Assault, Sexual Violence, Relationship Violence and Stalking [1]

*(Source: Office of the Provost, Almanac, January 27, 2015 (https://almanac.upenn.edu/archive/volumes/v61/n20/ pdf/012715supplement.pdf))*

## Introduction

The University of Pennsylvania is committed to providing a safe and healthy environment, free of gender-based misconduct, to all members of our community and visitors to our community.  As such, sexual assault, sexual violence, relationship violence, and stalking will not be tolerated.  In order to ensure the creation of a climate where students are able to thrive and achieve their full potential, the University has developed a wide range of policies, educational programs, broad-based resources, support, and reporting systems.  This amendment to the Student Disciplinary Charter supplements these other policies and initiatives, addressing the process by which complaints against an enrolled University student for a violation of the Sexual Violence, Relationship Violence and Stalking Policy ("Sexual Violence Policy") will be adjudicated and resolved.

## Confidentiality

Confidentiality is of critical importance in ensuring that these sensitive matters are handled appropriately.  The University has an obligation to address complaints with respect to the violation of the Sexual Violence Policy as fairly and expeditiously as possible as soon as it becomes aware of an allegation that the Policy has been violated.  To that end, if any University official is informed of an allegation that the Policy has been violated, the University is required to respond, unless the informed official is serving in a privileged capacity (designated confidential resource, therapists, clergy, or medical providers).

The response to the complaint, however, including seeking a resolution under this procedure, should be treated as confidential, to the extent consistent with the requirements of law.  University staff and faculty may share information with others who have a legitimate need to know in order to fairly and effectively address complaints, but the information should be considered confidential and should be protected to the extent possible consistent with legal obligations.  Such administrators may include, for example, the Office of the Vice Provost for University Life, the Office of the Sexual Violence Investigator, the Title IX Officer, Public Safety, the Office of General Counsel, Counseling and Psychological Services, Student Health, and academic advising offices.

# I. Reporting Complaints of Violation of the Sexual Assault Policy

## A. Office of the Sexual Violence Investigative Officer

The Office of the Sexual Violence Investigative Officer (IO) will be responsible for managing all complaints made against an enrolled University student alleging a violation of the Sexual Violence Policy.

Complaints must either be presented in writing, or based upon information provided by the complainant to the IO who will then memorialize the allegations in writing and have the allegations confirmed by the complainant. Complainants may include University students or others both within and outside the community alleging a violation against a University enrolled student.

## B. Office of the District Attorney and Office of Civil Rights

Complainants may also choose to file a report with the District Attorney or with the Office of Civil Rights of the U.S. Department of Education. The University system and the legal system work independently from one another, but will coordinate efforts to the extent possible. The University will not unilaterally defer its proceeding pending the outcome of any criminal process, nor will the outcome of any legal process be determinative of the University result. Rather, the University has its own interest in, and responsibility for, ensuring the enforcement of its Sexual Violence Policy.[2] The University will, however, comply with reasonable requests by law enforcement for cooperation, and will upon reasonable request temporarily suspend its fact-finding process in a sexual assault investigation so as not to impede the law enforcement process.

## C. Support, Counseling and Advice

In making a decision about how to proceed with a complaint, complainants may seek support, counseling, and advice from other offices on campus, including the Special Services Unit in the Division of Public Safety, the Sexual Violence Educator, the Office of the Chaplain, the Penn Women's Center, Counseling and Psychological Services, Student Intervention Services, and the Lesbian Gay Bisexual and Transgender Center. A list of these offices is provided in Section III below. Should the complainant determine to proceed with an on campus disciplinary process against an enrolled University student, the Office of the Sexual Violence Investigative Officer will be the single place to initiate the process.[3]

## D. Timeframe for Submitting a Complaint

The University does not limit the timeframe for filing a report of a violation of the Sexual Violence Policy. Reports may be filed at any time, although the University's ability to investigate or take any action may be limited by the passage of time or the matriculation status of the alleged respondent.

## E. Complainant Request for Confidentiality

The University is required by Title IX to weigh the complainant's request for confidentiality/privacy with the University's commitment to provide a reasonably safe and nondiscriminatory environment. In situations where a complainant requests privacy, the University's ability to investigate and respond to the allegations may be limited.

The IO will notify the complainant if the University cannot, in unusual cases, maintain the complainant's confidentiality/privacy. The complainant's and respondent's identities will only be revealed to those individuals who need to know their names in order to investigate or adjudicate the complaint or provide interim measures.

In situations where the University becomes aware of a pattern of behavior by one or more respondents, the University will take appropriate action in an attempt to protect the University community.

# II. Investigation and Resolution of Complaints

## A. Timely Resolution

The process of resolving complaints, exclusive of any appeal, should be completed, unless there are special circumstances, within 60 business days of the filing of the written complaint. The appeal should be completed, absent special circumstances, within 30 business days of the filing of the appeal.

In the event that a Hearing Panel is convened, the complainant and the respondent will both be provided with a copy of the decision of the Panel and given 10 business days to file an appeal.

## B. Rights and Protections for Complainant and Respondent

1. The complainant and respondent have the right to a process that is fundamentally fair, and free of bias or prejudice.

2. The complainant and respondent have the right to be treated with respect, dignity, sensitivity, and fairness throughout the entire process. They are both entitled to seek support from the University and to be informed about the process both before the process is initiated and throughout the process as it unfolds.

3. Both parties have the right to participate in the process, or to refrain from participation. The failure to participate will not be used as evidence against either party, but also will not prevent the process from proceeding unless the complainant determines to withdraw the complaint and the University determines to abide by that request.

4. Both parties may have a lawyer or other advisor present when being interviewed by the Investigative Team and the Hearing Panel, but the lawyer or other advisor will not be permitted to present statements, seek the production of evidence, or question any witnesses.

5. Evidence of prior sexual conduct by the complainant or respondent with other partners will not be considered in the process, and any evidence of a prior sexual relationship between the parties will not be determinative of the issue of consent. If there is credible evidence of a pattern of violations of the Sexual Violence Policy, that evidence may be considered by the Hearing Panel.

6. While the process is underway, the Vice Provost for University Life (VPUL) will work with the complainant and respondent, ensuring support is provided to both parties. VPUL will also be responsible for implementing interim measures to protect the parties, or any of the witnesses, consistent with principles of fairness, including implementing measures regarding housing, academic accommodations and scheduling changes, no contact orders, and any other appropriate actions to protect the parties or any of the witnesses.

## C. Preliminary Determination

Upon receiving a complaint, the IO will make a preliminary determination as to whether the complaint falls within the purview of the Sexual Violence Policy and whether, on its face, there appears to be a sufficient basis to conduct a full investigation. In making this determination, the IO may interview the complainant and the respondent and conduct whatever

preliminary investigation the Officer deems necessary to determine if the actions alleged in the complaint would, if true, constitute a violation of the University's Sexual Violence Policy and there is a reasonable basis for investigating the charges.  If the IO concludes there is insufficient basis to proceed, the matter will be concluded and the parties so advised.

## D. Investigation

If the IO makes the determination that there is a sufficient basis to proceed, the Officer will issue a Statement of Charge Letter, based on the complaint and any preliminary investigation conducted.  The Charge Letter will be provided to the complainant and the respondent.  The respondent will be provided the opportunity to respond in writing to the Charge, and any response will be shared with the complainant.

The IO will lead a thorough and fair investigation, assisted by one or more co-investigators who may come from the school of the complainant or respondent or from elsewhere in the University (the "Investigative Team").  The co-investigator(s) will be University administrators or faculty members appropriately trained as investigators in handling sexual violence cases, and will be selected for individual cases by the IO.  The investigation will include interviews of the complainant and respondent, interviews of witnesses, and review of documentation, physical evidence, and any other relevant evidence.

Prior to interviews, the complainant, the respondent, and any relevant witnesses will be informed by the IO that statements they make during the process may be admissible in concurrent or subsequent civil or criminal court proceedings, and will accordingly also be informed of their rights as outlined in Section B above. They will also be reminded of the consequences of making false statements to the IO under the Code of Student Conduct and the Charter of the University of Pennsylvania Student Disciplinary System. The complainant and respondent may have their advisors[4] and/or or outside counsel present for their interviews, but the advisors or outside counsel will not be permitted to participate in the interview other than to provide advice to the student, and they may be excluded from the interview for disruptive behavior.

In conducting the investigation, the Investigative Team may, as appropriate, also consult with other campus officials including but not limited to administrators in the relevant School, Public Safety, the Title IX Officer, or the Vice Provost for University Life. The Investigative Team may also consult with the Office of General Counsel, who may determine in particular cases to engage outside counsel to assist the University throughout this process. The Investigative Team may engage forensic and other experts, as needed.

## E. Investigative Report

At the conclusion of the investigation, the Investigative Team will prepare a draft factual investigative report, including assessments of credibility, a recommended finding as to responsibility, and recommended sanctions, if appropriate.  In making the responsibility determination, the Investigative team will use a "preponderance of the evidence" standard.  In other words, to find a student responsible for violating the Sexual Violence Policy, the Investigative Team must be convinced that it is more likely than not that a violation of the Sexual Violence Policy has occurred.

1. **Opportunity for Review and Comment**
   The draft investigative report will be provided to both the complainant and respondent for review and comment, under strict instructions that the draft report is confidential, and not to be shared with anyone other than their families and advisors, who must be members of the University community and/or outside counsel, as described above. Sharing of the report by either party, their

families, advisors or outside counsel with any addition persons will be strictly prohibited. The complainant and respondent will also be provided the opportunity to review the underlying evidence and witness statements with their advisors, but they will not be provided copies.The complainant and the respondent will be given the opportunity to respond to and comment on the draft investigative report in writing.

2. **Final Report**
   As a result of the response and comments received, the Investigative Team may conduct a further investigation and/or amend the draft report, if the Team determines either action to be warranted. A final investigative report will be prepared, incorporating any changes, and shared with the complainant and the respondent.  The complainant and respondent may submit formal objections or comments to the final report, which will become part of the final report of the matter.

## F. Resolution Without a Hearing

The matter may be resolved at this stage if both parties agree to the recommendations of the Investigative Team with respect to responsibility and, if applicable, sanctions, or if the parties otherwise reach a mutually acceptable resolution.  The University, however, will not compel either the complainant or the respondent to engage in face-to-face mediation or to accept the recommendations of the Investigative Team.

## G. Hearing Panel

If the matter is not resolved at this stage in a mutually acceptable manner, the IO will present the final investigative report, together with any comments provided by the complainant and/or respondent, to a Hearing Panel ("Panel").

1. **Panel Membership**
   The Panel will be comprised of three (3) faculty members and the Disciplinary Hearing Officer (DHO), who will be a non-voting member. The DHO will make all decisions about the organization of the Panel, including decisions regarding the admissibility of evidence, witnesses to appear before the panel, or any additional decisions regarding the administration of the hearing process.[5]
   Membership of the Panel, including the DHO, will observe the following guidelines:
   i. Members will be selected from a pool of faculty who have agreed to serve for a term of one or more years.
   ii. Only mixed-gender panels that have training and experience in handling complaints involving sexual misconduct will hear sexual misconduct cases.
   iii. Faculty comprising the Panel should be from academic departments in which neither of the parties is enrolled in a course of study, and no faculty member should serve on the Panel who has a mentoring relationship or other personal relationship with either of the parties.
   iv. Faculty asked to serve should recuse themselves or be dismissed if they have any personal ties to either of the parties or to individuals with whom the parties are closely associated. Nor may they have prior personal knowledge of the alleged incident of sexual misconduct.
   v. The University will train members of the pool to fulfill their responsibilities as adjudicators according to the procedures and policies outlined here and to ensure compliance with Title IX and other applicable state and federal guidelines.  In addition, the Panel will be provided with "just in time" training on adjudicating sexual violence cases.

vi. The IO may not serve on the Panel, however the IO may testify before the Panel regarding his or her investigation and may assist the DHO as needed in organizational and administrative matters related to the Panel.

vii. The complainant and respondent will be notified of the membership of the Panel in advance of the Hearing. Any challenges for cause against individual Panel members must be made promptly so as not to delay the conduct of the Hearing, and will be given serious consideration by the DHO to ensure impartiality of the proceedings.

viii. All proceedings must be kept strictly confidential among the parties, witnesses and members of the panel. All individuals involved in such hearings must agree to such conditions of confidentiality.

2. **Hearing Procedures**
Hearings must be prompt, fair, and impartial, affording the complainant's allegations and the respondent's defenses all due consideration and protecting the rights of both parties. The Panel will review the Investigative Team's final report, including any response, objections, or comments provided by the complainant or respondent. The Panel will also carefully review the evidentiary record, including witness statements, documents, and physical evidence.

i. **Hearing Panel Interviews**
The Panel will interview separately the IO (and co-investigator(s) if the Panel so chooses), the complainant, and the respondent. The Panel will, whenever possible, provide the complainant and respondent with at least five days advance notice of the Hearing. If reasonably possible, interviews will be conducted on one day, but if such scheduling would require an unreasonably long day, or if such scheduling would unreasonably delay the proceeding, the hearing may be scheduled over multiple days.
The Panel may seek additional evidence from the IO and interview key witnesses on whom the IO relied in drawing his or her conclusions, as well as request additional evidence from the IO to clarify the evidentiary record, provided that it can do so without unreasonably delaying the process. In the event that a new witness comes forward during the Hearing who was not originally interviewed by the IO, or new evidence discovered after the IO has issued his or her report, the DHO may allow that witness to testify or admit the evidence to the hearing, but only if the DHO judges the new witness or evidence to be highly relevant to an accurate and fair determination of the outcome.

a. The Hearing will be held in private, and only the Panel may conduct interviews. Only the person interviewed (and that person's advisor or outside counsel, as applicable) will be present at the Hearing during interviews. The complainant or respondent (and their advisor or outside counsel, as applicable) will be able to view testimony from separate rooms, upon request, via closed-circuit television or similar video transmission.

b. Subject to the Protections set forth in Section B above, the Panel has wide latitude when questioning the complainant, the respondent and any witnesses in order to determine the accuracy of the report.

c. The complainant and respondent may propose witnesses and provide specific questions in advance that they believe important to ask of other parties or witnesses. The DHO, in consultation with the Panel, will determine the relevance as well as the appropriateness of witnesses and questions, and may accordingly place restrictions on, include, or exclude witnesses or other information.

d. When the Panel is conducting the interview of the complainant and respondent, each student may bring an advisor or outside counsel with them to provide advice and support, but the advisor or outside counsel will not be permitted to participate in the interview other than to provide advice to the student and may be excluded from the interview by the DHO for disruptive behavior.

e. The interviews by the Panel will be recorded (audio only). No observers will be permitted to make any audio or video recordings.

3. **Hearing Panel Decision**
After the Hearing concludes, the Panel will immediately deliberate in private to decide whether a preponderance of the evidence shows that the respondent is responsible for a violation of the University's Sexual Violence Policy. Preponderance of the evidence means that the Panel must be convinced based on the evidence that it is more likely than not that a violation has occurred in order to find a student is responsible for violation the policy. A finding of responsibility requires a majority vote of the members of the Panel.

i. If the respondent is found responsible, the Panel will also determine the appropriate sanction, by majority vote, based upon the facts of the case and University precedent, with a presumption in favor of the sanction recommended by the IO.

ii. The Panel will arrive at its conclusion as expeditiously as possible, and will promptly advise both the complainant and the respondent in writing of its decision with respect to responsibility and, if applicable, sanctions. In keeping with guidelines for timely resolution as provided in Section A above, the written decision will be provided as soon after the conclusion of the proceeding as is possible.

iii. Decisions made by the Panel are considered final, subject only to appeal as outlined below.

## H. Appeal of Hearing Panel Decision

The Panel decision is subject to appeal by either party in writing to a Disciplinary Appellate Officer (DAO), a faculty member with exclusive jurisdiction to decide appeals. In keeping with guidelines for timely resolution as provided in Section A above, appeals should be submitted within 10 business days after the decision of the Panel. Letters of appeal should specifically state whether the objection is to the judgment of responsibility, the sanction, or both, and explain in detail the grounds for appeal.

1. The DAO will review the report of the Investigative Team and supporting evidence, the audio record from the Panel Hearing in the discretion of the Appellate Officer, and any other material the DAO deems relevant, in addition to the decision of the Panel in order to ensure that the process was consistent with University policy and that the result was not arbitrary or capricious.

2. After considering the appeal, the DAO will promptly issue his or her decision in writing and will provide copies to the DHO, the Provost, the Vice President for Institutional Affairs, the respondent(s) and other appropriate parties.

# III. Resource Offices
## A. Confidential Resources

The following can be contacted for support, counseling, and advice:

**Special Services Unit, Division of Public Safety**
24-hour Helpline:  215.898.6600
4040 Chestnut Street

**Counseling & Psychological Services (CAPS)**
Main Number:  215.898.7021
After hours emergency number:  215.349.5490
133 South 36th Street, 2nd Floor

**Penn Women's Center (PWC)**
Main Numbers:  215.898.8611 and 215.898.6500
3643 Locust Walk

**Student Health Service (SHS)**
Main Number:  215.746.3535
3535 Market Street, Suite 100

**Lesbian Gay Bisexual Transgender Center**
Main number:  215.898.5044
3901 Spruce Street

**Office of the Chaplain**
Main Number:  215.898.8456
240 Houston Hall, 3412 Spruce Street

**Director, Sexual Violence Prevention & Educator**
VPUL, 3611 Locust Walk
215.898.6081

## B. Official Reporting Offices

The following are official reporting offices for violations of the Sexual Violence Policy:

**Office of the Sexual Violence Investigator**
215.898.2887
3600 Chestnut Street, Sansom Place East, Suite 227

**Title IX Officer and Office of Affirmative Action and Equal Opportunity Programs (OAA/EOP)**
215.898.6993
3600 Chestnut Street, Sansom Place East, Suite 228

**Student Intervention Services, VPUL**
3611 Locust Walk
215.898.6081
215.768.6527 Nights/Weekends

**Office of Student Conduct**
207 Duhring Wing
215.898.5651

**Division of Human Resources**
3401 Walnut Suite 527A
215.898.7281

[1] This procedure amends and supersedes the Charter of the University of Pennsylvania Student Disciplinary System with respect to violations of the University policy on Sexual Violence, Relationship Violence, and Stalking as those terms are defined in that policy ("Sexual Violence Policy").  It applies to each of the 12 schools, notwithstanding the existence of separate procedures that individual schools may have adopted for violations of laws or policies other than the University Sexual Violence Policy.  If a complaint involves allegations of violations of the Sexual Violence Policy as well as other University policies, the matter can either be fully resolved using this process, or divided into two separate proceedings, as appropriate in any particular case.

[2] The University recognizes that should it be proceeding in cases where criminal charges are pending, the respondents may choose not to participate in the disciplinary process in order to protect their Fifth Amendment rights.  Such decision will not be used as evidence against any respondent and the Hearing Panel will be instructed not to draw any adverse inference from the failure to participate.

[3] While the Investigative Officer will be responsible for managing the complaint investigation and resolution process, as described below, the IO will work with other appropriate University offices, including the Vice Provost for University Life, to determine if interim measures are appropriate before a final resolution is reached.

[4] The University will provide a list of advisors from the Penn community to complainants and respondents.  Advisors will be trained by the University to support both complainants and respondents in this process.  The parties need not select an advisor from this list, but may select any faculty or administrative member of the community to advise them.  The parties may also retain outside counsel in addition to, or instead of, using an advisor.  The role of the outside counsel, however, will be limited to an advisory role and will not be permitted to have an active role in the proceedings.

[5] In carrying out these responsibilities, the DHO may consult with the IO, the Office of General Counsel and other appropriate offices such as the Office of Student Conduct and the Vice President for Institutional Affairs. University officers thus consulted will respect the confidentiality conditions of the proceedings.

# IV.D Faculty Authority to Assign Grades and Academic Integrity

*(Source: Office of the Provost,* Almanac, September 10, 1996 *(https://almanac.upenn.edu/archive/v43/n03/codechar.html#faculty))*

The Student Disciplinary Charter is based on the assumption that it is the obligation and right of faculty members to assign grades for academic work submitted to them by students under their supervision and that faculty members should grade student work, using their best judgment about the quality and propriety of that work, independently of disciplinary procedures. The present statement makes clear the relationship between grading and disciplinary action in cases in which a faculty member believes that a student did not fulfill an assignment in accord with the Code of Academic Integrity.

The Disciplinary Charter rests on the principle that faculty members have wide authority to judge the academic work of students and have a general responsibility for the academic progress of students, so much as lies within the power of faculty. Furthermore, the charter assumes that violations of the norms of academic integrity fall along a continuum from minor to major and that not all violations need to be treated as disciplinary cases. The authority and responsibility of faculty members require them to judge the relative severity of a violation. Good individual judgment and institutional practice will help faculty members make the judgment about when to treat a case as requiring disciplinary action.

The distinction between academic evaluation and disciplinary action is also important. Faculty members have the authority to make academic judgments in relation to their students and to make decisions in the interests of furthering their students' education. Only the institution, acting through its formal processes, may discipline a student. Grades

are not sanctions, even if they arise from a judgment that a student has violated a norm of academic integrity. In such cases, the grade may reflect the faculty member's view that a piece of work was done inappropriately, but it represents a judgment of the quality of the work, not a record of discipline for the behavior. There are many ways to do work inappropriately or badly, resulting in low or failing grades. The policy of the charter is to preserve the faculty member's right to grade work on the basis of all of its qualities and to make the decision to pursue disciplinary action a separate matter.

Students who believe that they have been graded unfairly have recourse of appeal through the grade appeal procedures established by each school. The charter explicitly recognizes the right of students to appeal grades. The appeal of a grade given because a faculty member believed that the student violated the norms of academic integrity is, for the purposes of the charter, no different from other grade appeals.

# IV.E. School Policies and Practices

Each of the twelve schools of the University has regulations, policies, and procedures specific to the undergraduate and graduate students within that school. These policies are stated in the official bulletins and announcements issued by each school and are available in the school and departmental offices. Faculty members and administrators who teach in the College of General Studies, in executive education programs and during the summer sessions should be aware that each of these divisions issues its own bulletin and that some policies may differ from those stated in the undergraduate and graduate studies bulletins.

Grading policies are strictly within the province of the faculties of the several schools. Students who believe that they have been graded unfairly have recourse of appeal through the grade appeal procedures established by each school.

# IV.F. Rules Governing Final Examinations

*(Source: Provost Memorandum 2-67, April 19, 1967; Office of the Provost, Almanac, May 1, 1979; revised, Almanac, November 21, 1995; revised, Almanac, November 25, 2003; revised, Almanac, November 22, 2005; revised,* Almanac, November 18, 2008 (https://almanac.upenn.edu/archive/ volumes/v55/n13/exams.html)*; revised, Almanac, March 31, 2015)*

1. No instructor may hold a final examination nor require the submission of a take-home final exam except during the period in which final examinations are scheduled; when necessary, exceptions to this policy may be granted for postponed examinations (see 3 and 4 below). No final examinations may be scheduled during the last week of classes or on reading days.

2. No student may be required to take more than two final examinations on any calendar day during the period in which final examinations are scheduled. If more than two are scheduled, the student may postpone the middle exam. If a take-home final exam is due on a day when two final examinations are scheduled, the take-home exam shall be postponed by one day.

3. Examinations that are postponed because of conflicts with other examinations, or because more than two examinations are scheduled on the same day, may be taken at another time during the final examinations period if the faculty member and student can agree on that time. Otherwise, they must be taken during the official period for postponed examinations.

4. Examinations that are postponed because of illness, a death in the family, for religious observance or some other unusual event, may be taken only during the official periods: the first week of the spring and fall semesters. Students must obtain permission from their Dean's office to take a postponed exam. Instructors in all courses must be willing to offer a make-up examination to all students who are excused from the final examination.

5. No instructor may change the time or date of a final exam without permission from the appropriate Dean.

6. No instructor may increase the time allowed for a final exam beyond the scheduled two hours without permission from the appropriate Dean.

7. No classes or required class activities may be held during the reading period.

8. The first examination of the day begins at 9 a.m. and the last examination concludes by 8 p.m. There will be one hour between exam time blocks.

9. All students must be allowed to see their final examination. Exams should be available as soon as possible after being graded with access ensured for a period of at least one regular semester after the exam has been given. To help protect student privacy, a student should have access only to his or her own exam and not the exams of other students. Therefore, for example, it is not permissible to leave student exams (or grades or papers) in publicly accessible areas.

10. Students may not be asked for their Social Security Numbers. Instructors may not publicly display a student's Penn ID or any portion of the Social Security Number, nor use name, initials or any personally identifiable information to post grades. Even when an identifier is masked or absent, grades may not be posted in alphabetical order, to protect student privacy.

11. Final exams for the College of Liberal and Professional Studies (LPS) courses must be given on the regular class meeting night during the week of final examinations. No change in scheduling is permitted without unanimous consent of all students in the class and the director of LPS. LPS final exams may not be administered during the last week of class or on a reading day.

In all matters relating to final exams, students with questions should first consult with their Dean's offices. Faculty wishing to seek exceptions to the rules also should consult with their Dean's offices. Finally, the Council of Undergraduate Deans and SCUE urge instructors to see that all examinations are actively proctored.

# IV.G. Reporting of Final Grades

*(Source: Provost Memorandum 7-70, April 5, 1970; revised, Office of the Provost, December, 1992)*

Grades in each course should be reported to the Registrar and the school offices within 72 hours of the last day of exams.

The validity of a grade for any student is determined by the home school of that student, not the home school of the faculty member teaching the course. For example, the grade of I (Incomplete) is governed by very specific regulations of the faculty in the student's home school and may be given to students of those schools only if those conditions are satisfied. If there is any doubt as to the validity of a grade for a particular student, the Dean's office of that student should be consulted.

# IV.H. Policy on Secular and Religious Holidays

*(Source: Provost Memorandum 9-63, September 13, 1963; revised, Provost's Memorandum 6-68, September 19, 1968; revised, Office of the Provost, Almanac, May 9, 1989; revised, Almanac, January 15, 1991; revised, Almanac, March 18, 1997; revised, Almanac, September 4, 2001; revised, Almanac, September 7, 2010; revised, Almanac, August 29,2017 (https://almanac.upenn.edu/articles/policy-on-secular-and-religious-holidays-2017-08-28/))*

1. The University recognizes/observes the following secular holidays: Martin Luther King, Jr. Day, Memorial Day, Juneteenth, July 4, Thanksgiving and the day after, Labor Day, and New Year's Day.

2. The University also recognizes that there are several secular and religious holidays that affect large numbers of University community members, including Christmas, Rosh Hashanah, Yom Kippur, Election Day in November, the first two days of Passover, and Good Friday. In consideration of their significance for many students, no examinations may be given and no assigned work may be required on these days. Students who observe these holidays will be given an opportunity to make up missed work in both laboratories and lecture courses. If an examination is given on the first class day after one of these holidays, it must not cover material introduced in class on that holiday.

Faculty should realize that Jewish holidays begin at sundown on the evening before the published date of the holiday. Late afternoon exams should be avoided on these days. Also, no examinations may be held on Saturdays or Sundays in the undergraduate schools unless they are also available on other days. Nor should seminars or other regular classes be scheduled on Saturdays or Sundays unless they are also available at other times.

Additionally, no examinations may be given or assignments due on the days of Fall Break, Thanksgiving Break, Winter Break, or Spring Break for programs that follow the main University Academic Calendar, with the exception of clinicals, global experiences, and approved academic experiences.

3. The University recognizes that there are other holidays, both religious and secular, which are of importance to some individuals and groups on campus. Such occasions include, but are not limited to, Sukkot, the last two days of Passover, Shavuot, Shemini Atzeret and Simchat Torah, Lunar New Year, the Muslim New Year, Diwali, Navaratri, Rama Navami, Paryushan, and the Islamic holidays Eid Al-Fitr and Eid Al-Adha. Students who wish to observe such holidays must inform their instructors within the first two weeks of each semester of their intent to observe the holiday even when the exact date of the holiday will not be known until later so that alternative arrangements convenient to both students and faculty can be made at the earliest opportunity. Students who make such arrangements will not be required to attend classes or take examinations on the designated days, and faculty must provide reasonable opportunities for such students to make up missed work and examinations. For this reason it is desirable that faculty inform students of all examination dates at the start of each semester. Exceptions to the requirement of a make-up examination must be approved in advance by the undergraduate dean of the school in which the course is offered.

# IV.I. Guidelines for Addressing Academic Issues of Students with Disabilities

*(Source: Provost's Memorandum, Almanac, September 10, 1991; revised, Office of the Provost, Almanac, October 4, 1994; revised, Almanac, December 7, 1999 (https://almanac.upenn.edu/archive/v46/n14/ORdisability.html); revised, Almanac, July 14, 2015)*

The University of Pennsylvania is committed to providing access and equal educational opportunities to all students, including students with disabilities.  Penn does not discriminate against students with disabilities.  The University provides reasonable accommodation to a student's known disability in order to afford that student an equal opportunity to participate in all University-sponsored academic and extra-curricular programs, activities, and services.

*Reason for Policy Guidance*

This policy guidance, known as the *Provost's Memorandum*, serves two purposes:

- to provide guidance to faculty and staff so that they may reasonably accommodate and support students with disabilities without compromising academic standards and requirements
- to assure students with disabilities that the University will provide access to all University-sponsored programs, benefits and activities through reasonable accommodation and program accessibility as required under the Rehabilitation Act of 1973, and the Americans with Disabilities Act of 1990, as amended ("ADA")

## Protection from Discrimination

The Rehabilitation Act and the ADA prohibit discrimination against people with disabilities by institutions like Penn that receive or benefit from federal financial assistance. These and other laws require that reasonable accommodations be provided to otherwise qualified individuals with a disability.

## Some Key Definitions

*Disability*—A person with a disability is defined as an individual who

1. has a physical or mental impairment that substantially limits one or more major life activities,
2. has a record of such an impairment, or
3. is regarded as having such an impairment.

Examples of recognized disabilities include, but are not limited to, blindness, deafness, paralysis, diabetes, epilepsy, lupus, bipolar disorder, generalized anxiety disorder, HIV/AIDS, specific learning disabilities, autism spectrum disorder and Attention Deficit Hyperactivity Disorder (ADHD).

*Reasonable Accommodation*—A reasonable accommodation is a modification or adjustment that enables an otherwise qualified individual with a disability full access to participation in University-sponsored programs. These modifications should not fundamentally alter the purpose or requirements of the course or program. Reasonable accommodations are determined on an individual basis and take into account the functional limitations of the impairment. Accommodations may vary from class to class depending upon course content and format.

They are intended to be effective and reasonable; they may not be exactly what the student wishes or requests.

*Appropriate Documentation*—Appropriate documentation is a written evaluation or report provided by a clinician in a specific profession or area of expertise who is considered qualified to make the diagnosis. The documentation must be current, comprehensive, and may include clinical and social histories from parents, counselors, and specialists. A diagnosis must be included. Documentation must identify the student's specific functional limitations within the academic setting and must show substantial limitation compared to most people. The documentation should conform to well-established practices in the specific area(s)/field(s). For more information, see Documentation Guidelines (https://www.vpul.upenn.edu/lrc/sds/ps_documentation_guidelines.php) on the Student Disabilities Services website.

# Responsible University Office

Students with disabilities and temporary conditions are served by the Office of Student Disabilities Services (SDS). The office is located in the Weingarten Learning Resources Center (WLRC), a department under the Office of the Vice Provost of University Life. SDS is responsible for assessing all student requests for accommodations and determining reasonable accommodations for students with disabilities.

The Office of Student Disabilities Services is available to assist faculty and professional staff with the provision of academic accommodations and for consultation regarding students with disabilities.

Phone: 215-573-9235
FAX: 215-746-6326
TYY: 215-746-6320
vpul-sdsmail@pobox.upenn.edu

# Accommodation Procedures

*Responsibilities of Students*

Students with disabilities who seek accommodation at Penn are responsible for self-identifying with SDS. Identification may take place upon admission or at any time during the student's course of study.

Students requesting accommodations are responsible for providing documentation, at their own expense, according to the guidelines published on the SDS website: https://www.vpul.upenn.edu/lrc/sds/ps_documentation_guidelines.php. SDS may request additional information if the documentation provided does not support the existence of a disability or the need for the accommodations requested.

The SDS Documentation Review Committee thoroughly reviews the documentation and accommodations are determined through an interactive process with input from the student. Consultation with faculty may be important in determining how to best accommodate a student in a specific course. A determination from the Committee may take four to six weeks, or longer if additional information is needed. For examples of reasonable accommodations, please see the SDS website at: http://www.vpul.upenn.edu/lrc/sds/academic_accommodations (http://www.vpul.upenn.edu/lrc/sds/academic_accommodations/).

Students who are approved for accommodations must authorize SDS to inform professors about their approved accommodations. They must also make online requests to SDS for individual exam accommodations

each semester. Students are encouraged to introduce themselves to professors to initiate a dialogue about their particular needs.

*Responsibilities of Faculty and Staff*

Faculty and staff are responsible for ensuring equity and access in their programs and classrooms. The SDS approved accommodations should not fundamentally alter the academic requirements essential to a course, program of study, or to licensing prerequisites. It is also important to recognize that students with disabilities must reach the same performance standards to fulfill degree requirements as their non-disabled peers. Accommodations provide students with disabilities equal access, not an unfair advantage.

**Instructors are required to accommodate students only after receiving an email from SDS indicating the accommodations that have been approved.**

A statement about services for students with disabilities should be included in the syllabus for each course. Below is a sample syllabus statement:

# Sample Syllabus Statement

*The University of Pennsylvania provides reasonable accommodations to students with disabilities who have self-identified and received approval from the Office of Student Disabilities Services (SDS). If SDS has approved your request for accommodations, please make an appointment to meet with me as soon as possible in order to discuss the arrangements for your accommodations.*

*If you have not yet contacted Student Disabilities Services, and would like to request accommodations or have questions, you can make an appointment by calling 215-573-9235. The office is located in the Weingarten Learning Resources Center at Stouffer Commons, 3702 Spruce Street, Suite 300. Please visit the SDS website at http://www.vpul.upenn.edu/lrc/sds/index.php (http://www.vpul.upenn.edu/lrc/sds/). SDS services are free and confidential.*

## Accommodated Exams

In order to effectively manage the logistics of exam accommodations, instructors are expected to respond promptly to SDS emails requesting information about exam accommodations. Although the exam may not be written until shortly before the exam date, other details are needed by the SDS accommodations staff as early as possible in order to arrange for exam administration and inform students of the arrangements. Professors are encouraged to provide SDS with exams as early as possible prior to the exam to allow SDS time to prepare exam materials. Exams are locked in a secure location until the exams are being administered.

In the event that questions arise during the administration of the exam at SDS, it is important that SDS has contact information for the instructor or TA (phone, text and/or email).

The *Standards for Accommodating Exams for Students with Disabilities* is available on the SDS website at: http://www.vpul.upenn.edu/lrc/sds/StandardsforAccommodatingExams.php. This document provides guidelines for accommodated exams that are administered by faculty or their designees.

## Note-taking Announcements

Faculty may be asked to assist SDS by identifying note-takers through an announcement or email to the class and referring interested note-takers

to SDS. A template for the email will be included when SDS contacts faculty regarding note-taker accommodations.

### Accessibility of Information and Course Materials

Faculty should collaborate with their department offices and SDS to ensure that their course materials, presentations, audio-visual materials and exams are available in an accessible format for students with sensory and print disabilities.

## Confidentiality

All disability documentation provided by the student is confidential and remains in the Office of Student Disabilities Services for the purpose of determining reasonable accommodations. **Students may not request accommodations from faculty that have not been approved by SDS. If documentation is provided to the instructor, it should be returned to the student and the student should be referred to SDS.**

Faculty should refrain from discussing a student's disabilities and accommodations in front of the class, in the presence of other students, or to faculty or staff not directly involved in the accommodation process.

## Reconsideration Process

Students may request reconsideration of the SDS accommodation determination through the *SDS Reconsideration Process* found on the website at: https://www.vpul.upenn.edu/lrc/sds/reconsiderationprocess.php.

## Concerns and Complaints

The Office of Affirmative Action and Equal Opportunity Programs is responsible for overseeing the University's implementation of its equal opportunity and nondiscrimination obligations arising under Federal, Commonwealth, and local laws. Any concerns or complaints should be addressed to:

The Office of Affirmative Action and Equal Opportunity Programs
Franklin Building
3451 Walnut Street, Room 421
Philadelphia, PA 19104-6205
(215) 898-6993 (voice)
(215) 746-7088 (fax)
http://www.upenn.edu/affirm-action/

## Additional Information

Related policies and procedures areavailable on the SDS website (http://www.vpul.upenn.edu/lrc/sds/) in the section for Faculty and Staff.

## IV.J. Policy on the Confidentiality of Student Records

*(Source: Provost's Memorandum 18-69, December 8, 1969; revised, Office of the Provost, February 1, 1977; revised, Almanac, April 29, 1997; revised, Almanac, December 14, 1999; revised, Almanac, March 16, 2010 (https://almanac.upenn.edu/archive/volumes/v56/n25/confidentiality.html))*

## I. Statement of Purpose

The purpose of this policy is to describe the rights and responsibilities of students, faculty and staff regarding the confidentiality of student records, including as specified under the Family Educational Rights and Privacy Act (FERPA).

## II. Scope
### A. Information

This policy pertains to personally identifiable information[1] contained in education records. The term "education records" generally includes records that are directly related to a student and maintained by the University or a party acting for the University.

*Exceptions:*

1. *Sole possession of the maker.* This policy does not apply to records kept in the sole possession of the maker and used only as a personal memory aid and not accessible to any other individual except a temporary substitute of the maker of the record.
2. *Peer graded papers.* This policy does not apply to grades on peer-graded papers/assignments before they are collected and recorded by a teacher.
3. *Law enforcement records.* This policy does not apply to records created and maintained by a law enforcement unit, including the Penn Police, for law enforcement purposes.
4. *Employment records.* This policy does not apply to records relating exclusively to an individual in his or her capacity as an employee except for records regarding an individual in attendance who is employed as a result of his or her status as a student.
5. *Treatment-related records.* This policy does not apply to records made or maintained by a healthcare professional that are used only in connection with treatment of the student and disclosed only to individuals providing treatment.
6. *Other FERPA exceptions.* This policy does not apply to any records or information specifically excepted from the term "education records" under FERPA and its implementing regulations, as they may be amended.

### B. Individuals

1. *Individuals in attendance.* This policy applies to students who are or have been in attendance at the University.
2. *Alumni.* In general, this policy does not apply to records that contain only information about an individual after he or she is no longer a student at the University. However, if the record relates back to the student's attendance at the University, it is still an "education record." A separate policy protecting the privacy of alumni records may be found at www.upenn.edu/privacy (http://www.upenn.edu/privacy/).
3. *Deceased individuals.* Neither FERPA nor this policy applies to records of deceased persons. The person responsible for such records, however, should exercise informed discretion in responding to requests for disclosures and should ensure that the person making the request has a legitimate interest in the information and that the privacy interests of the deceased and third parties are considered.
4. *Applicants.* This policy does not apply to applicants for admission. However, the admission-related records of applicants who become students at the University are subject to the policy.

## III. Notice

Penn will annually inform individuals in attendance of their rights under FERPA, including the right to consent to disclosure of personally identifiable information contained in their education records, the right to opt out of the disclosure of "directory information," the right to review and

seek correction of education records, and the right to file a complaint with the Department of Education concerning the University's alleged failure to comply with FERPA.

# IV. Disclosure of Education Records

## A. Consent Required

As a general rule, personally identifiable information from education records may not be disclosed to other parties without the student's prior written or electronic consent. Such consent shall be signed (on paper or using an appropriate electronic signature method) and dated and specify records or information to be disclosed, the purpose(s) of the disclosure, and the party or class of parties to whom disclosure may be made.

## B. Consent Not Required

In certain cases (some of which are described below) personally identifiable information from education records may, and in some cases must, be disclosed from the records of a student without that individual's prior written consent. If such disclosure is made, it should be limited to that information necessary for the purpose of the disclosure. Note also that specific requirements and qualifications may apply to these exceptions.

1. To "school officials" with "legitimate educational interests."
   a. "School officials" means employees of the University, including faculty and staff, as well as certain individuals such as vendors or contractors, performing work for the University under proper authorization.
   b. A school official has "legitimate educational interests" in personally identifiable information in the records of a student if the information in question is required or would be helpful to the official in the performance of his or her duties.
   c. A contractor, consultant, volunteer, or other party to whom the University has outsourced services may be considered a school official provided that the outside party (1) performs a service for which the University would otherwise use its employees (2) is under the direct control of the University with respect to the use and maintenance of education records and (3) is subject to FERPA requirement governing the use and redisclosure of personally identifiable information from education records.
   d. The University must use reasonable methods to ensure that school officials obtain access to only those education records in which they have legitimate educational interests. Custodians of records will establish control procedures to ensure that these limitations are observed. If the custodian does not use physical or technological access controls, the custodian must ensure that its administrative policy for controlling access to education records is effective.
2. To another school where the student seeks or intends to enroll or where the student is already enrolled so long as the disclosure is for purposes related to the student's enrollment or transfer and the University has provided notice of the disclosure or annual notice of its policy to make such disclosures.
3. In connection with financial aid for which a student has applied, or which he or she has received, but only for such purposes as determining eligibility for financial aid, the amount of financial aid, and the conditions that will be imposed, or for enforcing the terms or conditions of financial aid.
4. To comply with a judicial order or lawfully issued subpoena provided that the University makes a reasonable effort to notify the student whose records are involved in advance of disclosing the

information. Prior notification may be prohibited in certain situations. All subpoenas and court orders should be directed to the Office of General Counsel and disclosure in response to them must be approved by that office.
5. In connection with an emergency, to appropriate persons if knowledge of the information is necessary to protect the health or safety of the student or other individuals.
6. To parents as described in Section IV. (c) below.
7. Regarding directory information as described in Section IV. (d) below.
8. Other circumstances as authorized by FERPA and its implementing regulations, as they may be amended or as otherwise required by law. Questions about legal requirements should be directed to the Office of General Counsel.

## C. Parental Notification—Consent Not Required

The University's policy regarding disclosure of student information to parents is based both upon legal requirements and the University's philosophy that students should be treated as adults. The University generally will not share personally identifiable information (other than directory information) from a student's education records with third parties, including parents or guardians, without student consent, except in limited circumstances where such disclosure is permitted under FERPA (described below) and where the University determines in its discretion that disclosure is appropriate.

1. In connection with an emergency if knowledge of the information is necessary to protect the health or safety of the student or other individuals.
2. To the parent or legal guardian of a student under the age of 21, information regarding the student's violation of a University policy governing the use or possession of alcohol or drugs.
3. To a person who submits a written affirmation that he or she is the parent or legal guardian of a student and that the student is a dependent within the meaning of Section 152 of the Internal Revenue Code of 1954.
4. In other limited circumstances as allowed under FERPA and its implementing regulations, as they may be amended.

In cases involving a health or safety emergency or a violation of a University policy regarding the use or possession of alcohol or drugs, a decision to notify parents or guardians about information contained in an education record—and the actual communications to the parents or guardians—will be made by the Office of the Vice Provost for University Life or another senior student affairs officer, in each case after consultation with the student's school office and other appropriate offices. Whenever practicable, a student whose parents or guardians are to be notified will be informed before such notification occurs and given an opportunity to initiate contact with his or her parents or guardians.

## D. Consent Not Required—Directory Information

"Directory Information" is generally regarded to be less sensitive than other types of information in a student's education record. The University designates as "directory information," which may be disclosed from records relating to a student without his or her consent if the student has not "opted out" of allowing such disclosure, the following categories of information: a student's name, address (local, home or electronic mail), telephone number, date and place of birth, Penn ID number, major field of study, participation in officially recognized activities (including social and honorary fraternities) and sports, weight and height if a member of

an athletic team, dates of attendance, degrees and awards received, and previous educational institutions attended.

Each year, a notice will be given to students concerning these categories and their right to refuse to permit the University to make any or all of them available (i.e., "opt out"). Failure to respond to the annual notice in certain cases may result in the routine disclosure of one or more of the designated categories of personally identifiable information. The University will continue to exercise informed discretion in responding to requests for directory information.

## E. Limitation on Redisclosure

As required by FERPA, the University will inform a party to whom a disclosure of personally identifiable information from the records of a student is made; that disclosure is made only on the condition that the party will not disclose the information to any other party without the student's prior written consent. Exceptions to this requirement include disclosure of directory information, disclosures to the student, to parents under appropriate circumstances, to victims of certain disciplinary matters, and disclosures pursuant to court orders and valid subpoenas.

## F. Verification of Identity and Authority

Before disclosing personally identifiable information from education records, University employees must take reasonable steps to verify the identity of the requesting party as well as their authority to have access to the information.

# V. Maintaining a Record of Disclosures

As required by FERPA, the University will maintain a record of requests for and/or disclosures of personally identifiable information from a student's education records. The record must include the identities of the requesters and recipients and the legitimate interests they had in the information.  This record should be maintained with records for as long as the records themselves are maintained and may be inspected by the student.

These recordkeeping requirements do not apply to requests from or disclosures to:

1. the student;
2. a school official with a legitimate educational interest;
3. a person with written consent from the student;
4. a person seeking directory information; or
5. a federal grand jury or law enforcement agency in connection with an order or subpoena requiring

# VI. Right to Review Education Records & Seek Correction

**A.** Individuals who are or have been in attendance at the University are entitled to inspect and review their education records upon a written request. The request to inspect or review records must be honored within 45 days after the University has received the request. The request should be directed to the office that maintains the record and such office may charge a reasonable fee for copies.

**B.** A student does not have a right to inspect or review the following:

1. Financial records and statements of the student's parent(s), except with the written permission of the parent(s).

2. Confidential letters and statements of recommendation related to admission to an educational institution, application for employment, or the receipt of an honor or honorary recognition that were placed in a student's records after January 1, 1975, and as to which the student has executed a written waiver of his or her right to inspect and review; provided that the University uses the letters and statements only for the purpose for which they were originally intended and notifies the student upon request of the names of all individuals providing such letters and statements.

3. Other records as to which the student has executed a written waiver of his or her right to inspect and review. The University may not require a student to waive his or her rights under FERPA or this policy.

4. Those portions of records that contain information on other students.

5. Other exceptions as prescribed by FERPA and its implementing regulations, as they may be amended.

## C. Opportunity to Seek Correction

1. A student who believes that information contained in his or her education records is inaccurate or misleading or violates his or her privacy rights may request that the University amend them, and the University will decide whether to do so within a reasonable period of time.

2. If the University decides that the information is inaccurate or misleading or otherwise in violation of the privacy rights of a student, the University will amend the record and inform the student of the amendment in writing.

3. If the University declines to amend the student's records, it will so inform the student and inform him or her of the right to request a hearing to challenge the information believed to be inaccurate, misleading or in violation of his or her privacy rights. A hearing, however, may not be requested by a student to contest the appropriateness of a grade.

4. The hearing will be conducted by an individual who does not have a direct interest in the outcome of the hearing and will provide the student an opportunity to present evidence, relevant to the request to amend the student's record. The University will provide a written decision within a reasonable period of time after the hearing based on the evidence presented at the hearing.  The decision will include a summary of the evidence and the reasons for the decision. Additionally, information regarding hearing procedures will be provided when the student receives notice of his or her rights.

5. If, after a hearing, the University determines that a student's challenge is without merit it will notify the student of the right to place in his or her records a statement commenting on the challenged information and/or setting forth reasons for disagreeing with the University's decision. The University will maintain such statement with the student's record and disclose the statement whenever it discloses the portion of the record to which the statement relates.

# VII. Right to File Complaint

Students have a right to file a complaint concerning any alleged failure by the University to comply with the requirements of FERPA and its implementing regulations. A complaint may be filed with the federal office that administers FERPA:

**Family Policy Compliance Office**
**U.S. Department of Education**
**400 Maryland Avenue, SW**

**Washington, DC 20202-5915**

A complaint may be filed internally via the University's Compliance and Reporting Line by phone at (215) 726-6759 or online at www.upenn.edu/215pcomply (http://www.upenn.edu/215pcomply/).

## VIII. Waiver of Rights

A student may waive any of his or her rights under FERPA and this policy, provided that the waiver is made in writing and signed by the student. The University may not require a student to waive his or her rights under FERPA or this policy.

[1] The term "personally identifiable information" includes, but is not limited to, the name of the student or family member, the address of the student or family member, identification number, biometric record, indirect identifier (such as date of birth or mother's maiden name) or other information that, alone or in combination, is linked to the student and would allow a reasonable person in the school community, without personal knowledge of relevant circumstances, to identify the student with reasonable certainty.

# V. Policies Related to Information

- V.A. Guidelines on Open Expression (p. 113)
- V.B. Confidentiality of Employee Records (p. 116)
- V.C. Confidentiality of Health Information under HIPAA (p. 118)
- V.D. Closed Circuit Television Monitoring and Recording of Public Areas for Safety and Security Purposes (p. 119)
- V.E. Relationships Between Members of the University Community and Intelligence Organizations (p. 121)
- V.F. Photocopying for Educational Use (p. 123)
- V.G. Protocols for the University Archives and Records Center (p. 125)
- V.H. Policy on Acceptable Use of Electronic Resources (p. 127)
- V.I. Policy on Privacy in the Electronic Environment (p. 130)
- V.J. Policy on Security of Electronic Protected Health Information (ePHI) (p. 132)
- V.K. Information Systems Security Incident Response Policy (p. 133)
- V.L. Policy on Unauthorized Copying of Copyrighted Media (p. 133)
- V.M. Confiscation of Publications (p. 133)
- V.N. Policy on Computer Disconnection from PennNet (p. 133)

# V.A. Guidelines on Open Expression

*(Source: Offices of the President and Provost, 1969; revised, Office of the President, Almanac, May 2, 1978; revised, Almanac, September 8, 1987; revised, Almanac, December 3, 1991; revised,* Almanac, March 16, 1993 *(https://almanac.upenn.edu/archive/v39pdf/n25/031693.pdf))*

## I. Principles

A. The University of Pennsylvania, as a community of scholars, affirms, supports and cherishes the concepts of freedom of thought, inquiry, speech, and lawful assembly. The freedom to experiment, to present and examine alternative data and theories; the freedom to hear, express, and debate various views; and the freedom to voice criticism of existing practices and values are fundamental rights that must be upheld and practiced by the University in a free society.

B. Recognizing that the educational processes can include meetings, demonstrations, and other forms of collective expression, the University affirms the right of members of the University community to assemble and demonstrate peaceably in University locations within the limits of a set of Guidelines on Open Expression and undertakes to ensure that such rights shall not be infringed. In keeping with the rights outlined above, the University affirms that the substance or the nature of the views expressed is not an appropriate basis for any restriction upon or encouragement of an assembly or a demonstration. The University also affirms the right of others to pursue their normal activities within the University and to be protected from physical injury or property damage. The University shall attempt to ensure that, at any meeting, event or demonstration likely to be attended by non-University law enforcement authorities, the rights provided by these Guidelines are not infringed.

C. The University shall be vigilant to ensure the continuing openness and effectiveness of channels of communication among members of the University community on questions of common interest. To further this purpose, a Committee on Open Expression has been established as a standing Committee of the University Council. The Committee on Open Expression has as its major tasks: participating in the resolution of conflicts that may arise from incidents or disturbances implicating these Guidelines; mediating among the parties to prevent conflicts and violations of these Guidelines; interpreting these Guidelines; advising administrative officers when appropriate; and recommending policies and procedures for the improvement of all levels of communication.

D. In case of conflict between the principles of the Guidelines on Open Expression and other University policies, the principles of the Guidelines shall take precedence.

## II. Definitions

A. For the purposes of these guidelines, the "University Community" shall mean the following individuals:

1. Persons who are registered as students or who are on an unexpired official leave of absence.

2. All persons who are employed by the University.

3. Trustees and associate trustees of the University and members of Boards of Boards of Overseers or other bodies advisory to the University.

B. For the purposes of these Guidelines, "Meeting" and "Event" designate a gathering of persons in a University location previously reserved for that purpose. Unless designated as public, Meetings are considered to be private. Events are considered to be public. "Demonstration" designates the presence of one or more persons in a University location with the intent to express a particular point of view in a manner that attracts attention, as in protest, rallies, sit-ins, vigils, or similar forms of expression. "University Location" designates:

1. The campus of the University;

2. Any location owned, leased or used by the University, when used by members of the University community; and

3. Areas immediately adjacent thereto.

## III. Standards

A. The University, through the President, the Provost, and the Vice Provost for University Life, shall act to encourage and facilitate free and open expression within these Guidelines.

1. The University shall publish these Guidelines at least once each academic year in a manner that brings them to the attention

of members of the University Community. The University shall publish the rules adopted pursuant to IV B.1 by the Committee on Open Expression at least once each academic year in a manner that brings them to the attention of Members of the University Community.

2. The University shall establish standards for the scheduling of Meetings and Events. This shall involve:
   a. Publishing policies and procedures whereby members of the University Community, upon suitable request, can reserve and use designated spaces within University buildings for public or private Meetings or Events;
   b. Publishing policies and procedures whereby Members of the University community, upon suitable request, can reserve and use designated outdoor spaces on the University campus for public Meetings or Events;
   c. Publishing policies and procedures that specifically address requests involving groups composed entirely or predominantly of persons who are not Members of the University Community (see Section VI);
   d. Consulting with the Committee on Open Expression with regard to the substance of the policies and procedures and the manner of their publication; and, if practicable, consulting with the Committee on Open Expression before denying a request for use of a room, facility, or space by an organization recognized by the University for a reason other than prior assignment of the room, facility, or space. In any event, any such denial must be reported promptly to the Committee.

B. Each Member of the University Community is expected to know and follow the Guidelines on Open Expression. A person whose conduct violates the following Standards may be held accountable for that conduct, whether or not the Vice Provost or delegate has given an instruction regarding the conduct in question. Any member of the University community who is in doubt as to the propriety of planned conduct may obtain an advisory opinion from the Committee on Open Expression in advance of the event.

1. Individuals or groups violate these Guidelines if:
   a. They interfere unreasonably with the activities of other persons. The time of day, size, noise level,* and general tenor of a Meeting, Event or demonstration are factors that may be considered in determining whether conduct is reasonable; (* An "Unreasonable Noise Level" is defined as sound above 85 decibels measured by a calibrated sound-level meter at an "A" weighting on "slow" response ten feet away from and directly in front of the source, amplifier or loudspeaker when the latter is within 50 feet of a building. )
   b. They cause injury to persons or property or threaten to cause such injury;
   c. They hold meetings, events or demonstrations under circumstances where health or safety is endangered; or
   d. They knowingly interfere with unimpeded movement in a University location.

2. Individuals or groups violate these Guidelines if they hold a demonstration in the following locations:
   a. Private offices, research laboratories and associated facilities, and computer centers; or
   b. Offices, museums, libraries, and other facilities that normally contain valuable or sensitive materials, collections, equipment, records protected by law or by existing University policy such as educational records, student-related or personnel-related records, or financial records; or

   c. Classrooms, seminar rooms, auditoriums or meeting rooms in which classes or private meetings are being held or are immediately scheduled; or
   d. Hospitals, emergency facilities, communication systems, utilities, or other facilities or services vital to the continued functioning of the University.

3. Individuals or groups violate these Guidelines:
   a. If they continue to engage in conduct after the Vice Provost for University Life or delegate has declared that the conduct is in violation of the Guidelines and has instructed the participants to modify or terminate their behavior. Prompt compliance with the instructions shall be a mitigating factor in any disciplinary proceedings based upon the immediate conduct to which the instructions refer, unless the violators are found to have caused or intended to cause injury to person or property or to have demonstrated willfully in an impermissible location.
   b. If the individuals or groups refuse to comply with the Vice Provost's or delegate's order, they may challenge the appropriateness of the order to the judicial system. If the judiciary finds that the conduct was protected by the Guidelines, all charges shall be dismissed.
   c. Individuals or groups complying with the Vice Provost's or delegate's order may request that the Committee on Open Expression determine if the Guidelines were properly interpreted and applied to their conduct.

# IV. Committee on Open Expression

## A. Composition

1. The Committee on Open Expression consists of seventeen members: eight faculty members named by the Faculty Senate Executive Committee, two representatives of the Penn Professional Staff Assembly, one representative of the Weekly-Paid Professional Staff Assembly, and three undergraduate students and three graduate/professional students selected by the appropriate student governance organizations (currently the Nominations and Elections Committee of the Undergraduate Assembly and the Graduate and Professional Student Assembly).

2. Members of the Committee are appointed for the following terms:
   a. The faculty and representatives of the Penn Professional Staff Assembly are appointed to two-year terms, staggered so that in each year either two or three faculty members are appointed and one representative of the Penn Professional Staff Assembly is appointed.
   b. The representative of the Weekly-Paid Professional Staff Assembly is appointed for a two-year term.
   c. The undergraduate and graduate/professional student members are appointed to one-year terms.
   d. Vacancies shall be filled for the unexpired term by the appropriate nominating body or persons.

3. The Chair of the Committee shall be selected by the Committee on Committees from among the members of the Committee on Open Expression.

## B. Jurisdiction

The Committee has competence to act in issues and controversies involving open expression in accordance with these Guidelines. The Committee's responsibilities are the following:

1. Issuing rules to interpret or give more specific meaning to the Guidelines. Before adopting a rule, the Committee must hold an open hearing on the proposed rule and receive the views of individuals or groups. An affirmative vote of eight members is required for adoption, modification or rescision of a rule to be effective.

2. Recommending to the University Council proposals to amend or repeal the Guidelines. An affirmative vote of seven members is required to make such recommendations.

3. Giving advisory opinions interpreting the Guidelines at the request of a member of the University community for the purpose of advising that person or the University community. Such advice is provided to guide future action. If the Committee does not give a requested opinion, it must indicate its reasons for not doing so. The Committee must respond to such requests as soon as feasible but in any event not later than within one month of the receipt by the Chair of the Committee.

4. Giving advisory opinions interpreting the Guidelines at the request of administrative officials with responsibilities affecting freedom of expression and communication. Such advice is provided for the purpose of guiding future action.

5. Mediating in situations that involve possible violations of the Guidelines. Those Committee members available at the time may act on behalf of the Committee. In carrying out the mediation function, the Committee or those members present may advise the responsible administrative officials and any other person with respect to the implementation of the Guidelines. Those Committee members who have acted on behalf of the Committee must report on their activities to the full Committee.

6. Reviewing the following administrative decisions for the purpose of providing advice on future actions.
   a. At the discretion of the Committee, administrative decisions involving these Guidelines made without consultation with the full Committee.
   b. All instructions by the Vice Provost or delegate to modify or terminate behavior under Section III.B.3 of these Guidelines.

7. Investigating incidents involving the application of these Guidelines to aid the Committee in its functions of rulemaking, recommending changes in the Guidelines or issuing advisory opinions. Such functions provide guidance to the University community for future action. The results of Committee investigations for these purposes shall not be a part of the initiation, consideration or disposition of disciplinary proceedings, if any, arising from the incidents.

8. Adopting procedures for the functions of the Committee, varied to suit its several functions, consistent with these Guidelines. Procedures that are not wholly matters of internal Committee practice must be made public in advance of implementation. Except as otherwise provided, the Committee may determine its own voting procedures.

9. Submitting an annual report to the Council and the University on the status of the Committee's work in the University's journal of record, Almanac.

## C. Procedures

1. Except as provided with respect to the mediation function in Section IV.B.5, nine members of the Committee constitute a quorum.

2. The Committee can authorize subcommittees, selected from its own members, to act for the Committee in any matter except the issuance of rules interpreting or implementing the Guidelines or the making of recommendations to amend or repeal the Guidelines.

3. The Committee shall respect the privacy of individuals as its general policy and shall maintain the right to declare the confidentiality of its proceedings.
   a. If a person appearing before the Committee requests that his/her testimony or information be kept confidential, the Committee shall consider such a request. The Committee then shall determine whether to honor that request and shall inform that person of its decision before testimony is given.
   b. Minutes of particular Committee meetings may be declared confidential by the Committee or be so declared at the discretion of the chair subject to review by the Committee.
   c. All Committee documents containing confidential material, as determined by the chair, shall be clearly marked "confidential" and shall carry a warning against unauthorized disclosure.

## V. Responsibilities for Enforcement

A. It is the responsibility of the Vice Provost for University Life (hereafter referred to simply as the "Vice Provost") to protect and maintain the right of open expression under these Guidelines.

B. Observation of meetings, events or demonstrations, when deemed necessary by the Vice Provost to protect and maintain open expression, shall be the responsibility of the Vice Provost, who may delegate such responsibility. This delegate shall have full authority to act in the name of the Vice Provost under these Guidelines.
   1. The observer (Vice Provost or delegate) shall identify himself/herself to those responsible for the meeting or event or to the leaders of the demonstration.
   2. The Vice Provost shall attempt to inform the chair of the Committee on Open Expression of meetings, events or demonstrations to which an observer will be sent. The chair may designate a member or members of the Committee to accompany and advise the observer. Such a Committee representative shall also be identified to those responsible for the meeting or event or to the leaders of the demonstration.
   3. Except in emergencies, the Vice Provost's authority under these Guidelines shall not be delegated to employees of the University's Department of Public Safety ("Public Safety"). The role of Public Safety personnel at a meeting, event or demonstration is defined below, in Section V.C.3.
   4. Any observer or Committee representative who attends a meeting, event or demonstration shall respect the privacy of those involved. If there has been no violation of these Guidelines, other University regulations, or applicable laws, an observer, committee representative, or Public Safety employee who attends a meeting, event or demonstration shall not report on the presence of any person at such meeting, event or demonstration.

C. The Vice Provost or delegate is responsible for enforcing Section III.B. and may instruct anyone whose behavior is violating or threatens to violate these Guidelines to modify or terminate such behavior. The instruction shall include notice that failure or refusal to comply is a further violation according to Section III.B. of these Guidelines. However, an instruction or warning by the Vice Provost or delegate is not a prerequisite for a finding that a violation has occurred.
   1. When the Vice Provost or delegate declares that an individual or a group has violated the Guidelines, he/she may request to examine their University identification.
      a. Failure to comply with this request is in violation of the Guidelines.
      b. In the event that any person(s) are deemed by the Vice Provost or delegate, in consultation with available members

of the Committee on Open Expression, to have violated the Guidelines and such person(s) refuse to show University or other identification, the Vice Provost or delegate shall if practicable inquire of other individuals present as to the identity of the claimed violator(s). Identification by two other individuals shall suffice to establish identity. Should it not be possible to establish identity in this way, the Vice Provost or delegate may direct that photographs be taken of the participant(s) in the claimed violation. The Vice Provost or delegate must warn the individual(s) that their photographs will be taken unless identification is presented. Photographs and videotapes obtained without such warning may not be used as evidence in disciplinary proceedings. It is preferred that a member of the Committee on Open Expression take any such photographs; however, if no such person is able or willing to do so, another member of the University community may be requested to do so. As soon as safely practicable, all such photographs shall be turned over to the Vice Provost or delegate. Any photographs taken (including videotapes and negatives) shall be used solely by the Office of Student Conduct for the purpose of investigation of alleged violations and possible identification of alleged violators of these Guidelines. If it is determined that no violation has occurred, the Vice Provost or delegate shall destroy the photographs. If a violation is found to have occurred, after identification has been made and the case has been adjudicated, the Vice Provost or delegate shall destroy the photographs. None of the photographs shall be published. After each incident at which photographs are taken, the Committee on Open Expression shall report on the incident to the University Council, via the chair of the University Council Steering Committee, regarding what happened in the incident, which individuals saw the photographs, and the disposition of the photographs.

2. In carrying out this responsibility for safeguarding the right of open expression, the Vice Provost shall obtain the advice and recommendation of the representatives of the Committee on Open Expression whenever feasible.

3. The Vice Provost or delegate may request members of the University Police to attend meetings, events or demonstrations to help protect the open expression of those involved.

   a. Any person acting as an agent of the Division of Public Safety who attends a meeting, event or demonstration in a University location shall be clearly identifiable as such and in normal duty uniform. (Arms may be carried if they are part of "normal duty uniform. ")

   b. Public Safety personnel also may attend meetings, events or demonstrations when requested to do so by the person or group responsible for the event, when prominent public figures are involved, or when the Vice President for Public Safety or delegate determines that there exists an imminent danger of violence at the event.

4. Terminating a meeting, event or demonstration by force is a most serious step, as this action may exacerbate existing tensions and may lead to personal injury and property damage.

   a. Avoidance of injury to persons by the continuation of a meeting, event or demonstration is a key factor in determining whether it should be forcibly terminated. Property damage and significant interference with educational processes are also factors to be considered and may be of sufficient magnitude to warrant forcible termination.

   b. Whenever possible, the Vice Provost or delegate should consult with the Committee on Open Expression before seeking a court injunction against those involved in a meeting, event or demonstration or calling for police action.

   c. The Vice Provost or delegate shall inform those involved that he/she intends to seek an injunction or call for police intervention before he/she does so.

   d. When a meeting, event or demonstration is forcibly terminated, a full statement of the circumstances leading to the incident shall be publicized by the Vice Provost within the University.

D. Adjudication

   1. Cases involving undergraduate students are referred to the Office of Student Conduct, which investigates the event and decides what disciplinary proceedings, if any, to pursue.

   2. Cases involving graduate or professional students are referred to the Office of Student Conduct or to the established disciplinary body of the school in which the student is enrolled.

   3. Cases involving faculty are referred to the appropriate dean or to the Provost.

   4. Cases involving University staff or administrators are referred to that individual's supervisor or any other person with supervisory responsibility over that individual.

   5. Cases involving trustees and associate trustees of the University and members of the Boards of Overseers or other bodies advisory to the University are referred to the Executive Committee of the Trustees.

E. The Division of Public Safety shall not collect or maintain information about members of the University community[1], except in connection with alleged crimes, violations of University regulations, or as specifically authorized in writing by the President (to Public Safety and the Open Expression Committee). This regulation shall not affect personnel information concerning current, past or prospective employees of the Division of Public Safety.

## VI. Non-University Persons

These Guidelines address themselves explicitly to forms of individual and collective expression in a University location by members of the University community. The extent to which the privileges and obligations of these Guidelines may be made applicable in particular circumstances to individuals who are not members of the University community shall be determined by the Vice Provost or delegate. Participants in meetings, events and demonstrations in a University location are required to comply with the instructions of the Vice Provost or delegate. (See section III.A.2.c. of this policy.)

(See page 6-8 - Almanac, March 16, 1993 (https://almanac.upenn.edu/archive/v39pdf/n25/031693.pdf))

[1]  Videotaped or closed circuit television information collected by posted, fixed location cameras is excluded, as long as it is in conformance with the rules of the CCTV policy as of January 13, 1999.

# V.B. Confidentiality of Employee Records

*(Source: Offices of the President and Provost, December 5, 1980; revised, Almanac, October 6, 1981 and Personnel Policy Manual Policy No. 101; revised, Human Resources Policy Manual Policy No. 201, September 1, 1991*

*and Almanac, May 18, 1993; revised,* Personnel Policy Manual Policy 201, March 29, 2005 *(*https://www.hr.upenn.edu/policies-and-procedures/policy-manual/other-policies/confidentiality-of-records/*))*

To insure confidentiality, uniformity, and accuracy of personnel information, it is the responsibility of Division of Human Resources/Information Management/Records (HR/IM/Records) to handle all inquiries, other than subpoenas, which require reference to documentary records concerning past and present staff of the University. Responses to the subpoenas are handled by the Office of the General Counsel. Inquiries received by other offices should be referred to HR/IM/Records. All subpoenas and inquiries from lawyers should be referred to the Office of the General Counsel.

Personnel records, including those established in connection with the selection process, are University property and are afforded confidential treatment at all times.

Individually identifiable personal information contained in computerized databases, whether maintained centrally or by schools, departments or other units, is afforded the same confidential treatment that applies to written records.

The Provost (or designee) shall administer this policy with respect to the records of faculty members. The Vice President for Human Resources (or designee) shall administer the policy with respect to the records of staff members. Deans and directors shall notify the Provost or the Vice President for Human Resources, as appropriate, of the name of the individual who shall serve as custodian for personnel records maintained in their areas of responsibility.

## Exceptions

This policy does not cover disclosures of information that are made on the basis of personal knowledge or recollection.

This policy does not apply to applicants for employment unless they are subsequently hired.

## Access to Records

Both active and retired members of the faculty and staff shall have the right of access to their records as described in this policy.

Individuals who are on leave of absence or whose employment has been terminated for reasons other than retirement with reemployment rights shall have the right of access.

Legal representatives of deceased faculty and staff members shall have the right of access for five years after the death of the individual.

Exceptions to the above may be granted by the Provost or the Vice President for Human Resources.

## Review of Records

A. An individual may review his/her records by making an appointment with HR/IM/Records during regular business hours. HR/IM/Records shall assure that references to others that may be contained in the file are deleted for the purpose of the review. (For exceptions please refer to "Limitations on Review of Records," which follows later in this policy.)

B. The review shall take place in the office where the records are maintained and in the presence of a designated staff member of HR/IM/Records.

C. The individual shall sign a log indicating the date of the inspection of the records.

D. If necessary, an individual may request copies of his/her records. There is no charge for copies of records referred to in the Occupational Health and Safety Act (OSHA) standards for access to medical records; for other records a reasonable charge may be made for reproduction costs.

## Correction of Records

If an individual considers a record to be misleading, if it contains a statement of fact that can be shown to be erroneous, or if it contains information that is not relevant, a correction may be requested.

The request must be submitted in writing to HR/IM/Records.

A request for correction of information such as date of birth must be accompanied by supporting documentation, for example, birth certificate or passport. The designated custodian of the records may consult the Provost (or designee) or the Vice President for Human Resources (or designee), as appropriate. On the basis of this consultation, the custodian should make the correction or indicates the reason why the request is denied.

If a correction is sought on an appropriate ground but is denied, the individual involved may submit for inclusion in the file a short statement explaining the grounds for the request and the correction sought. The Provost or the Vice President for Human Resources may submit a counterstatement, a copy of which is sent to the affected individual. Both statement and counterstatement shall be placed in the Personnel Record.

## Limitations on Review of Records

To protect against inappropriate disclosure of confidential information, certain records, including those containing confidential information about more than one individual and medical records, are not open to review by an individual who is a subject of the record. These records are maintained separately from other benefits records and may be available under separate policies or practices applicable to all recipients of care at the Hospital of the University of Pennsylvania or elsewhere at the University.

Individuals may not review the following:

• records that contain confidential information about other people;
• all letters of recommendation relating to the consideration of a faculty member for appointment, re-appointment, promotion or tenure, or staff member for employment, unless released by written consent of the author;
• documents including records concerning benefits that are being developed or prepared for use in civil, criminal or grievance procedures;
• records relating to the investigation of a possible criminal offense;
• medical and hospital records.

## Records That May Be Disclosed to Third Parties

Information contained in personnel records may be disclosed by the University without the written consent of the subject of the record when the Provost or Vice President for Human Resources concludes that a

constructive purpose would be served or when required by law in the judgment of the Office of the General Counsel.

Unless specifically excepted from this policy, the content of personnel records may not be disclosed to third parties without the express written permission of the individual who is the subject of the record. The written permission must describe specifically the records to be disclosed and the persons to whom they are to be disclosed.

Except for disclosures of directory information and as required by law, the University shall notify any third party to whom disclosures are made that disclosures are made under the condition that the party shall not make any redisclosure of the information without the written consent of the subject of the record.

Certain substantive categories of information may be disclosed:

1. Penn makes certain directory information available to its staff, faculty, and students – and a more limited set of information available to the general public – so that the ordinary University business can be conducted. In some cases, individuals may "opt-out" of having certain data appear. In other cases involving more personal information, such as home contact information, individuals may "opt-in" to having their data appear. Also, individuals can often list organizational contact information, rather than personal contact information, in their directory entries. For more information on the levels of control individuals can exercise over their directory information in disclosures to Penn's faculty, staff and students and to the general public, see Appendix I., Directory Information Privacy Grid (https://www.hr.upenn.edu/policies-and-procedures/policy-manual/other-policies/confidentiality-of-records/directory-information-privacy-grid/).

2. Authorized Individuals: Personnel records may be disclosed to University officials, and authorized individuals performing work for the University who require the information for the performance of their duties.

3. Legal Requirements: The University may release personnel records in response to a lawful subpoena, warrant, or court order or if, in the opinion of the Office of the General Counsel, such records could be required by law to be produced for any reason, including disclosure to a government agency. Whenever possible, notice of disclosure shall be given in advance through the *Almanac* for general categories of personnel records or by mail for individual records.

4. Protection of University Interests: The University may disclose information contained in records to protect its legal interest when it believes the actions of an individual violate or have violated his/her conditions of employment or threaten injury to people or property

5. Collective Bargaining Agreements: Information may be disclosed as required under the terms of a collective bargaining agreement.

6. Emergencies: Information may be disclosed if, in the judgment of the designated custodian of HR/IM/Records, such disclosure is necessary to protect the health, safety or property of any person.

## Exemption to Third Party Disclosure Policy

The Office of Affirmative Action, Division of Human Resources and Office of the General Counsel are exempted from the above section, "Records That May be Disclosed to Third Parties."

## Record Retention Requirements

Records shall be maintained for the period specified by state or federal law, or longer at the direction of the Provost, the Vice President for Human Resources, the University Archivist or the General Counsel.

| Records | Years |
|---|---|
| Affirmative Action records | 7 years |
| Information Management/Records | 5 years after death |
| Medical records relating to job qualification | 30 years beyond termination date |
| Records relating to faculty appointment or promotion | 5 years after death |
| Grievance records | 5 years after death |
| Public Safety Records | 5 years after death |
| Payroll[1] | 7 years |
| Occupational Safety and Health Act (OSHA) records of exposure to toxic substances[1] | 30 years |
| Applications (unsuccessful canidates)[1] | 2 years |

[1] Payroll, OSHA records and applications are retained according to this schedule and are not dependent on employment status.

The Department of Public Safety and the Hospital of the University of Pennsylvania shall develop their own record retention policies for security records and medical records.

# V.C. Confidentiality of Health Information under HIPAA

*(Office of Audit, Compliance and Privacy, 2006; revised, 2009)*

All faculty members at the University of Pennsylvania should respect the privacy and security of personal health information. Personal health information may be used for appropriate patient care, teaching, and research purposes, consistent with applicable University policy. Further, faculty should take reasonable steps to safeguard personal health information from unauthorized access, use, and disclosure.

Under the Health Insurance Portability and Accountability Act (HIPAA), certain schools and centers within the University must comply with a number of regulatory requirements that have been incorporated into specific policies addressing the privacy and security of health information. Faculty members within the Perelman School of Medicine, the School of Dental Medicine, and faculty practicing at the Student Health Service and Living Independently for Elders (collectively, "HIPAA-Covered Faculty") should refer to and follow HIPAA privacy and security policies and procedures established for their schools and centers.

HIPAA-Covered Faculty must abide by the following HIPAA requirements:

1. HIPAA-Covered Faculty must receive training on policies and procedures implementing HIPAA and abide by such policies and procedures;

2. In general, HIPAA-Covered Faculty may not use and/or disclose personal health information without the patient's signed HIPAA-compliant authorization, except that:

a.  HIPAA-Covered Faculty may, without patient authorization, use and/or disclose personal health information for purposes of treatment, payment, and for the healthcare operations of the faculty member's school /center, including but not limited to management, quality assurance, training programs, and compliance programs;

b.  HIPAA-Covered Faculty may, without patient authorization, share personal health information with a patient's family members and other relatives or friends that is directly relevant to that person's involvement in the patient's care or payment for care, consistent with professional judgment unless the patient otherwise objects to such sharing;

c.  HIPAA-Covered Faculty may, without patient authorization, use or disclose personal health information for research purposes if Penn's Institutional Review Board (IRB) or a similar committee has waived the requirement for authorization under HIPAA. However, the faculty member must provide to the designated institutional official an accounting for all disclosures of that information in a manner described in the IRB procedures;

d.  HIPAA-Covered Faculty may, without patient authorization, use and disclose personal health information for designated priority purposes, including but not limited to reporting to certain governmental agencies, in emergency circumstances, for judicial and administrative proceedings, and where disclosure is required by law, provided that the HIPAA-covered faculty does so in accordance with specific conditions set out in school / center policies and procedures. However, the faculty member must provide to the designated institutional official an accounting for all disclosures of that information in a manner described in school / center policies and procedures;

3.  HIPAA-Covered faculty must limit uses, disclosures, and requests for personal information to the amount reasonably necessary to accomplish the purpose, except as related to treatment;

4.  HIPAA-Covered Faculty must permit patients the right to access, inspect, and copy their personal health information, except in specified cases, such as in the course of a clinical trial subject to the terms of the authorization to use the patient's health information in that trial.

5.  HIPAA-Covered Faculty must permit patients the right to request amendment of their health information;

6.  HIPAA-Covered Faculty must enter into HIPAA business associate agreements with vendors that create or receive personal health information on our behalf as described in school / center policies and procedures;

7.  HIPAA-Covered Faculty must ensure that they provide appropriate administrative, technical, and physical safeguards to protect the confidentiality, integrity, and availability of personal health information; and

8.  HIPAA-covered faculty must report all unauthorized access to personal health information to school/center privacy officials to the Office of Audit, Compliance and Privacy to ensure appropriate investigation and response.

# V.D. Closed Circuit Television Monitoring and Recording of Public Areas for Safety and Security Purposes

*(Source: Office of the President, Almanac, April 13, 1999; revised, Division of Public Safety, Almanac, April 29, 2008 (https://almanac.upenn.edu/archive/volumes/v54/n31/cctv.html))*

## I. Purpose

The purpose of this policy is to regulate the use of closed circuit television (CCTV) cameras to monitor and record public areas for the purposes of safety and security.

## II. Scope

This policy applies to all personnel, UPHS, schools and centers of the University, in the use of CCTV monitoring and recording. Legitimate uses of this technology related to research are covered by University policies governing research with human subjects and, therefore, excluded from this policy.

## III. General Principles

A.  The Division of Public Safety is committed to enhancing the quality of life of the campus community by integrating the best practices of public and private policing with state-of-the-art technology. A critical component of a comprehensive security plan using state-of-the-art technology is closed circuit television (CCTV).

B.  The purpose of CCTV monitoring of public areas by security personnel is to deter crime and to assist the Penn police in protecting the safety and property of the University community. Any diversion of security technologies and personnel for other purposes (e. g., CCTV monitoring of political or religious activities, or employee and/or student evaluations) would undermine the acceptability of these resources for critical safety goals and is therefore prohibited by this policy.

C.  Video monitoring for security purposes shall be conducted in a professional, ethical and legal manner. Personnel involved in video monitoring shall be appropriately trained and continuously supervised in the responsible use of this technology. Violations of the Code of Procedures for video monitoring referenced in this policy shall result in disciplinary action consistent with the rules and regulations governing employees of the University.

D.  Information obtained through video monitoring shall be used exclusively for security and law enforcement purposes. Information obtained through video monitoring shall only be released when authorized by the Vice President of Public Safety according to the procedures established in this policy.

E.  Video monitoring of public areas for security purposes shall be conducted in a manner consistent with all existing University policies, including the Non-Discrimination Policy, the Sexual Harassment Policy, Open Expression Guidelines and other relevant policies. The code of practice for video monitoring prohibits monitoring based on the characteristics and classifications contained in the Non-Discrimination Policy (such as, race, gender, sexual orientation, national origin, and disability)

F. Video monitoring of public areas for security purposes at the University is limited to uses that do not violate the reasonable expectation to privacy as defined by law.

G. To maintain an informed University community, the Division of Public Safety shall periodically disseminate written materials describing the purpose and location of CCTV monitoring and the guidelines for its use. The location of outdoor CCTV cameras monitored by the Division of Public safety shall be published in the *Almanac*.

H. Information obtained in violation of this Policy may not be used in a disciplinary proceeding against a member of the University faculty, staff or student body.

I. All existing uses of video monitoring and recording must comply with this policy.

# IV. Responsibilities

A. The Division of Public Safety is the department authorized to oversee and coordinate the use of CCTV monitoring for safety and security purposes at the University. All University areas using CCTV monitoring are responsible for implementing this Policy in their respective operations. Public Safety has primary responsibility for disseminating the Policy and assisting other units in implementing the Policy and related procedures.

B. The Vice President of Public Safety has the responsibility to authorize all CCTV monitoring for safety and security purposes at the University. All new installations shall follow the Division of Public Safety's operating principles. All existing CCTV monitoring systems shall be evaluated for compliance with this policy.

C. The Division of Public Safety shall monitor new developments in the relevant law and in security industry practices to ensure that CCTV monitoring at the University is consistent with the highest standards and protections.

D. A CCTV monitoring Panel shall be established to assure that the Division of Public Safety adheres to established policy and procedure in the use of CCTV and to review camera locations and request for release of tapes.

   1. The CCTV monitoring Panel shall consist of seven members who shall serve for a term of one year:
   The Chairperson of the Safety and Security Committee or his/her designee will serve as chair.
   Two faculty members appointed by the Chair of the Faculty Senate
   One member appointed by the President
   One student member
   One staff member
   The University Compliance Officer

   2. The CCTV Monitoring Committee will review camera locations to ensure the perimeter of view of public cameras conforms to this policy.
   The proposed location of permanent CCTV cameras will be provided to the CCTV Monitoring Committee for review and published in the *Almanac* before installation. A list of all University-owned or controlled camera locations will be published semi-annually in *Almanac* and made available by the Division of Public Safety to anyone requesting the list.
   The locations of temporary cameras to be used for special events will be reviewed by the CCTV Monitoring Committee for approval and published in *Almanac* before the event if possible. (*Note:* "Temporary cameras"—does not include mobile video equipment or hidden surveillance cameras used for criminal investigations.)

Included with the list of CCTV camera locations will be a general description of the technology employed and the capabilities of the cameras.
Students and staff entering certain sensitive locations on campus may have an increased concern for privacy or confidentiality.  In order to prevent a possible chilling effect on the use of service at these locations, concerned persons may petition the CCTV Monitoring Committee to forgo the installation of a proposed camera or for the removal of an existing camera. The CCTV Monitoring Committee will determine the appropriateness of an installation weighing the concerns of the person(s) making the requests and the safety and security of the entire community. In recognizing students may also have an enhanced expectation of privacy in the hallways and lounges of residence facilities, CCTV monitoring for safety and security purposes will not be used in residential hallways and lounges unless the Vice President of Public Safety determines a specific safety/security risk exists.
The CCTV Monitoring Committee will review complaints regarding camera locations and determine whether the CCTV Monitoring Policy is being followed. The panel should weigh whether the potential increment in community security outweighs any likely infringement of individual privacy.

   3. The CCTV Monitoring Committee, with the Vice President of Public Safety, will review all requests received by the Division of Public Safety to release recorded video images obtained through CCTV monitoring. No releases of recorded video images will occur without authorization by the Vice President and the CCTV Monitoring Committee. Excluded from review by the CCTV Monitoring Committee are releases of recorded video images directly related to a criminal investigation, arrest or subpoena. The CCTV Monitoring Committee may also approve release of recorded video images only for legitimate purposes, such as to protect the University and its members from harm or liability. Five affirmative votes are necessary to approve the release of recorded video images. Any release of recorded video images will be recorded on a written log.

   4. Any member of the CCTV Monitoring Committee may audit the Division of Public Safety's CCTV monitoring operations, including video storage, at any time without prior notice.

   5. The Chair of University Council's Committee on Campus & Community Life will report to the CCTV Monitoring Committee at least once a year describing all requests for camera locations and release of recorded video images and disposition of those requests.

   6. The CCTV Monitoring Committee will review this policy annually and recommend revisions if needed.

# V. Procedures

A. All operators and supervisors involved in video monitoring of public areas will perform their duties in accordance with the Code of Practice consistent with this policy developed by the Division of Public Safety.

B. Division of Public Safety Management will assure that responsible and proper camera monitoring practices by control operators is continuous.

C. The Division of Public Safety has posted signage at appropriate locations. Signage state *This area is subject to Video Monitoring by the University of Pennsylvania Police Department*

D. The Division of Public Safety will limit camera positions and views of residential housing. Any view given to the housing will be no greater than what is available with unaided vision. Furthermore the view of a residential housing facility must not violate the standard of "reasonable expectation of privacy."

E. The Division of Public Safety Central Monitoring Center and other central monitoring centers will be configured to prevent camera operators tampering with or duplicating recorded video information.

F. Recorded video will be stored for a period not to exceed 30 days and will then be erased, unless retained as part of a criminal investigation or court proceedings (criminal or civil), or other bona fide use as approved by the Vice President of Public Safety and the CCTV Monitoring Committee.

G. Recorded video images will be stored in a secure location with access by authorized personnel only.

H. Camera control operators will conduct video observation of areas only in plain view of others situated in the public area viewable to the public.

I. Camera control operators will be trained in the technical, legal and ethical parameters of appropriate camera use.
   1. Camera control operators will receive a copy of this policy and provide written acknowledgement that they have read and understood its contents.
   2. Camera control operators will receive training in cultural awareness.

J. Camera control operators will not monitor individuals based on characteristics of race, gender, ethnicity, sexual orientation, disability, or other classifications protected by the University's Non-Discrimination Policy. Camera control operators will monitor based on suspicious behavior, not individual characteristics.

K. Camera control operators will not spot and continuously view people becoming intimate in public areas.

L. Camera control operators will *not* view private rooms or areas through windows.

M. Mobile video equipment may be used in criminal investigations. Mobile video equipment will only be used in non-criminal investigations in specific instances creating significant risk to public safety, security, and property as authorized in writing by the President to the Division of Public Safety and the Open Expression Committee.

Portable hidden cameras with recording equipment will only be used for criminal investigation by the University Police Detective Unit with the approval of the Vice President of Public Safety.

## Examples of Video Monitoring and Recording of Public Areas

Legitimate safety and security purposes include, but are not limited to the following;

*Protection of buildings and property*
Building perimeter, entrances and exits, lobbies and corridors, receiving docks, special storage areas, laboratories, cashier locations, etc.

*Monitoring of Access Control Systems*
Monitor and record restricted access transactions at entrances to buildings and other areas.

*Verification of security alarms*
Intrusion alarms, exit door controls, hold-up alarms

*Video Patrol of Public Areas*

Transit Stops, parking lots, public streets (enclosed and unenclosed), shopping areas and vehicle intersections, etc.

*Criminal Investigation*
Robbery, burglary, and theft surveillance

*Protection of pedestrians*
Monitoring of pedestrian and vehicle traffic activity

# V.E. Relationships Between Members of the University Community and Intelligence Organizations

*(Source: University Council Resolution, January 19, 1979 and Offices of the President and Provost, 1979 Handbook for Faculty and Administration)*

## I. Introduction

The generation, preservation, and dissemination of information and ideas are primary functions of an academic institution. They are also primary functions of intelligence organizations. From this functional congruence have stemmed relationships between the academic and intelligence communities which in many instances are both proper and beneficial. There are, however, profound differences between the two communities which invest such relationships with potential for harm to the integrity and/or effectiveness of both. Open and unfettered exchange of information and ideas is the life blood of the academic community. For the intelligence community, on the other hand, secrecy is an inescapable fact of life.

Furthermore, reports of questionable activities of intelligence organizations must influence consideration of relationships between such organizations and an academic community. It therefore is appropriate for the University to establish policies regarding issues of concern in relationships between itself and members of the University community and intelligence organizations in order to protect its interests in any such relationships.

In adopting such policies the University recognizes the importance to the nation of effective intelligence organizations. University policies regarding issues of concern in relationships between members of the University community and intelligence organizations must be consistent with the maintenance of individual rights and freedoms. In addition, the University recognizes that some of the issues raised by relationships with intelligence organizations are not specific to such organizations and that, therefore, policies designed to govern these issues should be more broadly based.

These considerations have guided the development of the following policies that shall govern issues of concern in relationships between the University of Pennsylvania and members of the University community, and intelligence organizations.

## II. Definition of Terms as Used in This Section

**University:** The corporate entity formally known as the Trustees of the University of Pennsylvania.

**Intelligence organization:** Any organization or part thereof which has as its primary function the collection, analysis, or dissemination of

information in aid of the security objectives of a domestic or foreign government.

**University community:** The set of individuals who are employed by, or who participate in the educational and other activities of, the University, at times when they are, or may reasonably be thought by others to be, acting in their capacity as employees or participating in such activities.

**Explanatory Note:** The definition of University community is intended to reflect the fact that relationships between members of an academic community and intelligence organizations may pose a threat to the integrity of that community and to the academic community at large, even at times when the individuals in question are, in their own minds, pursuing private interests or conducting personal affairs. In attempting to achieve a balance between this concern and its concern for individual rights and freedoms, the committee who wrote this section concluded that adherence to policies in this area could legitimately be expected when individuals are conducting University business or participating in University activities and also when they "may reasonably be thought by others to be doing so."

The committee appreciated the difficulty of applying the definition of University community in some cases but nevertheless believes that it provides necessary and useful guidance. As an example, consider a situation in which a University faculty member and an employee of an intelligence organization find themselves participating as members of a church choir, a patently non-University activity. In terms of our definition, the faculty member could not normally be construed to be a member of the University community in these circumstances. However, if the employee of the intelligence organization were to take advantage of his proximity to question the faculty member about a University student or colleague for intelligence purposes, in the committee's view the faculty member should reasonably be thought to be responding as a member of the University community because the information in question would normally have been learned at a time when the faculty member was acting in his capacity as an employee of, or was participating in the activities of, the University.

# III. Research and Technical Service Agreements

The University may properly enter into an agreement with an intelligence organization for the conduct of a research program or for the provision of technical services, provided that the terms and conditions of such agreement are consistent with the Guidelines for the Conduct of Sponsored Research and with any other University policies and practices governing agreements with extramural organizations.

## Consultation

Individual members of the University community may properly enter into an agreement with an intelligence organization to act as a technical or professional consultant or practitioner, with or without fee, provided that the general nature of the proposed agreement is reported to the appropriate dean (for faculty or students) or other administrative officer (for others) prior to the provision of any services thereunder. The dean or other administrative officer shall consider whether the proposed agreement is consistent with existing University policies, e.g. the Conflict of Interest Policy for Faculty Members (section II. E. 10) or the Conflict of Interest Policy for Trustees, Associate Trustees, Officers and other University Employees (adopted by the Trustees, June 19, 1981). The dean or other administrative officer shall also consider whether the proposed agreement would compromise the individual's participation in, or the

integrity of, University programs or activities. If the proposed agreement appears to be in conflict with existing policies or to be inappropriate on the grounds stated in the preceding sentence, and if the matter cannot be resolved with the member of the University community, the dean or other administrative officer shall report that fact to the Provost and President and recommend appropriate action.

**Explanatory Note:** Existing University policies require reporting of extramural consultative and business activities for a fee by full-time members of the faculty, and reporting of such activities, whether compensated or not, by administrative and professional staff. Their purpose is to prevent excessive diversion of effort into extramural activities and to avoid conflicts of interest. Because recent events have raised concerns about the potential effect of agreements with intelligence organizations on an individual's ability to function properly in a free and open academic community, the committee believes that a reporting requirement for such agreements should be extended to all members of the University community and should apply whether or not a fee is involved. Such reports are not intended for public release.

The requirement that the dean or other administrative officer "consider whether the proposed agreement would compromise the individual's participation in, or the integrity of, University programs or activities" reflects a standard that is, at least in part, already embodied in the existing University policies mentioned in this section. However, these policies presently apply only to Standing Faculty, Standing Faculty-Clinician-Educators, and full-time members of the Associated Faculty and the Academic Support Staff contemplating an extramural consultative or business activity for fee and to administrative and professional staff. The committee's intent here is both to extend the standard of existing policies to all members of the University community in the case of a proposed relationship with an intelligence organization and to make it clear that in exceptional cases such a relationship may be objectionable for reasons not reflected in existing policies.

# V. Information Concerning Members of the University Community

Members of the University Community who provide any factual information or opinion about other members of the University Community to extramural organizations or individuals (*e.g.*, in connection with possible employment) must at all times exercise good judgment and discretion and distinguish clearly between factual information and opinion. In addition:

A. Any member of the University Community who has an agreement or understanding with an extramural organization or individual to provide any factual information or opinion about other members of the University community on a regular basis, for recruiting purposes, must identify him or herself to the appropriate dean or other administrative officer and to the appropriate University placement officer as a recruiter for the specified extramural organization or individuals.

B. Members of the University Community should require extramural organizations and individuals soliciting any factual information or opinion about another member of the University Community to identify themselves fully and accurately and to indicate the expected use of the information or opinion.

C. A member of the University Community who is asked by an intelligence organization or representative thereof to identify for recruiting purposes or to provide factual information or opinion about another member of the University Community should

consider whether the exercise of good judgment and discretion requires obtaining the prior informed consent of the individual in question. If the individual in question is a currently enrolled student, prior informed consent should always be obtained before factual information (including the individual's name) is provided.

The requirement of prior informed consent is not applicable where information is sought by an intelligence organization in connection with the investigation of alleged specific criminal activity. The requirement of prior informed consent shall be deemed to have been satisfied if the person requesting information provides proof that the student has given written consent (which may be a blanket consent) or, in the case of an application for employment, proof of such application.

The committee understands that the identity of "recruiters" is a matter of public record within the University. This record shall include the names of all recruiters for extramural organizations as defined in that subsection.

The University Guidelines on the Confidentiality of Student Records (IV.J.), which reflect and elaborate the requirements of federal law, specify the circumstances in which personally identifiable information may be disclosed from a student's education records without prior written consent. Even in such circumstances, the guidelines require the exercise of informed discretion by the person disclosing the information. The guidelines do not apply to information that is not part of or derived from a student's education records and, although individual departments of the University have policies regarding the confidentiality of other (e.g., employment) records, there is no comprehensive University policy with respect to such records.

We believe that the standard set forth in this section provides appropriate guidance for those providing factual information or opinions about any member of the University community to any extramural organization or individual. In light of reported abuses in the use of information provided to intelligence organizations by academic institutions or persons affiliated with them, particularly information about students, we believe that the requirement for the exercise of good judgment and discretion set forth in the section above applies with particular force in this context.

The committee notes, for example, that the director of the Central Intelligence Agency has recently confirmed that the agency currently has and intends to maintain secret contacts with University personnel for the purpose of recruitment of students, including foreign students. For this reason, we believe that a requirement of informed consent prior to the release of factual information about currently enrolled students (including students on summer recess or approved leave of absence) is appropriate. Unless students can be assured that activities of this sort will not be abetted by other members of the University community, the atmosphere of trust that is essential to the academic enterprise will suffer.

In cases where there is doubt about the purpose of an investigation, members of the University community who are requested to provide information shall refer the person making the request to the General Counsel, who shall determine whether a response is appropriate under these guidelines.

# VI. Operational and Other Activities

Members of the University Community may not undertake activities on behalf of an intelligence organization that are inconsistent with their normal University activities.

Members of the University Community may not knowingly lend their efforts, names or positions to the production or dissemination of information known by them to be false or misleading.

Members of the University Community may not cooperate with an intelligence organization in obtaining the unwitting services of any other individual.

# VII. Interpretation of These Guidelines

In the first instance, the responsibility for interpretation and implementation of these guidelines rests with the appropriate dean or other administrative officer. If such interpretation is disputed, all parties to the dispute have the right of appeal to the President of the University, who has the ultimate responsibility for interpretation of these guidelines.

It is understood that any member of the University Community who is party to a dispute over interpretation and implementation of these guidelines may have recourse to one or another of the existing University mechanisms for resolution of disputes, e.g. a committee on academic freedom and responsibility, a grievance procedure or the office of the University Ombudsman.

# V.F. Photocopying for Educational Use

*(Source: Office of the General Counsel, March 28, 1978 and 1979 Handbook for Faculty and Administration; reprinted,* Almanac, May 23, 1989 *(https://almanac.upenn.edu/archive/v35pdf/n36/052389.pdf))*

The enactment of a federal Copyright Act (hereinafter, "the Act"), effective January 1, 1978, has produced much misunderstanding among teachers regarding the permissible amount of photocopying for educational purposes.

Only copyrighted works are protected by the Act. This elemental point is often overlooked. Court opinions, legislative hearings and other government documents are not copyrighted, and may be freely photocopied. The same is true of works for which the copyright has expired, and of works which prior to January 1978 were sold or disseminated without proper notice of copyright.

There is a danger, however, of acting unlawfully when one photocopies without permission works which are covered by the Act. The Act applies to all "original works of authorship" in written (or other tangible) form, from the moment the work is created, whether it was created before or after January 1, 1978 and whether or not it has been published.

But even copyrighted materials may be photocopied without permission from, or payment to, the copyright owner, if it is a "fair use," a doctrine recognized by American courts for nearly a century and a half whose principal purpose is to protect the public interest in the dissemination of knowledge. This doctrine is endorsed in the text of the Act, which explicitly refers to the allowable reproduction of copyrighted works for purposes such as "criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research."

Congress appreciated the impossibility of announcing in a statute an exact quantitative measure that would distinguish copying which is a fair use from copying which is an infringement. Rather, the Act provides factors to be considered:

- The purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes;

- The nature of the copyrighted work;
- The amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
- The effect of the use upon the potential market for or value of the copyrighted work.

The making of a single copy of copyrighted material for a teacher's personal use in teaching, scholarship or research will almost always be a fair use. More difficult questions arise when multiple copies are made for distribution to students. Certainly, the risk of infringement increases in proportion to the amount of copyrighted material that is photocopied and the extent that the photocopying replaces what would otherwise be a purchase of copies of the work from trade sources by (or for) the students. Thus, the making of multiple photocopies of an entire or of a substantial part of an article will raise serious question as to whether such a use is "fair," while the reproduction of five pages of an article of 25 or 30 pages will generally be regarded as privileged. A teacher should try to avoid making multiple photocopies of copyrighted material that is not truly important for that teacher's pedagogical needs.

In any event, students receiving such photocopied material should be charged no more than is necessary to cover the cost of photocopying and processing. During Congressional deliberations on the Act, a group of educational associations and commercial publishers developed a set of guidelines that purport to announce the minimum reach of the fair use doctrine as applied to educational photocopying. The guidelines are set forth below. In the report by the House committee submitting the copyright bill, these guidelines were said to constitute a "reasonable" construction of the fair use doctrine. Several misconceptions about these guidelines have developed and should be dispelled.

Although some have read the guidelines as imposing limits upon educational photocopying, in fact they prohibit nothing. They purport to state only the minimum protection of the fair use doctrine and announce a "safe harbor" within which a teacher is assured of protection against claims of infringement. The guidelines acknowledge that there may be allowable photocopying beyond that which is set forth; they do not purport to state where the fair use privilege ends.

Although some have treated the guidelines as though they have the status of legislation, that is not true either. The text of the Act, strengthened in committee deliberations, explicitly refers to "teaching (including multiple copies for classroom use)" as a classic situation in which the fair use doctrine applies. This is the statutory text Congress had before it when it voted, and it is the statutory text that the courts will construe. The extent to which the privately-developed "guidelines" will preempt other "reasonable" interpretations of fair use is a judicial question.

A teacher should consider the potential consequences of an incorrect decision. If the teacher elects not to photocopy in circumstances constituting fair use, students must find the material in the library or elsewhere. Techniques for increasing student access to limited materials will vary; the question of permissible library photocopying for "reserve" purposes raises issues not addressed here.

If a teacher decides to photocopy for classroom use, the possible legal sanctions for an incorrect decision may be appreciated. Book publishers have declared and demonstrated their intention to sue faculty members, universities, and copy centers for copyright infringement. As a general rule, a copyright infringer is liable for damages, measured by the loss of profits to the copyright owner and any additional profits acquired by the infringer. Since in the academic setting there will not generally be profits to the teacher or school, damages will be measured by the likely loss in sales of the copyrighted work, normally an uncertain figure. For this reason, the Act permits the copyright owner to sue for "statutory damages" in lieu of actual damages, and the court is given discretion to enter an award between $250 and $10,000 (which may be increased to $50,000 for willful violations). If, however, a teacher had reasonable grounds to believe that the photocopying was a fair use, he/she is not liable for statutory damages (although he or she may be liable for actual damages). In all cases, the court may issue an order against the teacher or the educational institution barring future infringements.

Without regard to legal implications, a teacher should be sensitive to the dictates of good practice and courtesy in the use of copyrighted material. Authors and copyright owners appreciate notification that uses are being made of their work. It is common for the copyright owner to permit substantial photocopying for educational purposes, provided that the author and copyright owner are identified and proper copyright notice is affixed.

Questions regarding the application of the Copyright Act in specific situations should be addressed to the Office of the General Counsel.

## Guidelines

1. Single Copying for Teachers. A single copy may be made of any of the following by or for a teacher at his/her individual request for his/her scholarly research or use in teaching or preparation to teach a class:
   a. A chapter from a book;
   b. An article from a periodical or newspaper;
   c. A short story, short essay or short poem whether or not from a collective work;
   d. A chart, graph, diagram, drawing, cartoon or picture from a book, periodical, or newspaper.
2. Multiple Copies for Classroom Use. Multiple copies (not to exceed in any event more than one copy per pupil in a course) may be made by or for the teacher giving the course for classroom use or discussion provided that:
   a. The copying meets the tests of brevity and spontaneity as defined below; and
   b. Meets the cumulative effect test as defined below; and
   c. Each copy includes a notice of copyright.

## Definitions

Brevity

a. Poetry: (1) A complete poem if less than 250 words and if printed on not more than two pages, or (2) from a longer poem, an excerpt of not more than 250 words.
b. Prose: (1) Either a complete article, story or essay of less than 2,500 words, or (2) an excerpt from any prose work of not more than 1,000 words or ten percent of the work, whichever is less, but in any event a minimum of 500 words.
c. Each of the numerical limits stated in "a" and "b" above may be expanded to permit the completion of an unfinished line of a poem or of an unfinished prose paragraph.
d. Illustration: One chart, graph, diagram, drawing, cartoon or picture per book or per periodical issue.
e. "Special" works: Certain works in poetry, prose or in "poetic prose" that often combine language with illustrations and are intended sometimes for children and at other times for a more general audience fall short of 2,500 words in their entirety. Paragraph "b"

above notwithstanding, such "special works" may not be reproduced in their entirety; however, an excerpt comprising not more than two of the published pages of such special work and containing not more than ten percent of the words found in the text thereof may be reproduced.

Spontaneity

a. The copying is at the instance and inspiration of the individual teacher, and

b. The inspiration and decision to use the work and the moment of its use for maximum teaching effectiveness are so close in time that it would be unreasonable to expect a timely reply to a request for permission.

Cumulative Effect

a. The copying of the material is for only one course in the school in which the copies are made.

b. Not more than one short poem, article, story, essay or two excerpts may be copied from the same author, nor more than three from the same collective work or periodical volume during one class term.

c. There shall not be more than nine instances of such multiple copying for one course during one class term. [The limitations stated in "b" and "c" above shall not apply to current news periodicals and newspapers and current news sections of other periodicals.]

3. Prohibitions as to the above. Notwithstanding any of the above, the following shall be prohibited:

a. Copying shall not be used to create or to replace or substitute for anthologies, compilations or collective works. Such replacement or substitution may occur whether copies of various works or excerpts there from are accumulated or are reproduced and used separately

b. There shall be no copying of or from works intended to be "consumable" in the course of study or of teaching. These include workbooks, exercises, standardized tests and test booklets and answer sheets and like consumable material.

c. Copying shall not:

1. substitute for the purpose of books, publisher's reprints or periodicals;

2. be directed by higher authority;

3. be repeated with respect to the same item by the same teacher from term to term.

d. No charge shall be made to the student beyond the actual cost of the photocopying.

(See page 6 - Almanac, May 23, 1989 (https://almanac.upenn.edu/archive/v35pdf/n36/052389.pdf))

# V.G. Protocols for the University Archives and Records Center

*(Source: Office of the President, Almanac, January 23, 1990 and Resolution of the Trustees, June 22, 1990 (https://archives.upenn.edu/digitized-resources/docs-pubs/trustees-minutes/minutes-1990/june-22/); revised, Office of the Provost, February 2, 2023)*

## I. Mission

The University of Pennsylvania, acting through its University Archives and Records Center, recognizes its responsibility to the academic community and to the public for the orderly retention and disposition of all University records, both active and inactive, and for the timeless preservation of historically significant documents and other materials which reflect the University's origins and development and the activities and achievements of its officers, faculty, students, alumni, and benefactors.

In order to meet this obligation the University Archives and Records Center has been designated the official repository of all inactive and historical records of the University's administrative offices, academic departments, committees, and student groups. Documentation is sought for all aspects of University life. The University Archivist organizes and supervises the deposit and servicing of inactive records in the Records Center and the eventual permanent conveyance of historical materials to the Archives. The purpose of the records management program is to provide records retention and retrieval services which assist the faculty and administrative staff in the ongoing operation of the University. The purpose of the archives program is to collect, preserve and make accessible materials of historical value. Thus it serves scholars interested in the history of the University, institutions of higher learning in the United States, American intellectual life, and the Philadelphia community in which the University lives. In addition to the University's administrative records, the Archives and Records Center shall also collect the personal and professional papers of University officers, faculty, students, alumni, and benefactors and the papers of individuals and organizations where the subject matter of the collection is particularly relevant to University history.

The Archives and Records Center shall provide appropriate facilities for the retention, preservation and servicing of its holdings. Inactive records remain the property of the office of their origin and are made accessible only to authorized representatives of that office. Historical materials are the property of the Archives and Records Center and are made accessible to scholars and the community at large in accordance with University access policy. By making its historical collections accessible, by encouraging their use for historical research and scholarship and by entering into cooperative relationships with other archival and records management agencies and institutions, the Archives and Records Center shall serve as an educational resource center within the University of Pennsylvania, a place to stimulate and nourish creative teaching and learning.

## II. Administrative Mandate

The Trustees of the University of Pennsylvania, recognizing the need for formal archival and records management policy, hereby adopt the following policy and procedures for the collection, retention, preservation, and servicing of University records:

1. Responsibility for assuring that historically significant materials shall be preserved and permanently retained at the University of Pennsylvania lies with a single administrative unit, the University Archives and Records Center. The successful collection of all such records requires that one office, with University-wide purview, manage their progression through the several stages — active, inactive and archival — of their life cycle. In general, active records are those in use in the office in which they were created; inactive records are those placed under finite-term retention at a records center facility, and archival records are those of historical significance retained permanently in a repository open to research.

2. Any papers or other records generated or received by the administrative and academic offices of the University in the conduct of their business — including all official printed material, reports, record books, minutes, committee files, financial records,

correspondence, and associated papers — are the property of the University and may become archival material. The definition of University records shall also extend to forms other than paper, such as prints, photographs, microfilm, motion picture film, audio and video formats, digital, and electronic records.

3. All administrative officers of the University, including those members of the Faculty who, by virtue of administrative responsibilities either of a continuing or occasional nature, possess University records relating to their official duties, are to observe the following policy and procedures:

   a. Provision shall be made for efficient and economic records control by all University administrative offices and the University Archives and Records Center. Records shall be regularly surveyed, inventoried and appraised to determine retention value. Active records shall be retained by the office of origin; inactive records will be transferred to the Records Center and placed on finite-term retention schedules. The officer in charge of each administrative or academic office, in consultation with the University Archivist, shall be responsible for deciding how long both active and inactive papers shall be retained in and under the direct control of the office of origin. Inactive records transferred to the Records Center shall remain the property of the office of origin and shall be accessible only to authorized representatives of that office.

   b. University records may not be destroyed or placed in inactive storage at a site other than one designated by the Records Center without the joint approval of the senior officer in the office of origin and the University Archivist. Should these individuals be unable to agree on retention value, disposition shall be stayed pending review and final determination by the Advisory Committee on the University Archives and Records Center, as defined in paragraph seven below.

4. The University Archivist, in accordance with prevailing collections and access policies, shall be responsible for the appraisal of inactive University records for their historical significance. The University Archivist shall determine which such materials shall be permanently retained by the Archives, shall grant and limit access to the collections and shall establish and administer other public service policies and procedures as necessary. Historically significant records transferred to the University Archives for permanent retention shall become the property of the University Archives and Records Center.

5. The University Archives and Records Center shall be an administrative department within the Penn Libraries. The University Archivist is responsible for long-range planning and for hiring, training and supervising departmental staff. The University Archivist is accountable for the successful performance of all departmental services: records management, development of archival collections, cataloguing and other technical services, access, and other public services. The University Archivist shall review and have decision making power over University records which may be offered to or found in any of the multiple archival repositories at the University. The University Archivist shall establish intellectual access to all such repositories through the maintenance of shared collection catalogues and finding aids.

6. The University Archives and Records Center, as the official repository for all University records, including confidential records, shall provide appropriate facilities for their retention and preservation. The University Archives and Records Center shall be provided financial and personnel resources sufficient to maintain services at the level of comparable university archives and records management operations.

7. In order to facilitate these protocols an independent Advisory Committee on the University Archives and Records Center shall be established and shall have the following responsibilities:

   a. to advise the Penn Libraries or University Archivist on institutional support and initiatives required to fulfill archival and records management policy;

   b. to advise the University Archivist on the implementation of this policy; and

   c. in particular, to resolve substantive issues which may arise regarding access and collections policy and when necessary, to advise the Penn Libraries or University Archivist on the modification of these policies.

The Committee shall be composed of ten members: one representative each from the offices of the President, the Secretary of the University, the Provost, and the General Counsel; three members of the standing faculty appointed by the Senate Executive Committee to serve overlapping three-year terms; and three members of the standing faculty appointed by the President, also to serve overlapping three-year terms. The President shall appoint the Committee Chair.

The Committee shall meet at the call of the University Archivist or the Chair. It shall meet a minimum of once per semester.

# III. Collections Policy

The University Archivist and staff of the University Archives and Records Center shall actively seek, identify and acquire historically significant materials in the following categories:

1. University administrative records, including, but not limited to: correspondence, memoranda, minutes, summary financial records, academic research, curriculum, contracts, reports, subject files, published materials, photographs, and any other material generated or received by the administrative and academic offices of the University in the conduct of their business. These records shall be collected in accordance with the University-wide archives and records management program, in which all records pass through active and inactive phases prior to appraisal for historical significance.

2. Materials which document the life of the University community, including student activities, alumni organizations, organizations of faculty and administrators, and other University related groups. Such materials are essential complements to official University records. They may take a variety of physical, digital, and electronic forms, including books, news clippings, manuscripts, maps and posters, motion picture films, audio and video, and artifacts and objects.

3. The personal and professional papers of prominent people associated with the University, including University officers, faculty, students, alumni, and benefactors. These manuscript collections may include materials relating to issues of historical significance outside higher education as well as professional academic activities, research and teaching, and educational theories and practices during the lifetime of the University. This collecting mandate shall also extend to the papers of individuals and organizations where the subject matter of the collection is particularly relevant to the history of the University, institutions of higher learning in the United States, American intellectual life, and the Philadelphia community in which the University lives.

The deposit, transfer or donation of records and other materials to the Archives and Records Center shall follow specific procedures established by the University Archivist. In the case of deposit of University records at the Records Center, the office or individual of origin does not relinquish

control of the materials. In the case of transfer of University records for permanent retention at the Archives, the office or individual of origin relinquishes all rights to the materials. In cases where the materials are donated to the University, the donor usually relinquishes all rights, including copyright and literary rights. Donor restrictions are acceptable in special cases.

## IV. Access Policy

The historical collections of the University Archives and Records Center are open for research to all members of the University community, to visiting scholars and to the scholarly public. The University encourages the use of these collections through the dissemination of descriptive catalogues and the provision of public services at the Archives.

Access to certain classes of records, however, is restricted. Access to restricted records may be requested by written appeal to the Director of the University Archivist.

The following types of records generally will be closed:

- all administrative records of the University for twenty-five years from the date of their creation, with certain exceptions, such as those which must be open in conformance with law;
- records of a sitting administration;
- records the disclosure of which might expose the University to legal liability.

The following types of records will be absolutely closed:

- individual education records of living students or living former students, as defined by the Family Educational Rights and Privacy Act of 1974, as amended, unless the student or former student grants access in writing (in accordance with the University "Confidentiality of Student Records (https://catalog.upenn.edu/pennbook/confidentiality-student-records/)" as published in the *PennBook* and *Almanac*);
- individual employment records of living current or former faculty members, administrators or other staff members, including records which concern hiring, appointment, promotion, tenure, salary, performance, termination or other circumstances of employment, unless the faculty member, administrator, or staff member grants access in writing (in accordance with University Confidentiality of Records Policy No. 201 (https://www.hr.upenn.edu/policies-and-procedures/policy-manual/other-policies/confidentiality-of-records/));
- other records where usage might constitute an invasion of privacy;
- records the use of which has been restricted by Deed of Gift.

Requests to photocopy or otherwise reproduce restricted records generally will be denied.

Appeals to gain access to restricted records shall be conducted in the following manner:

1. a researcher seeking access to restricted records shall complete a "Restricted Records Access Request" form;
2. the University Archivist shall review each request with the Advisory Committee on the University Archives and Records Center; the Advisory Committee is composed of ten members: one representative each from the offices of the President, the Secretary of the University, the Provost and the General Counsel; and six members of the standing faculty;

3. the Advisory Committee shall base its decisions on the merits of each case, weighing the needs of scholarship against the privacy rights of individuals and the legal interests of the University; the Committee must be satisfied that a researcher seeking access to restricted records has demonstrated that the records are required to carry out a legitimate scholarly research project or for other appropriate use; in all cases, the decision of the Committee shall be fair and reasonable, permitting the greatest possible access, given the limitations imposed by legal and ethical considerations;
4. in order to come to such a decision, the Advisory Committee shall meet, review the research proposal of the scholar petitioning for access, examine the materials to which he or she is requesting access and discuss the case; in cases where the materials are voluminous, the University Archivist shall review them and summarize their nature and content for the Committee, presenting individual documents of particular concern; in cases of requests for innocuous materials, a less formal review process may be invoked, consisting of a telephone or electronic poll by the University Archivist;
5. the Advisory Committee may act as a whole in its review and decision making or may delegate to a sub-committee of its own members the power to implement this policy; the decisions of the Advisory Committee shall be final.

# V.H. Policy on Acceptable Use of Electronic Resources

*(Source: Office of the Provost,* Almanac, April 29, 1997 *(https://almanac.upenn.edu/archive/v43/n32/accept.html))*

## Summary

This policy defines the boundaries of "acceptable use" of limited University electronic resources, including computers, networks, electronic mail services and electronic information sources, as detailed below. It includes by reference a self-contained compilation of specific rules that can be modified as the electronic information environment evolves.

The policy is based on the principle that the electronic information environment is provided to support University business and its mission of education, research and service. Other uses are secondary. Uses that threaten the integrity of the system; the function of non-University equipment that can be accessed through the system; the privacy or actual or perceived safety of others; or that are otherwise illegal are forbidden.

By using University electronic information systems, you assume personal responsibility for their appropriate use and agree to comply with this policy and other applicable University policies, as well as City, State and Federal laws and regulations, as detailed below.

The policy defines penalties for infractions, up to and including loss of system access, employment termination or expulsion. In addition, some activities may lead to risk of legal liability, both civil and criminal.

Users of electronic information systems are urged in their own interest to review and understand the contents of this policy.

## Purposes

The University of Pennsylvania makes computing resources (including, but not limited to, computer facilities and services, computers, networks, electronic mail, electronic information and data, and video and voice services) available to faculty, students, staff, registered guests, and the

general public to support the educational, research and service missions of the University.

When demand for computing resources may exceed available capacity, priorities for their use will be established and enforced. Authorized faculty and staff may set and alter priorities for exclusively local computing/networking resources. The priorities for use of University-wide computing resources are:

*Highest:* Uses that directly support the educational, research and service missions of the University.

*Medium:* Other uses that indirectly benefit the education, research and service missions of the University, as well as and including reasonable and limited personal communications.

*Lowest:* Recreation, including game playing.

*Forbidden:* All activities in violation of the General Standards or prohibited in the *Specific Rules* interpreting this policy.

The University may enforce these priorities by restricting or limiting usages of lower priority in circumstances where their demand and limitations of capacity impact or threaten to impact usages of higher priority.

# Implied consent

Each person with access to the University's computing resources is responsible for their appropriate use and by their use agrees to comply with all applicable University, School, and departmental policies and regulations, and with applicable City, State and Federal laws and regulations, as well as with the acceptable use policies of affiliated networks and systems (See Appendices to *Specific Rules*).

*Open Expression in the Electronic Information Environment:* The rights to freedom of thought, inquiry and expression, as defined in the University's Guidelines on Open Expression (http://catalog.upenn.edu/pennbook/open-expression/), are paramount values of the University community. The University's commitment to the principles of open expression extends to and includes the electronic information environment, and interference in the exercise of those rights is a violation of this policy and of the Guidelines on Open Expression (http://catalog.upenn.edu/pennbook/open-expression/). As provided in the Guidelines (http://catalog.upenn.edu/pennbook/open-expression/), in case of conflict between the principles of the Guidelines on Open Expression (http://catalog.upenn.edu/pennbook/open-expression/) and this or other University policies, the principles of the Guidelines (http://catalog.upenn.edu/pennbook/open-expression/) take precedence.

*General Standards for the Acceptable Use of Computer Resources:* Failure to uphold the following General Standards for the Acceptable Use of Computer Resources constitutes a violation of this policy and may be subject to disciplinary action.

The General Standards for the Acceptable Use of Computer Resources require:

- Responsible behavior with respect to the electronic information environment at all times;
- Behavior consistent with the mission of the University and with authorized activities of the University or members of the University community;
- Respect for the principles of open expression;

- Compliance with all applicable laws, regulations, and University policies;
- Truthfulness and honesty in personal and computer identification;
- Respect for the rights and property of others, including intellectual property rights;
- Behavior consistent with the privacy and integrity of electronic networks, electronic data and information, and electronic infrastructure and systems; and
- Respect for the value and intended use of human and electronic resources.

Enforcement and Penalties for Violation:  Any person who violates any provision of this policy, of the *Specific Rules* interpreting this policy, of other relevant University policies, or of applicable City, State, or Federal laws or regulations may face sanctions up to and including termination or expulsion. Depending on the nature and severity of the offense, violations can be subject to disciplinary action through the Student Disciplinary System or disciplinary procedures applicable to faculty and staff.

It may at times be necessary for authorized systems administrators to suspend someone's access to University computing resources immediately for violations of this policy, pending interim resolution of the situation (for example by securing a possibly compromised account and/or making the owner of an account aware in person that an activity constitutes a violation). In the case of egregious and continuing violations suspension of access may be extended until final resolution by the appropriate disciplinary body.

System owners, administrators or managers may be required to investigate violations of this policy and to ensure compliance.

# Amendment

Formal amendment of the General Standards of Acceptable Use of Computing Resources or other aspects of this policy may be promulgated by the Provost following consultation with the University Council Committee on Communications, publication "For Comment" in *Almanac*, a reasonable waiting period, and publication "Of Record" in *Almanac*.

# Interpreting this Policy

As technology evolves, questions will arise about how to interpret the general standards expressed in this policy. The Vice President for Information Systems and Computing shall, after consultation with the University Council Committee on Communications, and subject to the same waiting period and publication provisions as above, publish specific rules interpreting this policy.

# Waiver

When restrictions in this policy interfere with the research, educational or service missions of the University, members of the University community may request a written waiver from the Vice President for Information Systems and Computing (http://www.upenn.edu/computing/isc/) (or designee).

# Further Information

For further information about University computing regulations or Commonwealth of Pennsylvania and Federal computing laws, contact the University Information Security Officer at (215) 898-2172 or send email to: security@isc.upenn.edu.

# Specific Rules Interpreting the Policy on Acceptable Use of Electronic Resources

The following specific rules apply to all uses of University computing resources. These rules are not an exhaustive list of proscribed behaviors, but are intended to implement and illustrate the General Standards for the Acceptable Use of Computer Resources, other relevant University policies, and applicable laws and regulations. Additional specific rules may be promulgated for the acceptable use of individual computer systems or networks by individual Schools, departments, or system administrators.

## Content of Communications

- Except as provided by applicable City, State, or Federal laws, regulations or other University policies, the content of electronic communications is not by itself a basis for disciplinary action.
- Unlawful communications, including threats of violence, obscenity, child pornography, and harassing communications (as defined by law), are prohibited.
- The use of University computer resources for private business or commercial activities (except where such activities are otherwise permitted or authorized under applicable University policies), fundraising or advertising on behalf of non-University organizations, or the reselling of University computer resources to non-University individuals or organizations, and the unauthorized use of the University's name, are prohibited. The Vice President for Information Systems (or designee) may specify rules and specific forums where limited use of University resources for non-recurring exchange and sale of personal items is permitted.

## Identification of Users

Anonymous and pseudonymous communications are permitted except when expressly prohibited by the operating guidelines or stated purposes of the electronic services to, from, or through which the communications are sent. However, when investigating alleged violations of the Guidelines on Open Expression (http://catalog.upenn.edu/pennbook/open-expression/), the Committee on Open Expression may direct the University's Information Security Officer, or an authorized system administrator, to attempt to identify the originator of anonymous/pseudonymous messages, and may refer such matters to appropriate disciplinary bodies to prevent further distribution of messages from the same source.

The following activities and behaviors are prohibited:

- Misrepresentation (including forgery) of the sender's identity or an electronic communication's source;
- Acquiring or attempting to acquire passwords of others;
- Using or attempting to use the computer accounts of others;
- Alteration of the content of a message originating from another person or computer with intent to deceive; and
- The unauthorized deletion of another person's news group postings.

## Access to Computer Resources

The following activities and behaviors are prohibited:

- The use of restricted-access University computer resources or electronic information without or beyond one's level of authorization;

- The interception or attempted interception of communications by parties not explicitly intended to receive them;
- Making University computing resources available to individuals not affiliated with the University of Pennsylvania without approval of an authorized University official;
- Making available any materials the possession or distribution of which is illegal;
- The unauthorized copying or use of licensed computer software;
- Unauthorized access, possession, or distribution, by electronic or any other means, of electronic information or data that is confidential under the University's policies regarding privacy or the confidentiality of student, administrative, personnel, archival, or other records, or as defined by the cognizant Data Steward;
- Intentionally compromising the privacy or security of electronic information; and
- Intentionally infringing upon the intellectual property rights of others in computer programs or electronic information (including plagiarism and unauthorized use or reproduction).

## Operational integrity

The following activities and behaviors are prohibited:

- Interference with or disruption of the computer or network accounts, services, or equipment of others, including, but not limited to, the propagation of computer "worms" and "viruses", the sending of electronic chain mail, and the inappropriate sending of "broadcast" messages to large numbers of individuals or hosts;
- Failure to comply with requests from appropriate University officials to discontinue activities that threaten the operation or integrity of computers, systems or networks, or otherwise violate this policy;
- Revealing passwords or otherwise permitting the use by others (by intent or negligence) of personal accounts for computer and network access;
- Altering or attempting to alter files or systems without authorization;
- Unauthorized scanning of networks for security vulnerabilities;
- Attempting to alter any University computing or networking components (including, but not limited to, bridges, routers, and hubs) without authorization or beyond one's level of authorization;
- Unauthorized wiring, including attempts to create unauthorized network connections, or any unauthorized extension or re-transmission of any computer or network services;
- Intentionally damaging or destroying the integrity of electronic information;
- Intentionally disrupting the use of electronic networks or information systems;
- Intentionally wasting human or electronic resources; and
- Negligence leading to the damage of University electronic information, computing/networking equipment and resources.

## Appendices

### Relevant University policies

This Acceptable Use Policy incorporates and supersedes the earlier Policy on Ethical Behavior with Respect to the Electronic Information Environment. The use of computing resources is also required to conform to the following University policies:

- Code of Student Conduct (http://catalog.upenn.edu/pennbook/code-of-student-conduct/)

- Guidelines on Open Expression (http://catalog.upenn.edu/pennbook/open-expression/)

In addition, specific policies of the University's Schools, departments, computer systems and networks, and other general University policies and regulations are also applicable to the use of computer resources. These policies include, but are not limited to, the following:

- Patent Policy (http://catalog.upenn.edu/pennbook/patent-tangible-research-property-policies-procedures/)
- Copyright Policy (p. 133)
- Computer Software Policy (http://www.upenn.edu/almanac/v45/n08/copy.html)
- Policy on the Uses of University Resources (https://www.hr.upenn.edu/policies-and-procedures/policy-manual/other-policies/uses-of-university-resources/)
- Policy on Confidentiality of Student Records and Information (http://catalog.upenn.edu/pennbook/confidentiality-student-records/)
- Policy Regarding Faculty Misconduct in Research (p. 61)
- Policy on Privacy in the Electronic Environment (http://catalog.upenn.edu/pennbook/policy-privacy-electronic-environment/)
- Code of Academic Integrity (http://catalog.upenn.edu/pennbook/code-of-academic-integrity/)
- Protocols for human subjects research: any research involving human subjects must be approved by the Committee on Studies Involving Human Beings
- Acceptable Use Policies of individual Schools, departments, computer systems, and networks
- Guidelines for Administrators of Penn E-mail Systems (https://provider.www.upenn.edu/computing/email/admin-guidelines.html)

### Applicable laws

Computer and network use is also subject to Pennsylvania and Federal laws and regulations. Suspected violations of applicable law are subject to investigation by University and law enforcement officials. Among the applicable laws are:

- *Federal Copyright Law:* U.S. copyright law grants authors certain exclusive rights of reproduction, adaptation, distribution, performance, display, attribution and integrity to their creations, including works of literature, photographs, music, software, film and video. Violations of copyright laws include, but are not limited to, the making of unauthorized copies of any copyrighted material (such as commercial software, text, graphic images, audio and video recordings) and distributing copyrighted materials over computer networks or through other means.
- *Federal Wire Fraud Law:* Federal law prohibits the use of interstate communications systems (phone, wire, radio, or television transmissions) to further an illegal scheme or to defraud.
- *Federal Computer Fraud and Abuse Law:* Federal law prohibits unauthorized access to, or modification of information in computers containing national defense, banking, or financial information.
- *Federal and Pennsylvania Child Pornography Laws:* Federal and Pennsylvania laws prohibit the creation, possession, or distribution of graphic depictions of minors engaged in sexual activity, including computer graphics. Computers storing such information can be seized as evidence.
- *Pennsylvania Computer Crime Law:* Pennsylvania law prohibits access to any computer system or network with the intent to interrupt an

organization, or to perpetrate a fraud including the intentional and unauthorized publication of computer passwords.

- *Pyramid Schemes/Chain Letters:* It is a violation of the Federal Postal Lottery Statute to send chain letters which request sending money or something of value through the US mail. Solicitations through electronic messaging are also illegal, if they require use of US mail for sending money/something of value.
- *Defamation:* Someone may seek civil remedies if they can show that they were clearly identified as the subject of defamatory messages and suffered damages as a consequence. Truth is a defense against charges of defamation.
- *Common law actions for invasion of privacy:* Someone may take seek civil remedies for invasion of privacy on several grounds.
- *Public disclosure of private facts:* the widespread disclosure of facts about a person, even when true, may be deemed harmful enough to justify a lawsuit.
- *False light:* a person wrongfully attributes views or characteristics to another person in ways that damage that person's reputation.
- *Wrongful intrusion:* the law often protects those areas of a person's life in which they can reasonably expect they will not be intruded upon.

# V.I. Policy on Privacy in the Electronic Environment

*(Source: University Council Resolution, April 26, 2000; Office of the Provost,* Almanac, September 19, 2000 *(https://almanac.upenn.edu/archive/v47/n04/OR-eprivacy.html))*

## I. Preliminary Observations

The University affirms that the mutual trust and freedom of thought and expression essential to the academic mission of a university rest on an expectation of privacy, and that the privacy of those who work, study, teach, and conduct research in a university setting will be respected. The University recognizes that as faculty, staff and students create, use and store more information in electronic form, there is growing concern that information the user or creator considers private may be more vulnerable to invasion than information stored in more traditional media. This policy is intended to highlight some general principles that should help to define the expectations of privacy of those in the University community. While no document addressing the fluid issue of technology can be exhaustive or inflexibly dictate outcomes in all circumstances, this policy attempts to articulate current practices and provide guidance, so that individuals may make informed and appropriate decisions concerning their various interactions in the electronic environment.

Before addressing these issues, it should also be noted that in carrying out their operations, various departments of the University accumulate information about members of its community, e.g., for purposes of payroll, employment or enrollment. Data are also created, though not necessarily compiled or retained on a personally identifiable basis, as an incident to the use of technology, e. g. , the charging of purchases on Penn Card or the borrowing of library books. The University does not condone disclosure or release of such personal information stored or transmitted through University systems, except for legitimate University purposes as outlined in this policy.

Those responsible for maintaining the University's computers and electronic networks have an important and special responsibility to recognize when they may be dealing with sensitive or private information. They may access such information without the user's consent and

without obtaining higher level approval, but only when necessary to fulfill their official responsibilities, and they are expected to carry out their duties in ways that are not unreasonably intrusive. They will be subject to disciplinary action if they misuse their access to personally identifiable data or to individuals' personal files, e-mail and voice mail or otherwise knowingly act in ways counter to University policies and applicable laws.

Finally, this policy should be understood in light of the many other University policies and laws that bear on individuals' rights to privacy and the institution's responsibilities with respect to information in its possession about individuals.

Examples of applicable laws include the Family Educational Rights and Privacy Act of 1974 (the "Buckley Amendment"), the Electronic Communications Privacy Act of 1986, and medical records regulations promulgated under the Health Insurance Portability and Accountability Act of 1996. Examples of applicable University policies include the Acceptable Use Policy for the Electronic Environment, Administrative Computing Security Policy, Policy for Closed Circuit Television Monitoring and Recording of Public Areas for Safety and Security Purposes and policies on Records Confidentiality and Safeguarding University Assets.

## II. Policy on Information Created, Stored or Transmitted Through University Electronic Media

A. In General:

The University provides computers, computer and e-mail accounts, networks and telephone systems to faculty members, staff and students for the purpose of furthering the University's academic mission and conducting University business. While incidental and occasional personal use of such systems, including e-mail and voice mail, is permissible, personal communications and files transmitted over or stored on University systems are not treated differently from business communications; there can be no guarantee that such personal communications will remain private or confidential (see Appendix at the end of this policy).

As is the case for information in non-electronic form stored in University facilities, the University's need for information will be met in most situations by simply asking the author or custodian for it. The University reserves the right, consistent with this policy, to access, review and release electronic information that is transmitted over or stored in University systems or facilities. When questions arise about such access, review or release of information, the University commits to treat electronic information no differently from non-electronic information. As with paper information, it is often the case by custom or rule that electronic files are shared and properly accessible by multiple parties in office settings. Where that is the case, the special provisions for access and notification outlined here need not be followed. In other cases, properly authorized University officials including the Vice President for Audit and Compliance and the Information Security Officer may access e-mail, voice mail or computer accounts without the consent of the assigned user when there is a reasonable basis to believe that such action

1. Is necessary to comply with legal requirements or process, or
2. May yield information necessary for the investigation of a suspected violation of law or regulations, or of a suspected serious infraction of University policy (for example alleged research misconduct, plagiarism or harassment), or
3. Is needed to maintain the integrity of University computing systems, or

4. May yield information needed to deal with an emergency, or
5. In the case of staff, will yield information that is needed for the ordinary business of the University to proceed.

Except as may otherwise be dictated by legal requirements, individuals will be notified of access to, or disclosure of, the contents of their e-mail, voice mail or their computer accounts as soon as practicable. In cases where such notification might jeopardize an ongoing investigation of suspected wrongdoing it may be delayed until the conclusion of the investigation. The Office of General Counsel is responsible for maintaining an official record of e-mail searches performed by authorized parties.

B. Faculty:

The University has the utmost respect for the freedom of thought and expression that are at the core of Penn's academic mission. Whenever possible, therefore, the University shall resolve any doubts about the need to access a University computer or other systems in favor of a faculty member's privacy interest. Computer files, e-mail and voice mail created, stored, transmitted or received by faculty shall be afforded the same level of privacy as the contents of their offices. The Policy on Safeguarding University Assets governs access to faculty records in connection with investigations carried out by the University's Office of Audit and Compliance, and provides for prior consultation with the Provost and Faculty Senate and for notifying the subject of a search of any files or materials taken during an investigation. Except as may otherwise be dictated by legal requirements, the procedures outlined in that policy shall be followed with respect to a faculty member's computer files, e-mail or voice mail in connection with other investigations or proceedings.

C. Staff:

It is generally not University policy to access staff members' electronically stored information. As noted above, the University's need for information shall normally be met by asking an employee for it. Properly authorized University officials, including supervisors acting with the consent of their management, may, however, access, review and release the contents of staff computer files, e-mail or voice mail transmitted over or stored on University systems when, for example, an employee is absent or has left the University and the information is not available elsewhere, or in other situations in which it is necessary if the ordinary business of the University is to proceed. In more complicated situations - where, for example, a supervisor believes University resources are being misused - he/she should consult with senior administrators, the Division of Human Resources, or the Office of General Counsel.

D. Students:

Students are provided e-mail and computer accounts for use primarily in connection with their academic activities. While the University does not generally monitor or access the contents of a student's e-mail or computer accounts, it reserves the right to do so. However, access to and disclosure of a student's e-mail messages and the contents of his/her computer accounts may only be authorized by any one of the dean of the student's School or his/her designate, the Vice Provost for University Life, or the Office of Audit and Compliance, in consultation with the Office of General Counsel.

E. Multiple Affiliations:

Some individuals have multiple University affiliations (e. g. students employed by the University). When the need for access to information arises from a particular status, the provisions above for that status

shall be applied. In other cases, the provisions for the individual's primary status shall be applied.

## III. Violations of this Policy

Members of the University community who believe that this policy has been violated with respect to their privacy should attempt initially to resolve the issue within their unit or department, if necessary through the mediation of the leadership of their representative assembly or the University Ombudsman. Others who become aware of violations of this policy should report them to the University Information Security Officer, Office of General Counsel, Division of Human Resources or the Office of Audit and Compliance. All University offices that substantiate such violations should report them to the University Information Security Officer, who will monitor them for repeat instances and patterns. Those who violate this policy may be subject to disciplinary procedures up to and including dismissal.

## Appendix: Special Note on E-mail Privacy

Despite the best intentions of users and the University or other system operators, it is difficult, if not impossible, to assure the privacy of e-mail. E-mail is not a good medium to use for sensitive matters that one would not want disclosed. There are numerous ways that plain text e-mail may be disclosed to persons other than the addressee, including:

- Recipient's address is mistyped; message is sent to someone else.
- Recipient forwards e-mail to someone else.
- Intruders break into e-mail system and read/disclose messages.
- Despite owner's belief that he/she deleted it, e-mail continues to exist on computer hard drive or a copy is archived on tape backup; disclosure of such copies may be required in connection with judicial or administrative proceedings or government investigations.
- E-mail is observed as it travels over public networks like PennNet and the Internet.
- In addition, e-mail users may want to consider routinely or periodically deleting old messages, and encrypting personal messages. Systems administrators should consider shorter retention of backup tapes, consistent with data integrity requirements.

## V.J. Policy on Security of Electronic Protected Health Information (ePHI)

*(Source: For Comment, Vice President for Information Systems and Computing, Almanac, February 22, 2005; approved, Almanac, April 5, 2005 (https://almanac.upenn.edu/archive/volumes/v51/n27/OR-phi.html))*

HIPAA is a federal law that, among other things, focuses on protecting the privacy and security of personal health information (protected health information or PHI). This law affords certain rights to individuals regarding their PHI and imposes obligations upon many institutions that maintain such PHI. At Penn, the following entities are responsible for compliance with HIPAA privacy and security regulations: the University of Pennsylvania Health System (UPHS), the Perelman School of Medicine, the School of Dental Medicine, the Living Independently For Elders (LIFE) program, Student Health Services, and the Employee Health Benefits Plan, as well as workforce members of other Penn offices that, while offering support to these entities, access PHI (workforce members pertains to anyone assessing ePHI working with the University of Pennsylvania's Covered Components and their Shared SupportServices as an employee, volunteer, student or faculty member.).

While inextricably linked, the HIPAA security regulation is distinguished from the HIPAA privacy regulation in that it applies to electronic storage and transmission of PHI (ePHI), compared with the privacy regulation that applies to all forms of PHI and prescribes more detailed requirements for securing such data.

The ePHI security policy outlines minimum standards for ensuring the confidentiality, integrity, and availability of electronic protected health information received, maintained or transmitted by all University HIPAA Covered Components (those schools and units listed above), as well as other offices which support these entities, listed below as Support Services. Covered Components shall meet or exceed these standards by implementing the necessary administrative, physical or technical safeguards as appropriate based on their assessments of risk. Compliance by Support Services with these standards is limited to activities that directly involve the creation or receipt of ePHI in support of Covered Components and does not pertain to activities related to services provided to non-covered areas of the University.

Support Services include:

- Office of Regulatory Affairs
- Institutional Review Board (eight review boards)
- Office of General Counsel
- Office of Audit and Compliance
- University Archives and Records Center
- Office of Environmental Health and Radiation Services
- Office of Risk Management and Insurance
- Office of the President
- Office of the Provost
- Office of the Executive Vice President
- Office of Student Financial Services
- Office of Development and Alumni Relations
- Office of the Comptroller
- Office of Information Systems and Computing
- School of Nursing Office of Technology and Information Systems, Center for
- Nursing Research, and Office of Business and Finance
- VPUL Technical Support

## Exclusions

Certain data is specifically excluded from coverage under HIPAA, most importantly:

1. Student records, except for student patient data maintained at Student Health Service;
2. Employment records, except for health benefits records; and
3. Information "de-identified" under HIPAA standards.

## Exceptions

Exceptions to this policy must be documented and submitted for approval to the University Information Security Officer who shall consult with the Office of General Counsel. Appeals of decisions shall be referred to the Vice President of Information Services and Computing.

For a description of the administrative, physical and technical safeguards that should be undertaken, a definition of various terms used in the policy and a list of related policies, see page 4 - Almanac, February

22, 2005 (https://almanac.upenn.edu/archive/volumes/v51/n22/pdf_n22/022205.pdf).

# V.K. Information Systems Security Incident Response Policy

*(Source: Vice President for Information Systems and Computing and Associate Vice President for Audit, Compliance and Privacy, Almanac, January 16, 2007 (https://almanac.upenn.edu/archive/volumes/v53/n18/or.html))*

This policy defines the steps that personnel must use to ensure that security incidents are identified, contained, investigated and remedied. It also provides a process for documentation, appropriate reporting internally and externally, and communication so that organizational learning occurs. Finally, it establishes responsibility and accountability for all steps in the process of addressing computer security incidents.

Without an effective incident response process, corrective action may be delayed and harmful effects unnecessarily exacerbated. Further, proper communication allows the University key learning opportunities to improve the security of data and networks. Individuals who fail to comply are subject to sanctions as appropriate under University policies.

This policy applies to all users. It applies to any computing devices owned or leased by the University of Pennsylvania that experience a Computer Security Incident. It also applies to any computing device regardless of ownership, which either is used to store Confidential University Data, or which, if lost, stolen, or compromised, and based on its privileged access, could lead to the unauthorized disclosure of Confidential University Data. Examples of systems in scope include, but are not limited to, a User's personally owned home computer that is used to store Confidential University Data, or that contains passwords that would give access to Confidential University Data.

This policy does not cover incidents involving the University of Pennsylvania Health System (UPHS) information systems, which has a separate incident response policy. ISC Information Security will coordinate with UPHS as appropriate when UPHS computing devices, data, or personnel are involved.

For information on identifying and reporting computer security incidents, the process for handling incidents and documentation, a list of best practices, compliance, and related University policies see: www.upenn.edu/almanac/volumes/v53/n18/or.html (http://www.upenn.edu/almanac/volumes/v53/n18/or.html).

# V.L. Policy on Unauthorized Copying of Copyrighted Media

*(Source: Vice President for Information Systems and Computing, Almanac, September 15, 1992 (https://almanac.upenn.edu/archive/v39pdf/n03/091592.pdf))*

The University of Pennsylvania does not condone or tolerate the unauthorized copying of copyrighted media by staff, faculty, or students. The University shall adhere to its contractual responsibilities and shall comply with all copyright laws, and expects all members of the University community to do so as well.

Members of the University community who violate this policy may be subject to discipline through standard University procedures. An

individual or University department engaged in the unauthorized copying or use of copyrighted materials may also face civil suit, criminal charges, and/or penalties and fines. Subject to the facts and circumstances of each case, such individual or department shall be solely responsible for its own defense and any resulting liability.

(See page 3 - Almanac, September 15, 1992 (https://almanac.upenn.edu/archive/v39pdf/n03/091592.pdf))

# V.M. Confiscation of Publications

*(Source: Office of the President, Almanac, July 18, 1989 (https://almanac.upenn.edu/archive/v36pdf/n01/071889.pdf))*

The confiscation of publications on campus is inconsistent with the University's policies and procedures, and with the ideals of the University. It is inconsistent with the University's Guidelines on Open Expression, and could violate contractual arrangements between the University and other parties.

Members of the University community who are responsible for confiscating publications should expect to be held accountable.

(See page 4 - Almanac, July 18, 1989 (https://almanac.upenn.edu/archive/v36pdf/n01/071889.pdf))

# V.N. Policy on Computer Disconnection from PennNet

*(Source: Vice President for Systems and Computing, Almanac, April 20, 1999 (https://almanac.upenn.edu/archive/v45/n29/communications.html))*

**Background:** A well functioning network is critical to the research, academic and service missions of the University. Information Security has documented an increasing frequency of computer intrusions that threaten the integrity of PennNet. The capacity of entire departments to teach and conduct research has been limited as a result, and sensitive data have been at risk of unauthorized disclosure. At times, rapid response is required to protect the integrity of systems, data and those that rely on them. Inefficiency sometimes results because the owners of the penetrated machines cannot be located. Disagreements arise over the magnitude and immediacy

of the problems without a formal mechanism for resolving conflicts.

Certain types of misconfiguration of Penn systems, intentional or otherwise, can have serious and detrimental consequences. Examples include using another host's Internet Protocol address ("IP Spoofing") or misconfigured networking protocols. Normal operation of Penn computers, and even computers elsewhere on the worldwide Internet, can be compromised. Networks can become so congested that network traffic cannot get through.

**Purpose:** The goal of this policy is to prevent disruption of the University's computers and networks.

**Policy:** Information Systems and Computing (ISC) will disconnect from PennNet any computers that have actually damaged or pose an imminent threat of harming the integrity of PennNet.

**Scope:** This policy only applies to computers and devices attached directly or indirectly to PennNet, including improper or defective "daisy-

chain" connections and private Local Area Networks with active networking components connected to PennNet wall plates and hosts.

This policy does not address removing computers from PennNet for reasons related solely to their content.

**Implementation:** Systems administrators must report serious computer security incidents to the University Information Security Officer. Serious computer security incidents will be defined as those that jeopardize the integrity, privacy and/or availability of other computers and networks. Examples of serious computer security incidents include break-ins where privileged accounts (e. g. UNIX "root" account, or NT "Administrator" account) are used without authorization, incidents where network traffic is monitored without authorization, and incidents where Penn computers or networks are either the source or the target of "denial of service" attacks. The Information Security Officer shall coordinate the response to computer security incidents, including notifying campus systems administrators, law enforcement officers, external sites, incident response teams and University offices as appropriate.

**Authorized actions:** If, in the judgment of the Vice President for Information Systems and Computing or his/her designate, a system poses a significant and immediate threat either to the security of other Penn computers and networks, or the continued operation of Penn networks and computers, and the problem cannot be resolved expeditiously through collaboration between the computer owners and ISC, then ISC shall notify senior management of the department or unit and shall require the owners to remove the computer from the network until the problem is solved.

**Absent/Unidentified Owners:** If ISC is unable, using the Assignments database, to identify a system owner or Local Support Provider (LSP), ISC will move unilaterally to protect the network by disconnecting the threatening system.

**Disputes:** In cases where there is persistent disagreement between ISC and the owner of the perceived threat, ISC must notify the owner and the LSP of the following information in writing:

- The reason for the disconnection
- What steps must be taken for the network connection to be restored
- How to arrange for the system to be reconnected
- The process of appealing a decision to disconnect

When the owner of the system has taken the steps necessary to correct the problem, ISC will restore the PennNet connection as soon as possible.

**Appealing a Decision to Disconnect:** The Council Committee on Communications shall appoint a subcommittee to review appeals of decisions to disconnect computers.

The subcommittee will consist of:

- At least four members of the faculty appointed by the Committee on Communications, one of whom shall serve as chair,
- The Vice President for Information Systems and Computing or his/her designate,
- The University Information Security Officer or his/her designate,
- The Committee on Communications may designate alternates to serve on the hearings of an appeal when its appointees are unavailable.

The owner of a disconnected system who believes that the threat that the system posed is outweighed by the impact of its disconnection on

his/her academic mission may appeal the decision by documenting this belief in writing to the chair of the subcommittee. The chair or his/her designate may resolve the dispute amicably; failing this it will be heard formally by the subcommittee. The subcommittee shall resolve conflicts as rapidly as possible within the constraints of fairness. It shall establish and follow its own operating procedures.

If the subcommittee does not begin the proceedings within five working days in cases where the issue is a threat and not actual harm, or thirty working days in cases where ISC can document actual harm, the subject system must be reconnected. Once the subcommittee has begun the process, time limits shall not be imposed.

In considering appeals, the subcommittee shall balance the value of leaving machines connected against the associated risks. Its decision shall be final. The only recourse for faculty whose appeals are denied shall be to the Senate Committee on Academic Freedom and Responsibility. ISC may not appeal. However, it may redisconnect the computer and restart the entire process whenever another trigger event is detected.

System owners who believe that their freedom of expression has been unduly infringed may, under the Guidelines for Open Expression, request that the Committee on Open Expression determine if the Guidelines were properly interpreted and applied to the disconnection of their system.

For additional information, contact security@isc.upenn.edu.

# VI. Other Policies

- VI.A. Use of University Name Policy (p. 135)
- VI.B. Acceptance of Gifts, Grants and Contracts (p. 135)
- VI.C. Acceptance of Conditional Gifts (p. 136)
- VI.D. Gift Policy (p. 136)
- VI.E-F. Sexual Misconduct Policy, Resource Offices and Complaint Procedures (p. 136)
- VI.G. The University Alcohol and Other Drug Policy (p. 156)
- VI.H. Drug-Free Workplace Policy (p. 161)
- VI.I. Procedures for the Evaluation and Certification of the English Fluency of Undergraduate Instructional Personnel (p. 162)
- VI.J. Policy Prohibiting Workplace Violence (p. 164)
- VI.K. Social Security Number Policy (p. 166)

# Note on Former Policies:

- **Consensual Sexual Relations Between Faculty and Students**— Effective on July 1, 2019, the University has a new policy, Consensual Romantic and Sexual Relations in Workplace and Educational Settings, which is part of its Sexual Misconduct Policy (p. 136). The current Policy may be found in the Sexual Misconduct Policy (p. 136).
- **Sexual Harassment Policy** – Effective on July 1, 2019, the University's Sexual Harassment Policy was updated and incorporated into its new Sexual Misconduct Policy (p. 136). The current Policy may be found in the Sexual Misconduct Policy (p. 136).
- **Sexual Violence, Relationship Violence, and Stalking Policy**— Effective on July 1, 2019, the Sexual Violence, Relationship Violence, and Stalking Policy was incorporated into the Sexual Misconduct Policy (p. 136). The University's current Policy may be found in the Sexual Misconduct Policy (p. 136).

# VI.A. Use of University Name Policy

*(Source: Office of the Secretary, 1969 Handbook for Faculty and Administration; revised, Almanac, October 14, 1997; revised, Almanac, May 16, 2000; revised, Almanac, October 24, 2017 (https://almanac.upenn.edu/uploads/media/102417.pdf))*

On September 30, 1791, an act confirmed an agreement which united the University of the State of Pennsylvania with the College, Academy and Charitable School and provided that the name of the institution would be "The Trustees of the University of Pennsylvania."[1]  To facilitate communication both internally and externally, the institution's name is commonly simplified as the "University of Pennsylvania," or, more recently, "Penn."

The University regulates use of its name, the names of its schools and programs, its shield and related insignia, trademarks and logos ("insignia") to ensure that such use is related to the University's educational, service and research missions and promotes its objectives. Responsibility for overseeing use of the University's names and insignia lies with the Secretary of the University.

## Official Use

When representing the University in an official capacity, all units of the University and members of the faculty and administration must use "University of Pennsylvania" in their publications and documents. Approved University stationery must be used for official correspondence.

University names and insignia may be used in connection with any academic University program provided that the program has been approved in advance by the responsible department chair and dean or director, and Provost, as appropriate. University units, faculty, staff and student organizations that wish to use University names or insignia in connection with any non-academic University program, activity, service or product must obtain the approval of the Secretary of the University before proceeding. Requests to use University names or insignia must first be presented to the appropriate department chair and dean, director, or, in the case of student organizations, to the Vice Provost for University Life, for review. If approved by the dean, director, or Vice Provost, a request with supporting information must be submitted to the Secretary for review. The Secretary will review the proposed use and determine, in consultation with appropriate colleagues, whether it is properly related to the University's missions and whether the benefits of the proposed use outweighs any risks associated with the use. The Secretary may approve the proposed use, with or without conditions, or disapprove the proposed use.

## Licensed Uses by Outside Entities

University names or insignia may be used on products or in connection with services offered by outside entities only under license from the University. Requests for such licenses are processed jointly through the Office of the Vice President for Business Services ("Business Services") and the Penn Center for Innovation ("PCI"), and with guidance from the Office of the University Secretary.

Outside sponsors of University programs or activities often seek to use University names or insignia in promotional or advertising materials. While the University is pleased to recognize the contributions of sponsors, such recognition must not suggest University endorsement of the sponsor's activities. Therefore, University names or insignia may not be used in connection with any outside entity's name or logo without prior approval of the Secretary of the University. In general, the Secretary will approve uses which recognize or acknowledge the sponsor's contribution to the University program or activity. Uses which, in the Secretary's judgment, may suggest University endorsement or approval of the sponsor's goods or services will not be permitted.

## Private Use

University faculty, staff and students may refer to their affiliation or status with the University in connection with personal activities, including consulting, provided that the affiliation or status is accurately represented and any title or position is accurately identified, and provided that such use does not imply University endorsement of the activity. In some cases, a disclaimer of University endorsement may be required. (See, for example, Handbook for Faculty and Academic Administrators, section II.E.10 (p. 38)). Use of University insignia in connection with personal activities is prohibited. The University's name must not be used in any announcement, advertising matter, publication, correspondence, or report in connection with personal or non-University activities if such use in any way could be construed as implying University endorsement of or responsibility for any project, product, or service.

## Related Policies

All faculty, staff and students are reminded that University equipment, stationery, campus mail service, and electronic media are to be used solely for University business by authorized University personnel and by officially recognized campus organizations. See Human Resources Policy No. 003 (https://www.hr.upenn.edu/policies-and-procedures/policy-manual/other-policies/uses-of-university-resources/). Additional information on faculty and staff involvement in extramural activities and organizations can be found in the *Conflict of Interest Policy for Faculty Members, and Human Resources Policy Nos.* 005 (https://www.hr.upenn.edu/policies-and-procedures/policy-manual/other-policies/conflict-of-interest/) *and* 006 (https://www.hr.upenn.edu/policies-and-procedures/policy-manual/other-policies/guidelines-for-extramural-activities-associations-and-interest-for-staff/).

[1]  *Statutes of the Trustees of the University of Pennsylvania*, p. 1.

# VI.B. Acceptance of Gifts, Grants and Contracts

*(Source: Offices of the President and Provost, Almanac, March 21, 1978; revised, Almanac, May 23, 1978 (https://almanac.upenn.edu/archive/v24pdf/n32/052378.pdf))*

The University of Pennsylvania enjoys financial support for its programs of instruction and research from many sources, public and private; faculty and staff are encouraged to pursue such support with vigor. Programs undertaken with the aid of external funding must, however, be fully consonant with the standards, character and responsibilities of the University. Conditions for the acceptance of gifts, grants and contracts include:

1. That the purposes to be served are academically worthy, are in accord with the needs and priorities of the University, and are not impediments to the achievement of other academically worthy aims or programs;
2. That there are no conditions attached to the gift, grant or contract that would in any way jeopardize the University's commitment to the principles of academic freedom and nondiscrimination;

3. That any academic appointment supported by such gifts, grants and contracts be made only in accord with established University procedures;
4. That all established University policies fostering the free dissemination of research results (and otherwise restricting secret research) are respected; and,
5. That acceptance of the gift, grant or contract entails no University financial obligations in the present or at any time in the future except those known and judged to be worth the expenditure or financial risk.

(See page 4 - Almanac, May 23, 1978 (https://almanac.upenn.edu/archive/v24pdf/n32/052378.pdf))

# VI.C. Acceptance of Conditional Gifts

(Source: Office of the President, Almanac, September 22, 1981 (https://almanac.upenn.edu/archive/v28pdf/n03/092281.pdf))

1. All proposals for gifts to the University, including endowments and similar agreements, will be processed by the Development Office.
2. In the event a proposed gift to the University is conditional, the conditions must be in writing. The Vice President for Development and Alumni Relations shall notify the President of all substantial conditional gifts and all other gifts containing conditions that might be construed to violate University policies. The President shall then determine, as a requirement for University acceptance, whether the conditions violate University policy, including recognized principles of academic freedom. If the President has doubts in that regard, he/she shall seek the advice of the chair of the Senate Committee on Academic Freedom and Responsibility, who will consult with the Chair of the Senate.
3. The Chairs of the Senate and the Senate Committee on Academic Freedom and Responsibility may inspect the terms of any final agreement. Other members of the University community may, as needed, make requests in writing to the Vice President for Development and Alumni Relations to see the conditions of such final agreements.

(See page 2 - Almanac, September 22, 1981 (https://almanac.upenn.edu/archive/v28pdf/n03/092281.pdf))

# VI.D. Gift Policy

*(Source: Division of Human Resources, Almanac, July 17, 2007 (https://almanac.upenn.edu/archive/volumes/v54/n01/gift-policy.html))*

In order to avoid a conflict of interest or the appearance of a conflict of interest, at no time should an employee solicit or accept personal gifts from current or potential vendors, contractors or their agents, local businesses, University departments, or others with whom there is a potential or ongoing business or professional relationship. Employees may accept ordinary business courtesies, such as payment for a modest meal or event, or gifts which are promotional items without significant value and which are distributed routinely. If the value of the gift is undetermined, it should be returned.

Gratuities or gifts of money to the employee cannot be accepted at any time and should be returned immediately to the donor.

All employees are responsible for becoming familiar with and adhering to this policy. In addition, supervisors are responsible for ensuring that this policy is known by their employees and that all employees are following it.

In the decision as to whether or not to accept any gift, employees should use good judgment and avoid in all cases any actual conflict of interest or the appearance of any conflict.  For example, University officials are often offered goodwill gifts when on a mission abroad, visiting other domestic institutions, or when officials from other institutions visit Penn. Because a refusal of a gift could offend the hosting officials, such gifts can be accepted. If the gifts are of significant value (i.e. greater than $100, consistent with IRS policy), they become the property of the University and should be discussed with the head of the department.

Employees who have questions regarding this policy or who are uncertain as to whether a conflict of interest exists should confer with their supervisors or the Division of Human Resources.

# VI.E-F. Sexual Misconduct Policy, Resource Offices and Complaint Procedures

*(Source: Office of the President, Almanac, December 6, 1988; revised, Almanac, November 7, 1995; Offices of the President and Provost, revised, Almanac, February 3, 2004; revised, Almanac, October 18, 2011 (https://almanac.upenn.edu/archive/volumes/v58/n08/policy.html); revised, Almanac, July 1, 2016 (https://almanac.upenn.edu/archive/between/2016/070116-of-record.html); revised, Almanac, April 30, 2019 (https://almanac.upenn.edu/uploads/media/OF_RECORD_Sexual_Misconduct_supplement-Web.pdf), revised Almanac, July 19, 2022 (https://almanac.upenn.edu/uploads/media/071922-sexual_misconduct_policy_supplement.pdf))*

Effective July 1, 2022

The mission of the University of Pennsylvania is to offer a world-class education to our students, train future leaders, expand and advance research and knowledge, serve our community and society both at home and abroad, and provide the most expert and outstanding healthcare for our patients. To create and sustain a campus climate in which members of the University community are able to thrive and achieve their full potential, the University has established a wide range of policies, educational programs, resources, support, and reporting systems to respond to complaints of sexual misconduct made against students, postdoctoral or other trainees, faculty, and staff. Sexual harassment, sexual violence, and other forms of sexual misconduct will not be tolerated. The University's policies, resources, and complaint procedures include the following:

I. Sexual Harassment, Sexual Violence, Relationship Violence and Stalking Policy (p. 138)

II. Consensual Romantic and Sexual Relationships in the Workplace and Educational Settings Policy (p. 140)

III. Student Disciplinary Procedures for Resolving Complaints of Sexual Misconduct (p. 141)

IV. Procedures for Resolving Complaints of Sexual Misconduct Against Faculty (p. 145)

V. Procedures for Resolving Complaints of Sexual Misconduct Against Staff (p. 150)

As detailed in these policies and procedures, in all cases where a member of the community, or other person, wishes to initiate a complaint against a member of the community (student, postdoctoral or other trainee, faculty, or staff) for sexual misconduct, the complaint should be brought to the Associate Vice President for Equity and Title IX Officer ("AVP"). The AVP will be responsible for determining the appropriate procedures to be followed and will be charged with overseeing the process.

Not every act that might be offensive to an individual or a group necessarily will be considered sexual misconduct and/or a violation of the University's standards of conduct. In determining whether an act violates University policy, the totality of the circumstances surrounding the conduct must be carefully reviewed. Due consideration must be given to the protection of individual rights, open expression, and academic freedom.

## Complaints Against Faculty

Any member of the University community, visitor to campus, or a participant in a University-sponsored activity may bring a complaint of sexual harassment, sexual violence, relationship violence, stalking or inappropriate consensual romantic or sexual relationships in the workplace or educational setting against a faculty member, instructor, postdoctoral or other trainee, or teaching assistant. The complaint should be made to the AVP who will meet with the complainant; determine whether the behavior is covered by the Sexual Misconduct Policy and, if so, the appropriate process for resolution or investigation; and oversee that process. If a determination is made that the complaint involves a possible violation of the Sexual Harassment, Sexual Violence, Relationship Violence and Stalking Policy, then the AVP will direct the process in accordance with the Procedures for Resolving Complaints of Sexual Misconduct Against Faculty. If a determination is made that the complaint involves a possible violation of the Consensual Romantic and Sexual Relationships in the Workplace and Educational Settings Policy, then the AVP will oversee the informal resolution or investigative process(es). The AVP will advise the Dean of the applicable school that a complaint has been made and discuss any interim measures that may be needed. In either case, for Standing Faculty, the Procedure Governing Sanctions Taken Against Members of the Faculty, Handbook for Faculty and Academic Administrators, Part II.E.16, will be followed where applicable. Complaints against faculty alleging inappropriate conduct that do not meet the definition of sexual harassment, sexual violence, or relationship violence or stalking under these policies shall be addressed by the Dean's Office of the school or the Office of the Vice Provost for Faculty, consistent with University policies and procedures.

## Complaints Against Staff

Any member of the University community, visitor to campus, or a participant in a University-sponsored activity may bring a complaint of sexual harassment, sexual violence, relationship violence, stalking or inappropriate consensual romantic or sexual relationships in the workplace or educational setting against a staff member. The complaint should be made to the AVP who will meet with the complainant and coordinate with the Office of Staff and Labor Relations in the Division of Human Resources, as appropriate. If a determination is made that the complaint involves a possible violation of the Consensual Romantic and Sexual Relationships in the Workplace and Educational Settings Policy, then the AVP will oversee the informal resolution or investigative process(es), advising the Dean or Vice President of the applicable administrative division that a complaint has been made and discussing any interim measures that may be needed. If a determination is made that the complaint involves a possible violation of the Sexual Harassment, Sexual Violence, Relationship Violence and Stalking Policy,

then the AVP will direct the process in accordance with the Procedures for Resolving Complaints of Sexual Misconduct Against Staff or the applicable collective bargaining agreement. Complaints against staff members alleging inappropriate conduct that does not meet the definition of sexual harassment, sexual violence, or relationship violence or stalking under these policies shall be addressed by the Division of Human Resources and/or the Office of Affirmative Action and Equal Opportunity Programs, consistent with University policies and procedures.

## Complaints Against Enrolled Students

Any member of the University community, visitor to campus, or a participant in a University-sponsored activity may bring a complaint of sexual harassment, sexual violence, relationship violence, stalking or inappropriate consensual romantic or sexual relationships in the educational setting or workplace against an enrolled student. The complaint should be directed to the AVP who will oversee the investigative and resolution process(es). If a determination is made that the complaint involves a possible violation of the Consensual Romantic and Sexual Relationships in the Workplace and Educational Settings Policy, then the AVP will oversee the informal resolution or investigative process(es), advising the Dean of the applicable school that a complaint has been made and discussing any interim measures that may be needed. If a determination is made that the complaint involves a possible violation of the Sexual Harassment, Sexual Violence, Relationship Violence and Stalking Policy, then the AVP will direct the process in accordance with the Student Disciplinary Procedures for Resolving Complaints of Sexual Misconduct. Complaints against enrolled students alleging inappropriate conduct that does not meet the definition of sexual harassment, sexual violence, or relationship violence or stalking under these policies shall be addressed by the Office of Student Conduct or the school in which the Respondent is enrolled, consistent with University and school policies and procedures.

## Reporting and Monitoring

The University is committed to ensuring that members of the University community who share information regarding incidents of sexual misconduct receive the information, counseling and support that they need and are aware of the process for making a complaint. The University is also committed to monitoring reports and complaints of sexual misconduct so that any patterns or systemic problems revealed by such reports and complaints can be addressed. Consistent with these commitments, the AVP should be advised when incidents of sexual misconduct are reported to any of the University's resource offices (except those identified as confidential resources, including the Division of Human Resources (and human resources staff in the schools and centers); Deans, Vice, Associate, or Assistant Deans in the 12 schools; Vice, Associate, or Assistant Provosts; Office of Affirmative Action and Equal Opportunity Programs (OAA/EOP); and Division of Recreation and Intercollegiate Athletics (DRIA). Offices designated as confidential resources in the Sexual Misconduct Policy are to provide information to the AVP regarding possible violations in a manner that protects the identity of the individual who provided it. However, in all cases in which there is a danger to the parties or others, that information must be reported immediately to Wellness Services or the Special Services Department in the Division of Public Safety. When an incident of sexual misconduct is reported to the AVP, appropriate steps will be taken to ensure that the individual who reported the incident has been advised of the available resources and the process for making a formal complaint. Members of the University community who have crime statistics reporting obligations under the Clery Act are obligated to report the matter to the Division of Public Safety, in addition to the AVP. For additional information about Clery Act reporting or to make

a report, refer to the Clery Act & Crime Reporting page at https://www.publicsafety.upenn.edu/clery/.

# I. Sexual Harassment, Sexual Violence, Relationship Violence, and Stalking Policy

All forms of sexual harassment, sexual violence, relationship violence and stalking and attempts to commit such acts are considered to be serious misconduct and may result in disciplinary action up to and including expulsion or termination of employment. In addition, such acts may violate federal, state and local laws and perpetrators of such acts may be subject to criminal prosecution. This policy, which prohibits behaviors that are more generally addressed by the University's Sexual Misconduct Policy, applies to faculty, postdoctoral and other trainees, students, staff and visitors to the University campus and facilities.

**Sexual Harassment**

For the purposes of University policy, the term "sexual harassment"[1] refers to any unwanted conduct that is based on an individual's sex, sexual orientation, gender identity, or gender expression and that:

- Conditions an educational or employment benefit on participation in unwelcome sexual conduct; or
- A reasonable person would determine is so severe, pervasive, and/or objectively offensive that it effectively denies a person equal access to an educational or employment program or activity.

**Sexual violence** includes a range of behaviors in which an act of a sexual nature is taken against another individual without that person's consent or when the individual is unable to consent. There are various types of sexual violence, including but not limited to sexual assault and rape (defined below).

**Sexual assault** (including but not limited to rape) is defined as having committed any of the following acts:

- Any physical sexual contact that involves the use or threat of force or violence or any other form of coercion or intimidation.
- Any physical sexual contact with a person who is unable to consent due to incapacity or mental or physical impairment. "Incapacity" or "impairment" include but are not limited to being under the influence of alcohol or drugs or being too young to consent.

**Rape** is defined as sexual assault involving an act of penetration (and includes such assaults when the individuals know one another).

**Non-forcible sex acts** include unlawful sex acts where consent is not relevant, such as sexual contact with an individual under the statutory age of consent as defined by Pennsylvania law.

**Consent** is an affirmative decision to engage in mutually agreed upon sexual activity and is given by clear words or actions. Consent may not be inferred from silence, passivity or lack of resistance alone. Furthermore, consent to one form of sexual activity does not imply consent to other forms of sexual activity and the existence of a current or previous dating, marital or sexual relationship is not sufficient to constitute consent to additional sexual activity. Assent shall not constitute consent if it is given by a person who, because of youth, disability, intoxication or other condition, is unable to lawfully consent.

**Relationship violence**, also commonly known as dating violence, is defined as an act or a pattern of abuse committed by a person involved in a social, sexual or romantic relationship, past or present, with the victim. Relationship violence can encompass a broad range of behaviors that may include physical violence, sexual violence, emotional violence and economic violence.

**Domestic violence** is defined as abuse committed against an adult who is a spouse, former spouse, cohabitant, someone with whom the person has a child, someone with whom the person has an existing dating or engagement relationship, or someone with whom the person had a dating or engagement relationship in the past.

**Stalking** means engaging in a course of conduct directed at specific person(s) that would cause a reasonable person to fear for their safety, the safety of others, or to suffer substantial emotional distress.

In determining whether the alleged conduct violates this policy, consideration will be given to the totality of the circumstances, including the nature of the conduct and the context in which the alleged incident occurred. Generally, complaints of sexual harassment, sexual violence, relationship violence and stalking are made by members of the University community and those made by individuals who are not students, faculty, staff, postdoctoral or other trainees, or alumni will be directed to external resources available to respond to their complaint or provide support and advice.

The University regards such behavior as a violation of the standards of conduct required of all members of its community. Accordingly, as noted in the University's *Handbook for Faculty and Academic Administrators, Human Resources Policy Manual, Pennbook* and other publications, persons engaged in such behavior are subject to the full range of internal disciplinary actions, including separation from the institution. The same range of disciplinary actions will be applied in the event of retaliation against an individual who in good faith makes an allegation of sexual misconduct, who cooperates in an investigation into such allegations, or who opposes any act of sexual misconduct as defined in this policy.

Not every act that might be offensive to an individual or a group necessarily will be considered a violation of the University's standards of conduct. In determining whether an act constitutes sexual misconduct, the totality of the circumstances surrounding the conduct must be carefully reviewed. Due consideration must be given to the protection of individual rights, open expression, and academic freedom.

## A. Resources

Schools, centers and administrative divisions should make known to all of their members the available resource offices for information, counseling and support, as well as the informal and formal procedures for resolving complaints of sexual harassment within the appropriate school, center, division, or at the University level. These resources include the following:

### 1. CONFIDENTIAL RESOURCES FOR INFORMATION, COUNSELING AND SUPPORT

Resource offices are available to assist members of the Penn community and visitors to the campus who have been, or know someone who has been, the victim of sexual violence, relationship violence or stalking. The staff of these offices are available to provide counseling and support, as well as information about and assistance with making a complaint.

Generally, the information shared with confidential resources will be held in confidence, consistent with the University's obligation to address complaints of sexual misconduct, unless the person sharing the information gives their consent to the disclosure of that information. Non-identifying information regarding complaints should be provided

to the AVP for purposes of assuring compliance with Title IX and other applicable laws and regulations. Confidential resources are not obligated to share identifying information with the AVP when an incident of sexual misconduct is shared with them. However, the commitment to confidentiality does not preclude the sharing of information among University administrators as appropriate to keep members of the University community safe. In addition, confidential resources should submit non-identifying information about incidents of sexual misconduct to the Division of Public Safety for the purpose of crime statistics reporting under the Clery Act. (For additional information regarding requirements, see the Clery Act & Crime Reporting page at https://www.publicsafety.upenn.edu/clery/.) The University's confidential resources are:.

- African-American Resource Center (http://www.upenn.edu/aarc/) (resource for students, staff or faculty)
- Employee Assistance Program (https://www.hr.upenn.edu/myhr/worklife/healthy/eap/) (resource for staff or faculty)
- Lesbian Gay Bisexual Transgender Center (http://www.vpul.upenn.edu/lgbtc/) (resource for students, staff or faculty)
- Office of the University Chaplain (http://www.upenn.edu/chaplain/) (resource for students, staff, faculty, postdoctoral and other trainees, or visitors)
- Office of the Ombuds (http://www.upenn.edu/ombuds/) (resource for students, staff, faculty, postdoctoral and other trainees, or visitors)
- Penn Violence Prevention (https://secure.www.upenn.edu/vpul/pvp/) (resource for students)
- Penn Women's Center (http://www.vpul.upenn.edu/pwc/) (resource for students, staff or faculty)
- Special Services Department (https://www.publicsafety.upenn.edu/about/special-services/), Division of Public Safety (resource for students, staff, faculty, postdoctoral and other trainees or visitors)
- Student Health and Counseling (http://www.vpul.upenn.edu/shs/) (including its Sexual Trauma Treatment Outreach and Prevention Team, also known as STTOP; resource for students)

## 2. INFORMAL AND FORMAL MECHANISMS FOR COMPLAINT RESOLUTION

If both parties agree and the AVP deems it to be an appropriate instance for an informal resolution of a complaint, the AVP (or the AVP's designee) will meet with the parties individually, and others as appropriate, in an effort to resolve the complaint. When informal resolution is not chosen, one of the parties is not satisfied with the results, or the proposed resolution is not appropriate, the formal mechanisms described below should be used.

A formal complaint of sexual misconduct against any member of the Penn community should be initiated by contacting the AVP. Formal complaints will be handled in accordance with the applicable procedures as set forth below.

### Complaints Against Faculty

Any member of the University community, visitor to campus or a participant in a University-sponsored activity may bring a complaint of sexual harassment, sexual violence, relationship violence, stalking or inappropriate romantic or sexual relationships in the workplace or educational setting or workplace against a faculty member, instructor, postdoctoral or other trainee, or teaching assistant. The complaint should be made to the AVP, who will meet with the complainant, determine the appropriate process under University policy for investigation, and oversee that process. If a determination is made that the complaint

involves a possible violation of the Sexual Harassment, Sexual Violence, Relationship Violence and Stalking Policy, then the AVP will direct the process in accordance with the Procedures for Resolving Complaints of Sexual Misconduct Against Faculty. If a determination is made that the complaint involves a possible violation of the Consensual Romantic and Sexual Relationships in the Workplace and Educational Settings Policy, then the AVP will oversee the formal or informal resolution process(es), advising the Dean of the applicable school that a complaint has been made and discussing any interim measured that may be needed. In either case, for Standing Faculty, the Procedure Governing Sanctions Taken Against Members of the Faculty, Handbook for Faculty and Academic Administrators, Part II.E.16, will be followed where applicable.

### Complaints Against Staff

Any member of the University community visitor to campus or a participant in a University-sponsored activity may bring a complaint of sexual harassment, sexual violence, relationship violence, stalking or inappropriate romantic or sexual relationships in the workplace or educational setting, against a staff member. The complaint should be made to the AVP who will meet with the complainant and coordinate with the Office of Staff and Labor Relations in the Division of Human Resources, as appropriate. If a determination is made that the complaint involves a possible violation of the Sexual Harassment, Sexual Violence, Relationship Violence and Stalking Policy, then the AVP will direct the process in accordance with the Procedures for Resolving Complaints of Sexual Misconduct Against Staff or the applicable collective bargaining agreement. If a determination is made that the complaint involves a possible violation of the Consensual Romantic and Sexual Relationships in the Workplace and Educational Settings Policy, the AVP will oversee the formal or informal resolution process(es), advising the Dean, Vice President, or Vice Provost of the applicable administrative division that a complaint has been made and discussing any interim measured that may be needed.

### Complaints Against Enrolled Students

Any member of the University community, a visitor to campus, or a participant in a University-sponsored activity may bring a complaint of sexual harassment, sexual violence, relationship violence, stalking or inappropriate romantic or sexual relationships in the workplace or educational setting against an enrolled student. The complaint should be directed to the AVP who will oversee the investigative and resolution\ process(es). If a determination is made that the complaint involves a possible violation of the Sexual Harassment, Sexual Violence, Relationship Violence and Stalking Policy, then the AVP will direct the process in accordance with the Student Disciplinary Procedures for Resolving Complaints of Sexual Misconduct. If a determination is made that the complaint involves a possible violation of the Consensual Romantic and Sexual Relationships in the Workplace and Educational Settings Policy, the AVP will oversee the formal or informal resolution process(es), advising the Dean of the applicable school that a complaint has been made and discussing any interim measures that may be needed.

Members of the University community who would like assistance with making a formal complaint may contact any of the confidential resources identified above. As further set forth below, all formal complaints involving Sexual Misconduct are to be initiated by contacting the Associate Vice President for Equity and Title IX Officer ("AVP") who will be responsible for deciding whether the conduct described would violate the Sexual Misconduct Policy, and if so, which investigative or resolution process to pursue.

## B. Reporting and Monitoring

The University is committed to ensuring that members of the University community who share information regarding incidents of sexual misconduct receive the information, counseling and support that they need and are aware of the process for making a formal complaint. The University is also committed to monitoring reports and complaints of sexual misconduct so that any patterns or systemic problems revealed by such reports and complaints can be addressed. Consistent with these commitments, AVP should be advised when incidents of sexual misconduct, including sexual violence, are reported to any of the University's resource offices (except those identified as confidential resources), Division of Human Resources (as well as human resources staff in the schools and centers); Deans, Vice, Associate or Assistant Deans of the 12 schools; Vice, Associate, and Assistant Provosts; Office of Affirmative Action and Equal Opportunity Programs (OAA/EOP); and Division of Recreation and Intercollegiate Athletics (DRIA). When an incident of sexual misconduct is reported to the AVP, appropriate steps will be taken to ensure that the individual who reported the incident has been advised of the resources available to them and the process for making a formal complaint. Members of the University community who have crime statistics reporting obligations under the Clery Act are obligated to report the matter to the Division of Public Safety, in addition to the AVP. For additional information about Clery Act reporting or to make a report, refer to the Clery Act & Crime Reporting page at https://www.publicsafety.upenn.edu/clery/.

## C. Rights of Complainants and Respondents

Persons who make a complaint and those who are responding to complaints have the following rights:

- The option to notify law enforcement;
- The option to have an advisor, including an attorney the party has retained, present during interviews that are part of a University initiated investigation;
- To be notified of counseling and support services available; and
- To be notified of available options to change academic, living or work arrangements.

## D. Education and Prevention

All members of the University community have a responsibility to aid in the prevention of sexual misconduct and are encouraged to discuss concerns with the AVP or another of the University resource offices listed in the policy. The AVP will ensure that the policy is publicized regularly and that educational programs and training are offered to faculty, staff, postdoctoral and other trainees, and students.

## E. Policy Against Retaliation

University policy expressly prohibits retaliation against faculty, staff, students, postdoctoral or other trainees, and members of the community who in good faith make reports of violations of this policy. In addition, knowingly and intentionally making a false report of a violation of this policy is prohibited. Members of the Penn community who take adverse action against, intimidate, threaten or otherwise engage in retaliation against a person because they made a complaint of sexual misconduct or served as a witness during an investigation are subject to disciplinary action, up to and including termination of their employment or expulsion from the University.

# II. Consensual Romantic and Sexual Relationships in the Workplace and Educational Setting Policy

## A. Faculty and Students and Academic Settings

The relationship between faculty member[2] and student is central to the academic mission of the University. No non-academic or personal ties should be allowed to interfere with the integrity of the faculty-student relationship. Consensual sexual relations between faculty and student can adversely affect the academic enterprise, distorting judgments, or appearing to do so to others, and providing incentives or disincentives for student-faculty contact that are inappropriate.

For these reasons, any sexual relations or dating relationships between a faculty member and an undergraduate student enrolled at the University are prohibited. The prohibition extends to all academic advisors and program directors, including those based in the College Houses and other University-owned or administered housing. The prohibition also extends to graduate, professional, or undergraduate student assistants, but, in their case, only with respect to those undergraduate students over whom they have academic responsibility.[3]

Although consensual sexual relations or dating relationships between faculty and graduate or professional students are not categorically prohibited, the University strongly discourages all sexual relations or dating relationships between faculty and graduate or professional students. Further, sexual relations or dating relationships between a faculty member and a graduate or professional student during the period of the faculty/student relationship are prohibited. The prohibition extends to sexual relations or dating between a graduate or professional student and other students for whom they have some supervisory academic responsibility, between department chairs and students in that department, and between graduate group chairs and students in that graduate group. Likewise, sexual relations and dating relationships are prohibited between a graduate or professional student and their academic advisors, program directors, and all others who have any supervisory responsibility for that student.

## B. Workplace and Other Settings

Those entrusted with responsibility for supervising, evaluating, advising, or mentoring other members of the Penn community are in inherently unequal positions. Faculty, staff, and others should not evaluate or supervise those with whom they have a familial, romantic or sexual relationship because of the potential for conflict of interest, or the appearance of favoritism, exploitation or bias. As is the case for faculty, sexual or romantic relationships between staff members and undergraduate students are prohibited. Although consensual sexual relations or dating relationships between staff and graduate or professional students, are not categorically prohibited, the University strongly discourages all sexual relations or dating relationships between staff and graduate or professional students.

Consensual sexual or romantic relationships between those employed by the University as faculty or staff are not in general prohibited by this policy. However, relationships between employees in which one has direct or indirect authority over the other are potentially problematic, including relationships between supervisors and their direct and indirect reports, between senior faculty and junior faculty, and managers and those who report to them (directly or indirectly). If such a relationship develops or exists as a result of a change in employment or academic status, the person in the position of greater authority or power must

recuse themselves to ensure that they do not exercise any supervisory or evaluative function over the other person in the relationship. Where such recusal is required, the recusing party must also notify their department chair, Dean, supervisor, or manager, so that person can ensure adequate alternative supervisory or evaluative arrangements are put in place. Such notification is always required where recusal is required. This obligation to recuse and notify exists for past as well as for current relationships. Failure to disclose the relationship in a timely fashion will itself be considered a violation of policy.

It is understood that sexual or romantic relationships may be private and the University treats such information sensitively and (to the extent practicable) confidentially. The University has the option to take any action necessary to ensure compliance with the spirit of this policy, including transferring either or both employees to minimize disruption of operations.

**MECHANISMS FOR COMPLAINT RESOLUTION**

To make a complaint alleging a violation of this policy, the Associate Vice President for Equity and Title IX Officer ("AVP") should be contacted.

**COMPLAINTS AGAINST FACULTY**

If a determination is made that the complaint involves a possible violation of the Consensual Romantic and Sexual Relations in the Workplace and Educational Settings Policy, (other than sexual harassment, sexual assault, sexual violence or sexual assault), then the AVP will oversee the informal resolution or investigative process(es), advising the Dean of the applicable school that a complaint has been made and discussing any interim measures that may be needed. In either case, for Standing Faculty, the Procedure Governing Sanctions Taken Against Members of the Faculty, *Handbook for Faculty and Academic Administrators*, Part II.E.16, will be followed where applicable.

**COMPLAINTS AGAINST STAFF**

If a determination is made that the complaint involves a possible violation of the Consensual Romantic and Sexual Relations in the Workplace and Educational Settings Policy (other than sexual harassment, sexual violence or sexual assault), then the AVP will oversee the informal resolution or investigative process(es), advising the Dean, Vice President, or Vice Provost of the applicable administrative division that a complaint has been made and discussing any interim measures that may be needed.

**COMPLAINTS AGAINST ENROLLED STUDENTS**

If a determination is made that the complaint involves a possible violation of the Consensual Romantic and Sexual Relations in the Workplace and Educational Settings Policy (other than sexual harassment, sexual violence or sexual assault), then the AVP will oversee the informal resolution or investigative process(es), advising the Dean of the applicable school that a complaint has been made and discussing any interim measures that may be needed.

## C. Policy Against Retaliation

University policy expressly prohibits retaliation against faculty, staff, students, postdoctoral or other trainees, or members of the community who in good faith make reports of violations of this policy. In addition, knowingly and intentionally making a false report of a violation of this policy is prohibited. Members of the Penn community who take adverse action against, intimidate, threaten or otherwise engage in retaliation against a person because they filed a complaint of sexual misconduct or served as a witness during an investigation are subject to disciplinary

action, up to and including termination of their employment or expulsion from the University.

# III. Student Disciplinary Procedures for Resolving Complaints of Sexual Misconduct
[4]

## A. Introduction

The University of Pennsylvania is committed to providing a safe and healthy environment, free of gender-based misconduct, to all members of our community and visitors to our community. As such, sexual harassment, sexual assault, sexual violence, relationship violence, and stalking will not be tolerated. To ensure the creation of a climate where students are able to thrive and achieve their full potential, the University has developed a wide range of policies, educational programs, broad-based resources, support, and reporting systems. This amendment to the Student Disciplinary Charter supplements these other policies and initiatives, addressing the process by which complaints against an enrolled University student for a violation of the Sexual Misconduct Policy (which includes its Sexual Harassment, Sexual Violence, Relationship Violence, and Stalking Policy ("Sexual Harassment Policy"), and the Consensual Romantic and Sexual Relationships in the Workplace and Educational Settings Policy will be adjudicated and resolved.

## B. Confidentiality

Confidentiality is of critical importance in ensuring that these sensitive matters are handled appropriately. The University has an obligation to respond to violations of its Sexual Misconduct Policy as fairly and expeditiously as possible when a complaint is received. University staff and faculty may share information with others who have a legitimate need to know to fairly and effectively address complaints, but the information should be considered confidential and protected to the extent possible consistent with legal obligations. Such administrators may include, for example those in, the Division of University Life, the Office of the Associate Vice President and Title IX Officer (AVP), the Division of Public Safety, the Senior Vice President for Institutional Affairs and Chief Diversity Officer, Office of General Counsel, Student Health and Counseling, and academic advising offices.

## C. Reporting Complaints of Violation of Sexual Misconduct

### 1. OFFICE OF THE ASSOCIATE VICE PRESIDENT FOR EQUITY AND TITLE IX OFFICER (AVP)

The Office of the AVP will be responsible for managing all complaints made against enrolled University students for violations of its Sexual Misconduct Policy (including sexual harassment and sexual violence). Complaints should be made to the AVP who will assign the complaint to a trained investigative officer (IO) who will work under the AVP's direction and supervision.

Complaints must either be presented in writing or based upon information provided by the complainant to the AVP or IO who will then memorialize the allegations in writing and have the allegations confirmed by the complainant. Complainants may include University students or others who allege a violation of the Policy by a student enrolled at the University during the period that student has been enrolled.

## 2. OFFICE OF THE DISTRICT ATTORNEY AND OFFICE FOR CIVIL RIGHTS

Complainants may also choose to file a report with the District Attorney, the Office for Civil Rights of the U.S. Department of Education, or other external agencies. The University processes and the legal system work independently of one another and the University has its own interest in, and responsibility for, ensuring the enforcement of its Sexual Misconduct Policy.[5] Therefore, the University will not unilaterally defer its processes pending the outcome of any criminal process, nor will the outcome of any legal process be determinative of the University result. The University will, however, comply with reasonable requests by law enforcement for cooperation, and upon reasonable request, will temporarily suspend its fact-finding process in a sexual misconduct investigation so as not to impede the law enforcement process.

## 3. SUPPORT, COUNSELING AND ADVICE

In making a decision about how to proceed with a complaint, complainants may seek support, counseling, and advice from other offices on campus, including the Special Services Department in the Division of Public Safety, Penn Violence Prevention, Office of the University Chaplain, Penn Women's Center, Student Health and Counseling, Office of the Ombuds, African-American Resource Center, or Lesbian Gay Bisexual Transgender Center. A list of these offices is provided in Section E below. Should a complainant decide to proceed with the University's disciplinary process against an enrolled University student, the Office of the AVP will be the single place to initiate the process.

## 4. TIMEFRAME FOR SUBMITTING A COMPLAINT

The University does not limit the timeframe for filing a report of a violation of the Sexual Misconduct Policy. Reports may be filed at any time, although the University's ability to investigate or take any action may be limited by the passage of time or the matriculation status of the alleged respondent.

## 5. COMPLAINANT REQUEST FOR CONFIDENTIALITY

The University is required by Title IX to weigh the complainant's request for confidentiality/privacy with the University's commitment to provide a reasonably safe and nondiscriminatory environment. In situations where a complainant requests confidentiality, the University's ability to investigate and respond to the allegations may be limited. The AVP or IO will notify the complainant if the University cannot, in unusual cases, maintain the complainant's confidentiality/privacy. The complainant's and respondent's identities will only be revealed to those individuals who need to know their names to investigate or adjudicate the complaint or provide interim measures. If the University becomes aware of a pattern of behavior by one or more respondents, the University will take appropriate action in an attempt to protect the University community.

# D. Investigation and Resolution of Complaints

## 1. TIMELY RESOLUTION

Where possible, the process of resolving complaints, exclusive of any appeal, should be completed within 60 business days of the filing of the written complaint. The appeal should be completed, where possible, within 30 business days of the filing of the appeal.

In the event that a Hearing Panel is convened, the complainant and the respondent will both be provided with a copy of the decision of the Panel and given 10 business days to file an appeal.

## 2. RIGHTS AND PROTECTIONS FOR COMPLAINANT AND RESPONDENT

(a) The complainant and respondent have the right to a process that is fundamentally fair, and free of bias or prejudice.

(b) The complainant and respondent have the right to be treated with respect, dignity, sensitivity, and fairness throughout the entire process. They are both entitled to seek support from the University and to be informed about the process both before the process is initiated and throughout the process as it unfolds.

(c) Both parties have the right to participate in the process, or to refrain from participation. Failure to participate will not be used as evidence against either party[6], but also will not prevent the process from proceeding unless the complainant withdraws the complaint and the University agrees to abide by that request or the respondent withdraws from the University.

(d) Each party may have a lawyer or other advisor present when being interviewed by the Investigative Team and the Hearing Panel, but the lawyer or other advisor will not be permitted to present statements or seek the production of evidence. The party's advisor will be able to direct questions to the other party or witnesses interviewed by the Panel subject to determinations of relevance and other procedural issues by the Disciplinary Hearing Officer.

(e) Evidence of prior sexual conduct by the complainant or respondent with other partners will not ordinarily be considered in the process, and any evidence of a prior sexual relationship between the parties will not be determinative of the issue of consent.

(f) If there is credible evidence of a pattern of violations of the Sexual Misconduct Policy, that evidence may be considered by the Hearing Panel if there is a finding of responsibility and a sanction is being determined.

(g) While the process is underway, the Division of University Life will work with the complainant and respondent, ensuring support is made available to both parties. The Division of University Life will also be responsible for implementing interim measures to protect the parties, or any of the witnesses, consistent with principles of fairness, including implementing measures regarding housing, academic accommodations and scheduling changes, no contact orders, and any other appropriate actions to protect the parties or any of the witnesses.

## 3. PRELIMINARY DETERMINATION

Upon receiving a complaint, the AVP will make a preliminary determination as to whether the complaint falls within the purview of a Sexual Misconduct Policy and whether, on its face, there appears to be a sufficient basis to conduct a full investigation. In making this determination, the AVP may interview the complainant and the respondent (after advising the respondent of the allegations in writing) and conduct whatever preliminary investigation the AVP deems necessary to determine if the actions alleged in the complaint would, if true, constitute a violation of the University's Sexual Misconduct Policy and there is a reasonable basis for investigating the charges. If the AVP concludes there is insufficient basis to proceed, the matter will be concluded, and the parties so advised.

## 4. INVESTIGATION

If the AVP makes the determination that there is a sufficient basis to proceed, the AVP will issue a Statement of Charge Letter, based on the complaint and any preliminary investigation conducted. The Charge Letter will be provided to the complainant and the respondent. The

respondent will be provided the opportunity to respond in writing to the Charge, and any response will be shared with the complainant.

The IO will lead a thorough and fair investigation, assisted by one or more co-investigators who may come from the school of the complainant or respondent or from elsewhere in the University (the "Investigative Team"). The co investigator(s) will be University staff or faculty members or a consultant or attorney appropriately trained to investigate and handle sexual misconduct cases who are selected for individual cases by the AVP or IO. The investigation will include interviews of the complainant, the respondent, and relevant witnesses, as well as a review of documentation, physical evidence, and any relevant evidence.

Prior to interviews, the complainant, the respondent, and any relevant witnesses will be informed by the IO that statements made during the process may be admissible in concurrent or subsequent civil or criminal court proceedings, and will accordingly also be informed of their rights as outlined in Section D.2(c) above. They will also be reminded of the consequences of making false statements to the IO under the Code of Student Conduct and the Charter of the University of Pennsylvania Student Disciplinary System. The complainant and respondent may have their advisors[7] and/or or outside counsel present for their interviews, but the advisors or outside counsel will not be permitted to participate in the interview other than to provide advice to the student, and they may be excluded from the interview for disruptive behavior.

In conducting the investigation, the Investigative Team may, as appropriate, also consult with other campus officials including but not limited to administrators in the relevant school, Division of Public Safety, the AVP and Title IX Officer, Senior Vice President for Institutional Affairs and Chief Diversity Officer, or the Division of University Life. The Investigative Team may also consult with the Office of General Counsel, who may determine in particular cases to engage outside counsel to assist the University throughout this process. The Investigative Team may engage forensic and other experts, as needed.

## 5. INVESTIGATIVE REPORT

At the conclusion of the investigation, the Investigative Team will prepare a draft factual investigative report, including assessments of credibility, a recommended finding as to responsibility, and recommended sanctions, if appropriate. In making the responsibility determination, the Investigative team will use a "preponderance of the evidence" standard. In other words, to find a student responsible for violating the Sexual Misconduct Policy, the Investigative Team must be convinced that it is more likely than not that a violation of the Policy has occurred.

### (a) Opportunity for Review and Comment

The draft investigative report and related exhibits and evidence will be provided to both the complainant and respondent for review and comment, under strict instructions that they are and at all times remains strictly confidential, and are not to be shared with anyone other than their families and advisors, and/or outside counsel, as described above without the expressed consent of the AVP. Sharing of the report by either party, their families, advisors or outside counsel with any additional persons is strictly prohibited and anyone with whom the report is shared must be so advised. The complainant and the respondent will be given the opportunity to respond to and comment on the draft investigative report in writing.

### (b) Final Report

As a result of the response and comments received, the Investigative Team may conduct a further investigation and/or amend the draft report, if the Team determines either action to be warranted. The Investigative Team will prepare a final investigative report, incorporating any changes

they believe are appropriate, and then share it with the complainant and the respondent. The complainant and respondent may submit formal objections or comments to the final report, which will be appended to the final report of the matter.

## 6. RESOLUTION WITHOUT A HEARING

The matter may be resolved at this stage if both parties agree to the recommendations of the Investigative Team with respect to responsibility and, if applicable, sanctions, or if the parties otherwise reach a mutually acceptable resolution. The University, however, will not compel either the complainant or the respondent to engage in face-to face mediation or to accept the recommendations of the Investigative Team.

## 7. HEARING PANEL

If the matter is not resolved at this stage in a mutually acceptable manner, either party may request a Hearing before a Hearing Panel (Panel) within 10 business days of transmission of the final report.

### (a) Panel Membership

The Panel will be comprised of three (3) faculty members and the Disciplinary Hearing Officer (DHO), who will be a non-voting member. The DHO will make all decisions about the organization of the Panel, including decisions regarding the admissibility of evidence, witnesses to appear before the Panel, or any additional decisions regarding the administration of the hearing process.[8]

Membership of the Panel, including the DHO, will observe the following guidelines:

i. Members will be selected from a pool of faculty who have agreed to serve for a term of one or more years.

ii. Only mixed-gender panels that have received training in handling complaints involving sexual misconduct will hear sexual misconduct cases.

iii. Faculty comprising the Panel should be from academic departments in which neither of the parties is enrolled in a course of study, and no faculty member should serve on the Panel who has a mentoring relationship or other personal relationship with either of the parties.

iv. Faculty asked to serve should recuse themselves or be dismissed if they have any personal ties to either of the parties or to individuals with whom the parties are closely associated, or if they have prior personal knowledge of the alleged incident of sexual misconduct.

v. The University will train members of the pool to fulfill their responsibilities as adjudicators according to the procedures and policies outlined here and to ensure compliance with Title IX and other applicable state and federal guidelines. In addition, the Panel will be provided with "just in time" training on adjudicating sexual misconduct cases.

vi. The IO may not serve on the Panel; however, the IO may be interviewed by the Panel regarding the investigation. The AVP or IO may assist the DHO as needed in organizational and administrative matters related to the Panel.

vii. The complainant and respondent will be notified of the membership of the Panel in advance of the Hearing. Any challenges for cause against individual Panel members must be made promptly

so as not to delay the conduct of the Hearing and will be given serious consideration by the DHO to ensure impartiality of the proceedings.

viii. All proceedings must be kept strictly confidential among the parties, witnesses and members of the panel. All individuals involved in such hearings must agree to such conditions of confidentiality.

### (b) Hearing Procedures

Hearings must be prompt, fair, and impartial, affording the complainant's allegations and the respondent's defenses all due consideration and protecting the rights of both parties. The Panel will review the Investigative Team's final report, including any response, objections, or comments provided by the complainant or respondent. The Panel will also carefully review the evidentiary record, including witness statements, documents, and physical evidence.

#### Hearing Panel Interviews

i. The Panel will interview separately the IO (and co-investigator(s) if the Panel so chooses), the complainant, and the respondent. The DHO will provide the complainant and respondent with 10 days advance notice of the Hearing. If reasonably possible, interviews will be conducted on one day, but if such scheduling would require an unreasonably long day, or if such scheduling would unreasonably delay the proceeding, the Hearing may be scheduled over multiple days.

ii. The Panel may seek additional evidence from the Investigative Team and interview key witnesses on whom the Investigative Team relied in drawing conclusions, as well as request additional evidence from the IO to clarify the evidentiary record, provided that it can do so without unreasonably delaying the process. In the event that a new witness comes forward during the Hearing who was not originally interviewed by the Investigative Team, or new evidence is discovered after the Investigative Team has issued their report, the DHO may allow that witness to testify or admit the evidence to the Hearing, but only if the DHO judges the new witness or evidence to be highly relevant to an accurate and fair determination of the outcome.

iii. The Hearing will be held in private. Only the person interviewed (and that person's advisor or outside counsel, as applicable) will be present during interviews. The complainant or respondent (and their advisor or outside counsel, as applicable) will be able to view testimony from separate rooms via closed-circuit television or similar video transmission.

iv. Subject to the Rights and Protections set forth in Section D.2 above, the Panel has wide latitude when questioning the complainant, the respondent, and any witnesses to determine the accuracy of the final report.

v. The complainant and respondent may propose witnesses and provide specific questions in advance that they believe important to ask of other parties or witnesses. The DHO, in consultation with the Panel, will determine the relevance as well as the appropriateness of witnesses and questions, and may accordingly place restrictions on, include, or exclude witnesses or other information.

vi. When the Panel is conducting the interview of the complainant and respondent, each student will have an advisor or outside counsel with them to provide advice and support. The advisor or outside counsel will be permitted to address questions to the other party during the Hearing subject to determinations of relevancy and other appropriate

considerations. If an advisor's or outside counsel's behavior is disruptive, the Hearing will be adjourned and they may be excluded from the Hearing.

vii. The interviews by the Panel will be recorded (audio only). No observers will be permitted to make any audio or video recordings.

### (c) Hearing Panel Decision

After the Hearing concludes, the Panel will immediately deliberate in private to decide whether a preponderance of the evidence shows that the respondent is responsible for a violation of the University's Sexual Misconduct Policy. Preponderance of the evidence means that the Panel must be convinced based on the evidence that it is more likely than not that a violation has occurred to find a student is responsible for a violation of the policy. A finding of responsibility requires a majority vote of the members of the Panel.

If the respondent is found responsible, the Panel will also determine the appropriate sanction, by majority vote, based upon the facts of the case and University precedent, with a presumption in favor of the sanction recommended by the IO.

The Panel will arrive at its conclusion as expeditiously as possible and will promptly advise both the complainant and the respondent in writing of its decision with respect to responsibility and, if applicable, sanctions. In keeping with guidelines for timely resolution as provided in Section D1 above, the written decision will be provided as soon after the conclusion of the proceeding as is possible.

Decisions made by the Panel are considered final, subject only to appeal as outlined below.

### (d) Appeal of Hearing Panel Decision

The Panel decision is subject to appeal by either party in writing to a Disciplinary Appellate Officer (DAO), a faculty member with exclusive jurisdiction to decide appeals. In keeping with guidelines for timely resolution as provided in Section D1 above, appeals should be submitted to the AVP within 10 business days after the decision of the Panel. Letters of appeal should specifically state whether the objection is to the judgment of responsibility, the sanction, or both, and explain in detail the grounds for appeal. The request for an appeal will be shared with the other party who will have the opportunity to provide a response or otherwise direct comments to the DAO within 10 business days. Any such comments or response will be shared with the other party.

The DAO will review the report of the Investigative Team and supporting evidence, the audio record from the Panel Hearing, and any other material the DAO deems relevant, in addition to the decision of the Panel to ensure that the process was consistent with University policy and that the result was not arbitrary or capricious, that there were no procedural irregularities, that there was no demonstrated bias or conflict of interest on the part of any fact-finder, and that no new evidence has been brought forward that would alter the outcome of the Hearing.

After considering the appeal, the DAO will promptly issue their decision in writing and will provide copies to the DHO, the Provost, the Senior Vice President for Institutional Affairs and Chief Diversity Officer, the complainant, the respondent, and other appropriate parties.

## E. Resource Offices
### 1. CONFIDENTIAL RESOURCES

Generally, the information shared with confidential resources will be held in confidence, consistent with the University's obligation to address complaints of sexual misconduct, unless the person sharing

the information gives their consent to the disclosure of that information. Non-identifying information regarding complaints should be provided to the AVP for purposes of assuring compliance with Title IX and other applicable laws and regulations. Confidential resources are not obligated to share identifying information with the AVP when an incident of sexual misconduct is shared with that resource. However, the commitment to confidentiality does not preclude the sharing of information among University administrators as appropriate to keep members of the University community safe. In addition, confidential resources should submit non-identifying information about incidents of sexual misconduct to the Division of Public Safety for the purpose of crime statistics reporting under the Clery Act. (For additional information regarding requirements, see the Clery Act & Crime Reporting page at https://www.publicsafety.upenn.edu/clery/.) The University's confidential resources are:

**Special Services Department, Division of Public Safety**
24-hours/7 days per week: (215) 898-6600
4040 Chestnut Street
http://www.publicsafety.upenn.edu/special-services/

**Penn Women's Center (PWC)**
(215) 898-8611 and (215) 898-6500
3643 Locust Walk
https://pwc.vpul.upenn.edu

**Student Health and Counseling**
Counseling: (215) 898-7021
After-hours emergency number: (215) 349-5490
3624 Market Street, 1st Floor, West
http://caps.wellness.upenn.edu/sttop (http://caps.wellness.upenn.edu/sttop/)

*Sexual Trauma Treatment, Outreach and Prevention (CAPS)*
http://caps.wellness.upenn.edu/sttop (http://caps.wellness.upenn.edu/sttop/)

Medical: (215) 746-3535
Suite 100, 3535 Market Street
http://shs.wellness.upenn.edu

**Lesbian Gay Bisexual Transgender Center**
(215) 898-5044
3907 Spruce Street
https://lgbtc.vpul.upenn.edu

**African-American Resource Center**
(215) 898-0104
3643 Locust Walk
http://www.upenn.edu/aarc/

**Office of the Ombuds**
(215) 898-8261
113 Duhring Wing, 236 S. 34th Street
http://www.upenn.edu/ombuds/

**Office of the University Chaplain**
(215) 898-8456
240 Houston Hall, 3417 Spruce Street
http://www.upenn.edu/chaplain/

**Penn Violence Prevention**
(215) 746-2642
3611 Locust Walk

https://pvp.vpul.upenn.edu

**2. OFFICIAL REPORTING OFFICES FOR SEXUAL MISCONDUCT COMPLAINTS**

If reports of sexual misconduct are made with or come to the attention of the following offices, they must ensure that appropriate action is taken, including notifying the University's AVP and Title IX Officer:

**Office of Affirmative Action and Equal Opportunity Programs**
(215) 898-6993
Suite 421, Franklin Building
http://www.upenn.edu/affirm-action/index.html (http://www.upenn.edu/affirm-action/)

**Student Intervention Services, VPUL**
(215) 898-6081
(215) 768-6527 Nights/Weekends
3611 Locust Walk
https://sis.vpul.upenn.edu

**Office of Student Conduct**
(215) 898-5651
Suite 400, 3440 Market Street
https://www.osc.upenn.edu/

**Office of Staff and Labor Relations, Division of Human Resources**
(215) 898-6093
Suite 600, Franklin Building
https://www.hr.upenn.edu/workplace-issues/staff-labor-relations (https://www.hr.upenn.edu/workplace-issues/staff-labor-relations/)

## F. Intake and Investigative Office for Sexual Misconduct Complaints

The official office for reporting, initiating a formal complaint, and investigation of violations of the Sexual Misconduct Policy, including violations of the Sexual Harassment Policy, is the Office of the Associate Vice President for Equity and Title IX Officer. The contact information for that Office is:

**Associate Vice President for Equity and Title IX Officer**
3901 Walnut Street, Suite 320
(215) 898-2887
https://titleixoffice.upenn.edu/

# IV. Procedures for Resolving Complaints of Sexual Misconduct Against Faculty

## A. Introduction

The University of Pennsylvania is committed to providing a safe and healthy environment, free of gender-based misconduct, to all members of our community and visitors to our community. As such, sexual assault, sexual violence, relationship violence and stalking will not be tolerated. To ensure the creation of a climate where members of the community are able to thrive and achieve their full potential, the University has developed a wide range of policies, educational programs, broad-based resources, support and reporting systems. These procedures supplement these other policies and initiatives, addressing the process by which complaints against a University faculty member for a violation of the Sexual Misconduct Policy (which includes the Sexual Harassment Sexual Violence, Relationship Violence and Stalking Policy ("Sexual Harassment Policy") and the Consensual Romantic and Sexual Relationships in the

Workplace and Educational Settings Policy) will be adjudicated and resolved.

## B. Confidentiality

Confidentiality is of critical importance in ensuring that these sensitive matters are handled appropriately. The University has an obligation to respond to violations of its Sexual Misconduct Policy as fairly and expeditiously as possible when a complaint is received. University staff and faculty may share information with others who have a legitimate need to know to fairly and effectively address complaints, but the information should be considered confidential and protected to the extent possible consistent with legal obligations. Such administrators may include, for example those in, the Division of University Life, the Office of the Vice Provost for Faculty, the Office of the Associate Vice President for Equity and Title IX Officer (AVP), the Division of Public Safety, the Senior Vice President for Institutional Affairs and Chief Diversity Officer, the Office of General Counsel, Employee Assistance Program, Student Health and Counseling, and academic advising offices.

## C. Reporting Complaints of Violation of the Sexual Misconduct Policy

### 1. OFFICE OF THE ASSOCIATE VICE PRESIDENT FOR EQUITY AND TITLE IX OFFICER

The Office of the Associate Vice President for Equity and Title IX Officer (AVP) will be responsible for overseeing all complaints made against a University faculty member, instructor, postdoctoral or other trainee, or teaching assistant ("faculty member") for possible violations of the Sexual Misconduct Policy. Complaints should be made to the AVP who will ensure that complaints are investigated by a trained Investigative Officer (IO), who will select a co-investigator to form the Investigative Team. The Investigative Team will consult with the appropriate Dean, or in any case for which the Dean has an actual or appearance of a conflict of interest or is implicated in the complaint, the Vice Provost for Faculty.

Complaints must either be presented in writing or based on information provided by the complainant or another individual making the report who will then memorialize the allegations in writing and ask the complainant to confirm them. Complainants may include University students, staff, faculty members, participants in a University-sponsored activity, or others alleging a violation of the Policy by a current University faculty member.

#### (a) Consensual Romantic and Sexual Relationships in the Workplace and Educational Settings

If the AVP determines that the complaint involves a possible violation of the Consensual Romantic or Sexual Relationships in the Workplace or Educational Settings Policy and not the Sexual Harassment, Sexual Violence, Relationship Violence and Stalking Policy, the complaint will be investigated by an IO.[9] The facts, conclusions, and recommendations reached by the IO will be reported to the Dean of the applicable school who may seek an informal resolution, if appropriate, or initiate the University's Procedure Governing Sanctions Taken Against Members of the Faculty (*Faculty Handbook* II.E.16).

#### (b) Sexual Harassment, Sexual Violence, Relationship Violence, and Stalking

If the AVP determines that the complaint involves a possible violation of the Sexual Harassment, Sexual Violence, Relationship Violence and Stalking Policy, the procedures outlined below in Section D of this policy will apply.

### 2. OFFICE OF THE DISTRICT ATTORNEY AND OFFICE FOR CIVIL RIGHTS

Complainants may also choose to file a report with the District Attorney, the Office for Civil Rights of the U.S. Department of Education, or other external agencies. The University's processes and the legal system are independent of one another, and the University has its own interest in, and responsibility for, the enforcement of its Sexual Misconduct Policy.[10] Therefore, the University will not unilaterally defer its processes pending the outcome of a criminal process, nor will the outcome of any legal process be determinative of the University result. The University will, however, comply with reasonable requests by law enforcement for cooperation, and upon reasonable request, will temporarily suspend its factfinding process in a sexual misconduct investigation so as not to impede the law enforcement process.

### 3. SUPPORT, COUNSELING AND ADVICE

In making a decision about whether to file a sexual misconduct complaint, complainants may seek support, counseling and advice from other offices on campus. A list of these offices is provided in Section E below. Should the complainant decide to proceed with a University investigation and resolution process against a University faculty member, the Office of the AVP will be the single place to initiate the process.[11]

### 4. TIMEFRAME FOR SUBMITTING A COMPLAINT

The University does not limit the timeframe for filing a sexual misconduct complaint. Reports may be filed at any time, although the University's ability to investigate or take action may be limited by the passage of time, changes in the employment relationship of the alleged respondent at the time the report is made, or other circumstances.

### 5. COMPLAINANT REQUEST FOR CONFIDENTIALITY

The University is required by Title IX to weigh the complainant's request for confidentiality/privacy with the University's commitment to provide a reasonably safe and nondiscriminatory environment. In situations where a complainant requests confidentiality, the University's ability to investigate and respond to the allegations may be limited. The AVP or IO will notify the complainant if the University cannot, in unusual cases, maintain the complainant's confidentiality/privacy. The complainant's and respondent's identities will only be revealed to those individuals who need to know their names in order to investigate or adjudicate the complaint or provide interim measures. If the University becomes aware of behavior or a pattern of behavior by one or more respondents, the University will take appropriate action in an attempt to protect the University community.

## D. Investigation and Resolution of Complaints of Sexual Harassment, Sexual Violence, Relationship Violence, and Stalking

### 1. TIMELY RESOLUTION

The process of resolving complaints, not including any appeal, should be completed, where practicable, within 60 business days of the filing of the written complaint. The appeal should be completed, where practicable, within 30 business days of the filing of the appeal. In the event that a Hearing Panel is convened, the complainant and the respondent will both be provided with a copy of the decision of the Panel and given 10 business days from the date of the transmittal of the Hearing Panel's decision to file an appeal.

## 2. RIGHTS AND PROTECTIONS FOR COMPLAINANT AND RESPONDENT

(a) The complainant and respondent have the right to a process that is fundamentally fair, and free of bias or prejudice.

(b) The complainant and respondent have the right to be treated with respect, dignity, sensitivity and fairness throughout the entire process. They are both entitled to seek support from the University and to be informed about the process both before it is initiated and as it unfolds.

(c) Both parties have the right to participate in the process, or to refrain from participation.[12] Failure to participate will not be used as evidence against either party, but also will not prevent the process from proceeding unless the complainant withdraws the complaint and the University agrees to abide by that request.

(d) Each party may have an advisor, who may be their lawyer, present when being interviewed by the Investigative Team and the Hearing Panel, but the lawyer or other advisor will not be permitted to present statements or seek the production of evidence. The advisor will be permitted to pose questions to the other party or any witnesses interviewed by the Hearing Panel subject to determinations of relevance and other appropriate issues by the DHO.

(e) Evidence of prior sexual conduct by the complainant or respondent with other partners will not ordinarily be considered in the process, and any evidence of a prior sexual relationship between the parties will not be determinative of the issue of consent.

(f) If there is credible evidence of a pattern of violations of the Sexual Misconduct Policy, evidence that helps to establish such a pattern may be considered by the Hearing Panel.

(g) While the process is underway, appropriate interim measures will be taken to protect the parties. If both the complainant and the respondent are faculty members, the Dean(s) of the school(s) to which the faculty members have appointments—or the Dean'(s) designee(s)—would work with the complainant and respondent, ensuring support is provided to both parties, and implementing interim measures to protect the parties, consistent with principles of fairness. In the event that the complainant is a staff member or a student, the Dean of the school to which the respondent has an appointment—or the Dean's designee—will work with the Division of Human Resources (for staff members) and the Division of University Life (for students) to implement interim measures.

## 3. PRELIMINARY DETERMINATION

Upon receiving a complaint, the AVP will make a preliminary determination as to whether the complaint on its face appears to be a sufficient basis to conduct a full investigation. In making this determination, the AVP may interview the complainant and the respondent (after advising the respondent of the allegations in writing) and conduct whatever preliminary investigation the AVP deems necessary to determine if the actions alleged in the complaint would, if true, constitute a violation of the University's Sexual Harassment, Sexual Violence, Relationship Violence, and Stalking Policy and there is a reasonable basis for investigating the charges. If the AVP concludes there is insufficient basis to proceed, the matter will be concluded, and the parties so advised.

## 4. INVESTIGATION

If the AVP makes the determination that there is a sufficient basis to proceed, an IO will be assigned to conduct the investigation. The AVP will issue a Statement of Charge Letter, based on the complaint and any preliminary investigation conducted. The Charge Letter will be provided to the complainant and the respondent. The respondent will be provided the opportunity to respond in writing to the Charge, and any response will be shared with the complainant. The Dean of each school to which the respondent faculty member has an appointment will also receive a copy of the Charge Letter.

The IO will lead a thorough and impartial investigation, assisted by one or more co-investigators who may come from the school of the complainant or respondent or from elsewhere in the University (the "Investigative Team"). Co-investigator(s) will be University staff or faculty members or a consultant or attorney appropriately trained to investigate and handle sexual misconduct cases who will be selected for individual cases by the AVP or IO. The investigation will include interviews of the complainant, respondent, and any relevant witnesses, as well as review of documentation, physical evidence and any other relevant evidence.

Prior to interviews, the complainant, the respondent and any relevant witnesses will be informed by the IO that statements they make during the process may be admissible in concurrent or subsequent civil or criminal court proceedings. Accordingly, the parties and witnesses will be informed of their rights as outlined in Section D2 above. The parties will be advised of the seriousness of the proceeding and the expectation that the information they provide is both accurate and complete. Any false or misleading statements may subject the party making such statements to proceedings under the applicable University policy, handbook, code and/ or charter. The complainant and respondent may have their advisors and/ or outside counsel present for their interviews, but the advisors or outside counsel will not be permitted to participate in the interview other than to provide advice to the person they have accompanied, and they may be excluded from the interview for disruptive behavior.

In conducting the investigation, the Investigative Team may, as appropriate, also consult with other campus officials including but not limited to administrators in the relevant school(s), the Division of Public Safety, the AVP, the Senior Vice President for Institutional Affairs and Chief Diversity Officer, the Vice Provost for Faculty or the Vice Provost for University Life. The Investigative Team may also consult with the Office of General Counsel, which may determine in particular cases to engage outside counsel to assist the University throughout this process. The Investigative Team may engage forensic and other experts, as needed.

## 5. INVESTIGATIVE REPORT

At the conclusion of the investigation, the Investigative Team will prepare a draft factual investigative report, including assessments of credibility, a recommended finding as to responsibility, and recommended sanctions, if appropriate.[13] In making the responsibility determination, the Investigative Team must be convinced that there is a preponderance of evidence that a violation of the Sexual Misconduct Policy has occurred. In other words, to find a faculty member responsible for violating the Sexual Misconduct Policy, the Investigative Team must be convinced that it is more likely than not that a violation of the Policy has occurred.

### (a) Opportunity for Review and Comment

The draft investigative report and related exhibits and evidence will be provided to both the complainant and respondent for review and comment, under strict instructions that they are and at all times remain strictly confidential, and are not to be shared with anyone other than their families and advisors or outside counsel, as described above without the expressed consent of the AVP. Sharing of the draft report by either party, their families, advisors or outside counsel with any additional persons is strictly prohibited and anyone with whom the report is shared must

be so advised. The complainant and the respondent will be given the opportunity to respond to and comment on the draft investigative report in writing.

**(b) Final Report**

As a result of the response and comments received, the Investigative Team may conduct a further investigation and/or amend the draft report, if the Team determines either action to be warranted. A final investigative report will be prepared, incorporating any changes, and shared with the complainant and the respondent. The complainant and respondent may submit formal objections or comments to the final report, which will be appended to the final report of the matter.

## 6. RESOLUTION WITHOUT A HEARING

The matter may be resolved at this stage if both parties agree to the recommendations of the Investigative Team with respect to responsibility and, if applicable, sanctions, or if the parties otherwise reach a mutually acceptable resolution. The University, however, will not compel either the complainant or the respondent to engage in face-to-face mediation or to accept the recommendations of the Investigative Team.

## 7. HEARING PANEL

If the matter is not resolved at this stage in a mutually acceptable manner, either party may request a hearing before a Hearing Panel (Panel) within 10 business days of transmission of the final report.

### (a) Panel Membership

The Panel will be comprised of three (3) faculty members and the Designated Hearing Officer (DHO), who will be a non-voting member. The DHO will make all decisions about the organization of the Panel, including decisions regarding the admissibility of evidence, witnesses to appear before the panel, or any additional decisions regarding the administration of the hearing process.[14]

Membership of the Panel, including the DHO, will observe the following guidelines:

i. Members will be selected from a pool of faculty who have agreed to serve for a term of one or more years.

ii. Only mixed-gender Panels that have received training in handling complaints involving sexual misconduct will hear sexual misconduct cases.

iii. Faculty serving on a Panel may not share a professional, personal or academic department affiliation (e.g., have a faculty appointment or be enrolled in a course of study) with either of the parties. Faculty asked to serve must recuse themselves or be dismissed if they have any professional or personal ties to either of the parties or to individuals with whom the parties are closely associated. Faculty with personal knowledge of the alleged incident of sexual misconduct also must recuse themselves or be dismissed.

iv. The University will train members of the pool to fulfill their responsibilities as adjudicators according to the procedures and policies outlined here and to ensure compliance with Title IX and other applicable state and federal guidelines. In addition, the Panel will be provided with "just in time" training on adjudicating sexual misconduct cases, unless the Panel members have recently been trained.

v. No member of the Investigative Team may serve on the Panel; however, any such individual may be interviewed by the Panel regarding the investigation. The AVP or IO may assist the DHO as needed in organizational and administrative matters related to the Panel.

vi. The complainant and respondent will be notified of the membership of the Panel in advance of the Hearing. Any challenges for cause against individual Panel members must be made promptly so as not to delay the conduct of the Hearing and will be given serious consideration by the DHO to ensure impartiality of the proceedings.

vii. All proceedings must be kept strictly confidential among the parties, witnesses and members of the Panel. All individuals involved in such Hearings must agree to such conditions of confidentiality.

### (b) Hearing Procedures

Hearings must be prompt, fair and impartial, affording the complainant's allegations and the respondent's defenses all due consideration and protecting the rights of both parties. The Panel will review the Investigative Team's final report, including any responses, objections or comments provided by the complainant and/or respondent. The Panel will also carefully review the evidentiary record, including witness statements, documents and physical evidence.

**Hearing Panel Interviews**

i. The Panel will interview separately the IO (and co-investigator(s) if the Panel so chooses), the complainant and the respondent. The Panel will provide the complainant and respondent with 10 days' advance notice of the Hearing. If reasonably possible, interviews will be conducted on one day, but if such scheduling would require an unreasonably long day, or if such scheduling would unreasonably delay the proceeding, the Hearing may be scheduled over multiple days.

ii. The Panel may seek additional evidence from the IO and interview key witnesses on whom the IO relied in drawing their conclusions, as well as request additional evidence from the IO to clarify the evidentiary record, provided that it can do so without unreasonably delaying the process. In the event that a new witness comes forward during the Hearing who was not originally interviewed by the IO, or new evidence is discovered after the IO has issued their report, the DHO may allow that witness to be interviewed or admit the evidence to the Hearing, but only if the DHO judges the new witness or evidence to be relevant to an accurate and fair determination of the outcome.

iii. The Hearing will be held in private. Initial interviews will be conducted by the Panel and each party's advisor will have an opportunity to pose questions to the other party and any witnesses. Only the person interviewed (and in the case of the parties, that person's advisor or outside counsel) will be present during the Panel interview. The complainant or respondent (and their advisor or outside counsel, as applicable) will be able to view interviews from separate rooms via closed-circuit television or similar video transmission.

iv. Subject to the protections set forth in Section D2 above, the Panel has wide latitude when questioning the complainant, the respondent and any witnesses in order to determine the accuracy of the report.

v. The complainant and respondent may propose witnesses and provide specific questions in advance that they believe important to ask of other parties or witnesses. The parties' advisors also may ask questions of the other party and witnesses during the Hearing subject to the DHO's determination of relevance or other appropriate reasons. The DHO, in consultation with the Panel, will determine the relevance as well as the appropriateness of witnesses and questions, and may accordingly place restrictions on, include or exclude witnesses or other information.

vi. When the Panel is conducting the interview of the complainant and respondent, each may bring an advisor or outside counsel with them

to provide advice and support. The advisor or outside counsel will be permitted to direct relevant questions to the other party or to witnesses. The advisor or outside counsel, complainant, or respondent may be excluded from the interview by the DHO for disruptive behavior.

vii. The interviews by the Panel will be recorded (audio only). No observers will be permitted to make any audio or video recordings.

**(c) Hearing Panel Decision**

After the Hearing concludes, the Panel will immediately deliberate in private to decide whether, by a preponderance of the evidence, the respondent has violated the University's Sexual Misconduct Policy. Preponderance of the evidence means that the Panel must find that it is more likely than not that the faculty member is responsible for a violation of the Policy. A finding of responsibility requires a majority vote of the members of the Panel.

i. If the respondent is found responsible, the Panel will also recommend an appropriate sanction, by majority vote, based upon the facts of the case and University precedent, with a presumption in favor of the sanction recommended by the Investigative Team.

ii. The Panel will arrive at its conclusion as expeditiously as possible and will promptly advise both the complainant and the respondent in writing of its decision with respect to responsibility and, if applicable, recommended sanctions. In keeping with guidelines for timely resolution as provided in Section D1 above, the written decision will be provided as soon after the conclusion of the proceeding as is possible.

## 8. SANCTIONS

After a final decision has been rendered by the Panel, the matter is presented to the Dean of the school in which the respondent has a primary appointment for procedures related to sanctions, if applicable. The Dean is provided the final investigative report, along with the Panel's decision and the appellate decision (if any).

(a) If the respondent is a member of the Standing Faculty, the Dean will follow the procedures described in the Faculty Handbook's section regarding Procedure Governing Sanctions Taken Against Members of the Faculty (Section II.E.16), as appropriate, to determine what, if any, sanction should be imposed against the respondent based on the determination of the Investigative Team, and if applicable, the Panel, and following the Dean's consultation with the Vice Provost for Faculty.

(b) If the respondent is a member of the Associated Faculty, the Dean will consider the determination of the Investigative Team, as well as the Panel and consult with the Vice Provost for Faculty before implementing an appropriate sanction.

(c) The matter will be referred to the Provost to determine the appropriate sanction in the event that the Dean is the respondent or if referral to the Dean would create an actual or apparent conflict of interest.

# E. Resource Offices
## 1. CONFIDENTIAL RESOURCES

Generally, the information shared with confidential resources will be held in confidence, consistent with the University's obligation to address complaints of sexual misconduct, unless the person sharing the information gives their consent to the disclosure of that information. Non-identifying information regarding complaints should be provided to the AVP for purposes of assuring compliance with Title IX and other applicable laws and regulations. Confidential resources are not obligated to share identifying information with the AVP when an incident of sexual

violence is shared with that resource. However, the commitment to confidentiality does not preclude the sharing of information among University administrators as appropriate to keep members of the University community safe. In addition, confidential resources should submit non-identifying information about incidents of sexual misconduct to the Division of Public Safety for the purpose of crime statistics reporting under the Clery Act. (For additional information regarding requirements, see the Clery Act & Crime Reporting page at https://www.publicsafety.upenn.edu/clery/). The University's confidential resources are:

**Special Services Department, Division of Public Safety**
24-hours/7 days per week: (215) 898-6600
4040 Chestnut Street
http://www.publicsafety.upenn.edu/special-services/

**Penn Women's Center**
(215) 898-8611
3643 Locust Walk
http://www.pwc.vpul.upenn.edu

**Lesbian Gay Bisexual Transgender Center**
(215) 898-5044
3907 Spruce Street
https://www.lgbtc.vpul.upenn.edu

**African-American Resource Center**
(215) 898-0104
3643 Locust Walk
http://www.upenn.edu/aarc/

**Office of the University Chaplain**
(215) 898-8456
240 Houston Hall, 3417 Spruce Street
http://www.upenn.edu/chaplain/

**Office of the Ombuds**
(215) 898-8261
113 Duhring Wing, 236 S. 34th Street
http://www.upenn.edu/ombuds/

**Employee Assistance Program, Health Advocate**
(866) 799-2329
www.healthadvocate.com/upenn (http://catalog.upenn.edu/faculty-handbook/vi/vi-e/www.healthadvocate.com/upenn/)

**Penn Violence Prevention**
(215) 746-2642
VPUL, 3539 Locust Walk
https://pvp.vpul.upenn.edu

## 2. OFFICIAL REPORTING OFFICES FOR SEXUAL MISCONDUCT COMPLAINTS

If reports of sexual misconduct are made with or come to the attention of the following offices, they must ensure that appropriate action is taken, including notifying the University's AVP and Title IX Officer.

**Office of Affirmative Action and Equal Opportunity Programs**
(215) 898-6993
Suite 421, Franklin Building
http://www.upenn.edu/affirm-action (http://www.upenn.edu/affirm-action/)

**Student Intervention Services, VPUL**
(215) 898-6081

(215) 768-6527 Nights/Weekends
3611 Locust Walk
https://sis.vpul.upenn.edu

**Office of Student Conduct**
(215) 898-5651
Suite 400, 3440 Market Street
https://www.osc.upenn.edu/

**Office of Staff and Labor Relations, Division of Human Resources**
(215) 898-6093
Suite 600, Franklin Building
https://www.hr.upenn.edu/workplace-issues/staff-labor-relations
(https://www.hr.upenn.edu/workplace-issues/staff-labor-relations/)

### 3. INVESTIGATIVE OFFICE FOR ALL SEXUAL MISCONDUCT COMPLAINTS

The official office for reporting, initiating a formal complaint, and investigation of violations of the Sexual Misconduct Policy, including violations of the Sexual Harassment Policy, is the Office of the Associate Vice President for Equity and Title IX Officer. The contact information for that Office is:

**Associate Vice President for Equity and Title IX Officer**
(215) 898-2887
3901 Walnut Street, Suite 320
https://titleixoffice.upenn.edu

# V. Procedures for Resolving Complaints of Sexual Misconduct Against Staff

## A. Introduction

The University of Pennsylvania is committed to providing a safe and healthy environment, free of gender-based misconduct, to all members of our community and visitors to our community. As such, sexual harassment, sexual assault, sexual violence, relationship violence, and stalking will not be tolerated. In order to ensure the creation of a climate where members of the community are able to thrive and achieve their full potential, the University has developed a wide range of policies, educational programs, broad-based resources, support, and reporting systems. These procedures supplement these other policies and initiatives, addressing the process by which complaints against a University staff member for a violation of its Sexual Misconduct Policy (which includes its Sexual Harassment, Sexual Violence, Relationship Violence and Stalking Policy ("Sexual Harassment Policy") and the Consensual Romantic and Sexual Relationships in the Workplace and Educational Settings Policy) will be investigated and resolved.

## B. Confidentiality

Confidentiality is of critical importance in ensuring that these sensitive matters are handled appropriately. The University has an obligation to respond to violations of its Sexual Misconduct Policy as fairly and expeditiously as possible when a complaint is received. University staff and faculty may share information with others who have a legitimate need to know in order to fairly and effectively address complaints, but the information should be considered confidential and should be protected to the extent possible consistent with legal obligations. Such administrators may include, for example those in, the Division of University Life, the Division of Human Resources, the Office of the Associate Vice President and Title IX Officer (AVP), the Division of Public Safety, Senior Vice President for Institutional Affairs and Chief Diversity Officer, the Office

of General Counsel, the Employee Assistance Program, Deans, Vice Provosts, and Vice Presidents of administrative divisions.

## C. Reporting Complaints of Sexual Misconduct

### 1. OFFICE OF THE ASSOCIATE VICE PRESIDENT AND TITLE IX OFFICER

The Office of the Associate Vice President and Title IX Officer (AVP) will be responsible for ensuring that all complaints made against a University staff member alleging a violation of the University's Sexual Misconduct Policy (which includes the Sexual Harassment and Consensual Romantic and Sexual Relationships in the Workplace and Educational Settings Policies) are handled appropriately. All AVP responsibilities as described in these procedures will be performed directly by the AVP or by the AVP's designee.

Complaints must either be presented in writing or based upon information provided by the complainant or another individual making the report to the AVP (or designee) who will then memorialize the allegations in writing and ask the complainant to confirm the allegations. Complainants may include University students, staff, or faculty members, participants in a University-sponsored activity, or others alleging a violation of the Policy by a current University staff member.

### 2. OFFICE OF THE DISTRICT ATTORNEY AND OFFICE FOR CIVIL RIGHTS

Complainants may also choose to file a report with the District Attorney, the Office for Civil Rights of the U.S. Department of Education, or other external agencies. The University's processes and the legal system work independently of one another, and the University has its own interest in, and responsibility for, the enforcement of its Sexual Harassment Policy.[15] Therefore, the University will not unilaterally defer its processes pending the outcome of a criminal process, nor will the outcome of any legal process be determinative of the University result. The University will, however, comply with reasonable requests by law enforcement for cooperation, and upon reasonable request, may temporarily suspend its factfinding process in a sexual misconduct investigation so as not to impede the law enforcement process.

### 3. SUPPORT, COUNSELING AND ADVICE

In making a decision about whether to file a complaint, complainants may seek support, counseling, and advice from other offices on campus. A list of these offices is provided in Section III below. Should the complainant decide to proceed with a University investigation and resolution process against a University staff member, the Office of the AVP will be the single place to initiate the process.[16]

### 4. TIMEFRAME FOR SUBMITTING A COMPLAINT

The University does not limit the timeframe for making a report of a violation of the Sexual Misconduct Policy. Reports may be made at any time, although the University's ability to investigate or take action may be limited by the passage of time, or by changes in the employment relationship of the alleged respondent at the time the report is made.

### 5. COMPLAINANT REQUEST FOR CONFIDENTIALITY

The University is required by Title IX to weigh the complainant's request for confidentiality/privacy with the University's commitment to provide a reasonably safe and nondiscriminatory environment. In situations where a complainant requests confidentiality, the University's ability to investigate and respond to the allegations may be limited. The AVP will notify the complainant if the University cannot, in unusual cases, maintain the complainant's confidentiality/privacy. The complainant's and respondent's identities will only be revealed to those individuals who

need to know their names in order to investigate, resolve the complaint or provide interim measures. If the University becomes aware of behavior or a pattern of behavior by one or more respondents, the University will take appropriate action in an attempt to protect the University community.

## D. Investigation and Resolution of Complaints

The Office of the Associate Vice President for Equity and Title IX Officer (AVP) is responsible for overseeing the informal or formal resolution of all complaints made against a University staff member for a violation of the University's Sexual Misconduct Policy. Complaints should be made with the AVP who will ensure that complaints are investigated by a trained Investigative Officer (IO), who will select a co-investigator to form the Investigative Team. The Investigative Team will consult with the Dean of the school or Vice President of the division in which the respondent works, or the Vice President for Human Resources in any case for which the Dean or Vice President has an actual or the appearance of a conflict of interest or is implicated in the complaint.

Complaints must either be presented in writing or based on information provided by the complainant or another individual making the report who will then memorialize the allegations in writing and ask the complainant to confirm them. Complainants may include University students, staff or faculty member, as well as others both within and outside the University community, alleging a violation of the University's Sexual Misconduct Policy by a University staff member.

### 1. TIMELY RESOLUTION

The process of resolving complaints, exclusive of any appeal, should be completed, unless there are special circumstances, within 60 business days of the filing of the written complaint. The appeal should be completed, absent special circumstances, within 30 business days of the filing of the appeal.

The complainant and the respondent will both be provided with a copy of the Investigative Team's decision and given 10 business days from the date of the transmittal of that decision to file an appeal.

### 2. RIGHTS AND PROTECTIONS FOR COMPLAINANT AND RESPONDENT

(a) The complainant and respondent have the right to a process that is fundamentally fair, and free of bias or prejudice.

(b) The complainant and respondent have the right to be treated with respect, dignity, sensitivity, and fairness throughout the entire process. They are both entitled to seek support from the University and to be informed about the process both before the process is initiated and throughout the process as it unfolds.

(c) Both parties have the right to participate in the process, or to refrain from participation.[17] The failure to participate will not be used as evidence against either party, but also will not prevent the process from proceeding unless the complainant withdraws the complaint and the University agrees to abide by that request

(d) Both parties may have an advisor present when being interviewed by the Investigative Team, but the advisor will not be permitted to present statements, seek the production of evidence, or question any witnesses during the investigative stage of the process.

(e) Evidence of prior sexual conduct by the complainant or respondent with other partners will not be considered in the process, and any evidence of a prior sexual relationship between the parties will not be determinative of the issue of consent. If there is credible evidence of a

pattern of violations of the Sexual Misconduct Policy, evidence that helps to establish such a pattern may be considered.

(f) While the process is underway, appropriate interim measures will be taken to protect the parties. The Office of Staff and Labor Relations in the Division of Human Resources (or another appropriate office), in consultation with the respondent's supervisor, will implement interim measure to protect the parties consistent with principles of fairness. The Office of Staff and Labor Relations in the Division of Human Resources (or other appropriate office) will work with the complainant and respondent to ensure that both parties have access to support and assistance during the process.

**Consensual Romantic and Sexual Relationships in the Workplace and Educational Settings**

If the AVP determines that the complaint involves a possible violation of the Consensual Romantic and Sexual Relationships in the Workplace and Educational Settings and not the Sexual Harassment, Sexual Violence Relationship Violence or Stalking Policy, the complaint will be investigated by an IO, working with the appropriate Dean or Vice President, or in the event of an actual or perceived conflict of interest, the Vice President for Human Resources. The facts, conclusions, and recommendations reached by the IO will be reported to the appropriate Vice President or Dean. In the event of a finding of responsibility for a violation of the Sexual Misconduct Policy, appropriate disciplinary action will be taken.

Any disciplinary action taken against a staff person is subject to appeal by either party in writing to the Vice President for Human Resources (or designee) and the Dean of the school, Vice President of the division, or Vice Provost of the division in which the respondent works, who jointly have exclusive jurisdiction to decide appeals.

i. Appeals should be submitted to the AVP within 10 business days of transmission of the decision of the Investigative Team. Letters of appeal should specifically state whether the objection is to the judgment of a violation of University policy, the recommended sanction, or both, and explain in detail the grounds for appeal.

ii. The Vice President for Human Resources (or designee) and the Dean or Vice President of the school or division will review the report of the Investigative Team to ensure that the process was consistent with University policy and that the decision was not arbitrary or capricious. Any supporting evidence, and any other relevant materials may also be reviewed by the Vice President for Human Resources (or designee) and the Dean or Vice President of the relevant school or division at their discretion.

iii. After considering the appeal, the Vice President for Human Resources (or designee) and the relevant Dean or Vice President (or designee) will promptly notify the parties in writing as to whether the Investigative Team's decision will be upheld or modified. The decision of the relevant Dean or Vice President and the Vice President for Human Resources will be final.

**Sexual Harassment, Sexual Violence, Relationship Violence and Stalking**

If the AVP determines that the complaint involves a possible violation of the Sexual Harassment, Sexual Violence Policy, Relationship Violence and Stalking Policy (Sexual Harassment Policy) the procedures set forth below will apply.

## 1. PRELIMINARY DETERMINATION

Upon receiving a complaint, the AVP will make a preliminary determination as to whether the complaint falls within the purview of the Sexual Misconduct Policy and whether, on its face, there appears to be a sufficient basis to conduct a full investigation. In making this determination, the AVP may interview the complainant and the respondent (after advising the respondent of the allegations in writing) and conduct whatever preliminary investigation the AVP deems necessary to determine if the actions alleged in the complaint would, if true, constitute a violation of the University's Sexual Harassment Policy) and there is a reasonable basis for investigating the complaint. If the AVP concludes there is insufficient basis to proceed, the matter will be concluded, and the parties so advised.

## 2. INVESTIGATION

If the AVP makes the determination that there is a sufficient basis to proceed, a Statement of Charge Letter will be issued, based on the complaint and any preliminary investigation conducted. The Charge Letter will be provided to the complainant and the respondent. The respondent will be provided the opportunity to respond in writing to the Charge, and any response will be shared with the complainant. The Dean or Vice President of the division i in which the respondent is employed will also receive a copy of the Charge Letter.

The AVP will appoint an Investigative Officer (IO) to lead a thorough and impartial investigation, assisted by one or more co-investigators who may come from the school or center of one of the parties or from elsewhere in the University (the "Investigative Team"). The co-investigator(s) will be University staff or faculty members appropriately trained to investigate and handle sexual misconduct cases who will be selected for individual cases by the IO. The investigation will include interviews of the complainant and respondent, interviews of witnesses, and review of documentation, physical evidence, and any other relevant evidence.

Prior to interviews, the complainant, the respondent, and any relevant witnesses will be informed by the IO that statements they make during the process may be admissible in concurrent or subsequent civil or criminal court proceedings and will accordingly also be informed of their rights as outlined in Section B above. The parties will be advised of the seriousness of the proceeding and the expectation that the information they provide is both accurate and complete. Any false or misleading statements may subject the party making such statements to proceedings under the applicable University policy, handbook, code and/or charter. The complainant and respondent may have their advisors[18] and/or outside counsel present for their interviews, but the advisors or outside counsel will not be permitted to participate in the interview other than to provide advice to the person they have accompanied, and they may be excluded from the interview for disruptive behavior.

In conducting the investigation, the Investigative Team may, as appropriate, also consult with other campus officials including but not limited to administrators in the relevant division(s), school(s), Public Safety, the AVP and Title IX Officer, the Senior Vice President for Institutional Affairs and Chief Diversity Officer, or the Vice President for Human Resources. The Investigative Team may also consult with the Office of General Counsel, who may determine in particular cases to engage outside counsel to assist the University throughout this process. The Investigative Team may engage forensic and other experts, as needed.

## 3. INVESTIGATIVE REPORT

At the conclusion of the investigation, the Investigative Team will prepare a draft report, including assessments of credibility, a finding as to whether there has been a violation of University policy, and, if applicable, recommended disciplinary action. In making a determination regarding responsibility, the Investigative team will use a preponderance of the evidence standard. In other words, to find a staff member responsible for violating the Sexual Misconduct Policy, the Investigative Team must be convinced that it is more likely than not that a violation of the Policy has occurred.

### (a) Opportunity for Review and Comment

The draft investigative report and related exhibits and evidence will be provided to both the complainant and respondent for review and comment, under strict instructions that they are and at all times remain strictly confidential, and are not to be shared with anyone other than their families and advisors or outside counsel, as described above without the expressed consent of the AVP. Sharing of the draft report by either party, their families, advisors or outside counsel with any additional persons is strictly prohibited and anyone with whom the report is shared must be so advised. The complainant and the respondent will be given the opportunity to respond to and comment on the draft investigative report in writing.

### (b) Final Report

As a result of the response and comments received, the Investigative Team may conduct a further investigation and/or amend the draft report, if the Team determines either action to be warranted. A final investigative report will be prepared, incorporating any changes, and shared with the complainant and the respondent. The complainant and respondent may submit formal objections or comments to the final report, which will be shared with the other party and be appended to the final report of the matter.

## 4. RESOLUTION WITHOUT A HEARING

The matter may be resolved at this stage if both parties agree to the recommendations of the Investigative Team with respect to responsibility and, if applicable, sanctions, or if the parties otherwise reach a mutually acceptable resolution. The University, however, will not compel either the complainant or the respondent to engage in face-to-face mediation or to accept the recommendations of the Investigative Team.

## 5. HEARING PANEL

If the matter is not resolved at this stage in a mutually acceptable manner, either party may request a hearing before a Hearing Panel (Panel) within 10 business days of transmission of the final report.

### (a) Panel Membership

The Panel will be comprised of three (3) faculty members and the Designated Hearing Officer (DHO), who will be a non-voting member. The DHO will make all decisions about the organization of the Panel, including decisions regarding the admissibility of evidence, witnesses to appear before the panel, or any additional decisions regarding the administration of the hearing process.[19] Members of the Panel, including the DHO, will observe the following guidelines:

i. Members will be selected from a pool of faculty who have agreed to serve for a term of one or more years.

ii. Only mixed-gender panels of faculty who have participated in training on handling complaints involving sexual misconduct will hear sexual misconduct cases.

iii. Faculty appearing on a Panel may not share an academic department affiliation (e.g., has a faculty appointment or is enrolled in a course of study) with either of the parties, nor may any faculty member serve on the Panel who has a professional, or personal relationship with either of the parties. Faculty asked to serve must recuse themselves or be dismissed if they have any personal or professional ties to either of the parties or to individuals with whom the parties are closely associated. Faculty with personal knowledge of the alleged incident of sexual misconduct also must recuse themselves or be dismissed.

iv. The University will train members of the pool to fulfill their responsibilities as adjudicators according to the procedures and policies outlined here and to ensure compliance with Title IX and other applicable state and federal guidelines. In addition, the Panel will be provided with "just in time" training on adjudicating sexual misconduct cases, unless the Panel members have recently been trained.

v. No member of the Investigative Team may serve on the Panel; however, any such individual may be interviewed by the Panel regarding the investigation. The AVP or IO may assist the DHO as needed in organizational and administrative matters related to the Panel.

vi. The complainant and respondent will be notified of the membership of the Panel in advance of the Hearing. Any challenges for cause against individual Panel members must be made promptly to the DHO so as not to delay the conduct of the Hearing. The DHO will give serious consideration to any challenges made to ensure impartiality of the proceedings.

vii. All proceedings must be kept strictly confidential among the parties, witnesses and members of the Panel. All individuals involved in such Hearings must agree to such conditions of confidentiality.

**(b) Hearing Procedures**
Hearings must be prompt, fair and impartial, affording the complainant's allegations and the respondent's defenses all due consideration and protecting the rights of both parties. The Panel will review the Investigative Team's final report, including any responses, objections or comments provided by the parties. The Panel will also carefully review the evidentiary record, including witness statements, documents and physical evidence.

**Hearing Panel Interviews**

i. The Panel will interview separately the IO (and co-investigator(s) if the Panel so chooses), the complainant and the respondent. The Panel will provide the complainant and respondent with ten days (10) advance notice of the Hearing. If reasonably possible, interviews will be conducted on one day, but if such scheduling would require an unreasonably long day, or if such scheduling would unreasonably delay the proceeding, the Hearing may be scheduled over multiple days.

ii. The Panel may seek additional evidence from the Investigative Team and interview key witnesses on whom the Investigative Team relied in drawing their conclusions, as well as request additional evidence from the IO to clarify the evidentiary record, provided that it can do so without unreasonably delaying the process. In the event that a new witness comes forward during the Hearing who was not originally interviewed by the Investigative Team, or new evidence is discovered after the Investigative Team has issued their report, the DHO may allow that witness to be interviewed or admit the evidence to the hearing, but only if the DHO judges the new witness or evidence to be relevant to an accurate and fair determination of the outcome.

iii. The Hearing will be held in private. Only the person being interviewed (and in the case of the parties, that person's advisor or outside counsel) will be present when the Hearing is in session. The complainant or respondent (and their advisor or outside counsel, as applicable) will be able to view interviews from separate rooms via closed-circuit television or similar video transmission.

iv. Subject to the protections set forth in Section D2 above, the Panel has wide latitude when questioning the complainant, the respondent and any witnesses in order to determine the accuracy of the report.

v. The complainant and respondent may propose witnesses and provide specific questions in advance that they believe important to ask of other parties or witnesses. The parties' advisors may also interview the other party and witnesses called by the Panel. The DHO, in consultation with the Panel, will determine the relevance as well as the appropriateness of witnesses and questions, and may accordingly place restrictions on, include or exclude witnesses or other information.

vi. When the Panel is conducting the interview of the complainant and respondent, each may bring an advisor or outside counsel with them to provide advice and support. The advisor or outside counsel will be permitted to direct relevant questions to the other party or to witnesses. The advisor or outside counsel may be excluded from the interview by the DHO for disruptive behavior.

vii. The interviews by the Panel will be recorded (audio only). No observers will be permitted to make any audio or video recordings.

**(c) Hearing Panel Decision**
After the Hearing concludes, the Panel will immediately deliberate in private to decide whether, by a preponderance of the evidence, the respondent has violated the University's Sexual Misconduct Policy. Preponderance of the evidence means that the Panel must find that it is more likely than not that the staff member is responsible for a violation of the Policy. A finding of responsibility requires a majority vote of the members of the Panel.

i. If the respondent is found responsible, the Panel will also recommend an appropriate sanction, by majority vote, based upon the facts of the case and University precedent, with a presumption in favor of the sanction recommended by the Investigative Team.

ii. The Panel will arrive at its conclusion as expeditiously as possible and will promptly advise both the complainant and the respondent in writing of its decision with respect to responsibility and, if applicable, recommended sanctions. In keeping with guidelines for timely resolution as provided in Section A above, the written decision will be provided as soon after the conclusion of the proceeding as is possible.

# E. Appeals

Either party may appeal the decision of the Hearing Panel by submitting a written request within 10 business days of transmission of the decision of the Hearing Panel. Letters of appeal should specifically state whether the objection is to the judgment of a violation of University policy, the recommended sanction, or both, and explain in detail the grounds for appeal. The request for an appeal (including any attachments) will be shared with the other party who will have the opportunity to respond or to direct comments to the DAO within 10 business days. Any such response or comments will be shared with the other party.

The DAO will review the report of the Investigative Team and supporting evidence, the audio record of the Panel Hearing, and any other material the DAO deems relevant, in addition to the decision of the Panel to ensure

that the process was consistent with University policy, that the result was not arbitrary or capricious, that there were no procedural irregularities, that there was no demonstrated bias or conflict of interest on the part of any fact-finder, and that no new evidence has been brought forward that would alter the outcome of the Hearing.

After considering the appeal, the DAO will promptly issue their decision in writing and will provide copies to the DHO, the Provost, the Senior Vice President for Institutional Affairs and Chief Diversity Officer, the Vice President for Human Resources, the complainant, respondent, and other appropriate parties.

## F. Resource Offices

### 1. CONFIDENTIAL RESOURCES

Generally, the information shared with confidential resources will be held in confidence, consistent with the University's obligation to address complaints of sexual misconduct, unless the person sharing the information gives their consent to the disclosure of that information. Non-identifying information regarding complaints should be provided to the AVP for purposes of assuring compliance with Title IX and other applicable laws and regulations. Confidential resources are not obligated to share identifying  information with the AVP when an incident of sexual misconduct is shared with that resource. However, the commitment to confidentiality does not preclude the sharing of information among University administrators as appropriate to keep members of the University community safe. In addition, confidential resources should submit non-identifying information about incidents of sexual misconduct to the Division of Public Safety for the purpose of crime statistics reporting under the Clery Act. (For additional information regarding requirements, see the Clery Act & Crime Reporting page at https://www.publicsafety.upenn.edu/clery/). The University's confidential resources are:

**Special Services Department, Division of Public Safety**
24-hours/7 days per week: (215) 898-6600
4040 Chestnut Street
http://www.publicsafety.upenn.edu/special-services/

**Penn Women's Center**
(215) 898-8611
3643 Locust Walk
http://pwc.vpul.upenn.edu

**Lesbian Gay Bisexual Transgender Center**
(215) 898-5044
3907 Spruce Street
https://lgbtc.vpul.upenn.edu/

**African-American Resource Center**
(215) 898-0104
3643 Locust Walk
http://www.upenn.edu/aarc/

**Office of the University Chaplain**
(215) 898-8456
240 Houston Hall, 3417 Spruce Street
http://www.upenn.edu/chaplain/

**Office of the Ombuds**
(215) 898-8261
113 Duhring Wing, 236 S. 34th Street
http://www.upenn.edu/ombuds/

**Employee Assistance Program, Health Advocate**

(866) 799-2329
www.healthadvocate.com/upenn (http://catalog.upenn.edu/faculty-handbook/vi/vi-e/www.healthadvocate.com/upenn/)

### 2. OFFICIAL REPORTING OFFICES FOR SEXUAL MISCONDUCT COMPLAINTS

If reports of sexual misconduct are made with or come to the attention of the following offices, they must ensure that appropriate action is taken, including notifying the University's AVP and Title IX Officer:

**Office of Affirmative Action and Equal Opportunity Programs**
Suite 421, Franklin Building
(215) 898-6993
http://www.upenn.edu/affirm-action/

**Student Intervention Services, VPUL**
(215) 898-6081
(215) 768-6527 Nights/Weekends
3611 Locust Walk
https://sis.vpul.upenn.edu

**Office of Student Conduct**
Suite 400, 3440 Market Street
(215) 898-5651
https://www.osc.upenn.edu/

**Office of Staff and Labor Relations, Division of Human Resources**
Suite 600, Franklin Building
(215) 898-6093
https://www.hr.upenn.edu/workplace-issues/staff-labor-relations (https://www.hr.upenn.edu/workplace-issues/staff-labor-relations/)

### 3. INVESTIGATIVE OFFICE FOR SEXUAL MISCONDUCT COMPLAINTS

The official office for reporting, initiating a formal complaint, and investigation of violations of the Sexual Misconduct Policy, including violations of the Sexual Harassment Policy, is the Office of the Associate Vice President for Equity and Title IX Officer. The contact information for that Office is:

**Associate Vice President for Equity and Title IX Officer**
3901 Walnut Street, Suite 320
(215) 898-2887
https://titleixoffice.upenn.edu

---

[1] The terms "harassment" and "sexual harassment" are used throughout and are defined as a matter of University policy, and are not necessarily identical or limited to the uses of the term in external sources, including governmental guidelines, laws, regulations or legal decisions. The Sexual Harassment, Sexual Violence, Relationship Violence and Stalking Policy and the Consensual Romantic and Sexual Relations in the Workplace and Educational Setting Policy are sometimes referred to together as the "Sexual Misconduct Policy."

[2] For purposes of this policy, "faculty" includes (but is not limited to) standing faculty, clinical faculty, associated faculty, and academic support staff, as well as clinical or lab supervisors, postdoctoral fellows, house staff, residents, graduate and undergraduate teaching assistants, and any other person providing instruction, academic advising, or academic oversight of an enrolled student in any school, course, or program, including summer and off-campus programs, irrespective of geographical location.

[3] "Academic responsibility" includes (but is not limited to) teaching, grading, mentoring, advising, or evaluating research or other academic activity, participating in decisions regarding funding or other resources, clinical supervision, and recommending for admissions, employment, fellowships, or awards. In this context, students include graduate and professional school students, postdoctoral scholars, and clinical residents or fellows.

[4] This procedure amends and supersedes the Charter of the University of Pennsylvania Student Disciplinary System with respect to violations of University policy for behaviors that are defined in the University's Sexual Misconduct Policy. It applies to each of the 12 schools, notwithstanding the existence of separate procedures that individual schools may have adopted for violations of laws or policies other than the University's Sexual Misconduct Policy. If a complaint involves allegations of violations of the Sexual Misconduct Policy as well as other University policies, the matter can either be fully resolved using this process, or divided into two separate proceedings, as appropriate in any particular case.

[5] The University recognizes that it should proceed in cases where criminal charges are pending; however, respondents may choose not to participate in the disciplinary process in order to protect their Fifth Amendment rights. Such decision will not be used as evidence against any respondent and the Hearing Panel will be instructed not to draw any adverse inference from the failure to participate.

[6] Please note that declining to respond to questions posed during a Hearing may impact the Panel's ability to rely upon the information provided by that person.

[7] The University will provide to the parties a list of advisors in the Penn community who have been trained by the University to support both complainants and respondents in this process. The parties need not select an advisor from this list. The parties may also retain outside counsel in addition to, or instead of, using an advisor. The role of outside counsel, however, will be limited to an advisory role and counsel will not be permitted to have an active role in the investigation and will have a limited role during any resulting Hearing or appeal.

[8] In carrying out these responsibilities, the DHO may consult with the AVP, the Office of General Counsel and other appropriate office such as the Office of Student Conduct and the Senior Vice President for Institutional Affairs and Chief Diversity Officer. University administrators thus consulted will respect the confidentiality conditions of the proceedings.

[9] The decision as to whether a complaint involves sexual harassment is made by the AVP.

[10] The University recognizes that in the event criminal charges are pending, a respondent may choose not to participate in the process described in these procedures in order to protect his or her Fifth Amendment rights. Such decision will not be used as evidence against any respondent and the Hearing Panel will be instructed not to draw any adverse inference from the failure to participate.

[11] The AVP or the IO will work with other appropriate University offices, including the Division of University Life and the Vice Provost for Faculty, to determine if interim measures are appropriate.

[12] Please note that declining to respond to questions posed during a Hearing may impact the Panel's ability to rely upon the information provided by that person.

[13] The parties will be advised, and acknowledge, that the Investigative Report, Exhibits and Drafts are confidential to be used by them and their families and advisors in connection with these proceedings.

[14] In carrying out these responsibilities, the DHO may consult with the AVP, the Office of General Counsel and other appropriate offices such as the Vice Provost for Faculty and the Senior Vice President for Institutional Affairs and Chief Diversity Officer. University officers thus consulted will respect the confidentiality conditions of the proceedings.

[15] The University recognizes that should it be proceeding in cases where criminal charges are pending, the respondents may choose not to participate in the process described in these procedures in order to protect their Fifth Amendment rights. Such decision will not be used as evidence against any respondent and the Hearing Panel will be instructed not to draw any adverse inference from the failure to participate.

[16] While the Investigative Officer will be responsible for managing the complaint investigation and resolution process, as described below, the AVP will work with other appropriate University offices, including the Office of Affirmative Action and Equal Opportunity Programs and the Division of Human Resources, to determine if interim measures are appropriate before a final resolution is reached.

[17] Please note that declining to respond to questions posed during a Hearing may impact the Panel's ability to rely upon the information provided by that person.

[18] The University will provide a list of advisors in the Penn community to complainants and respondents. Advisors will be offered training by the University to support both complainants and respondents in this process. The parties need not select an advisor from this list. The parties may also retain outside counsel in addition to, or instead of, using an advisor. The role of outside counsel, however, will be limited to an advisory role and counsel will not be permitted to have an active role in the investigation and will have a limited role during any resulting Hearing or appeal.

[19] In carrying out these responsibilities, the DHO may consult with the AVP, the Office of General Counsel and other appropriate offices such as the Vice Provost for Faculty and the Senior Vice President for Institutional Affairs and Chief Diversity Officer. University administrators thus consulted will respect the confidentiality conditions of the proceedings.

# VI.F. Consensual Sexual Relations Between Faculty and Students

*(Source: Provost Memorandum,* Almanac, March 27, 2018 *(https://almanac.upenn.edu/articles/of-record-consensual-sexual-relations-between-faculty-and-students/))*

The relationship between faculty[1] and student is central to the academic mission of the University. No non-academic or personal ties should be allowed to interfere with the integrity of the faculty-student relationship. Consensual sexual relations between faculty and student can adversely affect the academic enterprise, distorting judgments, or appearing to do so to others, and providing incentives or disincentives for student-faculty contact that are inappropriate.

For these reasons, any sexual relations or dating relationships between a faculty member and an undergraduate student enrolled at the University are prohibited. The prohibition extends to all academic advisors and program directors, including those based in the College Houses and other University-owned or administered housing. The prohibition also extends

to graduate, professional, or undergraduate student assistants, but, in their case, only with respect to those undergraduate students over whom they have academic responsibility.[2]

Although this policy does not categorically prohibit consensual sexual relations or dating relationships between faculty and graduate or professional students, the University strongly discourages all sexual relations or dating relationships between faculty and graduate or professional students.

Furthermore, sexual relations or dating relationships between a faculty member and a graduate or professional student during the period of the faculty/student relationship are prohibited. The prohibition extends to sexual relations or dating between a graduate or professional student and other students for whom they have some supervisory academic responsibility, between department chairs and students in that department, and between graduate group chairs and students in that graduate group. Likewise, sexual relations and dating relationships are prohibited between a graduate or professional student and academic advisors, program directors, and all others who have any supervisory responsibility for that student.

Faculty and academic supervisors who are or have been sexually involved with or dating students must decline to participate, either formally or informally, in any evaluative or supervisory academic activity with respect to those students.

The Provost, Deans, Department Chairs, and other administrators should respond to reports of prohibited sexual relations that are brought to them by investigating and, if warranted, initiating appropriate disciplinary action or remedial measures against the faculty member or supervisor involved. Violators of this policy will be subject to sanctions ranging from written reprimand to tenure revocation and/or termination of employment or expulsion.

[1]  For purposes of this policy, "faculty" includes (but is not limited to) standing faculty, clinical faculty, associated faculty, and academic support staff, as well as clinical or lab supervisors, postdoctoral fellows, house staff, residents, graduate and undergraduate teaching assistants, and any other person providing instruction, academic advising, or academic oversight of an enrolled student in any school, course, or program, including summer and off-campus programs, irrespective of geographical location.

[2]  "Academic responsibility" includes (but is not limited to) teaching, grading, mentoring, advising, or evaluating research or other academic activity, participating in decisions regarding funding or other resources, clinical supervision, and recommending for admissions, employment, fellowships, or awards. In this context, students include graduate and professional school students, postdoctoral scholars, and clinical residents or fellows.

# VI.G. The University Alcohol and Other Drug Policy

*(Source: Resolution of the Executive Board of Trustees, February 13, 1970; Office of the President, Almanac, July 12, 1994; revised, Almanac, September 7, 1999; Offices of the President and Provost, revised, Almanac, March 1, 2005; revised, Almanac, March 20, 2018 (https://almanac.upenn.edu/articles/penns-alcohol-and-drug-policy-and-antihazing-regulations/))*

# I. Introduction

The University Alcohol and Other Drug Policy, like other standards of conduct applicable to the University community, is intended to further the educational mission of the University of Pennsylvania. The University is committed to fostering an environment that promotes the acquisition of knowledge and nurtures the growth of the individual. Each member of our intellectual community is responsible for his or her own actions and is expected to contribute to the Penn community and to respect the rights of others to participate in the academic and social life of the University. The following Alcohol and Other Drug Policy, with its emphasis on individual and shared responsibility, healthy and informed decision-making, maintaining a caring environment, and the promotion of genuine dialogue, is adopted in this spirit. Students, staff and faculty may be subject to additional requirements and procedures set forth by their respective schools or departments, and which may be stated in handbooks generated by those entities.

# II. Standards of Conduct

## Drugs [See Summary of Controlled Substance Statutes in Appendix]

The University of Pennsylvania prohibits the unlawful manufacture, distribution, dispensation, sale, possession or use of any drug by any of its students, employees in its workplace, on its premises or as part of any of its activities. This includes the unlawful sale, distribution, dispensation, possession, or use of any prescription drug. Use or possession of marijuana is prohibited on University premises, per federal law, which supersedes Pennsylvania laws governing the use and possession of marijuana and marijuana products on university campuses. This policy is intended to supplement and not limit the provisions of the University's Drug-Free Workplace policy (https://www.hr.upenn.edu/policies-and-procedures/policy-manual/performance-and-discipline/drug-free-workplace/).

## Alcohol [See Summary of Alcohol Statutes in Appendix]

### A. General Rules Governing the Use of Alcohol

The University of Pennsylvania seeks to encourage and sustain an academic environment that respects individual freedom and promotes the health, safety and welfare of all members of its community. In keeping with these objectives, the University has established the following policy governing the possession, sale and consumption of alcoholic beverages by members of the University community, and conforming to the laws of the Commonwealth of Pennsylvania. Penn's alcohol policy and programs are intended to encourage its members to make responsible decisions about the use of alcoholic beverages, and to promote safe, legal, and healthy patterns of social interaction.

1. The University of Pennsylvania prohibits:

    a. The possession and/or consumption of alcoholic beverages by persons under the age of twenty-one on property owned or controlled by the University or as part of any University event or meeting organized by a University department, organization or group.

    b. The intentional and knowing selling, or intentional and knowing furnishing (as defined by Pennsylvania law) of alcoholic beverages to persons under the age of twenty-one or to persons obviously inebriated on property owned or controlled by the University or as part of any University event or meeting organized by a University department, organization or group. Pennsylvania law currently

defines "furnish" as "to supply, give, or provide to, or allow a minor to possess on premises or property owned or controlled by the person charged."

c. The consumption of alcoholic beverages by all University students and employees so as to adversely affect academic or job performance and/or endanger the physical well- being of other persons and/or oneself, and/or which leads to damage of property.

d. The possession, sale, distribution, promotion, or consumption of an alcoholic beverage in a manner that constitutes a violation of federal, state or local law, including the sale, directly or indirectly, of any alcoholic beverages at a premises or by an entity not licensed for such sales on property owned or controlled by the University or as part of any University event or meeting organized by a University department, organization or group.

e. When an entity without a liquor license is providing service of alcohol, the following is prohibited per Pennsylvania law:

- Sales of alcoholic beverages at a cash bar
- Sales of tickets or entrance fees to an event where alcohol is served
- Donations or reimbursements to support the cost of an event where alcohol is served
- Sales of drink tickets or inclusion of drink tickets in entry fees at events where alcohol is served

2. The University of Pennsylvania permits the lawful keeping and consumption, in moderation, of alcoholic beverages on its property or property under its control by persons of legal drinking age (21 years or older).

3. In cases of intoxication and/or alcohol poisoning, the primary concern is the health and safety of the individual(s) involved. Individuals are strongly encouraged to call for medical assistance for themselves or for a friend/acquaintance who is dangerously intoxicated. No student seeking medical treatment for an alcohol or other drug-related overdose will be subject to University discipline for the sole violation of using or possessing alcohol or drugs. This policy shall extend to another student seeking help for the intoxicated student.

4. Vice Provosts, Vice Presidents, Deans, and heads of administrative and residential units have the authority and responsibility to govern the use of alcohol in areas they control, both indoors and out, and to approve or disapprove of plans designed to ensure that (at events where alcohol will be served in such areas) only legal age individuals will have access to such alcohol. Further, those hosting such events must take reasonable steps to ensure that the acquisition, distribution and consumption of alcohol otherwise complies with applicable law and University policy.

5. At any event at which alcohol will be served, sufficient quantities of non-alcoholic beverages and food must also be available to guests without cost.

6. Consistent with Pennsylvania law, advertisements of social events shall not promote nor describe the availability of alcoholic beverages; nor shall such advertisements promote the consumption of alcohol by minors.

7. Ordinarily, consumption of alcoholic beverages in outdoor public areas such as walkways, building steps and porches, unenclosed patios, green spaces, and the like is not permitted regardless of the age of the drinker. However, appropriate administrators and University of Pennsylvania

Police (UPPD) may grant exceptions to this guideline on an event-by-event basis. Exceptions will be granted only for those events where an overwhelming majority of those reasonably expected to attend an event are of legal drinking age. Events for which exceptions have been granted must be limited to areas that are clearly demarcated and in which it is possible to exercise adequate control of access to and consumption of alcohol. Event hosts must ensure that barriers and other alterations to the outdoor venue which are required by the UPPD and/or the manager of the venue are in place.

8. Kegs of any amount of beer are not permitted at student-run events and are not allowed in any University-managed undergraduate residence. Kegs are permitted at University-sponsored, staff-run events only.

**B. Rules Governing Alcohol Use at Registered Undergraduate Social Events**

In order to minimize the risk of alcohol abuse, promote compliance with the law, and encourage students to make responsible decisions about the use of alcohol, the following rules are designed to control the volume and nature of alcohol products available and, ultimately, reduce the risk of alcohol-related incidents that pose a threat to the health and welfare of students and colleagues.

1. Undergraduate student groups—those recognized, registered, or identified as an organization by the University—which intend to sponsor events to be held at an on-campus space, an off-campus residence, or a third-party venue, and where alcohol will be served and consumed, must register the event with the Office of Alcohol and Other Drug Program Initiatives (AOD) and with their organization's advising office (where applicable) at least ten days in advance of the event. Failure to register an event at which alcohol is served does not exempt student organizations from the applicability of these rules. Registration of an event with AOD does not relieve the sponsor(s) of the event from complying with applicable codes and/or life safety standards.

2. Approval from UPPD must be obtained for any events, including alcohol-free events, which will have:

a. More than 400 guests,
b. Outside area/yard, and/or
c. Live music outside.

The party organizers must contact UPPD for approval as part of the event registration process with the Office of Alcohol and Other Drug Program Initiatives.

3. Professional security must be hired to check age identification of all attendees and wristbands must be distributed to guests who are of legal age to consume alcohol. Security will be coordinated by AOD or by the venue.

4. Hard alcohol, distilled liquor with an alcohol content of more than 15%, is prohibited at all registered on-campus undergraduate events, except at events with a set guest list of 150 attendees or fewer. A guest list must be supplied to AOD prior to the event. At such events, no more than two types of hard alcohol may be provided, and must be provided in single-shot drinks only. Shots or multiple-shot beverages are prohibited.

5. Service of alcohol at all on-campus registered events must end no later than 1 a.m.; events may continue until 2 a.m.

6. Undergraduate student organizations hosting events at an on-campus space, an off-campus residence, or a third-party venue, at which alcohol is served are responsible for assuring that alcohol is served and consumed

lawfully and safely.[1] To comply with this expectation undergraduate student organizations must adhere to the following conditions:

> a. No oversized or common source containers of any sort [including but not limited to kegs, punchbowls, beer balls, party balls] are permitted at any on-campus event;

> b. Only individuals with valid proof of legal drinking age may be served alcohol; alcohol may not be served to any visibly intoxicated person, regardless of age;

> c. Alcohol may be served only from a controlled, designated area by University-approved, sober, trained, of-age bartenders who are unaffiliated with the host organization;

> d. For the duration of registered events, individual members of host organizations may not entertain guests in private areas, including private bedrooms. Party attendance is restricted to the public area designated for the party. This means that individual members of a host organization may not serve alcohol in their private rooms for the duration of registered events, even if those in the room are of legal drinking age;

> e. No University funds may be used to purchase alcohol for any event sponsored by an undergraduate organization;

> f. Drinking contests or games of any sort are expressly prohibited.

* The amount of alcohol available at an event should not exceed a ratio of more than four (4) alcoholic drinks (premium beer, table wine, or wine coolers) per of-age person attending the event. One drink = 12 ounces of premium beer (alcohol content of less than 6% by volume) or 4-5 ounces of (unfortified) table wine or a standard serving size wine cooler (usually 10 ounces).

7. All registered events held at an on-campus space, an off-campus residence, or a third-party venue must have appropriately trained bartenders who are unaffiliated with the host organization and who are at least 21 years of age.

8. At all registered events, whether held at an on-campus space, an off-campus residence, or a third-party venue, the host organization must identify trained, host monitors who may not consume any alcoholic beverages during or immediately prior to the event. There shall be at least one such host monitor for each 30 guests at an on-campus venue or off-campus residence, or one monitor for each 50 guests at an off-campus third-party venue. Sober host monitors must be designated in advance of each event during the event registration process. Sober hosts must remain sober for the duration of the event. Each academic year, organizations hosting events with alcohol must demonstrate to the Director of the Office of Alcohol & Other Drug Program Initiatives that they have a clear understanding of the function of the sober host monitors and the University's alcohol and other drug policies and that they have participated in training or taken other steps to develop the ability to, wherever possible (l) handle emergency situations, (2) respond to alcohol-related medical concerns, (3) identify and intervene with overly intoxicated guests, whether or not they require medical treatment, (4) and take any necessary steps to protect the health and safety of guests.

9. University trained and appointed monitors will assist in assuring that University policy is followed at all on-campus events.

10. The organizers of events must properly dispose of partially filled and empty alcohol containers at the conclusion of the event.

11. The University supports the enforcement of all University, local, state and federal policies and laws by retail and wholesale distributors of alcohol on or near campus.

12. It is understood that in addition to University policy and state law, many University undergraduate student organizations are subject to policies regarding the possession and consumption of alcohol imposed by a parent organization. If the policies governing an individual organization impose more restrictive regulations regarding alcohol possession and consumption it will be necessary for that organization to follow its parent organization's policies or risk sanctions. If, however, the parent organization permits the possession or consumption of alcohol where otherwise prohibited by University policy, the organization must comply with the University's policy, notwithstanding its parent organization's rules.

**C. Rules Governing Alcohol Use at Registered Graduate and Professional Student Social Events**

1. Graduate and professional student organizations which intend to sponsor on-campus or off-campus third-party venue events at which it is anticipated alcohol will be served and consumed must have their event plans approved by the appropriate administrators in their school, department, or center.

> a. If the event is to be held within facilities managed by the student organization's school, department, or center, the event plan must be approved by the appropriate administrators within that space. The event must follow all policies for events with alcohol outlined by the administrators overseeing the student organization and venue.

> b. If the event is to be held in another on-campus venue, such as a Perelman Quadrangle space or an outdoor area, or at an off-campus third-party venue, the event plan will require additional approval by the appropriate administrator responsible for that space and by the Office of Alcohol and Other Drug Program Initiatives. UPPD approval must be obtained for any events taking place outdoors or that will feature live music. The event must follow the rules governing the use of alcohol in that particular space.

2. In order to minimize the risk of alcohol abuse, promote compliance with the law, and encourage students to make responsible decisions about the use of alcohol, the following rules are designed to control the volume and nature of alcohol products available and, ultimately, reduce the risk of alcohol-related incidents that pose a threat to the health and welfare of students and colleagues.

> a. Individuals under the age of 21 may not be served alcohol.

> b. Service of alcohol must be managed by a licensed bartender.

> c. Security must be present at the event or at the entrance to the building in which the event is to be held.

> d. Food and non-alcoholic beverages must be provided at events where alcohol is served.

> e. Sober hosts affiliated with the host organization must be present at the event to ensure that rules related to the service of alcohol and use of facilities are followed.

> f. Drinking games or contests are prohibited.

> g. Kegs are prohibited except at University-sponsored, staff-run events.

h. No funds can be exchanged for alcoholic beverages or for admission to events where alcohol is served except where an entity with a liquor license is controlling the service of alcohol.

# III. Penn's Commitment to Health Education and a Supportive Environment

Consistent with its educational mission, the University sponsors programs which help eradicate misperceptions about alcohol use among peers, create opportunities for open, honest dialogue about alcohol use and abuse, and promote awareness of the physical and psychological, social and behavioral effects of alcohol consumption. The University, along with its students, is committed to the creation of multiple recreational opportunities to help promote a wider variety of social experiences for undergraduates.

1. The University is committed to providing every Penn undergraduate student and parent or guardian with alcohol education from multiple sources when students are pre-freshman, during New Student Orientation, and during the course of the student's undergraduate education.

2. The University is committed to supporting continuous and expanded peer education, to creating opportunities for the integration of alcohol and drug related issues in its undergraduate co-curricular programs and maintaining an effective, coordinated and responsive alcohol abuse prevention plan implemented by the University's Director of the Office of Alcohol & Other Drug Program Initiatives.

3. In order to promote responsible group behavior regarding alcohol use, each student organization having more than 10 members and recognized by Division of Recreation and Intercollegiate Athletics, Vice Provost for University Life, Office of Fraternity and Sorority Life, Student Activities Council, Office of Student Affairs, Graduate and Professional Student Assembly, one of Penn's 12 schools, on-campus residential facilities and/or the College Houses is expected to meet the following requirements:

> Each organization or group that intends to host registered events with alcohol (both on-campus and at off-campus third-party venues), must design and implement an individualized plan to demonstrate competency in managing risk related to alcohol consumption. Such a plan would identify the methods through which the organization will control service of alcohol, promote moderate alcohol consumption, and respond to alcohol-related medical concerns. Each organization must specifically identify appropriate strategies for creating an environment in which alcohol use is secondary to the event itself and which emphasizes food and activities not related to alcohol so as to minimize the risk associated with its presence. This plan will be reviewed as part of event registration prior to each event with alcohol.

> Failure to meet this requirement could result in the loss of University recognition and/or support.

4. Organizations not officially recognized by the University are expected to undertake similar efforts to ensure that high-risk drinking and substance abuse are appropriately addressed.

# IV. Consequences for Policy Violations

All members of the University community and all University organizations are expected to comply with applicable local, state and federal laws regarding the possession, use or sale of alcohol or other drugs, whether on or off-campus, and are expected to comply with all University

regulations regarding alcohol possession or use. Individuals and organizations which violate this policy may be subject to appropriate disciplinary action.

1. Any student or employee who violates University policies or applicable law may be subject to disciplinary action and/or referral for prosecution. Disciplinary actions for students may include, but are not limited to, sanctions by the Office of College Houses & Academic Services and the Office of Residential Services, sanctions as set forth in the Charter of the University of Pennsylvania Student Disciplinary System, procedures outlined in the Fraternity and Sorority Advisory Board Judicial Charter, and other formal University consequences, as well as possible civil and criminal penalties. The severity of the sanctions will depend, in part, on whether there have been repeated violations and on the seriousness of the misconduct. Faculty, staff, and other non-students found to be in violation of this policy or applicable law may be subject to University disciplinary procedures which may impose sanctions up to and including termination of employment and/or referral for prosecution. The University also supports enforcement, by applicable law enforcement agencies, of all local, state and federal laws.

2. Along with disciplinary consequences, the University is committed to providing resources and education as appropriate to assist members of the community.

# V. Resources in the Penn Community for Information and Counseling Related to Alcohol and Other Drug Use

The University provides services and resources for community members who experience alcohol and/or other drug related difficulties. The following programs are available for students, staff, and faculty:

1. Office of Alcohol & Other Drug Program Initiatives (https://www.vpul.upenn.edu/alcohol/)
The Office of Alcohol & Other Drug Program Initiatives is responsible for ensuring the efficient and productive coordination of all relevant, alcohol-related campus services. Assistance is available by calling (215) 573-3525.

2. Employee Assistance Program (https://www.hr.upenn.edu/PennHR/wellness-worklife/counseling-and-employee-assistance-program/)
The Employee Assistance Program is a free, confidential one-on- one counseling service provided by the University for Penn faculty and staff and their family members. This program can offer assistance with serious life issues 24 hours a day, seven days a week by calling 1-888-321-4433. Services are available at over 450 locations throughout the Delaware Valley, including an on-campus office at 36th and Market Streets.

3. Additional Resources
The following offices provide information, education and services related to alcohol and other drug concerns. All services are provided free of charge and are available to students, faculty and staff at the University of Pennsylvania. If you are concerned about your own or someone else's use of substances, please contact one of these offices.

Office of Affirmative Action and Equal Opportunity Programs (http://www.upenn.edu/affirm-action/) (Faculty, Staff, & Students)
Franklin Building, 4th Floor, Room 421
3451 Walnut Street
(215) 898-6993 (Voice), (215) 898-7803 (TDD)

Counseling and Psychological Services (http://www.vpul.upenn.edu/caps/) (Students)
3624 Market Street #1
(215) 898-7021

Office of Alcohol & Other Drug Program Initiatives (https://www.vpul.upenn.edu/alcohol/) (Students)
3611 Locust Walk
(215) 573-3525

Human Resources (https://www.hr.upenn.edu/PennHR/wellness-worklife/) (Faculty and Staff)
600 Franklin Building
3451 Walnut Street/6228
(215) 898-6093

Penn Women's Center (http://www.vpul.upenn.edu/pwc/) (Faculty, Staff, & Students)
Locust House, 3643 Locust Walk/6230
(215) 898-8611/12

Student Health Service (https://www.vpul.upenn.edu/shs/) (Students)
3535 Market Street, Suite 100
(215) 746-3535

HELP Line (https://www.publicsafety.upenn.edu/help-line/) (Faculty, Staff, & Students)
(215) 898-HELP
A 24/7 phone line for members of the Penn community seeking help in navigating Penn's resources for health and wellness.

1   The amount of alcohol available at an event should not exceed a ratio of more than four (4) alcoholic drinks (premium beer, table wine, or wine coolers) per of-age person attending the event. One drink = 12 ounces of premium beer (alcohol content of less than 6% by volume) or 4-5 ounces of (unfortified) table wine or a standard serving size wine cooler (usually 10 ounces).

# Appendix

## I. Legal Sanctions

The following is a brief review of the legal sanctions under local, state, and federal law for the unlawful possession or distribution of illicit drugs and alcohol:

### A. Drugs

1. The Controlled Substance, Drug, Device and Cosmetic Act, 35 Pa. C.S.A. 780-101 et seq., sets up five schedules of controlled substances based on dangerousness and medical uses. It prohibits the manufacture, distribution, sale or acquisition by misrepresentation or forgery of controlled substances except in accordance with the Act as well as the knowing possession of controlled substances unlawfully acquired. Penalties for first-time violators of the Act range from thirty days imprisonment, $500 fine, or both for possession or distribution of a small amount of marijuana or hashish, not for sale, to fifteen years or $250,000 or both for the manufacture or delivery of a Schedule I or II narcotic. A person over eighteen years of age who is convicted for violating The Controlled Substance, Drug, Device and Cosmetic Act, shall be sentenced to a minimum of at least one year total confinement if

the delivery or possession with intent to deliver of the controlled substance was to a minor. If the offense is committed within 1,000 feet of the real property on which a university is located, the person shall be sentenced to an additional minimum sentence of at least two years total confinement.

2. The Pharmacy Act of 1961, 63 Pa. C.S.A. 390-8 makes it unlawful to procure or attempt to procure drugs by fraud, deceit, misrepresentation or subterfuge or by forgery or alteration of a prescription. The first offense is a misdemeanor, with a maximum penalty of one year's imprisonment, a $5,000 fine, or both.

3. The Vehicle Code, 75 Pa. C.S.A. 3101 et seq., which was amended effective July 1, 1977, prohibits driving under the influence of alcohol or a controlled substance, or both, if the driver thereby is rendered incapable of safe driving. A police officer is empowered to arrest without a warrant any person whom he or she has probable cause to believe has committed a violation, even though the officer may not have been present when the violation was committed. A person so arrested is deemed to have consented to a test of breath or blood for the purpose of determining alcoholic content, and if a violation is found it carries the penalties of a misdemeanor of the second degree, which includes imprisonment for a maximum of thirty days.

4. Federal drug laws, the Controlled Substances Act, 21 U.S.C. 801 et seq., are similar to the Pennsylvania Controlled Substance, Drug, Device, and Cosmetic Act, but contain, for the most part, more severe penalties. Schedules of controlled substance are established, and it is made unlawful to knowingly or intentionally to manufacture, distribute, dispense, or possess with intent to distribute or dispense a controlled substance. If the quantity of controlled substance is large (e.g. 1,000 kg of a mixture or substance containing marijuana), the maximum penalties are life imprisonment, a $4,000,000 fine, or both. Lesser quantities of a controlled substance (e.g. 100 kg of a mixture or substance containing marijuana) result in maximum penalties of life imprisonment, a $2,000,000 fine, or both. The distribution of small amounts of marijuana for no remuneration or simple possession of a controlled substance carries a maximum of one year's imprisonment, a $5,000 fine, or both, with the penalties for the second offense doubling. Probation without conviction is possible for first offenders. Distribution to persons under the age of twenty-one by persons eighteen or older carries double or triple penalties. Double penalties also apply to the distribution or manufacture of a controlled substance in or on or within 1,000 feet of the property of a school or college.

5. Students who have been convicted under state or federal law involving the possession or sale of a controlled substance, are ineligible for federal student aid for specific periods (ranging from one year to an indefinite period depending on the nature of the offense and whether the student is a repeat offender).

### B. Alcohol

The Pennsylvania Liquor Code, 47 Pa. C.S.A. 1-101 et seq., controls the possession and sale of alcoholic beverages within the Commonwealth. The Code as well as portions of the Pennsylvania Statutes pertaining to crimes and offenses involving minors, 18 Pa. C.S.A. 6307 et seq., provide the following:

1. It is a summary offense for a person under the age of twenty-one to attempt to purchase, consume, possess or knowingly and

intentionally transport any liquor or malt or brewed beverages. Penalty for a first offense is suspension of driving privileges for 90 days, a fine up to $500 and imprisonment for up to 90 days; for a second offense, suspension of driving privileges for one year, a fine up to $1,000, and imprisonment for up to one year; for subsequent offenses, suspension of driving privileges for two years, a fine up to $1,000 and imprisonment for up to one year. Multiple sentences involving suspension of driving privileges must be served consecutively.

2. It is a crime intentionally and knowingly to sell or intentionally and knowingly to furnish or to purchase with the intent to sell or furnish, any liquor or malt or brewed beverages to any minor (under the age of twenty-one). "Furnish" means to supply, give or provide to, or allow a minor to possess on premises or property owned or controlled by the person charged. Penalty for a first violation is $1,000; $2,500 for each subsequent violation; imprisonment for up to one year for any violation.

3. It is a crime for any person under twenty-one years of age to possess an identification card falsely identifying that person as being twenty-one years of age or older, or to obtain or attempt to obtain liquor or malt or brewed beverages by using a false identification card. Penalties are stated in (2) above.

4. It is a crime intentionally, knowingly or recklessly to manufacture, make, alter, sell or attempt to sell an identification card falsely representing the identity, birth date, or age of another. Minimum fine is $1,000 for first violation; $2,500 for subsequent violations; imprisonment for up to one year for any violation.

5. It is a crime to misrepresent one's age knowingly and falsely to obtain liquor or malt or brewed beverages. Penalties are as stated in (2) above.

6. It is a crime knowingly, willfully and falsely to represent that another is of legal age to obtain liquor or malt or brewed beverages. Penalty is a minimum fine of $300 and imprisonment for up to one year.

7. It is a crime to hire, request or induce any minor to purchase liquor or malt or beverages. Penalty is a minimum fine of $300 and imprisonment for up to one year.

8. Sales without a license or purchases from an unlicensed source of liquor or malt or brewed beverages are prohibited.

9. It is unlawful to possess or transport liquor or alcohol within the Commonwealth unless it has been purchased from a State Store or in accordance with Liquor Control Board regulations.

10. The use in any advertisement of alcoholic beverages of any subject matter, language or slogan directed to minors to promote consumption of alcoholic beverages is prohibited.

11. The Pennsylvania Liquor Code prohibits advertisements of alcoholic beverages, either directly or indirectly, in any booklet, program, book, yearbook, magazine, newspaper, periodical, brochure, circular, or other similar publication, published by, for, or on behalf of any educational institution. In Pitt News v. Pappert, 379 F.3d 96 (2004) this prohibition was construed to restrict constitutionally protected speech and the current applicability of these Liquor Code prohibitions is limited.  Please note that University policies regarding advertisement of alcoholic beverages

in University publications, which are more restrictive than those contained in the Liquor Code, govern.

The University will cooperate with the appropriate law enforcement authorities for violations of any of the above-mentioned laws by an employee in the workplace or student.

## II. Health Risks

Consistent with its mission to promote wellness and reduce the harm of alcohol and other drug use, the University is committed to providing education on the health risks associated with alcohol and other drug use, and providing counseling and support services to students. The list below is not a complete list of substances that are regulated or illegal, or that have health risks. More information can be found on the website of the Office of Alcohol and Other Drug Program Initiatives (http://www.vpul.upenn.edu/alcohol/).

**Alcohol.** Alcohol consumption causes a number of changes in behavior and physiology. Even low doses significantly impair judgment, coordination, and abstract mental functioning. Statistics show that alcohol use is involved in a majority of violent behaviors on college campuses, including acts of violence, vandalism, and incidents of drinking and driving. Continued abuse may lead to alcohol use disorder, which can lead to permanent damage to vital organs and deterioration of a healthy lifestyle.

**Amphetamines.** Amphetamines can cause a rapid or irregular heartbeat, tremors, loss of coordination, collapse, and death. Use can lead to erratic behavior.

**Cannabis (Marijuana, Hashish).** The use of marijuana may impair or reduce short-term memory and comprehension, alter sense of time, and reduce coordination and energy level. Frequent users often have a lowered immune system and an increased risk of lung cancer. The active ingredient in marijuana, THC, is stored in the fatty tissues of the brain and reproductive system for a minimum of 28 to 30 days.

**Cocaine/Crack.** The immediate effects of cocaine use include dilated pupils and elevated blood pressure, heart rate, respiratory rate, and body temperature, followed by depression. Crack, or freebase rock cocaine, is extremely addictive and can cause delirium, hallucinations, blurred vision, severe chest pain, muscle spasms, convulsions, and even death.

**Hallucinogens.** Lysergic acid (LSD), mescaline, and psilocybin cause illusions and hallucinations. The user may experience panic, confusion, suspicion, anxiety, and loss of control. Delayed effects, or flashbacks, can occur even when use has ceased. Phencyclidine (PCP) affects the section of the brain that controls the intellect and keeps instincts in check. Because the drug blocks pain receptors, violent PCP episodes may result in self-inflicted injuries.

# VI.H. Drug-Free Workplace Policy

*(Source: Office of the Senior Vice President, April 11, 1989; revised,* Division of Human Resources Policy Manual, August 7, 2002 *(https://www.hr.upenn.edu/myhr/resources/policy/performance/ drugfreeworkplace/))*

# I. Prohibited Drug Activity

The University of Pennsylvania prohibits the unlawful manufacture, distribution, dispensation, sale, possession or use of any drug by its

Case 2:25-cv-00269-TJS    Document 26-3    Filed 03/12/25    Page 163 of 175

162    VI.I. Procedures for the Evaluation and Certification of the English Fluency of Undergraduate Instructional Personnel

employees in its workplace. Each University employee agrees as a condition of employment to abide by this policy, and to notify his/her supervisor no later than five days after any conviction under a criminal drug statute for a violation that occurred in the workplace.

## II. Sanctions

Any University employee who violates the University's policy or who is convicted under a criminal drug statute for a violation occurring in the workplace shall be subject to the University's disciplinary procedures up to and including dismissal and may be required to participate satisfactorily in a drug abuse assistance or rehabilitation program.

## III. Drug-Free Workplace Program

A. The University of Pennsylvania has established a drug-free awareness program to inform employees about:
   • The dangers of drug abuse in the workplace through such activities as training programs for supervisors;
   • The University's policy of maintaining a drug-free workplace through distribution of the policy to all employees;
   • Available drug counseling, rehabilitation and employee assistance programs such as those provided through the Penn Employee Assistance Program and Worklife Benefits; and
   • The penalties that may be imposed upon employees for drug abuse violations in the workplace.

B. Each University employee shall be given a copy of the University's Drug-Free Workplace Policy.

C. Each employee, as a condition of employment, must agree to abide by the University's Drug-Free Workplace Policy and to notify his/her supervisor no later than five days after any conviction under a criminal drug statute for a violation that occurred in the workplace. When a supervisor is notified by an employee of such a conviction, he/she shall immediately notify the Vice President for Human Resources (or designee) and, if the employee is paid in whole or part from a federal grant, contract or cooperative agreement, the Executive Director for Sponsored Programs. The Executive Director for Sponsored Programs shall notify the appropriate federal agency within ten days of receiving notice of such conviction.

D. An employee who violates the University policy or who is convicted under a criminal drug statute for a violation occurring in the workplace shall be subject to the University's disciplinary procedures up to and including dismissal, and may be required to participate satisfactorily in a drug abuse assistance or rehabilitation program.

E. The University shall make a good faith effort to continue to maintain a drugfree workplace through implementation of the above program.

## VI.I. Procedures for the Evaluation and Certification of the English Fluency of Undergraduate Instructional Personnel

*(Source: Office of the Provost, Almanac, May 28, 1991; revised, Almanac, March 18, 1997; revised, Almanac, April 21, 1998 (https://almanac.upenn.edu/archive/v44/n30/orfluent.html); revised, Faculty Senate Executive Committee, June 2, 2015; revised, Office of the Provost, November 1, 2019)*

In 1990, the Commonwealth of Pennsylvania enacted legislation requiring that every member of an institution of high learning who teaches undergraduates be certified as fluent in the English language, if it is not his or her first language. In order to comply with this legislation, Penn instituted a set of requirements that are enforced through training and teaching performed by the Office of English Language Programs.

All persons hired on or after July 1, 1997, as members of the Standing or Associated Faculties, Academic Support Staff, graduate and professional student teaching staff, or as tutors, or for other undergraduate instructional duties (including, for example, leading laboratory or discussion sections or holding office hours), regardless of rank or title, in the Schools of Arts and Sciences, Engineering and Applied Science, Nursing, Wharton or the School of Design, the Annenberg School for Communication, and the Graduate School of Education, must be evaluated and certified as having met the University's standard of English fluency in the classroom before completion of the hiring process. In addition, all individuals who hold appointments elsewhere in the University and who are to be engaged in the teaching, tutoring, or other instruction of undergraduates must also be evaluated and certified before appointment.

Only members of the Visiting Faculty, instructional personnel whose entire undergraduate instruction (including office hours) will be conducted in a language other than English, and graduate students who have no direct instructional contact (including office hours) with undergraduates (e.g. some graders or research assistants) are exempt from this requirement.

## II. Standard of English Fluency in the Classroom

To be certified by the University of Pennsylvania as "fluent in the English language in the classroom," a speaker must always be intelligible to a non-specialist in the topic under discussion, despite an accent or occasional grammatical errors. General and field-specific vocabulary must be broad enough so that the speaker rarely has to grope for words. Listening comprehension must be sufficiently high so that misunderstandings rarely occur when responding to students' questions or answers. While teaching, the speaker should be able to use transitions to show the relationships between ideas, and to set main points apart from added details. When asked an ambiguous question, the speaker should be able to clarify the question through discussion with the student. When asked to restate a main point, the speaker should be able to paraphrase clearly. When challenged, the speaker should be able to defend his or her position effectively and appropriately.

Prospective instructional personnel, regardless of rank or title, who do not meet the above criteria shall not be certified and may not be assigned to any undergraduate instructional responsibilities.

## III. Certification Procedures

A. Newly-Hired Faculty Members
   Prospective members of the Standing or Associated Faculties, or of the Academic Support Staff, regardless of rank or title, shall be evaluated and certified by their department chairperson as to their English fluency in the classroom on the basis of one of the methods of evaluation listed in section IV, below. The department chairperson shall certify their English fluency in the classroom to their dean,

or to the dean's designee and the dean shall certify the same to the Provost. In schools having no departments, evaluation and certification shall be carried out by the dean or the dean's designee.

B. Native English-Speaking Graduate Teaching Assistants
Prospective graduate teaching assistants whose native language is English shall be evaluated and certified by their department chairperson as to their English fluency in the classroom on the basis of one of the methods of evaluation listed in section IV, below. The department chairperson shall certify their English fluency in the classroom to their dean, or to the dean's designee and the dean shall certify the same to the Provost. (This procedure applies to all native English-speaking graduate and professional student teaching staff, including those undertaking instructional duties as tutors, leading laboratory or discussion sections, graders, or holding office hours.) In schools having no departments, evaluation and certification shall be carried out by the dean or the dean's designee.

C. Non-native English-Speaking Graduate Teaching Assistants
Prospective graduate teaching assistants whose native language is other than English who have not taken either the Test of English as a Foreign Language (TOEFL) or the ACTFL Oral Proficiency Interview, or who score below a 27 on the Speaking section of the TOEFL or below Advanced-Mid on the ACTFL, shall be referred by their department chairperson to the English Language Programs (ELP) for professional evaluation of their English fluency in the classroom.
It is anticipated that most graduate students whose native language is not English shall not be sufficiently fluent in the use of English in the classroom to undertake undergraduate instructional responsibilities during their first year of graduate enrollment at Penn. Such individuals may be able to acquire fluency in English in the classroom by enrolling in the ELP's summer International Teaching Assistants Training Program, or during the academic year, by enrolling in the Graduate Division of Arts and Sciences course GAS 600 (fall semester) or the ELP's intensive English language and cultural familiarization courses, or through alternative programs appropriate to the student's needs. Graduate students placed in any of the above programs must be re-evaluated by the ELP before the Director may certify to the Provost that they are fluent in English in the classroom.

D. All Other Undergraduate Instructional Personnel
All other undergraduate instructional personnel, regardless of rank or title, shall be evaluated and certified by their department chairperson as to their English fluency in the classroom on the basis of one of the methods of evaluation listed in section IV, below. The department chairperson shall certify their English fluency in the classroom to their dean, or to the dean's designee, and the dean shall certify the same to the Provost. In schools having no departments, evaluation and certification shall be carried out by the dean or the dean's designee.

## IV. Evaluation and Testing

A. Methods of Evaluation
Department chairpersons and deans shall certify only those prospective instructional personnel whose English fluency in the classroom has been evaluated using one or more of the means of evaluation listed below and has been found to meet or exceed the standard set forth in Section II., above.
The following methods of evaluation may be used as the basis for a departmental certification:
  • A score of 27 out of 30 on the Speaking section of the Test of English as a Foreign Language (TOEFL).

  • A score of 8 or above on the "speaking" sub-band of the International English Language Testing System (IELTS).
  • A score of Advanced-Mid on the ACTFL Oral Proficiency Interview.
  • Academic presentation and discussion (such as a colloquium, lecture, seminar, or scholarly conference presentation) evaluated by two or more members of the standing faculty and/or the English Language Programs staff.
  • Extended, in-person discussion with one or more members of the standing faculty, and/or English Language Programs staff on a topic related to the candidate's research interests, teaching plans and/or experience.
  • Observation and evaluation of teaching performance in the classroom by two or more members of the standing faculty and/or the English Language Programs staff.
  • Videotape of classroom teaching or academic presentation evaluated by two or more members of the standing faculty and/or the English Language Programs staff.
    All prospective graduate teaching assistants whose native language is other than English shall be referred by their department chairperson to the English Language Programs for professional evaluation of their English fluency in the classroom, using the Interactive Performance Test (IPT) or future replacements, or the advisory ACTFL Oral Proficiency Interview administered by the English Language Programs (described in V.B., below).

B. Referral to and consultation with the English Language Programs
Using one of the methods listed above, department chairpersons and deans (or the dean's designee) shall either certify to the Provost that a prospective faculty member or other undergraduate instructional personnel is fluent in English in the classroom or refer them to the English Language Programs for further evaluation before they undertake any undergraduate instructional duties.
It should be borne in mind that, at the discretion of the department chairperson or the deans, both native and non-native speakers of English may be referred to the English Language Programs for further evaluation before certification of their English fluency.
The department chairperson or deans may find it useful, especially where the native language of prospective faculty members or instructional personnel is other than English, to consult with the directors of the English Language Programs regarding the advisability of further evaluation or the most appropriate method of evaluation before certification of their English fluency.
Prospective graduate teaching assistants with questions regarding the evaluation or certification of their English fluency in the classroom should consult with their department or graduate group chairperson, or the English Language Programs staff, 110 Fisher-Bennett Hall, 215-898-8681.

## V. Further Evaluation and Appeals

A. Further Evaluation by the English Language Programs
Prospective instructional personnel who are not certified under section III, above, shall be referred to the University's English Language Programs for further evaluation.

B. Interactive Performance Test
Graduate students whose native language is not English and who receive a Speaking section score on the Test of English as a Foreign Language (TOEFL) below 27 may be certified for classroom instruction by passing the Interactive Performance Test (IPT) administered by the English Language Programs. The IPT consists of

a 10-minute mini-lecture with a question and answer component on a topic in the candidate's academic discipline.

C.  Evaluation and Certification as Graders with Limited Office Hours
Alternately, and upon the written referral of the graduate group chair, graduate students whose native language is not English and who receive a Speaking section score on the Test of English as a Foreign Language (TOEFL) below 27 may be certified as graders with limited office hours by passing the Grader Exam administered by the English Language Programs. Graders with limited office hours are defined as graduate students who are responsible for grading exams and assignments and holding individual appointments with undergraduate students for the purpose of explaining grades and answers to exam questions or assignments.
Graders with limited office hours can have no responsibility for classroom teaching, tutoring, recitation, or laboratory sessions. Passing of this exam, which is tailored to one-on-one questions and answers, shall certify graduate students as sufficiently fluent in English to serve as graders with limited office hours, *but does not certify them to undertake other instruction duties at a later date.*

D.  Appeals of Certification Decisions
Appeals of certification decisions made by department chairpersons may be directed to the appropriate dean and appeals of certification decisions made by deans or by the Directors of English Language Programs may be directed to the Provost.

# VI. Deadlines for Certification and Reporting

In the case of appointment to the Standing or Associated Faculties, all submissions to the Provost's Staff Conference or Mini-Conference for appointments in Arts and Sciences, Engineering and Applied Science, Nursing, Wharton, Design, the Annenberg School for Communication and the Graduate School of Education, and for any faculty members in other schools who will ever teach undergraduates, shall include in the required documentation a certification by the dean stating that the candidate's fluency in the English language in the classroom has been evaluated and found to meet or exceed the University's standard of fluency. The dean's certification shall also include a brief description of the means used to evaluate such fluency and the results of such evaluation.

In all other cases, including graduate teaching assistants and academic support staff, the certification of fluency must be approved by the Provost before final approval of the appointment in the school or department and prior to the start of the term for which the individual is first hired for undergraduate instructional duties (specifically, by September 1 for the Fall term, by January 1 for the Spring Term, and by May 1 for the Summer term).

Each dean shall report to the Provost, no later than August l of each year, that all

faculty and other undergraduate instructional personnel (as defined in section I above) hired since the dean's previous certification have been evaluated for English fluency in the classroom prior to their appointment and were found to meet or exceed the University's standard of fluency.

# VII. Monitoring and Reporting of Complaints

Each school shall put in place one of the following procedures for the on-going monitoring of English fluency in the classroom of all undergraduate instructional personnel:

•  A systematic program of classroom observation of both faculty and teaching assistants by faculty members or English language specialists.
•  Inclusion of a question about communication with the instructor on the student course evaluations of all faculty, teaching assistants, and laboratory or recitation instructors each term. (Student evaluations may also be supplemented by peer, alumni, or other teaching evaluation mechanisms.)
•  Other monitoring mechanisms proposed by the dean and approved by the Provost.

In addition, each school shall ensure that all complaints regarding the English fluency of instructional personnel are reported (with the chairperson's evaluation of the complaint) to the dean and undergraduate dean, and by the dean (with a description of the resolution of the complaint) to the Provost, via the Associate Provost for Faculty Affairs in the case of faculty, and via the Vice Provost for Education in the case of graduate students.

# VIII. Review of English Fluency Standards and Procedures

These standards and procedures shall be reviewed periodically by the Provost's Council on Undergraduate Education, and in the light of Pennsylvania Department of Education regulations, when issued. It also should be noted that each school, at its option, may institute English fluency requirements more stringent than the minimum standards outlined above.

# VI.J. Policy Prohibiting Workplace Violence

*(Source: Offices of the President and Provost,* Almanac, May 4, 2004 *(https://almanac.upenn.edu/archive/v50/n32/OR-vio.html))*

The University is committed to maintaining an environment that supports the University's mission and promotes learning, productive employment, and safe experiences for all members of the University community including but not limited to faculty, staff, students, contracted employees, visitors and guests of the University.

This policy applies to all University employees including faculty, staff, temporary and occasional employees and student workers (with respect to conduct that arises from their employment status). In addition, the policy applies to individuals who the University contracts to do work on our behalf including, consultants, vendors, contractors and sub-contractors.  University employees and those working on the behalf of the University are covered by this policy at all times, on or off-campus, when they are officially representing or acting on behalf of the University, conducting University business and/or attending University sponsored or financed activities. This policy covers activity at all University owned and operated properties and facilities and off-campus locations where University business is conducted.

# Definition of Workplace Violence

Workplace violence is defined as any violent behavior or threat of violent behavior that would cause harm or reasonable fear of physical harm to a University employee, other member or guest of the University community, or anyone with whom the University is conducting business. Behaviors or conduct that are not tolerated include the following:

- Committing a violent felony, misdemeanor or summary offense as defined by Pennsylvania law against a person on University property, including but not limited to stalking, intimidation, coercion, harassment, and assault;
- Possession of weapons of any kind or dangerous articles in accordance with Human Resources Policy 706: Possession of Dangerous Articles;
- Willful or threatening destruction of University property or property of another University employee, other member or guest of the University community, or anyone with whom the University is conducting business;
- Threats, direct or implied; intimidation, aggressive or hostile behavior that creates a reasonable fear of injury to another.

# Reporting

Maintaining a safe and secure environment is a shared responsibility. All University employees are strongly encouraged to report any work-related or University connected behavior that they regard as threatening or violent (in accordance with the above definition) to at least one of the University resources listed below.

All emergency situations should be immediately reported to Penn Police by calling 511 (from a campus phone) or (215) 573-3333 (from an off-campus phone) or picking up one of the blue light phones located throughout campus.

Individuals who apply for and/or obtain Protection From Abuse (PFA) orders are encouraged to provide their supervisors and the Penn Police with copies of the temporary or permanent order.

Employees should report workplace violence, as defined above, to their supervisor, manager, department chair or Dean, whoever is deemed to be appropriate in the respective supervisory chain of command. Such reports can also be made, as appropriate, to Penn Police, the Division of Human Resources/Staff and Labor Relations, the Division of Public Safety/Special Services Department, the Office of Student Conduct, and/ or the Office of the Vice Provost for Faculty.

A University official who receives a report of workplace violence should take the matter seriously and first take prompt steps to ensure the safety of the parties and/or University property involved. Reports of workplace violence must be investigated appropriately. Supervisors and managers should consult with the Division of Human Resources, Penn Police, the Division of Public Safety/Special Services Department, and/or any of the other investigatory/fact-finding resources mentioned herein, to receive assistance in investigating reports of workplace violence. Where faculty members are concerned, Deans and Chairs should consult with the Office of the Provost on the appropriate procedures to follow as outlined in the *Handbook for Faculty and Academic Administrators*. Workplace violence complaints against student workers should be referred to the Office of Student Conduct, the Office of the Provost, or their respective school office responsible for student conduct and discipline.

# Non-Retaliation

Retaliatory action is prohibited against any persons who report, respond to, participate in an investigation of, are victims of, or use University resources to address workplace violence. Persons found responsible for retaliatory actions will be subject to disciplinary actions up to and including termination of employment and/or student status.

# Sanctions

Once the investigation, fact-finding or hearing is completed and recommended actions for redress are finalized, the University will take the appropriate steps to address the offensive behavior and restore and maintain safety in the community. Employees who violate the Policy Prohibiting Workplace Violence may be subject to disciplinary action up to and including, termination of employment and/or student status. Employees may also be subject to criminal prosecution.

Where appropriate, persons who have violated the Policy Prohibiting Workplace Violence may be required to undertake educational or training courses and/or perform community service to assist in correcting the offensive behavior.

# University Resources

The University offers employees a variety of resources to address workplace violence. These resources provide services ranging from conducting investigations/fact-finding processes, providing security services, training, and counseling, to making referrals and mediating lower level conflicts. The following descriptions outline the University resources provided to address conflicts.

*Counseling*–Personal and psychological counseling services are offered for individuals or groups.

*Conflict Resolution*–Facilitation, mediation, and consultation services are available to assist individuals and groups to proactively resolve workplace issues and concerns.

*Criminal Complaints*–The Penn Police process and investigate reports of criminal incidents.

*Crisis Management*–These resources assist work groups/teams who have experienced a traumatic event or crisis situation, process and acknowledge their reactions, and identify strategies to cope with the aftermath of such incidents. The major goal is to help the affected group restore their productive work environment.

*Education/Training*–Training and educational programs are available to the Penn community on various aspects of campus safety and security, crime prevention and/or workplace violence.

*Investigatory*–These resources are charged with the responsibility of investigating, conducting fact-finding processes, hearings, or just cause proceedings regarding allegations of employee and/or student misconduct, including allegations of workplace violence.

*Referrals*–Some resources will help affected employees identify appropriate University and external resources to assist them with workplace and/or personal concerns.

*Security Services*–Walking and riding escort services are available to members of the Penn community.

# VI.K. Social Security Number Policy

*(Source: Offices of the Vice President for Information Systems and Computing and the Associate Vice President for Audit, Compliance and Privacy, Almanac, December 18, 2007; revised April 6, 2010 (https://almanac.upenn.edu/archive/volumes/v56/n28/policies.html))*

## Authority and Responsibility

The Privacy unit within the Office of Audit, Compliance and Privacy is responsible for identifying major privacy-related risks that the University faces and coordinating appropriate responses to mitigate those risks. Information Systems and Computing is responsible for the operation of Penn's data network and infrastructure (PennNet) as well as the establishment of information security policies, guidelines, and standards. These offices, therefore, have a responsibility to develop a policy in response to the significant privacy, security, and compliance risks concerning Social Security numbers (SSNs).

## Executive Summary

This policy establishes expectations around the use of SSNs - sensitive data whose misuse poses privacy risks to individuals, and compliance and reputational risks to the University. It calls on staff, faculty, contractors, and agents of the above to inventory their online and offline SSNs and reduce the above risks by, in priority order:

1. eliminating this data altogether,
2. converting it to PennID,
3. truncating the data to capture and display only the last four digits,
4. when the complete SSN is clearly necessary, ensuring strict security controls to protect the full data.

## Purpose

This policy establishes a formal institutional program around SSNs for the purposes of protecting the privacy of Penn constituents and reducing compliance and reputational risks to Penn. This policy establishes clearly defined steps and announces available resources to reduce the availability of this sensitive data.

## Risk of Non-compliance

SSNs are often, in the wrong hands, used by identity thieves to commit fraud by opening and using new credit accounts in a victim's name as well as gaining access to other personal and confidential information. In the case of credit abuse, the result is often a credit report damaged with inaccurate information reflecting the activity of the thief rather than the victim. This credit report can take months or more to correct and in some cases, results in lost opportunities for the victim and at times out-of-pockets costs. In non-credit cases, the damage could be exposure or abuse of private personal data of many sorts, including medical records, financial information, and other sensitive data. In addition, Pennsylvania and other states' "security breach notification" laws impose compliance obligations to notify data subjects of computer security breaches that expose full SSNs among other data. Individuals who fail to comply with the policy are subject to sanctions up to and including termination, depending on the nature, scope and severity of the violation, in accordance with University policies.

# Definitions

## Desktop or Workstation

A computer primarily used to provide direct access (via a locally attached keyboard, mouse and monitor) to applications such as web browsers, email clients, office productivity and data analysis tools for use usually by one individual.

## Firewall

A device or a tool that restricts and or logs network traffic. Firewalls can be implemented in software, hardware or a combination of both on the host or at the gateway.

## Key recovery

A special feature of a key management scheme that allows data to be decrypted by an authorized party even if the original key is lost.

## Personal Computing Device

Any computer intended primarily for individual use. This includes, but is not limited to, Desktops, Workstations, laptop computers, PDAs, phones and data storage devices such as iPods, USB drives, CDs, DVDs, back-up media, etc.

## Personal Digital Assistant (PDA)

A hand-held electronic device or organizer that has the capability of accessing, storing and/or transmitting data.

## Server

A computer used primarily to provide network-based services (e.g. web, file, or email), typically for use by multiple users.

## Social Security Number (SSN)

A nine-digit account number issued by the United States government, relating to an individual's account with the Social Security Administration.

# Scope

A. The individuals subject to this policy are all faculty, staff, contractors, and their respective agents in connection with Penn-oriented functions and activities involving SSNs. This policy requires that Local Security Liaisons assist these individuals in developing compliance plans, where appropriate, and develop programs to promote compliance.

B. The information subject to this policy includes SSNs collected and maintained as part of University operations. For example, the handling of one's own SSN, or SSNs of family members, separate and apart from University operations is not subject to this policy, though many of the measures contained in this policy are recommended as a matter of best practice for such situations.

# Statement of policy

## General: Best Efforts to Identify and Reduce Availability of SSNs

It is the responsibility of individuals subject to this policy to use best efforts to know and inventory where they are maintaining SSNs and to make best efforts to securely delete, convert, truncate, or secure such information.

1. **Inventory of SSNs** The inventory requirement is met by:
   1. Identifying hard copy documents, including reports from information systems that contain SSNs.
   2. Identifying electronic files on Personal Computing Devices and servers including files stored in applications and databases, large and small - that contain SSNs. See Best Practices below.
   3. Identifying vendors, contractors, or agents with whom you are working who work with SSNs of Penn constituents as part of a Penn-sponsored activity.
2. **Remediation - Eliminate, Convert, or Truncate** In cases where complete SSNs are not necessary, and neither Penn's Records Retention Schedules nor applicable law require the retention of such information, the SSNs identified must be addressed in one of the following ways, in *priority order*:
   1. Securely destroy the information.
      1. Paper records may be securely destroyed by utilizing shredding services. For assistance in obtaining shredding bins or related records destruction services, contact the Penn Records Center at 898-9432. Recycling of paper records containing SSNs is prohibited under this policy.
      2. Electronic information may be securely destroyed using secure individual file deletion or secure disk wipe utilities. For resources regarding securely deleting electronic information, see References, below.
   2. Convert information to Penn ID or other identifier. Penn's Office of Information Systems and Computing must be consulted to employ the SSN-to-Penn ID conversion utility; this assistance is available free of charge. Any remaining files with SSNs, once converted, must be securely destroyed.
   3. Truncate SSNs.
      Collect, maintain, and display only the last four digits of SSN. Truncated SSNs, while still carrying some risk, are generally less harmful to individuals from a privacy perspective as compared to complete SSNs.
3. **Remediation - Securing Complete SSNs** In some cases, the maintenance of a complete SSN is necessary to comply with legal requirements or other business or IT processes that have not yet converted from SSN usage. Complete SSNs may also be necessary for certain Institutional Review Board-approved research activities. In such cases, this sensitive data must adhere to the following strict security standards:
   1. **Servers** - SSNs may only be stored on secure Penn servers that meet the requirements of Penn's Computer Security Policy (see References, below), as amended.
   2. **Desktops and Laptops** - SSNs may only be stored on desktops and laptops if
      1. the desktop or laptop meets the requirements of Penn's Computer Security Policy;
      2. the desktop or laptop is protected by a firewall;
      3. the data on the desktop or laptop is protected at rest with encryption, using strong encryption with a key recovery component;
      4. laptops storing SSNs additionally make use of software that allows for location tracking and remote secure wipe to provide additional protections in the event of loss or theft, except on systems for which the use of tracking software would interfere with the technical functionality or integrity of encryption software.

Users should be aware that if encryption or tracking software is installed, a risk is created that data stored on the machine's hard drive may be damaged through operation of that software.

   3. **Personal Data Assistants and similar computing devices, USB drives, iPods and similar storage devices** - These devices, because of their portability, are at great risk of being lost or stolen. As a result, storage of SSNs on such devices is strongly discouraged. If storage is clearly necessary, the data must be protected at rest with encryption, using strong encryption with a key recovery component. In addition, where effective technology is available for the device, such device must also be equipped with a remote wipe / delete function and a firewall. Users should be aware that if encryption software is installed, a risk is created that stored data may be damaged through operation of that software.
   4. **Remote Access**
      1. **Encryption Requirement** - Any SSNs accessed remotely must be encrypted in transmission and must not be stored locally unless they are encrypted in accordance with this policy. ISC Information Security shall publish technical interpretations of this requirement (see References, below).
      2. **Public Computers / Computers with Significant Security Risk** - Do not use public computers, and other computers whose security is unknown, to gain remote access to SSNs. Similarly, do not use computers whose security is known to be insufficient to protect SSNs.
   5. **Need to Know Access** - Access to SSNs must be restricted to individuals with a need to know for University functions to proceed.
   6. **Securing Paper** - Any paper containing SSNs must be held in a locked file cabinet. Any such paper must be securely destroyed as soon as practicable consistent with Penn's Records Retention Schedules and applicable law.
   7. **Electronic Records - Secure Destruction** - Any electronic record containing SSNs must be securely destroyed as soon as practicable consistent with Penn's Records Retention Schedules and applicable law.
4. **Remediation - Use by Third Parties** SSNs will be released by the University to entities outside the University only when:
   1. permission is granted by the individual, or
   2. the external entity is acting as a University's contractor or agent and Penn has made reasonable efforts to ensure that the entity has adequate security measures in place to protect the data from unauthorized access, or
   3. as approved by the Office of Audit, Compliance and Privacy.
5. **Remediation - Restrictions on Transmission** - SSNs may not be sent over any network in plaintext (unencrypted), including e-mail. ISC Information Security shall publish technical interpretations of this requirement (see References, below). For one option, see number 5 in Best Practices, below.

## Recommendations and Best Practices

1. **Inventory tools** - Automated tools are recommended as a best practice for locating files with SSNs. For information about what tools are available see Inventory Tools in References, below.

2. **Truncated SSNs as Authenticators** - Use of truncated SSNs as an authenticator is discouraged because it does not provide sufficient security. There may be limited situations where it is necessary to use truncated SSNs, in combination with other data, as an authenticator. Such situations should be remediated as soon as technically feasible.

3. **Reports from Central Systems** - Notify data stewards of central or other systems that continue to issue reports containing full SSNs.

4. **Consult with Security Liaisons** - Users of Personal Computing Devices storing SSNs should be encouraged to consult with Security Liaisons for the School or Center to assist in meeting the security requirements found in this policy.

5. **Secure Share** - For sharing documents that contain sensitive information, Secure Share is a safe alternative to file exchange methods such as e-mail, FTP, and portable devices.

# Compliance

A. **Verification:** Through its annual program of risk-based audits and compliance assessments, the Office of Audit, Compliance and Privacy will verify that organizations are in compliance with this policy.

B. **Notification:** Violations of this policy will be reported by ISC Information Security and the Office of Audit, Compliance and Privacy to the Senior Management of the Business Unit affected.

C. **Remedy:** Violations will be recorded by the Office of Audit, Compliance and Privacy and any required action to mitigate harmful effects will be initiated in cooperation with the Senior Management of the Business Unit affected.

D. **Financial Implications:** The business units shall bear the costs associated with compliance with this policy.

E. **Responsibility:** Responsibility for compliance with the policy lies with all faculty, staff, contractors, and their respective agents in connection with Penn-oriented functions and activities involving SSNs. In addition, Security Liaisons must assist these individuals in developing a compliance plan, where appropriate, and develop other programs to promote compliance. Such programs may include: raising awareness, designating a day or week for SSN clean-up programs and annual reports of progress from divisions / departments within the School or Center. The Office of Audit, Compliance and Privacy, and Information Systems and Computing, are available for consultation in connection with developing compliance plans and achieving compliance.

F. **Time Frame:** Compliance with this policy shall be achieved no later than December 15, 2010; with the following exception: schools and centers following compliance plans established on or before May 1, 2008 shall not be deemed out of compliance with this policy on the ground of lateness, as long as they are adhering to their respective plan timeframes.

G. **Enforcement:** Individuals not adhering to the policy may be subject to sanctions as appropriate under Penn policies.

H. **Appeals:** Requests for waiver from the requirements of this policy may be submitted to either the Office of Audit, Compliance and Privacy or Information Systems and Computing, Information Security. These requests shall be decided by the Vice President of Information Systems and Computing and the Associate Vice President of Audit, Compliance and Privacy.

# References

- **Shredding** - For assistance in obtaining shredding bins or related records destruction services, contact the Penn Records Center at 898-9432 http://www.archives.upenn.edu/

- **Computer Security Policy** - http://www.net.isc.upenn.edu/policy/approved/20100308-computersecurity.html

- **Inventory Tools** - One Step Ahead tip entitled "What's the Half Life of an SSN?," relating to Identity Finder software: https://almanac.upenn.edu/archive/volumes/v55/n25/osa.html

- **Requirement for Encryption of Data in Transit** - http://www.net.isc.upenn.edu/policy/supporting/20071120-ssnpol-tech-interpretation.html

- **Secure deletion of electronic files** - For resources regarding securely deleting electronic information, see http://www.upenn.edu/computing/security/privacy/data_clear.php

- **Secure Share** - https://www.isc.upenn.edu/security/secure-share (https://www.isc.upenn.edu/security/secure-share/)

- **SSN to PennID Conversion Tool** - Penn's Office of Information Systems and Computing must be consulted to employ the SSN-to-Penn ID conversion utility. Any remaining files with SSNs, once converted, must be securely destroyed. Contact 215-573-4492 to use the free SSN-PennID conversion tool.

- **Records Retention Schedules** - Penn's Records Retention Schedules may be found at http://www.archives.upenn.edu/urc/recrdret/entry.html

# Appendix A

**Policy on Consultation Where the Administration Has Primary Decision-making Responsibility** *(Source: Office of the President, Almanac, April 20, 1999 (https://almanac.upenn.edu/archive/v45/n29/ORconsultation.html))*

This statement sets forth the policy of the University on consultation between officers of the University and their representatives ("the administration") and persons or bodies who are members of constituent groups having an interest in the adoption, modification or implementation of various programs, actions and policies of the University in those areas of decision-making where the administration has final or primary responsibility and the faculty does not have a distinctive role.

Thus, this policy on consultation--which includes the standing faculty as one among several relevant constituency groups--does not pertain to those areas of decision-making where the standing faculty holds primary responsibility or where responsibility is held jointly by the administration and the standing faculty, under the University's system of coordinate powers and shared governance. Nor does it apply to those areas of primary administrative responsibility in which the standing faculty's distinctive role in the University would justify differential access to consultation as compared with the other constituency groups referred to in this policy.

# 1. Norms governing consultation policy

This policy shall be interpreted and applied in light of certain underlying premises and norms:

a. The University is a non-profit organization committed to the structuring of its work and educational activities so as to provide opportunities for all who live, teach, carry on research, work, or study here to be participants in the campus community.

b. Except where strategic concerns actually and reasonably counsel little or no public knowledge or awareness of emergent policies or actions, it is the administration's duty to allow for full and open discussion, that is consistent with the democratic aspirations of the University.

c. Faculty, students, and staff, both as individuals and as constituency groups, have a stake in the welfare of the community as a whole, typically make a major commitment of time and devotion to the common enterprise, and often possess skills, resources and perspectives critical to the making of decisions that improve the quality of life at the University and in the surrounding community.

d. As the largest private employer in Philadelphia, making its home in West Philadelphia, the University is an integral part of both the West Philadelphia community and the city as a whole, and has an important responsibility to take account of the effect of its decisions on those larger communities.

e. Consultation by the University administration should be understood as conferring on those who are consulted an invitation and a responsibility to respond, to respect confidentiality when it is promised, to report and represent accurately the views of constituents and superiors, and to report in a timely manner to their constituents.

f. In the decision-making areas to which this policy on consultation applies, ultimate decisional authority rests with the trustees and (pursuant to authority delegated by the trustees) the president, in order that they may fulfill their responsibility to ensure the institutional and financial health of the University, as distinguished from its academic and scholarly mission, where the faculty holds primary responsibility under the trustees or, in some cases, shares such responsibility with the administration. The consultative process itself may be considered separate from the outcomes of that process, and a democratic, substantive, interactive process of consultation is not a mechanism for ensuring specific outcomes or for suppressing disagreement on substantive issues.

## 2. Definition

Consultation includes, but goes beyond, the disclosure of information about emergent decisions and policies. It is a process that embodies the spirit of give-and-take, whereby information of all types--specific questions, concerns and methods, but also broader strategies, principles and frameworks--is exchanged and incorporated into the process throughout its duration.

## 3. The framework of consultation

a. Selection of consultation partners
It is for the most part in the administration's discretion to determine the identity of those bodies or individuals with whom to consult on specific matters. (Consultative procedures for use in the appointment, reappointment, or removal of academic administrators are specified elsewhere in this Handbook, and are not addressed here.) The University Council and Faculty Senate, and their appropriate committees, as well as the independent committees provided for in the bylaws of the Council, are the means of carrying on the process. They are readily available.

b. Structures facilitating consultation
The long-standing practice of the president and provost to meet regularly with several groups provides a flexible established mechanism for raising matters on which consultation is appropriate, including the further specification of consultation partners. Specifically (but not exclusively), the chair, past chair, and chair-elect of the Faculty Senate ("the three chairs") meet frequently, and the Senate Executive Committee meets periodically, with the president and the provost and, as needed with other senior administrators. Similar practices exist with respect to the chairs or other officers of the Undergraduate Assembly, the Graduate and Professional

Students Assembly, the Penn Professional Staff Assembly, and the A-3 Assembly Executive Board.

c. Range and timing of consultation

1. Range of decisions subject to consultation
The policies and decisions facing the University as an institution range along a continuum, from major developmental decisions, on one end, to narrower operational decisions, on the other. Broad consultation is needed most in the case of developmental decisions, and to a lesser extent with respect to operational decisions.

2. Timing of consultation
A decision-making process contains a number of steps: (1) gathering of data; (2) formulation of goals; (3) development of major alternatives; (4) provisional evaluation of each alternative; (5) provisional selection of the most desirable alternative or set of alternatives; (6) implementation of the decision made; and (7) monitoring and adjustment of the action to be taken. The process is often sequential, but may be cyclical or overlapping rather than linear, with decision makers often revisiting some or all of the steps as they move toward a decision, refining and understanding it better with each cycle. The following norms shall guide the administration in applying the "steps" model to the question of the appropriate timing of consultation:

a. Consultation is presumptively obligatory no later than the conclusion of Step 3, and should be considered earlier, and carried out, where the decision maker in fact believes it feasible or perceives its utility.

b. Earlier consultation is presumptively obligatory in a particular case if, in the considered judgment of a reasonable person in the position of the decision maker, the momentum inherent in moving through steps 1-3 would be recognized as sufficient to significantly inhibit (even though not preventing entirely) genuine consultation at the conclusion of Step 3.

c. Consultation may be deferred, notwithstanding it being presumptively obligatory under sections 3.c.(2) (a) or (b), where and only to the extent that, for concrete and specific reasons, the need for confidentiality is reasonably believed clearly and strongly to counsel against it; provided, that in such event it shall be the administration's responsibility to consult the three chairs, under a promise of confidentiality, to advise them of the matter in question, and to seek and take seriously their counsel whether, how and when any consultation, going beyond them, should take place. It shall be the responsibility of the three chairs to consider whether to suggest to the president that, in light of the specific issue at hand, it would be appropriate, still on a confidential basis, to bring the UA and GAPSA chairs, the PPSA and A-3 Assembly chairs, or both groups, into the discussion of a matter, or in any other manner to broaden the sharing of information. Where there has been such a deferral of a more open consultation with the constituencies themselves, the administration should be especially attentive to the need for consultation more broadly at the later stages.

## 4. Safeguards

a. When a constituency representative has been consulted in confidence about a matter thought by the administration not to be ripe for broader disclosure, the representative shall, at an appropriate later date, report the fact of confidential consultation to his or her constituency.

b. When those consulted by an administration representative believe that the issues involved are such that it is important that more senior administrators hear their views directly, it shall be their responsibility to bring that belief to the attention of the president or provost, utilizing the mechanisms described in section 3.b.

c. It shall be responsibility of the three chairs to advise the president or provost of any serious concerns that they have, or have come to their attention, regarding a matter that has not been disclosed to them by the administration, and to request the president to consider the timing and manner of consultation.

d. It shall be the responsibility of the leadership of student constituencies to take the necessary steps to orient the relevant student committees to the background and origin of a question, and to monitor the work of student committees to assure that their membership is active and increasingly informed and sophisticated about important matters.

e. It shall be the responsibility of a person, group of people, or committee or other body consulted by the administration on a matter, to consider whether that act suffices as consultation with the constituency itself, or whether it should share the information, propose that the administration itself share it, or (where the information has been given in confidence) seek administration approval to share it, with a broader range of membership within the relevant constituencies.

f. Where there is a need for consultation with a committee of Council or the Senate, or with officers of constituency bodies, the need is ordinarily not satisfied by consultation with an administrative committee that contains faculty, staff or student members among it.

(Almanac, April 20, 1999 (https://almanac.upenn.edu/archive/v45/n29/ORconsultation.html))

# FAQs

## Are consensual sexual relations or dating permitted between faculty and students?

In a broad set of circumstances, consensual sexual relations between faculty and students are prohibited. Effective March 27, 2018, consensual sex or dating relations are categorically prohibited between Penn faculty and undergraduate students. Consensual sex or dating relationships are also prohibited between faculty and those graduate or professional students over whom faculty have supervisory "academic responsibility" as defined in the policy.

As to graduate and professional students for whom faculty do not have academic responsibility, Penn faculty are nevertheless strongly discouraged from consensual sex or dating relationships. The policy applies to all categories of standing faculty, associated faculty, academic support staff, and staff and students who teach, grade or have other academic responsibilities for students.

Professionalism in the academy requires recognition by faculty that their positions come with authority and stature which convey power over students. In light of inequalities and asymmetries of institutional power, consensual sexual relations between faculty and students may involve unintended advantage-taking and manipulation. Sexual relations potentially compromise judgment and seriously undermine the climate of trust critical to the academic enterprise. Consensual sexual relations can create the perception that faculty preferentially treat one student or category of students over others. As a consequence of sexual relations, students can become mired in conflicts of interest that

deprive them of many of the benefits of their University education. These benefits include unencumbered access to faculty expertise, mentorship, evaluation, and endorsement. Not only can sexual relations with faculty diminish the educational experience of the individual students involved, they disturb the educational environment enjoyed by other students, by raising the possibility or perception of discrimination, bias, and harassment. Because of differences in power and authority, consensual sexual relations between faculty and students risk characterization as non-consensual or coercive, opening the door to allegations of sexual harassment or assault with the threat of liability for faculty and for the University.

*Click* here *(p. 136) for the Sexual Misconduct Policy, Resource Offices and Complaint Procedures.*

## May I go up for tenure or promotion in my terminal year?

Effective February 2015, terminal year promotion or tenure reviews are no longer permitted or encouraged as a routine alternative to mandatory review year review.  All faculty members will  be reviewed in their designated mandatory review years. Rare exceptions may be made, but require the advanced approval, normally prior to the mandatory review year, of both the faculty member's Dean and the Provost. Extensions of the probationary period for new children, medical problems and other special situations will be granted as in the past. Where terminal year review is approved, approval does not foretell or guarantee success.

*Click* here *(p. 33) for the Policy on the Tenure System.*
*Click* here *(p. 35) for the Policy on Academic Appointments and Promotions.*

## What role do faculty play in the appointments of senior faculty administrators?

Faculty are typically represented on the consultative committees for the appointments of deans and University-wide administrators.  For dean searches, Schools nominate specific faculty members to the President for appointment to the consultative committee.

*Click* here *(p. 8) for the Policy on Consultation Procedures for the Appointment and Reappointment of Deans and University-wide Administrators.*

## What is the role of the department in appointments and promotions?

Appointments and promotions are initiated in departments (or Schools, if the School has no departments).  Faculty members with a rank equal or equivalent to the rank of the proposed appointment or promotion are eligible to vote.  Only faculty members with tenure may vote on cases of faculty members proposed for tenure.

*Click* here *(p. 35) for the Policy on Academic Appointments and Promotions.*

## Can I be tenured at Penn if I am not a permanent resident of the United States?

No.  Only permanent residents or citizens of the United States can receive tenure at Penn.  It is possible to serve initially on the Penn faculty with

a non-immigrant visa and then be tenured upon receipt of permanent residency status.

*Click* here *(p. 37) for the Policy on Appointment of Non-U.S. Personnel.*

## Can my tenure clock be extended?

A faculty member can have his or her tenure clock extended due to a new child, a catastrophic event, a serious health condition, or the caregiving of another with a serious health condition.  Extensions are not granted for government service or fellowships.

*Click* here *(p. 41) for the Policy on Extension of Probationary Periods.*

## What are the policies for the parent of a new child?

A faculty member may be entitled to tenure-track extension and teaching relief upon the birth of, adoption of, or initiation of a foster care relationship with a child.  Short-term Disability Leave and Family Medical Leave may also be available to faculty members as employees of the University; faculty members are advised to consult Human Resources (https://www.hr.upenn.edu/) about these benefits.

*Click* here *(p. 41) for the Policy on Extension of Probationary Periods.*
*Click* here *(p. 42) for the Faculty Parental Policy.*

## Can I take a leave of absence before my first reappointment?

It is possible but not expected for a faculty member to take a leave before the first reappointment.  If a faculty member on a term appointment is granted a scholarly leave, the leave will be counted as part of the time accumulated toward tenure, unless the formal action approving the leave expressly provides otherwise.

*Click* here *(p. 39) for the Policy on Faculty Leaves of Absence.*

## Under what circumstances can I take a leave of absence from Penn?

Faculty members may take scholarly leave (sabbatical); leaves for employment at other institutions, agencies, or firms; reductions in duties; and leaves for various personal circumstances.

*Click* here *(p. 39) for the Policy on Faculty Leaves of Absence.*

## How do I take a sabbatical leave?

Sabbatical leaves with pay are available to standing faculty members and certain other categories of faculty.  Faculty members can apply for sabbaticals through their departments or Schools.  Sabbatical requests must be approved by the Office of the Provost.  Faculty are generally eligible for leaves of one semester at full pay or one year at half pay, although shorter sabbaticals may be permitted for otherwise eligible faculty.

*Click* here *(p. 39) for the Policy on Faculty Leaves of Absence.*

## What is Penn's policy in conflicts of interest?

Faculty are asked to report each year on their extramural activities. Outside employment may violate Penn's conflict of interest policy, as may teaching online courses not offered through Coursera.

*Click* here *(p. 45) for the Policy on Conflicts of Interest.*

## What is Penn's policy on misconduct in research?

For tenured faculty members, *click* here *(p. 61) for the Policy on Misconduct in Research.*

For non-tenured faculty members, *click* here *(p. 64) for the Policy on Misconduct in Research for Non-Tenured Faculty Members of the Research Community.*

## What is Penn's policy on copyright protection?

The Penn Libraries offer an overview of Copyright Basics (https://guides.library.upenn.edu/copyright/), as well as an FAQ on Copyright Issues (https://guides.library.upenn.edu/copyright/FAQ/).

## Who owns my inventions?

The University generally owns inventions and associated materials that are conceived or reduced to practice in the course of employment at the University or with a substantial use of University resources.  The University's copyright policy (https://almanac.upenn.edu/archive/v47/n24/ORcopyright.html) describes applicable rules for copyrightable works. In some cases, the terms of a sponsored research agreement may affect ownership. Please contact PCI for advice on specific cases; details of Penn's policy on ownership can be found in the patent policy (https://almanac.upenn.edu/archive/volumes/v57/n01/pdf_n01/Patentpolicy.pdf).

## How do I file a grievance?

The Deans, the Ombudsman and the Vice Provost for Faculty may be able to help faculty resolve serious conflicts related to employment at Penn. A faculty member who wishes to file a formal grievance should follow the procedures described here (p. 48) in the Faculty Handbook.

## What benefits are available to retired faculty?

The Office of the Provost publishes a comprehensive brochure on benefits available to retired faculty at Penn (https://provost.upenn.edu/uploads/media_items/the-changing-definition-of-retirement.original.pdf).  Faculty nearing retirement age are also invited to visit the Office of Human Resources (https://www.hr.upenn.edu/) to learn more about the many benefits enjoyed by retirees.

*Click* here *(p. 44) for the University's Retirement Policy.*

## Under what circumstances can I use an "emeritus" title post-retirement?

Emeritus status is conferred upon Professors and Associate Professors in the Standing Faculty and upon Standing Faculty-Clinician Educators

at the time of retirement.  Retiring standing faculty members have the option of using or not using the modifier "Emeritus."  Those who retire from administrative or non-standing faculty positions may not use the emeritus modifier (e.g., "emeritus dean" or "emeritus department chair").

*Click* here (p. 33) *for the Policy on Emeritus Faculty.*

# INDEX

## A

Appendix A ............................................................ 168

## F

Faculty Handbook .................................................... 3

FAQs ................................................................... 170

## I

I. University Structure ............................................... 3

I.A. Introduction ..................................................... 3

I.B. The Trustees .................................................... 3

I.C. The Central Administration .................................. 4

I.D. The Faculties and the Schools .............................. 5

I.E. General Provisions Concerning a Faculty ................. 6

I.F. Organization and Responsibilities of Graduate Groups ..... 6

I.G. Policies Concerning Academic and Administrative Officers ..... 7

I.H. The University Council, the Faculty Senate, and University Committees ............................................................... 12

I.I. Academic Planning and Budget Committee ................ 15

I.J. The Ombuds .................................................... 16

I.K. Equal Opportunity and Affirmative Action ............... 16

II. Faculty Policies and Procedures ............................ 17

II.A. Academic Freedom and Responsibility ................... 17

II.B. Structure of the Academic Staff .......................... 17

II.C. Tenure System at the University of Pennsylvania ....... 33

II.D. Appointments and Promotions ............................ 35

II.E. Terms and Conditions of Faculty Appointments ......... 38

III. Policies and Procedures Concerning Faculty Research ..... 59

III.A. Guidelines for the Conduct of Sponsored Research ...... 59

III.B. Procedures Regarding Misconduct in Research .......... 61

III.C. Procedures Regarding Misconduct in Research for Non-faculty Members of the Research Community .................................. 64

III.D. Policy Relating to Copyrights and Commitment of Effort for Faculty ............................................................... 67

III.E. Patent and Tangible Research Property Policies and Procedures ... 68

III.F. Policy on Conflicts of Interest Related to Research ...... 79

III.G. Consulting and Outside Activities Policies and Procedures ......... 84

III.H. Guidelines for Student Protection and Student Access to Information Regarding Sources of Financial Support ........................... 87

III.I. Policy Concerning the Exclusion of Foreign Nationals from Specific Research Areas ...................................................... 87

III.J. Guidelines for Research in the Community ............... 87

III.K. Human Research Protection Program ..................... 88

III.L. Policy Regarding Human Subject Research in the Sociobehavioral Sciences ............................................................... 89

III.M. Standard Operating Procedures and Policies of the University of Pennsylvania Institutional Animal Care and Use Committee (IACUC) .... 91

IV. Procedures Regarding Admission and Instruction of Students ........ 91

IV.A. Guidelines for Admissions Policies and Procedures ...... 91

IV.B. Code of Academic Integrity ............................... 93

IV.C. Charter of the University Student Disciplinary System ... 94

IV.D Faculty Authority to Assign Grades and Academic Integrity ........ 106

IV.E. School Policies and Practices ............................ 107

IV.F. Rules Governing Final Examinations ..................... 107

IV.G. Reporting of Final Grades ................................ 107

IV.H. Policy on Secular and Religious Holidays ............... 108

IV.I. Guidelines for Addressing Academic Issues of Students with Disabilities ............................................................. 108

IV.J. Policy on the Confidentiality of Student Records ........ 110

## V

V. Policies Related to Information ............................. 113

V.A. Guidelines on Open Expression ........................... 113

V.B. Confidentiality of Employee Records ..................... 116

V.C. Confidentiality of Health Information under HIPAA ...... 118

V.D. Closed Circuit Television Monitoring and Recording of Public Areas for Safety and Security Purposes ...................................... 119

V.E. Relationships Between Members of the University Community and Intelligence Organizations ............................................. 121

V.F. Photocopying for Educational Use ........................ 123

V.G. Protocols for the University Archives and Records Center ......... 125

V.H. Policy on Acceptable Use of Electronic Resources ....... 127

V.I. Policy on Privacy in the Electronic Environment ......... 130

V.J. Policy on Security of Electronic Protected Health Information (ePHI) ................................................................. 132

V.K. Information Systems Security Incident Response Policy ... 133

V.L. Policy on Unauthorized Copying of Copyrighted Media .... 133

V.M. Confiscation of Publications ............................. 133

V.N. Policy on Computer Disconnection from PennNet ........ 133

VI. Other Policies .............................................. 134

VI.A. Use of University Name Policy ........................... 135

VI.B. Acceptance of Gifts, Grants and Contracts ............. 135

VI.C. Acceptance of Conditional Gifts ........................ 136

VI.D. Gift Policy ................................................. 136

VI.E-F. Sexual Misconduct Policy, Resource Offices and Complaint Procedures ........................................................... 136

VI.F. Consensual Sexual Relations Between Faculty and Students ..... 155

VI.G. The University Alcohol and Other Drug Policy .......... 156

VI.H. Drug-Free Workplace Policy ............................. 161

VI.I. Procedures for the Evaluation and Certification of the English Fluency of Undergraduate Instructional Personnel ............................................. 162

VI.J. Policy Prohibiting Workplace Violence ......................................... 164

VI.K. Social Security Number Policy ...................................................... 166