# EXHIBIT B

# GUIDELINES ON OPEN EXPRESSION

## I. Principles

A. The University of Pennsylvania, as a community of scholars, affirms, supports and cherishes the concepts of freedom of thought, inquiry, speech, and lawful assembly. The freedom to experiment, to present and examine alternative data and theories; the freedom to hear, express, and debate various views; and the freedom to voice criticism of existing practices and values are fundamental rights that must be upheld and practiced by the University in a free society.

B. Recognizing that the educational processes can include meetings, demonstrations, and other forms of collective expression, the University affirms the right of members of the University community to assemble and demonstrate peaceably in University locations within the limits of these Guidelines and undertakes to ensure that such rights shall not be infringed. In keeping with the rights outlined in I.A. (p. 1) above, the University affirms that the substance or the nature of the views expressed is not an appropriate basis for any restriction upon or encouragement of an assembly or a demonstration. The University also affirms the right of others to pursue their normal activities within the University and to be protected from physical injury or property damage. The University shall attempt to ensure that, at any meeting, event or demonstration likely to be attended by non-University law enforcement authorities, the rights provided by these Guidelines are not infringed.

C. The University shall be vigilant to ensure the continuing openness and effectiveness of channels of communication among members of the University community on questions of common interest. To further this purpose, a Committee on Open Expression has been established as a standing Committee of the University Council. The Committee on Open Expression has as its major tasks: participating in the resolution of conflicts that may arise from incidents or disturbances implicating these Guidelines; mediating among the parties to prevent conflicts and violations of these Guidelines; interpreting these Guidelines; advising administrative officers when appropriate; and recommending policies and procedures for the improvement of all levels of communication.

D. In case of conflict between the principles of the Guidelines on Open Expression and other University policies, the principles of the Guidelines shall take precedence.

## II. Definitions

A. For the purposes of these guidelines, the "University community" shall mean the following individuals:

1. Persons who are registered as students or who are on an unexpired official leave of absence.

2. All persons who are employed by the University.

3. Trustees and associate trustees of the University and members of Boards of Overseers or other bodies advisory to the University.

B. For the purposes of these Guidelines, "meeting" and "event" designate a gathering of persons in a University location previously reserved for that purpose. Unless designated as public, meetings are considered to be private. Events are considered to be public. "Demonstration" designates the presence of one or more persons in a University location with the intent to express a particular point of view in a manner that attracts attention, as in protest, rallies, sit-ins, vigils, or similar forms of expression. "University location" designates:

1. The campus of the University;

2. Any location owned, leased or used by the University, when used by members of the University community; and

3. Areas immediately adjacent thereto.

## III. Standards

A. The University, through the President, the Provost, and the Vice Provost for University Life, shall act to encourage and facilitate free and open expression within these Guidelines.

1. The University shall publish these Guidelines at least once each academic year in a manner that brings them to the attention of members of the University community. The University shall publish the rules adopted pursuant to IV.B.1 (p. 2) by the Committee on Open Expression at least once each academic year in a manner that brings them to the attention of members of the University community.

2. The University shall establish standards for the scheduling of meetings and events. This shall involve:

   a. Publishing policies and procedures whereby members of the University community, upon suitable request, can reserve and use designated spaces within University buildings for public or private meetings or events;

   b. Publishing policies and procedures whereby members of the University community, upon suitable request, can reserve and use designated outdoor spaces on the University campus for public meetings or events;

   c. Publishing policies and procedures that specifically address requests involving groups composed entirely or predominantly of persons who are not members of the University community (see Section VI (p. 4));

   d. Consulting with the Committee on Open Expression with regard to the substance of the policies and procedures and the manner of their publication; and, if practicable, consulting with the Committee on Open Expression before denying a request for use of a room, facility, or space by an organization recognized by the University for a reason other than prior assignment of the room, facility, or space. In any event, any such denial must be reported promptly to the Committee.

B. Each member of the University community is expected to know and follow the Guidelines on Open Expression. A person whose conduct violates the following Standards may be held accountable for that conduct, whether or not the Vice Provost or delegate has given an instruction regarding the conduct in question. Any member of the University community who is in doubt as to the propriety of planned conduct may obtain an advisory opinion from the Committee on Open Expression in advance of the event.

