## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMY WAX, | |
| **Plaintiff,** | |
| v. | No. 2:25-cv-00269-TJS |
| THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, | |
| **Defendants.** | |

## PROFESSOR AMY WAX'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Professor Amy Wax ("Plaintiff" or "Professor Wax") submits this memorandum of law in support of her attached motion for preliminary injunction because Defendants' ongoing actions continually harm Professor Wax's reputation and continue to violate her civil rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. ("Title VI") and Section 1981, 42 U.S.C. § 1981 ("Section 1981"). Professor Wax respectfully requests a preliminary injunction, without bond, enjoining Defendants to immediately refrain from implementing the final sanctions against her, specifically: (1) refrain from requiring Professor Wax to adhere to the Speech Policy or face further sanctions; (2) refrain from suspending Professor Wax for the 2025-2026 academic year; and (3) restore Professor Wax's named chair.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................iii

BACKGROUND ............................................................................................... 1

LAW ................................................................................................................. 2

LEGAL STANDARD ........................................................................................ 3

ARGUMENT .................................................................................................... 3

    I.         Professor Wax is likely to succeed on the merits of her claims. ............................ 5

       A.       Professor Wax is likely to show the University breached its contract with her by sanctioning her in violation of its duties under the First Amendment, academic due process, and fundamental principles of academic freedom. ............................................................ 5

       B.       Professor Wax is likely to succeed on her Title VII claim. ................................. 8

       C.       Professor Wax is likely to succeed on her Section 1981 claim......................... 10

       D.       Professor Wax is likely to succeed on her Title VI claim. ............................... 12

    II.       Professor Wax faces irreparable injury to her reputation and civil rights that cannot be redressed after trial or by damages. ..................................................................... 13

    III.      The balance of the equities and public interest favor this injunction. .................. 15

CONCLUSION................................................................................................ 16

# TABLE OF AUTHORITIES

## Cases

*Ali v. Fed. Bureau of Prisons*,
  552 U.S. 214 (2008) .........................................................................................9

*Babb v. Wilkie*,
  140 S. Ct. 1168 (2020) ...................................................................................9

*Bair v. Shippensburg University*,
  280 F. Supp. 2d 357 (M.D. Pa. 2003) ...........................................................7

*Baker v. Lafayette Coll.*,
  532 A.2d 399 (Pa. 1987) ................................................................................5

*Bostock v. Clayton Cty.*,
  590 U.S. 644 (2020) .....................................................................................10

*Cohen v. California*,
  403 U.S. 15 (1971) .........................................................................................7

*Ctr. for Investigative Reporting v. SEPTA*,
  975 F.3d 300 (3d Cir. 2020) ..........................................................................6

*David v. Neumann Univ.*,
  177 F. Supp. 3d 920 (E.D. Pa. 2016) ..........................................................13

*De Piero v. Pa. State Univ.*,
  No. 23-2281, 2024 U.S. Dist. LEXIS 5768 (E.D. Pa. Jan. 10, 2024) ........12

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
  108 F.4th 194 (3d Cir. 2024) .............................................................4, 13, 14

*Desert Palace, Inc. v. Costa*,
  539 U.S. 90 (2003) .........................................................................................9

*Elrod v. Burns*,
  427 U.S. 347 (1976) .....................................................................................14

*FCC v. Pacifica Foundation*,
  438 U.S. 726 (1978) .......................................................................................6

*Ferrer v. Trs. of the Univ. of Pa.*,
  825 A.2d 591 (Pa. 2002) ................................................................................5

*Jones v. Sch. Dist. of Phila.*,
  198 F.3d 403 (3d Cir. 1999) ........................................................................10

*Kengerski v. Harper*,
  6 F.4th 531 (3d Cir. 2021) .............................................................................9

*Lei Ke v. Drexel Univ.*,
  No. 11-6708, 2015 U.S. Dist. LEXIS 118211 (E.D. Pa. Sept. 4, 2015) ....12

