**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

AMY WAX,

                **Plaintiff,**

    v.

THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA,

                **Defendants.**

No. 2:25-cv-00269-TJS

## <u>PROFESSOR AMY WAX'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND .............................................................................................................. 2

LEGAL STANDARD ...................................................................................................... 4

ARGUMENT ................................................................................................................... 5

    I.    Professor Wax Has Pled a Plausible Breach of Contract Claim. ........................... 5

        A.Penn's Repeated Promises to Respect the Free Speech and Academic Freedom of Its Tenured Professors Are Enforceable. ......................................................... 6

        B.Professor Wax's Contract Claims Should Be Reviewed *De Novo* ..................... 12

        C.Professor Wax Has Plausibly Alleged that Her Suspension and Related Penalties Violated the Free Speech and Academic Freedom Protections in Her Tenure Contract. .......................................................................................................... 14

        D.Professor Wax's Suspension Violated Her Contract's Promise that She Could Only Be Suspended for "Major Infractions of University Behavior Standards." .................................................................................................................. 17

        E. Penn's Disciplinary Process Was Conducted in Bad Faith and Violated Professor Wax's Procedural Rights. ........................................................................... 19

    II.    Professor Wax Has Plausibly Alleged Racial Discrimination Under Section 1981, Title VII, and Title VI. .......................................................................................... 22

        A.Professor Wax Plausibly Alleges that Penn's Speech Policy Was Intended to and Did Discriminate Based on the Race of the Speaker and the Subjects of the Speech. ................................................................................................................. 23

        B.Professor Wax Plausibly Alleges that She Suffered Discrimination Because She Advocated on Behalf of Protected Classes Who Were Targeted by Penn's Race-Based Admissions Policies. ............................................................................. 28

    III.    Professor Wax Has Pled a Plausible Claim for False Light Invasion of Privacy, and Penn's Affirmative Defense of Privilege Is Premature. ........................................ 29

        A. Professor Wax Has Adequately Alleged a Prima Facie Claim for False Light.29

        B. Penn's Privilege Defense Fails at the Motion to Dismiss Stage. ..................... 31

CONCLUSION .............................................................................................................. 33

# TABLE OF AUTHORITIES

## Cases

*Am. Eagle Outfitters v. Lyle & Scott Ltd.*,
    584 F.3d 575 (3d Cir. 2009) .............................................................9, 10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................4, 5, 25

*Bair v. Shippensburg Univ.*,
    280 F. Supp. 2d 357 (M.D. Pa. 2003) .............................................................15

*Barrett v. Whirlpool Corp.*,
    556 F.3d 502 (6th Cir. 2009) .............................................................29

*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020) .............................................................24

*Bridges v. Scranton Sch. Dist.*,
    644 F. App'x 172 (3d Cir. 2016) .............................................................23

*Burns Mfg. Co. v. Boehm*,
    356 A.2d 763 (Pa. 1976) .............................................................13

*Casselli v. City of Phila.*,
    54 F. Supp. 3d 368 (E.D. Pa. 2014) .............................................................31

*Castleberry v. STI Grp.*,
    863 F.3d 259 (3d Cir. 2017) .............................................................23

*Chilutti v. Uber Techs., Inc.*,
    300 A.3d 430 (Pa. Super. Ct. 2023) .............................................................12

*Commonwealth v. Golden Gate Nat'l Senior Care L.L.C.*,
    194 A.3d 1010 (Pa. 2018) .............................................................9, 10

*Connelly v. Lane Constr. Corp.*,
    809 F.3d 780 (3d Cir. 2016) .............................................................23, 27

*Ctr. for Investigative Reporting v. SEPTA*,
    975 F.3d 300 (3d Cir. 2020) .............................................................15

*Cypher v. Cal. Univ. of Pa.*,
    914 F. Supp. 2d 666 (W.D. Pa. 2012) .............................................................27

*DeCarolis v. Presbyterian Med. Ctr. of the Univ. of Pa. Health Sys.*,
    554 F. App'x 100 (3d Cir. 2014) .............................................................26

*Demesme v. Montgomery Cnty. Gov't*,
   63 F. Supp. 2d 678 (D. Md. 1999) .................................................................25

*Desert Palace, Inc. v. Costa*,
   539 U.S. 90 (2003) ..........................................................................................24

*Distribs., Inc. v. Herzog*,
   No. 141 WDA 2015, 2016 WL 907031 (Pa. Super. Ct. Mar. 9, 2016) ..................8

*Doe v. Univ. of the Scis.*,
   961 F.3d 203 (3d Cir. 2020) ........................................................10, 11, 12, 20, 21

*Fakhreddine v. Univ. of Pa.*,
   No. 24-cv-1034, 2025 WL 345089 (E.D. Pa. Jan. 30, 2025) .............................11

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3d Cir. 2009) ....................................................................5, 23, 24

*Frith v. Whole Foods Mkt., Inc.*,
   517 F. Supp. 3d 60 (D. Mass. 2021) ...........................................................25, 26

*Graboff v. Colleran Firm*,
   744 F.3d 128 (3d Cir. 2014) ....................................................................30, 31

*Howard Univ. v. Best*,
   547 A.2d 144 (1988) .....................................................................................8, 9

*Hulen v. Yates*,
   322 F.3d 1229 (10th Cir. 2003) ........................................................................6

*In re Minnotte Appeal*,
   192 A.2d 394 (Pa. 1963) .................................................................................19

*In re Tower Air, Inc.*,
   416 F.3d 229 (3d Cir. 2005) ............................................................................32

*James v. Zurich-Am. Ins. Co.*,
   203 F.3d 250 (3d Cir. 2000) ..............................................................................8

*Johnson v. Univ. of Cincinnati*,
   215 F.3d 561 (6th Cir. 2000) ...........................................................................29

*Jones v. Sch. Dist.*,
   198 F.3d 403 (3d Cir. 1999) ............................................................................27

*Lei Ke v. Drexel Univ.*,
   No. 11-6708, 2015 U.S. Dist. LEXIS 118211 (E.D. Pa. Sept. 4, 2015) .............25

*Kengerski v. Harper*,
   6 F.4th 531 (3d Cir. 2021) .........................................................................28, 29

*Kimberg v. Univ. of Scranton*,
   No. 06cv1209, 2007 WL 405971 (M.D. Pa. Feb. 2, 2007) .................................7

*Kortyna v. Lafayette Coll.*,
   No. 15-4625, 2017 WL 1134129
   (E.D. Pa. Mar. 27, 2017) .................................................................................7

*Krotkoff v. Goucher Coll.*,
   585 F.2d 675 (4th Cir. 1978) ....................................................................14, 15

*Landau v. Corp. of Haverford Coll.*,
   No. 24-2044, 2025 WL 35469 (E.D. Pa. Jan. 6, 2025) .................................19

*Lockhart v. Dorrance Publ'g Co.*,
   No. 22-02929(FLW), 2023 U.S. Dist. LEXIS 5238
   (D.N.J. Jan. 10, 2023) ......................................................................16, 17, 18

*Lum v. Bank of Am.*,
   361 F.3d 217 (3d Cir. 2004) ..........................................................................16

*Mallory v. S & S Publrs.*,
   168 F. Supp. 3d 760 (E.D. Pa. 2016) .............................................................30

*Manco v. St. Joseph's Univ.*,
   No. 22-285, 2024 U.S. Dist. LEXIS 13181
   (E.D. Pa. Jan. 25, 2024) ................................................................................31

*McClellan v. HMO*,
   686 A.2d 801 (Pa. 1996) ...............................................................................18

*McConnell v. Howard Univ.*,
   818 F.2d 58 (D.C. Cir. 1987) ......................................................6, 7, 12, 13, 14

*Minerva Marine, Inc. v. Spiliotes*,
   No. 02-2517 (WHW), 2006 U.S. Dist. LEXIS 13922
   (D.N.J. Mar. 13, 2006) ..................................................................................32

*Morosetti v. La. Land & Expl. Co.*,
   564 A.2d 151 (Pa. 1989) .................................................................................7

*Murphy v. Duquesne Univ. of the Holy Ghost*,
   777 A.2d 418 (Pa. 2001) ..............................................................12, 13, 14, 19

*Otero-Burgos v. Inter Am. Univ.*,
   558 F.3d 1 (1st Cir. 2009) .............................................................................6, 7

*PPG Indus. v. Zurawin*,
   52 F. App'x 570 (3d Cir. 2002) .....................................................................32

*Patterson v. Avery Dennison Corp.*,
   281 F.3d 676 (7th Cir. 2002) .........................................................................27

*Regents of Univ. of Mich. v. Ewing*,
    474 U.S. 214 (1985) ...................................................................13

*Reynolds v. Univ. of Pa.*,
    747 F. Supp. 2d 522 (E.D. Pa. 2010) ...........................................9

*Rogers v. Tennessee*,
    532 U.S. 451 (2001) ...................................................................21

*Rosenbloom v. Metromedia*,
    403 U.S. 29 (1971) .....................................................................32