1. Individuals or groups violate these Guidelines if:

   a. They interfere unreasonably with the activities of other persons. The time of day, size, noise level,[1] and general tenor of a meeting, event or demonstration are factors that may be considered in determining whether conduct is reasonable;

   b. They cause injury to persons or property or threaten to cause such injury;

   c. They hold meetings, events or demonstrations under circumstances where health or safety is endangered; or

   d. They knowingly interfere with unimpeded movement in a University location.

2. Individuals or groups violate these Guidelines if they hold a demonstration in the following locations:
   a. Private offices, research laboratories and associated facilities, and computer centers; or
   b. Offices, museums, libraries, and other facilities that normally contain valuable or sensitive materials, collections, equipment, records protected by law or by existing University policy such as educational records, student-related or personnel-related records, or financial records; or
   c. Classrooms, seminar rooms, auditoriums or meeting rooms in which classes or private meetings are being held or are immediately scheduled; or
   d. Hospitals, emergency facilities, communication systems, utilities, or other facilities or services vital to the continued functioning of the University.
3. a. Individuals or groups violate these Guidelines if they continue to engage in conduct after the Vice Provost for University Life or delegate has declared that the conduct is in violation of the Guidelines and has instructed the participants to modify or terminate their behavior. Prompt compliance with the instructions shall be a mitigating factor in any disciplinary proceedings based upon the immediate conduct to which the instructions refer, unless the violators are found to have caused or intended to cause injury to person or property or to have demonstrated willfully in an impermissible location.
   b. If the individuals or groups refuse to comply with the Vice Provost's or delegate's order, they may challenge the appropriateness of the order to the judicial system. If the judiciary finds that the conduct was protected by the Guidelines, all charges shall be dismissed.
   c. Individuals or groups complying with the Vice Provost's or delegate's order may request that the Committee on Open Expression determine if the Guidelines were properly interpreted and applied to their conduct.

# IV. Committee on Open Expression

A. **Composition**
   1. The Committee on Open Expression consists of seventeen members: eight faculty members named by the Faculty Senate Executive Committee, two representatives of the Penn Professional Staff Assembly, one representative of the Weekly-Paid Professional Staff Assembly, and three undergraduate students and three graduate/professional students selected by the appropriate student governance organizations (currently the Nominations and Elections Committee of the Undergraduate Assembly and the Graduate and Professional Student Assembly).
   2. Members of the Committee are appointed for the following terms:
      a. The faculty and representatives of the Penn Professional Staff Assembly are appointed to two-year terms, staggered so that in each year either two or three faculty members are appointed and one representative of the Penn Professional Staff Assembly is appointed.
      b. The representative of the Weekly-Paid Professional Staff Assembly is appointed for a two-year term.
      c. The undergraduate and graduate/professional student members are appointed to one-year terms.
      d. Vacancies shall be filled for the unexpired term by the appropriate nominating body or persons.

   3. The Chair of the Committee shall be selected by the Committee on Committees from among the members of the Committee on Open Expression.