*Lewis v. Kugler*,
   446 F.2d 1343 (3d Cir. 1971) ................................................................15

*Makky v. Chertoff*,
   541 F.3d 205 (3d Cir. 2008) ..................................................................8

*Matal v. Tam*,
   582 U.S. 218 (2017) ..............................................................................7

*Murphy v. Duquesne Univ. of the Holy Ghost*,
   777 A.2d 418 (Pa. 2001) .......................................................................5

*One World Botanicals v. Gulf Coast Nutritionals*,
   987 F. Supp. 317 (D.N.J. 1997) ...........................................................13

*Pryor v. Nat'l Collegiate Athletic Ass'n*,
   288 F.3d 548 (3d Cir. 2002) ................................................................10

*Reading v. N. Hanover Twp.*,
   124 F.4th 189 ........................................................................................3

*Saxe v. State College Area School District*,
   240 F.3d 200 (3d Cir. 2001) ..................................................................7

*Shire US Inc. v. Barr Labs., Inc.*,
   329 F.3d 348 (3d Cir. 2003) ................................................................15

*Somers v. Gen. Elec. Co.*,
   No. 22-1093, 2022 U.S. App. LEXIS 33143 (3d Cir. Nov. 30, 2022) ...........5

*Title VII." Brown v. J. Kaz, Inc.*,
   581 F.3d 175 (3d Cir. 2009) ................................................................10

*United States v. Philadelphia*,
   573 F.2d 802 (3d Cir. 1978) ................................................................14

*Vonderheide v. Harrisburg Area Cmty. Coll.*,
   No. 19-3096, 2019 U.S. Dist. LEXIS 183254 (E.D. Pa. Oct. 23, 2019) ...............13

**Statutes**

42 U.S.C. § 1981 .......................................................................................3

42 U.S.C. § 2000d .....................................................................................3

42 U.S.C. § 2000e-2 ...............................................................................3, 9

## BACKGROUND

This case primarily flows out of the contractual tenure relationship between Professor Wax and Defendants at the University's Carey School of Law.[1] That contractual relationship is governed by both (1) explicit promises to University faculty, including Professor Wax, of protections provided by the First Amendment to the Federal Constitution, and (2) the prohibitions of federal anti-discrimination laws. Wax has been a tenured professor there since July 1, 2001. Ver. Compl. ¶37. In 2017, she published an op-ed in the *Philadelphia Inquirer* praising bourgeois values and claiming that all cultures are not equal in preparing people to function in American society. This, combined with Wax's statements in a podcast about Black student performance at Penn and other of her public commentary on social issues, triggered significant backlash among faculty and administration at the University. This resulted in law school Dean Ted Ruger filing a "Charging Document" against Wax, accusing her of gross misconduct warranting "major sanctions"—a charge equivalent to allegations of "rape" or "misuse of University funds."  See Penn Faculty Handbook II.E.16.1.B.7; Ver. Compl. ¶¶54, 118. That document called for the formation of a five-person ad hoc "Hearing Board" to investigate the Dean's allegations, in lieu of the process of review by a standing committee that would ordinarily apply to accusations of academic misconduct like those asserted in the Dean's charges. Ver. Compl. ¶¶52-59.

This started a years-long review of the Dean's charges against Wax.  The procedures Penn used to conduct this review violated basic due process safeguards guaranteed Professor Wax in numerous respects.  Despite some internal dissent, none of the reviewing bodies or persons,

---

[1] For purposes of lawsuits, the University sues and is sued through the Trustees of the University, whom are vested with legal responsibility for the University. All other entities and individuals employed at or by Penn are considered agents of the Trustees for purposes of this lawsuit.

including the Penn Senate Committee on Academic Freedom and Responsibility or then-President Liz Magill, corrected any of the procedural defects, despite their duty to do so. In the end, Professor Wax was severely disciplined for speech that was clearly protected by university policy.