*S.A. v. Pitt. Pub. Sch. Dist.*,
    160 A.3d 940 (Pa. Commw. Ct. 2017) ........................................18

*Saxe v. State Coll. Area Sch. Dist.*,
    240 F.3d 200 (3d Cir. 2001) ........................................................15

*Shorter v. United States*,
    12 F.4th 366 (3d Cir. 2021) ......................................................5, 6

*Sims v. Court of Common Pleas*,
    No. 2:10-cv-151, 2010 U.S. Dist. LEXIS 103454
    (W.D. Pa. Sept. 30, 2010) ...........................................................27

*Southersby Dev. Corp. v. Borough of Jefferson Hills*,
    852 F. Supp. 2d 616 (W.D. Pa. 2012) .........................................28

*Students for Fair Admis., Inc. v. President & Fellows of Harv. Coll.*,
    600 U.S. 181 (2023) ...................................................................29

*Tex. Dep't of Cmty. Affairs v. Burdine*,
    450 U.S. 248 (1981) ...................................................................27

*United States v. Parada-Talamantes*,
    32 F.3d 168 (5th Cir. 1994) ...................................................21, 22

*United States v. Yung*,
    37 F.4th 70 (3d Cir. 2022) ..........................................................19

*Wagner v. Oneida Motor Freight*,
    3 Pa. D. & C.3d 23 (1976) ..........................................................12

*Weir v. Univ. of Pitt.*,
    No. 22-3392, 2023 WL 3773645 (3d Cir. June 2, 2023) ...............23

**Statutes**

42 U.S.C. § 1981 ..............................................................................22

42 U.S.C. § 2000d ............................................................................25

42 U.S.C. §§ 2000e –2 ..................................................................................2, 24

**Other Authorities**

Antonin Scalia & Bryan A. Garner, READING LAW:
    THE INTERPRETATION OF LEGAL TEXTS (2012) ...................................18

Ralph S. Brown & Jordan E. Kurland, Academic Tenure and Academic Freedom,
    53 L. & CONTEMP. PROBS. 325 (1990)..................................................6

Restatement (Second) of Contracts.........................................................8, 13

Stephen J. Leacock, *Tenure Matters: The Anatomy of Tenure and Academic Survival in
    American Legal Education*, 45 OHIO N.U. L. REV. 115 (2019)...............6

## INTRODUCTION

Tenure has long been cherished by colleges and universities, including the University of Pennsylvania ("Penn"), as "the preeminent means of fostering and protecting academic freedom." Obtaining tenure, particularly at an Ivy League law school, requires the most rigorous scrutiny. Those who survive that scrutiny, however, are provided with the job security needed to fearlessly challenge orthodoxy in government, culture, and even in academia itself. Given this rich tradition, one would expect that Penn would be eager to have its day in court to explain how its decision to suspend a tenured and award-winning professor based on her speech could possibly be consistent with the academic freedom it claims to hold dear.

Instead, in its motion to dismiss, Penn insists that the repeated promises of "academic freedom" contained in its Faculty Handbook are illusory—"mere aspirational language" that is not "definite enough to confer any rights." ECF No. 26-1, at 20. This is an amazing statement from one of the nation's oldest and most prestigious universities. Not only does it contradict multiple explicit promises in Penn's Faculty Handbook, but it is also flatly inconsistent with the position of Penn's Hearing Board in this very case, which conceded that "free speech . . . is broadly protected by University policy as articulated in the Faculty Handbook." Because Professor Wax's suspension violated Penn's contractual promises to respect its tenured professors' rights to free speech and academic freedom, in addition to a variety of other provisions of its Faculty Handbook, Professor Wax's contract claim should proceed.

Penn takes a similarly shocking position with respect to Professor Wax's discrimination claims: according to Penn, a university speech code can choose to prohibit hate speech against some racial minorities but not others. This position conflicts with the plain text of Title VII, which has been amended to specify that "an unlawful employment practice is established when . . . race

was . . . a motivating factor for *any employment practice*." 42 U.S.C. § 2000e–2(m) (emphasis added). Moreover, Professor Wax has alleged that Penn's discriminatory speech policy was intended to and did in fact discriminate by the race of the speaker, and has given multiple examples of speakers of other races who were not disciplined for endorsing violence against Jews. Finally, Professor Wax has plausibly alleged a false light claim based on Penn's deliberate campaign to portray her as a racist and a liar.

## BACKGROUND

Professor Amy Wax is a distinguished legal scholar and educator who has enjoyed a decades-long career at Penn's Carey Law School. While Professor Wax's unparalleled knowledge and skills would have made her an asset to any educational institution, she chose to accept a tenured position on Penn Law School's faculty in 2001. As then-Dean Michael A. Fitts noted in his Tenure Appointment Letter to Professor Wax, "news of [her] decision was received very enthusiastically" at Penn. Am. Compl. Ex. 13, at 76. Just five years later, Professor Wax was granted a named chair as the Robert Mundheim Professor of Law. *Id.* ¶¶ 37-38.

Throughout her time at Penn, students, colleagues, and administrators alike lauded Professor Wax's positive impact on those around her. She became one of few Penn Law professors to receive the Lindback Award for Distinguished Teaching, a University-wide prize that recognizes extraordinary classroom instruction. *Id.* Ex. 12, at 72; *id.* Ex. 16, at 114-17. This award represents Penn's highest teaching honor and is the result of a rigorous review process by the Dean of Students and other University officials, *id.* Ex. 12, at 72, as well as interviews with many students. *Id.* Ex. 16, at 114-18. Those students gave Professor Wax glowing reviews, and many maintained their praise years later while testifying at her disciplinary hearing. *Id.* Ex. 8, at 52; *see also id.* Ex. 8, at

49 (acknowledging that Wax was "an engaged member of the Penn Carey Law School community" who had been "an award-winning teacher").

Professor Wax's reputation for academic excellence stems from her intellectual curiosity and willingness to challenge prevailing dogmas. These traits were exemplified by her 2017 essay: "Paying the Price for Breakdown of the Country's Bourgeois Culture," in which she and her co-author argued that higher education was contributing to cultural trends that are harmful to Americans from many groups, including disadvantaged racial minorities. *Id.* ¶ 39. After this essay, Professor Wax became an increasingly vocal critic of affirmative action policies at Penn and elsewhere. *Id.* ¶¶ 40-42, 144-45.

Unfortunately, Penn's appreciation for Professor Wax's intellectual curiosity evaporated when certain faculty, students, and alumni objected to her criticism. *Id.* ¶ 40. What followed was a campaign to use disciplinary sanctions to silence her. Then-Dean Ted Ruger began an investigation of Professor Wax by commissioning Daniel Rodriguez—a former dean of Northwestern Law School—to investigate complaints against her. her. *Id.* ¶¶ 42-43. Although the resulting "Rodriguez Report" concluded there "was certainly no evidence" Professor Wax ever discriminated against anyone, Penn was not deterred. *Id.* As Senate Committee on Academic Freedom and Responsibility (SCAFR) member Professor Jules van Binsbergen observed in his letter documenting "the many serious procedural flaws in the case of Professor Amy Wax," the "incredibly large number of students [Professor Wax] has taught over the years" made "finding a few that were offended by her speech in class surely . . . not hard." *Id.* Ex. 12, at 72-75. That is exactly what Penn did. *Id.*

The result of this flawed process was a series of unprecedented charges against Professor Wax—all of which stemmed from her unpopular opinions. Dean Ruger categorized her speech as

a "Major Infraction of University Behavior Standards"—a classification typically reserved for "actions" that are illegal or clearly unethical. *Id.* ¶ 54-55. In his charging document, Dean Ruger accused Professor Wax of "callous and flagrant disregard for [the] University community" and of making "incessant racist, sexist, xenophobic, and homophobic statements and actions." *Id.* Ex. 4, at 11. Ultimately, he levied four specific charges against Professor Wax: "exploitation, harassment, and discriminatory treatment of students and . . . creating a hostile or discriminatory classroom"; not "evaluat[ing] each student's true merit"; not "respect[ing] the confidential nature of the relationship between professor and student"; and not "show[ing] respect for others." *Id.* Ex. 4, at 13-18. Dean Ruger's unofficial comments to students revealed his true motivations: Professor Wax's presence on campus made him "angry" and "pissed off," and he thought it "sucks" that she "still works here." *Id.* Ex. 16, at 111.

Penn proceeded to stack the deck against Professor Wax and employed a disciplinary process that violated the procedures contained in its Faculty Handbook. This process ended with the imposition of significant sanctions on Professor Wax, including a one-year suspension at half-pay, the loss of her named chair, the loss of summer pay in perpetuity, and a public reprimand. *Id.* ¶ 71. Professor Wax filed this suit in response, not only to vindicate her own rights, but also to protect the rights of all who have been harmed by the abandonment of academic freedom protections in higher education.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id.* The court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Legal conclusions are disregarded, and well-pleaded facts are taken as true. *Id.* at 210-11. All reasonable inferences are drawn in the plaintiff's favor. *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021).