B. **Jurisdiction**
   The Committee has competence to act in issues and controversies involving open expression in accordance with these Guidelines. The Committee's responsibilities are the following:
   1. Issuing rules to interpret or give more specific meaning to the Guidelines. Before adopting a rule, the Committee must hold an open hearing on the proposed rule and receive the views of individuals or groups. An affirmative vote of eight members is required for adoption, modification or recision of a rule to be effective.
   2. Recommending to the University Council proposals to amend or repeal the Guidelines. An affirmative vote of seven members is required to make such recommendations.
   3. Giving advisory opinions interpreting the Guidelines at the request of a member of the University community for the purpose of advising that person or the University community. Such advice is provided to guide future action. If the Committee does not give a requested opinion, it must indicate its reasons for not doing so. The Committee must respond to such requests as soon as feasible but in any event not later than within one month of the receipt by the Chair of the Committee.
   4. Giving advisory opinions interpreting the Guidelines at the request of administrative officials with responsibilities affecting freedom of expression and communication. Such advice is provided for the purpose of guiding future action.
   5. Mediating in situations that involve possible violations of the Guidelines. Those Committee members available at the time may act on behalf of the Committee. In carrying out the mediation function, the Committee or those members present may advise the responsible administrative officials and any other person with respect to the implementation of the Guidelines. Those Committee members who have acted on behalf of the Committee must report on their activities to the full Committee.
   6. Reviewing the following administrative decisions for the purpose of providing advice on future actions.
      a. At the discretion of the Committee, administrative decisions involving these Guidelines made without consultation with the full Committee.
      b. All instructions by the Vice Provost or delegate to modify or terminate behavior under Section III.B.3 (p. 2) of these Guidelines.
   7. Investigating incidents involving the application of these Guidelines to aid the Committee in its functions of rule making, recommending changes in the Guidelines or issuing advisory opinions. Such functions provide guidance to the University community for future action. The results of Committee investigations for these purposes shall not be a part of the initiation, consideration or disposition of disciplinary proceedings, if any, arising from the incidents.
   8. Adopting procedures for the functions of the Committee, varied to suit its several functions, consistent with these Guidelines. Procedures that are not wholly matters of internal Committee practice must be made public in advance of implementation. Except as otherwise provided, the Committee may determine its own voting procedures.

9. Submitting an annual report to the Council and the University on the status of the Committee's work in the University journal of record.

C. **Procedures**

1. Except as provided with respect to the mediation function in Section IV.B.5 (p. 2), seven members of the Committee constitute a quorum.

2. The Committee can authorize subcommittees, selected from its own members, to act for the Committee in any matter except the issuance of rules interpreting or implementing the Guidelines or the making of recommendations to amend or repeal the Guidelines.

3. The Committee shall respect the privacy of individuals as its general policy and shall maintain the right to declare the confidentiality of its proceedings.

   a. If a person appearing before the Committee requests that his or her testimony or information be kept confidential, the Committee shall consider such a request. The Committee then shall determine whether to honor that request and shall inform that person of its decision before testimony is given.

   b. Minutes of particular Committee meetings may be declared confidential by the Committee or be so declared at the discretion of the chair subject to review by the Committee.

   c. All Committee documents containing confidential material, as determined by the chair, shall be clearly marked "confidential" and shall carry a warning against unauthorized disclosure.

# V. Responsibilities for Enforcement

A. It is the responsibility of the Vice Provost for University Life (hereafter referred to simply as the "Vice Provost") to protect and maintain the right of open expression under these Guidelines.

B. Observation of meetings, events or demonstrations, when deemed necessary by the Vice Provost to protect and maintain open expression, shall be the responsibility of the Vice Provost, who may delegate such responsibility. This delegate shall have full authority to act in the name of the Vice Provost under these Guidelines.

1. The observer (Vice Provost or delegate) shall identify himself or herself to those responsible for the meeting or event or to the leaders of the demonstration.

2. The Vice Provost shall attempt to inform the chair of the Committee on Open Expression of meetings, events or demonstrations to which an observer will be sent. The chair may designate a member or members of the Committee to accompany and advise the observer. Such a Committee representative shall also be identified to those responsible for the meeting or event or to the leaders of the demonstration.

3. Except in emergencies, the Vice Provost's authority under these Guidelines shall not be delegated to employees of the University's Department of Public Safety. The role of public safety personnel at a meeting, event or demonstration is defined below, in Section V.C.3 (p. 3).

4. Any observer or Committee representative who attends a meeting, event or demonstration shall respect the privacy of those involved. If there has been no violation of these Guidelines, other University regulations, or applicable laws, an observer, committee representative, or public safety employee who attends a meeting, event or demonstration shall not report on the presence of any person at such meeting, event or demonstration.

C. The Vice Provost or delegate is responsible for enforcing Section III.B (p. 1). and may instruct anyone whose behavior is violating or threatens to violate these Guidelines to modify or terminate such behavior. The instruction shall include notice that failure or refusal to comply is a further violation according to Section III.B (p. 1). of these Guidelines. However, an instruction or warning by the Vice Provost or delegate is not a prerequisite for a finding that a violation has occurred.