While all that was happening, Defendants presided over a sordid chapter of the University's history characterized by an explosion of antisemitic speech and conduct at Penn. Applying a blatantly discriminatory double standard, Penn treated speakers who engaged in grossly antisemitic speech far more leniently than Professor Wax. The Complaint lists the overwhelming examples of antisemitic speech allowed by Defendants and not subject to any sanction while Professor Wax faced unfair discipline for her commentary on race that some deemed "offensive." See Ver. Compl. ¶¶87-105.

Professor Wax filed a Verified Complaint against Defendants, the Trustees of the University of Pennsylvania, on January 17, 2025. Defendants waived service and this Court issued a schedule for their answer to the Complaint. Professor Wax now moves for a preliminary injunction.

## LAW

Professor Wax's contract and false light claims are controlled by Pennsylvania common law. Penn has explicitly incorporated into the contract the protections of the First Amendment, which, *inter alia*, prohibit viewpoint-based restrictions on speech, in particular speech restrictions based purely on perceived offensiveness.

Section 1981 of the Civil Rights Act of 1866 states: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be

subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981.

Title VII of the Civil Rights Act of 1964 states: "It shall be an unlawful employment practice for an employer—(1) to … otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.

Title VI of the Civil Rights Act of 1964 states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

## LEGAL STANDARD

"To obtain [a preliminary injunction], the plaintiff must show that (1) she is likely to succeed on the merits, that (2) she is likely to suffer irreparable harm in the absence of preliminary relief, that (3) the balance of equities tips in her favor, and that (4) an injunction is in the public interest." *Reading v. N. Hanover Twp*., 124 F.4th 189, __ (3d Cir. 2024) (cleaned up) (slip op. at 12).

## ARGUMENT

Federal court cases with wide-ranging implications like this one properly take a long time to resolve. Professor Wax doesn't have that time. She faces certain impending harms that will be irreparable beginning in August 2025. The capstone of the University's sanctions against her—a year's suspension from teaching—will take effect that month. She is likely to succeed on the merits of her contractual and civil rights claims, both of which serve the public interest—including the interest of the community of students and professors at the University of Pennsylvania itself.

Ensuring academic freedom and civil rights protections at Penn will not harm the University but rather will further its very purpose.

Professor Wax faces two kinds of irreparable harms.

*First*, the harms caused by the implementation of the sanctions themselves—namely, the ongoing reputational and professional harms resulting from the one-year suspension, the loss of her named chair, and the requirement that she state at every public event that she does not speak on behalf of the University. Because all the harm to her reputation is happening right now, it cannot be redressed by later damages. Likewise, because the one-year suspension will begin in August of this year, the harm and stigma from that sanction will attach long before this case is resolved. To ensure that there is still meaningful relief available to Professor Wax at the end of this litigation, *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 200 (3d Cir. 2024), that harm must be staunched now.

*Second*, Professor Wax continues to face harm from the civil rights violations caused by the Defendants' racially discriminatory Speech Policy, as defined in the Verified Complaint ¶7. The Policy was a but-for cause of the sanctions levied against Professor Wax, and the violation of the law continues to this day. Specifically, the Provost, in publishing the sanctions against Professor Wax, specified that Penn's "directives" (i.e., its directives that Wax adhere to the university's discriminatory Speech Policy) "will remain in effect for so long as you [Wax] are a member of the University's standing faculty." ECF No. 1.1 at 70-71. In other words, one of the sanctions levied against Professor Wax was that she must immediately adhere to the University's illegal Speech Policy. As a result, Professor Wax must either bow to that illegal policy or face the prospect of further discipline. Imposing Penn's Speech Policy on Wax in violation of Title VI and

Section 1981 inflicts upon her ongoing harm and should be halted pending full resolution of this case.