## ARGUMENT

### I.    Professor Wax Has Pled a Plausible Breach of Contract Claim.

Contrary to Penn's assertions, Professor Wax has alleged that Penn's pursuit of sanctions against her violates several specific provisions of Penn's Faculty Handbook. These include (but are not limited to):

- Provisions promising that Penn would respect freedom of speech and academic freedom, Faculty Handbook §§ II.A, II.C.1, V.1;

- Provisions specifying that tenured professors can only be suspended for major infractions and setting different procedures for adjudicating major and minor infractions, *id.* §§ II.E.16.1.B.7-10, II.E.16.2-4;

- Provisions promising that internal disciplinary matters will be handled "fairly" and in a manner that "protects the rights of faculty," *id.* § II.E.16.1.A; and

- Provisions promising accused professors "any . . . university documents that are relevant to the[ir] procedural or substantive rights," *id.* § II.E.16.4.E, and "the production of such documents as may be relevant," *id.* § II.E.16.4G.

These contractual provisions are repeatedly referenced in the Amended Complaint, *see* Am. Compl. ¶¶ 28, 45-52, 109-110, 112-13, 122-27, and the text of the relevant provisions are attached thereto, *id.* Exs. 1-3, 14. They are discussed in detail below.

**A. Penn's Repeated Promises to Respect the Free Speech and Academic Freedom of Its Tenured Professors Are Enforceable.**

Tenure has a special place in academia. Dating back to at least 1940 in its modern form, "tenure is intended to foster academic freedom" by protecting tenured professors from being disciplined for their speech, research, or viewpoints. *Otero-Burgos v. Inter Am. Univ.*, 558 F.3d 1, 10 (1st Cir. 2009); *see also Hulen v. Yates,* 322 F.3d 1229, 1239 (10th Cir. 2003) (noting the "inherent autonomy of tenured professors and the academic freedom they enjoy"); Stephen J. Leacock, *Tenure Matters: The Anatomy of Tenure and Academic Survival in American Legal Education*, 45 OHIO N.U. L. REV. 115, 139-40 (2019) ("Faculty members desire tenure for the job security, but a more important feature of tenure to both the faculty member and the university is the freedom of the employee to teach and explore ideas without the fear of persecution."). The tenured professor's protection from censorship has long been understood as a real legal protection, not just a lofty ideal. *See* Ralph S. Brown & Jordan E. Kurland, *Academic Tenure and Academic Freedom*, 53 L. & CONTEMP. PROBS. 325, 328 (1990) ("The conferral of tenure makes it very difficult thereafter to dismiss a professor for views expressed in the classroom, in scholarly writing, or in public arenas . . . There seems to be little room here for seizing on heterodox or unpopular views as a ground for dismissal or for any lesser sanction.") (citations omitted); Leacock, *supra*, at 139-40 ("Tenured faculty members . . . become . . . unafraid of persecution for their unconventional and heterodox theories.").

In accordance with this understanding, courts have refused to interpret tenure contracts in a manner that would render their promises of academic freedom illusory. *See McConnell v. Howard Univ.,* 818 F.2d 58, 67 & n.7 (D.C. Cir. 1987) (refusing to interpret a tenured professor's employment contract in a way that would "render[] tenure a virtual nullity" and explaining that tenure contracts instead must be read "by reference to the norms of conduct and expectations

6

founded upon them"); *Otero-Burgos*, 558 F.3d at 13 (rejecting an interpretation that would render the "tenure contract [unable] to fulfill its function of safeguarding academic freedom").

Penn's Faculty Handbook[1] mirrors the traditional understanding of the academic freedom guaranteed by tenure. It states that "[t]he University recognizes the importance of a system of tenure for faculty members as the preeminent means of fostering and protecting academic freedom in teaching and in scholarly inquiry." Faculty Handbook § II.A. It continues that "[i]t is the policy of the University of Pennsylvania to maintain and encourage freedom of inquiry, discourse, teaching, research, and publication and to protect any member of the academic staff . . . in the exercise of these freedoms." *Id.* The Handbook further provides that "[t]he teacher is entitled to freedom in the classroom in discussing their subject," and "[w]hen speaking or writing as an individual, the teacher should be free from institutional censorship or discipline." *Id.* Later, under the heading "Purpose of the Tenure System," the Handbook declares that "[t]he statutes of the University hold that a system of tenure for faculty members is the preeminent means of fostering and protecting academic freedom of the faculty in teaching and in scholarly inquiry" and asserts that (1) "[t]he protection of academic freedom" is a core purpose of tenure; and (2) "[t]he protections of academic freedom ***are extended*** to all members of the faculty during their terms of appointment." *Id.* § II.C.1 (emphasis added). Finally, Penn's "Guidelines on Open Expression," which are incorporated into the Faculty Handbook, *see id.* § V.A., provide that Penn "affirms,

---

[1] There does not appear to be any dispute that the Faculty Handbook constitutes a binding contract between Professor Wax and Penn. Nor could there be. *See Kimberg v. Univ. of Scranton*, No. 06-1209, 2007 WL 405971, at *3 (M.D. Pa. Feb. 2, 2007) (the contract between a tenured professor and a private university consists of the offer letter, the faculty handbook, and the university's "written guidelines, policies, and procedures." (citing *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999))); *Morosetti v. Louisiana Land & Expl. Co.*, 564 A.2d 151, 152 (Pa. 1989) ("[A] handbook distributed to employees as an inducement for employment may be an offer and its acceptance a contract."); *Kortyna v. Lafayette Coll.*, No. 15-4625, 2017 WL 1134129, at *21 (E.D. Pa. Mar. 27, 2017) (treating a faculty handbook as a contract).

supports and cherishes the concepts of freedom of thought, inquiry, [and] speech," and that "the freedom to hear, express, and debate various views; and the freedom to voice criticism of existing practices and values are fundamental rights that must be upheld and practiced by the University in a free society." Am. Compl. Ex. 14, at 78; *see also id.* ¶¶ 122-27. In total, the phrase "academic freedom" appears in Penn's Faculty Handbook dozens of times.

"Academic freedom" and "freedom of speech" are not novel concepts; they reflect the legal protections of the First Amendment. Penn's then-President said as much in testimony to Congress: "Our free speech policies are guided by the United States Constitution," i.e., the First Amendment's Free Speech Clause. *Id.* ¶¶ 99, 127 & n.9.[2] Similarly, the Hearing Board conceded that "free speech . . . is broadly protected by University policy as articulated in the Faculty Handbook," citing Section II.A. of the Faculty Handbook. *Id.* Ex. 6, at 23. President Magill likewise conceded that Penn's Faculty Handbook protects Professor Wax's rights to academic freedom and free speech: "'the University recognizes the importance of a system of tenure . . . as the preeminent means of fostering and protecting academic freedom in teaching and scholarly inquiry.'" *Id.* Ex. 8, at 53 (quoting Faculty Handbook § II.A). Therefore, President Magill continued, "faculty members rightly enjoy broad academic freedom in their scholarly inquiry and in their teaching." *Id.* (citing Faculty Handbook § V.A)

---

[2] The statements of Penn's President interpreting contested contractual terms are relevant to resolve any possible ambiguities in Penn's contracts. *See, e.g., James v. Zurich-Am. Ins. Co. of Illinois,* 203 F.3d 250, 255 (3d Cir. 2000) ("[T]he consistent practical construction given to [an ambiguous contractual] provision by the parties to the contract controls its terms."); *Distributors, Inc. v. Herzog,* No. 141 WDA 2015, 2016 WL 907031, at *3 (Pa. Super. Ct. Mar. 9, 2016) ("Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning." (citing *Denharter v. First Fed. Sav. & Loan Ass'n of Pittsburgh,* 194 A.2d 214, 220 (Pa. 1963))); Restatement (Second) of Contracts § 201(1) & cmt. c; *Howard Univ. v. Best,* 547 A.2d 144, 149 (D.C. 1988) ("[I]n the context of University employment contracts, that the custom and practice of the University be taken into account in determining what were the reasonable expectations of persons in the position of the contracting parties.").