1. When the Vice Provost or delegate declares that an individual or a group has violated the Guidelines, he or she may request to examine their University identification.

   a. Failure to comply with this request is in violation of the Guidelines.

   b. In the event that any person(s) are deemed by the Vice Provost or delegate, in consultation with available members of the Committee on Open Expression, to have violated the Guidelines and such person(s) refuse to show University or other identification, the Vice Provost or delegate shall if practicable inquire of other individuals present as to the identity of the claimed violator(s). Identification by two other individuals shall suffice to establish identity. Should it not be possible to establish identity in this way, the Vice Provost or delegate may direct that photographs be taken of the participant(s) in the claimed violation. The Vice Provost or delegate must warn the individual(s) that their photographs will be taken unless identification is presented. Photographs and videotapes obtained without such warning may not be used as evidence in disciplinary proceedings. It is preferred that a member of the Committee on Open Expression take any such photographs; however, if no such person is able or willing to do so, another member of the University community may be requested to do so. As soon as safely practicable, all such photographs shall be turned over to the Vice Provost or delegate. Any photographs taken (including videotapes and negatives) shall be used solely by the Office of Student Conduct for the purpose of investigation of alleged violations and possible identification of alleged violators of these Guidelines. If it is determined that no violation has occurred, the Vice Provost or delegate shall destroy the photographs. If a violation is found to have occurred, after identification has been made and the case has been adjudicated, the Vice Provost or delegate shall destroy the photographs. None of the photographs shall be published. After each incident at which photographs are taken, the Committee on Open Expression shall report on the incident to the University Council, via the chair of the University Council Steering Committee, regarding what happened in the incident, which individuals saw the photographs, and the disposition of the photographs.

2. In carrying out this responsibility for safeguarding the right of open expression, the Vice Provost shall obtain the advice and recommendation of the representatives of the Committee on Open Expression whenever feasible.

3. The Vice Provost or delegate may request members of the University Police to attend meetings, events or demonstrations to help protect the open expression of those involved.

   a. Any person acting as an agent of the Division of Public Safety who attends a meeting, event or demonstration in a University location shall be clearly identifiable as such and in normal duty uniform. (Arms may be carried if they are part of "normal duty uniform.")

b. Public Safety personnel also may attend meetings, events or demonstrations when requested to do so by the person or group responsible for the event, when prominent public figures are involved, or when the Commissioner of Public Safety or delegate determines that there exists an imminent danger of violence at the event.

4. Terminating a meeting, event or demonstration by force is a most serious step, as this action may exacerbate existing tensions and may lead to personal injury and property damage.

   a. Avoidance of injury to persons by the continuation of a meeting, event or demonstration is a key factor in determining whether it should be forcibly terminated. Property damage and significant interference with educational processes are also factors to be considered and may be of sufficient magnitude to warrant forcible termination.

   b. Whenever possible, the Vice Provost or delegate should consult with the Committee on Open Expression before seeking a court injunction against those involved in a meeting, event or demonstration or calling for police action.

   c. The Vice Provost or delegate shall inform those involved that he or she intends to seek an injunction or call for police intervention before he or she does so.

   d. When a meeting, event or demonstration is forcibly terminated, a full statement of the circumstances leading to the incident shall be publicized by the Vice Provost within the University.

D. 1. Cases involving undergraduate students are referred to the Office of Student Conduct who investigates the event and decides what disciplinary proceedings, if any, to pursue.

   2. Cases involving graduate or professional students are referred to the Office of Student Conduct or to the established disciplinary body of the school in which the student is enrolled.

   3. Cases involving faculty are referred to the appropriate Dean or to the Provost.

   4. Cases involving University staff or administrators are referred to that individual's supervisor or any other person with supervisory responsibility over that individual.

   5. Cases involving trustees and associate trustees of the University and members of the Boards of Overseers or other bodies advisory to the University are referred to the Executive Committee of the Trustees.

E. The Division of Public Safety shall not collect or maintain information about members of the University community,[2] except in connection with alleged crimes, violations of University regulations, or as specifically authorized in writing by the President (to Public Safety and the Open Expression Committee). This regulation shall not affect personnel information concerning current, past or prospective employees of the Division of Public Safety.