### I.    Professor Wax is likely to succeed on the merits of her claims.

**A. Professor Wax is likely to show the University breached its contract with her by sanctioning her in violation of its duties under the First Amendment, academic due process, and fundamental principles of academic freedom.**

The baseline elements for a breach of contract claim in Pennsylvania remain "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." *Somers v. Gen. Elec. Co*., No. 22-1093, 2022 U.S. App. LEXIS 33143, at *6 n.8 (3d Cir. Nov. 30, 2022). "[A] breach of contract claim may be brought by a tenured professor when it is asserted that the University failed to comply with the procedures established by the parties' contractual agreement." *Ferrer v. Trs. of the Univ. of Pa*., 825 A.2d 591, 609 (Pa. 2002). Pennsylvania courts do not afford deference to universities' internal procedures where, as here, "it can be clearly demonstrated that that body violated its own procedures." *Baker v. Lafayette Coll*., 532 A.2d 399, 403 (Pa. 1987). Thus, while an internal process "conducted in good faith, is final within the institution and precludes or prohibits review in a court of law," *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 428–29 (Pa. 2001), procedurally irregular processes—such as the multitude of kangaroo-court tactics imposed on Professor Wax here—enjoy no such immunity.

Penn's internal proceedings against Professor Wax *are* reviewable here because, as alleged in the Complaint (and as described in the breach section below), the process in its entirety deviated significantly and clearly from Penn's own official and professed procedures as promised to professors and students. See Ver. Compl. ¶¶73, 85, 118. Moreover, as the Complaint details, various officials at Penn acted in bad faith in pursuing charges against Professor Wax.

Penn offered Professor Wax a tenure relationship in 2001, promising her a package of rights that comes with being a tenured professor, including but not limited to academic freedom rights, rights to a fair process as delineated in the Faculty Handbook, and a speech policy that expressly incorporated the protections of the First Amendment. See Ver. Compl. Exs. 13-15.

Through its sanctions process and by imposing "major sanctions" upon her, Defendants violated Penn's contract with Professor Wax in two distinct but interrelated ways.

*First*, Defendants violated Professor Wax's contractual First Amendment rights. As stated and never disavowed by Defendants, Penn's speech policies explicitly include the protections of the First Amendment, contractually binding Penn to First Amendment principles as if it were a public university. Penn is thus bound to adhere to First Amendment law when evaluating student and faculty speech. But, as illustrated by Penn's actions towards Professor Wax in contrast to its actions towards other speakers, Penn engages in blatant viewpoint discrimination. Such viewpoint discrimination, when the government targets particular views taken by speakers on a subject, is "especially egregious" and "presumed to be unconstitutional." *Ctr. for Investigative Reporting v. SEPTA*, 975 F.3d 300, 313 (3d Cir. 2020) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995)).

The University's punishment of speech based on the putative "harm" Professor Wax's statements allegedly caused—"harm" wholly defined by the upset and offense felt by those who heard the speech—is directly at odds with First Amendment law. Such punishment—meted out by the very body who deemed it "offensive" in the first place—is precisely the type of scenario the Constitution protects against. "[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it [under the First Amendment]. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *FCC v.*

6

*Pacifica Foundation*, 438 U.S. 726, 745–46 (1978). *See also Saxe v. State College Area School District,* 240 F.3d 200 (3d Cir. 2001) (striking down public high school anti-harassment policy because it conditioned the permissibility of speech on subjective listener reaction); *Bair v. Shippensburg University,* 280 F. Supp. 2d 357 (M.D. Pa. 2003) ("[R]egulations that prohibit speech on the basis of listener reaction alone are unconstitutional both in the public high school and university settings"). Indeed, because "one man's vulgarity is another's lyric," offensiveness is simply not a permissible basis upon which to criminalize or otherwise penalize speech. *Cohen v. California*, 403 U.S. 15, 25 (1971). When a restriction on speech "reflects the [authority's] disapproval of a subset of messages it finds offensive . . . [it] is the essence of viewpoint discrimination," which the First Amendment will not suffer. *Matal v. Tam*, 582 U.S. 218, 249 (2017).