Yet Penn now claims that its promises to respect free speech and academic freedom are "mere aspirational language" that is not "definite enough to confer any rights that could be judicially enforced." ECF No. 26-1, at 20 (internal quotations omitted). While there can be circumstances where a contract may be "so vague that a court might find the contract impossible to understand and enforce," that only occurs where "the parties had never reached any kind of accord over the necessary components of their deal." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 585-87 (3d Cir. 2009). It is "relatively rare" for "a court [to find] contractual terms too indefinite to be enforced"; "courts more frequently find contractual language to be ambiguous than indefinite." *Reynolds v. Univ. of Pa.*, 747 F. Supp. 2d 522, 544 (E.D. Pa. 2010). Indeed, "[d]isputes over the meaning of a given phrase are common in contract disputes," but "the presence of such interpretative ambiguity . . . does not go to whether the contract is enforceable, but rather who (the judge or the jury) must decide what the given clause means." *Am. Eagle Outfitters*, 584 F.3d at 585-86.[3]

It is hard to see how contractual terms such as "academic freedom," "freedom . . . when speaking and writing," "free[dom] from institutional censorship," "freedom of thought, inquiry, [and] speech," and "the freedom to hear, express, and debate various views" are not "definite

---

[3] Alternatively, Penn may be invoking the notion of "puffery," that is, a statement or term that is so "patently hyperbolic or excessively vague [in] character" so as to "dissuade[] any reasonable consumer from placing reliance thereon." *Commonwealth v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1023 (Pa. 2018). It is hard to believe that an elite university would describe its commitment to academic freedom in such terms, which is perhaps why Penn has not made the "puffery" argument explicitly. In any event, it is clear from the authorities cited above, and from Penn's own statements in this case, that tenure contracts are widely believed to contain real, enforceable protections of academic freedom. But, if Penn actually believes its academic freedom promises were mere puffery that no reasonable person would take seriously, that is a fact issue for the jury. *See id.* at 1024 ("[W]hether a statement is deemed puffery is a question of fact to be resolved by the finder of fact" because it "requires consideration of the overall impression of the statement and the context in which it is made." (citations omitted)).

enough to confer any rights that could be judicially enforced." ECF No. 26-1, at 20. The same applies to the Penn Handbook's explicit promise that, "[w]hen speaking or writing as an individual, the teacher should be free from institutional censorship or discipline." Faculty Handbook § II.A. The federal courts enforce the First Amendment's "freedom of speech" guarantee every day, and Penn itself has confirmed that the "free speech policies" contained in its Faculty Handbook "are guided by the United States Constitution," Am. Compl. ¶ 127 & n.9., and that "free speech . . . is broadly protected by University policy as articulated in the Faculty Handbook." *Id.* Ex. 6, at 23. To the extent the parties dispute the precise meaning or application of the Handbook's free speech provisions, those disputes can be resolved through ordinary contract litigation. *See Am. Eagle Outfitters*, 584 F.3d at 585-86; *supra* note 2.

Doe v. University of the Sciences, 961 F.3d 203 (3d Cir. 2020), is directly on point. There, a student whose university adjudicated him guilty of sexual assault alleged the university violated its promise to provide a process that was "adequate, reliable, impartial, prompt, fair and equitable" and "conducted with fairness to all." *Doe*, 961 F.3d at 212. The Third Circuit rejected the university's position that "the fairness promised in the Student Handbook" did not have any independent, enforceable content because, under Pennsylvania law, "all provisions in the agreement . . . *will be given effect*." *Id.* at 212 (quoting *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 647-48 (Pa. 2009)); *see also id.* ("When 'the contract evidences care in its preparation, it will be presumed that [the contract's] words were employed deliberately and with intention.'" (quoting *Steuart v. McChesney*, 444 A.2d 659, 662 (Pa. 1982))). Although the university's policies did not define "fairness," the Third Circuit held that "fair process" is "a term of art used to describe a 'judicial or administrative hearing conducted in accordance with due process,'" and that "[p]rocedural fairness is a well-worn concept." *Id.* at 212-14 (quotations

omitted). Accordingly, the Third Circuit looked to notions of constitutional due process to determine the meaning of procedural "fairness" in a university's contract. *Id.*

Penn relies heavily on *Fakhreddine v. University of Pennsylvania*, No. 24-CV-1034, 2025 WL 345089 (E.D. Pa. Jan. 30, 2025), in which several Penn professors and students sued the University based on its "decision to comply with a Congressional documents request." *Id.* at *1. Penn's compliance with that request, plaintiffs alleged, violated academic freedom provisions in the Faculty Handbook, most specifically, Penn's policy "to protect any member of the academic staff against influences, from within or without the University, which would restrict a member of the academic staff in the exercise of [academic] freedoms." *Id.* at *7. The court rejected the faculty members' claims on the grounds that "the faculty handbook provision contains no specific steps or procedures to 'protect' the faculty" from government document requests. *Id.* at *8. The court also stressed that "Penn's compliance with the Committee's request cannot be considered a 'clear violation'" of Penn's academic freedom protections because plaintiffs did not allege "how complying with the Committee's request has restricted the Faculty Plaintiffs from exercising their academic freedoms inside the classroom." *Id.*

This case could not be more different from *Fakhreddine*. That case dealt with a "generalized assurance" that Penn would "protect" the faculty against unnamed outside "influences," and was dismissed due to plaintiffs' complete failure to explain how complying with a congressional document request would undermine academic freedom. *Id.* at *7-8. Here, by contrast, Professor Wax relies on "well-worn concept[s]" and "term[s] of art" that courts have experience applying, *Doe*, 961 F.3d at 212-14, and alleges that Penn committed a "clear violation" of those rights by directly punishing her for her unpopular speech. Am. Compl. ¶ 128.

**B. Professor Wax's Contract Claims Should Be Reviewed *De Novo*.**

Where a professor sues a private university for breach of contract, "the issues raised are no different from those the Pennsylvania judiciary has typically adjudicated when presented with allegations of a contract's breach," and there is "no need or reason to devise special rules for restricting review" simply because "one of the parties to [a contractual] dispute is an institution of higher learning." *Murphy v. Duquesne Univ.*, 777 A.2d 418, 428 (Pa. 2001); *see also McConnell*, 818 F.2d at 67 (rejecting as "astonishing" the university's claim that its "decision to fire a tenured faculty member is largely unreviewable," because that position would "allow[] one of the parties to the contract to determine whether the contract had been breached" and thus "make a sham of the parties' contractual tenure arrangement").

Of course, all "private parties, including religious or educational institutions, may draft employment contracts which restrict review of professional employees' qualifications to an internal process" and "prohibit[] review in a court of law." *Murphy*, 777 A.2d at 428. "***When a contract so specifies,*** generally applicable principles of contract law will suffice to insulate the institution's internal, private decisions from judicial review." *Id.* at 429 (emphasis added). However, in Pennsylvania, a contractual waiver of the right to judicial review must be unambiguous. *See, e.g.*, *Wagner v. Oneida Motor Freight*, 3 Pa. D. & C.3d 23, 25 (C.P. 1976) ("[a]bsent a clear, unambiguous and unequivocal waiver" of the right to appeal an arbitration award for judicial review, "such waiver cannot be found"); *Chilutti v. Uber Techs., Inc.*, 300 A.3d 430, 443 (Pa. Super. Ct. 2023) (applying the criminal law precept that "a waiver must be clearly described and understood to be giving up a constitutional right to a jury trial" to analogous provisions of civil contracts). And if a contract is ambiguous as to waiver of judicial review, any ambiguity on this point (or any other) must be construed "against th[e] party responsible for the

12

ambiguity, the drafter of the document." *Burns Mfg. Co. v. Boehm*, 356 A.2d 763, 766 n.3 (Pa. 1976); *see also* Restatement (Second) of Contracts § 206.

Penn cites no contractual provisions whereby its tenured professors agree to waive their right to judicially enforce their employment contracts. Nor does the Faculty Handbook suggest that Penn's internal disciplinary procedures are the sole means of enforcing Penn's employment contracts; to the contrary, the Handbook states that "the president's decision," made upon the completion of the internal disciplinary process, "is final *within the University*." Faculty Handbook § II.E.16.4.I.5 (emphasis added); *see also McConnell*, 818 F.2d at 68 (even where the faculty handbook stated that "[t]he decision of the Board of Trustees shall be final," judicial review was not waived because, in context, "the 'final' nature of the Board's decision . . . speaks only to further avenues of review *within the University*") (emphasis in original); *compare Murphy*, 777 A.2d at 432-33 (holding that the university's disciplinary procedure was the exclusive means for challenging a termination where "the decisions made [on] tenure forfeiture, were repeatedly described in the Contract as 'final,'" the contract "spoke in terms of a 'closed' case," and indicated "the case shall be closed" following the completion of the internal process).

Instead, Penn quotes *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225-26 (1985), for the proposition that the Court must "'show great respect for the faculty's professional judgment.'" ECF No. 26-1, at 16. But *Ewing* involved a constitutional due process claim against a public university, whereas *Murphy* found "no principled basis for reviewing a breach of contract action that involves private conduct according to the [due process] principles that arise out of the Fourteenth Amendment," nor any basis to apply the APA's "substantial evidence" standard. *Murphy*, 777 A.2d at 428; *see also McConnell*, 818 F.2d at 69 ("The notion of treating a private

university as if it were a state or federal administrative agency is simply unsupported where a contract claim is involved.").

Penn also cites Title VII cases for the proposition that "scholars are in the best position to make the highly subjective judgements related with the review of scholarship and university services." ECF No. 26-1, at 16. But Professor Wax's contract claim does not call for an assessment of Penn's academic decisions, only the application of familiar legal terms such as "freedom of speech." Moreover, there is no reason why "university affairs are more deserving of judicial deference than the affairs of any other business or profession." *McConnell*, 818 F.2d at 69. There are "many area[s] of the law" where courts lack technical expertise, but that "does not compel courts to defer to the view of one of the parties" to a contract over the other. *Id.*; *see also Krotkoff v. Goucher Coll.,* 585 F.2d 675, 681-83 (4th Cir. 1978) (refusing to defer to a private university in breach of contract case and rejecting an analogy to cases alleging race or sex discrimination).