# VI. Non-University Persons

These Guidelines address themselves explicitly to forms of individual and collective expression in a University location by members of the University community. The extent to which the privileges and obligations of these Guidelines may be made applicable in particular circumstances to individuals who are not members of the University community shall be determined by the Vice Provost or delegate. Participants in meetings, events and demonstrations in a University location are required to comply with the instructions of the Vice Provost or delegate. (See III.A.2.c (p. 1).)

[1] An "unreasonable noise level" is defined as sound above 85 decibels measured by a calibrated sound-level meter at an "A" weighting on "slow" response ten feet away from and directly in front of the source, amplifier or loudspeaker when the latter is within 50 feet of a building.
[2] Videotaped or closed circuit television information collected by posted, fixed location cameras is excluded, as long as it is in conformance with the rules of the CCTV policy as of January 13, 1999.

(Source: Almanac, March 16, 1993 (https://almanac.upenn.edu/archive/v39pdf/n25/031693.pdf))

# Interpretative Guidelines (Sections I & II) Adopted by the 2014-2015 Committee on Open Expression

These are interpretative guidelines adopted by the members of the 2014-2015 Committee on Open Expression of the University, pursuant to the Guidelines on Open Expression, Section IV.B.

## I. Inviting Speakers to Campus

A. The Guidelines clearly express the foundational value of free speech at Penn (I.A.): "The University of Pennsylvania, as a community of scholars, affirms, supports and cherishes the concepts of freedom of thought, inquiry, speech, and lawful assembly. The freedom to experiment, to present and examine alternative data and theories; the freedom to hear, express, and debate various views; and the freedom to voice criticism of existing practices and values are fundamental rights that must be upheld and practiced by the University in a free society." These values are of paramount importance: "In case of conflict between the principles of the Guidelines on Open Expression and other University policies, the principles of the Guidelines shall take precedence" (I.D).

By allowing a controversial speaker to speak or a group to organize and invite a speaker or hold an event, the University of course in no way endorses that speaker's or event organizer's content or viewpoint; rather, it affirms the value of creating a robust marketplace of ideas and fostering reasoned disagreement and discourse.

B. The Guidelines on Open Expression already unambiguously forbid discriminating against particular content and viewpoints (I.B): "the substance or nature of the views expressed is not an appropriate basis for any restriction upon or encouragement of an assembly or demonstration." The unpopularity of a speech's content or viewpoint is not a reason to suppress speech. Objectors may not have a "heckler's veto" over speech with which they disagree. Allowing threats of protests or violence to suppress speech in any way would encourage protesters to make such threats. In keeping with this foundational principle, the University has never revoked a commencement speaker's invitation to speak based upon the substance of the speaker's views, including any controversy they might generate.

Most speakers at Penn are invited not by the University itself, but by particular organizations, departments, schools, and individuals at Penn. The Guidelines protect members of the entire University community against official reprisals for hosting controversial speakers and events. An event organizer is at liberty to change its

mind freely, without duress, and to cancel an event or a speaker invitation. Other members of the University community likewise have the right to criticize a proposed speaker's or event's substance or viewpoint, or even to call upon the event organizer to cancel an event or rescind an invitation. But they may not go beyond criticism to exert any duress on the event organizer or speaker to withdraw. Duress includes any express or implied threat—by an administrator, a member of an administrative staff, a student leader, or a faculty member or teaching assistant in a supervisory or hierarchical relationship to an event organizer or speaker (particularly one within the same department or school)—to an organization's or speaker's or event's safety, recognition, registration, budget, funding, or access to venues or security, or to any faculty, student, administrator, or staff member's employment, tenure candidacy, funding, grades, honors, academic standing, or other status within the University, or a threat of violence or similar unlawful conduct. Any such duress, express or implied, gives rise to the natural inference that the actor is seeking to suppress speech because it is controversial or unpopular. That would amount to "any restriction upon" "the substance or nature of the views expressed," in violation of the Guidelines (I.B).