*Second*, the tenure contract between the parties guarantees certain protections to professors like Professor Wax, including a fair process in any disciplinary proceedings. It is clear that Penn departed from its own procedures in its evaluation of the charges against Wax. As stated by one of the members of the Senate Committee on Academic Freedom and Responsibility (SCAFR), which was assigned to conduct the ultimate review of Wax's case, the process was replete with departures from Penn's own promises of due process:

(i)     as noted immediately above, the case against Professor Wax, based almost entirely on examples of speech occurring outside the classroom or the University, was entirely inconsistent with Defendants' statements in congressional testimony, public interviews, and on Penn's official websites;

(ii)    Defendants introduced post hoc a new professional conduct standard creating a dichotomy between protected speech and behavior;

(iii)   Defendants retroactively applied that new standard to Professor Wax's past behavior;

(iv)    Defendants used the "major infraction" article reserved for exceptionally serious misconduct, such as rape and misappropriation, instead of the "minor infraction" standard that should have been used;

     (v)     Defendants through their agents engaged in "intentional initial suppression and later misrepresentation of a report [the Rodriguez Report] largely favorable to the accused by (then) law school Dean Professor Ted Ruger and the legal counsel of the university";

     (vi)    Defendants chose not to provide Professor Wax with the information she needed to challenge and exclude certain candidates for the ad hoc Hearing Board based on conflict of interest / bias;

     (vii)   Defendants, by not correcting Dean Ruger's egregious misuse of the Charging Document procedure, used a "guilty-by-association mechanism" to falsely imply that Professor Wax shares all the views of Jared Taylor, painted by Ruger in the Charging Document as a "renowned white supremacist"; and

     (viii)  Defendants, through its general counsel office, engaging in "inappropriate conduct…by pretending to SCAFR that they are impartial in this matter which, given their actions described in the previous points, is clearly false."

See Ver. Compl. ¶85. In other words, this SCAFR committee member judged that Penn's procedures were grossly deficient and repeatedly departed from its own standards. These breaches clearly harmed Professor Wax, since they led directly to the sanctions against her. The caselaw is straightforward: a professor's breach of contract claim is reviewable in Pennsylvania when procedures are clearly ignored or the defendant acts in bad faith. Both of these conditions were satisfied here, so Professor Wax is likely to prevail on this claim.

**B. Professor Wax is likely to succeed on her Title VII claim.**

Under Title VII, a plaintiff must show: (1) She is a member of a protected class; (2) she is qualified for the position she seeks to retain; (3) she suffered an adverse employment action, and (4) the adverse action occurred under circumstances that may give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

Professor Wax, as a qualified White Jewish professor at Penn who was sanctioned by her employer, satisfies the first three elements. She is also likely to succeed in showing that the circumstances of the discipline against give rise to such an inference because Penn's racially discriminatory approach to disciplining speech at Penn caused the adverse actions against Wax.

Penn's Speech Policy discriminates on the basis of race because it punishes some speakers due to the racial content of their speech but does not punish other speakers that engage in speech of the same or materially similar racial content—depending on what racial group is the subject of the speech at issue. This is enough under subsection (m) of Title VII, which prohibits employment actions where "race was a motivating factor for any employment practice," without any limitation to the race of the Title VII plaintiff. 42 U.S.C. § 2000e-2(m). By its plain text, Title VII thus prohibits actions in which "race was a motivating factor for any employment practice." *Id.* (emphasis added). Subsection (m) "unambiguously states that a plaintiff need only 'demonstrate' that an employer used a forbidden consideration with respect to 'any employment practice.'" *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98–99 (2003) (quoting subsection (m)); see also *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (The word "'any' has a well-established "expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" (citation omitted)); *accord Babb v. Wilkie*, 140 S. Ct. 1168, 1174 n.3 (2020) ("We have repeatedly explained that 'the word 'any' has an expansive meaning."). Similarly, Title VII prohibits employers from taking actions based on the negative associations with some racial groups but not others. See *Kengerski v. Harper*, 6 F.4th 531, 538 (3d Cir. 2021) ("On the merits, we agree with our sister circuits that associational discrimination is well grounded in the text of Title VII.").