### C. Professor Wax Has Plausibly Alleged that Her Suspension and Related Penalties Violated the Free Speech and Academic Freedom Protections in Her Tenure Contract.

Professor Wax alleges that her suspension and related punishments were based solely on the content and viewpoint of statements she allegedly made while addressing controversial subjects such as race, gender, and immigration, as well as the affirmative action policies of Penn and other institutions—all topics of great public, political, and academic concern. Am. Compl. ¶¶ 2, 42, 53, 114. She alleges that Penn suspended her based on subjective listener reactions—that is, simply because some of Penn's alumni, faculty, students, as well as local politicians, felt upset, offended, and "harmed" by her alleged statements, which is a rationale for suppressing speech that is flatly and unquestionably inconsistent with the First Amendment or any other recognized conception of free speech and academic freedom. *Id.* ¶¶ 5-6, 27. Moreover, Professor Wax maintains that even Penn's alleged "harm" principle is pretextual and applied in a manner that is

14

content and viewpoint-based and that discriminates on the basis of the race of the speaker and the

subjects and viewpoints of the speech. *Id.* ¶¶ 7-9, 19, 27-28, 94, 98. These allegations, if true,

certainly violate the free speech protections that Penn promised to Professor Wax and other tenured

professors. *See Ctr. for Investigative Reporting v. SEPTA*, 975 F.3d 300, 313 (3d Cir. 2020)

(viewpoint discrimination is "especially egregious" and "presumed to be unconstitutional")

(quotations omitted); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001) (striking

down high school harassment policy that censored speech based on subjective listener reaction);

*Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 369 (M.D. Pa. 2003) ("[R]egulations that prohibit

speech on the basis of listener reaction alone are unconstitutional in . . . university settings.").

In its motion to dismiss, Penn does not even argue that its suspension of Professor Wax is

consistent with the First Amendment or any other concept of free speech and academic freedom.

Instead, it relies on a litany of statements it asserts that Professor Wax made, which do not appear

in the Amended Complaint. ECF No. 26-1, at 3-4. Penn does not even cite the names of the

publications or articles in which these alleged statements appear; instead, Penn simply lists a

number of URLs where the statements can be found. Clicking those URLs reveals that Penn's

sources are publications that largely support Penn's position on Professor Wax and do not even

purport to establish the accuracy of her alleged statements or to provide their full context,

including:

- A *New York Times* opinion piece covering Penn's own allegations. *See* Vimal Patel, *UPenn Accuses a Law Professor of Racist Statements. Should She Be Fired?*, N.Y. TIMES (Mar. 13, 2023) (URL cited in ECF No. 26-1, at 4 n.7).

- A *New Yorker* article purporting to contain an interview with Professor Wax but admitting that Professor Wax's alleged statements were "edited for length and clarity." *See* Isaac Chotiner, *A Penn Law Professor Wants to Make America White Again*, NEW YORKER (Aug. 23, 2019) (URL cited in ECF No. 26-1, at 3 n.4).

- A *Substack* post from an online podcast called "the Glenn Show." *See* Glenn Loury, *Amy Wax Redux*, GLENN SHOW (Jan. 2, 2022) (URL cited in ECF No. 26-1, at 4 n.6).

- An article in the *Daily Pennsylvanian* that contains three-to-four alleged and selective quotes from an interview with Tucker Carlson. *See* Jared Mitovich, *Amy Wax Repeats Racist Rhetoric on National Television amid Ongoing University Investigation*, DAILY PENNSYLVANIAN (Apr. 11, 2022) (URL cited in ECF No. 26-1, at 4 n.8).

This is not how motions to dismiss work. "Courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004). News articles are not considered "matters of public record." *See, e.g.*, *Lockhart v. Dorrance Publ'g Co.*, No. 22-02929, 2023 U.S. Dist. LEXIS 5238, at *29 (D.N.J. Jan. 10, 2023) ("[A]t the motion to dismiss stage, the Court may not consider the Publishers Weekly article cited and referenced by Defendant."). Indeed, not even prior judicial opinions may be used "for the truth of the facts asserted in the opinion" at the motion to dismiss stage. *Lum*, 361 F.3d at 221 n.3.

Penn seeks to justify its extra-complaint media sources by claiming that "Plaintiff does not deny having made any of these statements." ECF No. 26-1, at 3 n.2. Again, that is not how this works. *See Lockhart*, 2023 U.S. Dist. LEXIS 5238, at *29-30 (declining to consider a news article even though the plaintiff "d[id] not contest the authenticity of the article"). In any event, Professor Wax has absolutely denied the accuracy of the statements that Penn has attributed to her, accusing Penn of suspending her based on comments that "were in many cases lifted out of context and simply misrepresented." Am. Compl. ¶ 53; *see also id.* ¶¶ 74, 118. To be sure, some of the purported statements upon which Penn relies are contained in Penn's charging letter, hearing board report, and president's decision, which the Amended Complaint attaches as evidence that Penn relies on allegations that are false and misleading or that misrepresent Professor Wax's actual statements. At this stage, the Court must accept the Amended Complaint's explicit assertions that these allegations are false and misleading. *See id.* ¶¶ 53, 74, 118.

In addition, Penn's motion merely lists Wax's alleged and undocumented statements. It identifies no specific Penn rules or standards that her assertions violate, nor does it explain why they justify the sanctions imposed against her.  Professor Wax's position is that these sanctions are wholly unjustified on Penn's own rules and standards, in addition to violating promised protections for academic free expression and free speech.

### D. Professor Wax's Suspension Violated Her Contract's Promise that She Could Only Be Suspended for "Major Infractions of University Behavior Standards."

"The imposition of a sanction on a faculty member at the University of Pennsylvania is a rare event." Faculty Handbook § II.E.16.1.A. And "major sanctions," which include "suspension" and "reduction in academic base salary," may only be imposed if the professor commits "a Major Infraction of University Behavior Standards." *Id.* §§ II.E.16.1.B.7-10, II.E.16.2-4. The Handbook defines "a Major Infraction of University Behavior Standards" as:

> An action involving flagrant disregard of the standards, rules, or mission of the University or the customs of scholarly communities, including, but not limited to, serious cases of the following: plagiarism; misuse of University funds; misconduct in research; repeated failure to meet classes or carry out major assigned duties; harassment of, improperly providing controlled substances to, or physical assault upon, a member of the University community; the bringing of charges of major or minor infractions of University standards against a member of the University community, knowing these charges to be false or recklessly indifferent to their truth or falsity; flagrant or knowing violation of the University's conflict of interest policy or commission of serious crimes such as, but not limited to, murder, sexual assault or rape.

*Id.* § II.E.16.1.B.17. This definition does not reach unpopular statements on matters of public concern that are not directed at any particular student. As an initial matter, the "major infraction" standard is a high bar. The Handbook notes that the imposition of any sanction, let alone "major" sanctions, "is a rare event." And the illustrative examples of "major infractions" in Section

17

II.E.16.1.B.17 involve outrageous misconduct such as physically assaulting or dealing drugs to students, misuse of university funds, and "*serious* crimes," such as "murder" and "rape."

More importantly, the Handbook contemplates that tenured faculty can only be suspended for improper *actions*, not unpopular speech. Suspensions are limited to a "Major Infraction of University *Behavior* Standards," which is defined as "[a]n *action* involving flagrant disregard" of University standards. *Id.* § II.E.16.1.B.7 (emphasis added). And the illustrative list of "actions" that constitute "flagrant" violations all involve conduct, and none bear any resemblance to mere offensive speech. Under the canon *ejusdem generis*, "where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated." *McClellan v. Health Maint. Org. of Pa.*, 686 A.2d 801, 806 (Pa. 1996).[4] So, for example, a Pennsylvania appellate court held that a student who stabbed another with a sharpened pencil did not violate a policy against possessing a "weapon" where "weapon" was defined as "a knife, cutting instrument, cutting tool, explosive, mace, nunchaku, firearm, shotgun, rifle" or "any other tool . . . capable of inflicting serious bodily injury." *S.A. by H.O. v. Pittsburgh Pub. Sch. Dist.*, 160 A.3d 940, 945-46 (Pa. Commw. Ct. 2017). The court held that "*ejusdem generis* carries the day here" and "limit[s] the meaning of the general and broad words located in the second clause to the nature and kind of the words in the first clause." *Id.* at 946. Similarly, here, while the general term "[a]n action involving flagrant disregard" of the University's standards is not necessarily limited to the particular examples that follow, it is limited to acts of the "same general nature or class as those enumerated." *McClellan*, 686 A.2d at 806.

---

[4] "Most of the interpretive principles applicable to [statutes] are applicable to [contracts] as well." Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 42 (2012).