C.  The norm at the University is to allow reservations of rooms and other venues on a first-come, first-served basis. Denying a room-reservation request on any other basis, or worse rescinding an existing reservation of a room or other venue, raises the almost inescapable inference that the denial or rescission is based on "the substance or nature of the views expressed" (I.B). Thus, the Guidelines already require, "if practicable, consulting with the Committee on Open Expression before denying a request for use of a room, facility, or space by an organization recognized by the University for a reason other than prior assignment of the room, facility, or space. In any event, any such denial must be reported promptly to the Committee" (III.A.2.d).

The same principle, in keeping with the Guidelines' letter and spirit, applies to the authorization of events and to the provision of security, audiovisual, publicity, and other logistical support. An organization must of course have a budget sufficient to defray the necessary expenses and must reserve any such resources sufficiently in advance to allow the University to provide them on a first-come, first-served basis. Once such reservations have been made with adequate funding and advance planning, however, and particularly once a student group, faculty member, school, department, or organization has formally invited a speaker, whether by contract or other formal invitation such as one on University letterhead, any rescission or compelled modification of existing reservations or security arrangements raises the strong inference that the rescission or modification is based on "the substance or nature of the views expressed" (I.B). "[I]f practicable, [any member of the University community must thus] consult[] with the Committee on Open Expression before denying [such] a request [or rescinding or forcibly modifying such a reservation] . . . for a reason other than prior [reservation of the scarce resource at issue]. In any event, any such denial [including a rescission or compelled modification] must be reported promptly to the Committee" (III.A.2.d).

D.  "[T]o ensure the continuing openness and effectiveness of channels of communications" at Penn, the Guidelines establish the Committee on Open Expression (I.C). The Committee is expressly charged with "its major tasks" of "interpreting these Guidelines" and "recommending policies and procedures for the improvement of

all levels of communication" (I.C). The Committee is also expressly charged with preventing, mediating, and resolving conflicts related to open expression (IV.B).

Penn's tradition strongly encourages consulting with interested stakeholders across campus. On issues involving open expression, such consultation ought to include the Committee on Open Expression and the Office of the Vice Provost for University Life. The Committee strongly encourages students, faculty, staff, and campus organizations and groups to raise such issues at the earliest possible opportunity. If a student group or other University of Pennsylvania affiliate believes that a member of the University community is violating or attempting to violate the Guidelines on Open Expression, including any of the foregoing provisions, it may ask the Office of the Vice Provost for University Life to mediate to resolve the issue. If the mediation does not produce a mutually satisfactory resolution, the aggrieved party may file a complaint with the Committee on Open Expression, or with the chair, administrative liaison, or members of the committee if a quorum is not immediately available.

## II. Open Expression in Electronic Media and Cyberspace

The University's Guidelines on Open Expression were originally drafted decades before the spread of email and the Internet and well before the creation of social media, and therefore do not expressly mention electronic forms of communication. But their principles apply equally online.

The value of free and open expression and vigorous debate apply with equal force to newer forms of communication, including emails, web sites, social media, and other technologies and communication media. As the University's Information Systems and Computing Department's Policy on Acceptable Uses of Electronic Resources puts it, "The University's commitment to the principles of open expression extends to and includes the electronic information environment, and interference in the exercise of those rights is a violation of this policy and of the Guidelines on Open Expression" *http://www.upenn.edu/computing/policy/aup.html* Whether communications occur on Locust Walk or in cyberspace, open expression remains equally valuable to the University and equally protected to the same extent, under the same principles, and subject to the same limitations as non-digital forms of communication.

(Source: Almanac, March 3, 2015, Volume 61 Issue 25 (https://almanac.upenn.edu/archive/volumes/v61/n25/open-expression.html); Almanac, July 14, 2015, Volume 62 Issue 1 (https://almanac.upenn.edu/articles/council-2014-2015-year-end-report-of-the-committee-on-open-expression/))

# Interpretive Guidelines (Section III) Adopted by the 2022-2023 Committee on Open Expression

June 20, 2023

These interpretative guidelines are adopted by the members of the 2022-2023 committee (Section III below), pursuant to the Guidelines on Open Expression, Section IV.B. This interpretation provides clarification to the University community regarding the role of the Committee on Open Expression (COE) on campus. Parenthetical references below are to the Guidelines on Open Expression (guidelines). This interpretation is

adopted in accordance with Section IV.B.1 of the guidelines and will be published as Section III of the Interpretive Guidelines.