Penn's Speech Policy also discriminates based on the race of the speaker. Penn's actions against Plaintiff Wax were triggered by Professor Wax's speech on affirmative actions and other topics involving the race and were intended to punish her for engaging in speech Penn disfavored. At the same time, Penn did not punish any antisemitic speech made by persons of various other non-White races and ethnicities.

As pleaded in the Amended Complaint, Professor Wax's speech would not have been policed were she a different race, and "[s]o long as the plaintiff's [protected status] was one but-for cause of that [adverse employment] decision, that is enough to trigger [Title VII]". *Bostock v. Clayton Cty.*, 590 U.S. 644, 656 (2020). Further: An employer who intentionally treats a person worse because of [Jewishness]—such as by firing the person for actions … it would tolerate in an individual of another [race/color]—discriminates against that person in violation of Title VII. *Id.* at 658. Defendants intentionally treated Wax worse by disciplining her for actions—namely, speech concerning racial topics—that it tolerated in individuals of other races. If Professor Wax were an Arab Muslim, for example, and made statements about Jewish students equivalent to those she made about Black student performance (or even statements taken out of context, such as about Mexican men), no one seriously contends that she would have been disciplined. After all, Penn is replete with examples of other faculty and staff being held to a different standard.

For those reasons, Plaintiff Wax is likely to succeed on her Title VII claim.

**C. Professor Wax is likely to succeed on her Section 1981 claim.**

To succeed on a Section 1981 claim, a plaintiff must show: (1) she belongs to a protected racial group; (2) the defendants intended to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute. *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 569 (3d Cir. 2002). "[T]he substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII." *Brown v. J. Kaz, Inc*., 581 F.3d 175, 181-82 (3d Cir. 2009). Accordingly, *McDonnell-Douglas* applies. *Jones v. Sch. Dist. of Phila*., 198 F.3d 403, 410 (3d Cir. 1999).

Professor Wax is likely to prevail on her claim that she was prevented from enforcing her tenure contract because of Defendants' racially discriminatory Speech Policy. Professor Wax is a

member of a protected class, was qualified for her tenured position, and suffered an adverse employment action in violation of the contract.

Most significantly, Penn's actions give rise to an inference of intentional discrimination because the University's Speech Policy discriminates based on the content of speech, the identity of the group that is the subject of the speech, and also the racial identity of the speaker. In particular, Penn, through its substantial control over the University community, crafted a *de facto* Speech Policy that disfavored certain speech about racial topics while giving special solicitude to antisemitic speech. See Ver. Compl. ¶¶87-105. Second, and relatedly, Penn's actions suggest that Professor Wax's speech would not have been sanctioned if, rather than being White, she were a member of a racial group higher up on Penn's intersectionality pyramid of favored races and speakers.

Based on the content of Professor Wax's speech—specifically, her critiques of affirmative action policies and statements about Black student performance at Penn—the University initiated disciplinary proceedings and ultimately imposed sanctions. But this exposed a massive double standard: Minority speakers were not subject to any disciplinary proceedings for criticizing other racial groups or speaking on other racial topics. Antisemitic discrimination is prohibited by federal civil rights law. As recited at length in the Complaint, however, anti-Jewish speech at Penn is not subject to the same discipline under the Speech Policy as speech alleged to target other racial groups. See Ver. Compl. ¶¶87-105. This in turn has created a university-wide racially hostile environment in which antisemitic speech—and speakers—are given special solicitude, while academic speech discussing race in ways that Penn finds unacceptable, such as Plaintiff Wax's, is punished. This racially discriminatory Speech Policy was undoubtedly the primary cause of the

discipline imposed upon Professor Wax. Therefore, racial discrimination interfered with her contractual rights. Section 1981 was violated.