The closest Section II.E.16.1.B.17 comes to including a speech-based infraction is the inclusion of "harassment." But the Third Circuit has limited the term "harass" to behavior that is "threatening" or "intimidating" such that "it constitutes true threats or speech that is integral to proscribable criminal conduct." *United States v. Yung*, 37 F.4th 70, 80-81 (3d Cir. 2022). Moreover, the Handbook goes out of its way to specify that punishable "harassment" must be "harassment *of . . . a member of the University community*," as opposed to unpopular statements that are not spoken to or directed at any particular person. Faculty Handbook § II.E.16.1.B.7 (emphasis added).

Finally, the Faculty Handbook's repeated promises to protect "academic freedom" make clear that its limitation of "major infractions" to "action[s]" was intentional and that the phrase should not be stretched to cover speech that is merely offensive. *See In re Alloy Mfg. Co. Emps. Tr.*, 192 A.2d 394, 396 (Pa. 1963) (courts read contracts "as a whole . . . it being necessary to consider every part thereof in order to resolve the meaning of a particular part"); *Landau v. Corp. of Haverford Coll.*, No. CV 24-2044, 2025 WL 35469, at *8 (E.D. Pa. Jan. 6, 2025) ("When interpreting university policies as contracts, each provision must be read in the context of the larger policy.").

### E.  Penn's Disciplinary Process Was Conducted in Bad Faith and Violated Professor Wax's Procedural Rights.

Even where a contract limits an employee to an internal disciplinary process, that process must still be "conducted in good faith" and "[a]ll the participants in the process" are "required to follow the Contract's process to the letter." *Murphy*, 777 A.2d at 434. Penn's Handbook requires that internal disciplinary matters be handled "fairly" and in a manner that "protects the rights of faculty." Faculty Handbook § II.E.16.1.A.  It sets different procedures for adjudicating major and minor infractions. *Id.* § II.E.16.2-3. And it promises respondents "copies of any . . . university documents that are relevant to the respondent's procedural or substantive rights," *id.* § II.E.16.4.E,

as well as "the cooperation of the University administration in securing the attendance of such witnesses and the production of such documents as may be relevant." *Id.* § II.E.16.4G. In addition, the promise that the process will be conducted "fairly" requires more than following the specific procedures outlined in the Handbook; it "require[s], at a minimum, 'rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary'" punishment, as well as "the basic elements of federal procedural fairness." *Doe*, 961 F.3d at 214-15 (quoting *Goss v. Lopez*, 419 U.S. 565, 581 (1975)). Here, Penn committed a "large number of procedural errors," as determined by a member of Penn's own SCAFR. Am. Compl. ¶¶ 85-86 & Ex. 12.

*First,* Penn suppressed the report of Dean Rodriguez, who determined that there "was certainly no evidence . . . to suggest that [Professor Wax] graded minority students differently, denied them access to professional opportunities over which she had some modicum of control, or singled them out for special ridicule or disparagement." *Id.* ¶ 42. This report was relevant and exculpatory, especially since Penn charged that Professor Wax breached University standards that prohibit "exploitation, harassment, and discriminatory treatment of students" and require faculty to "evaluate each student's true merit." *Id.* Ex. 4, at 13, 15. Nonetheless, Dean Rodriguez was instructed not to share his report with Professor Wax or her counsel, and Penn later misrepresented the contents of the report. *Id.* ¶¶ 43, 85, 118; *id.* Ex. 12, at 74-75. This violated Penn's obligation to produce all "relevant" documents. Faculty Handbook §§ II.E.16.4G, II.E.16.4.E. Similarly, Penn refused to provide Professor Wax with the basic information she needed to exercise her procedural right to challenge the composition of the hearing board, which she alleges was stacked against her. Am. Compl. ¶¶ 63-67, 85(vi).

*Second,* Penn relied on speech that occurred outside of the classroom and off campus, in violation of Penn's promise that, "[w]hen speaking or writing as an individual, the teacher should

20

be free from institutional censorship or discipline," Faculty Handbook § II.A, as well as Penn's public statements and longstanding norms that it cannot and does not regulate faculty speech outside the classroom. Am. Compl. ¶ 86; *id.* Ex. 12, at 72.

**Third,** Penn's Hearing Board created a new standard for "major infractions" that it retroactively applied to Professor Wax. Penn had never previously applied its "major infraction" rules to speech, *id.* ¶ 56, and the hearing board conceded that "free speech . . . is broadly protected by University policy." *Id.* Ex. 6, at 23. Nonetheless, to get around these protections, the Hearing Board created a new rule that speech can become punishable "unprofessional conduct" at some indefinite point, without giving any clear indication of when speech crosses the line. *Id.* This violates the most basic requirement of due process: that rules must give fair notice of what is proscribed and be applied prospectively. *See Rogers v. Tennessee*, 532 U.S. 451, 462 (2001).

**Fourth,** Penn employed the "major infraction" procedures contained in Section II.E.16.4, rather than the "minor infraction" provisions of Section II.E.16.3, despite the alleged conduct utterly failing to meet the Handbook's definition of "major infraction." Am. Compl. ¶ 85(iv).

**Fifth,** Penn relied on prejudicial "guilt-by-association" evidence, such as Professor Wax's inviting of Jared Taylor to campus, to falsely imply that Professor Wax shares all of Taylor's views. *See United States v. Parada-Talamantes*, 32 F.3d 168, 170 (5th Cir. 1994) ("Because evidence of 'guilt by association' is typically highly prejudicial, it should be excluded.").

**Sixth,** Penn's legal counsel instructed SCAFR on "how its meetings should be run and what exactly is SCAFR's scope of investigation." Am. Compl. ¶ 85(viii); *id.* Ex. 12, at 71. Penn's counsel's involvement in advising the charging party and in instructing the decision-maker violated basic notions of due process.

*Finally,* Penn conducted the hearing in "bad faith . . . by mischaracterizing Professor Wax's speech, . . . without engaging in even the most rudimentary and basic evaluation . . . of any of the allegations." Am. Comp. ¶¶ 118; *see also id.* ¶¶ 53, 74 (providing examples of Professor Wax's alleged statements that Penn took wildly out of context and testimony the Hearing Board ignored). Indeed, the Hearing Board Report imposing sanctions on Professor Wax was entirely devoid of any discussion of the specific factual allegations against her, the accusations in the complaint filed against her, or the statements of witnesses contained in the complaint or put forward at the hearing held in her case. In particular, the Report did not even mention the witnesses that appeared on her behalf at the hearing, nor the arguments they put forward. Nor did it discuss the evidence Professor Wax herself presented at the hearing (or in her numerous filings in various stages of the proceedings) to refute the allegations against her and demonstrate how statements attributed to her were fabricated, misrepresented, or distorted. In sum, the Hearing Board failed to adhere to even the most rudimentary standards of due process or fair procedures promised to Professor Wax under the Faculty Handbook or her tenure contract.

## II.   Professor Wax Has Plausibly Alleged Racial Discrimination Under Section 1981, Title VII, and Title VI.

Professor Wax alleges that her suspension and related punishments were the result of unlawful racial discrimination in violation of Title VI, Title VII, and Section 1981. To sufficiently plead the "racial discrimination" element of these claims,[5] a plaintiff simply needs to "plead factual allegations suggesting that any of the alleged [adverse employment actions] were taken under circumstances giving rise to an inference of discrimination." *Weir v. Univ. of Pittsburgh*, No. 22-3392, 2023 WL 3773645, at *5-6 (3d Cir. June 2, 2023); *see also Castleberry v. STI Grp.*, 863

---

[5] Because Penn's motion only challenges the racial discrimination element of these claims, ECF No. 26-1, at 22-29, this opposition will likewise confine its discussion to that element.

F.3d 259, 266 (3d Cir. 2017) (a Section 1981 plaintiff must allege "an intent to discriminate on the basis of race"); *Bridges v. Scranton Sch. Dist.*, 644 F. App'x 172, 179 (3d Cir. 2016) ("Title VI prohibits intentional discrimination based on race in any program that receives federal funding."). This is not a high standard: "the post-*Twombly* pleading standard simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" unlawful discrimination. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 788-89 (3d Cir. 2016). Accordingly, the Third Circuit held that a discrimination claim was plausible simply because "[t]he complaint pleads how, when, and where [the employer] allegedly discriminated." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211-12 (3d Cir. 2009) (holding that, "[u]nder the 'plausibility paradigm' . . . these averments are sufficient: (1) [plaintiff] . . . [w]as disabled . . . ; (2) there was an opening for a telephone operator . . . for which she applied; (3) [plaintiff] was not transferred to that position; (4) [the employer] never contacted her about the telephone operator position . . . ; and (5) [plaintiff] believed [the employer's] actions were based on her disability").

## A. Professor Wax Plausibly Alleges that Penn's Speech Policy Was Intended to and Did Discriminate Based on the Race of the Speaker and the Subjects of the Speech.

The Amended Complaint alleges that Penn's Speech policy reflects a particular worldview, which is prevalent in higher education, that divides races into oppressors and oppressed. Am. Compl. ¶¶ 23-24. Historically oppressed races must be handled with kid gloves: speech that might offend members of such oppressed races must be censored, whereas those members themselves are almost incapable of engaging in speech that is racist or offensive. *Id.* By contrast, members of races deemed historic oppressors must be tightly regulated in their speech, while speech that might offend oppressors is generally permitted. *See id.* ¶¶ 1, 8.