## III. Clarification of the Role of the Committee on Open Expression within the University Community

1. The Vice Provost for University Life (VPUL) or its delegate (VPUL-D) has the authority to determine if the guidelines are being violated by any member of the University community. The COE is advisory to the VPUL and to members of the University community regarding interpretations of the guidelines (Section II.B). COE members may assist in offering real time advice to requesting parties regarding the Open Expression guidelines if they are present during a situation that involves possible violations of the guidelines. Currently, the VPUL refers to its delegates as "Open Expression Observers," which has led some members of the University community, including some students, to view them incorrectly as representatives of the COE. In order to avoid confusion, the COE recommends that VPUL refer to its delegates instead as VPUL-delegates charged with enforcing the guidelines (Section III) but who do not represent the COE.

2. The VPUL or a VPUL-D may intervene to address in real time any conduct that it has declared to be in violation of the guidelines (Section V.C). Intervention may include instructions to participants to modify or terminate their behavior (Id.). The COE interprets these provisions to mean the following:

- For students, compliance with instructions from the VPUL or a VPUL-D will have the consequence that no referral will be made by the VPUL to the Center for Community Standards and Accountability (CSA) for a disciplinary hearing or penalty. (The CSA was formerly known as the Office of Student Conduct and renamed in 2022.)
- Refusal to comply with these instructions may lead to a referral by the VPUL to the CSA, who will investigate the event and decide what disciplinary proceedings, if any, to pursue.

3. Whenever feasible, the VPUL and its delegates shall, in carrying out their responsibility for safeguarding the rights of open expression, obtain the advice and recommendation of the representatives of the Committee on Open Expression (Section V.C.2). The COE interprets this requirement to mean that the chair of the COE should be advised of any likely future possible controversial conduct or events (see also Section V.B.2) to determine if the COE should meet and provide anticipatory guidance. The COE recognizes that the VPUL and its delegates may sometimes need to act expeditiously in situations about which they did not have advance notice or warning.  Even in these situations, all instructions given by the VPUL or its delegates to members of the University community to modify or terminate their behavior under the authority of the guidelines should be reported to the COE as soon as practical and in a manner agreed with the COE chair. (See Section IV.B.6.b.)

4. Any member of the University community (including, without limitation, the VPUL and any of its delegates, as well as students or student groups) may request advice from the COE. Although the COE may sometimes be requested to provide advisory opinions in advance about its interpretation of the guidelines (Section IV.B.3 & 4), its primary role is to review incidents in retrospect to provide guidance to the University community for future action (Section IV.B.6 & 7).  The COE interprets these provisions to mean that the VPUL and its delegates, or any other members of the University community, including students and student groups, may consult with the COE in advance of meetings, events or demonstrations, but this is optional and choosing not to consult the COE in advance cannot be used as grounds for punitive action against any member of

the University community. Advance consultation with COE does not offer any blanket protection with respect to VPUL's enforcement jurisdiction. The COE shall respect the privacy of individuals as general policy and maintains the right to declare the confidentiality of its proceedings.

5. With respect to COE's responsibilities in reviewing administrative decisions for the purpose of providing advice for future action (Section IV.B.6 & 7), the COE interprets these provisions to mean that it may provide advice to the appropriate governing body (VPUL for students, deans for faculty, supervisors for staff, etc.) prior to referral regarding the application/interpretation of the guidelines. The COE may suggest that their advice be included in any referrals for consideration of any further adjudication and/or restorative practice. However, the COE acts in an advisory capacity only in this context, and its advice is not binding with respect to either a decision to bring a disciplinary action or the nature of such disciplinary actions.

(Source: Almanac, June 20, 2023, Volume 67 Issue 37) (https://almanac.upenn.edu/articles/interpretative-guidelines-adopted-by-the-2022-2023-committee-on-open-expression/)