**D.  Professor Wax is likely to succeed on her Title VI claim.**

"Under Title VI, a plaintiff must show: (1) that there is racial or national origin discrimination; and (2) the entity engaging in discrimination is receiving federal financial assistance." *Lei Ke v. Drexel Univ.*, No. 11-6708, 2015 U.S. Dist. LEXIS 118211, at *36 (E.D. Pa. Sept. 4, 2015). Penn's racially discriminatory Speech Policy, which is generally applicable to students, faculty, administrators, and line employees alike, chills the speech of everyone at Penn. The antisemitic, racially hostile environment created by the race-based double standard of the Speech Policy is well-known to Defendants and affects multiple University programs that receive federal funding, yet Penn (like many other universities) has done next to nothing to ameliorate its deleterious effects. The Governor of this Commonwealth has even weighed in to opine that Penn has "lost its way" on the issue of antisemitic speech. Novi Zhukovsky, *Governor Shapiro Says University of Pennsylvania Has "Lost Its Way" on Campus Antisemitism*, NEW YORK SUN (Dec. 18, 2024), https://www.nysun.com/article/governor-shapiro-says-university-of-pennsylvaniahas-lost-its-way-on-campus-antisemitism (last accessed January 27, 2025). Accordingly, the Speech Policy's discrimination, which caused harm to Professor Wax, harms other intended beneficiaries of Title VI and federal funding at Penn. See *De Piero v. Pa. State Univ.*, No. 23-2281, 2024 U.S. Dist. LEXIS 5768, at *27 (E.D. Pa. Jan. 10, 2024).

In the Third Circuit, Title VI claims are generally treated identically to Title VII claims, which are likewise treated akin to Section 1981 claims. As noted above, Professor Wax satisfies the elements of membership in a protected class, qualifying for the benefit at issue, and suffering the harms of an unlawful adverse action. For the same reasons articulated above for the Section

1981 claim, there is a valid inference of intentional discrimination. See *David v. Neumann Univ.*, 177 F. Supp. 3d 920, 927 (E.D. Pa. 2016).

**II.    Professor Wax faces irreparable injury to her reputation and civil rights that cannot be redressed after trial or by damages.**

Injuries are irreparable if they threaten interim harm that the court cannot redress after trial. *Del. State Sportsmen's Ass'n*, 108 F.4th at 200.

Ongoing harm to one's reputation constitutes irreparable harm. *Vonderheide v. Harrisburg Area Cmty. Coll.*, No. 19-3096, 2019 U.S. Dist. LEXIS 183254, at *27–28 (E.D. Pa. Oct. 23, 2019) ("The Third Circuit has explained that '[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will.'") (quoting *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998); *Groupe SEB United States, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 204 (3d Cir. 2014)). Certain reputational "harm cannot be measured" when "money damages cannot compensate for all of the threatened injuries which plaintiff asserts because the injuries involve incalculable harm to plaintiff's reputation." *One World Botanicals v. Gulf Coast Nutritionals*, 987 F. Supp. 317, 336–37 (D.N.J. 1997). The harms to Wax's reputation continue apace and will not be remedied after trial. The stripping of her title and Defendants' painting of Professor Wax as unprofessional, racist, and mendacious in their public reprimand have continuing effects on Professor Wax, including (as noted in the Verified Complaint at ¶86) cancellations of interviews and speeches due to Defendants' sanctions. The one-year suspension that will attach this August, which is certainly before these matters are resolved, imposes additional ongoing injuries of interfering with her teaching and cutting her off from students. Further, due to the high-profile nature of this case, Penn's actual (as opposed to simply announced) imposition of sanctions in August works to vindicate, in the eyes of the students and public, the institution's

painting of our client as a liar, racist, and harasser, none of which she is. Our client wishes to be vindicated in the federal courts.

The harm to Professor Wax's professional reputation simply cannot be adequately addressed without this injunction.

Harms to civil rights may be similarly irreparable. For instance, the Third Circuit has presumed that irreparable injury will result from a Title VII violation. See *United States v. Philadelphia*, 573 F.2d 802, 807 (3d Cir. 1978). Here, as established above, Professor Wax is likely to succeed on her civil rights claims under Title VI and Section 1981. The harms to her civil rights are ongoing because Penn's directive to Professor Wax to abide by the unlawful Speech Policy "remain[] in effect" right now. And Penn's infliction of a suspension on Wax also violates her civil rights and contractual rights. The injury to her right to enjoy her tenure contract without race-based interference is therefore not just continuous and ongoing but will be further compounded by any imposed suspension.