The intent and predictable effect of this speech policy is that a white Jewish woman such as Professor Wax who wades into sensitive topics such as affirmative action can and is punished,

whereas multiple Penn employees of different races are not penalized for speech that calls for and/or celebrates violence against Jews. *See id.* ¶¶ 23, 25, 28, 135-38, 158. Indeed, the Amended Complaint provided several examples of Penn employees of different races who made hateful statements about Jews—and have even praised, defended, and advocated violence against Jews—all with impunity. *See id.* ¶¶ 99-103.

Amazingly, Penn insists that a speech policy that prohibits so-called "hate speech" against some favored races, while permitting such speech against disfavored races, is perfectly consistent with federal anti-discrimination laws, even for institutions that receive federal financial assistance. ECF No. 26-1, at 21-24. Such a policy is legal, according to Penn, because it does not discriminate based on the race ***of the speaker*** (i.e., all races would be equally free to call for violence against Jews, and equally unfree to make statements that could be offensive to other racial minorities). As an initial matter, while section (a)(1) of Title VII is focused on adverse employments actions "against any individual . . . because of ***such individual's*** race," 42 U.S.C. § 2000e–2(a)(1) (emphasis added), Congress expanded Title VII to cover "***any*** employment practice" where "race was . . . a motivating factor." *Id.* § 2000e–2(m) ("an unlawful employment practice is established when . . . race was . . . a motivating factor for ***any employment practice.***") (emphasis added); *see also Bostock v. Clayton Cnty.*, 590 U.S. 644, 657 (2020) (subsection (m) provides a "more forgiving standard" than the original text of Title VII, "allow[ing] a plaintiff to prevail merely by showing that a protected trait . . . was a 'motivating factor' in a defendant's challenged employment practice"); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98-99 (2003) (subsection (m) "unambiguously states that a plaintiff need only 'demonstrate' that an employer used a forbidden consideration with respect to 'any employment practice'").

Similarly, Title VI is not limited to discrimination based on the plaintiff's race; it bars all actions taken "on the ground of race" that "den[y] the benefits of . . . any program or activity receiving Federal financial assistance" to any "person." 42 U.S.C. § 2000d; *see also Ke v. Drexel Univ.*, No. 11-6708, 2015 U.S. Dist. LEXIS 118211, at *36 (E.D. Pa. Sep. 4, 2015) ("Under Title VI, a plaintiff must show: (1) that there is racial or national origin discrimination; and (2) the entity engaging in discrimination is receiving federal financial assistance.").

In any event, a speech policy that discriminates in terms of what races are protected from offensive speech necessarily discriminates based on the racial identity of the speaker. That is because statements about a speaker's own race are far less likely to be deemed offensive than a speaker's statements about another race. *Cf. Demesme v. Montgomery Cnty. Gov't*, 63 F. Supp. 2d 678, 683 (D. Md. 1999) ("The fact that the decision makers were of the same protected class [as plaintiff] suggests no discriminatory motivation."). Given this commonsense reality, it is extremely plausible that, by discriminating in terms of what races it permitted to be offended by speech, Penn intended to and did police the speech of some races more harshly than others. Am. Compl. ¶¶ 8, 25, 137; *see also Iqbal*, 556 U.S. at 679 (assessing plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense").

Penn claims that *Frith v. Whole Foods Market*, 517 F. Supp. 3d 60 (D. Mass. 2021), establishes that employers are allowed to racially discriminate in terms of what "statements about race" they permit. ECF No. 26-1, at 22-23. There, Whole Foods employees brought Title VII claims alleging that Whole Foods selectively enforced its dress code so as to prohibit "Black Lives Matters" messages but to allow political messages in support of other protected groups, such as LGBTQ. *Frith*, 517 F. Supp. 3d at 65-66. Oddly, Penn focuses entirely on the district court's decision in that case, while ignoring the First Circuit's decision that, "[u]nlike the district court,"

held that plaintiffs "have pleaded discrimination claims that are, conceptually, consistent with Title VII." *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 274 (1st Cir. 2022). Unlike the district court, the First Circuit did "not think the fact that both Black and non-Black employees were disciplined for wearing Black Lives Matter masks undercuts the discrimination claim." *Id.* Rather, the First Circuit only upheld the dismissal of those claims because it found an "obvious alternative explanation" to plaintiff's claims that Whole Foods targeted BLM expressions for racial reasons, that is, that Whole Foods began enforcing its dress code once the COVID-19 pandemic "created the conditions for employees to easily and in a highly visible fashion display non-company messages" on face masks. *Id.* at 275. Critically, the First Circuit stressed that plaintiffs "have not alleged . . . that once Whole Foods began enforcing the [dress code], the company disciplined only the wearing of Black Lives Matter apparel and did not discipline other violations." *Id.* at 274.

Penn's remaining cases on this point involve plaintiffs who were disciplined for making statements that their employers deemed racist. ECF No. 26-1, at 23-24. But those plaintiffs did not allege that the employer had a policy of permitting offensive comments about some races and not others, nor that the policy was intended to and did police the speech of some races more harshly than others. *See, e.g.*, *DeCarolis v. Presbyterian Med. Ctr. of the Univ. of Pa. Health Sys.*, 554 F. App'x 100, 105 (3d Cir. 2014) (affirming summary judgment against an employee who was fired for sending an email mocking President Obama where there were no allegations about how speech by or about other races were handled).

Here, by contrast, Professor Wax alleges multiple specific instances in which speakers of a different race than Professor Wax (i.e., nonwhite and/or non-Jewish) were not disciplined for racist speech that endorsed violence against Jews. Am. Compl. ¶¶ 9-15, 87-105. Penn dismisses these shocking examples of race-based discrimination by claiming that such comparators are only

relevant if the plaintiff "allege[s] facts showing that the asserted comparators are 'similarly situated' to the plaintiff, meaning 'directly comparable to the plaintiff in all material respects.'" ECF No. 26-1, at 25 (quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). But *Patterson* was a summary judgment case applying the *McDonnell Douglas* standard for proving a prima facie case, whereas "[e]ven post-*Twombly*, . . . a plaintiff is not required to establish the elements of a prima facie case." *Connelly*, 809 F.3d at 789. Moreover, "'*Iqbal* and *Twombly* do not require a plaintiff to identify specific comparators in a complaint.'" *Cypher v. Cal. Univ. of Pa.*, 914 F. Supp. 2d 666, 667 (W.D. Pa. 2012) (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 748 n.3 (7th Cir. 2012)). That makes sense, given that "the question of whether other employees are similarly situated is fact-intensive." *Sims v. Ct. of Common Pleas of Allegheny Cnty.*, No. 10-151, 2010 U.S. Dist. LEXIS 103454, at *10 (W.D. Pa. Sept. 30, 2010) (citing *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 306 (3d Cir. 2004)). Accordingly, a plaintiff who states a plausible claim for relief should be "entitled to engage in discovery as to whether the alleged comparators are, in fact, similarly situated." *Id.* at *10-11.

Even in the summary judgment context, alleging similarly situated comparators is just one way to show "circumstances that give rise to an inference of unlawful discrimination." *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999) (noting that a "prima facie case depend[s] on the facts of the particular case," "cannot be established on a one-size-fits-all basis," and can be shown by suspicious "circumstances . . . ***such as***" relevant comparators) (emphasis added); *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981) ("the burden of establishing a prima facie case of disparate treatment is not onerous"; the plaintiff must show the adverse employment action occurred "under circumstances which give rise to an inference of unlawful discrimination"). And, even where plaintiff relies on comparators at summary judgment, "the Third Circuit does not

27

require [a plaintiff] to show that the other [alleged comparators] are *identical* in all relevant respects but only that they are alike." *Southersby Dev. Corp. v. Borough of Jefferson Hills*, 852 F. Supp. 2d 616, 628 (W.D. Pa. 2012) (citing *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008)).

Penn objects that the comparators Professor Wax cites were not from the law school. But, putting aside that Professor Wax did allege that the law school librarian was not disciplined for tweeting "I love Hamas" shortly after Hamas massacred Jewish civilians, Am. Compl. ¶ 101, Professor Wax was disciplined by the University President, pursuant to a University-wide discriminatory policy, after a process purportedly conducted under the University-wide Faculty Handbook, by a Hearing Board that had University-wide jurisdiction. *Id.* ¶¶ 44-86. Penn further complains that the Amended Complaint contains insufficient details about the racial identities and disciplinary history of the comparators it names. ECF No. 26-1, at 28-29. But Professor Wax did allege that one Penn professor who was permitted to make hateful racial comments was Palestinian, and that the others also belong to "more-favored racial groups." Am. Compl. ¶¶ 97, 101. While Professor Wax intends to uncover stronger comparator evidence in discovery, her detailed allegations about Penn's discriminatory speech policy and the specific examples of uneven application, taken together, are sufficient to state a plausible claim of discrimination.