Also at play here are Professor Wax's contractual First Amendment rights. As the Verified Complaint alleged at ¶¶65, 66, 99, Defendants have voluntarily bound themselves to the First Amendment as part of their duties to professors and students at Penn. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Accordingly, the Third Circuit "presume[s] that First Amendment harms are irreparable." *Del. State Sportsmen's Ass'n*, 108 F.4th at 204. That principle should apply here, where Defendants (1) have bound themselves contractually to the First Amendment, and (2) have told Professor Wax that she will be further sanctioned if she continues to engage in any speech they find violative of Penn's Speech Policy. This untenable situation means that Professor Wax faces irreparable harm because her First Amendment "rights have been

14

chilled as a result of" the Defendants' actions. See *Lewis v. Kugler*, 446 F.2d 1343, 1350 n.12 (3d Cir. 1971). Accordingly, if Professor Wax is likely to succeed on her contract claim, then First Amendment contractual irreparable injury should be presumed.

### III.    The balance of the equities and public interest favor this injunction.

Although this is not a case where the third and four factors "merge" formally, they do here as a practical matter. The third factor is sometimes called the balance of the equities or, phrased differently, "(3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued." *Shire US Inc. v. Barr Labs., Inc.*, 329 F.3d 348, 352 (3d Cir. 2003). Requiring Penn to uphold its contractual promise of free speech and to stop discriminating on the basis of race and ethnicity are both in the public interest and do not harm the institution.

As Professor Wax noted in her Verified Complaint at. ¶¶71, 135, 159-62, Penn's Speech Policy, including its race-based double standards, generally applies to all members of the University community, students, staff, and professors alike. It thus harms not just Professor Wax but all those who are forced to abide by its race-based preferential system or face harsh disciplinary consequences. For the reasons stated above, the Speech Policy violates Title VI in part through its chilling effects on speech involving the topic of race by all professors and by all students, who are the intended beneficiaries of Title VI.

Indeed, Penn likely faces additional legal liability if it continues to give antisemitic speech special solicitude. See, e.g., Resolution Agreement Between The University of California and OCR (Dec. 18, 2024) (available at https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/09222257-b.pdf). On top of that, the Speech Policy runs contrary to Penn's own stated commitment to open expression and inquiry, First Amendment principles and protections, and

academic freedom for all its community members. It is no great hardship to require Penn to refrain from applying its double standard to Professor Wax during the pendency of this litigation.

Nor will pausing any of the other sanctions harm Defendants in any way.

Therefore, it is both in the University's interest and the public interest for the University to be held to its own standards regarding Professor Wax.

## CONCLUSION

For those reasons, this Court should grant the injunction.

Dated: March 14, 2025                                    Respectfully submitted,

                                    /s/ *Samantha K. Harris*
                                    Samantha K. Harris
                                    PA Bar No. 90268
                                    ALLEN HARRIS PLLC
                                    P.O. Box 673
                                    Narberth, PA 19072
                                    (610) 634-8258
                                    sharris@allenharrislaw.com

                                    Caleb Acker
                                    PA Bar No. 330399
                                    HOLTZMAN VOGEL BARAN
                                    TORCHINSKY & JOSEFIAK PLLC
                                    15405 John Marshall Hwy
                                    Haymarket, VA 20169
                                    cacker@holtzmanvogel.com
                                    540-341-8808

                                    Jason B. Torchinsky*
                                    D.C. Bar No. 976033
                                    HOLTZMAN VOGEL BARAN
                                    TORCHINSKY & JOSEFIAK
                                    2300 N Street NW,
                                    Suite 643
                                    Washington, D.C. 20037
                                    jtorchinsky@holtzmanvogel.com
                                    Phone: (202) 737-8808

*Attorneys for Plaintiff Professor Amy Wax*

*\* pro hac vice*