**B. Professor Wax Plausibly Alleges that She Suffered Discrimination Because She Advocated on Behalf of Protected Classes Who Were Targeted by Penn's Race-Based Admissions Policies.**

The Third Circuit has recognized that "associational discrimination" is a valid theory of Title VII liability. *See Kengerski v. Harper*, 6 F.4th 531, 538 (3d Cir. 2021) ("We agree with our sister circuits that associational discrimination is well grounded in the text of Title VII."). This theory recognizes that Title VII protects individuals from adverse employment actions taken

because of their association with members of a protected class. *Id.* Specifically, "[i]ndividuals are . . . protected under Title VII from discrimination because of their advocacy on behalf of protected class members." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 513 (6th Cir. 2009) (cited with approval in *Kengerski*, 6 F.4th at 538). Under this theory, "the fact that [p]laintiff has not alleged discrimination because of *his* race is of no moment inasmuch as it was a racial situation in which [p]laintiff became involved" that led to the adverse employment action. *Johnson v. University of Cincinnati*, 215 F.3d 561, 575 (6th Cir. 2000).

Here, Professor Wax alleges that her suspension was based on her vocal criticism of affirmative action policies at elite universities, especially at Penn, Am. Compl. ¶¶ 39-41, 144-45, 189—criticisms that have since been vindicated by the Supreme Court. *See Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023). Indeed, Professor Wax's statement about Black student performance at Penn Law School, *see* Am. Compl. ¶ 5, properly understood, was not a criticism of Black law students; rather, it was a critique of Penn's race-conscious admissions policies which, she believes, did not set Black students up for success. By taking adverse employment actions against Professor Wax based on this and similar criticisms of affirmative action, Penn has discriminated against Professor Wax based on her "advocacy on behalf of protected class members," *Barrett*, 556 F.3d at 513, that is, racial groups harmed by Penn's affirmative action policies. *See Johnson*, 215 F.3d at 575 (plaintiff stated a viable Title VII claim by alleging that he was discriminated against for advocating affirmative action policies).

### III.    Professor Wax Has Pled a Plausible Claim for False Light Invasion of Privacy, and Penn's Affirmative Defense of Privilege Is Premature.

#### A. Professor Wax Has Adequately Alleged a Prima Facie Claim for False Light.

To establish a false light claim, "a plaintiff must allege facts showing that the published material 'is not true, is highly offensive to a reasonable person, and is publicized with knowledge

or in reckless disregard for its falsity.'" *Mallory v. S & S Publishers*, 168 F. Supp. 3d 760, 776 (E.D. Pa. 2016) (quoting *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014)).

One of the ways in which a plaintiff may establish falsity—the first prong of the false light pleading standard—is "by showing that a defendant selectively printed or broadcast true statements or pictures in a manner which created a false impression." *Graboff*, 744 F.3d at 136 (quotations omitted). "Thus, even where a publication is literally true, discrete presentation of information in a fashion which renders the publication susceptible to inferences casting one in a false light entitles the grievant to recompense for the wrong committed." *Id.* at 136-37 (quotations omitted). Here, Professor Wax satisfies this prong because she alleges that Penn's final reports announcing the sanctions "cherry-picked, misrepresented, or outright misstated certain statements by Professor Wax, the result of which was to portray Professor Wax" as "a virulent racist." Am. Compl. ¶ 166. She further alleges that the publication "work[ed] to portray Professor Wax not only as a racist but a liar" by "repeatedly accusing her of lying about Black student performance" without providing "evidence of the falsity of Professor Wax's statements." *Id.* ¶ 169.

Penn represents the challenged publication in a different manner, claiming that it "accurately and fairly described the disciplinary proceedings and their results, without selectively presenting only one side of the story." ECF No. 26-1, at 34. Penn's argument, however, is as inaccurate as the publication Professor Wax challenges. The Rodriguez Report, which was commissioned by Penn, stated that there was "no evidence from these interviews to suggest that [Professor Wax] graded minority students differently, denied them access to professional opportunities over which she had some modicum of control, or singled them out for special ridicule or disparagement." Am. Compl. ¶ 42. The challenged publications omitted these exculpatory findings, and instead falsely described Professor Wax as making "sweeping and unreliable

conclusions," using data uncritically, making "unfounded declarative claims," and issuing "unsubstantiated statements," without providing specific examples to support these broad and derisory characterizations. *Id.* ¶ 71. The report also failed to mention or evaluate the testimony of any of Professor Wax's hearing witnesses. *Id.* ¶ 73(g).

The second prong of the Third Circuit's false light standard requires that the published material be highly offensive to a reasonable person. Professor Wax has satisfied this prong because she has alleged that Penn's public reports portrayed her as "a racist" and "a liar." *Id.* ¶¶ 166, 169; *see also, e.g.*, *Manco v. St. Joseph's Univ.*, No. 22-285, 2024 U.S. Dist. LEXIS 13181, at *39 (E.D. Pa. Jan. 25, 2024) (holding that a communication representing that a professor was "a racist and treated his students in a racist manner" was actionable for defamation).

The third prong requires that the matter be publicized "by communicating it to the public at large." *Casselli v. City of Phila.*, 54 F. Supp. 3d 368, 380 (E.D. Pa. 2014). Professor Wax has met this prong because she alleges that Penn "published the formal reprimand and made public Penn's sanctions against Plaintiff Wax" on September 23, 2024, and Interim President Jameson "publish[ed] the SCAFR Report on Penn's website" on September 24, 2024. Am. Compl. ¶¶ 81-82.

### B. Penn's Privilege Defense Fails at the Motion to Dismiss Stage.

Penn argues that its publication of statements regarding Professor Wax's disciplinary proceedings is privileged because the Faculty Handbook "specifically requires publication in the *Almanac*." ECF No. 26-1, at 34. However, Penn's argument overlooks a critical limitation: the Faculty Handbook requires that any published statement describe the case "in *appropriate detail*." Faculty Handbook § II.E.16.6.D (emphasis added). As Professor Wax alleges, Penn's published reports selectively presented information, mischaracterized her statements, and omitted

exculpatory evidence, thereby failing to provide "appropriate detail" as required by the Faculty Handbook. *See* Am. Compl. ¶ 166.

Consent is not unlimited under Pennsylvania law. "Pennsylvania adheres to the Restatement (Second) of Torts['s] definition of consent in defamation actions," which establishes that "a plaintiff consents to the making of defamatory statements if the plaintiff 'knows the exact language' that the defendant will use in those statements or 'has reason to know that' such language 'may be defamatory.'" *PPG Indus. v. Zurawin*, 52 F. App'x 570, 578 (3d Cir. 2002) (quoting Restatement (Second) of Torts § 583); *see also Minerva Marine, Inc. v. Spiliotes*, No. 02-2517, 2006 U.S. Dist. LEXIS 13922, at *107-08 (D.N.J. Mar. 13, 2006). It is impossible for Professor Wax to have consented to the publications in question under this standard. She could not have known the "exact language" Penn would use in its later publications when she signed her contract, as she had not yet been charged with any "major infractions," and she could not have reasonably expected that her future speech would be characterized as such.

In any event, privilege is an affirmative defense. *See Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 38 (1971). As such, it cannot be raised at the motion to dismiss stage unless the defense is obvious from the face of the complaint. *See, e.g.*, *In re Tower Air, Inc.*, 416 F.3d 229, 242 (3d Cir. 2005). Penn's privilege defense is far from obvious, and requires factual determinations, such as whether Penn published its findings "in appropriate detail" and whether Professor Wax consented to the specific misleading statements Penn published, that cannot be resolved at this stage of the litigation. *See id.* at 238.

## CONCLUSION

For forgoing reasons, the motion to dismiss should be denied.


Dated: March 26, 2025                     Respectfully submitted,

                                          /s/ *Samantha K. Harris*
                                          Samantha K. Harris
                                          PA Bar No. 90268
                                          ALLEN HARRIS PLLC
                                          P.O. Box 673
                                          Narberth, PA 19072
                                          (610) 634-8258
                                          sharris@allenharrislaw.com

                                          Caleb Acker
                                          PA Bar No. 330399
                                          HOLTZMAN VOGEL BARAN
                                          TORCHINSKY & JOSEFIAK PLLC
                                          15405 John Marshall Hwy
                                          Haymarket, VA 20169
                                          cacker@holtzmanvogel.com
                                          (540) 341-8808

                                          Jason B. Torchinsky*
                                          D.C. Bar No. 976033
                                          Kellen S. Dwyer**
                                          D.C. Bar No. 1008151
                                          HOLTZMAN VOGEL BARAN
                                          TORCHINSKY & JOSEFIAK
                                          2300 N Street NW,
                                          Suite 643
                                          Washington, D.C. 20037
                                          jtorchinsky@holtzmanvogel.com
                                          kdwyer@holtzmanvogel.com
                                          (202) 737-8808

                   *Attorneys for Plaintiff Professor Amy Wax*

                           * *pro hac vice*
                        ** *pro hac vice pending*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of March, 2025, a true and correct copy of the foregoing was electronically filed and is available for viewing and downloading from the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Samantha K. Harris*
Samantha K. Harris
